# Exhibit A

 DAVID LYNCH FOUNDATION

# CENTER FOR HEALTH AND WELLNESS

### HEALING TRAUMATIC STRESS AND RAISING PERFORMANCE

GET EMAIL UPDATES

ABOUT TM

**DONATE**

HOME    OUR WORK    **ABOUT US**    VIDEOS    EVENTS    ABOUT TM    RESEARCH

SEARCH

SCHOOLS
QUIET TIME

VETERANS
21 TO NONE

COMMUNITY
SILENCE THE VIOLENCE

HEALTHCARE
HEAL THE HEALERS

PROGRAMS
& REGIONS

## About us

**Message from David Lynch**

**About DLF**

**Staff**

**Board of Directors**

**Board of Advisors**

**Board Emeritus**

**Leadership Circle**

**FAQ**

**Careers**

## About DLF

### Our Mission

The David Lynch Foundation helps to prevent and eradicate the all-pervasive epidemic of trauma and toxic stress among at-risk populations through promoting widespread implementation of the evidence-based Transcendental Meditation (TM) program in order to improve their health, cognitive capabilities and performance in life.

### Our Vision

Working in partnership with an international network of specially trained instructors, the David Lynch Foundation will be a global catalyst for the adoption of the Transcendental Meditation (TM) program by individuals and institutions by:

- Establishing mainstream understanding of the effects of Transcendental Meditation among government, health, education, media, and business leaders, as well as the general public
- Raising funds to implement TM pilot programs in institutions that serve at-risk populations
- Ensuring the institutional implementation of the TM program on a national and international basis
- Funding independent research on the TM program to more profoundly understand the wide-ranging effects of the technique on the brain, health and behavior

### Background

At-risk populations suffer from epidemic levels of chronic stress and stress-related disorders —fueling violence, crime and soaring health costs, and compromising the effectiveness of education, health, rehabilitation and vocational programs now in place.

Since opening its doors in 2005, the David Lynch Foundation, a 501(c)(3) organization, has helped to bring the stress-reducing Transcendental Meditation technique to more than 500,000 children and adults around the world. We focus our efforts on underserved inner-city students; veterans with PTS and their families; and women and children who are survivors of violence and abuse.

We organize and host scientific and professional conferences on business, education, veterans, corrections, and rehabilitation as well as town hall meetings to educate leaders and the general public in the benefits of meditation and the good works of the Foundation. In addition, we fund university and medical school research to assess the effects of the program on academic performance, ADHD and other learning disorders, anxiety, depression, substance abuse, cardiovascular disease, post-traumatic stress disorder and diabetes.

The effectiveness of our programs have been researched at leading medical schools, including Harvard Medical School, Stanford Medical School and Yale Medical School, and have received the endorsement of and support from private foundations and government agencies, including the National Institutes of Health, General Motors Foundation, the Chrysler Foundation, the Kellogg Foundation, the American Indian Education Association, Indian Health Services, many school districts and state departments of corrections.

"Your programs have significant impact for dramatically improving academic performance and reducing the stress and violence that permeate impoverished communities. Thank you for all you do to bring change for



healthy, peaceful communities worldwide."

**—Bill Clinton**

WATCH THE VIDEO

---



"Veterans need our help, and this is a wonderful cause. The initial research on the effects of Transcendental Meditation in treating PTS offers so much hope—reduced anxiety, depression, hypervigilance and insomnia, as well as reductions in substance abuse, violent behavior and suicidal tendencies —better than many things being tried and at far less a cost."

**—Candy Crowley**

WATCH THE VIDEO

---



"TM is the only time I have that stillness… it gives me this peaceful feeling, and I love it so much. I can't say enough good things about it. All the benefits that you can achieve from sitting still and going within—it really is a beautiful experience. David Lynch is such a wonderful man to start this foundation to help people."

**—Ellen DeGeneres**

WATCH THE VIDEO

---



"Putting [TM] into schools is a fabulous thing. The kids love it and you're getting results."

**—Paul McCartney**

WATCH THE VIDEO

---



"I want to offer my support and encouragement in these efforts to help children and veterans—and anyone who needs help to overcome stress though meditation."

**—Martin Scorsese**

WATCH THE VIDEO

---

**BACK TO TOP**

DAVID'S BOOK  |  SITE MAP  |  SUBSCRIBE  |  CONTACT  |  FINANCIALS

Copyright © 2020 David Lynch Foundation
Please refer to legal details concerning copyright and trademark protection.

Learn about our privacy policy.

# Exhibit B

JULY 21, 2020

● DAVID LYNCH FOUNDATION

# CENTER FOR HEALTH AND WELLNESS
### HEALING TRAUMATIC STRESS AND RAISING PERFORMANCE

GET EMAIL UPDATES
ABOUT TM
DONATE

HOME   **OUR WORK**   ABOUT US   VIDEOS   EVENTS   ABOUT TM   RESEARCH    SEARCH

**SCHOOLS** — QUIET TIME    **VETERANS** — 21 TO NONE    **COMMUNITY** — SILENCE THE VIOLENCE    **HEALTHCARE** — HEAL THE HEALERS    **PROGRAMS** — & REGIONS



# QUIET TIME
# CHANGES LIVES

"Since I started TM, life has gotten a lot easier.
I think more clearly and I don't rush into things.
Plus, my grades have gone up."

– Cecilia, 7th grader

SUPPORT OUR WORK



VIDEO NBC: Detroit school uses TM as stress-buster



VIDEO Combating poverty and exceeding expectations in Los Angeles schools



VIDEO How Quiet Time started in schools



VIDEO Connecticut high school students praise TM



VIDEO Arizona students and teachers see big changes

"The Quiet Time Program is the most powerful, effective program I've come across in my 40 years as a public school educator. It is nourishing these children

## The Quiet Time program: improving academic performance and reducing stress and violence

### Stress: the #1 enemy of learning

In low-income urban schools, traumatic stress is a reality for millions of children who grow up in an oppressive climate of poverty, violence, and fear. This stress impedes learning and undermines physical and mental health:

- 25% of teenagers suffer from anxiety disorders
- 6.5 million children struggle from disabilities that impair their ability to learn
- One in four high school students has been offered, sold or given illegal drugs on school property
- One in three children are either overweight or obese
- Nearly 3 million children receive medication for ADHD
- Suicide is the third leading cause of death among teenagers

High stress levels also damage teachers and educators, resulting in extremely high burnout rates.

### Stress reduction and cognitive development through Quiet Time

The Quiet Time program is a practical, evidence-based approach to reduce stress and dramatically improve academic performance, student wellness and the school environment.

Quiet Time provides students with two 15-minute periods of Transcendental Meditation each day to help balance their lives and improve their readiness to learn. This schoolwide program complements existing educational strategies by improving the physiological underpinnings of learning and behavior.

and providing them an immensely valuable tool for life. It is saving lives."

**—James S. Dierke, Executive Vice President, American Federation of School Administrators**

For more information on the Quiet Time Program, contact quiettime@davidlynchfoundation.org.

View the official Quiet Time brochure

### Groundbreaking research on schools with a Quiet Time program has found:

- ↑ 10% improvement in test scores—and a narrowing of the achievement gap
- ↑ Highly effective for increasing creativity
- ↑ Improved teacher retention and reduced teacher burnout
- ↑ Greater happiness, focus and self-confidence

- ↓ Reduced ADHD symptoms and symptoms of other learning disorders
- ↓ 86% reduction in suspensions over two years
- ↓ 40% reduction in psychological distress, including stress, anxiety and depression
- ↓ 65% decrease in violent conflict over two years

View references for these findings

### The Transcendental Meditation technique

Transcendental Meditation, the core intervention of the Quiet Time Program, is a simple, easily learned technique, practiced by students and teachers while sitting comfortably with the eyes closed. It does not involve any religion, philosophy, or change in lifestyle. Over 340 published scientific studies document its effectiveness for improving health and learning.

This approach has been adopted by hundreds of public, private and charter schools worldwide—with strong support from students, parents and educators.

### Transforming education, changing the lives of at-risk youth

The success of the Quiet Time program has generated a demand that far exceeds our available resources. Right now, there are literally hundreds of schools with tens of thousands of underserved students who are waiting to learn to meditate. Your generous support will help to continue and expand the Quiet Time program in the U.S. and around the world.

**Please contribute today**

DAVID'S BOOK   |   SITE MAP   |   SUBSCRIBE   |   CONTACT   |   FINANCIALS

Copyright © 2020 David Lynch Foundation
Please refer to legal details concerning copyright and trademark protection.
Learn about our privacy policy.

# Exhibit C



JULY 21, 2020

DAVID LYNCH FOUNDATION

# CENTER FOR HEALTH AND WELLNESS
### HEALING TRAUMATIC STRESS AND RAISING PERFORMANCE

GET EMAIL UPDATES

ABOUT TM

## DONATE

HOME    OUR WORK    **ABOUT US**    VIDEOS    EVENTS    ABOUT TM    RESEARCH          SEARCH

**SCHOOLS**          **VETERANS**          **COMMUNITY**          **HEALTHCARE**          **PROGRAMS**
QUIET TIME          21 TO NONE          SILENCE THE VIOLENCE          HEAL THE HEALERS          & REGIONS

## About us

**Message from David Lynch**

**About DLF**

**Staff**

**Board of Directors**

**Board of Advisors**

**Board Emeritus**

**Leadership Circle**

**FAQ**

**Careers**

## Funding Guidelines

### Underserved Schools

DLF's goal in this area is to expand the network of schools with *Quiet Time* programs. Funding priorities for *Quiet Time* programs include (in order of importance):

- Programs that can demonstrate funding from additional sources.
- Programs that have planned for sustainability without DLF funds within five years.
- Schools located in New York, Los Angeles, Chicago, or Washington DC.

In addition to the above factors, priority will be given to applications with the following characteristics:

- Middle or high school.
- High level of school leadership commitment to the program.
- High percentage of low-income students.
- Dedicated room on school premises for learning TM.
- Ability and commitment to share school attendance, suspension, dropout, GPA, and standardized test scores with DLF and to allow Quiet Time staff to administer surveys to the students.

For an overview of the *Quiet Time* implementation process, please click here.

Operating a successful *Quiet Time* program requires significant financial resources. Costs can vary widely by school based on size, need, and other factors. Costs in the initial years can be estimated as follows – one TM teacher for every 100 students plus an additional $25,000 in costs per 100 students. The average salary of a certified TM teacher is $60,000 annually.

### Grade School Programs

*Word of Wisdom* is a meditation program for children below the age of 10 (who are not old enough to learn TM). DLF will consider funding initiatives that are designed to build the evidence and outcome knowledge base of the *Word of Wisdom* program.

Entities eligible to apply for funding for *Quiet Time* or *Word of Wisdom* include:

- Individual schools or school districts.
- School PTA.
- 501(c)(3) nonprofit organizations.
- Certified Transcendental Meditation teachers.

For schools seeking funding, if the main applicant is not a school or district, in addition to the online letter of inquiry form outlined below, a hard copy of this letter signed by the principal of the school must be completed and emailed to sean@davidlynchfoundation.org.

### Letter of Inquiry Submission Guidelines

Letters of Inquiry submissions will be accepted twice a year, due on January 15th and April 1st. Submissions will be accepted only through the online portal here.

All Letters of Inquiry will need to include the following:

1. Project name
2. Contact person

3. Contact email

4. Funding requested from DLF

5. Total project budget

6. Funding from other sources: Include funds already committed by source, pending funds, and projected support (maximum 1000 characters with spaces).

7. Organization description: Within this section please include experience implementing a program or research study with similar populations as well as experience implementing a TM-based program (maximum 2000 characters with spaces).

8. Program description: Include an explanation of the project; a rough timeline for implementation; program start and end dates; program partners (if applicable) with a description of the organization, the commitment of their leadership to the project and whether the leadership practice TM; TM teachers associated with the project along with their experience with the population served; the number of people who will learn TM or Word of Wisdom; a list of outcomes to be measured; and a statement of need for support from the David Lynch Foundation (maximum 5000 characters with spaces).

9. Memorandum of Understanding accompanying the letter of inquiry (establishing partnerships central to the proposal) must be emailed to sean@davidlynchfoundation.org.

The David Lynch Foundation will reply to applicants within six weeks of the Letter of Inquiry submission deadline to inform applicants whether they are invited to submit a full proposal and/or to ask further questions about the application.

**BACK TO TOP**

---

DAVID'S BOOK   |   SITE MAP   |   SUBSCRIBE   |   CONTACT   |   FINANCIALS

Copyright © 2020 David Lynch Foundation
Please refer to legal details concerning copyright and trademark protection.
Learn about our privacy policy.

# Exhibit D

The Wayback Machine - https://web.archive.org/web/20181010021204/https://www.davidlynchfoundation.org/about-tm.html

OCTOBER 09, 2018      C E N T E R    F O R    H E A L T H    A N D    W E L L N E S S

GET EMAIL UPDATES

Healing Traumatic Stress and
Raising Performance in At-risk Populations

LEARN TM

DONATE

HOME    OUR WORK    ABOUT US    VIDEOS    EVENTS    **ABOUT TM**    RESEARCH    PRESS    OTHER WAYS TO GIVE    SEARCH

SCHOOLS    VETERANS    WOMEN    HIV WELLNESS    PRISONS    LOS ANGELES    CHICAGO    WASHINGTON, D.C.    INTERNATIONAL



# IT CHANGED MY LIFE.

"Meditation has changed my life. It makes me calm and happy – and it gives me some peace and quiet in what's a pretty chaotic life!"

– Hugh Jackman



VIDEO What Is TM? with Bob Roth



VIDEO Jerry Seinfeld: "It's like a charger for your body and mind."



VIDEO Ellen DeGeneres "It gives me a peacefulness and I just love it."



Martin Scorsese: "That 20 minutes is a godsend"

"Meditation helps me make better decisions. I'm more creative too."

**—Arianna Huffington, Founder and Editor-in-Chief, Huffington Post**

# About the Transcendental Meditation Technique

### What Is Transcendental Meditation?

It is a simple, natural, effortless technique practiced 20 minutes twice a day while sitting comfortably with the eyes closed. It's not a religion, philosophy or lifestyle.

### What Happens When You Meditate?

Transcendental Meditation allows the active thinking mind to settle inward to experience a naturally calm, peaceful level of awareness. During TM, the body enjoys a profoundly rejuvenating rest, while the brain functions with significantly greater coherence.

### How Does Transcendental Meditation Differ from Other Meditation Techniques?

Brain research has identified three basic approaches to meditation:

- Focused attention (concentrating on a thought or object)
- Open monitoring (observing breath, thoughts, or the environment)
- Automatic self-transcending (spontaneously experiencing quieter levels of thought — a unique state of restful alertness)

The Transcendental Meditation technique involves no focused attention nor open monitoring. It is a process of automatic self-transcending, allowing the practitioner to experience a field of calm deep within.

### How Do You Learn Transcendental Meditation?

TM is taught in a personal course of instruction by a specially-trained, certified teacher. To learn TM in New York City, please email tm@davidlynchfoundation.org or call 212-444-1185 for more information. For all other cities please visit www.tm.org.

DAVID'S BOOK  |  SITE MAP  |  SUBSCRIBE  |  CONTACT  |  FINANCIALS



Copyright © 2018 David Lynch Foundation
Please refer to legal details concerning copyright and trademark protection.

Learn about our privacy policy.

# Exhibit E

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

## SERVICES AGREEMENT
(David Lynch Foundation for Consciousness Based Education and World Peace)

This Services Agreement ("**Agreement**") is entered into as of the 1st day of March, 2018 ("**Effective Date**"), by and between the Board of Education of the City of Chicago, a body politic and corporate, commonly known as the Chicago Public Schools (the "**Board**" or "**CPS**") and David Lynch Foundation for Consciousness Based Education and World Peace ("**Vendor**" or "**David Lynch Foundation**").

## RECITALS

A.      WHEREAS, The Board desires that Vendor render certain services more fully described herein.

B.      WHEREAS, Vendor has demonstrated expertise in providing such services, has represented that it has the requisite knowledge, skill, experience and other resources necessary to perform such services and is desirous of providing such services for the Board; and

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants contained herein, the parties hereby agree as follows:

1.      **Incorporation of Recitals:** The matters recited above are hereby incorporated into and made a part of this Agreement.

2.      **Term:** This Agreement is for a term commencing on the Effective Date and continuing through June 30, 2018 ("**Term**"), unless terminated sooner as provided herein. There are no options to renew.

4.      **Scope of Services:** Vendor agrees to provide the services as set forth in the Scope of Services attached hereto as **Exhibit A** ("**Services**") in accordance with the terms and conditions of this Agreement. "Services" means, collectively, the services, deliverables, duties and responsibilities described in **Exhibit A** of this Agreement and any and all work necessary to complete them or carry them out fully and to the standard of performance required in this Agreement. The Board retains final authority with respect to all Services related decisions. The Board may, from time to time, request changes in the Scope of Services. Any such changes shall be documented by a written amendment to this Agreement signed by both parties and the Board's General Counsel.

5.      **Compensation, Payment and Purchase Orders:**

5.1.    Compensation: The total maximum compensation payable to Vendor under   this Agreement during the Term, inclusive of any and all reimbursable expenses specifically identified herein, shall not exceed One Hundred Seventy Thousand 00/100 Dollars ($170,000.00) ("**Maximum Compensation Amount**"), without a written amendment to this Agreement signed by the authorized representatives of each party and approved by the Board's General Counsel. Compensation for Services during the Term shall be payable in accordance with Section IV of **Exhibit A** (the "**Payment Schedule**"). The Board will not reimburse for any expenses.

It is understood and agreed that the Maximum Compensation Amount is a 'not-to-exceed amount' and is not a guaranteed payment. Compensation shall be based on actual Services performed during the Term of this Agreement, and the Board shall not be obligated to pay for any Services or deliverables not in compliance with this Agreement. In the event the Agreement is terminated early, the Board shall only be obligated to pay the fees incurred up to the effective date of

BOE 001179

**THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE**

termination and Vendor shall promptly refund to the Board any payments received for Services and deliverables not provided.

5.2.     Purchase Orders: Any purchase by the Board of Services covered by this Agreement will be completed by submitting an order on the Board's Standard Purchase Order Form ("PO"). The pre-printed terms and conditions found on the PO shall apply to the extent that such terms supplement and are not inconsistent with the terms and conditions contained in this Agreement. It is understood and agreed that Vendor shall not provide any Services without a valid purchase order. If Vendor provides any Services without a valid purchase order Vendor shall not be entitled to receive any payment for such Services.

5.3     Billing and Payment Procedures: All invoices must be submitted electronically via email in PDF format to cpsinvoice@cps.edu. Each email may only contain one invoice and must include your Vendor name and the CPS Purchase Order number. All invoices must include:

- Vendor name and payment address
- Unique invoice number (determined by Vendor)
- Valid purchase order number (only one PO number may be referenced on each invoice)
- Invoice date
- Itemized description of the services rendered and/or goods delivered
- Date the services were provided and/or goods were delivered to CPS
- Detailed pricing information such as quantities, unit prices, discount, and final net amount due

Invoices shall be submitted in a timely manner. The final invoice shall be submitted no later than ninety (90) days after the expiration or termination of this Agreement. If Vendor has more than one contract with the Board, separate invoices must be submitted for each contract. The Board shall process payments in accordance with the Local Government Prompt Payment Act [50 ILCS 505/1 *et seq.*]. The Board reserves the right to request additional information and supporting documentation necessary for the Board to verify the Services provided under this Agreement.

5.4. Electronic Payments:   Vendor agrees  that, at the Board's sole discretion, the Board may make payment electronically to Vendor for any and all amounts due by means of the Board's procurement charge card account. Vendor recognizes that any charge to the Board's procurement charge card that is in excess of the open remaining amount as stipulated in the applicable Purchase Order, or any charge unaccompanied by the requisite documentation and data as required by the Board, shall be deemed invalid and disputed by the Board. Vendor further recognizes that, in the absence of any supporting documentation as may be required by the Board, payments associated with disputed charges shall be rescinded by the Board and deemed not owed by the Board. Vendor agrees to comply with the rules, procedures and documentation required for electronic payment via the Board's procurement charge card as established by the Board's Department of Procurement and Contracts.

6.     **Standards of Performance:** Vendor shall devote, and shall cause all of its staff, agents and subcontractors, if any, to devote, such of their time, attention, best skill and judgment, knowledge and professional ability as is necessary to perform all Services effectively, efficiently and consistent with the best interests of the Board and to the satisfaction of the Board's Chief Officer of College and Career Success. Vendor shall retain and utilize, as required by law or by the Agreement, professionals licensed to practice in the State of Illinois in the applicable profession. Vendor shall

BOE 001180

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

use efficient business administration methods and perform the Services in the most expeditious and economical manner so as to assure, among other things, that the Services are performed at a reasonable cost to the Board and that Services performed by other entities or persons in connection with this Agreement are efficiently and cost-effectively delivered. Vendor acknowledges that, if in the course of providing Services hereunder, it is entrusted with or has access to valuable and confidential information and records of the Board, that with respect to that information, Vendor agrees to be held to the standard of care of a fiduciary. Any review, approval, acceptance of Services or deliverables or payment for any of the Services by the Board does not relieve Vendor of its responsibility for the professional skill, care, and technical accuracy of its Services and deliverables. Vendor shall remain responsible for the professional and technical accuracy of all Services, including any deliverables furnished, whether by Vendor or its subcontractors or others on its behalf.

7.  **Personnel:** Vendor must assign and maintain during the Term of this Agreement and any renewal of it, an adequate staff of competent personnel that is fully equipped, licensed as appropriate, available as needed, qualified and assigned to perform the Services. If the Board determines, in its sole discretion that any employee, subcontractor or other person providing Services hereunder for Vendor is not performing in accordance with the performance standards or other requirements of this Agreement or is endangering the safety or welfare of any CPS student, the Board shall have the right to direct Vendor to remove that person from performing Services under this Agreement.

8.  **Non-appropriation:** Expenditures not appropriated by the Board in its current fiscal year budget are deemed to be contingent liabilities only and are subject to appropriation in subsequent fiscal year budgets. In the event no funds or insufficient funds are appropriated and budgeted in any subsequent fiscal period by the Board for performance under this Agreement, the Board shall notify Vendor and this Agreement shall terminate on the earlier of the last day of the fiscal period for which sufficient appropriation was made or whenever the funds appropriated for payment under this Agreement are exhausted. Payments for Services completed to the date of notification shall be made to Vendor except that no payment shall be made or due to Vendor under this Agreement beyond those amounts appropriated and budgeted by the Board to fund payments under this Agreement.

9.  **Termination, Suspension of Services, Events of Default, Remedies, and Turnover of Documents:**

    9.1     Early Termination: The Board may terminate this Agreement in whole or in part, without cause, at any time, by a notice in writing from the Board to Vendor in accordance with the notice provisions herein. The effective date of termination shall be thirty (30) calendar days from the date the notice is received or the date stated in the notice, whichever is later.

    After notice is received, Vendor must restrict its activities and those of its subcontractors, to winding down any reports, analyses, or other activities previously begun. No costs incurred after the effective date of the termination are allowed. Payment for any Services actually and satisfactorily performed before the effective date of the termination is on the same basis as set forth herein in the provision regarding compensation and payment.

    Vendor must include in its contracts with subcontractors an early termination provision in form and substance equivalent to this early termination provision to prevent claims against the Board arising from termination of subcontracts after the early termination of this Agreement.

Vendor shall not be entitled to make any early termination claims against the Board resulting from any subcontractor's claims against Vendor or the Board to the extent inconsistent with this provision.

9.2    Suspension of Services: The Board may, upon thirty (30) calendar days written notice, direct Vendor to suspend Services in whole or part. Vendor shall promptly resume performance of Services upon written notice from the Board and upon such equitable extension of time as may be mutually agreed upon in writing by the Board and Vendor. Responsibility for any additional costs or expenses actually incurred by Vendor as a result of remobilization shall be determined by mutual agreement of the parties.

9.3    Vendor's Events of Default: Events of default ("**Events of Default**") include, but are not limited to, the following:

    a.    Any material misrepresentation by Vendor in the inducement or the performance of this Agreement.

    b.    Breach of any term, condition, representation or warranty made by Vendor in this Agreement.

    c.    Default by Vendor under any other agreement Vendor may presently have or may enter into with the Board;

    d.    Assignment by Vendor for the benefit of creditors or consent by Vendor to the appointment of a trustee or receiver or the filing by or against Vendor of any petition or proceeding under any bankruptcy, insolvency or similar law.

    e.    Failure of Vendor to perform any of its obligations under this Agreement, including, but not limited to, the following:

        i.    Any action or failure to act by Vendor which affects the safety and/or welfare of students or Board staff;

        ii.    Failure to perform in accordance with terms, conditions, and specifications of this Agreement;

        iii.    Failure to supply any portion of the Services herein at the time fixed for performance and in the manner specified herein;

        iv.    Failure to supply the Services with sufficient personnel and equipment or which sufficient material to ensure the supply of Services due to a reason or circumstances within Vendor's reasonable control;

        v.    Inability to supply the Services satisfactorily as a result of insolvency or filing for bankruptcy;

        vi.    Failure to promptly re-supply Services that were determined by the Board to be defective or failing to meet the scope of Services within a reasonable time;

        vii.    Discontinuance of the supply of Services for reasons not beyond Vendor's reasonable control; or

        viii.    Failure to comply with any term of this Agreement, including but not limited to, the provisions concerning insurance and nondiscrimination, and any other acts specifically and expressly stated in this Agreement constituting an Event of

BOE 001182

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

Default.

9.4      Remedies: The Board in its sole discretion may declare Vendor in default if Vendor commits an Event of Default. The Chief Procurement Officer may in her or his sole discretion give Vendor an opportunity to cure the default within a certain period of time (the "Cure Period"). The Chief Procurement Officer shall give Vendor written notice of the default either in the form of a cure notice ("Cure Notice") or, if no opportunity for cure is granted, a default notice ("Default Notice"). If the Chief Procurement Officer gives a Default Notice stating that the  Chief Procurement Officer has decided to terminate this Agreement, then that decision is final and effective on giving of the notice. If the Chief Procurement Officer decided not to terminate, then she or he may decide at any time thereafter to terminate this Agreement in a subsequent Default Notice.

The Chief Procurement Officer may give a Default Notice if Vendor fails to effect a cure within the Cure Period given in the applicable Cure Notice. When a Default Notice includes the Chief Procurement Officer's decision to terminate, Vendor must discontinue all Services unless otherwise specifically directed in the notice, and Vendor must deliver to the Board all materials prepared or created in the performance of this Agreement whether completed or in-process, except for Vendor's Intellectual Property (as defined below). Upon the occurrence of an Event of Default, the Board may invoke any or all of the following remedies:

   a.   The right to terminate this Agreement, in whole or in part, as to any or all of the Services yet to be supplied effective at a time specified by the Board;
   b.   The right to suspend the supply of Services during the cure period if the default results from Vendor's action or failure to act which affects the safety or welfare of students or Board staff;
   c.   The right to specific performance, an injunction or any other appropriate equitable remedy;
   d.   The right to receive from Vendor any and all damages incurred as a result or in consequence of an Event of Default;
   e.   The right to money damages;
   f.   The right to withhold all or part of Vendor's compensation under this Agreement; and
   g.   The right to use an Event of Default as a basis to deem Vendor non-responsible in future contracts to be awarded by the Board, pursuant to the Board's Debarment Policy (08-1217-PO1), as may be amended.

The Board may elect not to declare Vendor in default or to terminate this Agreement. The parties acknowledge that this provision is solely for the benefit of the Board and that if the Board permits Vendor to continue to provide the Services despite one or more Events of Default, Vendor shall in no way be relieved of any responsibilities, duties or obligations under this Agreement nor shall the Board waive or relinquish any of its rights under this Agreement, at law, equity or statute, nor shall the Board be deemed to have waived or relinquished any of the rights it has to declare an Event of Default in the future.

The remedies under the terms of this Agreement are not intended to be exclusive of any other

BOE 001183

remedies provided, but each and every such remedy shall be cumulative and shall be in addition to any other remedies, existing now or hereafter, at law, in equity or by statute. No delay or omission to exercise any right or power accruing upon the occurrence of any Event of Default shall be construed as a waiver of any Event of Default or acquiescence thereto, and every such right and power may be exercised from time to time and as often as may be deemed expedient.

If the Board's election to terminate this Agreement for default under this Section is determined by a court of competent jurisdiction to have been wrongful, then in that case the termination is to be considered an early termination pursuant to the Early Termination provision above.

9.5     Turnover of Documents and Records: Upon demand of the Board after termination of this Agreement for any reason or the expiration of this Agreement by its terms, Vendor shall turn over to the Board or its designee within five (5) days of demand, all materials, supplies, equipment owned or purchased by the Board, completed or partially completed work product or analyses, data, computer disks, documents and any other information relating in any way to this Agreement or the performance or furnishing of Services, except:  (1) material which is Vendor's Intellectual Property (as defined below), and (2)  Vendor may keep a copy of such information for its own records, subject to other restrictions contained in this Agreement regarding the retention and use of this information.

10.     **Assignment**: This Agreement shall be binding on the parties and their respective successors and assigns; provided, however, that neither party may assign this Agreement or any obligations imposed hereunder without the prior written consent of the other party.

11.     **Handling of Confidential Information, Including Student Data:**

11.1 Definitions:

a.     **Confidential Information:** In the performance of the Agreement, Vendor may have access to or receive certain information that is not generally known to others ("Confidential Information" or "CPS Data"). Such Confidential Information may include, but is not limited to: Student Data (as defined below), personal data about CPS employees, unpublished school information, CPS financial information, and CPS business plans. It is understood and agreed that Confidential Information also includes proprietary or confidential information of third parties provided by the Board to Vendor. Confidential Information will not include information that is: (i) or becomes part of the public domain through no fault of Vendor; (ii) made available to Vendor by an independent third party having the legal right to make such disclosure; and (iii) information that can be established and documented by Vendor to have been independently developed or obtained by Vendor without violating the confidentiality obligations of this Agreement and any other agreements with the Board.

b.     **Student Data:** Student Data means any data, metadata, information, records, or other materials of any nature recorded in any form whatsoever, that is generated, disclosed, maintained by, transmitted, created, or provided by the Board, either directly or through its students, employees, agents, and subcontractors, including all information used, created, maintained or generated through the Services provided under this Agreement that is directly related to a CPS student. For purposes of this Agreement, Student Data shall still be considered Confidential Information; additional requirements regarding Student Data specifically are described below.

BOE 001184

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

    c.  **De-Identified Data:** De-identified Data will have all direct and indirect personal identifiers removed. This includes, but is not limited to, persistent unique identifiers, name, ID numbers, date of birth, demographic information, location information, and school ID. Vendor agrees not to attempt to re-identify de-identified Data. For the purposes of this Agreement, De-Identified Data will still be considered Confidential Information and treated as such unless expressly provided otherwise in this Agreement.

11.2    <u>Use of Confidential Information</u>: Vendor shall:

    a.  Only use Confidential Information for the sole purpose of delivering the Services to the Board hereunder, and shall not disclose the Confidential Information except to those of its officers, agents, employees, and subcontractors who have a need to access the Confidential Information for said purpose. Notwithstanding the foregoing, as described in the Compliance with Laws Section, it is understood and agreed that such protection of Confidential Information shall be subject to the special requirements of the Family Educational Rights and Privacy Act ("FERPA"), the Children's Online Privacy Protection Act ("COPPA"), and the Illinois School Student Records Act ("ISSRA").

    b.  Not copy or reproduce in any manner whatsoever the Confidential Information of the Board without the prior written consent of the Board, except where required for its own internal use strictly in accordance with this Agreement.

11.3    <u>Transmitting and Storing Confidential Information</u>: When transmitting and storing the Board's Confidential Information, Vendor shall use commercially reasonable best efforts, but at a minimum with no less protection than Vendor uses to protect its own confidential information. When transmitting and storing the Board's Confidential Information that is personally identifiable ("Personally Identifiable Confidential Information"), which includes but is not limited to Student Data, Vendor shall:

    a.  When mailing physical copies of Personally Identifiable Confidential Information, send the Personally Identifiable Confidential Information in a tamper-proof, labeled container, with a tracking number and a delivery confirmation receipt;

    b.  Only electronically transmit, mail, or store Personally Identifiable Confidential Information on electronic media, such as CDs, DVDs, electronic tape, flash drives, etc., if the Confidential Information is encrypted. Encryption must utilize the Advanced Encryption Standard ("AES") algorithm with a key of 256 bits or greater ("Encrypt"). Any media containing Personally Identifiable Confidential Information shall only be mailed in accordance with the provisions of Section 11.3(a) above;

    c.  Not send, via mail or electronically, any password or other information sufficient to allow decryption of Personally Identifiable Confidential Information with the Encrypted Confidential Information;

    d.  Keep all physical copies (paper, portable or removable electronic media, or other physical representations) of Personally Identifiable Confidential Information under lock and key, or otherwise have sufficient physical access control measures to prevent unauthorized access. Vendor shall not leave Personally Identifiable Confidential Information unsecured and unattended at any time;

BOE 001185

e.  Password protect any desktop, laptop or other similar device that contains Personally Identifiable Confidential Information. Additionally, any desktop or laptop that contains Personally Identifiable Confidential Information shall have its full hard drive Encrypted. Vendor shall not leave any desktop or laptop unattended without enabling a screen-lock or otherwise blocking access to the desktop or laptop. Vendor shall ensure that no password or other information sufficient to access a desktop or laptop containing Personally Identifiable Confidential Information is attached to or located near the desktop or laptop at any time.

f.  Store and back up Personally Identifiable Confidential Information on a proprietary file server located in the continental United States that is not shared by other entities including, but not limited to, other departments of Vendor. Vendor shall ensure the security of the Personally Identifiable Confidential Information stored on the server by employing adequate security measures to prevent unauthorized access to that information. These measures include policies, procedures, and technical elements relating to data access controls. In addition, Vendor shall use standard security protocols and mechanisms to protect the exchange and transmission of Personally Identifiable Confidential Information. Data stored in cloud-based systems must be protected in the same manner as local data as described throughout the Agreement.

11.4    Dissemination of Information: Vendor shall not disseminate any Confidential Information to a third party without the prior written consent of the Board except as may be necessary to perform Services under this Agreement. If Vendor is presented with a request for documents by any administrative agency or with a *subpoena duces tecum* regarding any Confidential Information which may be in Vendor's possession as a result of Services supplied under the Agreement, Vendor shall immediately give notice to the Board and its General Counsel with the understanding that the Board shall have the opportunity to contest such process by any means available to it prior to submission of any documents to a court or other third party. Vendor shall not be obligated to withhold delivery of documents beyond the time ordered by a court of law or administrative agency, unless the request for production or subpoena is quashed or withdrawn, or the time to produce is otherwise extended.

11.5    Press Release; Publicity: Vendor shall not issue publicity news releases, grant press interviews, or use any Confidential Information or Board intellectual property (as defined below), including but not limited to the CPS logo or the logos of any schools, during or after the performance or delivery of materials and Services without the prior express written consent of authorized representatives of the Board. Furthermore, Vendor may not photograph or film or cause others to photograph or film within any CPS school or facility without the prior express written consent of the Board's Chief Communications Officer or his/her designee.

11.6    Return or Destruction of Confidential Information: Vendor shall, at the Board's option, destroy or return all Confidential Information to the Board within five (5) business days of demand, or if no demand is made, it shall destroy or return all Confidential Information to the Board within five (5) days of the expiration or termination of this Agreement unless Vendor receives permission in writing from the Board's Director of Performance Data and Policy or his/her designee that Vendor may retain certain Confidential Information for a specific period of time. In the event the Board elects to have Vendor destroy the Confidential Information, Vendor shall provide an affidavit attesting to such destruction. Vendor shall delete a specific student's Student Data upon the

**THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE**

written request of the Board.

11.7    Unauthorized Access, Use or Disclosure: If Vendor has knowledge of any unauthorized access, use and/or disclosure of Confidential Information, it shall: (i) notify the Board immediately, which in no event shall be longer than twenty-four (24) hours from Vendor receiving notice of the unauthorized access, use, or disclosure; (ii) take prompt and appropriate action to prevent further unauthorized access, use, or disclosure; (iii) cooperate with the Board and any government authorities with respect to the investigation and mitigation of any such unauthorized access, use, or disclosure, including the discharge of the Board's duties under the law; and (iv) take such other actions as the Board may reasonably direct to remedy such unauthorized access, use, or disclosure, including, if required under any federal or state law, providing notification to the affected persons. Vendor shall bear the losses and expenses (including attorneys' fees) associated with a breach of Vendor's obligations regarding Confidential Information as set forth in this Agreement, including without limitation any costs: (1) of providing notices of a data breach to affected persons and to regulatory bodies; and (2) of remedying and otherwise mitigating any potential damage or harm of the data breach, including without limitation, establishing call centers and providing credit monitoring or credit restoration services, as requested by the Board. Vendor shall include this provision in any and all agreements they execute with subcontractors performing Services under this Agreement.

11.8    Employees, Agents, and Subcontractors: Vendor agrees to provide its employees, agents, and subcontractors only such Confidential Information that is necessary for the delivery of materials and the performance of Services pursuant to this Agreement and to cause its employees, agents, and subcontractors to undertake the same obligations as agreed to herein by Vendor.

11.9    Injunctive Relief: In the event of a breach or threatened breach of this Section, Vendor acknowledges and agrees that the Board would suffer irreparable injury not compensable by money damages and would not have an adequate remedy at law. Accordingly, Vendor agrees that the Board shall be entitled to immediate injunctive relief to prevent or curtail any such breach, threatened or actual. The foregoing shall be in addition and without prejudice to such rights that the Board may have in equity, by law or statute.

11.10   Additional Obligations Regarding Treatment of Student Data: In addition to the above stated obligations for the treatment and handling of Confidential Information, Vendor shall abide by the following obligations when handling Student Data:

   a.    **Student Data Use**. Vendor shall not use Student Data, including persistent unique identifiers, data created or gathered by Vendor's Services to amass a profile about a CPS student or otherwise identify a CPS student except in furtherance of specific school purposes as may be agreed upon in writing between the Board and Vendor. Vendor will use Student Data only for the purpose of fulfilling its duties and delivering Services under this Agreement.

   b.    **Student Data Collection**. Vendor will collect only Student Data necessary to fulfill its duties as outlined in this Agreement.

   c.    **Marketing and Advertising.** Vendor shall not advertise or market to students or their parents/guardians when the advertising is based upon any Student Data that Vendor has acquired because of the use of that Vendor's Services. Advertising or marketing may be

BOE 001187

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

directed to a school or Board only if the student information underlying the marketing and/or advertising is properly de-identified.

d.   **Student Data Mining.** Vendor is prohibited from mining Student Data for any purposes other than those agreed to by the parties in this Agreement. Student Data mining or scanning of user content for the purpose of advertising or marketing to students or their parents/guardians is prohibited.

e.   **Student Data Transfer or Destruction**. Vendor will ensure that all Student Data in its possession and in the possession of any subcontractors, or agents to whom Vendor may have transferred Student Data, are destroyed or transferred to the Board under the direction of the Board when Student Data is no longer needed for its specified purpose.

f.   **Rights and License in and to Student Data**. All rights, including all intellectual property rights, associated with such Student Data shall remain the exclusive property of the Board. Nothing in this Agreement is meant and nothing shall be interpreted to mean that the Board releases any ownership or control of Student Data during the performance of the Services under this Agreement. Student Data shall remain under the control of the Board throughout the Term of this Agreement. Vendor has a limited, nonexclusive license to the use of Student Data solely for the purpose of performing its obligations as outlined under the Agreement. This Agreement does not give Vendor any rights, implied or otherwise, to Student Data, content, or intellectual property, except as expressly stated in the Agreement. Vendor does **not** have the right to sell or trade Student Data.

g.   **Sale of Student Data**. Vendor is prohibited from selling, trading, or otherwise transferring Student Data to any third parties, except with the express written prior consent of the authorized Board representative and approval of the Board's General Counsel. This prohibition does not apply to the purchase, merger, or other type of acquisition of Vendor by another entity approved by the Board in accordance with the Assignment Section of this Agreement, provided that Vendor or successor entity continues to be subject to the provisions of this Agreement with respect to previously acquired Student Data.

h.   **Use of De-Identified Data**. Vendor may use De-Identified Data that it obtains through use of Vendor's Services for product development, research, or other purposes to develop and improve Vendor's Services, provided that the De-Identified Data does not identify and cannot be analyzed and identified to be associated with or generated from CPS. Vendor may use De-Identified Data for research. Vendor may use De-Identified Data to demonstrate the effectiveness of Vendor's services, including in its marketing, provided that Vendor's marketing shall not identify or suggest that the Board or any of its students, employees, agents, or subcontractors approve of, recommend, vouch for, or otherwise positively advance the use of Vendor's products or Services without the prior written consent of the individual identified and the Board's Chief Communications Officer.

i.   **Access**. Any Student Data held by Vendor will be made available to the Board upon request of the Board. The identity of all persons having access to Student Data through Vendor will be documented and access will be logged.

j.   **Security Controls**. Vendor will store and process Student Data in accordance with the

BOE 001188

industry best practices. This includes appropriate administrative, physical, and technical safeguards to secure Student Data from unauthorized access, disclosure, and use. All data must be secured in transit using https/TLS 1.0+, or secure FTP services. Vendor is required to specify any Personally Identifiable Information (PII) collected or used by its Services. In addition, Vendor must maintain industry recognized security practices to establish secure application(s), network, and infrastructure architectures. Industry certifications, such as International Organization for Standardization (ISO), SysTrust, Cloud Security Alliance (CSA) STAR Certification, or WebTrust security for SaaS environments are recommended.

Such safeguards shall be no less rigorous than accepted industry practices, including specifically the NIST 800-53r4 moderate level, International Organization for Standardization's standards ISO/IEC 27001:2005 (Information Security Management Systems – Requirements), and ISO-IEC 27002:2005 (Code of Practice for International Security Management). Vendor shall ensure that the manner in which Student Data is collected, accessed, used, stored, processed, disposed of and disclosed complies with applicable data protection and privacy laws, as well as the terms and conditions of this Agreement. Vendor will conduct periodic risk assessments and remediate any identified security vulnerabilities in a timely manner. Vendor will also have a written incident response plan, to include prompt notification of the Board in the event of a security or privacy incident, as well as best practices for responding to a breach of Student Data security practices. Vendor agrees to share its incident response plan upon request.

Vendor shall assure that all data that is transmitted between the Board's access points and the ultimate server, by Vendor or its subcontractors, will use Board-approved encryption of no less rigor than NIST-validated DES standards.

k.  **Security Safeguards:** Vendor agrees to provide the following additional safeguards:
    i.  Include component and system level fault tolerance and redundancy in system design.
    ii.  Encrypt user passwords in any data storage location and obfuscate password entry fields in any entry interface controlled by the discloser.
    iii.  Encrypt Student Data at-rest and in-transit.
    iv.  Authentication of users at login with a 128-bit or higher encryption algorithm.
    v.  Secure transmission of login credentials.
    vi.  Automatic password change routine.
    vii.  Trace user system access via a combination of system logs and Google Analytics.
    viii.  Secure (encrypt) the audit trails and system generated logs and ensure that they are stored in locations that are inaccessible to automated content discovery software.
    ix.  Conduct or undergo system level testing whenever new functionalities are added to the system to reconfirm system security measures are retained and functional, and that interaction with the Board systems is not degraded or compromised.
    x.  Employ an in-line Intrusion Protection System that inspects incoming data transmissions.
    xi.  Ensure that Student Data is stored in privately addressed network devices that have no direct interaction with public networks.
    xii.  Provide a documented disaster recovery plan that includes the following elements:
        a.  Available recovery times.
        b.  Conduct 24x7 system monitoring that is capable of detecting potential outages.

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

    c.  Plans for File-level, Database and server recovery after a component/system failure, damage or compromise.

    d.  Substantial geographical separation between data centers hosting production, backup and redundant system elements.

    e.  Include recovery/mitigation procedures for all managed sites, including subcontractors, agents, and other recipients.

    f.  Include provisions for at least the following events:

       i.  Fire
      ii.  Natural disaster
     iii.  Sabotage
     iv.  Accidental human error
      v.  Flooding
     vi.  Equipment failure
    vii.  Application/database failure
   viii.  Other unlikely events

    g.  No less than annual testing of the disaster recovery plan (at least parts that affect Student Data) with results of the test made available to the Board, as well as information about, and schedule for, the correction of deficiencies identified in the test.

xiii.  Prevention of hostile or unauthorized intrusion.

xiv.  Screening of employees with access to Student Data to assure that any employees who are in violation of the statutes referenced in the Criminal Background Check in the Agreement do not have access to Student Data. Vendor shall provide the security measures taken to ensure that said employees do not have access to Student Data.

xv.  Backup of all Student Data at least once every twenty-four (24) hours.

xvi.  Perform content snapshots at least daily and retain for at least ninety (90) days.

I.    **Data Security Manager:** Vendor shall provide the Board with the name and contact information for a primary and alternate employee of Vendor who shall serve as the Board's primary security contact and who shall be available to assist the Board twenty-four (24) hours per day, seven (7) days per week as a contact in resolving obligations associated with a Student Data-related security breach. The designated contact shall respond to any Board inquiries within two (2) hours.

11.11  Survival: The provisions of this Section shall survive the termination or expiration of this Agreement.

12.    **Intellectual Property**:

12.1  Intellectual Property Defined: Intellectual Property shall mean all trademarks, trade dress, copyrights and other intellectual property rights in the materials used in the performance of Services under this Agreement.

12.2  Board's Intellectual Property: Vendor agrees that all Confidential Information, as well as any intellectual property arising therefrom, and, to the extent permitted by law, any and all intellectual property developed by Vendor including all finished or unfinished, documents, screens, reports, writings, procedural manuals, forms, source code, object code, work flow charts, methods, processes, drawings, maps, files, records, computer printouts, designs, or other materials prepared in the performance of the Services ("Work Product") shall exclusively be deemed "works for hire" within the meaning and purview of the United States Copyright Act, 17 U.S.C. § 101 *et seq*. To the extent any Work Product does not qualify as a "work for hire," Vendor irrevocably grants, assigns,

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

and transfers to the Board all right, title, and interest in and to the Work Product in all media throughout the world in perpetuity and all intellectual property rights therein, free and clear of any liens, claims, or other encumbrances, to the fullest extent permitted by law. Any intellectual property or other documents and materials created by the Board either alone or in cooperation with Vendor in connection with the Services ("Board Materials") shall be the property of the Board. Board Materials shall exclude any and all (i) third party intellectual property, and (ii) pre-existing Vendor intellectual property that is delivered to the Board as part of the Services. Vendor shall execute all documents and perform all acts that the Board may request in order to assist the Board in perfecting or protecting its rights in and to intellectual property rights as defined in this Section. Upon written agreement signed by the authorized representatives of each party and approved by the Board's General Counsel, Vendor may be licensed to use the Board's intellectual property for specifically defined uses and terms.

12.3     Vendor's Intellectual Property: All intellectual property possessed, owned or licensed by Vendor prior to, created in, or concurrently with the performance of Services under this Agreement that pertain to the instruction or teaching of the Transcendental Meditation program or technique and that are not within the definition of Work Product shall be and remain at all times "Vendor's intellectual property", provided that none of the Board's Confidential Information is used or disclosed in Vendor's intellectual property. In the event that any of the Board's Confidential Information is used or disclosed in any intellectual property, the Board shall have full and exclusive ownership rights to such intellectual property. Other than as may be expressly stated elsewhere in this Agreement, Vendor grants to the Board a royalty free (other than fees identified in this Agreement), non-transferable license to use such of Vendor's intellectual property as may be necessary for the receipt and use of the Services for educational, non-commercial purposes through the Term of this Agreement, including any Renewal Terms.

12.4     Third Party Intellectual Property: Vendor represents and warrants to the Board that Vendor, in connection with providing the Services, will not infringe on any presently existing United States patent, copyright, trademark, service mark, trade secret and/or other confidentiality or proprietary right of any person or other third party.

12.5     Survival: The obligations set forth in this Section shall survive the termination or expiration of this Agreement.

13.     **Representations and Warranties of Vendor:** Vendor represents and warrants that the following shall be true and correct as of the Effective Date of this Agreement and shall continue to be true and correct during the Term of this Agreement.

13.1     Licensed Professionals: Vendor is appropriately licensed under Illinois law to perform Services required under this Agreement and shall perform no Services for which a professional license is required by law and for which Vendor, its employees, agents, or subcontractors, as applicable, are not appropriately licensed.

13.2     Compliance with Laws: Vendor is and shall remain in compliance with all applicable federal, state, county, and municipal, statutes, laws, ordinances, and regulations relating to this Agreement and the performance of Services in effect now or later and as amended from time to time, including but not limited to the Prevailing Wage Act, 820 ILCS 130/1 et seq., the Drug-Free Workplace Act, the Illinois Student Records Act, the Family Educational Rights and Privacy Act, the Protection of Pupil Rights Act and any others relating to non-discrimination. Further, Vendor is and shall remain in compliance with all applicable Board policies and rules. Board policies and rules are available at http://www.cps.edu/.

BOE 001191

13.3    Good Standing: Vendor is not in default and has not been deemed by the Board to be in default under any other Agreement with the Board during the five (5) year period immediately preceding the effective date of this Agreement.

13.4    Authorization: In the event Vendor is an entity other than a sole proprietorship, Vendor represents that it has taken all action necessary for the approval and execution of this Agreement, and execution by the person signing on behalf of Vendor is duly authorized by Vendor and has been made with complete and full authority to commit Vendor to all terms and conditions of this Agreement which shall constitute valid, binding obligations of Vendor.

13.5    Financially Solvent: Vendor warrants that it is financially solvent, is able to pay all debts as they mature and is possessed of sufficient working capital to complete all Services and perform all obligations under this Agreement.

13.6    Gratuities: No payment, gratuity or offer of employment was made by or to Vendor, any of its members if a joint venture or, to the best of Vendor's knowledge after due inquiry, by any of its subcontractors, in relation to this Agreement or as an inducement for award of this Agreement. Vendor is and shall remain in compliance with all applicable anti-kickback laws and regulations.

13.7    Contractor's Disclosure Form: The disclosures in the Contractor Disclosure Form, previously submitted by Vendor, are true and correct. Vendor shall promptly notify Board in writing of any material change in information set forth therein, including but not limited to change in ownership or control, and any such change shall be subject to Board approval which shall not be unreasonably withheld.

13.8    Criminal History Records Search: Vendor represents and warrants that, at its own cost and expense, it shall have a complete fingerprint-based criminal history records check conducted on all employees, agents, volunteers and subcontractors who may have contact with CPS students (individually and collectively "Staff") in accordance with the Illinois School Code (105 ILCS 5/34-18.5); the Sex Offender and Child Murderer Community Notification Law (730 ILCS 152/101 et seq.); and the Murderer and Violent Offender Against Youth Registration Act (730 ILCS 154/1 et seq.) ("Records Check"). It is understood and acknowledged that contact via text messages, live chats, emails or through any other means shall be considered "contact" for the purposes of this Section. A complete Records Check includes the following:

    (a)    Fingerprint-based checks through the Illinois State Police and the FBI;
    (b)    A check of the Illinois Sex Offender Registry;
    (c)    A check of the National Sex Offender Registry maintained by the U.S. Department of Justice; and
    (d)    A check of the Violent Offender Against Youth Database.

The purpose of the Records Check is to confirm that none of these persons have been convicted of any of the criminal or drug offenses enumerated in subsection (c) of 105 ILCS 5/34-18.5 or any offenses enumerated under the Sex Offender and Child Murderer Community Notification Law or the Murderer and Violent Offender Against Youth Registration Act, or have been convicted within the past seven (7) years of any other felony under the laws of Illinois or of any offense committed or attempted in any other state or against the laws of the United States that, if committed or attempted in the State of Illinois, would have been punishable as a felony under the laws of Illinois.

BOE 001192

**THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE**

Vendor shall not allow any of its Staff to have contact with a CPS student until a Records Check has been conducted for that person and the results of the Records Check satisfy the requirements of 105 ILCS 5/34-18.5 and the requirements of all other Acts and Laws referenced in this Section, as may be amended. Within fifteen (15) business days before any Staff has contact with any CPS students and on or before the Agreement's anniversary date(s) during the Term and any Renewal Term, Vendor shall submit a written report to CPS's Chief Officer of Safety & Security and/or its Deputy Chief of Network Security ("CPS Safety Officer"). The report shall include at least the following information:

1)   the specific method of completing the Records Check;
2)   the names of each Staff member who satisfactorily passed the Records Check within the quarter before s/he has any contact with a CPS student; and
3)   the procedure to update each Staff member's Records Check through the Term of the Agreement, including any Renewal Terms (intervals between each Staff member's updates shall not be less than annually).

On a quarterly basis thereafter, Vendor shall: i) periodically check the Illinois Violent Offender Against Youth Registry and the Illinois Sex Offender Registry for each Staff member who has contact with students and shall immediately remove any Staff member who may be identified on either registry; ii) provide a written report to CPS's Safety Officer listing the names of all new Staff members who have contact with CPS students and certifying that Records Checks were satisfactorily completed for those individuals before s/he had any contact with CPS students; and iii) provide any other information requested by the Board.

If Vendor fails to comply with this Section, in whole or in part, then, in addition to the Remedies set forth in this Agreement, the Board may exercise additional remedies, including but not limited to: (i) withholding payments due under this Agreement and any others that Vendor may have with the Board; (ii) immediately terminating this Agreement, in whole or in part, without any further obligation by the Board of any kind; or (iii) seeking liquidated damages.

13.9    Research Activities and Data Requests: Vendor shall not conduct research in the Chicago Public Schools or use Confidential Information for research purposes. In the event Vendor seeks to conduct research activities in the Chicago Public Schools or use Confidential Information for purposes in connection with this Agreement or for any other purposes, Vendor shall comply with the Board's Research Study and Data Policy adopted on July 28, 2010 (10-0728-PO1), as may be amended from time to time. Vendor acknowledges and agrees that it may not begin any research activities or obtain data for research purposes without the prior written consent of the Director of Performance Data and Policy or his or her designee.

13.10    Free of Computer Viruses: Vendor shall use commercially reasonable best efforts to ensure that the Services and any technology used in the performance of Services are free of malicious code, malware, Trojan horses, ransomware, worms, and other computer viruses.

13.11    Prohibited Acts: Within the three (3) years prior to the effective date of this Agreement, Vendor or any of its members if a joint venture or a limited liability company, or any of its or their respective officers, directors, shareholders, members, managers, other officials, agents or employees (i) have not been convicted of bribery or attempting to bribe a public officer or employee of any public entity and (ii) have not been convicted of agreeing or colluding among

BOE 001193

contractors or prospective contractors in restraint of trade, including bid-rigging or bid-rotating, as those terms are defined under the Illinois Criminal Code.

13.12    Debarment and Suspension: Vendor represents and warrants to the best of knowledge and belief, after due inquiry, that:

    i.    it, its principals, and its subcontractors providing Services under this Agreement are not barred from contracting with any unit of state or local government as a result of a violation of either Section 33E-3 (bid-rigging) or Section 33E-4 (bid-rotating) of the Illinois Criminal Code (720 ILCS 5/33A *et seq.*);

    ii.    it, its principals, and its subcontractors providing Services under this Agreement are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participation in this transaction by any federal department or agency or any unit of State or local government; and

    iii.    it, its principals, and its subcontractors providing Services under this Agreement have not violated the rules, regulations, or laws of any federal, state, or local government unit or agency.

"**Principals**" for the purposes of this certification means officers, directors, owners, partners, persons having primary management or supervisory responsibilities within a business entity; and, if a joint venture is involved, each joint venture member and the principals of each such member.

13.13    Continued Disclosure Requirement: If at any time during the Term of the Contract or during any Renewal Terms Vendor becomes aware of any change in the circumstances that makes the representations and warranties stated above no longer true, Vendor must immediately disclose such change to the Board in accordance with the Notice provision of this Agreement.

13.14    Survival: All warranties in this Section shall survive inspection, acceptance, payment, expiration, and termination of this Agreement. Nothing in the foregoing warranties shall be construed to limit any other rights or remedies available to the Board under the law and this Agreement.

14.    **Independent Contractor:** It is understood and agreed that the relationship of Vendor to the Board is and shall continue to be that of an independent contractor and neither Vendor nor any of Vendor's employees shall be entitled to receive Board employee benefits. As an independent contractor, Vendor agrees to be responsible for the payment of all taxes and withholdings specified by law which may be due in regard to compensation paid by the Board. To the extent that Vendor is subject to taxes under Section 4980H of the Internal Revenue Code, Vendor shall be solely responsible for paying such taxes. Vendor agrees that neither Vendor nor its employees, staff or subcontractors shall represent themselves as employees or agents of the Board. Vendor shall provide the Board with a valid taxpayer identification number as defined by the United States Internal Revenue Code, including but not limited to, a social security number or federal employer identification number.

15.    **Indemnification:** Vendor agrees to defend, indemnify, and hold harmless the Board, its members, employees, agents, officers and officials from and against liabilities, losses, penalties, damages, and expenses, including costs and attorney fees, arising out of all claims, liens, damages, obligations, actions, suits, judgments or settlements, or causes of action, of every kind, nature, and character (collectively "**Claims**") arising or alleged to arise out of the acts or omissions of the Vendor, its officials, agents and employees and subcontractors in the performance of this Agreement. The foregoing obligation extends to and is intended to encompass any and all Claims that the Services infringe, misappropriate, or otherwise violate any confidentiality, proprietary or intellectual property rights of a third party.

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

Furthermore, in the event that the Board is determined to be liable for taxes under Section 4980H of the Internal Revenue Code as a result of its use of Vendor's employees under this Agreement, Vendor shall indemnify the Board for any such liability. And, in the event of unauthorized access, use, or disclosure of the Board's Confidential Information arising or alleged to arise from the acts or omissions of Vendor, its employees, agents, or subcontractors, in addition to the obligations provided in this Section, Vendor shall cover any costs or fees associated with (i) providing notices of a data breach to effected persons and to regulatory bodies and (ii) remedying and otherwise mitigating any potential damages or harm from the data breach, including but not limited to call centers and providing credit monitoring or credit restoration services as may be requested by the Board.

Vendor shall, at its own cost and expense, appear, defend and pay all attorney fees and other costs and expenses arising hereunder. In addition, if any judgment shall be rendered against the Board in any such action, the Vendor shall, at its own expense, satisfy and discharge such obligation of the Board. The Board shall have the right, at its own expense, to participate in the defense of any suit, without relieving the Vendor of any of its obligations hereunder. The Board retains final approval of any and all settlements or legal strategies which involve the interest of the Board.

However, if Vendor, after receiving notice of any such proceeding, fails to immediately begin the defense of such claim or action, the Board may (without further notice to Vendor) retain counsel and undertake the defense, compromise, or settlement of such claim or action at the expense of Vendor, subject to the right of Vendor to assume the defense of such claim or action at any time prior to settlement, compromise or final determination thereof. The cost and expense of counsel retained by the Board in these circumstances shall be borne by Vendor and Vendor shall be bound by, and shall pay the amount of, any settlement, compromise, final determination or judgment reached while the Board was represented by counsel retained by the Board pursuant to this paragraph, or while Vendor was conducting the defense.

To the extent permissible by law, Vendor waives any limits to the amount of its obligations to defend, indemnify, hold harmless, or contribute to any sums due under any losses, including any claim by any employee of Vendor that may be subject to the Workers Compensation Act, 820 ILCS 305/1 *et seq.* or any other related law or judicial decision (such as *Kotecki v. Cyclops Welding Corp.*, 146 Ill.2d 155 (1991)). The Board, however, does not waive any limitations it may have on its liability under the Illinois Workers Compensation Act, the Illinois Pension Code, or any other statute or judicial decision.

The indemnities set forth herein shall survive the expiration or termination of this Agreement.

16.     **Non-Liability of Board Officials:** Vendor agrees that no Board member, employee, agent, officer or official shall be personally charged by Vendor, its members if a joint venture, or any subcontractors with any liability or expense under this Agreement or be held personally liable under this Agreement to Vendor, its members if a joint venture, or any subcontractors.

17.     **Board Not Subject to Taxes:** The federal excise tax does not apply to the Board and the State of Illinois sales tax does not apply to the Board by virtue of Exemption No. E9997-7109. The compensation set in the Schedule of Compensation is inclusive of all other taxes that may be levied or based on this Agreement, including without limitation sales, use, nonresident, value-added, excise, and similar taxes levied or imposed on the Services to be provided under this Agreement, but excluding taxes levied or imposed on the income or business privileges of the Vendor. The Vendor shall be responsible for any taxes levied or imposed upon the income or business privileges of the Vendor.

18.     **Insurance:** Vendor, at its own expense, shall procure and maintain insurance covering all operations under this Agreement, whether performed by Vendor or by subcontractors. All insurers shall be

BOE 001195

licensed by the State of Illinois and rated A-VII or better by A.M. Best or a comparable rating service. Vendor shall submit to the Board satisfactory evidence of insurance coverage and upon request, shall promptly provide a certified copy of any applicable policy of insurance. Minimum insurance requirements include the coverage set forth below:

18.1 **Workers' Compensation and Employers' Liability Insurance:** Workers' Compensation Insurance affording workers' compensation benefits for all employees as required by law and Employers' Liability Insurance covering all employees who are to provide Services under this Agreement with limits of not less than One Million Dollars ($1,000,000.00) per occurrence. The workers' compensation policy must contain a waiver of subrogation clause.

18.2 **Commercial General Liability Insurance (Primary and Umbrella):** Commercial General Liability Insurance or equivalent with limits of not less than One Million Dollars ($1,000,000.00) per occurrence and Two Million Dollars ($2,000,000) in the aggregate for bodily injury, personal injury and property damage liability. Coverage shall include, but not be limited to: all operations, contractual liability, independent contractors, products/completed operations (for a minimum of two (2) years following completion), and defense. Coverage must include and not exclude sexual abuse and molestation claims.

18.3 **Automobile Liability Insurance:** Automobile Liability Insurance when any motor vehicle (whether owned, non-owned or hired) is used in connection with Services to be performed, with limits of not less than One Million Dollars ($1,000,000.00) per occurrence for bodily injury and property damage.

18.4 **Umbrella/Excess Liability Insurance:** Umbrella or Excess Liability Insurance with limits not less than Two Million Dollars ($2,000,000.00) per occurrence, which will provide additional limits for Vendor's general and automobile liability insurance. Vendor may satisfy the limits of insurance required herein with any combination of primary and umbrella/excess insurance policies.

18.5. **Professional Liability/Errors and Omissions:** When any professionals perform Services in connection with this Agreement, Professional Liability Insurance covering acts, errors, or omissions in conjunction with the professional services must be maintained with limits of not less than Two Million Dollars ($2,000,000.00) each claim. Coverage must include contractual liability. When policies are renewed or replaced, the policy retroactive date must coincide with or precede start of Services under this Agreement. A claims-made policy, which is not renewed or replaced, must have an extended reporting period of two (2) years following completion of professional services.

18.6 **Additional Insured:** Vendor shall have its General, Umbrella and Automobile Liability Insurance policies endorsed to provide that "the Board of Education of the City of Chicago, a body politic and corporate, and its members, employees and agents, and any other entity as may be designated by the Board are named as additional insured on a primary basis without recourse or right of contribution from the Board".

The insurance company, or its representative, shall submit an insurance certificate evidencing all coverage as required hereunder and indicating the Additional Insured status as required above. The Board will not pay Vendor for any Services if satisfactory proof of insurance is not provided by Vendor prior to the performance of any Services. The Certificate must provide thirty (30) days prior written notice of material change, cancellation, or non-renewal be given to:

BOE 001196

**THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE**

Risk Management
Board of Education of the City of Chicago
42 West Madison, 2nd Floor
Chicago, Illinois 60602
riskmanagement@cps.edu

Any failure of the Board to demand or receive proof of insurance coverage shall not constitute a waiver of Vendor's obligation to obtain the required insurance. The receipt of any certificate does not constitute agreement by the Board that the insurance requirements in this Agreement have been fully met or that the insurance policies indicated on the certificate are in compliance with all Agreement requirements. Vendor's failure to carry or document required insurance shall constitute a breach of the Vendor's Agreement with the Board. In the event Vendor fails to fulfill the insurance requirements of this Agreement, the Board reserves the right to stop the Services until proper evidence of insurance is provided, or this Agreement may be terminated.

Any deductibles or self-insured retentions on referenced insurance coverage must be borne by Vendor. Any insurance or self-insurance programs maintained by the Board of Education do not contribute with insurance provided by the Vendor under this Agreement.

All subcontractors are subject to the same insurance requirements of Vendor unless otherwise specified in this Agreement. The Vendor shall require any subcontractors under this Agreement to maintain comparable insurance naming the Vendor, the Board inclusive of its members, employees and agents, and any other entity designated by the Board, as Additional Insureds. The Vendor will maintain a file of subcontractor's insurance certificates evidencing compliance with these requirements.

The coverage and limits furnished by Vendor in no way limit the Vendor's liabilities and responsibilities specified within this Agreement or by law. The required insurance is not limited by any limitations expressed in the indemnification language in this Agreement, if any, or any limitation that might be placed on the indemnity in this Agreement given as a matter of law.

The Vendor agrees that insurers waive their rights of subrogation against the Board.

Vendor must register with the insurance certificate monitoring company designated by the Board and indicated below, and must maintain a current insurance certificate on file during the entire time of providing services to the Board. Vendor must register and pay the initial annual monitoring fee to the insurance certificate monitoring company prior to performing services for the Board. The **initial** annual monitoring fee is currently Twelve Dollars ($12.00) per year, but the fee may subject to change.

**Each year, Board-approved, registered vendors will be notified 30 to 45 days prior to the expiration date of their required insurance coverage (highlighted on their latest submitted insurance certificate on file) in order to submit an updated insurance certificate with the insurance certificate monitoring company. Insurance certificate submissions and related annual fees are required to be made online at the dedicated website established by the certificate monitoring company (see URL below). Should you have any questions on submissions and payment options, you can contact the certificate monitoring company.**

Certificate Monitoring Company:

**THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE**

Topiary Communications Inc.
676 N. LaSalle - Suite 230
Chicago, IL 60654
Phone: (312) 494-5709
Email: dans@topiarycomm.net
www.cpsvendorcert.com **(designated website for online registration, insurance certificate submissions and annual fee payments)**

19.    **Audit and Records Retention**: Vendor shall permit and cooperate in good faith in any audits by the Board, including its Department of Procurement and Contracts, or its agents for compliance by the Vendor with this Agreement. Vendor shall furnish the Board with such information, supporting documentation and reports as may be requested relative to the progress, execution and costs of the Services and compliance with applicable MBE/WBE requirements. Failure of the Vendor to comply in full and cooperate with the requests of the Board or its agents shall give the Board, in addition to all other rights and remedies hereunder, the right to charge the Vendor for the cost of such audit.

Vendor shall retain all records relating to Vendor's Services under this Agreement for five (5) years after the termination or expiration of this Agreement and such records shall be subject to inspection and audit by the Board. If any audit, litigation or other action involving the records is being conducted or has not been resolved, all applicable records must be retained until the proceeding is closed. As used in this clause "records" includes correspondence (including emails), receipts, vouchers, memoranda and other data, regardless of type and regardless of whether such items are in written form, electronic, digital, or in any other form. Vendor shall require all of its subcontractors to maintain the above-described records and allow the Board the same right to inspect and audit said records as set forth herein.

20.    **Minimum Wage**: Vendor must comply with the Board's Minimum Wage Resolution (14-1217-RS2) and any applicable regulations issued by the Board's CPO. The Board's resolution adopts Chicago Mayoral Executive Order 2014-1. As of December 17, 2014 the minimum wage to be paid pursuant to the Resolution is $13.00 per hour (the "Minimum Wage"). A copy of the Mayoral Order may be downloaded from the Chicago City Clerk's website at: http://chicityclerk.com/wp-content/uploads/2014/09/Executive-Order-No.-2014-1.pdf; the Board's Resolution may be downloaded from the Chicago Public School's website at: http://www.cpsboe.org/content/actions/2014_12/14-1217-RS2.pdf. In the event of any discrepancy between the summary below and the Resolution and Order, the Resolution and Order shall control.

Vendor must: (i) pay its employees no less than the Minimum Wage for work performed under the Agreement; and (ii) require any subcontractors, sublicensees, or subtenants, to pay their employees no less than the Minimum Wage for work performed under the Agreement.

The Minimum Wage must be paid to: 1) All employees regularly performing work on property owned or controlled by the Board or at a Board jobsite and 2) All employees whose regular work entails performing a service for the Board under a Board contract.

Beginning on July 1, 2015, and every July 1 thereafter, the Minimum Wage shall increase in proportion to the increase, if any, in the Consumer Price Index for All Urban Consumers most recently published by the Bureau of Labor Statistics of the United States Department of Labor, and shall remain in effect until any subsequent adjustment is made. On or before June 1, 2015, and on or before every June 1 thereafter, the City of Chicago may issue bulletins announcing adjustments to the Minimum Wage for the upcoming year.

BOE 001198

**THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE**

The Minimum Wage is not required to be paid to employees whose work is performed in general support of Vendor's operations, does not directly relate to the services provided to the Board under the Agreement, and is included in the contract price as overhead, unless that employee's regularly assigned work location is on property owned or controlled by the Board or at a Board. It is also not required to be paid by employers that are 501(c)(3) not-for-profits.

The term 'employee' as used herein does not include persons subject to subsection 4(a)(2), subsection 4(a)(3), subsection 4(d), subsection 4(e), or Section 6 of the Illinois Minimum Wage Law, 820 ILCS 105/1 et seq., in force as of the date of this Agreement or as amended. Nevertheless, the Minimum Wage is required to be paid to those workers described in subsections 4(a)(2)(A) and 4(a)(2)(B) of the Illinois Minimum Wage Law.

The Minimum Wage is not required to be paid to employees subject to a collective bargaining agreement that provides for different wages than those required by the Board's Resolution, if that collective bargaining agreement was in force prior to December 17, 2014 or if that collective bargaining agreement clearly and specifically waives the requirements of the Resolution.

If the payment of a prevailing wage is required and the prevailing wage is higher than the Minimum Wage, then the Vendor must pay the prevailing wage.

21.     **MBE/WBE Program:** Vendor acknowledges that it is familiar with the requirements of the Board's *"Remedial Program for Minority and Women Owned Business Enterprise Participation in Goods and Services Agreements"*, which is incorporated by reference as if fully set forth herein. Vendor agrees to adhere to the minimum participation goals and to all other applicable MBE/WBE requirements as set forth in the program. Vendor agrees to submit such documentation in connection with the program as may be requested by the Board.

22.     **Notices:** All notices required under this Agreement shall be in writing and sent to the addresses and persons set forth below, or to such other addresses as may be designated by a party in writing. All notices shall be deemed received when (i) delivered personally, or (ii) one day after deposit with a commercial express courier specifying next day delivery, with written verification of receipt. Refusal to accept delivery has the same effect as receipt.

|  |  |
|---|---|
| **IF TO THE BOARD:** | Office of College and Career Success<br>Board of Education of the City of Chicago<br>42 W. Madison Street<br>Chicago, IL 60602 |
| Copy to: | General Counsel<br>Board of Education of the City of Chicago<br>1 North Dearborn, 9th Floor<br>Chicago, IL 60602<br>Fax: (773) 553-1701 |
| **IF TO VENDOR:** | David Lynch Foundation for Consciousness Based Education and World Peace<br>Attn: Julia Busch<br>228 East 45th Street, 15th Floor |

BOE 001199

**THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE**

New York, NY 10017

23.      **Right of Entry:** Vendor and any of its officers, employees, subcontractors or agents, performing Services hereunder shall be permitted to enter upon Board property in connection with the performance of the Services hereunder, subject to the terms and conditions contained herein and those rules established by the Board and the subject school principal. Vendor shall provide advance notice to the Board whenever applicable, of any such intended entry. Consent to enter upon a site given by the Board shall not create, nor be deemed to imply, the creation of any additional responsibilities on the part of the Board. Vendor shall use, and shall cause each of its officers, employees and agents to use, the highest degree of care when entering upon any property owned by the Board in connection with the Services. Any and all claims, suits or judgments, costs, or expenses, including reasonable attorney fees, arising from, by reason of, or in connection with any such entries shall be treated in accordance with the applicable terms and conditions of this Agreement, including without limitation, the indemnification provisions contained in this Agreement.

24.      **Non-Discrimination:** It shall be an unlawful employment practice for Vendor or any of its subcontractors to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to compensation, or other terms, conditions, or privileges of employment, because of such individual's race, color, national origin, religion, sex, gender identity/expression, sexual orientation, age or disability; or to limit, segregate, or classify employees or applicants for employment in any way that would deprive or tend to deprive any individual from equal employment opportunities or otherwise adversely affect an individual's status as an employee because of such individual's race, color, national origin, religion, sex, gender identity/expression, sexual orientation, age or disability. Vendor shall particularly remain in compliance at all times with: the Civil Rights Act of 1964, 42 U.S.C.A. §2000a, *et seq.,* as amended; the Age Discrimination in Employment Act, 29 U.S.C.A. §621, *et seq.*; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C.A. §701, *et seq.,* as amended; the Americans with Disabilities Act, 42 U.S.C.A. §12101, *et seq.*; the Illinois Human Rights Act, 775 ILCS 5/1-101, *et seq.,* as amended; the Illinois School Code, 105 ILCS 5/1-1 *et seq.*; the Illinois Public Works Employment Discrimination Act, 775 ILCS 10/0.01 *et seq.*; the Individuals with Disabilities Education Act (IDEA) 20 U.S.C.A. §1400 *et seq.*; and, the Chicago Human Rights Ordinance, ch. 2-160 of the Municipal Code of Chicago, and all other applicable federal statutes, regulations and other laws. Nothing in this paragraph is intended nor shall be construed to create a private right of action against the Board or any of its employees. Furthermore, no part of this paragraph shall be construed to create contractual or other rights or expectations for the Vendor's employees or the Vendor's subcontractors' employees.

25.      **Entire Agreement and Amendment:** This Agreement, including all exhibits attached to it and incorporated into it, constitutes the entire agreement of the parties with respect to the matters contained herein. All attached exhibits are incorporated into and made a part of this Agreement. No modification of or amendment to this Agreement shall be effective unless such modification or amendment is in writing and signed by both parties hereto. Any prior agreements or representations, either written or oral, relating to the subject matter of this Agreement are of no force or effect.

26.      **Governing Law:** This Agreement shall be governed as to performance and interpretation in accordance with the laws of the State of Illinois. Vendor irrevocably submits itself to the original jurisdiction of those courts located in the County of Cook, State of Illinois, with regard to any controversy arising out, or relating to, or in any way concerning the execution or performance of this Agreement. Vendor agrees that service of process on the Vendor may be made, at the option of the Board, by either registered or certified mail addressed to the office identified in the notice provision herein, by registered or certified mail addressed to the office actually maintained by the Vendor, or by personal delivery on any officer, director, or managing or general agent of the Vendor. If any action is brought by the Vendor against

BOE 001200

**THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE**

the Board concerning this Agreement, the action shall only be brought in those courts located within the County of Cook, State of Illinois.

27.     **Continuing Obligation to Perform:** In the event of any dispute between Vendor and Board, Vendor shall expeditiously and diligently proceed with the performance of all its obligations under this Agreement with a reservation of all rights and remedies it may have under or pursuant to this Agreement at law or in equity.

28.     **Conflict of Interest:** This Agreement is not legally binding on the Board if entered into in violation of the provisions of 105 ILCS 5/34-21.3, which restricts the employment of, or the letting of contracts to, former Board members within a one year period following expiration or other termination of their office.

29.     **Indebtedness:** The Vendor agrees to comply with the Board's Indebtedness Policy adopted June 26, 1996 (96-0626-PO3), as amended from time to time, which policy is hereby incorporated by reference into and made a part of this Agreement as fully set forth herein.

30.     **Ethics:** No officer, agent or employee of the Board is or shall be employed by the Vendor or has or shall have a financial interest, directly, or indirectly, in this Agreement or the compensation to be paid hereunder except as may be permitted in writing by the Board's Ethics Policy adopted May 25, 2011 (11-0525-PO2), as amended from time to time, which policy is hereby incorporated by reference into and made a part of this Agreement as fully set forth herein.

31.     **Inspector General:** Each party to this Agreement hereby acknowledges that in accordance with 105 ILCS 5/34-13.1, the Inspector General of the Board of Education of the City of Chicago has the authority to conduct certain investigations and that the Inspector General shall have access to all information and personnel necessary to conduct those investigations.

32.     **Waiver:** No delay or omission by the Board to exercise any right hereunder shall be construed as a waiver of any such right and the Board reserves the right to exercise any such right from time to time as often and as may be deemed expedient.

33.     **Freedom of Information Act:** Vendor acknowledges that this Agreement and all documents submitted to the Board related to the contract award are a matter of public record and are subject to the Illinois Freedom of Information Act (5 ILCS 140/1) and any other comparable state and federal laws and that this Agreement is subject to the reporting requirements under 105 ILCS 5/10-20.44. Vendor further acknowledges that this Agreement shall be posted on the Board's website.

34.     **Authority:** Vendor understands and agrees that Vendor is not an authorized representative of the Board or the Chicago Public Schools. All agreements and approvals (written or verbal) of the Board or the Chicago Public Schools must be made by authorized Board employee(s).

35.     **Survival/Severability.** All express representations or indemnifications made or given in this Agreement shall survive the completion of Services or the termination of this Agreement for any reason. If any provision or part of this Agreement is held to be unenforceable, the Agreement shall be considered divisible and such provision shall be deemed inoperative to the extent it is deemed unenforceable, and in all other respects the Agreement shall remain in full force and effect; provided, however, that if any such provision may be made enforceable by limitation thereof, then such provision shall be deemed to be so limited and shall be enforceable to the maximum extent permitted by applicable law.

BOE 001201

**THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE**

36.      **Joint and Several Liability**. In the event that Vendor, or its successors or assigns, if any, is comprised of more than one individual or other legal entity (or a combination thereof, then, and in that event, each and every obligation or undertaking herein stated to be fulfilled or performed by Vendor shall be the joint and several obligation or undertaking of each such individual or other legal entity.

37.      **Counterparts and Facsimiles**. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute but one instrument. A signature delivered by facsimile or electronic means shall be considered binding for both parties.

[Signature page to follow]

**THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

**BOARD OF EDUCATION OF THE**
**CITY OF CHICAGO**

By: _____

    Frank M. Clark, President

Attest: _____ 4/23/18

    Estela G. Beltran, Secretary

Date: _____ 4/23/18 _____

By: _____

Janice K. Jackson EdD, Chief Executive Officer

**Board Report No.:** 18-0228-PR2-1

Approved as to legal form: _____

_____
Joseph Moriarty, General Counsel

**DAVID LYNCH FOUNDATION FOR CONSCIOUSNESS**
**BASED EDUCATION AND WORLD PEACE**

By: _____

Name: __Julia Busch_____

Title: __Regional Director - Chicago__

Date: _____April 11, 2018_____

**Attachments:**

**Exhibit A: Scope of Services**

**THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE**

**EXHIBIT A**

**SCOPE OF SERVICES**

Name of Project: Quiet Time

CPS Project Manager: Justina Schlund       Phone: 773/553-5058       E-Mail: jlschlund@cps.edu

Vendor's Project Manager: Julia Busch       Phone: 641-919-8888       E-Mail: Julia@davidlynchfoundation.org

This Scope of Services will be conducted pursuant to the terms and conditions of that Services Agreement (the " **Agreement**") dated March 1, 2018 by and between David Lynch Foundation For Consciousness Based Education and World Peace ("**Vendor**") and The Board of Education of the City of Chicago (the "**Board**"), commonly known as The Chicago Public Schools ("**CPS**"). Defined terms used in this Scope of Services will have the same meanings as those ascribed to such terms in the Agreement.

I.       **Summary:**

Stress is a major health epidemic in the United States; in particular, trauma and toxic stress experienced at a young age. Studies show two out of three children experience trauma at some point in their young lives. This is highly significant because research has shown repeated childhood trauma to be the top predictor of student misbehavior and the number two predictor of academic failure.

The meditation-based Quiet Time program is a simple, but powerful answer to this problem. By relieving stress and enhancing cognitive function, the program supports healthy social-emotional development, positive school climate, and higher academic achievement. Quiet Time involves the introduction of two restful 15-minute periods into the day in which youth in traditional schools, alternative schools and juvenile detention centers have the opportunity to experience a peaceful break in their lives, providing a counterbalance to the hyper-stimulating tension of urban culture. The key component of Quiet Time is an evidenced-based stress reduction and cognitive development technique known as Transcendental Meditation® (TM). If youth choose not to meditate, they are free to select another quiet activity, such as sustained silent reading, resting or quiet sitting.

II.       **Goals and Objectives:**

Quiet Time will positively affect the stress response enough to meaningfully impact students, leading to reduced negative behaviors and improved academic performance.

III.       **Program Structure:**

Vendor will provide the Services below at the following schools: Gage Park and Daniel Hale Williams Prep School of Medicine.

BOE 001204

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

| Stage | Key Activities | Target dates |
|---|---|---|
| **Stage 1:**<br><br>Re-engage program with School Faculty and Administrators | • Provide teachers and administrators an overview of the Quiet Time program, including structure, content and purpose.<br>• Offer meditation instruction and training to those teachers and administrators who have not yet learned and any new faculty.<br>• Provide teachers with the training to oversee the Quiet Time program in their classrooms.<br>• Provide teachers on-going support in their meditation practice | • TM presentations and orientations (1 hour) will be scheduled the first month for those who have not learned TM.<br><br>• TM training will be offered to all faculty and staff who have not already taken the training last year (involves 4 consecutive days for 1 hr per day). Several courses will be offered to accommodate schedules.<br><br>• Regular TM check-ins and support on site throughout the school year. |
| **Stage 2:**<br>Introduction to Parents and Students | • Provide written information to parents and obtain permission from parents<br>• Introduce students to the program and organize their orientation for TM instruction<br>• Four-Day TM Core Course for Students<br>   ○ The course is taught over four consecutive days. On each day, students meet for one class period, or for a full hour, if this can be arranged.<br>   ○ On the first day, students meet one-on-one with a Quiet Time instructor or in small groups of 3 - 4 to learn the technique and have their first experience with meditation.<br>   ○ On days 2-4, students meet in small groups to gain intellectual understanding of the practice they have learned. | Parents<br><br>• Parent presentations may be offered, but not required and scheduled at each site, as convenient.<br><br>• Permission slips will be sent home for parent signatures, with follow up reminders to students and parents to return signed slips. (Ongoing with target of 50% of permission slips returned in first month). A one page FAQ will be included.<br><br>Students<br><br>• TM training will be offered at each site to the whole student population (last year's controls and freshman).<br><br>• TM presentations and orientations will be scheduled, with a rolling schedule to accommodate the selected groups at each site.<br><br>• TM training for students will be scheduled in groups<br><br>• Regular TM check-ins and support on site throughout the school year for students who took the training last year and for the students who will learn |

BOE 001205

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

| | | this spring. |
|---|---|---|
| **Stage 3:**<br><br>On-Going Quiet Time Implementation | • Daily practice in Quiet Time<br>• On-going student follow-up, including:<br>  o Individual or small group check-ins lasting 20 to 25 minutes, two- to three-times in the spring semester after instruction<br>  o Short reviews prior to Quiet Time sessions in classroom<br>  o Special curriculum on topics such as coping with stress, or meditation and the brain presented to a whole class. These discussions are held once or twice a semester. Units on the relevance of meditation for health, learning, or brain development can also be integrated into science, health, or learning skills classes.<br>  o Design and oversight of incentive and accountability systems to support student meditation practice.<br>  o Optional ½ day youth conference on topics such as creation of peaceful neighborhoods. | • TM trainings and subsequent daily practice will start as soon as students have turned in permission forms. |

IV. **Payment Schedule:**

David Lynch Foundation will invoice CPS for actual Services provided in accordance with the schedule below. Under no circumstances will the total compensation exceed $170,000.00.

| Invoice Date | Payment |
|---|---|
| 3/30/2018 | $42,500 |
| 4/30/2018 | $42,500 |
| 5/30/2018 | $42,500 |
| 6/30/2018 | $42,500 |

BOE 001206

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

## SERVICES AGREEMENT
(David Lynch Foundation for Consciousness Based Education and World Peace)

This Services Agreement ("Agreement") is entered into as of the 1st day of March, 2018 ("**Effective Date**"), by and between the Board of Education of the City of Chicago, a body politic and corporate, commonly known as the Chicago Public Schools (the "**Board**" or "**CPS**") and David Lynch Foundation for Consciousness Based Education and World Peace ("**Vendor**" or "**David Lynch Foundation**").

## RECITALS

A.  WHEREAS, The Board desires that Vendor render certain services more fully described herein.

B.  WHEREAS, Vendor has demonstrated expertise in providing such services, has represented that it has the requisite knowledge, skill, experience and other resources necessary to perform such services and is desirous of providing such services for the Board; and

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants contained herein, the parties hereby agree as follows:

1.  **Incorporation of Recitals**: The matters recited above are hereby incorporated into and made a part of this Agreement.

2.  **Term:** This Agreement is for a term commencing on the Effective Date and continuing through June 30, 2018 ("**Term**"), unless terminated sooner as provided herein. There are no options to renew.

4.  **Scope of Services:** Vendor agrees to provide the services as set forth in the Scope of Services attached hereto as **Exhibit A** ("Services") in accordance with the terms and conditions of this Agreement. "Services" means, collectively, the services, deliverables, duties and responsibilities described in **Exhibit A** of this Agreement and any and all work necessary to complete them or carry them out fully and to the standard of performance required in this Agreement. The Board retains final authority with respect to all Services related decisions. The Board may, from time to time, request changes in the Scope of Services. Any such changes shall be documented by a written amendment to this Agreement signed by both parties and the Board's General Counsel.

5.  **Compensation, Payment and Purchase Orders:**

    5.1.  Compensation: The total maximum compensation payable to Vendor under this Agreement during the Term, inclusive of any and all reimbursable expenses specifically identified herein, shall not exceed One Hundred Seventy Thousand 00/100 Dollars ($170,000.00) ("**Maximum Compensation Amount**"), without a written amendment to this Agreement signed by the authorized representatives of each party and approved by the Board's General Counsel. Compensation for Services during the Term shall be payable in accordance with Section IV of **Exhibit A** (the "**Payment Schedule**"). The Board will not reimburse for any expenses.

    It is understood and agreed that the Maximum Compensation Amount is a 'not-to-exceed amount' and is not a guaranteed payment. Compensation shall be based on actual Services performed during the Term of this Agreement, and the Board shall not be obligated to pay for any Services or deliverables not in compliance with this Agreement. In the event the Agreement is terminated early, the Board shall only be obligated to pay the fees incurred up to the effective date of

DLF 000099

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

termination and Vendor shall promptly refund to the Board any payments received for Services and deliverables not provided.

5.2.     Purchase Orders: Any purchase by the Board of Services covered by this Agreement will be completed by submitting an order on the Board's Standard Purchase Order Form ("PO"). The pre-printed terms and conditions found on the PO shall apply to the extent that such terms supplement and are not inconsistent with the terms and conditions contained in this Agreement. It is understood and agreed that Vendor shall not provide any Services without a valid purchase order. If Vendor provides any Services without a valid purchase order Vendor shall not be entitled to receive any payment for such Services.

5.3     Billing and Payment Procedures: All invoices must be submitted electronically via email in PDF format to cpsinvoice@cps.edu. Each email may only contain one invoice and must include your Vendor name and the CPS Purchase Order number. All invoices must include:

- Vendor name and payment address
- Unique invoice number (determined by Vendor)
- Valid purchase order number (only one PO number may be referenced on each invoice)
- Invoice date
- Itemized description of the services rendered and/or goods delivered
- Date the services were provided and/or goods were delivered to CPS
- Detailed pricing information such as quantities, unit prices, discount, and final net amount due

Invoices shall be submitted in a timely manner. The final invoice shall be submitted no later than ninety (90) days after the expiration or termination of this Agreement. If Vendor has more than one contract with the Board, separate invoices must be submitted for each contract. The Board shall process payments in accordance with the Local Government Prompt Payment Act [50 ILCS 505/1 *et seq.*]. The Board reserves the right to request additional information and supporting documentation necessary for the Board to verify the Services provided under this Agreement.

5.4. Electronic Payments:   Vendor agrees  that, at the Board's sole discretion, the Board may make payment electronically to Vendor for any and all amounts due by means of the Board's procurement charge card account. Vendor recognizes that any charge to the Board's procurement charge card that is in excess of the open remaining amount as stipulated in the applicable Purchase Order, or any charge unaccompanied by the requisite documentation and data as required by the Board, shall be deemed invalid and disputed by the Board. Vendor further recognizes that, in the absence of any supporting documentation as may be required by the Board, payments associated with disputed charges shall be rescinded by the Board and deemed not owed by the Board. Vendor agrees to comply with the rules, procedures and documentation required for electronic payment via the Board's procurement charge card as established by the Board's Department of Procurement and Contracts.

6.     Standards of Performance: Vendor shall devote, and shall cause all of its staff, agents and subcontractors, if any, to devote, such of their time, attention, best skill and judgment, knowledge and professional ability as is necessary to perform all Services effectively, efficiently and consistent with the best interests of the Board and to the satisfaction of the Board's Chief Officer of College and Career Success. Vendor shall retain and utilize, as required by law or by the Agreement, professionals licensed to practice in the State of Illinois in the applicable profession. Vendor shall

DLF 000100

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

use efficient business administration methods and perform the Services in the most expeditious and economical manner so as to assure, among other things, that the Services are performed at a reasonable cost to the Board and that Services performed by other entities or persons in connection with this Agreement are efficiently and cost-effectively delivered. Vendor acknowledges that, if in the course of providing Services hereunder, it is entrusted with or has access to valuable and confidential information and records of the Board, that with respect to that information, Vendor agrees to be held to the standard of care of a fiduciary. Any review, approval, acceptance of Services or deliverables or payment for any of the Services by the Board does not relieve Vendor of its responsibility for the professional skill, care, and technical accuracy of its Services and deliverables. Vendor shall remain responsible for the professional and technical accuracy of all Services, including any deliverables furnished, whether by Vendor or its subcontractors or others on its behalf.

7.  **Personnel:** Vendor must assign and maintain during the Term of this Agreement and any renewal of it, an adequate staff of competent personnel that is fully equipped, licensed as appropriate, available as needed, qualified and assigned to perform the Services. If the Board determines, in its sole discretion that any employee, subcontractor or other person providing Services hereunder for Vendor is not performing in accordance with the performance standards or other requirements of this Agreement or is endangering the safety or welfare of any CPS student, the Board shall have the right to direct Vendor to remove that person from performing Services under this Agreement.

8.  **Non-appropriation:** Expenditures not appropriated by the Board in its current fiscal year budget are deemed to be contingent liabilities only and are subject to appropriation in subsequent fiscal year budgets. In the event no funds or insufficient funds are appropriated and budgeted in any subsequent fiscal period by the Board for performance under this Agreement, the Board shall notify Vendor and this Agreement shall terminate on the earlier of the last day of the fiscal period for which sufficient appropriation was made or whenever the funds appropriated for payment under this Agreement are exhausted. Payments for Services completed to the date of notification shall be made to Vendor except that no payment shall be made or due to Vendor under this Agreement beyond those amounts appropriated and budgeted by the Board to fund payments under this Agreement.

9.  **Termination, Suspension of Services, Events of Default, Remedies, and Turnover of Documents:**

    9.1  Early Termination: The Board may terminate this Agreement in whole or in part, without cause, at any time, by a notice in writing from the Board to Vendor in accordance with the notice provisions herein. The effective date of termination shall be thirty (30) calendar days from the date the notice is received or the date stated in the notice, whichever is later.

    After notice is received, Vendor must restrict its activities and those of its subcontractors, to winding down any reports, analyses, or other activities previously begun. No costs incurred after the effective date of the termination are allowed. Payment for any Services actually and satisfactorily performed before the effective date of the termination is on the same basis as set forth herein in the provision regarding compensation and payment.

    Vendor must include in its contracts with subcontractors an early termination provision in form and substance equivalent to this early termination provision to prevent claims against the Board arising from termination of subcontracts after the early termination of this Agreement.

DLF 000101

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

Vendor shall not be entitled to make any early termination claims against the Board resulting from any subcontractor's claims against Vendor or the Board to the extent inconsistent with this provision.

9.2     Suspension of Services: The Board may, upon thirty (30) calendar days written notice, direct Vendor to suspend Services in whole or part. Vendor shall promptly resume performance of Services upon written notice from the Board and upon such equitable extension of time as may be mutually agreed upon in writing by the Board and Vendor. Responsibility for any additional costs or expenses actually incurred by Vendor as a result of remobilization shall be determined by mutual agreement of the parties.

9.3     Vendor's Events of Default: Events of default ("Events of Default") include, but are not limited to, the following:

    a.   Any material misrepresentation by Vendor in the inducement or the performance of this Agreement.

    b.   Breach of any term, condition, representation or warranty made by Vendor in this Agreement.

    c.   Default by Vendor under any other agreement Vendor may presently have or may enter into with the Board;

    d.   Assignment by Vendor for the benefit of creditors or consent by Vendor to the appointment of a trustee or receiver or the filing by or against Vendor of any petition or proceeding under any bankruptcy, insolvency or similar law.

    e.   Failure of Vendor to perform any of its obligations under this Agreement, including, but not limited to, the following:

        i.    Any action or failure to act by Vendor which affects the safety and/or welfare of students or Board staff;

        ii.   Failure to perform in accordance with terms, conditions, and specifications of this Agreement;

        iii.  Failure to supply any portion of the Services herein at the time fixed for performance and in the manner specified herein;

        iv.   Failure to supply the Services with sufficient personnel and equipment or which sufficient material to ensure the supply of Services due to a reason or circumstances within Vendor's reasonable control;

        v.    Inability to supply the Services satisfactorily as a result of insolvency or filing for bankruptcy;

        vi.   Failure to promptly re-supply Services that were determined by the Board to be defective or failing to meet the scope of Services within a reasonable time;

        vii.  Discontinuance of the supply of Services for reasons not beyond Vendor's reasonable control; or

        viii. Failure to comply with any term of this Agreement, including but not limited to, the provisions concerning insurance and nondiscrimination, and any other acts specifically and expressly stated in this Agreement constituting an Event of

DLF 000102

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

Default.

9.4    Remedies: The Board in its sole discretion may declare Vendor in default if Vendor commits an Event of Default. The Chief Procurement Officer may in her or his sole discretion give Vendor an opportunity to cure the default within a certain period of time (the "Cure Period"). The Chief Procurement Officer shall give Vendor written notice of the default either in the form of a cure notice ("Cure Notice") or, if no opportunity for cure is granted, a default notice ("Default Notice"). If the Chief Procurement Officer gives a Default Notice stating that the Chief Procurement Officer has decided to terminate this Agreement, then that decision is final and effective on giving of the notice. If the Chief Procurement Officer decided not to terminate, then she or he may decide at any time thereafter to terminate this Agreement in a subsequent Default Notice.

The Chief Procurement Officer may give a Default Notice if Vendor fails to effect a cure within the Cure Period given in the applicable Cure Notice. When a Default Notice includes the Chief Procurement Officer's decision to terminate, Vendor must discontinue all Services unless otherwise specifically directed in the notice, and Vendor must deliver to the Board all materials prepared or created in the performance of this Agreement whether completed or in-process, except for Vendor's Intellectual Property (as defined below). Upon the occurrence of an Event of Default, the Board may invoke any or all of the following remedies:

    a.  The right to terminate this Agreement, in whole or in part, as to any or all of the Services yet to be supplied effective at a time specified by the Board;
    b.  The right to suspend the supply of Services during the cure period if the default results from Vendor's action or failure to act which affects the safety or welfare of students or Board staff;
    c.  The right to specific performance, an injunction or any other appropriate equitable remedy;
    d.  The right to receive from Vendor any and all damages incurred as a result or in consequence of an Event of Default;
    e.  The right to money damages;
    f.  The right to withhold all or part of Vendor's compensation under this Agreement; and
    g.  The right to use an Event of Default as a basis to deem Vendor non-responsible in future contracts to be awarded by the Board, pursuant to the Board's Debarment Policy (08-1217-PO1), as may be amended.

The Board may elect not to declare Vendor in default or to terminate this Agreement. The parties acknowledge that this provision is solely for the benefit of the Board and that if the Board permits Vendor to continue to provide the Services despite one or more Events of Default, Vendor shall in no way be relieved of any responsibilities, duties or obligations under this Agreement nor shall the Board waive or relinquish any of its rights under this Agreement, at law, equity or statute, nor shall the Board be deemed to have waived or relinquished any of the rights it has to declare an Event of Default in the future.

The remedies under the terms of this Agreement are not intended to be exclusive of any other

DLF 000103

remedies provided, but each and every such remedy shall be cumulative and shall be in addition to any other remedies, existing now or hereafter, at law, in equity or by statute. No delay or omission to exercise any right or power accruing upon the occurrence of any Event of Default shall be construed as a waiver of any Event of Default or acquiescence thereto, and every such right and power may be exercised from time to time and as often as may be deemed expedient.

If the Board's election to terminate this Agreement for default under this Section is determined by a court of competent jurisdiction to have been wrongful, then in that case the termination is to be considered an early termination pursuant to the Early Termination provision above.

9.5    Turnover of Documents and Records: Upon demand of the Board after termination of this Agreement for any reason or the expiration of this Agreement by its terms, Vendor shall turn over to the Board or its designee within five (5) days of demand, all materials, supplies, equipment owned or purchased by the Board, completed or partially completed work product or analyses, data, computer disks, documents and any other information relating in any way to this Agreement or the performance or furnishing of Services, except:  (1) material which is Vendor's Intellectual Property (as defined below), and (2) Vendor may keep a copy of such information for its own records, subject to other restrictions contained in this Agreement regarding the retention and use of this information.

10.    **Assignment**: This Agreement shall be binding on the parties and their respective successors and assigns; provided, however, that neither party may assign this Agreement or any obligations imposed hereunder without the prior written consent of the other party.

11.    **Handling of Confidential Information, Including Student Data:**

11.1  Definitions:

a.    **Confidential Information:** In the performance of the Agreement, Vendor may have access to or receive certain information that is not generally known to others ("Confidential Information" or "CPS Data"). Such Confidential Information may include, but is not limited to: Student Data (as defined below), personal data about CPS employees, unpublished school information, CPS financial information, and CPS business plans. It is understood and agreed that Confidential Information also includes proprietary or confidential information of third parties provided by the Board to Vendor. Confidential Information will not include information that is: (i) or becomes part of the public domain through no fault of Vendor; (ii) made available to Vendor by an independent third party having the legal right to make such disclosure; and (iii) information that can be established and documented by Vendor to have been independently developed or obtained by Vendor without violating the confidentiality obligations of this Agreement and any other agreements with the Board.

b.    **Student Data:** Student Data means any data, metadata, information, records, or other materials of any nature recorded in any form whatsoever, that is generated, disclosed, maintained by, transmitted, created, or provided by the Board, either directly or through its students, employees, agents, and subcontractors, including all information used, created, maintained or generated through the Services provided under this Agreement that is directly related to a CPS student. For purposes of this Agreement, Student Data shall still be considered Confidential Information; additional requirements regarding Student Data specifically are described below.

DLF 000104

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

c. **De-Identified Data:** De-identified Data will have all direct and indirect personal identifiers removed. This includes, but is not limited to, persistent unique identifiers, name, ID numbers, date of birth, demographic information, location information, and school ID. Vendor agrees not to attempt to re-identify de-identified Data. For the purposes of this Agreement, De-Identified Data will still be considered Confidential Information and treated as such unless expressly provided otherwise in this Agreement.

11.2 Use of Confidential Information: Vendor shall:

a. Only use Confidential Information for the sole purpose of delivering the Services to the Board hereunder, and shall not disclose the Confidential Information except to those of its officers, agents, employees, and subcontractors who have a need to access the Confidential Information for said purpose. Notwithstanding the foregoing, as described in the Compliance with Laws Section, it is understood and agreed that such protection of Confidential Information shall be subject to the special requirements of the Family Educational Rights and Privacy Act ("FERPA"), the Children's Online Privacy Protection Act ("COPPA"), and the Illinois School Student Records Act ("ISSRA").

b. Not copy or reproduce in any manner whatsoever the Confidential Information of the Board without the prior written consent of the Board, except where required for its own internal use strictly in accordance with this Agreement.

11.3 Transmitting and Storing Confidential Information: When transmitting and storing the Board's Confidential Information, Vendor shall use commercially reasonable best efforts, but at a minimum with no less protection than Vendor uses to protect its own confidential information. When transmitting and storing the Board's Confidential Information that is personally identifiable ("Personally Identifiable Confidential Information"), which includes but is not limited to Student Data, Vendor shall:

a. When mailing physical copies of Personally Identifiable Confidential Information, send the Personally Identifiable Confidential Information in a tamper-proof, labeled container, with a tracking number and a delivery confirmation receipt;

b. Only electronically transmit, mail, or store Personally Identifiable Confidential Information on electronic media, such as CDs, DVDs, electronic tape, flash drives, etc., if the Confidential Information is encrypted. Encryption must utilize the Advanced Encryption Standard ("AES") algorithm with a key of 256 bits or greater ("Encrypt"). Any media containing Personally Identifiable Confidential Information shall only be mailed in accordance with the provisions of Section 11.3(a) above;

c. Not send, via mail or electronically, any password or other information sufficient to allow decryption of Personally Identifiable Confidential Information with the Encrypted Confidential Information;

d. Keep all physical copies (paper, portable or removable electronic media, or other physical representations) of Personally Identifiable Confidential Information under lock and key, or otherwise have sufficient physical access control measures to prevent unauthorized access. Vendor shall not leave Personally Identifiable Confidential Information unsecured and unattended at any time;

DLF 000105

e.   Password protect any desktop, laptop or other similar device that contains Personally Identifiable Confidential Information. Additionally, any desktop or laptop that contains Personally Identifiable Confidential Information shall have its full hard drive Encrypted. Vendor shall not leave any desktop or laptop unattended without enabling a screen-lock or otherwise blocking access to the desktop or laptop. Vendor shall ensure that no password or other information sufficient to access a desktop or laptop containing Personally Identifiable Confidential Information is attached to or located near the desktop or laptop at any time.

f.   Store and back up Personally Identifiable Confidential Information on a proprietary file server located in the continental United States that is not shared by other entities including, but not limited to, other departments of Vendor. Vendor shall ensure the security of the Personally Identifiable Confidential Information stored on the server by employing adequate security measures to prevent unauthorized access to that information. These measures include policies, procedures, and technical elements relating to data access controls. In addition, Vendor shall use standard security protocols and mechanisms to protect the exchange and transmission of Personally Identifiable Confidential Information. Data stored in cloud-based systems must be protected in the same manner as local data as described throughout the Agreement.

11.4   Dissemination of Information: Vendor shall not disseminate any Confidential Information to a third party without the prior written consent of the Board except as may be necessary to perform Services under this Agreement. If Vendor is presented with a request for documents by any administrative agency or with a *subpoena duces tecum* regarding any Confidential Information which may be in Vendor's possession as a result of Services supplied under the Agreement, Vendor shall immediately give notice to the Board and its General Counsel with the understanding that the Board shall have the opportunity to contest such process by any means available to it prior to submission of any documents to a court or other third party. Vendor shall not be obligated to withhold delivery of documents beyond the time ordered by a court of law or administrative agency, unless the request for production or subpoena is quashed or withdrawn, or the time to produce is otherwise extended.

11.5   Press Release; Publicity: Vendor shall not issue publicity news releases, grant press interviews, or use any Confidential Information or Board intellectual property (as defined below), including but not limited to the CPS logo or the logos of any schools, during or after the performance or delivery of materials and Services without the prior express written consent of authorized representatives of the Board. Furthermore, Vendor may not photograph or film or cause others to photograph or film within any CPS school or facility without the prior express written consent of the Board's Chief Communications Officer or his/her designee.

11.6   Return or Destruction of Confidential Information: Vendor shall, at the Board's option, destroy or return all Confidential Information to the Board within five (5) business days of demand, or if no demand is made, it shall destroy or return all Confidential Information to the Board within five (5) days of the expiration or termination of this Agreement unless Vendor receives permission in writing from the Board's Director of Performance Data and Policy or his/her designee that Vendor may retain certain Confidential Information for a specific period of time. In the event the Board elects to have Vendor destroy the Confidential Information, Vendor shall provide an affidavit attesting to such destruction. Vendor shall delete a specific student's Student Data upon the

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

written request of the Board.

11.7    Unauthorized Access, Use or Disclosure: If Vendor has knowledge of any unauthorized access, use and/or disclosure of Confidential Information, it shall: (i) notify the Board immediately, which in no event shall be longer than twenty-four (24) hours from Vendor receiving notice of the unauthorized access, use, or disclosure; (ii) take prompt and appropriate action to prevent further unauthorized access, use, or disclosure; (iii) cooperate with the Board and any government authorities with respect to the investigation and mitigation of any such unauthorized access, use, or disclosure, including the discharge of the Board's duties under the law; and (iv) take such other actions as the Board may reasonably direct to remedy such unauthorized access, use, or disclosure, including, if required under any federal or state law, providing notification to the affected persons. Vendor shall bear the losses and expenses (including attorneys' fees) associated with a breach of Vendor's obligations regarding Confidential Information as set forth in this Agreement, including without limitation any costs: (1) of providing notices of a data breach to affected persons and to regulatory bodies; and (2) of remedying and otherwise mitigating any potential damage or harm of the data breach, including without limitation, establishing call centers and providing credit monitoring or credit restoration services, as requested by the Board. Vendor shall include this provision in any and all agreements they execute with subcontractors performing Services under this Agreement.

11.8    Employees, Agents, and Subcontractors: Vendor agrees to provide its employees, agents, and subcontractors only such Confidential Information that is necessary for the delivery of materials and the performance of Services pursuant to this Agreement and to cause its employees, agents, and subcontractors to undertake the same obligations as agreed to herein by Vendor.

11.9    Injunctive Relief: In the event of a breach or threatened breach of this Section, Vendor acknowledges and agrees that the Board would suffer irreparable injury not compensable by money damages and would not have an adequate remedy at law. Accordingly, Vendor agrees that the Board shall be entitled to immediate injunctive relief to prevent or curtail any such breach, threatened or actual. The foregoing shall be in addition and without prejudice to such rights that the Board may have in equity, by law or statute.

11.10   Additional Obligations Regarding Treatment of Student Data: In addition to the above stated obligations for the treatment and handling of Confidential Information, Vendor shall abide by the following obligations when handling Student Data:

    a.  **Student Data Use.** Vendor shall not use Student Data, including persistent unique identifiers, data created or gathered by Vendor's Services to amass a profile about a CPS student or otherwise identify a CPS student except in furtherance of specific school purposes as may be agreed upon in writing between the Board and Vendor. Vendor will use Student Data only for the purpose of fulfilling its duties and delivering Services under this Agreement.

    b.  **Student Data Collection.** Vendor will collect only Student Data necessary to fulfill its duties as outlined in this Agreement.

    c.  **Marketing and Advertising.** Vendor shall not advertise or market to students or their parents/guardians when the advertising is based upon any Student Data that Vendor has acquired because of the use of that Vendor's Services. Advertising or marketing may be

Page 9 of 28

DLF 000107

directed to a school or Board only if the student information underlying the marketing and/or advertising is properly de-identified.

d.   **Student Data Mining.** Vendor is prohibited from mining Student Data for any purposes other than those agreed to by the parties in this Agreement. Student Data mining or scanning of user content for the purpose of advertising or marketing to students or their parents/guardians is prohibited.

e.   **Student Data Transfer or Destruction.** Vendor will ensure that all Student Data in its possession and in the possession of any subcontractors, or agents to whom Vendor may have transferred Student Data, are destroyed or transferred to the Board under the direction of the Board when Student Data is no longer needed for its specified purpose.

f.   **Rights and License in and to Student Data.** All rights, including all intellectual property rights, associated with such Student Data shall remain the exclusive property of the Board. Nothing in this Agreement is meant and nothing shall be interpreted to mean that the Board releases any ownership or control of Student Data during the performance of the Services under this Agreement. Student Data shall remain under the control of the Board throughout the Term of this Agreement. Vendor has a limited, nonexclusive license to the use of Student Data solely for the purpose of performing its obligations as outlined under the Agreement. This Agreement does not give Vendor any rights, implied or otherwise, to Student Data, content, or intellectual property, except as expressly stated in the Agreement. Vendor does not have the right to sell or trade Student Data.

g.   **Sale of Student Data.** Vendor is prohibited from selling, trading, or otherwise transferring Student Data to any third parties, except with the express written prior consent of the authorized Board representative and approval of the Board's General Counsel. This prohibition does not apply to the purchase, merger, or other type of acquisition of Vendor by another entity approved by the Board in accordance with the Assignment Section of this Agreement, provided that Vendor or successor entity continues to be subject to the provisions of this Agreement with respect to previously acquired Student Data.

h.   **Use of De-Identified Data.** Vendor may use De-Identified Data that it obtains through use of Vendor's Services for product development, research, or other purposes to develop and improve Vendor's Services, provided that the De-Identified Data does not identify and cannot be analyzed and identified to be associated with or generated from CPS. Vendor may use De-Identified Data for research. Vendor may use De-Identified Data to demonstrate the effectiveness of Vendor's services, including in its marketing, provided that Vendor's marketing shall not identify or suggest that the Board or any of its students, employees, agents, or subcontractors approve of, recommend, vouch for, or otherwise positively advance the use of Vendor's products or Services without the prior written consent of the individual identified and the Board's Chief Communications Officer.

i.   **Access.** Any Student Data held by Vendor will be made available to the Board upon request of the Board. The identity of all persons having access to Student Data through Vendor will be documented and access will be logged.

j.   **Security Controls.** Vendor will store and process Student Data in accordance with the

DLF 000108

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

industry best practices. This includes appropriate administrative, physical, and technical safeguards to secure Student Data from unauthorized access, disclosure, and use. All data must be secured in transit using https/TLS 1.0+, or secure FTP services. Vendor is required to specify any Personally Identifiable Information (PII) collected or used by its Services. In addition, Vendor must maintain industry recognized security practices to establish secure application(s), network, and infrastructure architectures. Industry certifications, such as International Organization for Standardization (ISO), SysTrust, Cloud Security Alliance (CSA) STAR Certification, or WebTrust security for SaaS environments are recommended.

Such safeguards shall be no less rigorous than accepted industry practices, including specifically the NIST 800-53r4 moderate level, International Organization for Standardization's standards ISO/IEC 27001:2005 (Information Security Management Systems – Requirements), and ISO-IEC 27002:2005 (Code of Practice for International Security Management). Vendor shall ensure that the manner in which Student Data is collected, accessed, used, stored, processed, disposed of and disclosed complies with applicable data protection and privacy laws, as well as the terms and conditions of this Agreement. Vendor will conduct periodic risk assessments and remediate any identified security vulnerabilities in a timely manner. Vendor will also have a written incident response plan, to include prompt notification of the Board in the event of a security or privacy incident, as well as best practices for responding to a breach of Student Data security practices. Vendor agrees to share its incident response plan upon request.

Vendor shall assure that all data that is transmitted between the Board's access points and the ultimate server, by Vendor or its subcontractors, will use Board-approved encryption of no less rigor than NIST-validated DES standards.

k. **Security Safeguards:** Vendor agrees to provide the following additional safeguards:
   i.  Include component and system level fault tolerance and redundancy in system design.
   ii.  Encrypt user passwords in any data storage location and obfuscate password entry fields in any entry interface controlled by the discloser.
   iii.  Encrypt Student Data at-rest and in-transit.
   iv.  Authentication of users at login with a 128-bit or higher encryption algorithm.
   v.  Secure transmission of login credentials.
   vi.  Automatic password change routine.
   vii.  Trace user system access via a combination of system logs and Google Analytics.
   viii.  Secure (encrypt) the audit trails and system generated logs and ensure that they are stored in locations that are inaccessible to automated content discovery software.
   ix.  Conduct or undergo system level testing whenever new functionalities are added to the system to reconfirm system security measures are retained and functional, and that interaction with the Board systems is not degraded or compromised.
   x.  Employ an in-line Intrusion Protection System that inspects incoming data transmissions.
   xi.  Ensure that Student Data is stored in privately addressed network devices that have no direct interaction with public networks.
   xii.  Provide a documented disaster recovery plan that includes the following elements:
      a.  Available recovery times.
      b.  Conduct 24x7 system monitoring that is capable of detecting potential outages.

DLF 000109

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

    c.  Plans for File-level, Database and server recovery after a component/system failure, damage or compromise.

    d.  Substantial geographical separation between data centers hosting production, backup and redundant system elements.

    e.  Include recovery/mitigation procedures for all managed sites, including subcontractors, agents, and other recipients.

    f.  Include provisions for at least the following events:

        i.     Fire
        ii.    Natural disaster
        iii.   Sabotage
        iv.   Accidental human error
        v.     Flooding
        vi.   Equipment failure
        vii.  Application/database failure
        viii. Other unlikely events

    g.  No less than annual testing of the disaster recovery plan (at least parts that affect Student Data) with results of the test made available to the Board, as well as information about, and schedule for, the correction of deficiencies identified in the test.

xiii.  Prevention of hostile or unauthorized intrusion.

xiv.  Screening of employees with access to Student Data to assure that any employees who are in violation of the statutes referenced in the Criminal Background Check in the Agreement do not have access to Student Data. Vendor shall provide the security measures taken to ensure that said employees do not have access to Student Data.

xv.  Backup of all Student Data at least once every twenty-four (24) hours.

xvi.  Perform content snapshots at least daily and retain for at least ninety (90) days.

l.      **Data Security Manager:** Vendor shall provide the Board with the name and contact information for a primary and alternate employee of Vendor who shall serve as the Board's primary security contact and who shall be available to assist the Board twenty-four (24) hours per day, seven (7) days per week as a contact in resolving obligations associated with a Student Data-related security breach. The designated contact shall respond to any Board inquiries within two (2) hours.

11.11   Survival: The provisions of this Section shall survive the termination or expiration of this Agreement.

12.    Intellectual Property:

12.1   Intellectual Property Defined: Intellectual Property shall mean all trademarks, trade dress, copyrights and other intellectual property rights in the materials used in the performance of Services under this Agreement.

12.2   Board's Intellectual Property: Vendor agrees that all Confidential Information, as well as any intellectual property arising therefrom, and, to the extent permitted by law, any and all intellectual property developed by Vendor including all finished or unfinished, documents, screens, reports, writings, procedural manuals, forms, source code, object code, work flow charts, methods, processes, drawings, maps, files, records, computer printouts, designs, or other materials prepared in the performance of the Services ("Work Product") shall exclusively be deemed "works for hire" within the meaning and purview of the United States Copyright Act, 17 U.S.C. § 101 *et seq.* To the extent any Work Product does not qualify as a "work for hire," Vendor irrevocably grants, assigns,

DLF 000110

and transfers to the Board all right, title, and interest in and to the Work Product in all media throughout the world in perpetuity and all intellectual property rights therein, free and clear of any liens, claims, or other encumbrances, to the fullest extent permitted by law. Any intellectual property or other documents and materials created by the Board either alone or in cooperation with Vendor in connection with the Services ("Board Materials") shall be the property of the Board. Board Materials shall exclude any and all (i) third party intellectual property, and (ii) pre-existing Vendor intellectual property that is delivered to the Board as part of the Services. Vendor shall execute all documents and perform all acts that the Board may request in order to assist the Board in perfecting or protecting its rights in and to intellectual property rights as defined in this Section. Upon written agreement signed by the authorized representatives of each party and approved by the Board's General Counsel, Vendor may be licensed to use the Board's intellectual property for specifically defined uses and terms.

12.3    Vendor's Intellectual Property: All intellectual property possessed, owned or licensed by Vendor prior to, created in, or concurrently with the performance of Services under this Agreement that pertain to the instruction or teaching of the Transcendental Meditation program or technique and that are not within the definition of Work Product shall be and remain at all times "Vendor's intellectual property", provided that none of the Board's Confidential Information is used or disclosed in Vendor's intellectual property. In the event that any of the Board's Confidential Information is used or disclosed in any intellectual property, the Board shall have full and exclusive ownership rights to such intellectual property.   Other than as may be expressly stated elsewhere in this Agreement, Vendor grants to the Board a royalty free (other than fees identified in this Agreement), non-transferable license to use such of Vendor's intellectual property as may be necessary for the receipt and use of the Services for educational, non-commercial purposes through the Term of this Agreement, including any Renewal Terms.

12.4    Third Party Intellectual Property: Vendor represents and warrants to the Board that Vendor, in connection with providing the Services, will not infringe on any presently existing United States patent, copyright, trademark, service mark, trade secret and/or other confidentiality or proprietary right of any person or other third party.

12.5    Survival: The obligations set forth in this Section shall survive the termination or expiration of this Agreement.

13.    Representations and Warranties of Vendor: Vendor represents and warrants that the following shall be true and correct as of the Effective Date of this Agreement and shall continue to be true and correct during the Term of this Agreement.

13.1    Licensed Professionals: Vendor is appropriately licensed under Illinois law to perform Services required under this Agreement and shall perform no Services for which a professional license is required by law and for which Vendor, its employees, agents, or subcontractors, as applicable, are not appropriately licensed.

13.2    Compliance with Laws: Vendor is and shall remain in compliance with all  applicable federal, state, county, and municipal, statutes, laws, ordinances, and regulations relating to this Agreement and the performance of Services in effect now or later and as amended from time to time, including but not limited to the Prevailing Wage Act, 820 ILCS 130/1 et seq., the Drug-Free Workplace Act, the Illinois Student Records Act, the Family Educational Rights and Privacy Act, the Protection of Pupil Rights Act and any others relating to non-discrimination. Further, Vendor is and shall remain in compliance with all applicable Board policies and rules. Board policies and rules are available at http://www.cps.edu/.

DLF 000111

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

13.3    Good Standing: Vendor is not in default and has not been deemed by the Board to be in default under any other Agreement with the Board during the five (5) year period immediately preceding the effective date of this Agreement.

13.4    Authorization: In the event Vendor is an entity other than a sole proprietorship, Vendor represents that it has taken all action necessary for the approval and execution of this Agreement, and execution by the person signing on behalf of Vendor is duly authorized by Vendor and has been made with complete and full authority to commit Vendor to all terms and conditions of this Agreement which shall constitute valid, binding obligations of Vendor.

13.5    Financially Solvent: Vendor warrants that it is financially solvent, is able to pay all debts as they mature and is possessed of sufficient working capital to complete all Services and perform all obligations under this Agreement.

13.6    Gratuities: No payment, gratuity or offer of employment was made by or to Vendor, any of its members if a joint venture or, to the best of Vendor's knowledge after due inquiry, by any of its subcontractors, in relation to this Agreement or as an inducement for award of this Agreement. Vendor is and shall remain in compliance with all applicable anti-kickback laws and regulations.

13.7    Contractor's Disclosure Form: The disclosures in the Contractor Disclosure Form, previously submitted by Vendor, are true and correct. Vendor shall promptly notify Board in writing of any material change in information set forth therein, including but not limited to change in ownership or control, and any such change shall be subject to Board approval which shall not be unreasonably withheld.

13.8    Criminal History Records Search: Vendor represents and warrants that, at its own cost and expense, it shall have a complete fingerprint-based criminal history records check conducted on all employees, agents, volunteers and subcontractors who may have contact with CPS students (individually and collectively "Staff") in accordance with the Illinois School Code (105 ILCS 5/34-18.5); the Sex Offender and Child Murderer Community Notification Law (730 ILCS 152/101 et seq.); and the Murderer and Violent Offender Against Youth Registration Act (730 ILCS 154/1 et seq.) ("Records Check"). It is understood and acknowledged that contact via text messages, live chats, emails or through any other means shall be considered "contact" for the purposes of this Section. A complete Records Check includes the following:

(a)    Fingerprint-based checks through the Illinois State Police and the FBI;
(b)    A check of the Illinois Sex Offender Registry;
(c)    A check of the National Sex Offender Registry maintained by the U.S. Department of Justice; and
(d)    A check of the Violent Offender Against Youth Database.

The purpose of the Records Check is to confirm that none of these persons have been convicted of any of the criminal or drug offenses enumerated in subsection (c) of 105 ILCS 5/34-18.5 or any offenses enumerated under the Sex Offender and Child Murderer Community Notification Law or the Murderer and Violent Offender Against Youth Registration Act, or have been convicted within the past seven (7) years of any other felony under the laws of Illinois or of any offense committed or attempted in any other state or against the laws of the United States that, if committed or attempted in the State of Illinois, would have been punishable as a felony under the laws of Illinois.

DLF 000112

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

Vendor shall not allow any of its Staff to have contact with a CPS student until a Records Check has been conducted for that person and the results of the Records Check satisfy the requirements of 105 ILCS 5/34-18.5 and the requirements of all other Acts and Laws referenced in this Section, as may be amended. Within fifteen (15) business days before any Staff has contact with any CPS students and on or before the Agreement's anniversary date(s) during the Term and any Renewal Term, Vendor shall submit a written report to CPS's Chief Officer of Safety & Security and/or its Deputy Chief of Network Security ("CPS Safety Officer"). The report shall include at least the following information:

1) the specific method of completing the Records Check;
2) the names of each Staff member who satisfactorily passed the Records Check within the quarter before s/he has any contact with a CPS student; and
3) the procedure to update each Staff member's Records Check through the Term of the Agreement, including any Renewal Terms (intervals between each Staff member's updates shall not be less than annually).

On a quarterly basis thereafter, Vendor shall: i) periodically check the Illinois Violent Offender Against Youth Registry and the Illinois Sex Offender Registry for each Staff member who has contact with students and shall immediately remove any Staff member who may be identified on either registry; ii) provide a written report to CPS's Safety Officer listing the names of all new Staff members who have contact with CPS students and certifying that Records Checks were satisfactorily completed for those individuals before s/he had any contact with CPS students; and iii) provide any other information requested by the Board.

If Vendor fails to comply with this Section, in whole or in part, then, in addition to the Remedies set forth in this Agreement, the Board may exercise additional remedies, including but not limited to: (i) withholding payments due under this Agreement and any others that Vendor may have with the Board; (ii) immediately terminating this Agreement, in whole or in part, without any further obligation by the Board of any kind; or (iii) seeking liquidated damages.

13.9    Research Activities and Data Requests: Vendor shall not conduct research in the Chicago Public Schools or use Confidential Information for research purposes. In the event Vendor seeks to conduct research activities in the Chicago Public Schools or use Confidential Information for purposes in connection with this Agreement or for any other purposes, Vendor shall comply with the Board's Research Study and Data Policy adopted on July 28, 2010 (10-0728-PO1), as may be amended from time to time. Vendor acknowledges and agrees that it may not begin any research activities or obtain data for research purposes without the prior written consent of the Director of Performance Data and Policy or his or her designee.

13.10   Free of Computer Viruses: Vendor shall use commercially reasonable best efforts to ensure that the Services and any technology used in the performance of Services are free of malicious code, malware, Trojan horses, ransomware, worms, and other computer viruses.

13.11   Prohibited Acts: Within the three (3) years prior to the effective date of this Agreement, Vendor or any of its members if a joint venture or a limited liability company, or any of its or their respective officers, directors, shareholders, members, managers, other officials, agents or employees (i) have not been convicted of bribery or attempting to bribe a public officer or employee of any public entity and (ii) have not been convicted of agreeing or colluding among

DLF 000113

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

contractors or prospective contractors in restraint of trade, including bid-rigging or bid-rotating, as those terms are defined under the Illinois Criminal Code.

13.12    Debarment and Suspension: Vendor represents and warrants to the best of knowledge and belief, after due inquiry, that:

i.    it, its principals, and its subcontractors providing Services under this Agreement are not barred from contracting with any unit of state or local government as a result of a violation of either Section 33E-3 (bid-rigging) or Section 33E-4 (bid-rotating) of the Illinois Criminal Code (720 ILCS 5/33A *et seq.*);

ii.    it, its principals, and its subcontractors providing Services under this Agreement are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participation in this transaction by any federal department or agency or any unit of State or local government; and

iii.    it, its principals, and its subcontractors providing Services under this Agreement have not violated the rules, regulations, or laws of any federal, state, or local government unit or agency.

"Principals" for the purposes of this certification means officers, directors, owners, partners, persons having primary management or supervisory responsibilities within a business entity; and, if a joint venture is involved, each joint venture member and the principals of each such member.

13.13    Continued Disclosure Requirement: If at any time during the Term of the Contract or during any Renewal Terms Vendor becomes aware of any change in the circumstances that makes the representations and warranties stated above no longer true, Vendor must immediately disclose such change to the Board in accordance with the Notice provision of this Agreement.

13.14    Survival: All warranties in this Section shall survive inspection, acceptance, payment, expiration, and termination of this Agreement. Nothing in the foregoing warranties shall be construed to limit any other rights or remedies available to the Board under the law and this Agreement.

14.    Independent Contractor: It is understood and agreed that the relationship of Vendor to the Board is and shall continue to be that of an independent contractor and neither Vendor nor any of Vendor's employees shall be entitled to receive Board employee benefits. As an independent contractor, Vendor agrees to be responsible for the payment of all taxes and withholdings specified by law which may be due in regard to compensation paid by the Board. To the extent that Vendor is subject to taxes under Section 4980H of the Internal Revenue Code, Vendor shall be solely responsible for paying such taxes. Vendor agrees that neither Vendor nor its employees, staff or subcontractors shall represent themselves as employees or agents of the Board. Vendor shall provide the Board with a valid taxpayer identification number as defined by the United States Internal Revenue Code, including but not limited to, a social security number or federal employer identification number.

15.    Indemnification: Vendor agrees to defend, indemnify, and hold harmless the Board, its members, employees, agents, officers and officials from and against liabilities, losses, penalties, damages, and expenses, including costs and attorney fees, arising out of all claims, liens, damages, obligations, actions, suits, judgments or settlements, or causes of action, of every kind, nature, and character (collectively "Claims") arising or alleged to arise out of the acts or omissions of the Vendor, its officials, agents and employees and subcontractors in the performance of this Agreement. The foregoing obligation extends to and is intended to encompass any and all Claims that the Services infringe, misappropriate, or otherwise violate any confidentiality, proprietary or intellectual property rights of a third party.

DLF 000114

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

Furthermore, in the event that the Board is determined to be liable for taxes under Section 4980H of the Internal Revenue Code as a result of its use of Vendor's employees under this Agreement, Vendor shall indemnify the Board for any such liability. And, in the event of unauthorized access, use, or disclosure of the Board's Confidential Information arising or alleged to arise from the acts or omissions of Vendor, its employees, agents, or subcontractors, in addition to the obligations provided in this Section, Vendor shall cover any costs or fees associated with (i) providing notices of a data breach to effected persons and to regulatory bodies and (ii) remedying and otherwise mitigating any potential damages or harm from the data breach, including but not limited to call centers and providing credit monitoring or credit restoration services as may be requested by the Board.

Vendor shall, at its own cost and expense, appear, defend and pay all attorney fees and other costs and expenses arising hereunder. In addition, if any judgment shall be rendered against the Board in any such action, the Vendor shall, at its own expense, satisfy and discharge such obligation of the Board. The Board shall have the right, at its own expense, to participate in the defense of any suit, without relieving the Vendor of any of its obligations hereunder. The Board retains final approval of any and all settlements or legal strategies which involve the interest of the Board.

However, if Vendor, after receiving notice of any such proceeding, fails to immediately begin the defense of such claim or action, the Board may (without further notice to Vendor) retain counsel and undertake the defense, compromise, or settlement of such claim or action at the expense of Vendor, subject to the right of Vendor to assume the defense of such claim or action at any time prior to settlement, compromise or final determination thereof. The cost and expense of counsel retained by the Board in these circumstances shall be borne by Vendor and Vendor shall be bound by, and shall pay the amount of, any settlement, compromise, final determination or judgment reached while the Board was represented by counsel retained by the Board pursuant to this paragraph, or while Vendor was conducting the defense.

To the extent permissible by law, Vendor waives any limits to the amount of its obligations to defend, indemnify, hold harmless, or contribute to any sums due under any losses, including any claim by any employee of Vendor that may be subject to the Workers Compensation Act, 820 ILCS 305/1 *et seq.* or any other related law or judicial decision (such as *Kotecki v. Cyclops Welding Corp.*, 146 Ill.2d 155 (1991)). The Board, however, does not waive any limitations it may have on its liability under the Illinois Workers Compensation Act, the Illinois Pension Code, or any other statute or judicial decision.

The indemnities set forth herein shall survive the expiration or termination of this Agreement.

16.     **Non-Liability of Board Officials:** Vendor agrees that no Board member, employee, agent, officer or official shall be personally charged by Vendor, its members if a joint venture, or any subcontractors with any liability or expense under this Agreement or be held personally liable under this Agreement to Vendor, its members if a joint venture, or any subcontractors.

17.     **Board Not Subject to Taxes:** The federal excise tax does not apply to the Board and the State of Illinois sales tax does not apply to the Board by virtue of Exemption No. E9997-7109. The compensation set in the Schedule of Compensation is inclusive of all other taxes that may be levied or based on this Agreement, including without limitation sales, use, nonresident, value-added, excise, and similar taxes levied or imposed on the Services to be provided under this Agreement, but excluding taxes levied or imposed on the income or business privileges of the Vendor. The Vendor shall be responsible for any taxes levied or imposed upon the income or business privileges of the Vendor.

18.     **Insurance:** Vendor, at its own expense, shall procure and maintain insurance covering all operations under this Agreement, whether performed by Vendor or by subcontractors. All insurers shall be

DLF 000115

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

licensed by the State of Illinois and rated A-VII or better by A.M. Best or a comparable rating service. Vendor shall submit to the Board satisfactory evidence of insurance coverage and upon request, shall promptly provide a certified copy of any applicable policy of insurance. Minimum insurance requirements include the coverage set forth below:

18.1 **Workers' Compensation and Employers' Liability Insurance:** Workers' Compensation Insurance affording workers' compensation benefits for all employees as required by law and Employers' Liability Insurance covering all employees who are to provide Services under this Agreement with limits of not less than One Million Dollars ($1,000,000.00) per occurrence. The workers' compensation policy must contain a waiver of subrogation clause.

18.2 **Commercial General Liability Insurance (Primary and Umbrella):** Commercial General Liability Insurance or equivalent with limits of not less than One Million Dollars ($1,000,000.00) per occurrence and Two Million Dollars ($2,000,000) in the aggregate for bodily injury, personal injury and property damage liability. Coverage shall include, but not be limited to: all operations, contractual liability, independent contractors, products/completed operations (for a minimum of two (2) years following completion), and defense. Coverage must include and not exclude sexual abuse and molestation claims.

18.3 **Automobile Liability Insurance:** Automobile Liability Insurance when any motor vehicle (whether owned, non-owned or hired) is used in connection with Services to be performed, with limits of not less than One Million Dollars ($1,000,000.00) per occurrence for bodily injury and property damage.

18.4 **Umbrella/Excess Liability Insurance:** Umbrella or Excess Liability Insurance with limits not less than Two Million Dollars ($2,000,000.00) per occurrence, which will provide additional limits for Vendor's general and automobile liability insurance. Vendor may satisfy the limits of insurance required herein with any combination of primary and umbrella/excess insurance policies.

18.5. **Professional Liability/Errors and Omissions:** When any professionals perform Services in connection with this Agreement, Professional Liability Insurance covering acts, errors, or omissions in conjunction with the professional services must be maintained with limits of not less than Two Million Dollars ($2,000,000.00) each claim. Coverage must include contractual liability. When policies are renewed or replaced, the policy retroactive date must coincide with or precede start of Services under this Agreement. A claims-made policy, which is not renewed or replaced, must have an extended reporting period of two (2) years following completion of professional services.

18.6 **Additional Insured:** Vendor shall have its General, Umbrella and Automobile Liability Insurance policies endorsed to provide that "the Board of Education of the City of Chicago, a body politic and corporate, and its members, employees and agents, and any other entity as may be designated by the Board are named as additional insured on a primary basis without recourse or right of contribution from the Board".

The insurance company, or its representative, shall submit an insurance certificate evidencing all coverage as required hereunder and indicating the Additional Insured status as required above. The Board will not pay Vendor for any Services if satisfactory proof of insurance is not provided by Vendor prior to the performance of any Services. The Certificate must provide thirty (30) days prior written notice of material change, cancellation, or non-renewal be given to:

DLF 000116

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

Risk Management
Board of Education of the City of Chicago
42 West Madison, 2nd Floor
Chicago, Illinois 60602
riskmanagement@cps.edu

Any failure of the Board to demand or receive proof of insurance coverage shall not constitute a waiver of Vendor's obligation to obtain the required insurance. The receipt of any certificate does not constitute agreement by the Board that the insurance requirements in this Agreement have been fully met or that the insurance policies indicated on the certificate are in compliance with all Agreement requirements. Vendor's failure to carry or document required insurance shall constitute a breach of the Vendor's Agreement with the Board. In the event Vendor fails to fulfill the insurance requirements of this Agreement, the Board reserves the right to stop the Services until proper evidence of insurance is provided, or this Agreement may be terminated.

Any deductibles or self-insured retentions on referenced insurance coverage must be borne by Vendor. Any insurance or self-insurance programs maintained by the Board of Education do not contribute with insurance provided by the Vendor under this Agreement.

All subcontractors are subject to the same insurance requirements of Vendor unless otherwise specified in this Agreement. The Vendor shall require any subcontractors under this Agreement to maintain comparable insurance naming the Vendor, the Board inclusive of its members, employees and agents, and any other entity designated by the Board, as Additional Insureds. The Vendor will maintain a file of subcontractor's insurance certificates evidencing compliance with these requirements.

The coverage and limits furnished by Vendor in no way limit the Vendor's liabilities and responsibilities specified within this Agreement or by law. The required insurance is not limited by any limitations expressed in the indemnification language in this Agreement, if any, or any limitation that might be placed on the indemnity in this Agreement given as a matter of law.

The Vendor agrees that insurers waive their rights of subrogation against the Board.

Vendor must register with the insurance certificate monitoring company designated by the Board and indicated below, and must maintain a current insurance certificate on file during the entire time of providing services to the Board. Vendor must register and pay the initial annual monitoring fee to the insurance certificate monitoring company prior to performing services for the Board. The initial annual monitoring fee is currently Twelve Dollars ($12.00) per year, but the fee may subject to change.

Each year, Board-approved, registered vendors will be notified 30 to 45 days prior to the expiration date of their required insurance coverage (highlighted on their latest submitted insurance certificate on file) in order to submit an updated insurance certificate with the insurance certificate monitoring company. Insurance certificate submissions and related annual fees are required to be made online at the dedicated website established by the certificate monitoring company (see URL below). Should you have any questions on submissions and payment options, you can contact the certificate monitoring company.

Certificate Monitoring Company:

DLF 000117

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

Topiary Communications Inc.
676 N. LaSalle - Suite 230
Chicago, IL 60654
Phone: (312) 494-5709
Email: dans@topiarycomm.net
www.cpsvendorcert.com (designated website for online
registration, insurance certificate submissions and annual fee
payments)

19.     **Audit and Records Retention**: Vendor shall permit and cooperate in good faith in any audits by the Board, including its Department of Procurement and Contracts, or its agents for compliance by the Vendor with this Agreement. Vendor shall furnish the Board with such information, supporting documentation and reports as may be requested relative to the progress, execution and costs of the Services and compliance with applicable MBE/WBE requirements. Failure of the Vendor to comply in full and cooperate with the requests of the Board or its agents shall give the Board, in addition to all other rights and remedies hereunder, the right to charge the Vendor for the cost of such audit.

Vendor shall retain all records relating to Vendor's Services under this Agreement for five (5) years after the termination or expiration of this Agreement and such records shall be subject to inspection and audit by the Board. If any audit, litigation or other action involving the records is being conducted or has not been resolved, all applicable records must be retained until the proceeding is closed. As used in this clause "records" includes correspondence (including emails), receipts, vouchers, memoranda and other data, regardless of type and regardless of whether such items are in written form, electronic, digital, or in any other form. Vendor shall require all of its subcontractors to maintain the above-described records and allow the Board the same right to inspect and audit said records as set forth herein.

20.     **Minimum Wage**: Vendor must comply with the Board's Minimum Wage Resolution (14-1217-RS2) and any applicable regulations issued by the Board's CPO. The Board's resolution adopts Chicago Mayoral Executive Order 2014-1. As of December 17, 2014 the minimum wage to be paid pursuant to the Resolution is $13.00 per hour (the "Minimum Wage"). A copy of the Mayoral Order may be downloaded from the Chicago City Clerk's website at: http://chicityclerk.com/wp-content/uploads/2014/09/Executive-Order-No.-2014-1.pdf; the Board's Resolution may be downloaded from the Chicago Public School's website at: http://www.cpsboe.org/content/actions/2014_12/14-1217-RS2.pdf. In the event of any discrepancy between the summary below and the Resolution and Order, the Resolution and Order shall control.

Vendor must: (i) pay its employees no less than the Minimum Wage for work performed under the Agreement; and (ii) require any subcontractors, sublicensees, or subtenants, to pay their employees no less than the Minimum Wage for work performed under the Agreement.

The Minimum Wage must be paid to: 1) All employees regularly performing work on property owned or controlled by the Board or at a Board jobsite and 2) All employees whose regular work entails performing a service for the Board under a Board contract.

Beginning on July 1, 2015, and every July 1 thereafter, the Minimum Wage shall increase in proportion to the increase, if any, in the Consumer Price Index for All Urban Consumers most recently published by the Bureau of Labor Statistics of the United States Department of Labor, and shall remain in effect until any subsequent adjustment is made. On or before June 1, 2015, and on or before every June 1 thereafter, the City of Chicago may issue bulletins announcing adjustments to the Minimum Wage for the upcoming year.

DLF 000118

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

The Minimum Wage is not required to be paid to employees whose work is performed in general support of Vendor's operations, does not directly relate to the services provided to the Board under the Agreement, and is included in the contract price as overhead, unless that employee's regularly assigned work location is on property owned or controlled by the Board or at a Board. It is also not required to be paid by employers that are 501(c)(3) not-for-profits.

The term 'employee' as used herein does not include persons subject to subsection 4(a)(2), subsection 4(a)(3), subsection 4(d), subsection 4(e), or Section 6 of the Illinois Minimum Wage Law, 820 ILCS 105/1 et seq., in force as of the date of this Agreement or as amended. Nevertheless, the Minimum Wage is required to be paid to those workers described in subsections 4(a)(2)(A) and 4(a)(2)(B) of the Illinois Minimum Wage Law.

The Minimum Wage is not required to be paid to employees subject to a collective bargaining agreement that provides for different wages than those required by the Board's Resolution, if that collective bargaining agreement was in force prior to December 17, 2014 or if that collective bargaining agreement clearly and specifically waives the requirements of the Resolution.

If the payment of a prevailing wage is required and the prevailing wage is higher than the Minimum Wage, then the Vendor must pay the prevailing wage.

21.     **MBE/WBE Program:** Vendor acknowledges that it is familiar with the requirements of the Board's *"Remedial Program for Minority and Women Owned Business Enterprise Participation in Goods and Services Agreements"*, which is incorporated by reference as if fully set forth herein. Vendor agrees to adhere to the minimum participation goals and to all other applicable MBE/WBE requirements as set forth in the program. Vendor agrees to submit such documentation in connection with the program as may be requested by the Board.

22.     **Notices:** All notices required under this Agreement shall be in writing and sent to the addresses and persons set forth below, or to such other addresses as may be designated by a party in writing. All notices shall be deemed received when (i) delivered personally, or (ii) one day after deposit with a commercial express courier specifying next day delivery, with written verification of receipt. Refusal to accept delivery has the same effect as receipt.

|  |  |
|---|---|
| **IF TO THE BOARD:** | Office of College and Career Success<br>Board of Education of the City of Chicago<br>42 W. Madison Street<br>Chicago, IL 60602 |
| Copy to: | General Counsel<br>Board of Education of the City of Chicago<br>1 North Dearborn, 9th Floor<br>Chicago, IL 60602<br>Fax: (773) 553-1701 |
| **IF TO VENDOR:** | David Lynch Foundation for Consciousness Based Education and World Peace<br>Attn: Julia Busch<br>228 East 45th Street, 15th Floor |

DLF 000119

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

New York, NY 10017

23.    **Right of Entry:** Vendor and any of its officers, employees, subcontractors or agents, performing Services hereunder shall be permitted to enter upon Board property in connection with the performance of the Services hereunder, subject to the terms and conditions contained herein and those rules established by the Board and the subject school principal. Vendor shall provide advance notice to the Board whenever applicable, of any such intended entry. Consent to enter upon a site given by the Board shall not create, nor be deemed to imply, the creation of any additional responsibilities on the part of the Board. Vendor shall use, and shall cause each of its officers, employees and agents to use, the highest degree of care when entering upon any property owned by the Board in connection with the Services. Any and all claims, suits or judgments, costs, or expenses, including reasonable attorney fees, arising from, by reason of, or in connection with any such entries shall be treated in accordance with the applicable terms and conditions of this Agreement, including without limitation, the indemnification provisions contained in this Agreement.

24.    **Non-Discrimination:** It shall be an unlawful employment practice for Vendor or any of its subcontractors to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to compensation, or other terms, conditions, or privileges of employment, because of such individual's race, color, national origin, religion, sex, gender identity/expression, sexual orientation, age or disability; or to limit, segregate, or classify employees or applicants for employment in any way that would deprive or tend to deprive any individual from equal employment opportunities or otherwise adversely affect an individual's status as an employee because of such individual's race, color, national origin, religion, sex, gender identity/expression, sexual orientation, age or disability. Vendor shall particularly remain in compliance at all times with: the Civil Rights Act of 1964, 42 U.S.C.A. §2000a, *et seq.*, as amended; the Age Discrimination in Employment Act, 29 U.S.C.A. §621, *et seq.*; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C.A. §701, *et seq.*, as amended; the Americans with Disabilities Act, 42 U.S.C.A. §12101, *et seq.*; the Illinois Human Rights Act, 775 ILCS 5/1-101, *et seq.*, as amended; the Illinois School Code, 105 ILCS 5/1-1 *et seq.*; the Illinois Public Works Employment Discrimination Act, 775 ILCS 10/0.01 *et seq.*; the Individuals with Disabilities Education Act (IDEA) 20 U.S.C.A. §1400 *et seq.*; and, the Chicago Human Rights Ordinance, ch. 2-160 of the Municipal Code of Chicago, and all other applicable federal statutes, regulations and other laws. Nothing in this paragraph is intended nor shall be construed to create a private right of action against the Board or any of its employees. Furthermore, no part of this paragraph shall be construed to create contractual or other rights or expectations for the Vendor's employees or the Vendor's subcontractors' employees.

25.    **Entire Agreement and Amendment:** This Agreement, including all exhibits attached to it and incorporated into it, constitutes the entire agreement of the parties with respect to the matters contained herein. All attached exhibits are incorporated into and made a part of this Agreement. No modification of or amendment to this Agreement shall be effective unless such modification or amendment is in writing and signed by both parties hereto. Any prior agreements or representations, either written or oral, relating to the subject matter of this Agreement are of no force or effect.

26.    **Governing Law:** This Agreement shall be governed as to performance and interpretation in accordance with the laws of the State of Illinois. Vendor irrevocably submits itself to the original jurisdiction of those courts located in the County of Cook, State of Illinois, with regard to any controversy arising out, or relating to, or in any way concerning the execution or performance of this Agreement. Vendor agrees that service of process on the Vendor may be made, at the option of the Board, by either registered or certified mail addressed to the office identified in the notice provision herein, by registered or certified mail addressed to the office actually maintained by the Vendor, or by personal delivery on any officer, director, or managing or general agent of the Vendor. If any action is brought by the Vendor against

DLF 000120

the Board concerning this Agreement, the action shall only be brought in those courts located within the County of Cook, State of Illinois.

27.     **Continuing Obligation to Perform:** In the event of any dispute between Vendor and Board, Vendor shall expeditiously and diligently proceed with the performance of all its obligations under this Agreement with a reservation of all rights and remedies it may have under or pursuant to this Agreement at law or in equity.

28.     **Conflict of Interest:** This Agreement is not legally binding on the Board if entered into in violation of the provisions of 105 ILCS 5/34-21.3, which restricts the employment of, or the letting of contracts to, former Board members within a one year period following expiration or other termination of their office.

29.     **Indebtedness:** The Vendor agrees to comply with the Board's Indebtedness Policy adopted June 26, 1996 (96-0626-PO3), as amended from time to time, which policy is hereby incorporated by reference into and made a part of this Agreement as fully set forth herein.

30.     **Ethics:** No officer, agent or employee of the Board is or shall be employed by the Vendor or has or shall have a financial interest, directly, or indirectly, in this Agreement or the compensation to be paid hereunder except as may be permitted in writing by the Board's Ethics Policy adopted May 25, 2011 (11-0525-PO2), as amended from time to time, which policy is hereby incorporated by reference into and made a part of this Agreement as fully set forth herein.

31.     **Inspector General:** Each party to this Agreement hereby acknowledges that in accordance with 105 ILCS 5/34-13.1, the Inspector General of the Board of Education of the City of Chicago has the authority to conduct certain investigations and that the Inspector General shall have access to all information and personnel necessary to conduct those investigations.

32.     **Waiver:** No delay or omission by the Board to exercise any right hereunder shall be construed as a waiver of any such right and the Board reserves the right to exercise any such right from time to time as often and as may be deemed expedient.

33.     **Freedom of Information Act:** Vendor acknowledges that this Agreement and all documents submitted to the Board related to the contract award are a matter of public record and are subject to the Illinois Freedom of Information Act (5 ILCS 140/1) and any other comparable state and federal laws and that this Agreement is subject to the reporting requirements under 105 ILCS 5/10-20.44. Vendor further acknowledges that this Agreement shall be posted on the Board's website.

34.     **Authority:** Vendor understands and agrees that Vendor is not an authorized representative of the Board or the Chicago Public Schools. All agreements and approvals (written or verbal) of the Board or the Chicago Public Schools must be made by authorized Board employee(s).

35.     **Survival/Severability.** All express representations or indemnifications made or given in this Agreement shall survive the completion of Services or the termination of this Agreement for any reason. If any provision or part of this Agreement is held to be unenforceable, the Agreement shall be considered divisible and such provision shall be deemed inoperative to the extent it is deemed unenforceable, and in all other respects the Agreement shall remain in full force and effect; provided, however, that if any such provision may be made enforceable by limitation thereof, then such provision shall be deemed to be so limited and shall be enforceable to the maximum extent permitted by applicable law.

DLF 000121

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

36. **Joint and Several Liability**. In the event that Vendor, or its successors or assigns, if any, is comprised of more than one individual or other legal entity (or a combination thereof, then, and in that event, each and every obligation or undertaking herein stated to be fulfilled or performed by Vendor shall be the joint and several obligation or undertaking of each such individual or other legal entity.

37. **Counterparts and Facsimiles**. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute but one instrument. A signature delivered by facsimile or electronic means shall be considered binding for both parties.

[Signature page to follow]

DLF 000122

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

**BOARD OF EDUCATION OF THE CITY OF CHICAGO**

By: _____

    Frank M. Clark, President

Attest: _____ 4/23/18

    Estela G. Beltran, Secretary

Date: _____4/23/18_____

By: _____

Janice K. Jackson EdD, Chief Executive Officer

**Board Report No.:** 18-0228-PR2-1

Approved as to legal form:

_____

Joseph Moriarty, General Counsel

**Attachments:**

Exhibit A: Scope of Services

**DAVID LYNCH FOUNDATION FOR CONSCIOUSNESS BASED EDUCATION AND WORLD PEACE**

By: _____

Name: Julia Busch

Title: Regional Director - Chicago

Date: April 11, 2018

DLF 000123

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

EXHIBIT A

SCOPE OF SERVICES

Name of Project: Quiet Time

| | | |
|---|---|---|
| CPS Project Manager: Justina Schlund | Phone: 773/553-5058 | E-Mail: jlschlund@cps.edu |
| Vendor's Project Manager: Julia Busch | Phone: 641-919-8888 | E-Mail: Julia@davidlynchfoundation.org |

This Scope of Services will be conducted pursuant to the terms and conditions of that Services Agreement (the "**Agreement**") dated March 1, 2018 by and between David Lynch Foundation For Consciousness Based Education and World Peace ("**Vendor**") and The Board of Education of the City of Chicago (the "Board"), commonly known as The Chicago Public Schools ("**CPS**"). Defined terms used in this Scope of Services will have the same meanings as those ascribed to such terms in the Agreement.

I.      Summary:

Stress is a major health epidemic in the United States; in particular, trauma and toxic stress experienced at a young age. Studies show two out of three children experience trauma at some point in their young lives. This is highly significant because research has shown repeated childhood trauma to be the top predictor of student misbehavior and the number two predictor of academic failure.

The meditation-based Quiet Time program is a simple, but powerful answer to this problem. By relieving stress and enhancing cognitive function, the program supports healthy social-emotional development, positive school climate, and higher academic achievement. Quiet Time involves the introduction of two restful 15-minute periods into the day in which youth in traditional schools, alternative schools and juvenile detention centers have the opportunity to experience a peaceful break in their lives, providing a counterbalance to the hyper-stimulating tension of urban culture. The key component of Quiet Time is an evidenced-based stress reduction and cognitive development technique known as Transcendental Meditation® (TM). If youth choose not to meditate, they are free to select another quiet activity, such as sustained silent reading, resting or quiet sitting.

II.      Goals and Objectives:

Quiet Time will positively affect the stress response enough to meaningfully impact students, leading to reduced negative behaviors and improved academic performance.

III.      Program Structure:

Vendor will provide the Services below at the following schools: Gage Park and Daniel Hale Williams Prep School of Medicine.

DLF 000124

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

| Stage | Key Activities | Target dates |
|---|---|---|
| **Stage 1:** Re-engage program with School Faculty and Administrators | <ul><li>Provide teachers and administrators an overview of the Quiet Time program, including structure, content and purpose.</li><li>Offer meditation instruction and training to those teachers and administrators who have not yet learned and any new faculty.</li><li>Provide teachers with the training to oversee the Quiet Time program in their classrooms.</li><li>Provide teachers on-going support in their meditation practice</li></ul> | <ul><li>TM presentations and orientations (1 hour) will be scheduled the first month for those who have not learned TM.</li><li>TM training will be offered to all faculty and staff who have not already taken the training last year (involves 4 consecutive days for 1 hr per day). Several courses will be offered to accommodate schedules.</li><li>Regular TM check-ins and support on site throughout the school year.</li></ul> |
| **Stage 2:** Introduction to Parents and Students | <ul><li>Provide written information to parents and obtain permission from parents</li><li>Introduce students to the program and organize their orientation for TM instruction</li><li>Four-Day TM Core Course for Students<ul><li>The course is taught over four consecutive days. On each day, students meet for one class period, or for a full hour, if this can be arranged.</li><li>On the first day, students meet one-on-one with a Quiet Time instructor or in small groups of 3 - 4 to learn the technique and have their first experience with meditation.</li><li>On days 2-4, students meet in small groups to gain intellectual understanding of the practice they have learned.</li></ul></li></ul> | Parents<ul><li>Parent presentations may be offered, but not required and scheduled at each site, as convenient.</li><li>Permission slips will be sent home for parent signatures, with follow up reminders to students and parents to return signed slips. (Ongoing with target of 50% of permission slips returned in first month). A one page FAQ will be included.</li></ul>Students<ul><li>TM training will be offered at each site to the whole student population (last year's controls and freshman).</li><li>TM presentations and orientations will be scheduled, with a rolling schedule to accommodate the selected groups at each site.</li><li>TM training for students will be scheduled in groups</li><li>Regular TM check-ins and support on site throughout the school year for students who took the training last year and for the students who will learn</li></ul> |

DLF 000125

THIS AGREEMENT WILL BE POSTED ON THE CPS INTERNET WEBSITE

| | | this spring. |
|---|---|---|
| Stage 3:<br><br>On-Going Quiet Time Implementation | • Daily practice in Quiet Time<br>• On-going student follow-up, including:<br> o Individual or small group check-ins lasting 20 to 25 minutes, two- to three-times in the spring semester after instruction<br> o Short reviews prior to Quiet Time sessions in classroom<br> o Special curriculum on topics such as coping with stress, or meditation and the brain presented to a whole class. These discussions are held once or twice a semester. Units on the relevance of meditation for health, learning, or brain development can also be integrated into science, health, or learning skills classes.<br> o Design and oversight of incentive and accountability systems to support student meditation practice.<br> o Optional ½ day youth conference on topics such as creation of peaceful neighborhoods. | • TM trainings and subsequent daily practice will start as soon as students have turned in permission forms. |

IV.     Payment Schedule:

David Lynch Foundation will invoice CPS for actual Services provided in accordance with the schedule below. Under no circumstances will the total compensation exceed $170,000.00.

| Invoice Date | Payment |
|---|---|
| 3/30/2018 | $42,500 |
| 4/30/2018 | $42,500 |
| 5/30/2018 | $42,500 |
| 6/30/2018 | $42,500 |

DLF 000126

# Exhibit F

**Expert Report on the Religious Nature of Transcendental Meditation**

**Aryeh Siegel**

**April 1, 2022**

## I.  Summary of Opinions

A.  The TM practice is religious in nature and can also be perceived as religious.

B.  The mantra and puja ceremony are central to TM

C.  The mantra and the puja ceremony are religious in nature

D.  The TM in New Jersey public schools in *Malnak v. Yogi* is substantially similar to the TM in the Chicago Public Schools

E.  TM has Hindu origins

F.  TM Instructors are bound by confidentiality agreements to preventing the disclosure of certain information about TM

G.  The TM Movement shares many features associated with cultic organizations

## II.  Essentials of Transcendental Meditation ("TM"): The Mantra and the Puja

In his book *Strength in Stillness: The Power of Transcendental Meditation*, the David Lynch Foundation's CEO Bob Roth described the TM mantra as a word or sound with no meaning. (Bob Roth, *Strength in Stillness: The Power of Transcendental Meditation* (New York, NY: Simon & Schuster, 2018), p. 53).

Mr. Roth went further to discount any deity connection in a TM.org video:

> I have been asked, "Aren't mantras the names of Buddhist Deities of Hindu gods or whatever?" And the answer is a flat-out no. There is no meaning associated with the sound . . . They are not the names of some deity. They are not the names of anything. They are just a sound. (*What Is the Transcendental Meditation Mantra?* YouTube video (*1,* 41). Posted by Transcendental Meditation online at https://youtu.be/_0rbfSaRwCU)

TM mantras do have meanings. They are the Tantric names of Hindu Deities. However, the meanings are withheld from TM students. Maharishi, the featured speaker in 1955 at a Hindu religious gathering in Kerala, India, admitted that not only are TM mantras the names of Hindu deities but they are meant to invoke the influence of Hindu gods in the life of the practitioner:

> But we do not select the sound at random. We do not select any sound like "mike," flower, table, pen, wail, etc. because such ordinary sounds can do nothing more than merely sharpening the mind . . . For our practice, we select only the suitable mantras of personal gods. Such mantras fetch to us the grace of personal gods. (Maharishi Mahesh Yogi, *Beacon*

1

*Light of the Himalayas, 3 of 4*. Available online at
[http://minet.org/www.trancenet.net/secrets/beacon/beacon1.shtml](http://minet.org/www.trancenet.net/secrets/beacon/beacon1.shtml))

None of this is disclosed to the student learning TM.

The chart below lists the mantras Maharishi gave our group upon completing my teacher training course to the best of my recollection. While I understood that different TM mantras are associated with various Hindu deities, I cannot confirm that the gods depicted on the chart are associated with the listed mantras.

In his book, Mr. Roth asserts that TM mantras are based on the information provided in the interview form filled out by the prospective student, the personal meeting with the TM teacher, and the teacher's comprehensive certification training. (Roth, Ibid.) When I became a teacher, the only mantra assignment criteria was and, I believe, still is the student's age. I believe age remains the only criteria for mantra selection.

**All TM Mantras: Root Biji Mantra, Initiate Age, Sanskrit, Sound, Deity, Characteristics & TM Variations**
CH2020

| Age of Initiate | TM Bija Mantra | Sanskrit Character | Sound Link | Deity | Characteristics |
|---|---|---|---|---|---|
| 03-30 | AIM | ऐं Aiṁ | www.rosshouse.ca /mantra-sounds | Saraswati | Creativity, Knowledge, Wisdom, Courage, Communication, Success, Learning, Music |
| | | | *TM Variations of AIM Mantra:* AYING AYEIM AING AYIM    AENG AEM AYIMA AYINGA AIMA    AEMA AENGA AINGA    ENG EM EMA    ING    IN INGA INGA | | |
| 24-35 | SHRIM | श्री Srih | www.rosshouse.ca /mantra-sounds | Lakshmi | Wealth, Business, Success, Fortune, Social Status |
| | | | *TM Variations of SHRIM Mantra:* SRIM SHREEM SHIRIM SHIRING SHIRIN | | |
| 35-45 | HRIM | ह्रीं Hrih | www.rosshouse.ca /mantra-sounds | Kali | Powerful leader of men, Dispel Sorrows, Shiva + Shakti = Clarity, See through illusions of reality |
| | | | *TM Variations of HRIM Mantra:* HIRIM  HREEM HIRING HIRIN | | |
| 45-55 | KRIM | क्रीं Krih | www.rosshouse.ca /mantra-sounds | Indra | Thunder bolt destroys ignorance, Health, Strength Power Confidence, Problems Solved |
| | | | *TM Variations of KRIM Mantra:* KIRIM  KREEM KIRING | | |
| 55-90 + | SHYAM | Shyam श्याम्  śyāma ेयाम् | www.rosshouse.ca /mantra-sounds | Krishna | Love identified with Krishna, sexual desire |
| | | | *TM Variations of SHYAM Mantra:* SHIAMA SHIAM SHYAMA SHAMA SHAM | | |

This is a compilation of mantras from TM teachers taught in the years 1969, 1972, 1976, 1977, 1978 & 1987.
Sources:
http://www.astrojyoti.com/bijamantras.htm    http://minet.org/www.trancenet.net/secrets/mantras.shtml
http://minet.org/mantras.html    https://www.youtube.com/watch?v=oDqJGlbBP7o
https://www.sanskrit-trikashaivism.com/en/learning-sanskrit-sacred-mantra-s-1/468#Imagesfirstseries
https://www.scribd.com/document/425841918/Beacon-Light-of-the-HImalayas-pdf    All at: www.RossHouse.ca

Chart of TM Mantras

Below is an introductory note and another list of TM mantras with their associated gods.

2

(Please note that English orthography varies somewhat, but the Sanskrit is basically the same in all sources quoted. Also the termination consonant, either "m" or "ng," known as the Candra-bindu, are both the same nasal in Sanskrit and don't appear to change the meaning.)

| TM Mantra | Garland | Sastra | Tantra | Devata |
|---|---|---|---|---|
| ENG, EM, ENGA, EMA, AING, AIM, AINGA, AIMA (essentially the same bija mantra) | AIM | AIM | AIM | Saraswati, Devi of learning, music, speech, the fine arts |
| SHIRING, SHIRIM | SHREEM | S'RÍM | S'RÍM | Mahalakshmi or Lakshmi, Devi of wealth |
| HIRING, HIRIM | HREEM | HRÍM | HRÍM | Bhuvanesvari, Mahamaya |
| KIRING, KIRIM | KREEM | KRÍM | KRÍM | Devi Kalika |
| SHYAM, SHYAMA | | | | Krishna |
| RAM, SHRIRAM (RAM plus SHRI, see below) | RAM | RAM | RAM | Agni, Deva of Fire |

Source: http://minet.org/www.trancenet.net/secrets/mantras.shtml

It is noted that while TM describes devatas as an "impulse of creative intelligence." In the first chart, various Hindu gods are labeled deities. The second chart uses the term devata. Regardless of how TM tries to skirt the mantra/deity relationship, in the Hindu religion, a devata is a term used to describe a god, not an impulse of intelligence.

I had two advanced TM techniques before my first teacher training course. An additional Sanskrit word was added to my then existing mantra each time. The first advanced technique added the Sanskrit word *Nemah* to my mantra as a suffix. *Nemah* in Sanskrit means, "I bow down." The second advanced technique added the Sanskrit word Shri as a prefix, meaning "effulgent or radiant." The whole mantra meant, "To the effulgent (name of deity), I bow down." I was not told the meanings of either word when I added them to my mantra. I did learn their English meaning in my teacher training course.

### The Puja



The Transcendental Meditation Puja Altar

Learning TM requires the student's mandatory participation in an initiation that's a Hindu worship service known as the *puja*. The puja is chanted in Sanskrit by the TM teacher. Memorizing the puja is a non-negotiable part of becoming a TM teacher. We were tested until we got it right. We also had to memorize hand movements for the various offerings performed during the ceremony. In addition, we were supposed to try to experience different emotions during different offerings. The entire process was reverential.

In his book, *Strength in Stillness: The Power of Transcendental Meditation*, Bob Roth, CEO of the David Lynch Foundation, minimizes the religious significance of the puja,

> Also, during this initial meeting, your teacher will talk about the tradition of great meditation teachers who have safeguarded the knowledge of transcendence for millennia, and about the traditional way a TM teacher acknowledges this lineage of teachers today. Prior to the instruction, your teacher will perform a simple thank-you ceremony—an ancient way of expressing gratitude to the teacher. It's a lovely cultural tradition, and not religious in any way. It also reminds your teacher to maintain the integrity and accuracy of the steps of instruction to ensure maximum benefit for those who learn in the future. You won't, of course, be asked to participate in it. The thank-you includes a few flowers, some fresh fruit, a candle, a stick of incense, and, to represent the tradition of meditation teachers, a picture of Maharishi's teacher, Guru Dev. I have instructed many hundreds of devoutly religious people of all faiths, and when I describe the ceremony, some initially think it could be religious. But when I explain its purpose, they appreciate it. To honor one's teacher like this is rare in our modern world—but not altogether unfamiliar. (Roth, Bob. *Strength in Stillness: The Power of Transcendental Meditation.* Simon & Schuster. P.52)

Contrary to Bob Roth's assertion that TM is not religious, in my teacher training course, there were videos of Maharishi Mahesh Yogi stating the puja inserted the influence of Hindu deities into TM initiates' lives. Also, Maharishi reputedly believed the puja created a mystical connection with Guru Dev, Maharishi's long-dead teacher Swami Brahmananda Saraswati, and ultimately to Maharishi as the true teacher/guru. While not taught in my teacher training program, this was confirmed by course leaders.

Even before my Teacher Training course, I knew the purpose of the puja from lectures I frequently attended in 1974-76 at TM's spiritually oriented center, the Spiritual Regeneration Movement (SRM) in Los Angeles. SRM was the first TM organization in the US. The speaker was always Charles Lutes, who directed SRM, and was a revered leader in the TM movement. He was one of the earliest and closest of Maharishi's disciples. Mr. Lutes was my mentor both before and after my teacher training course. He told me and other attendees attending SRM lectures that the purpose of the puja was to tie the student's soul to Maharishi's teacher, Guru Dev. The white cloth in the ceremony represented the offering of the initiate's soul, the flower for the blossoming of the L-rd's presence in the initiate's heart, and the fruit for material wealth, success, happiness.

During my training course, we were taught subtly encourage the student to kneel before Guru Dev's photo. At the end of the ceremony, we made a sweeping gesture inviting the student to join the teacher as he knelt. While not required, most of my TM students did kneel.

As noted in the Roth quote, "You won't, of course, be asked to participate in it." In other words, TM appears to be representing that TM students are simply passive witnesses to the ceremony. However, Roth's statement is contradicted by the Minutes from February 6, 2007, TM directors' meeting, February 6, 2007. Speaking to local TM directors, Roger Badgett, then TM's Executive Director (Raja) for the Southern U.S., presents a story about Arjuna, a central figure in Hindu scripture:

> The great general was teaching Arjuna about all the celestial weapons and how to use them. After the training, Arjuna tried to use them. They wouldn't work. The great general told him, "There has to be Dakshina for them to work."

Then Badgett continued,

> Dakshina is a gift, like the fruit, flowers, and course fee to learn TM. From our own understanding, the technique will not work until it is Dakshina. We don't tell the general public this.

According to Badgett, using items the student brings to the ceremony in offerings to the Hindu deities worshipped in the puja, shifts the student's status from a passive witness as Mr. Roth states, to an unwitting, full-fledged participant. I believe the deception is clear and deliberate.

(See *Transcendental Meditation Domain of Atlanta Directors Meeting Notes, 2005-2007*. Available online at https://wikileaks.org/wiki/Transcendental_Meditation_Domain_of_Atlanta_Directors_Meeting_Notes,_2005-2007)

### *Malnak v. Yogi*, 440 F. Supp. 1284 (DNJ 1977)

I believe the New Jersey lawsuit against TM in the New Jersey public schools evidenced that the puja and TM's philosophical underpinning, known as the Science of Creative Intelligence, are Hindu religious practices and violate the Establishment Clause.

The puja, along with TM's Hindu philosophy, known as "The Science of Creative Intelligence" (SCI), provided the basis for the New Jersey U.S. District Court in 1978 to rule that

TM violated the Establishment Clause of the US Constitution. (Malnak v. Yogi, 440 F. Supp. 1284 (DNJ 1977). Retrieved from **https://law.justia.com/cases/federal/district-courts/FSupp/440/1284/1817490/)** The court ordered all TM programming in New Jersey public schools immediately shut down. Quotes from a transcript of the court's decision include the following:

> [D]efendants have failed to raise the slightest doubt as to the facts or as to the religious nature of the teachings of the Science of Creative Intelligence and the puja. Teaching the SCI/TM course in New Jersey public high schools violates the establishment clause of the first amendment, and its teaching must be enjoined.

> Defendants seek to characterize the puja as "a ceremony of gratitude" and apparently so represented it to the New Jersey high school students. It is difficult to understand why defendants label the puja a "ceremony of gratitude" because the English translation of the chant fails to reveal one word of gratefulness or thanksgiving.

### Puja Translation

While there are several translations of the puja used by TM on the internet, the puja translation below was provided to the New Jersey District Court by the TM organization. I believe it conforms to the puja ceremony I memorized over the course of several months in my teacher training course, repeated each time I taught TM to over 100 students, and frequently practiced privately on various occasions:

> "Invocation

> Whether pure or impure, where purity or impurity is permeating everywhere, whoever opens himself to the expanded vision of unbounded awareness gains inner and outer purity.

> Invocation

> To Lord Narayana, to lotus-born Brahma the Creator, to Vashishtha, to Shakti and his son Parashar,

> To Vyasa, to Shukadeva, to the great Gaudapada, to Govinda, ruler among the yogis, to his disciple,

> Shri Shankaracharya, to his disciples Padma Pada and Hasta Malaka

> And Trotakacharya and Vartika-Kara, to others, to the tradition of our Master, I bow down.

To the abode of the wisdom of the Shrutis, Smritis and Puranas, to the abode of kindness, to the personified glory of the Lord, to Shankara, emancipator of the world, I bow down.

To Shankaracharya the redeemer, hailed as Krishna and Badarayana, to the commentator of the Brahma Sutras, I bow down. To the glory of the Lord I bow down again and again, at whose door the whole galaxy of gods pray [*sic*] for perfection day and night.

Adorned with immeasurable glory, preceptor of the whole world, having bowed down to Him we gain fulfillment.

Skilled in dispelling the cloud of ignorance of the people, the gentle emancipator, Brahmananda Sarasvati, the supreme teacher, full of brilliance, Him I bring to my awareness.

Offering the invocation of the lotus feet of Shri Guru Dev, I bow down.

Offering a seat to the lotus feet of Shri Guru Dev, I bow down.

Offering an ablution to the lotus feet of Shri Guru Dev, I bow down.

Offering a cloth to the lotus feet of Shri Guru Dev, I bow down.

Offering sandalpaste to the lotus feet of Shri Guru Dev, I bow down.

Offering full rice to the lotus feet of Shri Guru Dev, I bow down.

Offering a flower to the lotus feet of Shri Guru Dev, I bow down.

Offering incense to the lotus feet of Shri Guru Dev, I bow down.

Offering light to the lotus feet of Shri Guru Dev, I bow down.

Offering water to the lotus feet of Shri Guru Dev, I bow down.

Offering fruit to the lotus feet of Shri Guru Dev, I bow down.

Offering water to the lotus feet of Shri Guru Dev, I bow down.

Offering a betel leaf to the lotus feet of Shri Guru Dev, I bow down.

Offering a coconut to the lotus feet of Shri Guru Dev, I bow down.

Offering camphor light

8

White as camphor, kindness incarnate, the essence of creation garlanded with Brahman, ever dwelling in the lotus of my heart, the creative impulse of cosmic life, to That, in the form of Guru Dev, I bow down.

Offering light to the lotus feet of Shri Guru Dev, I bow down.

Offering water to the lotus feet of Shri Guru Dev, I bow down.

Offering a handful of flowers.

Guru in the glory of Brahma, Guru in the glory of Vishnu, Guru in the glory of the great Lord Shiva, Guru in the glory of the personified transcendental fulness [*sic*] of Brahman, to Him, to Shri Guru Dev adorned with glory, I bow down.

The Unbounded, like the endless canopy of the sky, the omnipresent in all creation, by whom the sign of That has been revealed, to Him, to Shri Guru Dev, I bow down.

*Malnak v. Yogi*, 440 F. Supp. 1284, 1307 (D.N.J. 1977), *aff'd,* 592 F.2d 197 (3d Cir. 1979).

Additional excerpts from the court opinion

As can be seen from the English translation, the double invocation of the puja chant takes the form of expressions of reverence for "the Lord," other named entities or individuals, "the tradition of our Master," and Guru Dev, who is portrayed as a personification of a divine being or essence. The translation of the chant reads in part as follows:

> To the glory of the Lord, I bow down again and again, at whose door the whole galaxy of gods pray [sic] for perfection day and night.

> Adorned with immeasurable glory, preceptor of the whole world, having bowed down to Him we gain fulfillment.

This passage makes clear that the chanter is referring to a divine being or essence or entity, "the Lord." No other reasonable interpretation is possible. The chanter then makes fifteen offerings and fourteen obeisances to Guru Dev.

> The chanter then makes three more offerings to Guru Dev and three additional obeisances to Guru Dev. The chant then moves to a passage in which a string of divine epithets are applied to Guru Dev. Guru Dev is called "The Unbounded," "the omnipresent in all creation," "bliss of the Absolute," "transcendental joy," "the Self-Sufficient," "the embodiment of pure knowledge which is beyond and above the universe like the sky," "the One," "the Eternal," "the Pure," "the Immovable," "the Witness of all intellects, whose status transcends thought," "the Transcendent along with the three gunas," and "the true preceptor." Manifestly, no

one would apply all these epithets to a human being. The chant ends with another offering and two more obeisances to "Him," to Guru Dev."

**Decision Upheld on Appeal**

TM appealed the New Jersey decision to the United States Court of Appeals, Third Circuit, and lost again. The court wrote**,**

> Religious observation and instruction in public schools may be sustainable if ideas are taught in an objective fashion, or if the overall impact of the religious observance is *de minimis*. Neither was true here. Once SCI/TM is found to be a religion, the establishment resulting from direct government support of that religion through the propagation of its religious ideas in the public school system is clear.

> Although federal courts should be reluctant to interfere in the judgments of educational authorities on questions of what subject matter should be taught in the schools, our constitutional duty to guard against state efforts to promote religion may not be set aside out of deference to the policy choices of other officials. Whatever its merits, the program under consideration here, endorsed, as it is, by the State of New Jersey and the Department of Health, Education and Welfare, is forbidden by the first amendment. As such, it cannot stand. *Malnak v. Yogi*, 592 F.2d 197 (3d Cir. 1979)

## III. Confidentiality

Confidentiality is central to the TM organization. Below are excerpts of a recent associate agreement between TM teachers and the TM organization. See Article 8, Protection of Confidential Knowledge is most relevant.

Initials of the Associate: .............

without any reservation in protecting the authenticity of the knowledge of Maharishi Vedic Science in accord with the design laid out in the following. He agrees that only graduation from training that is offered or approved by MVU or its Affiliates would enable him to offer any services in the field of Maharishi Vedic Science or any of its Aspects that are at present available or that will be made available in the future. He therefore also undertakes the obligations of this Agreement with regard to any training, instruction, and other information, that he has received in any Aspect of Maharishi Vedic Science before the date of this Agreement, thereby explicitly confirming and supplementing all obligations, that he has assumed in the context of such previous training or instruction.

**Subsection 3**  Notwithstanding the concrete provisions in this Agreement concerning finances and monetary obligations, the Parties agree that the protection of the integrity and authenticity of the

knowledge of Maharishi Vedic Science is a concern of more profound consequence than any material consideration, and that such material interest under no circumstances shall hamper the achievement of the protection of this valuable intellectual right as laid out in the following articles. The Associate also acknowledges that his engagement in the Activities (confer Article 2, Subsection 1, Paragraph D) primarily is motivated by his altruistic desire to benefit fellow human beings and society as a whole by means of the theoretical and practical application of Maharishi Vedic Science as administered by MVU, and by the personal inspiration and evolution that such activity may produce in his own life. The Parties are aware that whether the Activities can be expected to generate any income for the Associate will depend on to which extent individuals and society as a whole will be able to appreciate and assimilate the knowledge of Maharishi Vedic Science, and shall be willing to make financial contributions accordingly.

## Article 2 - Definitions of Some Terms used in this Agreement

**Subsection 1**  The most important terms used in this Agreement are defined as follows:

**A**: "*Maharishi Vedic Science*" means the entire information contained in the classical Veda, originating from India 'The Land of the Veda' as it has been formulated in its completeness and fullness by His Holiness Maharishi Mahesh Yogi through MVU and its Affiliates.

**B**: "*Aspect of Maharishi Vedic Science*" means one of several areas of knowledge, in which Maharishi Vedic Science unfolds, however, all encompassing the essential holistic concept of Maharishi Vedic Science. As of the date of this Agreement the Aspects of Maharishi Vedic Science include, but are not limited to those listed in the Preamble of this Agreement. The practical implementation of Maharishi Vedic Science is an ongoing process, and the Parties are aware that new Aspects are likely to be introduced in the future as a result of the research of MVU, and that existing Aspects may still undergo further adjustment and refinement leading to changes in structure and content (including the transliteration of the Sanskrit components in texts and names).

**C**: "*Confidential Knowledge*" means all theoretical information and practical procedures relating to Maharishi Vedic Science, that are imparted to the Associate in the form of courses or as individual or general instructions with the explicit or implicit indication that the knowledge thus being made available is intended for his own use only to enable him to carry out the Activities (confer Paragraph D in this Subsection). Whether information is to be considered to have been indicated to be Confidential Knowledge, may for instance depend on (1) the content of printed material issued by MVU or its Affiliates and/or the oral or electronically or otherwise recorded teaching, which make up the teaching material of a course, or (2) the policies and guidelines, whether issued by MVU or its Affiliates in writing, orally, visually, or electronically concerning the information in question. The term also includes but is not limited to the content of this Agreement as well as all information, with which the Associate in connection with the Activities may become familiar concerning: financial data and procedures; personal data; organisational structures and proceedings; and general operations and planning concerning MVU and its Affiliates. MVU shall always be considered to be the ultimate authority in deciding on questions concerning confidentiality.

**D**: "*The Activities*" means all activities by the Associate, that he carries out for MVU or its Affiliates. The Activities may consist of but are not limited to: administration, management, promotion, sales on a retail or wholesale basis, processing of applications for National and International courses, public performances, written or oral translation, giving consultations, prescription or performance of treatments, lecturing, teaching of courses, etc.

**E**: "*Service Names*" means trademarks, names, designs, and logos and other non-lexical graphical structures, that, whether officially registered or not, designate or refer to any of the services or products offered by MVU or its Affiliates.

**F**: "*The Parties*" means the Associate and MVU together.

**G**: "*Affiliates*" means organisations, companies, or individuals who at the point in time or during the period being considered in the past have been, presently are, or in the future shall be expressly declared by MVU to be designated as Affiliates. The term is not limited to only cover cases of legal, economical, managerial, or other formal relationships, but may include instances of an organisation, a company, or an individual merely sharing a commitment to Maharishi Vedic Science at the time of designation as an affiliate.

**H**: "*Other Programmes*" means any commercial or non-commercial teachings, operations, or proceedings that with regard to: intellectual content; general philosophical and ideological concept; procedures, methods, and techniques; format and set-up; or overall style and appearance have a resemblance to one or more of the present or future Aspects of Maharishi Vedic Science, and that are not offered or carried out in conformity with instructions by MVU or its Affiliates. Whether the term is used to cover cases of resemblance to one or more Aspect, or to all Aspects of Maharishi Vedic Science will be specified in the respective Articles where the term is being used. The definition in this Paragraph for example includes but is not limited to the following types of activity when resembling but not related to Maharishi Vedic Science as described above: theoretical philosophical teaching; instruction in techniques and methods for personal development or mental or physical healing; application of educational modes and designs for presenting teachings or philosophical principles; and prescription or performance of health-care methods and treatments, as well as counselling, that are not officially recognized by public health authorities.

Initials of the Associate: ............

**Subsection 2** If the laws in the geographical area of activity demand an official licence or permission for the Associate to perform any of the Activities for which he is in the future may become approved by MVU, such approval by MVU shall only be considered valid as long as the Associate is licensed by the competent authorities. If his licence is revoked he shall forthwith inform MVU of this. The Associate is aware that if any of the Activities due to local laws necessitates coverage by an insurance policy, it is his responsibility to make arrangements accordingly.

## Article 7 - Protection of the Personal Contacts of MVU

**Subsection 1** The Associate is aware that he is accepted to carry out the Activities in the field of Maharishi Vedic Science only for purposes defined by MVU and not for any private purpose. He acknowledges that all individuals or organisations, with whom he will be dealing during his Activities as an Associate, including those engaged by MVU and whichever of his acquaintances, whom the Associate may introduce to Maharishi Vedic Science, shall be considered the exclusive personal contacts of MVU. He will therefore in perpetuity refrain from making use of such contacts for promoting or recommending any Other Programmes that have a resemblance to any of the Aspects of Maharishi Vedic Science. He will for instance always abstain from encouraging individuals, who are or have been performing Activities for MVU, to involve in Other Programmes.

**Subsection 2** Furthermore he will always encourage fellow employees, agents, and volunteers who are carrying out Activities for MVU to follow established guidelines. If he notices any deviation from policies or guidelines in force, he will immediately act to correct the situation first by addressing the person whom he believes to be violating the guidelines, and secondly by alerting MVU's representatives to this fact, if the primary approach proves fruitless.

**Subsection 3** The Associate will keep records of names and/or addresses of business contacts, course participants, consultation clients, customers etc. only to the extent instructed by MVU; and he will do so only in a format and using media for storage (electronic or other) according to instruction. The Associate agrees that these files remain the property of MVU and to exclusively use them in connection with his Activities for MVU and only according to specific instruction. He will store such address files under double lock and will not make any part or whole of the address files available to any other person or organisation unless instructed by MVU to do so. Nor will he in any way copy the information contained in these files.

**Subsection 4** The Associate will at any given time give MVU access to all such files as mentioned in Subsection 3, and at the request of MVU he will without delay hand over these files in their entirety to the representatives of MVU. If for legal reasons they cannot be handed over to MVU, the files and all copies, if any, shall be erased in a process, which allows MVU to verify that the information has been completely deleted.

## Article 8 - Protection of Confidential Knowledge

**Subsection 1** In order to protect the knowledge of Maharishi Vedic Science the Associate undertakes in perpetuity to keep secret all parts of the Confidential Knowledge and not to attempt to give it out in any form, written, oral, electronic, or other, to any individual or organisation. Nor shall he discuss the Confidential Knowledge with third parties or in any form make copies or summaries of the Confidential Knowledge in whole or in part without prior approval from MVU. He specifically agrees to take upon himself this obligation with regard to Confidential Knowledge that he has been entrusted with before as well as after the date of this Agreement, thereby confirming and supplementing commitments made by him in connection with previous training and instruction by MVU or its Affiliates.

**Subsection 2** The Associate agrees to exclusively use the Confidential Knowledge within the set-up of MVU or its Affiliates, and then in absolute accord with MVU's instructions in force at the time in question and to discontinue the use of the Confidential Knowledge, if so instructed. Because the unity, wholeness, and integration between the components of Maharishi Vedic Science are quintessential characteristics of this science and decisive for the results that it can yield, he furthermore accepts that the obligation stated in the previous sentence shall be binding, even if parts of the said information may be or may become available from other sources than MVU or its Affiliates.

**Subsection 3** The Associate is aware that policies and guidelines concerning Confidential Knowledge may be subject to change over time and undertakes to inquire with MVU, if he has any reason to believe that a certain policy regarding Confidential Knowledge has been revised.

## Article 9 - Other Programmes and Activities Not Related to MVU

**Subsection 1** The Associate agrees in perpetuity to abstain from using or referring to any names or graphical designs that are identical with or similar to the Service Names such as trade names, trademarks, service marks, or logos applied now or in the future by MVU, for any other purposes than those approved by MVU.

**Subsection 2** The Associate appreciates that when he is being active for MVU, the success of the Activities will entirely be based on the quality of the theoretical and practical elements in Maharishi Vedic Science and on the goodwill and reputation generated by the worldwide organisation of MVU and its Affiliates over several decades. He agrees that from the date of this Agreement and until seven years after the end of his last activity as Associate, he will not in any way support, promote, or offer any services or products relating to Other Programmes that have a resemblance to any of the Aspects of Maharishi Vedic Science.

**Subsection 3** The Associate additionally accepts in perpetuity to refrain from in any way supporting, promoting, or offering any services or products relating to Other Programmes that have a resemblance to those Aspects of Maharishi Vedic Science, in which the Associate will be active as indicated in the Preamble, and in which he therefore has or will receive specific training and experience with MVU. This also applies if such involvement does not comprise the use of Confidential Knowledge.

**Subsection 4** He also agrees from the date of this Agreement and until the date of the end of his last activity as an Associate of MVU to keep MVU informed and up-to-date in full detail, if he for his own personal use should start or continue to avail himself of any Other Programmes that have a resemblance to any Aspect of Maharishi Vedic Science.

4

## IV. Cult

I believe the David Lynch Foundation and the TM organization share many features associated with cultic organizations. The vast majority of prospective TM students are looking for a way to relax. If they become more involved, there is a series of stages in which more esoteric information is revealed.

Rank-and-file TM teachers are currently known as *Governors*. In 2005, Maharishi used this language when addressing his governors:

> And each of the Governors in this blessed assembly will be Raja in their territory. The Rajas are the representatives of Divine Intelligence. They will set all life in the evolutionary direction, the ideal parental role for their people. They'll radiate the Light, and everyone will draw the Light, according to their ability to absorb. We are going to be a practical channel of the Cosmic Government on Earth. We are going to be the administrators of Heaven on Earth.

In return, the Governors promised Maharishi,

> **I resolve today** on the auspicious day of *Rom Navami* of the Vedic Calendar, April 18, 2005, to be an exponent of Total Knowledge of Natural Law for my city and for the 4-5 surrounding towns of which I will take care—to bring all the programs of Vedic Education, Vedic Health, Vedic Architecture, Vedic Organic Agriculture, Vedic Music, Vedic Economy, and Vedic Administration, as brought to light by His Holiness Maharishi Mahesh Yogi, by establishing Peace Palaces that will bring enlightenment to the population under my care and create a powerful influence of harmony and coherence and permanent world peace with Invincibility for every nation.

> Having undergone this recertification program I will take all these steps so that, on this *Guru Purnima*, the full moon of July 2005, my city will welcome the descent of Heaven on Earth—the descent of *Satya Yuga* saying bye-bye to *Kali Yuga*.

> *Governor Recertification Course: Overview of Policies & Procedures*, Wikileaks. See https://file.wikileaks.org/file/tm-overnor-course-2005.pdf

### The Leaders of TM Are Rajas

Rajas are the leaders of the global TM world. However, becoming a Raja requires paying a million dollars to attend a three-week, videotaped course. Rajas wear special costumes, including a gold crown, white robes, gemstones, and necklaces. They address each other as *His Excellency, His Royal Highness,* or *His Majesty.* Each Raja has bought the right to run a small country—or a

few states in a larger country—within the TM fantasy world, known as the Global Country of World Peace (GCWP).

## Policies & Procedures May 2005.

The following points are taken from **Governor Recertification Course** Overview of Policies & Procedures dated May, 2005. There is a disclaimer that the document isn't an official operation manual, but a summary of the policies and principles set forth in the Governor Recertification Course held the previous month.

It must be pointed out that every active TM teacher must be certified by the TM organization. As such they must agree to subscribe to the policies and procedures presented below, with the understanding that some modifications may have been made at different points in time. Specifically, this means that every TM teacher who worked in five CPS schools and taught Quiet Time to several thousand public school students, subscribed to these policies.

Maharishi's description of a Raja:

> In this world assembly of the enlightened, the Center Leaders will be deciding on the Peace Palaces in order that everyone singly, and society as a whole, will keep radiating the Total Light of Life, and this will be radiated by the shining star of every Center. And each of the Governors in this blessed assembly will be Raja in their territory. The Rajas are the representatives of Divine Intelligence. They will set all life in the evolutionary direction, the ideal parental role for their people. They'll radiate the Light, and everyone will draw the Light, according to their ability to absorb. This assembly is a beautiful expression of Total Knowledge, that great law, the Constitution of the Universe, which will not allow anyone to go astray.

> This will be the Peace Government, as the government of Nature administers a very concrete galactic universe, but very peacefully. We are going to be a practical channel of the Cosmic Government on Earth. We are going to be the administrators of Heaven on Earth.

> These days are going to bring to us that benign authority which is pure Divinity in our simple humble human nature. This is the fruit of this Assembly. It started very fortunately, and it will end with the greatest fortune of the whole world.
> With this thought, we offer our everything to Guru Dev. Jai Guru Dev

General points taken from the document:

14

- Recertified Governors are only hope of the world and you are very few and must know what you are—you possess Total Knowledge and you go to bank to fulfill your desire

- We have a parental role for the public. We are not in a position to have a negative feeling for anyone. That we always remember.

- Do your three-hour program morning and evening (six hours a day devoted to TM practices).

- You may do program with a group if you wish. Simply plan your program start time to align properly with the group's Yogic Flying start time. Continue flying for the fulltime, then do full rest and listening

- Assistants who are Sidhas should be on their 2 hours program morning and afternoon program and Yogic flying—is a must!

- Only Certified Governors teach Transcendental Meditation technique

- Non Certified Governors are not Governors. Governors will need to be recertified every five years or so. Anything dealing with lecturing or teaching or checking (except an initiator checking his initiates) can only be done by recertified Governors. But a Teacher of TM who is not certified can be hired in some other capacity at a Peace Palace or some other Movement organization. But teaching or lecturing on their own in the area of TM is not an option.

- **In advanced lectures we can spread carpet of "Peace and Heaven on Earth" but 1st emphasize benefits.**

- **Maharishi said near the end of the course not to use "unknown" words when first introducing Maharishi's programs—keep the language simple and benefit oriented. For example "Vedic" right at first, is unknown**

- **We use the word Vedic when we want to go into the knowledge of Natural Law. But for public advertising we should use words that people understand – more fulfilling life, good health, etc**

Guiding Principles:

- We are not going to take help from medical Drs. **as medical professionals give poison.** So don't engage any medical Drs. for anything—absolutely whatever it is—even if they are in our Movement family
- Raja Raam's discovery shows us that without handling consciousness there is no hope of handling health--there will never be total health. And we have the programs for handling consciousness.
- **Hold onto the fact that we are the supreme authorities on health**—we know how to create perfect health—we are challenging all governments in world.
  https://file.wikileaks.org/file/tm-governor-course-2005.pdf

Photos below include images of the leaders of the David Lynch Foundation, Maharishi International University (MIU), and the Global Country of World Peace.



David Lynch, President of the David Lynch Foundation, with the Raja of Germany



Raja John Hagelin, PhD President MIU,
Immediate Past President, David Lynch Foundation





Tony Nader MD, PhD aka Maharaja Adhiraj Raja Raam, **First Sovereign Ruler of the Global Country of World Peace**, and Successor to TM's Founder Maharishi Mahesh Yogi With Followers at TM Headquarters Vlodrop Holland

**The TM-Sidhi Program**

A TM brochure describes the TM-Sidhi program as a natural extension of the TM technique that may be learned after two months of TM practice.

> Practice of the TM-Sidhi program accelerates the progress of the individual toward realizing his full potential—the state of enlightenment.

> The TM technique gives a direct experience of the least excited state of consciousness, the pure consciousness, the unified field, which is the total potential of Natural Law. The TM-Sidhi program trains the individual to operate from the least-excited state of consciousness, to think from the level of the unified field of all the laws of nature.

The highlight of the Sidhi program is "yogic flying," during which primarily young men hop around on dense form mattresses. When the Sidhi program was introduced in 1977, the promise made was mastering the ability to levitate. After four or five years, not one person could levitate. Responding to the disappointment, Maharishi introduced the term *yogic flying* to dress up the butt-hopping visual and blamed "cosmic stress" for preventing the ability to fly through the air like birds. Forty-five years later, not one person has ever demonstrated levitation, nor has anyone acquired a single superpower. The TM-Sidhi program, still marketed by the Maharishi Foundation, costs several thousand dollars and requires three weekends of training and two weeks in residence.

## V. Fraud

Maharishi sold the Sidha program by promising the development of numerous superpowers: levitation, supervision and hearing, the ability to become invisible, the strength of an elephant, and omniscience. In 1977-78, hundreds of advertisements like the one below appeared hundreds of times on campus and in regular newspapers throughout the US and Canada. There were also press conferences where TM Governors proclaimed they could levitate but were too modest to demonstrate. In 1977, Maharishi proclaimed that Sidhas would be able to fly through the sky on the then-popular Merv Griffin television show. I was part of Maharishi's entourage and attended the show. In 1978, the Sidhi course tuition was $3,000 to $5,000, or $13,000 to $23,000 in current value. The photos in the ads were photoshopped to give the appearance of levitation (hovering in mid-air). In the late 1970s, Maharishi perpetrated an enormous fraud on the North American public.

19

Edmonton Journal (Edmonton, Alberta, Canada)
Sat, Aug 6, 1977
Page 86



Although the TM Sidha program and what follows has not been taught in Quiet Time at CPS, TM aims to draw students into more advanced mantras, programs, and esoteric practices after the initial training.

## VI. How TM Lures the Young and Vulnerable

A concerned parent who was active in her child's school described the TM inculcation process in a letter to the San Rafael Board of Education, protesting a Lynch Foundation grant to teach TM in the district's public schools. She began by describing the mandatory follow-up sessions after TM instruction.

With the student in a relaxed, semitrance state, the TM teachers would explain Cosmic Consciousness, God Consciousness, and Unity Consciousness as evolutionary states of consciousness that could be achieved after the long-term practice of TM.

She described advanced meditation programs and residence programs to achieve more profound rest and release stress in a community of other caring, supportive meditators.

As participants became further involved, they would learn lifestyle guidelines to enhance their growth of consciousness. Such lifestyle guidelines may include unscientific Maharishi Ayur-Veda medicinals, Ghandarhva Veda music, Maharishi Jyotish astrology, and Sthapatya Veda—architectural guidelines for enlightened household construction. Advanced programs were optional but highly lauded and encouraged through slow and subtle coercive persuasion.

Continuing, she wrote,

Those seeking further involvement could attend the *Maharishi University of Management* to study *Vedic Science* or join the *Thousand-Headed Purusha* or *Mother Divine* programs— monastic branches of this "nonreligious" organization. They could participate in programs where groups of Sidhas (advanced meditators who have supposedly learned techniques for achieving paranormal powers) meditate and "fly" together for hours daily. TM refers to these groups of yogic flyers as *peace-creating experts* who will promote coherent national and world consciousness and thereby prevent any negativity from arising in America or in the family of nations.

The devout could relocate to *Maharishi Vedic City,* Iowa, where all is orchestrated according to Maharishi's fantastical *Laws of Nature*, beneath the golden banner for *Maharishi's Global Country of World Peace* (GCWP). Purchases in Vedic City are made with their currency, the Raam.

Those with more time and money could opt for further expensive, prolonged meditation courses to become *Rajas*. For one million dollars, golden-crowned Rajas are assigned a geographical domain to support consciousness expansion on Earth. How TM Lures the Young and Vulnerable

21

Kropinski and Soma and the G-ds

In 1987 Robert Kropinski sued the World Plan Executive Council, bringing fraud, negligence, and intentional tort claims. https://law.justia.com/cases/federal/appellate-courts/F2/853/948/121594/

The information below on *soma* was presented at the trial. I include it because it supports what I believe to be a deliberate withholding of information on some rather bizarre elements of TM from prospective TM students and the CPS schools, students, and parents.

## VII.    "Soma and the Gods"

What follows below is represented as taken from the testimony of the Kropinski trial. I have not independently verified it.

On the next Web page begins the transcription of "Soma and the Gods" taken from testimony in the Kropinski trial. This videotape is one of a handful that have become infamous in the TM movement because of their secrecy: It is only shown to TM teachers on the heavily regimented Teacher Training Course (TTC). For many years copies of this tape were not even allowed to enter the continental US.

According to participants in the Kropinski trial, this tape -- along with the entire TTC (Teacher Training catalog) -- appeared mysteriously on someone's doorstep one day. Since then the tape has been used by plaintiffs in court cases to prove that the TM movement had a religious, specifically Hindu, agenda -- largely because it's one of the few times the Maharishi was captured on tape talking about worshipping the Vedic Gods. (Of course today, the TM movement sells Hindu sacrifices, *yagyas* or *yajnas,* to Ganesh, Lakshmi, and other Gods for thousands of dollars without batting an eye!)

But the true significance of "Soma and the Gods" is much larger. And the theology that the Maharishi espouses is not Hinduism. It is much more idiosyncratic -- and frankly bizarre.

In a nutshell, the Maharishi describes a sort of parasitic relationship between TMers and the Vedic Gods. TMers produce the magical chemical Soma in their gut -- but it isn't something they can use directly. The Vedic Gods, principally Indra, descend from Heaven and feed on the Soma in the TMers' belly. In return for this primitive relationship, the Gods grant all manner of boons. TMers become successful, happy, prosperous, and develop supernormal abilities.

Unbeknownst to non-TM teachers, the entire TM program can be understood through this simple model.

We practice yogic asanas and pranayama to clear the channels through which Soma will flow. We repeat the name of our own personal "Ishta" (God) to summon Him or Her.

22

Advanced TMers practice the sidhis to "stir" the Soma and further clear channels. We read verses from the Ninth Mandala that literally invite the Gods by name to feast on the Soma in our belly: "Flow, Soma, in a most sweet and exhilarating stream, effused for Indra to drink.... Be the lavish giver of wealth, most bounteous, the destroyer of enemies, bestow on us the riches of the affluent." And we take Ayurvedic potions and pills believing we will produce "extra" or "more refined" soma.

An anecdote from a former Maharishi International University (MIU/MUM) professor:

When I was on MIU faculty, there was a special videotape that only faculty were privy to. It was the "Ninth Mandala," chanted in the original Sanskrit. Sitting with eyes closed, listening to it was considered a great privilege and was highly secret.

On my Governor Training Course, after we had rounded and rounded and rounded for three months, MMY [the Maharishi] finally called to answer our questions. I asked what we should expect from endlessly reading the Ninth Mandala of the Rig Veda and I never forgot his reply: "It will become a living reality."

I practiced the Sidha program with groups of Sidhas in West Los Angeles. for two hours in the morning and two hours in the late afternoon for four years. During each session, we spent 15-20 minutes reading the ninth mandala in English.



Printed by Maharishi University Press



TM Vedic Calendar. https://calendars.globalgoodnews.com/vedic/vedic-calendar.htm

Aryeh Siegel, Qualifications.

I have an MSSA (MSW) in community planning from Case-Western Reserve University, an MPH in health planning, and an advanced certificate in mental health planning from UC Berkeley. I also completed all Ph.D. level coursework in behavioral science research at UCLA's School of Public Health. From 1972 to 1974, I had a research appointment in the Psychiatry Department, UC San Francisco School of Medicine. While there, I authored or co-authored ten published papers and book chapters on mental health planning.

In 2015, I noticed a reemergence of Transcendental Meditation (TM) in the media. I learned that the David Lynch Foundation, a TM affiliate, planned to teach TM to a million "at-risk" school kids while claiming TM wasn't a religion. I took eighteen months from my real estate business doing research and conducting interviews to write a book exposing what I knew to be TM's religious underpinnings and the cultic aspects of the TM organization. In 2018, I was a speaker at the Association's International Conference. My work has been cited in recent books about cults.

I am the president of TM Deception, a non-profit organization devoted to informing the public of the deceptions of Transcendental Meditation. www.TMDeception.com

I learned TM in the Berkeley TM Center in 1971 when I was a graduate student at the University of California, Berkeley. In July 1974, I studied to become a TM teacher (initiator) in Italy for three months. This was the first half of the then-required six-month teacher training program. Upon completion, I was invited to join Maharishi Mahesh Yogi at his headquarters in Arosa, Switzerland. I stayed there for several weeks attending all public meetings and most private meetings for high-level employees with Maharishi.

Upon my return to Berkeley, I was offered a position directing TM's nascent Institute for Social Rehabilitation at TM's national headquarters located in Los Angeles, known as the World Plan Executive Council (WPEC), which I accepted. I was responsible for developing TM programs in rehab settings such as prisons and drug and alcohol abuse programs in the US and Canada.

In June 1975, I completed my teacher training program, spending an additional three months in Switzerland. I again joined Maharishi for three weeks after the course at his headquarters in Courchevel, France. All expenses for the training program, including travel and continuing my salary, were covered by WPEC.

**Publications**

*Transcendental Deception, Behind the TM Curtain – bogus science, hidden agendas, and David Lynch's campaign to push a million public school kids into Transcendental Meditation while falsely claiming it is not a religion* 2018, Janreg Press, Los Angeles

*Deception in Transcendental Meditation* the International Cultic Studies Association. ISCA Today, 2018, Vol. 9. No. 3

**Compensation**

| | |
|---|---|
| Preparation of expert statement: | $500. |
| Deposition if called: | $500 |
| Testimony at trial if called: | $500 |
| Previous expert witness experience: | None |

**Signature**

_Aryeh Siegel_  4/1/22

Aryeh Siegel                    Date
Expert Witness

# Exhibit G

Page 1

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION
3    AMONTAE WILLIAMS, individually   )
     and as a representative for all  )
4    similarly situated persons; and  )
     DARRYL WILLIAMS, individually    )
5    and as a representative for all  )
     similarly situated persons,      )
6                                      )
            Plaintiffs,               )
7                                      ) Case No. 1:20-cv-04540
        v.                            )
8                                      ) Judge Matthew F. Kennelly
     THE BOARD OF EDUCATION OF THE    )
9    CITY OF CHICAGO; THE DAVID LYNCH )
     FOUNDATION; and THE UNIVERSITY   )
10   OF CHICAGO,                      )
                                       )
11          Defendants.               )
12
13
14
15
16
17
18          Remote deposition of KAYA HUDGINS, via Zoom,
19   taken before Christina M. Cummins, CSR and Notary
20   Public, pursuant to the Federal Rules of Civil Procedure
21   for the United States District Courts pertaining to the
22   taking of depositions, at 10:37 a.m. on the 11th day of
23   March, A.D., 2022.
24

Page 2

```
 1   PRESENT:  (ALL PARTIES APPEARED REMOTELY)
 2   MAUCK & BAKER LLC
       By MR. JOHN MAUCK
 3     1 North LaSalle Street - Suite 600
       Chicago, Illinois 60602
 4     312.726.1243
       jmauck@mauckbaker.com
 5
       appeared on behalf of the Plaintiffs;
 6
       MS. CHRISTINA ROSENBERG, ESQ.
 7     Chicago Board of Education
       One North Dearborn Street - Suite 900
 8     Chicago, Illinois 60602
       773.553.1700
 9     crosenberg@cps.edu
10     appeared on behalf of the Defendant The Board of
       Education of the City of Chicago;
11
       PRETZEL & STOUFFER CHARTERED
12     By MR. JAMES SIPCHEN
       One South Wacker Drive - Suite 2500
13     Chicago, Illinois  60606-4673
       312.346.1973
14     jsipchen@pretzel-stouffer.com
15     appeared on behalf of the Defendant The David
       Lynch Foundation;
16
       LATHAM & WATKINS LLP
17     By MR. CAROLYN HOMER
       Willis Tower - Suite 5800
18     233 South Wacker Drive
       Chicago, Illinois 60606
19     312.876.7700
20     appeared on behalf of the Defendant The
       University of Chicago.
21
22   ALSO PRESENT: Ms. Kaitlin Salisbury
23
24
```

Page 3

```
 1             I N D E X
 2   WITNESS
 3     KAYA HUDGINS
 4   EXAMINED BY              PAGE
 5     MS. HOMER              4, 297
 6     MS. CHRISTINA ROSENBERG    100, 299
 7     MR. SIPCHEN            233
 8
 9
10          E X H I B I T S
11   HUDGINS DEPOSITION           PAGE
12   Exhibit 1  Legal Services Agreement      9
13   Exhibit 2  Enrollment List          27
14   Exhibit 3  Student Application for Transcendental  64
15            Meditation Instruction
16   Exhibit 4  Signed Declaration of Kaya Hudgins   74
17   Exhibit 5  Hudgins 11              103
18   Exhibit 6  Screenshot of Facebook Page     152
19   Exhibit 7  Photograph             215
20   Exhibit 8  University 27 through 35       222
21   Exhibit 9  University 36 through 53       223
22   Exhibit 10  Unsigned Declaration        234
23   Exhibit 11  BOE 17004 through BOE 17006    283
24   Exhibit 12  Kaya Hudgins' High School Transcript  295
```

Page 4

```
 1            KAYA HUDGINS,
 2   having been first duly sworn, was examined and testified
 3   as follows:
 4            EXAMINATION
 5   BY MS. HOMER:
 6     Q    Okay.  Good morning.  Can you please state and
 7   spell your name for the record?
 8     A    Kaya Hudgins, it's spelled Kaya, K-a-y-a,
 9   Hudgins, H-u-d-g-i-n-s.
10     Q    Okay.  Thank you.  So I'm just going to go
11   through some preliminaries with you.  Have you ever been
12   deposed before?
13     A    Excuse me?
14     Q    Have you ever had your deposition taken before
15   like we're asking you questions today?
16     A    No, not previously before this, no.
17     Q    Have you ever testified in court before?
18     A    Yes.
19     Q    When did you testify in court before?
20     A    To testify means to appear in court and
21   basically you tell your side of what happened, that's
22   what it means to testify, correct?
23     Q    Yes, that's correct.  Have you ever done that
24   before?
```

Page 5

```
 1     A    Not for myself, no.
 2     Q    Have you ever been a witness to anyone else's
 3   court case before?
 4     A    No, ma'am.
 5     Q    Okay.  So I'm just going to go through some
 6   basics because I know you are new to this.  So first
 7   off, I see you have your attorney with you, right?
 8     A    Yes.
 9     Q    Okay.  So every now and then your attorney may
10   object to my question.  And so it's usually a good idea
11   when I finish a question just to wait half a beat in
12   case he has an objection before you answer.  Can you do
13   that?
14     A    Yes, ma'am.
15     Q    Great.  Also, everything we say is being
16   recorded by our court reporter.
17     A    Okay.
18     Q    And so because of that it's very important
19   that we don't interrupt each other and that we try to
20   give answers verbally on the record.  And don't say
21   uh-huh or shake your head.  It's a lot better if you
22   just say yes or no or use complete sentences.  Can you
23   do that?
24     A    Yes.
```

2 (Pages 2 - 5)

Page 6

1   Q   Great.  And I know this is remote.  Usually
2  we're in a conference room, but there's been a pandemic,
3  but you don't have any notes in front of you, do you?
4   A   No, ma'am.
5   Q   Okay.  And you don't have like your phone in
6  front of you, you're not texting with anyone?
7   A   No.
8   Q   Great.  Do you understand that you're under
9  oath today, that you have to -- that you've sworn to
10 tell the truth?
11  A   Yes.
12  Q   Okay.  So even though this is a little more
13 informal than an office, it has the same effect as if
14 you were testifying in court, do you understand that?
15  A   Yes.
16  Q   Okay.  Is there any reason you cannot testify
17 fully or truthfully today?
18  A   No.
19  Q   Okay.  You don't have any memory problems or
20 health problems that would, you know, prevent you from
21 testifying truthfully?
22  A   No.
23  Q   Okay.  What did you do to prepare to testify
24 today?

Page 7

1   A   Nothing really, honestly.
2   Q   Okay.  What is your understanding as to why
3  you are here today?
4   A   To take down the Quiet Time Program.
5   Q   Okay.  What do you mean by take down the Quiet
6  Time Program?
7   A   To eliminate them from schools.
8   Q   Okay.  How did you come to be involved today?
9   A   What led me here?
10  Q   Yeah.  How is it that you got involved in this
11 effort to take down the Quiet Time Program?
12  A   Because I wanted to play a role in it because
13 I wanted to be a part of it.
14  Q   Who told you about -- well, I will back up.
15      When you say take down the Quiet Time Program,
16 you understand that this is part of a lawsuit against
17 the Quiet Time Program?
18  A   Yes.
19  Q   Okay.  Who first told you about this lawsuit?
20  A   Amontae Williams.
21  Q   Okay.  When did Amontae Williams tell you
22 about this lawsuit?
23  A   I believe about six months ago.
24  Q   Okay.  What did he tell you?

Page 8

1   A   He told me that he wanted me to get involved,
2  he needed my help and he wanted me to get involved with
3  the case because we needed more witnesses.
4   Q   Okay.  What did he ask you to do in terms of
5  getting involved?
6   A   To testify against the Quiet Time Program.
7   Q   Okay.  Did he ask for any details about what
8  you could say about the Quiet Time Program?
9   A   What are you asking?
10  Q   Okay.  Fair.  That was a confusing question.
11 So when he said he needed more witnesses to testify
12 against the Quiet Time Program, what did you tell him in
13 response?
14  A   That I was willing.
15  Q   And I'm going to come back to a lot of the
16 details about your involvement in Quiet Time a little
17 bit.  So at that point, you said about six months ago,
18 so that was last fall, the fall of 2021?
19  A   Honestly it was around that time.  I don't
20 know a specific time, but yes, it was around that time.
21  Q   And prior to the fall of 2021 had you heard
22 anything about this lawsuit against the Quiet Time
23 Program?
24  A   No, I did not.

Page 9

1   Q   Okay.  Did Amontae then introduce you to the
2  lawyer you're sitting next to today?
3   A   Yes.
4   Q   Okay.  When did that happen?
5   A   I'd have to say February, around January or
6  February, I believe.
7   Q   Okay.  So just within the last month or two?
8   A   Yes.
9   Q   Okay.  And then you just this morning signed
10 an agreement with these lawyers, is that correct?
11  A   Yes.
12      MS. HOMER:  Okay.  I want to mark Exhibit 1
13 for the record.  And then I will share it.  It got
14 scanned weird, so give me a moment.  I need to
15 rotate it.
16      (Document marked as Hudgins Deposition
17      Exhibit 1 for identification.)
18  Q   And now that you'll see that although I'm
19 technically savvy I don't know how to rotate the page.
20 Give me a second.  Oh, there it is.  Hold on.  I have to
21 do this on every page.  Okay.
22      So is this the agreement you signed this
23 morning?
24  A   Yes.

3 (Pages 6 - 9)

Page 10

1    Q   Okay.  So this is your signature, Kaya
2 Hudgins?
3    A   Yes.
4    Q   And this is your phone number?
5    A   Yes.
6    Q   And this is your email address,
7 KayaHudgins28@gmail.com?
8    A   Yes.
9    Q   Okay.  And this is your handwriting?
10    A   Yes.
11    Q   Okay.  Great.  I want to just ask you a
12 question.  What is your understanding of what your
13 involvement in this lawsuit is going to be?
14    A   Like what am I hoping to get out of it or
15 what --
16    Q   Yes, what are you hoping to get out of this
17 lawsuit?
18    A   Like I said previously, I'm just hoping to
19 help take down the Quiet Time Program so that they won't
20 be able to do this in different schools so they can be
21 stopped.  That's my main goal.
22    Q   Are you expecting to get any money out of your
23 participation?
24    A   I'm not expecting anything.

Page 11

1    Q   Okay.  Have your -- scratch that.
2        Do you think there's a possibility you might
3 get money out of your participation in this lawsuit?
4    A   I have no reason to think that, so, I mean, if
5 I did, then I wouldn't be mad.
6    Q   Okay.  And your goal is not to get money, is
7 that correct?
8    A   My goal is to take down the Quiet Time
9 Program.
10    Q   So your goal is to make sure that the Quiet
11 Time Program does not run in Chicago Public Schools, is
12 that correct?
13    A   Yes.
14    Q   Okay.
15    A   In schools, period.
16    Q   Okay.  Are you getting paid to be here today?
17    A   No.
18    Q   Did anyone else pay for your transportation --
19    A   No.
20    Q   -- to get to the office today?  No.  Did you
21 drive yourself?
22    A   Yes.
23    Q   You just hit bad traffic, that's why you were
24 late?

Page 12

1    A   Yeah.
2    Q   Yeah, Chicago traffic's terrible.  I
3 understand.  Okay.
4        Based on your understanding, who brought this
5 lawsuit against Quiet Time?
6    A   To my understanding, Amontae Williams did.
7    Q   Okay.  And do you know when he filed this
8 lawsuit?
9    A   I'm not sure.
10    Q   Are you yourself to your understanding suing
11 anyone right now based on the Quiet Time Program?
12    A   No.
13    Q   So you understand that you are here as a
14 witness today, but you are not actually suing anyone, is
15 that correct?
16    A   Yes.
17    Q   Do you know what a class action is?
18    A   Yes.
19    Q   What is your understanding of what a class
20 action is?
21    A   My understanding of what a class action is is
22 basically when a class gets together and they form
23 something to -- they form something for results, you
24 know.

Page 13

1    Q   Okay.  And is that in connection with lawsuits
2 is your understanding?
3    A   Could be with anything to my understanding, to
4 my knowledge.
5    Q   Okay.  Do you have any understanding of what a
6 class action is in connection with court cases?
7    A   Yes.
8    Q   What is your understanding?
9    A   My understanding of a class action when it
10 comes to court cases is let's say a variety of people or
11 a class, it happens to the whole class, so the whole
12 class can take action, you know.
13    Q   Okay.  Do you understand yourself to be part
14 of that entire class that can take action against the
15 Quiet Time Program?
16    A   Yes, if I would consider myself a part of the
17 class?
18    Q   Yeah, do you consider yourself a part of the
19 class that is challenging the Quiet Time Program?
20    A   Yes.
21    Q   Okay.  Why is that?
22    A   Because I was present.
23    Q   So you were present --
24    A   During the -- during the time where the Quiet

4 (Pages 10 - 13)

Page 14

1 Time was there at Bogan.
2    Q    Okay.  So you were present for the Quiet Time
3 Program at Bogan, and because of that, you consider
4 yourself to be part of the class of students who are
5 challenging the Quiet Time Program, is that correct?
6    A    Not only that but because -- that is correct,
7 but not only that, also because I was -- I had to
8 participate.  Not only was I there and present, I also
9 had to participate.  So that's why I would consider
10 myself as part of it.
11    Q    Okay.  Do you know who Amontae Williams sued
12 as part of his challenge to the Quiet Time Program?
13    A    No, ma'am.
14    Q    Okay.  So do you know what a defendant in a
15 case is?
16    A    No.
17    Q    Okay.  Do you understand that, you know, when
18 a lawsuit is filed, there's the person who filed it,
19 right?
20    A    Uh-huh, yeah.
21    Q    And you understand that person is Amontae
22 Williams?
23    A    Yeah.
24    Q    Okay.  And then there are the people or

Page 15

1 organizations the lawsuit is filed against, do you
2 understand that?
3    A    Yes.
4    Q    And you don't know who Amontae filed the
5 lawsuit against?
6    A    The Quiet Time Program.
7    Q    So you understand that he is challenging the
8 Quiet Time Program, correct?
9    A    Yes.
10    Q    Do you understand what organizations may have
11 helped run the Quiet Time Program that he is suing?
12        MR. MAUCK:  Objection, that's overbroad to
13    organizations.  You can go ahead and answer if you
14    can understand the question.
15    A    I don't understand the question.
16 BY MS. HOMER:
17    Q    Okay.  Who did you interact with when you were
18 at Bogan High School involved with the Quiet Time
19 Program?
20    A    Multiple people, students there.
21    Q    Okay.  What student names do you remember?
22    A    Amontae Williams, this girl we called Turbo.
23 Well, we all had to participate in it, so I would say
24 all of my classmates.

Page 16

1    Q    Okay.  Were there any instructors in the Quiet
2 Time Program?
3    A    Yes.
4    Q    Do you remember any of their names?
5    A    No, I do not.
6    Q    Okay.  Do you remember whether or not any of
7 the instructors -- let me rephrase.
8        Do you remember who employed any of the
9 instructors that you interacted with during the Quiet
10 Time Program?
11    A    I believe Bogan, I believe Bogan because our
12 teachers were also like instructors.  We had someone who
13 came in, but our teachers were instructing it everyday,
14 so.
15    Q    Okay.  So you inter --
16        MR. MAUCK:  Can I interrupt for a second?
17    Would you mind taking down the exhibit so we can
18    see things again?
19        MS. HOMER:  Oh, yeah, sorry.
20        MR. MAUCK:  That's okay.
21        MS. HOMER:  Thank you.
22    Q    Okay.  So your memory is that there were
23 teachers employed by Bogan High School who helped with
24 the instruction of Quiet Time, is that correct?

Page 17

1    A    Yes.
2    Q    Okay.  Then you mentioned there was somebody
3 who also came into the classroom, is that right?
4    A    Yes.
5    Q    What do you remember about that person?
6    A    I remember -- I remember them taking us out of
7 class and like having us learn how to meditate.
8    Q    Okay.  Do you remember that person's name?
9    A    I believe her name was Erin.
10    Q    Eric you said or Erin?
11    A    Erin I believe.
12    Q    Okay.  Do you remember if she was employed by
13 anyone?
14    A    I know she was -- she wasn't employed by
15 Bogan.  I don't believe she wasn't employed by Bogan.
16 She would sit there with the Quiet Time Program.
17    Q    Okay.  You understand that she was employed by
18 the Quiet Time Program somehow?
19    A    Yes.
20    Q    Or that was -- okay.  Have you ever heard of
21 the David Lynch Foundation?
22    A    Yes.
23    Q    What do you know about the David Lynch
24 Foundation?

5 (Pages 14 - 17)

Page 18

1 A I know that they're part of the Quiet Time.
2 Q Okay. How? What does the David Lynch
3 Foundation do as part of the Quiet Time --
4 A They --
5 Q -- program? I'm sorry?
6 A (Inaudible) Quiet Time Program.
7 (Interruption by court reporter.)
8 A So yeah, I believe they fund the Quiet Time
9 Program.
10 Q Okay. Do you understand the David Lynch
11 Foundation to do anything else with respect to the Quiet
12 Time Program other than fund it?
13 A They allow it.
14 Q What does it mean for the David Lynch
15 Foundation to allow the Quiet Time Program?
16 A They basically try to put it in schools, in
17 CPS schools.
18 Q And what is your understanding of what the
19 David Lynch Foundation did to put Quiet Time Program in
20 CPS schools?
21 A I'm not sure.
22 Q Okay. So you don't know any of the details
23 between what the connection is between the David Lynch
24 Foundation and CPS schools, you just understand they

Page 19

1 were involved somehow, is that fair?
2 A Right. I do understand that they worked
3 together.
4 Q Okay. Do you know what the University of
5 Chicago is?
6 A Yes.
7 Q Okay. What do you know about the University
8 of Chicago?
9 A It's a college, right?
10 Q Yes, it's a college. And it's a college
11 that's in Chicago?
12 A Yes.
13 Q Do you know whether it is a private college or
14 a state college?
15 A It's a state college.
16 Q Okay. So your understanding is that the
17 University of Chicago is a state college?
18 A Yes.
19 Q What's that understanding based on?
20 A Just that it means -- I don't even -- I'm not
21 sure.
22 Q So you don't really know one way or the other
23 how --
24 A Like I know it's here, but I'm not sure if

Page 20

1 it's private or if it's public, but I am pretty sure it
2 is a state school.
3 Q Okay. You're not sure whether or not
4 University of Chicago is private or public, right?
5 A Correct.
6 Q Okay. You've never attended the University of
7 Chicago?
8 A No.
9 Q Have you ever just like visited its campus and
10 wandered around?
11 A I believe so, yes.
12 Q It's in downtown Chicago, right?
13 A Uh-huh.
14 MR. MAUCK: You have to answer yes or no.
15 BY MS. HOMER:
16 Q Was that a yes?
17 A Yes, I'm sorry.
18 MS. ROSENBERG: Miss Hudgins, could you please
19 speak up? I'm also losing you. I'm sure that
20 would be helpful for everyone on the call. Thank
21 you.
22 THE WITNESS: I can do that.
23 MS. HOMER: I know I have my volume on the
24 headset all the way up, so I'm hearing okay, but it

Page 21

1 might be harder through others' speakers.
2 Q Okay. Miss Hudgins, have you ever personally
3 interacted with anyone at the University of Chicago?
4 A No.
5 Q Okay. In connection with the Quiet Time
6 Program, do you remember talking to anyone at the
7 University of Chicago?
8 A No.
9 Q You don't have any memory of anyone from the
10 University of Chicago helping instruct students in Quiet
11 Time?
12 A I'm not sure. I don't -- I probably didn't
13 ask, but I'm not sure.
14 Q I did want to ask, I'm just going to screen
15 share Exhibit 1, I had one question about it and then
16 I'll take it back down. Miss Hudgins, you read this
17 agreement before you signed it, correct?
18 A Yes.
19 Q Okay. Do you see down here where it says
20 client cooperation? Do --
21 A Yes.
22 Q -- you see that? Okay. And so the client
23 says, one, shall cooperate fully with the law firm in
24 its representation, you see that?

6 (Pages 18 - 21)

Page 22

1    A    Uh-huh, yes.
2    Q    So that generally means you're going to work
3  with your lawyers to help this case, is that fair?
4    A    Yes.
5    Q    Okay.  And I want to go down to number three.
6  Do you see where it says that the client shall avoid all
7  acts that are illegal, immoral or unethical or that
8  might jeopardize the client's position in the matters
9  with respect to which the firm acts as counsel, do you
10  see that number three?
11    A    Yes.
12    Q    What do you understand that to mean?
13    A    I understand that to mean like basically stay
14  out of trouble.
15    Q    Okay.
16    A    And don't make unethical and unlogical
17  decisions.
18    Q    Okay.  And what does it mean to stay out of
19  trouble?
20    A    Well, in my opinion that means to not do
21  anything that would jeopardize -- that would jeopardize
22  your success.
23    Q    Okay.  So, for example, if you were to get
24  arrested, do you think that would violate --

Page 23

1        MR. MAUCK:  Objection.  You're asking the
2  client for legal conclusions.  She's not -- she is
3  not a lawyer on legal interpretations.  You may
4  answer if you know.
5    A    No, I do not know.
6        MR. SIPCHEN:  John, you know, since we're on
7  Zoom, I just ask you to wait till Carolyn finishes
8  her question before you object.  I understand you
9  were eager to jump in, but it's hard for me to -- I
10  think I lost part of Carolyn's question.  I think I
11  lost part of your objection.  So just for, you
12  know, flow of things.  Thanks.
13  BY MS. HOMER:
14    Q    Miss Hudgins, do you understand this Mauck &
15  Baker law firm to be a Christian law firm?
16    A    Yes.
17    Q    Okay.  And so do you understand that one of
18  the goals of this lawsuit is to promote Christianity?
19        MR. MAUCK:  Objection, relevance.  Go ahead
20  and answer if you can.
21    A    I don't understand the question.
22  BY MS. HOMER:
23    Q    Okay.  Did Amontae Williams ever tell you
24  anything about whether or not this lawsuit was

Page 24

1  affiliated with Christianity in any way?
2    A    Yes.
3    Q    What did Amontae tell you?
4    A    That he was inspired to be more -- he was
5  inspired to my knowledge, that's what he told me, you
6  know, to follow Christ ever since he's been working on
7  this case.
8    Q    When do you remember that conversation
9  happening?
10    A    This was maybe like -- I'm not sure.
11    Q    Was it three months ago, six months ago?
12    A    Yeah, about three months.
13    Q    Okay.  Did anyone ask -- well, let me back up.
14        Are you a Christian?
15    A    No.
16    Q    Okay.  You were raised Muslim, is that right?
17    A    Yes.
18    Q    Okay.  And were you raised any particular type
19  of Muslim?
20    A    No.
21    Q    Okay.  So you're not affiliated with the
22  Nation of Islam?
23    A    Not anymore.
24    Q    Okay.  Let me back up.  When you were growing

Page 25

1  up Muslim, were you affiliated with the Nation of Islam?
2    A    Yes.
3    Q    Okay.  You were not -- when -- let me start
4  over.
5        When you were growing up you were not a Sunni
6  Muslim?
7    A    So particularly in -- I feel like Sunni and --
8  it's -- in the religion of Islam, we don't like to
9  separate.  When I was, there was no separation.  You
10  know, if you're Muslim you're Muslim.
11    Q    That's fair.  So just stepping back, I used to
12  work for a Muslim organization, so I'm not trying to be
13  insensitive, I just generally know that, you know,
14  there's Sunni Muslim, Shia Muslim, Nation of Islam and
15  the five percenters, for lack of a better word.  And I
16  was just wondering if there was any one of those groups
17  that you considered yourself more affiliated with when
18  you were growing up.
19    A    Not particularly.
20    Q    Not particularly, okay.  You're no longer
21  Muslim, is that correct?
22    A    Correct.
23    Q    When did you stop being Muslim?
24    A    I want to say when I graduated from high

7 (Pages 22 - 25)

Page 26

1 school, so 2020.
2 Q Okay. And do you consider yourself to be any
3 religious affiliation now?
4 A No, I am not.
5 Q And as part of this lawsuit, is there any
6 expectation that you will support Christianity?
7 A Can you ask the question again?
8 Q Yeah. Has anyone asked you to support
9 Christianity as part of this lawsuit?
10 A No.
11 Q Okay. So I want to change topics for a bit,
12 and I just want to walk down your attendance history
13 within Chicago Public Schools, especially high school.
14 So where did you attend high school for your freshman
15 year?
16 A Amandla High.
17 Q Is Amandla High a Chicago public school?
18 A Amandla is a charter school.
19 Q It's a charter school. And is it a charter
20 school in Chicago?
21 A Yes.
22 Q Okay. Where did you attend high school your
23 sophomore year?
24 A Bogan.

Page 27

1 Q Okay. Where did you attend high school your
2 junior year?
3 A Bogan.
4 Q And where did you attend high school your
5 senior year?
6 A McKinley Lakeside Academy.
7 Q Okay. And when did you graduate from McKinley
8 Lakeside Academy?
9 A In 2021.
10 Q So you graduated from McKinley Lakeside
11 Academy in June of 2021?
12 A Yes.
13 Q So about nine months ago?
14 A Yes.
15 MS. HOMER: Okay. I'm going to show Exhibit 2
16 to the witness quickly. And I will represent that
17 this is a document produced by the Board of
18 Education for Chicago Public Schools in this matter
19 bearing Bates page number BOE 017080.
20 (Document marked as Hudgins Deposition
21 Exhibit 2 for identification.)
22 Q Miss Hudgins, have you ever seen this document
23 before?
24 A No.

Page 28

1 Q Okay. Have you ever seen an enrollment list
2 like this before related to your attendance at Chicago
3 Public Schools?
4 A Yes.
5 Q Okay. When have you seen documents like this
6 before?
7 A When I was in school.
8 Q So when you were in school you saw enrollment
9 lists for your attendance, is that fair?
10 A I'm not sure what you're asking.
11 Q Okay. I just want to -- do you have any
12 reason to doubt that this is a record from Chicago
13 Public Schools of your attendance in Chicago Public
14 Schools?
15 A No, ma'am.
16 Q Okay. Thank you. And then as we just
17 discussed, okay, you said that your sophomore and junior
18 years you attended Bogan High School, is that correct?
19 A Yes.
20 Q Okay. And here it says you enrolled in Bogan
21 High School in September 2018, is that the right year?
22 A Yes.
23 Q And then it says you stopped attending Bogan
24 High School around March of 2020, is that correct?

Page 29

1 A Yes, I believe so.
2 Q Okay. And then you'll note here that there's
3 nothing in 2017, right? There's a gap between 2016 and
4 2018, do you see that?
5 A Yes.
6 Q Okay. Is that was -- let me back up.
7 Did you attend Wentworth Elementary School?
8 A Yes.
9 Q Okay. So between Wentworth Elementary School
10 and when you started as a sophomore at Bogan High
11 School, is that when you attended the charter school for
12 your freshman year? And I can blow up the document so
13 you can see it better.
14 A So in the year 2017?
15 Q Yeah. So in 2017, is that when you were
16 attending the charter school?
17 A Yes.
18 Q Okay. And so the reason that there's nothing
19 in 2017 on the Chicago Public Schools record is because
20 you were at the charter school in 2017, not at Wentworth
21 elementary or Bogan High School, does that make sense?
22 Is that correct?
23 A Yes.
24 Q Okay. And then in September of 2020 you

8 (Pages 26 - 29)

Page 30

1  transferred to the McKinley High School?
2      A    Yes.
3      Q    Okay.  Why did you transfer from Bogan High
4  School to McKinley High School?
5      A    Not only because I was having like my own --
6  my own problems, but also because of the Quiet Time
7  Program, like it was really interfering with at the time
8  me being a Muslim, you know, it was going against my
9  beliefs.  That's one of the reasons why I left, and I
10  was also going through personal problems at the time,
11  so.
12      Q    Okay.  What were the personal problems you
13  were going through?
14      A    At the time I was experiencing homelessness.
15      Q    I'm sorry to hear that.  Is McKinley some sort
16  of special high school?
17      A    It is an alternative school.
18      Q    Alternative school, okay.  And then you
19  graduated from McKinley High School in June of 2021,
20  correct?
21      A    Yes.
22      Q    Now, when you left Bogan High School in 2020,
23  you just said one of the reasons you left was because of
24  the Quiet Time Program?

Page 31

1      A    Yes, ma'am.
2      Q    Was the Quiet Time Program still going on at
3  Bogan High School in 2020?
4      A    Yes, I believe so, yes.
5      Q    Okay.  Do you have any understanding or
6  knowledge about whether the Quiet Time Program has been
7  canceled in Chicago Public Schools?
8      A    No, I do not.
9      Q    Okay.  Do you think the Quiet Time Program is
10  still going on in Chicago Public Schools?
11      A    Yes.
12      Q    Okay.  Did you ever raise any complaints about
13  the Quiet Time Program while you were attending Bogan
14  High School?
15      A    Yes.
16      Q    Who did you complain to?
17      A    My teachers.
18      Q    Okay.  Do you remember any of the teachers'
19  names that you complained to?
20      A    No, I am not good with names at all.
21      Q    Okay.  Did you ever complain to the principal
22  or assistant principal about the Quiet Time Program
23  while you were at Bogan High School?
24      A    No, but the dean.  I hardly saw the principal

Page 32

1  or the assistant principal, but I did complain to the
2  dean.
3      Q    Was that the dean of students?
4      A    Yes.
5      Q    Do you remember their name?
6      A    We called him JB.
7      Q    JB?
8      A    Yes.
9      Q    Okay.  What do you remember telling JB about
10  the Quiet Time Program?
11      A    I remember telling him that I didn't want to
12  participate and I felt like we shouldn't get in trouble
13  because we don't want to participate and it shouldn't
14  affect us academically because we don't want to
15  participate.
16      Q    And what do you remember JB saying in
17  response?
18      A    Basically saying that we had to.  It was
19  something that we had to do.
20      Q    Okay.  Okay.  So let's talk about -- well,
21  actually, first off, did you ever complain to like the
22  Chicago Public Schools' school board?
23      A    No, I didn't know how to do that.
24      Q    Okay.  Did you ever attend any like student

Page 33

1  and parent meetings where people were complaining about
2  the Quiet Time Program?
3      A    No, because most of the parents didn't know,
4  but the students, we were -- like me and my classmates,
5  we would always complain about it.
6      Q    Did you ever complain to any of your parents?
7      A    No.  My parents didn't know about it.
8      Q    Why didn't your parents know about it?
9      A    Because we were asked not to tell my parents
10  about it.
11      Q    Okay.  But you were complaining to your
12  friends at school, right?
13      A    Yes.
14      Q    Was there anything stopping you from
15  complaining to your parents?
16      A    Yes.
17      Q    What was stopping you?
18      A    Because at the time, like I said, I came from
19  like a religious household.  So if they knew that that
20  was what we were doing at the school, then I felt like I
21  would have gotten in trouble.
22      Q    Okay.  Are you aware of any of your friends
23  ever complaining to their parents?
24      A    Not that I know of.  I know Amontae has, but

9 (Pages 30 - 33)

Page 34

1 other than that, no.
2    Q    Okay.  So you knew Amontae complained to his
3 parents about the Quiet Time Program?
4    A    Yes.
5    Q    Do you know anyone by the name of Dasha
6 Skinner?
7    A    Dasha Skinner, yes.
8    Q    Dasha Skinner.  What do you know about Dasha
9 Skinner?
10    A    She was -- she was employed at Bogan, and she
11 is also helping take the Quiet Time Program down.
12    Q    Have you ever had any conversations with Dasha
13 Skinner about the Quiet Time Program?
14    A    No, not to my knowledge, no.
15    Q    Okay.  Dasha Skinner didn't ask you to get
16 involved in this lawsuit?
17    A    No.
18    Q    Dasha Skinner didn't ask you to like write any
19 complaints to the school administration?
20    A    No.
21    Q    You've never spoken to any journalists about
22 the Quiet Time Program, is that correct?
23    A    Yes, that's correct to my --
24    Q    Okay.  So like you've never given a television

Page 35

1 interview or a newspaper interview about the Quiet Time
2 Program?
3    A    No, ma'am.
4    Q    Okay.  Let's talk about the Quiet Time Program
5 for a minute.  Can you describe to me what you remember
6 about how you started being involved in the Quiet Time
7 Program?
8    A    I remember the Quiet Time people coming to the
9 school and them explaining to us what that -- what
10 meditation was, and we had to sign a consent.  We had to
11 give consent, the students did.  That's basically what
12 got me involved.
13    Q    Okay.  Do you remember what year that happened
14 in?
15    A    Not exactly.
16    Q    Okay.  You don't remember --
17    A    I remember it was my sophomore year, but I
18 don't remember what year that is.
19    Q    Okay.  It was your sophomore year.  And you
20 said that there was a consent form?  What do you
21 remember about that consent form?
22    A    I remember that the students had to sign the
23 consent form.
24    Q    And did you sign the consent form?

Page 36

1    A    Yes, I did.
2    Q    Okay.  Why did you sign the consent form?
3    A    Because we had to.
4    Q    What would have happened if you didn't sign
5 the consent form?
6    A    If we didn't sign the consent form, they --
7 I'm not sure, but they was telling us that it was
8 mandatory.  I signed it, so I'm not sure what would have
9 happened.
10    Q    Did you ever -- did every student at Bogan
11 High School participate in the Quiet Time Program?
12         MR. MAUCK:  Objection, there's no foundation
13         and going way beyond the scope to ask the client if
14         she knows about every student at Bogan.  Go ahead
15         and answer if you can.
16    A    I'm not sure.
17 BY MS. HOMER:
18    Q    Do you know if everyone who participated in
19 the Quiet Time Program at Bogan -- actually, scratch
20 that.  Let me back up.
21         To your knowledge of you and your friends who
22 were participating in Quiet Time, were all of them
23 trained in meditation?
24    A    Yes.

Page 37

1    Q    Okay.  Are you aware of any students at Bogan
2 High School who were not trained in meditation?
3    A    No.
4    Q    Do you know whether students could just sit
5 quietly during class but not meditate during the Quiet
6 Time Program?
7    A    Well, there was no way to tell, but.
8    Q    What do you mean there was no way to tell who
9 was meditating and who wasn't?
10    A    Because you really couldn't tell.
11    Q    Okay.
12         MR. MAUCK:  Please speak up.
13 BY MS. HOMER:
14    Q    The Quiet Time Program, right, it was, you
15 know, my understanding is that it occurred during like
16 second period every day.  There was a 15 or 20 minute
17 blocked out time.  Is that your memory?
18    A    So we were -- it was mandatory that we
19 meditate twice a day.  So it was once second period and
20 then again sometime later in the day.
21    Q    Like sixth or seventh period.
22    A    Who knows.
23    Q    Later.  So there was once in the morning and
24 once in the afternoon.  There was a Quiet Time session

10 (Pages 34 - 37)

---

**Page 38**

1 every day, is that correct?
2   A   Yes.
3   Q   Okay.  And during those sessions, did you ever
4 see anyone playing on their phones?
5   A   No, no, because if we did, then we would get
6 kicked out of class.
7   Q   Did you ever see anyone reading a book?
8   A   I'm not sure.
9   Q   Did you ever see anyone just like drawing on a
10 piece of paper?
11   A   I'm not sure.
12   Q   Did you ever see anyone doing their homework
13 like it was a study hall?
14   A   I'm really not sure, but I do know that when
15 it was time for us to meditate, then it was mandatory
16 that we put everything away.
17   Q   Okay.  Did you ever see anyone put their head
18 down on their desk?
19   A   I'm not sure.
20   Q   Did you ever see anyone sleeping?
21   A   I'm not sure.
22   Q   Did you personally meditate every day during
23 those two class periods?
24   A   No, not every day.

**Page 39**

1   Q   Okay.  What did you do on the days you weren't
2 meditating?
3   A   Act like I was.
4   Q   So were you sitting there with your eyes
5 closed?
6   A   Yes.
7   Q   Did you ever put your head down on a desk?
8   A   No.
9   Q   Did you ever just kind of stare at the wall?
10   A   Yeah.
11   Q   Did you ever do any homework?
12   A   No.  Like I said, it was mandatory that we put
13 everything away during.
14   Q   Yeah, and who mandated that?  Was that your
15 teacher's requirement?
16   A   I'm not sure who mandated it, but they just
17 enforce it.
18   Q   Okay.  Did you ever get sent out of the
19 classroom because you were not meditating?
20   A   Yes.
21   Q   Okay.  When did that happen?
22   A   I'm not sure.
23   Q   Okay.  You're not sure of the exact like month
24 or year when that happened, right?

**Page 40**

1   A   Right.
2   Q   Do you remember what you were doing that
3 caused you to be sent out of the classroom?
4   A   Yes.
5   Q   What were you doing?
6   A   I believe I was trying to ask my teacher,
7 because like I said, I was Muslim at the time and
8 praying five times a day is mandatory.  So I was asking
9 my teacher like instead of doing this can I go out and
10 pray, you know.  And then they told me no, and that
11 upset me, so then I got sent out to the dean's office.
12   Q   Do you remember any conversation you had with
13 the dean about that?
14   A   Like I spoke about earlier, I was complaining
15 to him, telling him that I would rather be doing the
16 five daily prayers than that.
17   Q   So the time you remember complaining to the
18 dean was the same time that you got dismissed from the
19 classroom because you had asked if you could pray
20 instead?
21   A   Yes.
22   Q   Okay.  Did you have any other conversations
23 with the dean?
24   A   Not to my knowledge.

**Page 41**

1   Q   Okay.  Did Chicago Public Schools permit you
2 to do any of your five daily prayers during the school
3 day?
4   A   Can you ask that one more time?
5   Q   Yeah.  When you were attending Bogan High
6 School did you ever do any of your five daily prayers at
7 school?
8   A   Let's say if I could, like if I had the time
9 to, but I was not permitted to.  I did not have
10 permission to.
11   Q   Okay.  So there was no time -- I want to set
12 aside Quiet Time for a minute.  Like I want to ask like
13 during your lunch break, for example, did you ever --
14   A   Oh, yeah, yeah.
15   Q   Okay.  Okay.  So like during your lunch break
16 did you ever do any of your -- I'm trying to remember
17 the name of the lunchtime prayer.
18   A   Salhet?
19   Q   How do you spell that again?
20   A   S-a-l-h-e-t, I believe.  It's called Salhet.
21   Q   Salhet, that's right.  So did you ever do
22 Salhet during your lunch break?
23   A   Yes.
24   Q   And did Chicago Public Schools have like a

11 (Pages 38 - 41)

Page 42

1 room where you could go pray --
2     A    No.
3     Q    -- during your lunch break?  Okay.  Where
4 would you pray during your lunch break?
5     A    In the hallway.
6     Q    And did you ever pray in the mornings before
7 school started?
8     A    Yeah, so the first prayer, which is like first
9 thing when the sun rises.
10     Q    Okay.  But what Chicago Public Schools
11 wouldn't let you do is go say one of your prayers during
12 the Quiet Time Program?
13     A    Correct.
14     Q    Okay.  Did you feel at the time like the Quiet
15 Time Program violated your religion somehow?
16     A    Oh, yeah.
17     Q    Okay.  Why is that?
18     A    Because for me it was just kind of confusing,
19 you know, and it was -- I felt like if we could practice
20 this and we could be doing that meditation, then people
21 who are required to do like the five daily prayers or
22 whatever else should be able to do that as well or
23 instead.
24     MS. HOMER:  Okay.  Could we actually go off

Page 43

1 the record for just like a five-minute break?
2     We've been going about an hour.  Also my puppy has
3     asked to go outside.
4     MR. MAUCK:  All right.  We're going to go get
5     some coffee then.
6     MS. HOMER:  We'll be back in five minutes,
7     okay?
8     MR. MAUCK:  Okay.
9     MR. SIPCHEN:  Yes.
10     (Recess taken.)
11 BY MS. HOMER:
12     Q    So, Miss Hudgins, can you describe the initial
13 training in meditation you received?
14     A    Pertaining to like what happened?
15     Q    Yeah.  So you first encountered Quiet Time at
16 Bogan High School, right?
17     A    Yes.
18     Q    And you mentioned earlier there was some
19 instructor who took you out of the classroom to teach
20 you how to meditate, is that right?
21     A    Yes.
22     Q    Can you describe what that experience was
23 like?
24     MR. SIPCHEN:  Excuse me, is anybody else

Page 44

1 getting freezing from the question and the answer?
2     MS. ROSENBERG:  I think that was okay.
3     MR. SIPCHEN:  Court reporter?  I couldn't hear
4 Carolyn's last question and the answer.  I'm so
5 sorry to interrupt your examination, Carolyn.
6     MR. MAUCK:  That's okay.  Let me just explain.
7 Sometimes there's an audio problem when you're
8 hearing the question and you're answering right
9 away.
10     THE WITNESS:  Okay.
11     MR. MAUCK:  So just, again, pause for a
12 moment, and then that should solve the problem.  Go
13 ahead, Miss Homer.
14     MS. HOMER:  Okay.
15     Q    So I was asking if you could describe that
16 experience you had where an instructor took you out of
17 the classroom to teach you how to meditate.
18     A    For me it was a very uncomfortable experience,
19 because I wasn't familiar with what was -- what that
20 was.  And not only that, it was like the altar set up.
21 And to me when I first seen it, I thought to myself like
22 this looks like an offering, you know.  To me that's what
23 it looked like.  So I was very uncomfortable, you know,
24 because I didn't know much about what it was, you know.

Page 45

1     But when I -- when she started to tell me
2 more, I kind of got like curious, because she said that
3 the mantra was meaningless.  But when I started to do
4 more research into it, I found out that it wasn't.  And
5 then not only that, I was talking to others as well, and
6 we weren't supposed to share our mantra.  They told us
7 not to share our mantra.
8     But then when I started talking to others and
9 I was asking them their mantra and they was telling me,
10 I looked it up because I was thinking like it has to
11 have some meaning behind it, you know, it had to have
12 some significance behind it.  And when I started to do
13 more research, that's when I did found out that the same
14 mantras that they gave us and told us not to tell anyone
15 and that it was meaningless, they were actually the
16 names of Hindu gods.  So for me that was very
17 uncomfortable.
18     Q    Okay.  When do you remember researching the
19 mantras?
20     A    I remember researching the mantras when I
21 started to get suspicious, like when I started to get
22 suspicious about what was really going on.
23     Q    And when was that?
24     A    This was shortly after, this was shortly after

12 (Pages 42 - 45)

Page 46

1 it was introduced.
2 Q Okay. So you remember at Bogan High School
3 getting pulled out of class to learn this meditation
4 training, is that correct?
5 A Yes.
6 Q And you remember there being some sort of
7 altar --
8 A Yes.
9 Q -- in a room? Okay. And was it just you and
10 this female instructor in the room?
11 A Yes.
12 Q Do you remember what was on this altar?
13 A Yes. So on the altar it was some rice, like a
14 bowl of rice. There was an incense and it was a photo,
15 it was a photo of a guy like dressed as like in --
16 dressed as like, I don't know, kind of like a Hindu
17 priest or he was dressed some kind of way, but she told
18 me that there was no significance behind it at all.
19 Q Okay.
20 A But it was fruit, it was some rice, it was the
21 photo of that. She had a bell, yeah.
22 Q Okay. And do you remember any words being
23 spoken or any conversation that happened around this
24 altar?

Page 47

1 A Yes.
2 Q What do you remember?
3 A I remember her reciting something, but it
4 wasn't in English, so I don't know what it was that she
5 said.
6 Q Okay. So you don't understand what it was she
7 said?
8 A Correct.
9 Q Did you ever go and try and look it up?
10 A No.
11 Q Okay. And then during this, you know, meeting
12 where there was an altar, is that when you received a
13 mantra?
14 A Yes.
15 Q Okay. How was the mantra communicated to you?
16 A Can you -- like what you're asking --
17 Q Yeah, how did -- like did the instructor tell
18 you what your mantra was?
19 A Yes, ma'am.
20 Q Okay. What do you remember about that?
21 A I remember her like after she did recite what
22 she recited and we went through the process of
23 meditation, I remember feeling like -- thinking to
24 myself like if it has no significance to it, then why

Page 48

1 can't we tell anyone. That was my -- that's what I
2 thought about the mantra.
3 Q Did the instructor tell you not to tell
4 anyone?
5 A Yes.
6 Q When she was teaching you how to meditate, how
7 did she teach you to meditate?
8 A She -- she was telling me to sit up, to sit
9 up, to close my eyes, to breathe slowly, to listen to
10 what she was saying. And then she was just talking to
11 me. I started to fall into like a trance, like a
12 hypnosis almost.
13 Q Can you describe what that trance felt like?
14 A It felt like I wasn't in control, like I
15 didn't -- I couldn't -- almost like not being there,
16 like, you know, but it wasn't until she rang the bell
17 that kind of like made me snap back, if you understand
18 what I'm saying.
19 Q Okay. So after that initial training, then,
20 you know, meditation started actually in the classrooms
21 twice a day, is that correct?
22 A Correct.
23 Q And you said earlier that sometimes you
24 pretended to meditate but weren't actually meditating?

Page 49

1 A Correct.
2 Q Okay. Were there days when you actually
3 meditated?
4 A Yes, ma'am.
5 Q And why did you actually meditate on some
6 days?
7 A Because I was curious about what -- like why
8 did I feel that way, you know, why is it that when I
9 meditated I felt like I was under hypnosis. So I felt
10 like that's what made me kept doing it because it was
11 kind of different for me, it was a different experience,
12 so.
13 Q So every time you meditated in the classroom
14 did you have that same hypnosis experience?
15 A Same effect, yes.
16 Q Okay. Did you ever enjoy that experience?
17 A Yes, I did. I did.
18 Q Did you ever find it relaxing?
19 A Yes.
20 Q Did you ever meditate at home even when you
21 weren't in the classroom?
22 A Yes.
23 Q Okay. Why were you meditating at home, too,
24 sometimes?

13 (Pages 46 - 49)

Page 50

1    A    Because like I said, it did put me in like a
2    hypnosis state and it did make me very calm, you know,
3    but I just couldn't understand why then.
4        Q    Okay.  Did you ever talk to any of your
5    friends about that calm feeling you got from meditating?
6        A    Not exactly.
7        Q    Did you ever talk to your friends at Bogan
8    High School about meditation at all?
9        A    Yes.
10       Q    What sorts of things did you talk to your
11   friends about?
12       A    Well, at the time I was like -- I was like an
13   advocate for it.  So I was like -- although I was --
14   although I was against it like and I felt like I would
15   rather be praying, but it was up to allow -- at first I
16   was okay with it, but then I started to do more research
17   and then I figured out that's not what I wanted to do.
18   So then I stopped promoting it, you know.  But at first
19   I was promoting it and I was telling them that they
20   should be involved and should meditate, you know.
21           And that is because when someone pulled me
22   aside and they told me that they wanted me to push it,
23   you know, to tell other students like, you know, come
24   on, let's meditate, like they wanted me to be the

Page 51

1    advocate for it, and then we got rewarded for doing
2    that.  So that's another reason why I was, you know,
3    trying to tell the others about it.
4        Q    Do you remember who pulled you aside and asked
5    you to help advocate for meditation?
6        A    No, ma'am, I do not know the names.
7        Q    Do you remember whether it was a Bogan teacher
8    or somebody from outside of Bogan?
9        A    I'm not sure.
10       Q    And you said that you got rewarded for
11   promoting meditation?
12       A    Yes, ma'am.
13       Q    What rewards did you get?
14       A    We got pizza, snacks.  We got to get pulled
15   out of class.
16       Q    Can you describe more about that?  When would
17   you get pizza?
18       A    During class.
19       Q    Okay.
20       A    So during class someone would come get --
21   someone would come get the advocates for promoting it,
22   and we'll just go in a separate classroom and eat pizza
23   and snacks.
24       Q    Okay.  Do you remember who it was that would

Page 52

1    come get you and take you to the separate classroom?
2        A    I don't remember.
3        Q    When you were in the separate classroom were
4    they also discussing Quiet Time or was it like just a
5    party?
6        A    It was -- I don't remember, but I do know we
7    had snacks and pizza.
8        Q    Do you remember how many times you got snacks
9    and pizza as part of that -- go ahead.
10       A    I'm sorry.  We got snacks and pizza often.
11       Q    Yeah, was it like once a week, once a month?
12       A    Probably like once a week.
13       Q    Okay.  And how many times do you personally
14   remember getting pulled out of class to get those
15   rewards?
16       A    About -- I'm not sure exactly, but I know it
17   was often.
18       Q    Okay.  So six times, 12 times, 20 times,
19   anywhere in there?
20       A    Could be.  I'm not sure.
21       Q    Okay.  So you said when you first started
22   Quiet Time you were advocating for it, right?
23       A    Yes.
24       Q    And then it wasn't until later that you got

Page 53

1    suspicious about it?
2        A    Correct.
3        Q    And that's when you started complaining about
4    it?
5        A    Uh-huh.  I'm sorry.  Yes.
6        Q    Okay.  And was Quiet Time in Bogan High School
7    your entire sophomore year?
8        A    Yes.
9        Q    Okay.  How about the next school year, your
10   junior year, was Quiet Time still active at Bogan High
11   School?
12       A    Yes, it was still active, but I'm not sure
13   like what -- what ended up happening with it because I
14   ended up transferring from that school.  So I know it
15   was there my sophomore and my junior year.
16       Q    Okay.  When did you transfer out of Bogan High
17   School?  Was it part of the way through your junior
18   year?
19       A    Yes, it was like three-fourths of the way.
20       Q    Okay.  And your junior year were you still
21   getting rewards for participating in Quiet Time?
22       A    Then I wasn't an advocate.
23       Q    Okay.  So you were only an advocate for it
24   your sophomore year?

14 (Pages 50 - 53)

Page 54

1    A    Yes.
2    Q    At some point during your sophomore year, is
3  that when you started complaining about Quiet Time?
4    A    Yes.
5    Q    Do you remember when during your sophomore
6  year you started complaining?
7    A    After I did the research.
8    Q    Okay.  But do you remember if it was winter or
9  spring?
10    A    No, I don't remember.
11    Q    Did you stop getting rewards like pizza --
12    A    Yes.
13    Q    -- when you -- yes?  Okay.  Can you describe
14  how that happened?
15    A    Because I was no longer promoting it, so they
16  wasn't going to reward me.
17    Q    Like do you remember any specific conversation
18  where someone told you you're not going to get these
19  rewards anymore?
20    A    No.  It was more so like -- it was more so
21  like when they saw that I was no longer promoting it and
22  I was against it, they just took me out of it.
23    Q    So you just stopped getting invited to the
24  pizza --

Page 55

1    A    Exactly.  Correct.
2    Q    Did you ever attend any after school like
3  focus group about Quiet Time?
4    A    No.
5    Q    And you said that during this time you were
6  participating in Quiet Time you were Muslim, correct?
7    A    Yes, ma'am.
8    Q    Did you change religions in high school at
9  all?
10    A    No.  I was Muslim when I was in the whole year
11  of high school.  Like I say, it wasn't until I graduated
12  till I decided to.
13    Q    Okay.  So you decided to stop being Muslim
14  after you graduated from high school, is that correct?
15    A    Correct.
16    Q    Okay.  And you spent your last year of high
17  school at the McKinley High School, right?
18    A    Yes.
19    Q    And Quiet Time wasn't running at the McKinley
20  High School while you were there, is that correct?
21    A    No.
22    Q    Okay.  When you were advocating for Quiet Time
23  during your sophomore year at Bogan, did you feel like
24  it was possible to both be Muslim and meditate?

Page 56

1    A    Yes, I did feel like it was okay to do both,
2  but what they -- what I did not believe in was the
3  mantra and the photo and stuff like that because I felt
4  like that was against my religious beliefs.  So it's not
5  the meditating that I'm against, but it's the deception.
6    Q    Okay.  So if you had only meditated during the
7  school -- during the school day but never had that
8  opening ceremony, would you have thought that was okay?
9         MR. MAUCK:  Go ahead.  No objection.
10    A    Can you restate the question?
11  BY MS. HOMER:
12    Q    Yeah, okay.  So you -- you have an objection
13  to that initial training with the altar and the mantra,
14  right?
15    A    Yes.
16    Q    Okay.  And I just want you to pretend for a
17  minute that that had never happened and that all
18  meditation was is a quiet period during the school day,
19  do you understand what I'm asking?
20    A    Yes.
21    Q    Would you have thought that just being quiet
22  during the school day itself, that that violated your
23  religion?
24    A    No.

Page 57

1    Q    At Bogan High School there are hundreds of
2  students, right?
3    A    Right.
4    Q    And did you have friends who were lots of
5  different religions at Bogan High School?
6    A    Yes, mostly Christians.
7    Q    And do you know whether those Christians felt
8  like meditation violated their religion?
9    A    Yes.
10    Q    Okay.  What do you know about that?
11    A    Well, I feel like a lot of times my
12  classmates, they knew that it was -- it was not going
13  against their religion, but they kind of -- I'm pretty
14  sure they knew it was a little off, that something about
15  it was like not -- it was from the signing the paperwork
16  that gave people suspicion, like why are you all telling
17  us not to tell our parents about it, why are you all
18  telling us not to tell anyone our mantra, like that's
19  weird.
20    Q    Did you also hear any of your classmates talk
21  about how much they liked the Quiet Time Program?
22    A    No.
23    Q    Did you ever hear any -- I mean, you said you
24  were an advocate, right, for the program at the

15 (Pages 54 - 57)

Page 58

1 beginning?
2    A    Yes.
3    Q    And there were other students who were also
4 advocates for the program with you?
5    A    Yes.
6    Q    Okay. About how many students were attending
7 these like pizza parties that you remember?
8    A    It wasn't a large amount of people, probably
9 like five or six, around that number.
10   Q    Okay. And those five or six students, do you
11 remember any of their names?
12   A    I know it was Turbo, yeah, that's pretty much
13 it. She was -- we're familiar with each other, but I
14 don't know anyone else names that was involved besides
15 her.
16   Q    Do you know how to spell her name?
17   A    That's her nickname. Her nickname is Turbo.
18 I don't know her real name.
19   Q    Do you know how to spell her nickname?
20   A    T-u-r-b-o.
21   Q    Okay. But there were other students who had
22 positive reactions to Quiet Time at Bogan High School,
23 right?
24   A    Not to my knowledge.

Page 59

1    Q    And you said earlier there were some students
2 who thought the program was a little off, but that's not
3 the same thing as thinking it might have violated their
4 religion, is that fair?
5    A    Correct, because I don't know about anyone
6 else's opinion about how it affected their religion, you
7 know.
8    Q    Yeah, you don't know how the Quiet Time
9 meditation program affected anyone else's religious
10 beliefs, right?
11   A    Correct. I can only speak for myself.
12   Q    So I would have to ask all of those other
13 students about their religious experience with Quiet
14 Time to find out, right?
15   A    As far as -- as far as religion, but when it
16 comes to the -- they did not want to participate, I can
17 tell you that. Most students didn't want to participate
18 and were forced to participate. But as far as religion,
19 I'm not sure.
20   Q    And when you say they were forced to
21 participate, what do you mean by that?
22   A    If we didn't participate in Quiet Time, there
23 was disciplinary action.
24   Q    What did the disciplinary action look like?

Page 60

1    A    Getting sent out the classroom or we were even
2 told that if we didn't participate, then it would affect
3 us academically.
4    Q    How could it affect you academically?
5    A    If we didn't participate, then our teachers
6 was telling us that it could affect our grades.
7    Q    Do you know anyone whose grades suffered
8 because they weren't participating in Quiet Time?
9    A    Not personally.
10   Q    And did you ever observe anyone like getting
11 up, wandering around or talking during the Quiet Time
12 period?
13   A    No, ma'am. Well, if they did, they got sent
14 out of the classroom.
15   Q    When you were just in class normally, like if
16 you were in math class and people started talking out of
17 turn, did they ever get sent out of the classroom for
18 that?
19   A    If it wasn't time to meditate? You're talking
20 about outside of those times?
21   Q    Yeah. So just in normal class could you get
22 in trouble if you were talking too much?
23   A    Depends on what you're talking about.
24   Q    That's fair. So let's say it was a test, like

Page 61

1 everyone's taking a math test, okay?
2    A    Uh-huh.
3    Q    And somebody just starts talking out loud
4 during the math test, could they get in trouble for
5 that?
6    A    Yes.
7    Q    Because you're supposed to be quiet during
8 tests, right?
9    A    Correct.
10   Q    Because that helps prevent cheating, for
11 example?
12   A    Uh-huh.
13   Q    And it helps other students focus, right?
14   A    Yeah.
15   Q    Okay. So if you were disruptive during the
16 Quiet Time period by talking out loud, for example, you
17 could also get sent out of the classroom and get in
18 trouble for that?
19   A    Yes.
20   Q    Did you ever see that happen?
21   A    Yes, multiple times.
22   Q    How often do you remember somebody getting
23 sent outside of the classroom because they were talking
24 during the Quiet Time period?

16 (Pages 58 - 61)

Page 62

1    A   Every day.
2    Q   So it was really common that students talked
3  during the Quiet Time?
4    A   Correct.
5    Q   When you --
6    A   I'm sorry, can we go back?  You said that it
7  was common that students talked during Quiet Time?
8    Q   Yes, that was my question.
9    A   So most of the time it would be them like
10  complaining about having to meditate and to do it, you
11  know.  It wasn't just random conversation, it was more
12  like oh, we don't want to -- I don't want to do this,
13  you know, it was more like that, you know, and not like
14  what you doing after school, like it wasn't like that.
15  It's more like complaining about having to participate,
16  which got them --
17    Q   Okay.  So if a student at the start of the
18  Quiet Time period started complaining out loud about
19  having to meditate, they would get kicked out of the
20  classroom?
21    A   Correct.
22    Q   Do you ever wonder if students complained
23  intentionally because getting kicked out of the
24  classroom was like a reward?

Page 63

1      MR. MAUCK:  Objection, calls for speculation.
2      Go ahead and answer.
3    A   I don't know how to answer that.
4  BY MS. HOMER:
5    Q   Yeah, if you didn't want to participate and
6  you complained about it, then the effect, right, was you
7  went into the hallway and didn't have to participate, is
8  that correct?
9    A   No.
10    Q   No.  What would happen to the students who
11  went into the hallway?
12    A   There would be disciplinary action, like it
13  would get sent to the dean's office or you would have
14  to -- you will be punished.  Like if you didn't want to
15  participate, let's say you would have to participate in
16  in-school, meaning that you have to sit into one
17  classroom the entire day.
18    Q   Okay.  If somebody was complaining out loud
19  about Quiet Time meditation, though, they probably
20  weren't meditating, is that fair?
21    A   Can you restate the question?
22    Q   Yeah.  So if somebody is complaining about
23  meditating, then they aren't actually meditating, is
24  that correct?

Page 64

1    A   I can only speak for myself.
2    Q   Okay.  But if you're talking out loud you are
3  not sitting quietly, is that correct?
4    A   Yes.
5      MS. HOMER:  I would like to mark Exhibit 3 for
6  the record.  This is a document produced by the
7  David Lynch Foundation.
8      MR. SIPCHEN:  Hey, Carolyn?
9      MS. HOMER:  Yeah?
10      MR. SIPCHEN:  Before you put that up, can we
11  take a 30-second break?  I ran out of ink.
12      MS. HOMER:  Oh, yeah.  Can we go off the
13  record just for one minute?  We'll be right back.
14      (Brief recess.)
15      MS. HOMER:  So when we were signing off I was
16  about to mark as Exhibit 3 a document produced by
17  the David Lynch Foundation bearing the Bates page
18  number 013500.
19      (Document marked as Hudgins Deposition
20      Exhibit 3 for identification.)
21    Q   Here, I'll scroll through it.  It's five pages
22  long.
23      MR. MAUCK:  We were given a copy of this
24  today.  Do you object if she looks at the copy we

Page 65

1  printed out?
2      MS. HOMER:  Yeah, if you have a printed out
3  copy, please, feel free to go ahead and give her a
4  copy.
5      MR. MAUCK:  Okay.  She's got it.
6      MS. HOMER:  Okay.
7      MR. SIPCHEN:  There's no writing or notes on
8  it, right?
9      MR. MAUCK:  No, nothing's changed from what
10  was sent.
11      MR. SIPCHEN:  Okay.
12      MS. HOMER:  Okay.
13    Q   Ms. Hudgins, do you recognize this document?
14    A   Yes.
15    Q   Okay.  Is this your handwriting, your name,
16  Kaya Hudgins at the top?
17    A   Yes.
18    Q   Okay.  And is your birthday April 22nd, 2003?
19    A   Yes.
20    Q   So you are currently 19 years old?
21    A   Eighteen.
22    Q   Eighteen.  I apparently can't do math.  And
23  then you filled this out in November of 2018, is that
24  correct?

17 (Pages 62 - 65)

Page 66

1    A    Yes.
2    Q    And this was your sophomore year at Bogan High
3 School?
4    A    Yes.
5    Q    Is this form from the first day you ever
6 learned about the Quiet Time Program?
7    A    Yes.
8    Q    And is this the form you remember filling out
9 to give consent to the Quiet Time Program?
10    A    Yes.
11    Q    Okay.  So if you look -- oh, and if you look
12 down at the bottom where it says TM instructor, do you
13 see that?
14    A    Yes.
15    Q    Okay.  Do you understand TM to mean
16 transcendental meditation?
17    A    Yes.
18    Q    Okay.  And then the name is written Erin,
19 E-r-i-n, Levi, L-e-v-i, do you see that?
20    A    Yes.
21    Q    Is that the woman who you thought was named
22 Erin you were talking about earlier?
23    A    Yes, ma'am.
24    Q    Did you remember Erin's name today because you

Page 67

1 had seen this form?
2    A    I knew it -- previously I knew it was
3 something similar, but I was sure today.
4    Q    Okay.  So before today you vaguely remembered
5 her name might be Erin, but you were sure after looking
6 at this form today that her name was Erin, is that
7 correct?
8    A    Yes.
9    Q    Okay.  So I want to look at the middle of the
10 page where -- do you see the question what are the
11 benefits you'd like to gain from learning the
12 transcendental meditation technique?
13    A    Yes.
14    Q    Do you see that?  Okay.  That response is in
15 your handwriting, right?
16    A    Yes.
17    Q    Can you read what it says?
18    A    It says what are the benefits you'd like to
19 gain from learning the transcendental meditation
20 technique.  My answer was using my subconscious mind to
21 bloom into a phenomenal, successful woman.
22    Q    Do you feel like the transcendental meditation
23 practice helped you bloom into a phenomenal, successful
24 woman?

Page 68

1    A    No.
2    Q    Why not?
3    A    Because it was deception.
4    Q    Okay.  And what did you think was deception
5 about it?
6    A    The part -- mostly everything, but the part
7 where they said that it had no meaning to it, giving us
8 the mantra, having us sign without our parents'
9 permission, telling us not to tell our parents.  So all
10 of that is deception in my eyes.
11    Q    Do your parents know you're here today?
12    A    My grandmother does.
13    Q    Your grandmother.  Were you living with your
14 parents when you attended Bogan High School?
15    A    I was living with my grandma at the time.
16    Q    Did you ever tell your grandmother about Quiet
17 Time meditation while you were attending Bogan High
18 School?
19    A    No, not while attending.
20    Q    When did you first tell her about the Quiet
21 Time meditation program?
22    A    Afterwards.
23    Q    When?  Do you remember a year?
24    A    My junior year.

Page 69

1    Q    Okay.  So your junior year you remember
2 telling your grandmother about Quiet Time meditation, is
3 that correct?
4    A    Yes, mentioning it to her.
5    Q    What did you tell her?
6    A    I told her basically what happened.  I told
7 her that they -- that the Quiet Time people told us not
8 to tell, not to say what was going on, how they gave us
9 a mantra.  I think I told her everything.
10    Q    How did she react?
11    A    She was shocked.  She was shocked.
12    Q    So that was your junior year, that would have
13 been in 2019 sometime?
14    A    Yes.
15    Q    Okay.  Did you or your grandma in 2019 then do
16 anything to tell anyone else about those concerns?
17    A    No, because she wasn't too much like involved
18 with other parents at the school.  But what we did do
19 was transfer me schools, transfer me to a different
20 school.
21    Q    Okay.  Can you describe why you transferred
22 from Bogan High School to McKinley High School?
23    A    Not only because I felt like -- not only
24 because I felt like the TM program was going against my

18 (Pages 66 - 69)

1 religious beliefs and I wanted to be able to pray five
2 times a day, and at McKinley they was fine with that.
3 Not only because of that, but also because, like I said,
4 I was having my own personal issues.
5    Q    Yeah, okay.  So you said McKinley High School
6 let you pray five times a day including during your
7 school day?
8    A    Yes.
9    Q    Did McKinley have a separate room where you
10 could go to pray?
11    A    Yes.
12    Q    Where was that room?
13    A    Inside the school.
14    Q    Yeah, like was it near the cafeteria or near
15 the library?
16    A    It was right -- it was right -- it was
17 right -- it was right on the other side of the
18 principal's office.
19    Q    Okay.  So I just wanted to turn to page two of
20 this exhibit.  So is this still your handwriting?
21    A    Yes.
22    Q    Okay.  What do you -- or back up.  Do you
23 understand this page to be you answering questions about
24 how transcendental meditation was going for you?

1    A    Yes.
2    Q    Okay.  And you answered that your mind and
3 body feel wonderful, is that correct?
4    A    Yes.
5    Q    Okay.  And you said yes to the meditation
6 being easy and peaceful?
7    A    Yes.
8    Q    And that you felt happiness during meditation?
9    A    I wouldn't say happiness but more of it says
10 or a good feeling, so I would say more on that side.
11    Q    Okay.  So you had a good feeling when you were
12 meditating?
13    A    Correct.
14    Q    And this is what we were describing earlier
15 when you said you were an advocate for meditation
16 because it helped you feel calm, is that correct?
17    A    Correct.
18    Q    And that changed later once you learned more
19 about it?
20    A    Yes.
21    Q    I'm going to stop sharing this.  So you can
22 put that exhibit aside.
23        When you said you did research into the
24 mantras, what did that research look like?  What did you

1 do?
2    A    Going on Safari and just trying to type in
3 the -- tried to type in -- I didn't know how to spell
4 it.  Like the mantra, I didn't know how to spell it, but
5 I was trying to spell it.  And when I did and I started
6 to ask other people what their mantra was and
7 researching theirs as well, each time it showed me oh,
8 okay, this is something that -- this is a practice, this
9 is a Hindu god or, you know.  But it wasn't up until I
10 started to do research that I found that out.
11    Q    And when you say Safari, you're referring to
12 like the internet browser on a computer, right?
13    A    Yes.
14    Q    Okay.  Just making sure we're all on the same
15 page.  And so you were researching on the internet your
16 best guess as to how to spell your mantra, is that
17 right?
18    A    Correct.
19    Q    Okay.  And you said that you were also asking
20 other students about their mantras, is that correct?
21    A    Yes.
22    Q    And did those students tell you their mantras?
23    A    Yeah, select students did tell me their mantra
24 when I did tell them what I thought.  But like at the

1 time I was telling the students like hey, I don't think
2 this is what it seems like, you know.  So when I started
3 to kind of tell them that, then they was like -- they
4 was like kind of willing to tell me, but some students
5 still kept it to their self, you know.
6    Q    Yeah.  So some students were willing to tell
7 you their mantra while you were researching it, is that
8 correct?
9    A    Yes.
10    Q    And then some students weren't willing to tell
11 you their mantra and they kept it to themselves?
12    A    Correct.
13    Q    But you learned enough mantras from other
14 students that it helped you do more internet research,
15 is that right?
16    A    Yes.
17    Q    Okay.  And then did you share the results of
18 that research with any of your friends at school?
19    A    So afterwards I just ended up transferring.
20    Q    How -- okay.  So let's get -- so you started
21 doing research.  Do you remember if you did research
22 your sophomore year or your junior year at Bogan?
23    A    It was my sophomore year.
24    Q    Okay.  But then you were back at Bogan for the

19 (Pages 70 - 73)

Page 74

1  start of your junior year, right?
2     A   Right.
3     Q   And then it was -- it wasn't until your junior
4  year that you told your grandma about the program,
5  right?
6     A   Correct.
7     Q   And then you transferred to McKinley?
8     A   Yeah.
9     Q   Okay.  So there was a gap between when you did
10 the research and started being suspicious of the Quiet
11 Time Program and when you transferred to McKinley, is
12 that correct?
13    A   Correct.
14    Q   And do you know how many months long that gap
15 was?
16    A   Truthfully I'm not sure.
17    Q   Okay.  But as you said, you started doing
18 research your sophomore year and you transferred your
19 junior year, is that right?
20    A   Yes.
21    Q   And you said there were other factors like
22 trouble at home and with the homelessness, that
23 contributed to you also transferring to McKinley, is
24 that right?

Page 75

1     A   Yes.
2         MS. HOMER:  Hold on a second.  Okay.  Then
3  finally, I think this is Exhibit 4.  We're on 4,
4  right, Christina?
5         MS. ROSENBERG:  Yes.
6         MS. HOMER:  You probably also have a signed
7  copy of this in front of you.  I want to put in
8  front of you the declaration that you signed this
9  morning.
10        MR. MAUCK:  This is what I'm giving her, what
11 we sent you.
12        MS. HOMER:  Okay.  So I'm marking for the
13 record as Exhibit 4 the Declaration of Kaya Hudgins
14 which was provided by the Mauck & Baker law firm to
15 all counsel this morning right before this
16 deposition.
17        (Document marked as Hudgins Deposition
18 Exhibit 4 for identification.)
19 BY MS. HOMER:
20    Q   So, Ms. Hudgins, did you write -- actually,
21 let me back up.
22        If you turn to page six, is that your
23 signature?
24    A   Yes.

Page 76

1     Q   Okay.  And did you sign this document this
2  morning?
3     A   Yes.
4     Q   And today's date is March 11th, 2022, is that
5  correct?
6     A   Yes.
7     Q   And you signed this document in Chicago?
8     A   Yes.
9     Q   That's where the office is you currently are
10 sitting in are, is that correct, they're in Chicago?
11    A   Yes.
12    Q   And you signed this declaration also under
13 penalty of perjury?
14    A   Can you elaborate?
15    Q   Yeah.  You swore to tell the truth in this
16 declaration, is that correct?
17    A   Yes.
18    Q   Did you write this document?
19    A   No, I did not.
20    Q   Okay.  Did your attorneys give you this
21 document that they had written?
22    A   Yes.
23    Q   Did you have conversations with the attorneys
24 that informed the content of this declaration before

Page 77

1  they gave it to you today?
2     A   Yes.
3     Q   Do you remember how many conversations you had
4  with attorneys about what would go in this declaration?
5     A   Not exactly.
6     Q   Was it more than one?
7     A   No, just once.
8     Q   Just once.  So you had one conversation with
9  attorneys about the contents that would go in this
10 declaration, correct?
11    A   Yes.
12    Q   And that conversation occurred before you
13 officially signed the document to have them be your
14 attorneys, which was also signed this morning, right?
15    A   Yes.
16    Q   Do you remember when you had the conversation
17 with attorneys about the Quiet Time Program?
18    A   I believe last month.
19    Q   Okay.  Did you see a copy of this declaration
20 before today?
21    A   Yes.
22    Q   Did you review it before today?
23    A   Yes.
24    Q   When did you review it?

20 (Pages 74 - 77)

Page 78

1    A    When I first seen it.
2    Q    When did you first see it?
3    A    When it was mailed to me.
4    Q    Okay.  And when was that, was it one week ago,
5    two weeks ago, a month ago?
6    A    About a week ago.
7    Q    And did you review it about a week ago when it
8    was mailed to you?
9    A    I went over it once, yes.
10   Q    Did you have any edits to it?
11   A    No, ma'am, besides the -- besides the high
12   school dates, then no.
13   Q    Okay.  So I want to actually look at the high
14   school dates.  So can you turn back to page one?
15   A    Yes.
16   Q    Okay.  And that's a photo of you on page one,
17   right?
18   A    Yes.
19   Q    It looks like a selfie you took in a car, is
20   that right?
21   A    Yes.
22   Q    Okay.  So in paragraph one you say I am a
23   former Chicago public school student, right?
24   A    Yes.

Page 79

1    Q    I actually want to go to the last part first
2    where it says -- that was confusing.  Do you see the
3    sentence that says I attended McKinley Lakeside Academy
4    for my senior year, 2019-2020, do you see that?
5    A    Yes.
6    Q    Now, you told me earlier that you graduated
7    McKinley in June of 2021, is that correct?
8    A    Yes.
9    Q    So are all of these days -- or are all of
10   these years still off by a year?
11   A    Yes.
12   Q    Okay.  So you actually attended McKinley
13   Lakeside Academy from 2020 to 2021, is that correct?
14   A    Yes.
15   Q    And then you actually attended Bogan High
16   School from 2018 to 2020?
17   A    Yes.
18   Q    And then you attended Amandla High School from
19   2016 to 2017?
20   A    Correct.
21   Q    Okay.  Just wanted to make sure we were
22   straight on that.  Okay.  Similarly -- so if you scroll
23   down to paragraph three on page two, do you see that?
24   So you said that you signed the Quiet Time consent form

Page 80

1    and that you were 16 years old at the time?
2    A    Yes.
3    Q    Okay.  We just looked at that consent form,
4    right?
5    A    You know what?  You know what?  I was 15 at
6    the time.
7    Q    Exactly.  Okay.  So yes, you were 15 at the
8    time you signed the consent form?
9    A    Correct.
10   Q    Okay.  Then looking down at the Puja ceremony
11   section, when did you first hear the word Puja?
12   A    I'm actually not sure.
13   Q    Have you ever heard the word Puja ceremony
14   before your attorneys sent you this declaration in the
15   mail a week ago?
16   A    No.
17   Q    Did the attorneys who helped prepare this
18   declaration, did they give you any information about
19   transcendental meditation?
20   A    Some information, but it was information that
21   I had already known from previously doing research.
22   Q    Okay.  So in the course of writing this
23   declaration, did the attorneys remind you of things that
24   had happened with transcendental meditation that you had

Page 81

1    previously experienced?
2    A    No, they didn't remind me, more so like just
3    told them what happened.
4    Q    Okay.  And they -- but they asked you -- back
5    up.
6        Did the attorneys you met with give you any
7    books or brochures or internet links to look at about
8    transcendental meditation?
9    A    No, ma'am.
10   Q    I'm going to stop sharing this for a second.
11   In connection with meditation, did anyone ever give you
12   like a Fitbit device to wear on your wrist to measure
13   how well you were sleeping?
14   A    No.
15   Q    Okay.  In connection with Quiet Time, did
16   anyone ever try to take a blood or a saliva sample from
17   you to measure like chemicals in your body?
18   A    No.
19   Q    Okay.  I want to just close out by asking
20   about your relationship with Amontae Williams.  How did
21   you meet Amontae Williams?
22   A    At Bogan.
23   Q    Okay.  And did you meet him your sophomore
24   year?

21 (Pages 78 - 81)

Page 82

1    A    Yes.
2    Q    Were you in a class together?
3    A    We did not have any classes together, but we
4  just seen each other in the hallways.
5    Q    Okay.  Do you remember the first time you met
6  him?
7    A    Yes.
8    Q    Can you describe that?  How did you meet him?
9    A    He was asking me if I wanted to be a part of
10 something that he had going on with like his music.
11   Q    Okay.  What was the music thing he had going
12 on?
13   A    Honestly I don't remember to this day.  That
14 was years ago.
15   Q    And did you become friends?
16   A    Yes.
17   Q    Did you have other friends in common?
18   A    Yes.
19   Q    Who were like the friends in your friends
20 circle with Amontae at Bogan High School?
21   A    So the only two people, because we -- in high
22 school we just talk every now and then, you know.  But
23 the only people that I know that he knows that we have
24 in common is the girl Turbo, her, and Jaylon Brown,

Page 83

1  which is his old best friend.
2    Q    Jaylon, do you know how to spell that?
3    A    J-a-y-l-o-n.
4    Q    And is Jaylon a boy or a girl?
5    A    A boy.
6    Q    Okay.  And was Jaylon a friend that you also
7  did music with with Amontae?
8    A    Yes.  He does music as well.  I don't do
9  music.  He just wanted me to be a part of it.
10   Q    Do you remember what you did to be a part of
11 Amontae's music?
12   A    I believe he wanted me to do like an intro for
13 him.
14   Q    Okay.  What sort of intro?
15   A    Just kind of like when you introduce the
16 artist.
17   Q    What sort of music did Amontae do?
18   A    I'm not really sure.  I don't really listen to
19 his music like that.
20   Q    Does he play any instruments?
21   A    Not to my knowledge.  I don't know.
22   Q    Does he sing?
23   A    I'm not sure if he sings, no.
24   Q    Does he rap or do hip hop?

Page 84

1    A    I guess you could call it that.  I'm really
2  not sure.  I'm not that -- I'm not that familiar with
3  what he does with his career, I just know he does music.
4    Q    Have you ever listened to any music Amontae
5  has recorded?
6    A    I believe so, once before, yes.
7    Q    Did you think it was good or bad music?
8    A    It was neutral.  I like all kinds of music,
9  so.
10   Q    Okay.  At some point -- are you and Amontae
11 the same age or is one of you older and one of you is
12 younger?
13   A    He's older.
14   Q    How much older than you is Amontae?
15   A    Four years.
16   Q    Four years older than you.  So you met him --
17   A    Three years, I'm sorry, three years.
18   Q    So when you met Amontae, you were 15 at Bogan
19 and he was 18, is that right?
20   A    I believe he was 17.
21   Q    Okay.  So maybe more like two-and-a-half
22 years?
23   A    Yeah.
24   Q    Okay.  What was Amontae like when you first

Page 85

1  met him, like what clothes did he wear, what did he like
2  to do?
3    A    If anything I've always seen him as being
4  outgoing, bright, playful, funny.
5    Q    Okay.  Has --
6    A    Athletic.
7    Q    Athletic?  Did he play any sports at Bogan
8  High School?
9    A    He played soccer to my knowledge.
10   Q    Okay.  Did he play soccer for the Bogan High
11 School team?
12   A    I'm not sure about that.
13   Q    Okay.  Did you ever see or hear about Amontae
14 skipping class at Bogan?
15   A    No, ma'am.
16   Q    So did he ever get in trouble at Bogan, like
17 get sent to the dean's office?
18   A    I'm not sure.
19   Q    Do you remember if he regularly dressed in
20 black clothing at Bogan?
21   A    I'm not too sure.  I don't remember.
22   Q    Do you remember anything about like his
23 fashion sense while you were at Bogan?
24   A    Oh, he had style, but to me it was just a

22 (Pages 82 - 85)

Page 86

1 fashion statement, that's all, you know, never
2 anything -- I feel like even if he was to like wear
3 black clothes, that's not how -- that's not his
4 personality, you know.
5 Q How would you describe his style?
6 A Different, unique.
7 Q When you were friends at Bogan, did Amontae
8 ever talk about his religion?
9 A No. We wasn't -- we wasn't acquainted that
10 well. Like we would speak every now and then and have a
11 conversation every now and then, but in high school it
12 was -- it was just formal.
13 Q Okay. At some point did you and Amontae start
14 dating?
15 A Yes.
16 Q When did that happen?
17 A This happened like last year.
18 Q Okay. So in like 2021 sometime?
19 A Yes.
20 Q So did you start dating after you graduated
21 high school?
22 A So it was around that time.
23 Q Okay. But you did not date while you were in
24 high school?

Page 87

1 A Exactly.
2 Q Okay. How is it that you and Amontae got
3 together to start dating?
4 A Snapchat.
5 Q Snapchat? Did you still have his Snapchat
6 contact information from when you were at Bogan High
7 School together?
8 A Yes.
9 Q Okay. And had you been talking regularly on
10 Snapchat for awhile?
11 A Currently or then?
12 Q Yeah, so when you got together, how long had
13 you been talking on Snapchat?
14 A Like on and off periodically for like years
15 before then, but it was just like -- it was just like
16 hey, how are you kind of thing.
17 Q Yeah. And how did it come to happen that you
18 just went from staying in contact on Snapchat to getting
19 together?
20 A It was -- I guess it was time, you know, as we
21 just started to communicate more, just time.
22 Q Okay. Did you -- and so your best memory is
23 that you got together with Amontae last spring or summer
24 sometime?

Page 88

1 A Sometime last year.
2 Q Okay. Are you still dating Amontae?
3 A No, I'm not.
4 Q When did you break up?
5 A Recently, like -- recently.
6 Q Like within the last month?
7 A Probably like two or three months ago.
8 Q Okay. Why did you break up?
9 A Because I just wanted to do me, I guess.
10 Q What do you mean by that?
11 A Basically I just didn't want to be in a
12 relationship, that's all.
13 Q Okay. While you were dating did you ever see
14 Amontae go to church?
15 A Yeah.
16 Q What church did he go to?
17 A I'm not sure. I never -- I never went with
18 him.
19 Q Okay. You never went to church with him.
20 What were his religious beliefs while you were dating?
21 A I believe he's -- he didn't talk so much about
22 religion, but I know he believe in God.
23 Q Did Amontae ever talk to you about a time when
24 he sold his soul to the devil?

Page 89

1 A I believe he mentioned it before.
2 Q What do you remember him mentioning?
3 A He will say he didn't -- like he was basically
4 saying that at the time he didn't know what he was
5 doing. He was saying he had repented from that time.
6 And I guess that was just a bad time in his life.
7 Q Did you and Amontae ever live together?
8 A Yes.
9 MR. MAUCK: Hold on for a second. If you want
10 to ask her a question, do it out loud.
11 A Okay. I was asking if we could take a break
12 because I have to use the restroom.
13 MS. HOMER: Oh, yeah, absolutely. Why don't
14 we take a five-minute break. I'm getting close to
15 being done, but I think some of the other lawyers
16 may have questions.
17 (Recess taken.)
18 BY MS. HOMER:
19 Q Miss Hudgins, right before you left I had
20 asked if you had ever lived together with Amontae, and
21 you had said yes, is that correct?
22 A Yes.
23 Q When did you live together?
24 A We lived together, I know it was last year. I

23 (Pages 86 - 89)

Page 90

1 know it was last year. It was probably like six months,
2 six or seven months after we dated, after getting
3 together.
4   Q   Okay. So you started dating sometime last
5 spring or summer you had said?
6   A   Yes.
7   Q   And then you were dating for several months
8 and then you moved in together, is that correct?
9   A   About, about several months.
10   Q   Okay. And where were you living before you
11 and Amontae lived together?
12   A   Wisconsin.
13   Q   Wisconsin. Who were you living with?
14   A   My grandmother.
15   Q   Okay. So you were living with your
16 grandmother in Wisconsin when you started dating
17 Amontae?
18   A   Yes.
19   Q   Okay. Where was Amontae living when you first
20 started dating?
21   A   In Chicago.
22   Q   Okay. Who was he living with?
23   A   His parents.
24   Q   Did the two of you get a new place together

Page 91

1 when you moved in together?
2   A   So when we first moved in together, we were
3 staying at a studio, and then we went on to get an
4 apartment.
5   Q   Okay. So -- and was it just the two of you
6 living in that studio?
7   A   Yes.
8   Q   Okay. Where was that studio?
9   A   In Willowbrook, Illinois.
10   Q   Do you remember the address?
11   A   No.
12   Q   Okay. And do you remember what month you
13 moved into that studio in Willowbrook?
14   A   I really don't know. I'm not good with names
15 or times. I just know it was last year.
16   Q   Okay. And then how long were you in that
17 studio in Willowbrook?
18   A   Probably for like three or four months.
19   Q   Okay. And then you said you moved out of the
20 studio and into a different apartment with Amontae?
21   A   Yes, which was in Chicago.
22   Q   Okay. Do you remember where in Chicago?
23   A   73rd and Racine.
24   Q   And what was the name of the second street?

Page 92

1   A   Racine.
2   Q   Racine, okay. And how long did you live at
3 that 73rd Street apartment with Amontae?
4   A   For a few months.
5   Q   Okay. And then were you still living there
6 together when you broke up about a month ago?
7   A   We were. We were and then -- and then we just
8 ended up going our separate ways.
9   Q   Okay. And where are you living now?
10   A   With my grandmother.
11   Q   Okay. So you left the Racine and 73rd
12 apartment and moved back in with your grandmother in
13 Wisconsin, is that correct?
14   A   She lives here in Chicago right now.
15   Q   Okay. So your grandmother now lives in
16 Chicago and you moved in with your grandma?
17   A   Yes.
18   Q   Okay. And Amontae, do you know where he lives
19 now?
20   A   I believe he still lives with his parents.
21   Q   Okay. So he left the 73rd and Racine
22 apartment and moved back in with his parents, is that
23 correct?
24   A   Yes.

Page 93

1   Q   Are the two of you still in contact?
2   A   Yeah, we talk.
3   Q   Okay. How often do you talk?
4   A   Maybe about once a week.
5   Q   How do you talk?
6   A   Casually.
7   Q   Yeah, are you -- do you see each other in
8 person?
9   A   No.
10   Q   Okay. Do you talk on your phone?
11   A   Yeah.
12   Q   Okay. Do you text each other?
13   A   Not really, it's mostly phone conversations.
14   Q   Okay. Do you Snapchat each other still?
15   A   No.
16   Q   Okay. Do you have any other social media
17 accounts except Snapchat?
18   A   Yeah. I have Instagram, Facebook.
19   Q   Do you use Instagram or Facebook to talk to
20 Amontae?
21   A   No.
22   Q   Do you have TikTok?
23   A   I do, but I never -- I'm never on there.
24   Q   Do you ever use Twitter?

24 (Pages 90 - 93)

Page 94

1    A    No.
2    Q    Do you ever email with Amontae from your gmail
3  address?
4    A    Do I have emails with him?
5    Q    Yeah, do you have emails with Amontae?
6    A    Yes.
7    Q    Okay.  What email address do you use to
8  communicate with Amontae?
9    A    WilliamsAmontae18@gmail.  My email or his?
10    Q    So you just answered.  So his email address is
11  the WilliamsAmontae18@gmail you just mentioned, right?
12    A    Yes.
13    Q    Then what email address of yours do you use?
14    A    KayaHudgins28@gmail.com.
15    Q    And that was that same email address we saw
16  earlier today, right?
17    A    Yes.
18    Q    Do you have any other email addresses you've
19  ever used to communicate with Amontae?
20    A    I really don't know.  I got a lot of emails.
21    Q    Are most of your emails in that
22  KayaHudgins28@gmail account?
23    A    Yes.
24    Q    You said you don't text a lot, but have you

Page 95

1  ever texted with Amontae?
2    A    Yeah.  Yeah.
3    Q    Did you search any of your emails or social
4  media accounts and give those records to your lawyer
5  before today?
6    A    No.
7    Q    Okay.  Have you ever communicated with Amontae
8  about the Quiet Time Program via email?
9    A    He sent me his deposition through email.
10    Q    Okay.  Have you ever communicated with Amontae
11  about the Quiet Time Program via text messages?
12    A    Mostly in person because we were around each
13  other, so there was no need for us to text.
14    Q    Have you ever communicated with Amontae about
15  the Quiet Time Program via Snapchat or Instagram or
16  Facebook?
17    A    No.  Like I said, we would mostly talk in
18  person or on the phone.
19    Q    Have you ever like posted anything to your
20  friends about the Quiet Time Program on Snapchat or
21  Instagram or Facebook?
22    A    No.
23    Q    Have you ever tried to contact anyone else
24  from Bogan High School who was also involved in the

Page 96

1  Quiet Time Program to talk about the Quiet Time Program?
2    A    So yes, I did try to get in touch with the
3  girl Turbo.  I did try to get in touch with her, but
4  she's like hard to reach, so --
5    Q    So you never -- how did you try to get in
6  touch with her?
7    A    Through her Instagram.
8    Q    Okay.  And she didn't respond?
9    A    Right.  But this was a while back ago.  This
10  was a while ago.
11    Q    And by awhile do you mean like last year or do
12  you mean years ago?
13    A    Like probably years ago.
14    Q    You haven't tried to get in touch with Turbo
15  in the last six months about Quiet Time?
16    A    No, because she's -- like I said, she's not
17  easy to reach, so.
18    Q    Okay.  Why are you still involved with this
19  lawsuit against Quiet Time even though you and Amontae
20  broke up?
21    A    Because it has nothing -- I'm not in it for
22  him.
23    Q    Okay.  So he asked you to get involved and you
24  got involved, as you said earlier, to help take down

Page 97

1  Quiet Time, is that correct?
2    A    Yes.
3    Q    And so even though you broke up, you're still
4  involved in the lawsuit?
5    A    Yes.
6    Q    Did you tell Amontae that you were going to
7  come testify today?
8    A    No.
9    Q    Have you -- were you living together with
10  Amontae last August?
11    A    Yes, I believe so.
12         MS. HOMER:  Hold on a split second.  Sorry, I
13    had another meeting that I had to tell them I
14    wouldn't be there.
15    Q    Okay.  So you believe you were living together
16  last August?
17    A    Yes.
18    Q    Okay.  Did you and Amontae get arrested
19  together last August?
20    A    Yes.
21    Q    And was that at a Walmart?
22    A    Yes.
23    Q    And was that for allegedly stealing more than
24  $300 in goods from Walmart?

25 (Pages 94 - 97)

Page 98

1    A    Yes.
2    Q    What happened?  Is that case still pending?
3    A    No, it's not -- it's not pending now.  So like
4    right now it's like a two-year probation that I have to
5    go through.  And then it will be wiped from my record
6    because that was my first and only offense.
7    Q    Okay.  So you have a deal that you're on
8    probation and the case will go away completely and be
9    wiped from your record if you have no further offenses
10   in the next two years, is that right?
11   A    Yes.
12   Q    Do you know if the case against Amontae is
13   still pending?
14   A    I'm not sure.
15   Q    You wouldn't know.
16   A    No.
17   Q    Okay.  So I think you answered this.  I'm
18   sorry if I forgot.  You said that Amontae emailed you
19   something about his deposition in this case, is that
20   right?
21   A    Yes.
22   Q    Okay.  Have you provided a copy of that email
23   to your lawyers?
24   A    I have not.

Page 99

1    Q    Would you be willing to provide a copy of that
2    email to your lawyers?
3    A    Yes.
4    Q    Same with any other communications you've had
5    with Amontae about Quiet Time, would you be willing to
6    provide a copy of those communications to your lawyers?
7    A    Yes.
8    MS. HOMER:  Okay.  I think that's all my
9    questions.  So Jim or Christina, whoever wants to
10   take the floor, go ahead.
11   MR. SIPCHEN:  Do you want me to go next,
12   Christina?
13   MS. ROSENBERG:  Actually can I go?
14   MR. SIPCHEN:  You sure can.  You know what?
15   Before you do, though, do you mind if we take a
16   quick ten-minute break for me?  I need to load a
17   document or two, so.
18   MS. ROSENBERG:  Sure, sure.  Of course.  So
19   maybe 1:15?
20   MR. SIPCHEN:  Yeah, that's fine.  Thank you.
21   MS. ROSENBERG:  Great.  Thanks.
22   (Recess taken.)
23   MS. ROSENBERG:  Can we go back on the record?
24   MR. MAUCK:  Yes.  And I'll state for the

Page 100

1    record, you can ask Miss Hudgins to confirm this,
2    she checked her phone and could find no records of
3    anything to or from Amontae on her cellphone at
4    this time.
5    THE WITNESS:  It's because I thought it would
6    maybe still be there, but I recently -- my phone
7    got water damage and I had to get a brand new
8    phone.  So anything that was there before is not
9    anymore.  So I thought maybe there would be some
10   documents, but there's not any.
11   MS. ROSENBERG:  Well, thank you, John, for
12   letting us know about that.
13   Miss Hudgins, I am Christina Rosenberg.  I am
14   one of the attorneys representing the Board of
15   Education, which also includes CPS or Bogan.  And
16   so I'll be asking you some questions as well, and I
17   presume the -- so let me just get started.
18   EXAMINATION
19   BY MS. ROSENBERG:
20   Q    Earlier today you signed a legal services
21   agreement with the firm Mauck & Baker with Mr. Mauck who
22   is sitting next to you, is that accurate?
23   A    Yes.
24   Q    Did you pay them any money for your

Page 101

1    representation today?
2    A    No.
3    Q    Okay.  Is there -- what is your understanding
4    of how they will get paid for representing you today?
5    A    I'm not sure at all.
6    Q    Do you believe you have to -- that you will
7    have to pay them anything for your representation today?
8    A    No.
9    Q    Okay.  You haven't seen any information about
10   either their billing rate or how they would get paid for
11   representing you today?
12   A    No.
13   Q    Have they given you any information about how
14   they will be paid in the event that you may become a
15   class member in a class action for this lawsuit?
16   A    No.
17   Q    All right.  Going to your preparation for
18   today's deposition, have you had any drugs in the past
19   24 hours that may affect your testimony today?
20   A    No.  I don't do drugs.
21   Q    And have you -- have you had any alcohol in
22   the last 24 hours that may affect your testimony today?
23   A    No, ma'am.  I don't drink.
24   Q    Did you meet with your attorneys prior to

26 (Pages 98 - 101)

Page 102

1 today to prepare for your deposition?
2   A   No.
3   Q   Did you have any phone calls with any of your
4 attorneys to prepare for your deposition today?
5   A   No, ma'am.
6   Q   Okay.  Did you review any documents in
7 preparation for your deposition today?
8   A   No.
9   Q   Okay.  Have you received any documents from
10 Mauck & Baker relating to basically this lawsuit?
11   A   My deposition, yes.
12   Q   Okay.  What have you received?
13   A   This here (indicating).
14   Q   And I believe you are showing us for the
15 record a copy of your declaration?
16   A   Yes, my declaration.
17   Q   Okay.  That you had not yet signed until
18 today, is that accurate?
19   A   Yes.
20   Q   Okay.  Have you received any other documents
21 from Mauck & Baker related to Quiet Time Program -- let
22 me first do that, in this lawsuit?
23   A   No.
24       MS. ROSENBERG:  Let me put up -- Carolyn, can

Page 103

1 I have share access?  Let me see if I can do that.
2       THE COURT REPORTER:  I gave it to you.
3       MS. ROSENBERG:  Are we on 4 or 5?
4       MS. HOMER:  The new exhibit would be 5.
5       (Document marked as Hudgins Deposition
6 Exhibit 5 for identification.)
7       MS. ROSENBERG:  Can you guys see this?  It's
8 Bates labeled Hudgins 11, which is an email from
9 Jonathan Rosenthal to KayaHudgins28@gmail.com?
10       MR. MAUCK:  Enlarge that a little bit.  It's
11 hard to read.  There we go.
12 BY MS. ROSENBERG:
13   Q   Kaya, can you see this document?
14   A   Yes.
15   Q   Okay.  And Jonathan is I guess an employee at
16 the Mauck & Baker firm, is that accurate?
17   A   Yes.
18   Q   And so on February 21st, 2022, this is an
19 email that's Bates labeled Hudgins 11, he sent you it
20 appears to be three attachments.  Do you have any
21 recollection of receiving those documents?
22   A   Like I said, I haven't been able to access any
23 of that information that was on my phone since it was
24 water damage, so.

Page 104

1   Q   Did you receive Mr. Rosenthal's email?
2   A   Yes, I believe so.
3   Q   Did you review the -- were there documents
4 attached to that email?
5   A   I'm not sure.
6   Q   From the email it looks to be that there is a
7 document labeled 89-1_Exhibit A, Amontae Letter, and
8 89_second amended complaint.  Do you recall seeing any
9 of those documents?
10   A   Yes.
11   Q   Okay.  And it states in the email that
12 89-1_Exhibit A is Amontae's declaration.  Do you recall
13 reviewing Amontae's declaration in this matter?
14   A   Yes.
15   Q   Okay.  And given that the email is dated
16 February 21st, 2022, that is prior to today, March 11th,
17 2022, is that accurate?
18   A   Yes.
19   Q   Okay.  And had you reviewed Amontae's
20 declaration prior to receiving your own declaration?
21   A   No.
22   Q   When did you first review Amontae's
23 declaration?
24   A   When I viewed mine.

Page 105

1   Q   Did you compare them against each other?
2   A   Honestly I went over his declaration one time,
3 and I already know what I had said, so I didn't like too
4 much go over mine that much.  But no, I did not compare
5 the two.
6   Q   Okay.
7   A   Even though they were similar, but.
8   Q   All right.  Do you recall -- did you review
9 Amontae's declaration prior to giving testimony today?
10   A   Yes, when I viewed mine.
11   Q   Okay.  And that was when your declaration was
12 mailed to you?
13   A   Correct.
14   Q   Okay.  Was Amontae there when you reviewed
15 both your declaration and his declaration?
16   A   No.
17   Q   Do you recall the second document,
18 Amontae letter?
19   A   I don't recall.
20   Q   Do you -- can you describe that document?
21   A   I don't recall it.
22   Q   Do you recall who the letter was to?
23   A   I don't recall the letter at all.
24       MS. ROSENBERG:  Okay.  And, counsel, I would

27 (Pages 102 - 105)

Page 106

1  actually -- I understand that -- I request copies
2  of what was sent to Miss Hudgins as part of this
3  email from your firm.
4      MR. MAUCK: Let me check on it right now to
5  save some time. I'll be right back.
6      MS. ROSENBERG: I guess we're going to go off
7  the record until Mr. Mauck comes back.
8      (Brief recess.)
9      MR. MAUCK: We can go back on the record. I
10 talked to Mr. Rosenthal, and he's looking for them
11 and we will try and get them.
12     MS. ROSENBERG: Great. Thank you. And you
13 can have him email the service list when he can
14 with the attachments. That would be great.
15     MR. MAUCK: I'll look at them briefly to make
16 sure there's no -- nothing that's privileged. And
17 if there's not, we'll send it all out to you.
18     MS. ROSENBERG: You don't have a claim of
19 privilege because this was prior to your retention
20 of today. So they were sent on February 21st of
21 2022, which you did not have an attorney-client
22 relationship with Miss Hudgins at that time.
23 Q   But anyway, going back onto the record,
24 Miss Hudgins, do you have a recollection of reviewing

Page 107

1  the second amended complaint in this matter?
2  A   Can you restate the question?
3  Q   Sure. There's a third document that's
4  attached to this email to you that's labeled second
5  amended complaint. Did you ever review the second
6  amended complaint in this matter?
7  A   I reviewed it once.
8  Q   When was that?
9  A   Can I see the document so I can know exactly
10 what it is that you're talking about?
11 Q   This was all that was given to us. So once we
12 have a copy of what was sent, we can revisit that.
13     Let me ask it this way. Have you reviewed any
14 pleadings in this lawsuit, and I guess by pleadings I
15 mean legal documents that were filed by attorneys Mauck
16 & Baker in this lawsuit?
17 A   I'm not understanding.
18 Q   Beyond Amontae's declaration, did you review
19 any other legal documents or documents in court with
20 kind of file stamped that are related to this lawsuit?
21 A   No.
22 Q   Did Mauck & Baker ever provide you with a copy
23 of Aryeh Siegel's book Transcendental Deception?
24 A   No.

Page 108

1  Q   Okay. Have you ever seen that book?
2  A   Yes.
3  Q   Where did you -- where did you see that?
4  A   Amontae had it.
5  Q   Did you read that book that Amontae had?
6  A   No, I did not.
7  Q   Okay. Did you ever see the packet that
8  Amontae had from Mauck & Baker that had a bunch of tabs
9  in it with transcendental meditation writings?
10 A   No.
11 Q   Okay. Did you ever receive any materials
12 about transcendental meditation from Amontae?
13 A   No.
14     MR. MAUCK: Christina, I can answer your
15 question now. You're being sent the documents that
16 were attached to the Hudgins 11. There is a letter
17 from Amontae Williams to the board. It's Board of
18 Education document 000001. That's from him. The
19 second document is filed 9/9/21, which is the
20 second amended class action complaint that
21 everybody has a copy of. And the third document,
22 the Declaration of Amontae Williams, is Exhibit A
23 to the second amended class action complaint.
24     So everybody has those, but for convenience,

Page 109

1  Mr. Rosenthal is sending around copies now. And if
2  you don't object, I'll show them to Miss Hudgins
3  now to see if that refreshes her recollection.
4  Would you like me to do that?
5      MS. ROSENBERG: Sure. And can you identify
6  the document that you are showing her to refresh
7  her recollection?
8      MR. MAUCK: Okay. Well, we'll start with
9  Board of Education document 1. It's a letter from
10 Amontae to the board.
11 A   I'm familiar with this. That's the thing I
12 didn't know what it is that you were asking, but yes, I
13 am familiar with this. I have read this along with
14 that.
15 BY MS. ROSENBERG:
16 Q   Sure. And when you are stating -- so that we
17 have a clear record, are you saying that you have
18 reviewed Amontae's letter to the Board of Education as
19 well as the other two documents that Mr. Mauck has in
20 his hand that were previously identified?
21 A   Yes.
22 Q   Okay. And when did you first review Amontae's
23 letter to the board?
24 A   I reviewed this before I reviewed his

28 (Pages 106 - 109)

Page 110

1  declaration.
2      Q   Okay.  And was it close in time or was it much
3  further -- or when was the first time that you reviewed
4  Amontae's letter to the board?
5      A   Probably -- probably a couple of months ago,
6  like when I first got -- when I first knew about it.
7      Q   And who gave you a copy of the letter to the
8  board from Amontae?
9      A   It was sent to me.
10     Q   Okay.  So was this the first time, the email
11 that we've just been referencing to, February 2022?  I'm
12 sorry?
13     A   February 21st?
14     Q   Yes.  Was that the first time that you
15 reviewed Amontae's letter to the board?
16     A   Yes.
17     Q   Okay.  So the documents that are included in
18 this email from Mr. Rosenthal, was that the first time
19 that you reviewed those three documents?
20     A   Yes.
21     Q   Okay.  And just to be clear, did you review
22 any of those documents in preparation for today's
23 deposition?
24     A   In preparation?  No.

Page 111

1      Q   Okay.  You mentioned that Amontae sent you his
2  deposition by email.  Did he send you a transcript of
3  his deposition?
4      A   No, he didn't.
5      Q   What did he send you?
6      A   He sent me just like the front page of what --
7  the front page of his declaration, but this was when I
8  first learned about what was going on, you know, when I
9  first -- when he first introduced me to like the case,
10 when he first kind of got me involved.
11     Q   Okay.  And I think we're, not going to say
12 crossing wires, but prior in your testimony you
13 mentioned that Amontae emailed you his deposition.  Is
14 that accurate?
15     A   A photo, a photo of this, this first page
16 here, his deposition, this is -- declaration, this is
17 mine.  Like he sent me a photo of this first page when I
18 was first introduced to the case like.
19     Q   So that is not his deposition, which is the
20 proceeding that we are having right now, that is his
21 declaration.
22     A   Right.
23     Q   Okay.  Has Amontae sent you anything related
24 to his deposition, which is what we've been, you know,

Page 112

1  participating in today?
2      A   No, ma'am.  See, I got the two confused.  I'm
3  sorry.
4      Q   That's all right, just to be clear.  He hasn't
5  sent you any notes or -- and you haven't discussed his
6  deposition in this case, have you?
7      A   No, ma'am.
8      Q   Okay.  Miss Hudgins, have you ever gone by any
9  other names?
10     A   Kay.
11     Q   And is that K-a-y or just -- can you spell
12 that?
13     A   Kay, K-a-y, or just the initial K.
14     Q   Okay.  Have you ever gone by any other last
15 names?
16     A   No.  Oh, my middle name, but not my last name.
17     Q   What's your middle name?
18     A   Marie.
19     Q   Have you ever presented yourself as any other
20 person other than Kaya Hudgins?
21     A   No.
22     Q   Currently what is your phone number?
23     A   (312) 709-8671.
24     Q   Okay.  Do you have the same phone number as

Page 113

1  you did in 2018?
2      A   No, ma'am.
3      Q   Okay.  When did you change phone numbers?
4      A   When my phone got water damage.  So I just
5  recently got a new one.
6      Q   So you just got a new phone number?
7      A   Yep.
8      Q   And did you get a new carrier?
9      A   Yes.
10     Q   Okay.  What is your current carrier right now?
11     A   T-Mobile.
12     Q   Okay.  What was your prior carrier?
13     A   Verizon.
14     Q   And what phone number were you using prior to
15 this one?
16     A   I honestly don't remember.
17     Q   Do you recall how long you had that phone
18 number with Verizon?
19     A   I'm not sure.
20     Q   Okay.  Do you have the same phone number that
21 you did in 2018 when you were in high school at Bogan?
22     A   No.
23     Q   Was it a different phone number than the
24 Verizon number?

29 (Pages 110 - 113)

Page 114

1   A   Yes.
2   Q   Was it a different carrier?
3   A   Yes.
4   Q   All right.  Between 2018 and today, how many
5   phones have you gone through?
6   A   Probably like four or five.
7   Q   Okay.  And do you remember any of the other
8   numbers prior to your current one?
9   A   No, ma'am.
10  Q   Okay.  And you also changed carriers?
11  A   Yes.
12  Q   Okay.  What kind of phone do you have right
13  now?
14  A   IPhone 11.
15  Q   When did you get your -- the most recent
16  iPhone?
17  A   I want to say the end of February.
18  Q   Okay.  Do you have a tablet?
19  A   No.
20  Q   Okay.  Do you have a laptop?
21  A   No.
22  Q   How else do you communicate with other people
23  other than your phone?
24  A   I have an Apple Watch.

Page 115

1   Q   Any other devices for communication?
2   A   No.
3   Q   Okay.  Let's see.  Let's go through your
4   social media accounts.  You mentioned that you had a
5   Snapchat account and do you still have that Snapchat
6   account?
7   A   Yes.
8   Q   Okay.  And what is your handle?
9   A   It's not the same Snapchat account, but it's a
10  different one now.
11  Q   How many Snapchat accounts do you have?
12  A   I only have one now.
13  Q   Okay.  And what is your handle?
14  A   Like my name on there?
15  Q   Yeah.
16  A   I could check real quick.
17  Q   Let me ask this first.  Do you communicate by
18  Snapchat with Amontae?
19  A   No.
20  Q   Okay.  I think you also mentioned that you had
21  a Facebook account?
22  A   Yes.
23  Q   Is it public?
24  A   Yes, it is.

Page 116

1   Q   Okay.  Do you only have -- how many Facebook
2   accounts do you have?
3   A   Just one.
4   Q   Okay.  What about Instagram accounts?
5   A   Well, I have a few of them, but I don't have
6   access to all of them.  I have access to one of them, my
7   Facebook.  As far as Instagram, I have one Instagram
8   account.
9   Q   What do you mean you don't have access to
10  several of your Facebook accounts?
11  A   Not several, I have a few of them, but I don't
12  have access to the other -- I had like three or four,
13  but I only have access to one.
14  Q   Why don't you have access to the other two or
15  three?
16  A   I forgot the password.
17  Q   Okay.  Are they corporate accounts or are they
18  personal accounts?
19  A   Personal.
20  Q   Okay.  Would you ever message Amontae off your
21  personal Facebook account?
22  A   Saying would I or have I?
23  Q   Have you.
24  A   Yes, before.

Page 117

1   Q   Okay.  Do you still have those messages?
2   A   If so, then it's not pertaining to this.
3   Q   Have you ever messaged Amontae on your
4   Facebook account about the Quiet Time Program?
5   A   No.  We only have like a few messages on
6   there.
7   Q   And what account do you contact him on on
8   Facebook?
9   A   We're not in contact on there anymore.
10  Q   What did you -- what account did you contact
11  him with?
12  A   My -- it's my page Kaya Marie.  I already told
13  you that, yeah.
14  Q   From what I understand is that he has multiple
15  Facebook accounts.  What account did he use to talk to
16  you?
17  A   I'm not sure about him having multiple
18  accounts.
19  Q   Okay.  You don't know that he has multiple
20  Facebook accounts?
21  A   No.
22  Q   Okay.  Let's get to Instagram.  You said you
23  had how many accounts?
24  A   I only have one Instagram account.

30 (Pages 114 - 117)

Page 118

1  Q   Okay.  Is it public?
2  A   Yes.
3  Q   Okay.  And what is your name on Instagram?
4  A   I am Kaya Marie.
5  Q   I'm sorry, I am Kaya Marie?
6  A   Yep.
7  Q   Have you contacted Amontae through Instagram?
8  A   No.
9  Q   All right.  Do you --
10  A   I'm sorry, previously, previously before, not
11  recently.
12  Q   Okay.  And what do you mean by before?
13  A   This was like a year, two years ago maybe.
14  Q   While you were in high school?
15  A   No.
16  Q   How old were you when you were messaging
17  Amontae?
18  A   Like I say, it wouldn't be -- it would just be
19  like small conversation because we did see each other
20  every day, so it was more like can you -- mostly we who
21  communicate on social media if I blocked him, you know.
22  Q   Did you block him frequently?
23  A   No, he's not blocked now.
24  Q   Okay.  When you were a student at Bogan, and

Page 119

1  from what we have learned is that you were a student at
2  Bogan from September of 2018 through March of 2020, is
3  that accurate?
4  A   Yes.
5  Q   Okay.  What was your address in September of
6  2018?
7  A   I believe it was 1409 West 71st Street.
8  Q   I'm sorry, could you restate that?  I lost the
9  last bit of your --
10  A   1409 West 71st Street.
11  Q   Okay.  And who were you living with in
12  September of 2018?
13  A   My grandmother at the time.
14  Q   Were you living with -- do you have any
15  siblings?
16  A   Yes, I do.
17  Q   Were they living with you at your
18  grandmother's house?
19  A   Yes.
20  Q   Okay.  How many siblings do you have?
21  A   I have three.
22  Q   Are they older or younger than you?
23  A   Two is younger, one is older.
24  Q   Do you have any children?

Page 120

1  A   No, ma'am.
2  Q   Were your parents living with you at your
3  grandmother's house in 2018?
4  A   No.
5  Q   Where were your parents?
6  A   My father was -- my father was and still is
7  living in Texas, and my mother was living in Arizona at
8  the time.
9  Q   In 2018 was your grandmother your guardian?
10  A   Yes.
11  Q   Okay.  Until you were 18 was she basically --
12  was she your guardian through the age -- through your
13  legal age?
14  A   Yes.
15  Q   Okay.  So she held all decision-making
16  authority for you?
17  A   Yes, correct.
18  Q   Okay.  And what's your grandmother's name?
19  A   Leitha Watkins.
20  Q   Was your grandfather also living in the house
21  at the time?
22  A   No.
23  Q   Okay.  It was just your grandma?
24  A   Yes.

Page 121

1  Q   And your siblings and yourself in September
2  2018?
3  A   So one of my siblings, but the two younger
4  siblings live in Texas.
5  Q   Okay.  So the older sibling and yourself lived
6  with your grandmother in September of 2018, is that
7  accurate?
8  A   Right.
9  Q   And when did you -- how long did you live at
10  the 71st Street address?
11  A   For about two years.
12  Q   So September 2020 you moved out, is that
13  accurate, or you moved from that address?
14  A   Yeah.
15  Q   Is that when you and your grandmother moved to
16  Wisconsin?
17  A   Yes.
18  Q   Where in Wisconsin did you move?
19  A   Fond du Lac.
20  Q   Fond du Lac?
21  A   Yes.
22  Q   Okay.  You mentioned earlier in your testimony
23  that you were experiencing homelessness in around 2020,
24  is that accurate?

31 (Pages 118 - 121)

Page 122

1    A   I honestly don't remember because it was like
2 on and off, you know.
3    Q   Could you tell me about that?
4    A   It was a situation with my mother.  So my
5 mother, she came here to Chicago.  And she came to --
6 she had to live with my grandmother basically.  And
7 later on down the line my grandmother end up saying that
8 we all had to go, so that's how that happened.  But then
9 I end up moving back in with my grandmother in
10 Wisconsin.
11    Q   Okay.  In your high school years did you ever
12 not stay at the 71st Street house with your grandma?
13    A   No.
14    Q   Did you on a daily basis -- strike that.
15       Were there other places that you stayed during
16 the years that you were at Bogan?
17    A   Like during that time that I was experiencing
18 homelessness, like I would probably go to my aunt's
19 house, but I wasn't staying there.  Like I had no mail
20 coming there.
21    Q   Sure.  But would you stay there for days at a
22 time, weeks?
23    A   Right, days, probably like one or two nights
24 and then I leave.

Page 123

1    Q   And go back to your 71st Street address with
2 your grandma?
3    A   Yeah.
4    Q   Okay.  You never changed residences while in
5 high school, is that right?
6    A   So my freshman year of high school -- oh, I'm
7 sorry, that was middle school.  Yeah, I stayed at the
8 same address for my high school years.
9    Q   Okay.  How involved was your grandma in your
10 high school education?
11    A   She would be involved.
12    Q   Okay.  Would she -- you know, if you got in
13 trouble, would she be the one to go talk to your
14 teachers or the dean?
15    A   So it was either -- it was either my
16 grandmother or it was my mother or my grandfather on my
17 father's side.  So it was just my whole family.
18    Q   All right.  Do you recall maybe towards the
19 end of your -- or the middle of your junior year you not
20 being in school for a long stretch of time?
21    A   Yes.
22    Q   Okay.  Can you tell me about that?
23    A   So that is the time where I was experiencing
24 homelessness.  And then, like I said, that's the time

Page 124

1 where I took some time away from school but I wasn't in
2 school but then I transferred to McKinley.  So that gap
3 in between there is the time where I was experiencing
4 that.
5    Q   Do you recall that time period being around
6 mid November of 2019 and March of 2020?
7    A   It might be.
8    Q   If there are records to support that time
9 period, would you have anything to dispute those
10 records?
11    A   Can you elaborate on the question?
12    Q   Sure.  If there are records say, for example,
13 attendance records at Bogan documenting the fact that
14 you were absent for around that time period, would you
15 have anything to dispute the accuracy of those records?
16    A   No.
17    Q   Okay.  Did you take an official leave of
18 absence from school or did you tell school officials
19 that you would not be coming to school around that time
20 or did you just not show up?
21    A   Like I didn't officially get transferred out.
22 I didn't officially get transferred out but I was
23 letting my school know what was going on.
24    Q   Okay.

Page 125

1    A   Like why I wasn't showing up.
2    Q   All right.  Let's continue our path through
3 your addresses.  Okay.  So you moved to Wisconsin around
4 September 2020, is that accurate, with your grandma?
5    A   Yes.
6    Q   Okay.  And I think you mentioned that there
7 was a studio that you lived with Amontae.  Does an
8 Oglesby address ring any bells for you?
9    A   Yes, that's my Uncle Petey's house.
10    Q   That's your Uncle Petey's house?
11    A   Yes.
12    Q   Did you stay there with Amontae?
13    A   No.
14    Q   When you were arrested, did you give your
15 Uncle Petey's address to the police?
16    A   Yes.
17    Q   Okay.  Were you staying there at the time?
18    A   At that time it was like I was staying there
19 but not really.  Like I was getting mail there and
20 staying there every now and then because I didn't really
21 have a secure place.  So like I was staying there from
22 time to time, but I was getting mail there and I do have
23 an ID, an ID there, so.
24    Q   Were there any other locations that you were

32 (Pages 122 - 125)

Page 126

1 staying in 2020 -- or actually let's just say 2021 that
2 you haven't mentioned?
3    A   No.
4    Q   Okay.  And I think you also mentioned your
5 aunt's house.  Where did your aunt live?
6    A   She lives in Chicago as well.  I'm not sure
7 exactly what the address is.
8    Q   Okay.  Miss Hudgins, are you married?
9    A   No.
10   Q   Okay.  Have you done any other education other
11 than high school, any -- basically any university
12 classes?
13   A   No.
14   Q   Okay.  Any trade school classes?
15   A   No.
16   Q   Okay.  Do you have a job?
17   A   Self -- no, not at the moment.
18   Q   Have you had a job since high school?
19   A   Yes.
20   Q   Okay.  What job -- how many jobs have you had
21 since your graduation from high school in, sorry, let me
22 finish the question, June 2021?
23   A   I believe one or two.
24   Q   Okay.  And tell me -- all right.  When was

Page 127

1 your first job after graduating high school?
2    A   It was shortly after.
3    Q   Would you say summer of 2021?
4    A   Yeah, about.
5    Q   Okay.  And what were you doing?
6    A   I had only stayed there for like a couple of
7 days, but it was like a production warehouse.
8    Q   Did you get paid for the couple of days that
9 you worked there?
10   A   Yes.
11   Q   Okay.  What was the company called?
12   A   I believe Voyant Beauty.
13   Q   Did Amontae work there, too?
14   A   Yes, he did.
15   Q   Okay.  What was he doing at Voyant?
16   A   The same thing.  They basically just produce
17 beauty products.
18   Q   And did you and him know people that worked at
19 Voyant?
20   A   No.
21   Q   Okay.  How did you get that job?
22   A   I applied there.
23   Q   And, I'm sorry, not to say there
24 transportation, but did you apply for the position and

Page 128

1 get accepted?
2    A   Yes.
3    Q   Okay.  And can you tell me what the title or
4 role of your position was at Voyant?
5    A   I believe it was like packer.
6    Q   Okay.  And what were your hours at Voyant?
7    A   6:00 a.m -- I mean, not 6:00 a.m.  10:00 p.m.
8 to 6:00 a.m.
9    Q   So you worked the night shift?
10   A   Yes.
11   Q   It seems hard for an 18 year old, but it's
12 okay.  So how many days did you work at Voyant?
13   A   I worked there for like I want to say -- I
14 want to say like a couple of weeks.
15   Q   Okay.  Did you end towards the -- was this
16 during the summer of 2021?
17   A   It was around that time.
18   Q   Okay.  Did Amontae also work there during that
19 time that you were there?
20   A   Yes.
21   Q   Okay.  Did he work after you ended your work
22 there?
23   A   Yeah, he was still working there when I quit.
24   Q   Okay.  How would you and him get to work?

Page 129

1    A   I drive.
2    Q   Okay.  Does Amontae have an active driver's
3 license?
4    A   Not to my knowledge.  I don't know.
5    Q   How would he get to work?
6    A   I would drive him to work.
7    Q   Okay.  Do you own your car?
8    A   Yes.
9    Q   Okay.  How much were you making at Voyant?
10   A   Probably like 18 a hour, like somewhere around
11 that.  I'm not sure.
12   Q   Okay.  You mentioned you might have had a
13 second job.  What was your second job?
14   A   The second job is the -- so Voyant, I stayed
15 there for a couple of weeks.  But the second job, that's
16 the job I only stayed there for two days.
17   Q   Okay.  And what job was that?
18   A   I forgot the name of it.  I forgot the name of
19 the job.
20   Q   What were you doing?
21   A   The same thing.
22   Q   Okay.  You were packing also?
23   A   Yep.
24   Q   Was it a different company?

33 (Pages 126 - 129)

Page 130

1　A　Yes, it was.
2　Q　What were you -- what types of items were you
3　packing?
4　A　Food.
5　Q　Food?
6　A　Yes.
7　Q　And by the way, where was Voyant located?
8　A　In Willowbrook, Illinois.
9　Q　Was that close to your house that you were
10　staying in Willowbrook?
11　A　Not close but not far.
12　Q　Okay.　Under 30 minutes?
13　A　Yes.
14　Q　Okay.　What about the food company, where is
15　that company located?
16　A　That's Willowbrook, I believe.
17　Q　Okay.　Do you recall the company that it was
18　called?
19　A　I'm sorry, no, I don't recall the company, but
20　I know it was in Darien, Illinois, which is right next
21　to Willowbrook.
22　Q　Did you say Darien?
23　A　Yes.
24　Q　Okay.　And do you recall what shift you were

Page 131

1　working there at the food company?
2　A　Third shift, I believe.
3　Q　Was that also overnight?
4　A　Yes.
5　Q　Okay.　Similar hours to -- you know, 10:00 to
6　6:00, overnight?
7　A　Yeah.
8　Q　Okay.　What would you do during the day?
9　A　During the day I just probably run some
10　errands, it all depends, you know, get some rest.
11　Q　I'm sorry.
12　A　I say it all depends, you know.　Most likely I
13　probably just run some errands, get some rest.
14　Q　Okay.　Do you currently have a job?
15　A　No.
16　Q　Okay.　Have you ever had -- do you own any
17　companies?
18　A　Yes.
19　Q　Okay.　How many companies do you own?
20　A　Just one.
21　Q　And tell me what that company's about.
22　A　I started it when I was in high school, a
23　freshman in high school.　I started selling my own
24　lashes.　So the company is called Bad & Boujee Mink

Page 132

1　Lashes.
2　Q　Okay.　And how long have you been -- is it
3　still selling products today?
4　A　I'm actually in the process of relaunching it,
5　so.
6　Q　I guess was there a pause since you're saying
7　it was relaunched?
8　A　Yes.
9　Q　What time period was it paused?
10　A　Just recently.
11　Q　Okay.　How much money have you made maybe in
12　the past year from this company?
13　A　If I had to guess, I would say a little over
14　$20,000.
15　Q　Okay.　In the past year?
16　A　So within that timeframe of like having the
17　entire company, so from freshman year up until recently
18　when I decided to relaunch it.
19　　　MR. MAUCK:　I object to the question as being
20　ambiguous, the word made.　Could be profit or could
21　be gross sales, so.
22　　　MS. ROSENBERG:　Sure.　And let me rephrase the
23　question.　Let me ask a different question first.
24　Q　Have you filed your company as a corporation

Page 133

1　or LLC with the Secretary of State?
2　A　So I did, I did file it, but when I did decide
3　that I didn't want to -- I didn't -- I wanted to stop
4　doing it and relaunch it, that's when I went ahead and
5　took out of that.　And then when I was in high school,
6　like when I was a freshman in high school, I was just
7　selling the lashes.　It was no -- it was no -- it wasn't
8　an LLC or anything like that.　Then I went on to
9　register it, but then I said I wanted to start all over,
10　so.
11　Q　Have you paid any fees in registering your
12　company with the state?
13　A　I'm not too sure about -- I'm not too sure
14　about that because I kind of left it up to my
15　grandmother.
16　Q　Your grandmother was involved in your company?
17　A　Yes.
18　Q　Okay.　Have you paid taxes on your earnings
19　that you've made from your sales with your company?
20　A　No.
21　Q　What do you do for income right now?
22　A　It depends, you know.
23　Q　I'm sorry?
24　A　I said it depends.　Like I'm not employed

34 (Pages 130 - 133)

Page 134

1  right now, but I'll do a cleaning job, because my
2  grandma, she owns her own cleaning company. So she kind
3  of employed me. So if I'm not like an official
4  employee, like I just help out every now and then.
5  Q   Okay. Was the reason -- was there ever a time
6  in which you did not pay rent in anyplace that you
7  stayed in the past two years?
8  A   Yeah.
9  Q   Okay. Is that why you had to move residences?
10  A   That's not -- that was part of the reason why,
11  but the other reason was because we were separating, me
12  and Amontae were separating. So we got the apartment
13  together, but since we were separating, then I just
14  thought it would be a good idea to move. And then not
15  only that, my grandma, she was the one that rented out
16  the apartment to us.
17  Q   So you were staying at your grandmother's --
18  let me strike that.
19      The apartment that you got with Amontae was
20  owned by your grandmother?
21  A   Correct.
22  Q   Okay. Did you sign a lease with your
23  grandmother?
24  A   I did not.

Page 135

1  Q   Okay. Have you ever signed a lease between
2  2018 and today?
3  A   No.
4  Q   Did you have a landlord at the -- strike that.
5      At the studio that you lived with with
6  Amontae, who owned that unit?
7  A   It was an extended stay studio, meaning like
8  it was like one bedroom, bathroom, it had a kitchen and
9  stove, all that, but it was like -- you know what an
10  extended stay is?
11  Q   From what I understand, is that a hotel
12  basically?
13  A   It's like that, but it's like you can live
14  there.
15  Q   For like a month or, you know, more than a
16  day?
17  A   For as long as you need. So we stayed there
18  for about three or four months.
19  Q   Okay. What was the extended stay place
20  called?
21  A   I believe like Willow Springs or something.
22  I'm not completely sure.
23  Q   Okay. And you mentioned that after you and
24  Amontae had broken up that you moved back in with your

Page 136

1  grandmother.
2  A   Yes.
3  Q   Is that where you currently live today?
4  A   Yes.
5  Q   Okay. Do you help with any, you know,
6  household expenses or anything other than, you know, her
7  giving you work periodically with her cleaning company?
8  A   Oh, I pay rent there.
9  Q   Oh, you pay rent there. How much do you pay?
10  A   300 a month.
11  Q   Okay. Where does that income come from?
12  A   Basically the cleaning job. I'll braid my
13  friend's hair, just, you know.
14  Q   How often do you do cleaning jobs?
15  A   Whenever she needs my help, which is probably
16  like once or twice a month.
17  Q   How often do you braid your friend's hair?
18  A   That's not often. Like majority, majority of
19  my income comes from my father, like he still supports
20  me.
21  Q   Okay. And how much does your father give you
22  every month?
23  A   It's not a set amount, it's just --
24  Q   Is it as needed?

Page 137

1  A   Yeah.
2  Q   How often do you ask your dad for money?
3  A   Whenever I need it.
4  Q   Can you approximate in the past maybe since
5  the beginning of the year?
6  A   Probably like once a month I will ask for
7  like -- he probably sends like 500 or 600 a month.
8  Q   Do you smoke pot?
9  A   Marijuana?
10  Q   Yes.
11  A   I used to.
12  Q   Okay. When did you stop?
13  A   Recently.
14  Q   Okay. What does recently mean?
15  A   I want to say in January.
16  Q   Of 2022?
17  A   Yes.
18  Q   Would you smoke pot with Amontae when you were
19  living together?
20  A   The majority I just used to smoke by myself.
21  Q   And why did you stop smoking in January this
22  year?
23  A   Just decided to, you know, healthier lifestyle
24  choices I guess.

35 (Pages 134 - 137)

Page 138

1   Q   All right.  Let's change paths for a second
2   and go back to your time at Bogan.  Do you recall how
3   attendance was taken at Bogan?
4   A   Yes.
5   Q   Can you tell me about that?
6   A   Here, like they would call -- like a teacher
7   would call your name and you would just say here.
8   Q   Was that role call in every single classroom?
9   A   Yeah, for the most part, or else they'll just
10  see if you're there.
11  Q   For you to be recorded as attending school
12  that day, did you have to swipe in or out at all at the
13  school?
14  A   For lunch.
15  Q   Was there any other time other than -- was
16  there any other records of, you know, you being at
17  school that day?
18  A   What day?
19  Q   Say, for example, beyond the oral roll call in
20  a classroom or your swiping at lunch, did you have to
21  anything else to basically say I'm here for the school?
22  A   No.
23  Q   Okay.  Was there attendance staff at the
24  school?

Page 139

1   A   I'm not sure.
2   Q   Okay.  Could you leave in the middle of the
3   day?
4   A   No.
5   Q   Okay.  Did you ever cut class at Bogan?
6   A   Yes.
7   Q   Okay.  How often would you cut class let's
8   just say your sophomore year?
9   A   Not often.
10  Q   Why would you cut class?
11  A   It depends.  Most of the time it was because
12  like family issues or, you know.
13  Q   What do you mean by family issues?
14  A   Let's just say I didn't feel comfortable with
15  going to school at the time.
16  Q   Was there -- was there conflict at the house?
17  A   Exactly.
18  Q   Okay.  And then would you go home when you
19  missed class during the day?
20  A   No, I couldn't go home.
21  Q   Okay.  Where would you go if you didn't go to
22  class during the day?
23  A   To the library.
24  Q   And what would you do at the library?

Page 140

1   A   Read.
2   Q   In September 2018, 2019 was there -- basically
3   your sophomore year, was there a lot of conflict at home
4   during that time?
5   A   Yeah, there was.
6   Q   Okay.  Would you ever basically say I'm here
7   or, you know, do attendance at the beginning of class
8   and then leave in the middle of class?
9   A   Uhn-uhn.
10  Q   I'm sorry, you have to say yes or no.
11  A   No.
12  Q   Okay.  Did you ever skip class during the
13  Quiet Time periods?
14  A   Yes.
15  Q   How often would you do that?
16  A   When I would go and pray instead.
17  Q   Okay.  You'd pray to Islam during that time?
18  A   To Allah.
19  Q   Yeah, to Allah.  I'm sorry.
20  A   Yes.
21  Q   Would you go to the library to do that?
22  A   Not particularly to do that, but if it was
23  time for prayer and I just so happened to be at the
24  library, then yeah.

Page 141

1   Q   Okay.  So sometimes you would cut the Quiet
2   Time periods to go pray.  Where would you go pray?
3   A   In the hallway.
4   Q   Okay.  How often would you do that during
5   sophomore year?
6   A   Often.
7   Q   Often?
8   A   Yeah.
9   Q   Could you -- would it be like more than once a
10  week?
11  A   Yeah, it was almost like a everyday thing.
12  Q   Okay.  When did that start?
13  A   After -- after -- like after I did the
14  research on the TM and stuff like that, that's when I
15  started to not participate in it, when I started going
16  against it, that's when I was like oh, yeah, I'm going
17  to just practice what I do instead.
18  Q   Okay.  Did you ever -- did anything ever
19  happen to you when you went to go into the hallway and
20  pray instead of participating in Quiet Time?
21  A   Yeah.
22  Q   Okay.  What happened to you?
23  A   I used to get in trouble.
24  Q   What does that --

36 (Pages 138 - 141)

Page 142

1    A    I used to -- like the security would try to
2  tell me to go back in the class or try to send me to the
3  dean or to an in-school suspension.
4    Q    All right.  Did anyone ever tell you you were
5  getting in trouble because you were cutting class in
6  Bogan?
7    A    You talking about during the Quiet Time
8  Program, during --
9    Q    Yeah, during the Quiet Time classroom periods
10  when you were out in the hall praying, did security or
11  anyone from Bogan ever tell you that the reason why you
12  had to, you know, you're going to the dean or the
13  principal's office was because you were cutting class?
14    A    That -- that was no question, like I wasn't --
15  if I was getting in trouble, then I knew what it was
16  for.
17    Q    What did you think it was for?
18    A    Because I wasn't participating.
19    Q    Okay.  It's not because you weren't
20  meditating, is that right?
21    A    I believed it was.
22    Q    Did you ever tell anyone that you were not
23  meditating?
24    A    Well, it's clear to see if I'm up and walking

Page 143

1  around.
2    Q    Beyond up and walking around, do you believe
3  that if you had just been sitting there quietly with
4  your eyes closed that you would not have been in
5  trouble?
6    A    Right, because there was no way to tell
7  whether or not I was meditating.
8    Q    Okay.  All right.  You mentioned that you --
9  okay.  Let's go back to your religious beliefs in 2018.
10  You mentioned you grew up Muslim.  So in 2018 I know you
11  just mentioned that you were praying in school.  Can you
12  tell me more about that in your sophomore year at Bogan,
13  when that started, you know, how you were able to
14  practice Islam in that school?
15    MR. MAUCK:  Well, I'll object that it's been
16  asked and answered.  Go ahead.
17    A    Can you restate the question?
18  BY MS. ROSENBERG:
19    Q    Sure.  Were you able to practice Islam at
20  Bogan during your sophomore year?
21    A    Was I able to?
22    Q    Yeah.
23    A    I feel as if what was coming in between me
24  being able to practice the religion of Islam is the

Page 144

1  Quiet Time.  That's what was preventing me.
2    Q    Did you pray at school in September of 2018?
3    A    My sophomore year, yes.
4    Q    Okay.  How often would you pray in school?
5    A    Every day.
6    Q    How many times a day?
7    A    If not five then three.
8    Q    When would you pray?
9    A    During -- like if we were switching periods or
10  I would ask to go to the restroom.
11    Q    Now, where would you pray?
12    A    In the hallway.
13    Q    Okay.  How long would your prayer be?
14    A    It's not long.
15    Q    Under two minutes?
16    A    Yeah.
17    Q    Okay.  Did you have to say anything out loud
18  when you prayed?
19    A    No.
20    Q    Okay.  So you could just pray silently in the
21  hall?
22    A    Yes.
23    Q    Okay.  Were there set times in which you had
24  to pray?

Page 145

1    A    Yes.
2    Q    Okay.  Did you keep a schedule or -- as to the
3  prayer times in sophomore year at Bogan?
4    A    I actually had an app on my phone that just
5  alerted me when it was time.
6    Q    Okay.  Did you ever ask the -- any classroom
7  teachers about -- or the dean or any kind of Bogan staff
8  about being able to accommodate you -- your prayer?
9    A    I did.
10    Q    Okay.  Who did you talk to?
11    A    I talked to my -- my teacher.  He was my
12  computer science teacher.
13    Q    And what did you ask him?
14    A    I'll ask him instead of -- because it was like
15  around my last period, the classes where we had to
16  meditate, I asked him like if instead I could go and
17  pray, and of course the answer was no, but.
18    Q    Did they tell you -- did you ask whether you
19  could pray at your seat during the Quiet Time period?
20    A    I didn't -- I wasn't specific.  I just asked
21  if I could remove myself from the classroom in order to.
22    Q    Okay.  And they said you could not leave the
23  class to pray, is that accurate?
24    A    Correct.

37 (Pages 142 - 145)

Page 146

1  Q   Okay.  Okay.  At some point I think you
2  mentioned that your -- oh, sorry.  Strike that.
3       What does it mean to be -- what are your core
4  beliefs as a Muslim that you grew up with?
5  A   There is no God but Allah.
6  Q   Okay.
7  A   Muslims aren't to like worship anything --
8  anything that's -- anything that's outside of Allah,
9  like basically no object, no person, no thing.
10  Q   Okay.
11  A   And the core issue, you have to wear, like
12  when I was in high school I would always wear a turbine
13  or, you know, you can't -- it's just -- for me it wasn't
14  a -- it wasn't difficult things, you know, it wasn't
15  difficult things to follow.  Of course when it came to
16  like drugs or alcohol and stuff like that, you can't do
17  that stuff, you know.
18  Q   Okay.  All right.  At some point did you, not
19  obviously change beliefs, did you stop practicing Islam?
20  A   Yes.
21  Q   Okay.  Around what time did you do that?
22  A   Around the time I graduated from high school.
23  Q   Okay.  Why did you stop practicing Islam?
24  A   I wanted to move more into spirituality.

Page 147

1  Q   And what does spirituality mean to you?
2  A   It's meaning that you believe in a higher
3  power, you know, just to be aligned with yourself, you
4  know, to like really know who you are.
5  Q   To your understanding does your spirituality
6  conflict with Christian beliefs?
7  A   Parts of it.
8  Q   What parts conflict?
9  A   So I do believe in God, so that's -- that's
10  something.
11  Q   I'm sorry, you do not believe in God or you
12  do?
13  A   I do.
14  Q   You believe in God.
15  A   Yes.
16  Q   Do you believe in the devil?
17  A   Yes.
18  Q   Okay.  Do you believe in demons?
19  A   Yes.
20  Q   Okay.  Do you believe that there is a heaven
21  and a hell?
22  A   I feel like heaven and hell is a mindset.
23  Q   Okay.  Was smoking marijuana against your
24  Muslim upbringing and beliefs?

Page 148

1  A   Yes, unless you have some sort of condition.
2  Q   Okay.  Did you have some sort of condition
3  when you were smoking?
4  A   I was never diagnosed with anything, but I was
5  kind of depressed at the time, so.
6  Q   Okay.  When were you depressed?
7  A   Around the time I was smoking weed.
8  Q   Was that during your time at Bogan?
9  A   Around that time, yes.
10  Q   Did you ever see --
11      MR. MAUCK:  Are we going to have a break for
12  lunch here?  This has been going on a long time,
13  and we didn't expect it to last this long.  So we'd
14  like to -- we'd like to get lunch unless you're
15  down to a short period of time, Miss Rosenberg and
16  Mr. Sipchen.  I don't want you to cut back on your
17  time.
18      MS. ROSENBERG:  Sure.  Can we do -- I would
19  say I have some more.  But do you want to take
20  maybe a 20-minute break or can we come back at
21  2:45?
22      MR. MAUCK:  Let's make it 3:00 o'clock.  Is
23  that all right?
24      THE WITNESS:  Yeah.

Page 149

1      MR. MAUCK:  We'll run down and grab something.
2  We'll be back at 3:00.
3      MS. ROSENBERG:  Great.
4      (Lunch recess.)
5  BY MS. ROSENBERG:
6  Q   Miss Hudgins, I think the last question that
7  we had was something along the lines of you were telling
8  me about how your belief of spirituality sometimes
9  conflicts with Christian beliefs.  Can you tell me what
10  elements of your spirituality conflicts with
11  Christianity?
12  A   I feel like my belief system and spirituality
13  resonates with Christianity because first and foremost I
14  believe in God.  Christians believe in God.  And not
15  only that, but like other metaphorical things like you
16  said, the devil and angels, all those things I believe
17  in, so they do conflict with my beliefs.
18  Q   It seems like you're using conflict with
19  align.
20  A   Align.
21  Q   Okay.  So to clarify the record, are there any
22  parts of your current religious beliefs that conflict or
23  basically go against Christianity?
24  A   No.

38 (Pages 146 - 149)

Page 150

1  Q   So you have no issue if the purpose of this
2  lawsuit was to fight on behalf of Christianity?
3  A   No.
4  Q   You would have no problem with that?
5  A   No.
6  Q   Okay.  How does your spiritual beliefs, how
7  are they different from Christianity?
8  A   Like you asked me earlier is there a heaven
9  and hell, and I told you it's more of a mindset for me.
10  And I feel like that's the biggest, the main difference,
11  you know.  There's no -- I don't believe there's like a
12  heaven and hell, a place that you go, but it's more so a
13  mindset and like what you choose to make it.  Like you
14  could be living through hell or you could live in heaven
15  if you choose to live in peace, you know, but you can be
16  living in hell if you don't.
17  Q   Okay.  Do you believe that Jesus Christ is the
18  one true God?
19  A   No.
20  Q   Do you know what the Kingdom of God is?
21  A   Heaven, I believe, right?
22  Q   And you don't believe in heaven as a place, is
23  that correct?
24  A   Correct.

Page 151

1  Q   Okay.  Do you know what spiritual warfare is?
2  A   Yes.
3  Q   What does it mean to you?
4  A   To me to be in a spiritual warfare is like
5  battling things that are unseen, you know.
6  Q   Do they -- okay.  Go ahead.
7  A   Basically good against evil.
8  Q   Do they happen on earth or basically, not say
9  in space, but not on earth?
10  A   Actually like a spiritual warfare can reside
11  on earth.  It can reside within us.
12  Q   Do you believe that demons or the devil can be
13  used within spiritual warfare on earth?
14  A   Oh, yeah.
15  Q   And you believe in both demons and the
16  presence of the devil on earth?
17  A   Yes.
18  MS. ROSENBERG:  All right.  Let me move on.
19  I'm going to share my -- so let's go back to your
20  business.  I think there was a couple of follow-up
21  questions I wanted to ask you.  Kaya, this is a
22  screenshot of a Facebook page.  Let me see here.
23  Can you guys see this?
24  MR. MAUCK:  We could see it but it's kind of

Page 152

1  small, if you can enlarge it.
2  MS. ROSENBERG:  Let me see what I can do here.
3  Okay.  Here.
4  (Document marked as Hudgins Deposition
5  Exhibit 6 for identification.)
6  Q   Kaya, is this -- first of all, are these
7  pictures of you?
8  A   Yes.
9  Q   Is this a Facebook page that you own?
10  A   Yes.
11  Q   Okay.  And it mentions that you are an
12  entrepreneur.  And I just kind of want to ask you
13  what -- I know you mentioned that you sold eyelashes.
14  What else do you sell?
15  A   Vendors.
16  Q   I'm sorry, what did you say, vendors?
17  A   Yes.
18  Q   And how do you get paid by selling vendors?
19  A   So basically what I do is provide -- provide
20  suppliers to people that are looking to start their own
21  business or want to buy things wholesale but they don't
22  know where to get them.  So I know the suppliers.  So
23  what I basically would do is provide them with that
24  supplier for a price, a small price.

Page 153

1  Q   And how did you find your list of vendors?
2  A   Because I've purchased from them personally.
3  Q   I'm sorry, you purchase from them personally?
4  A   Yes.
5  Q   Okay.  Who pays you in that transaction, does
6  the vendor pay you or does the business who you're
7  working with pay you?
8  A   It's not -- it's not -- it doesn't have to be
9  a business, but the individual pays me.
10  Q   So the person getting the rec or the list of
11  vendors?
12  A   Right, the person interested in purchasing the
13  list of vendors in order to start their business or in
14  order to get wholesale.  A vendor is just a supplier
15  that supplies items for a wholesale price.
16  Q   Do people pay to get on the list of vendors?
17  A   No.
18  Q   Okay.
19  MR. SIPCHEN:  Hey, Christina, is this
20  Exhibit 6?
21  MS. ROSENBERG:  Yes, I think so.
22  MR. SIPCHEN:  Just for marking purposes,
23  that's all.
24  MS. ROSENBERG:  Yeah, I believe so, yes.  I

39 (Pages 150 - 153)

Page 154

1   lost my notes, but yes.
2   Q  Let's see here. Does the vendor pay you for
3 promoting them or having you -- having them be on your
4 list?
5   A  No.
6   Q  Okay. And I think -- I don't think I got an
7 answer before your counsel tried to clarify the
8 question, but in 2021 how much did your company make in
9 total revenue?
10   A  I'm not exactly sure.
11   Q  Could you give me a ballpark number?
12   A  Not exactly. If I have to guess, and this is
13 just out of pure speculation, you know, I'm not sure
14 because like I said, my grandma, she mostly handles
15 that. So if I had to guess, it would be like around 20,
16 25, I'm not sure, you know.
17   Q  How much money did you receive as profit from
18 your business in 2021?
19   A  Alone in 2021? See, when I said 20,000, I
20 thought you were talking about the entire range
21 from my freshman year when I first started the business.
22 But in 2021 alone, I would say like maybe -- maybe like
23 5, 5, 7,000, around that.
24   Q  And again, you have not paid taxes on any

Page 155

1 income that you received from your business, is that
2 accurate?
3   A  Correct. It's --
4   MR. MAUCK: It's not clear that there was
5 taxable income. She's testifying to gross revenue,
6 not the profit.
7   MS. ROSENBERG: That is not the question, but
8 let me re-ask it.
9   Q  Have you paid any taxes on any income that
10 you've received from your business in 2021?
11   MR. MAUCK: I'll object to the relevance of
12 this entire line of questioning due to the points
13 of the lawsuit, but you can go ahead and answer.
14   A  I'm not sure.
15 BY MS. ROSENBERG:
16   Q  All right. Let's stop this share. Let's go
17 to your -- I think this was Exhibit 2, correct me if I'm
18 wrong, Carolyn or Christina. Okay. So this is your
19 student application that we previously saw in your
20 deposition.
21   MR. SIPCHEN: Sorry, I think -- I think
22 Carolyn marked it as Exhibit 3.
23   MS. ROSENBERG: Okay. So for the record this
24 is Exhibit 3 which is Miss Hudgins's Student

Page 156

1 Application for Transcendental Meditation
2 Instruction that's dated 11/1/18.
3   Q  Miss Hudgins, do you recall this document?
4   A  Yes, it's right here (indicating).
5   Q  Great. Let's go to this first question here,
6 have you ever used any form of meditation before, and
7 you checked yes. Can you tell me about when you first
8 meditated in your entire life?
9   A  It was -- it was I believe like my freshman
10 year. My freshman year. I didn't have a mantra or
11 anything like that. It was -- for me meditation was
12 just more so for relaxing, you know.
13   Q  And what -- can you describe how you would
14 meditate your freshman year?
15   A  I would just like close my eyes and then try
16 to think of nothing. That was my way of meditating.
17   Q  Did you experience any hypnosis during those
18 experiences meditating your freshman year?
19   A  No, so I didn't experience the hypnosis till
20 the time where I was first introduced to TM.
21   Q  Okay. Did you feel calm when you meditated
22 your freshman year when you thought about nothing?
23   A  Yes.
24   Q  Okay. Did you think it benefited you when you

Page 157

1 meditated your freshman year?
2   A  Mentally, yes.
3   Q  Okay. How often would you meditate your
4 freshman year?
5   A  Not often.
6   Q  Once a week?
7   A  If I had to guess, it would probably be like
8 once every other month, whenever I just felt
9 overwhelmed.
10   Q  Okay. Your freshman year was your home life
11 more, not to say more calm -- I don't want to say more
12 calm, but was there conflict at your house your freshman
13 year?
14   A  So my freshman year, it wasn't -- it wasn't --
15 no, it was not much going on my freshman year.
16   Q  Okay. And the things that happened in your
17 house didn't start going on until your sophomore year?
18   A  Yeah, about.
19   Q  Okay. Did you know anything about Hinduism I
20 guess let's just say ever?
21   A  When I researched it, yeah, but previously
22 before that, no.
23   Q  Okay. So basically your knowledge of Hinduism
24 was based off of your research relating to

40 (Pages 154 - 157)

Page 158

1 transcendental meditation, is that accurate?
2    A   Yes.
3    Q   Okay. What did you learn about Hinduism when
4 you started doing research related to the Quiet Time
5 Program?
6    A   I didn't too much want to get into what it was
7 about. I just knew that the mantra that was given to me
8 and other classmates were names of Hindu gods, but I --
9    Q   Did -- no, go ahead.
10    A   What were you going to ask?
11    Q   Did you go to a website that had a list of
12 mantras on it?
13    A   No, I'm -- I -- like I said, I searched the
14 closest that I could like spell it, because I searched
15 it up, but the -- can you restate the question one more
16 time?
17    Q   Sure. I asked if there was a -- or actually,
18 Christina, can you reread the question?
19      (Question read.)
20    A   I don't recall exactly, I just recall trying
21 to search the closest that I could find to pronouncing
22 the mantra. And that's how I found out. But I'm not
23 sure if it was exactly a list, it was just oh, I know
24 that my mantra was this and she told me her mantra was

Page 159

1 this, so I went and researched that.
2    Q   Did someone tell you to do that?
3    A   No.
4    Q   How did you get the idea to search the
5 internet that way?
6    A   Out of suspicion.
7    Q   Out of suspicion, okay. Prior to your
8 research on the mantras, were you ever in a class
9 that -- where other students had been claiming,
10 basically this was in the spring of 2019, that other
11 students had been saying that their mantras were Hindu
12 gods?
13    A   I don't think any -- I don't think that people
14 thought to look into it, so.
15    Q   Could you just answer the question? Were you
16 in a classroom where other students basically stated in
17 any sort of way that they didn't want to do Quiet Time
18 because their mantras meant -- it meant that they were
19 praying to Hindu gods?
20    A   No. I'm pretty sure they were unsure or they
21 didn't know.
22    Q   All right. Do you know if Hinduism has
23 multiple gods or one god?
24    A   I believe multiple gods.

Page 160

1    Q   Do you know what their names are?
2    A   No, I do not.
3    Q   What was your mantra at Bogan?
4    A   It was like -- it sounded like, and I don't
5 remember vividly, I just remember Ahm, Ahm, something
6 like that. I'm not sure.
7    Q   Did you ever write it out in any sort of form
8 or fashion?
9    A   When I was researching it, yeah, but other
10 than that, no.
11    Q   Were you guessing because -- have you ever by
12 the way -- strike that.
13      Had you ever seen it written down prior to
14 your research?
15    A   No.
16    Q   So you were doing your best to figure out how
17 to write out your mantra, is that accurate?
18    A   Yes.
19    Q   But you don't know how it's actually spelled,
20 is that correct?
21    A   Correct.
22    Q   Okay. In 2018 I think you mentioned that you
23 may have been experiencing some depression. Did you
24 ever -- did you have any other mental health issues

Page 161

1 during your sophomore year at Bogan?
2    A   No.
3    Q   Okay. And you were in the general education
4 program and not -- is that right?
5    A   I believe so.
6    Q   Okay. Great. Did you ever go -- I think you
7 mentioned that you smoked marijuana previously. Did you
8 ever go to rehab for smoking?
9    A   No.
10    Q   I think you mentioned previously that your mom
11 came to stay with you even though -- you know, with your
12 grandma during your sophomore and junior years. Would
13 your mom call you to see you periodically?
14    A   Now or --
15    Q   So basically this time period will be the time
16 you were at Bogan, so sophomore and the first half of
17 junior year. Your mom was not saying with you, is that
18 accurate?
19    A   She came and moved down to Chicago from
20 Arizona sometime in between my freshman and sophomore
21 year.
22    Q   Okay. So was she living with you your
23 sophomore year with grandma?
24    A   Yes.

41 (Pages 158 - 161)

Page 162

1  Q   Okay.  Did she -- was there a reason why she
2  was not your guardian at the time?
3  A   Yeah.
4  Q   Why?
5  A   Because she had went to prison.  She had went
6  to prison for awhile, and my grandmother got
7  guardianship of me and my sister and it just stayed that
8  way ever since.
9  Q   Okay.  Did your mother go back to prison while
10 you were in high school?
11 A   No.
12 Q   Okay.  When did she move out or when did she
13 stop living with you and your grandmother in high
14 school?
15 A   When she was diagnosed with schizophrenia and
16 bipolar disorder, so she had went to a mental facility.
17 Q   And when did she go to the mental facility?
18 A   During my sophomore year.
19 Q   Okay.  Do you know around what month she went?
20 A   No, I don't.
21 Q   Do you remember it being in the fall or --
22 A   I don't recall.
23 Q   Okay.  But sometime during your sophomore year
24 she went to a mental institution?

Page 163

1  A   Yes.
2  Q   Okay.  Is she still there or is she living
3  independently?
4  A   She passed away this year.
5  Q   I'm so sorry to hear that.
6      And similarly, your dad, was he in your life
7  say for -- strike that.
8      During your sophomore and junior years at
9  Bogan, how frequently would you see your dad?
10 A   I had -- not often at all.
11 Q   Okay.  He was in Texas?
12 A   Yes.
13 Q   Okay.  Do you currently have a relationship
14 with your father?
15 A   Yes.
16 Q   Okay.  Is it about the same as you did your
17 sophomore and junior years at Bogan?
18 A   No.
19 Q   Is it more or less?
20 A   More.
21 Q   Okay.  During your sophomore and junior years
22 at Bogan, how often would you have contact with your
23 dad?
24 A   Not often.

Page 164

1  Q   Once every three months?
2  A   Yeah, like once probably, probably if I had to
3  say like once a month, if that.
4  Q   Okay.  And would this be -- would he ever
5  visit you in Chicago?
6  A   When I was in high school?  No.
7  Q   Okay.  Was this by like phone call or email or
8  text?
9  A   Phone call, FaceTime.
10 Q   Okay.  And when did you start having more of a
11 relationship with your dad?
12 A   Last year.
13 Q   Okay.  Is your grandmother also Muslim?
14 A   She's a Christian.
15 Q   She's a Christian?
16 A   Yes.  I meant to correct you earlier when you
17 said -- when you said something.  So I converted to a
18 Muslim on my own.  The rest of my family are Christians.
19 Q   And when did you convert to Muslim?
20 A   This had to be my -- when I was in eighth
21 grade.
22 Q   Okay.  Why did you convert to being a Muslim?
23 A   Because I felt as if my life was going in the
24 wrong direction, so.

Page 165

1  Q   Had you grown up Christian?
2  A   Yes.
3  Q   Okay.  Is your grandmother still practicing
4  Christianity?
5  A   One of them is and I have another grandmother
6  who's a Jehovah's Witness.
7  Q   Did they take you to church while growing up?
8  A   All the time.
9  Q   Okay.  How often?
10 A   Every day.
11 Q   Every day?
12 A   Yes, after school.
13 Q   Okay.  Did you convert to being Muslim to stop
14 going to church?
15 A   No.
16 Q   Okay.  Were you part of Sunday school?
17 A   Yes.
18 Q   And did you go to any religious schools
19 growing up?
20 A   No.
21 Q   Is the grandma that you live with, is she the
22 Jehovah's Witness or the Christian?
23 A   Christian.
24 Q   Okay.  Has she continued to go to church?

42 (Pages 162 - 165)

Page 166

1   A   She goes -- she goes every now and then, but
2 not as often as she used to.
3   Q   Do you ever go to church with her?
4   A   Yeah.
5   Q   Okay. How often do you go to church?
6   A   Last time I've been to church was like about
7 three months ago. I went with one of my friends.
8   Q   Which church do you go to?
9   A   I went to BrightStar.
10   Q   Did you ever go to church with Amontae when
11 you were dating?
12   A   No.
13   Q   Okay. Did you go to church at all in high
14 school when you were at Bogan?
15   A   No, because I was Muslim at the time, so I was
16 going to the masjid.
17   Q   Okay. Since you've graduated, how many times
18 have you gone to church?
19   A   None.
20   Q   You said none?
21   A   Since I graduated? When did I graduate?
22   Q   June 2021, so last June.
23   A   So last time I've been to church was probably,
24 like I said, like three months ago, three or four months

Page 167

1 ago with my friend, so that's afterwards, yeah. Just
2 once.
3   Q   Okay. Did you like it?
4   A   Yeah. I got really emotional.
5   Q   Would you go again?
6   A   I would.
7   Q   All right. Okay. I think we talked about
8 your application, and I think you have -- you prior --
9 earlier today you stated that this was the document that
10 you were referring to when you said consent. Is that
11 what you were referring to, this document?
12   A   Which document?
13   Q   The student application for transcendental
14 meditation instruction. Do you want me to put it back
15 up?
16   A   No, I have it right here.
17   Q   Yeah, is that the document you meant when you
18 said that, you know, you were signing a consent for the
19 program?
20   A   Yes.
21   Q   Okay. You didn't sign -- did you sign any
22 other documents relating to the Quiet Time Program?
23   A   I'm not completely sure.
24   Q   Okay. Do you know -- did you take any papers

Page 168

1 relating to the Quiet Time Program back home?
2   A   Not for anyone to sign, no.
3   Q   Okay. Did you take any information sheets
4 home about the Quiet Time Program?
5   A   No.
6   Q   Do you remember seeing any information, like
7 packets or anything from anyone to take home about the
8 Quiet Time Program?
9   A   Not that I recall.
10   Q   Okay. All right. Let's see. You talked
11 about -- so from what we saw is that there is multiple
12 pages to this application. And I know we kind of
13 briefly went over your TM training or instruction. Do
14 you remember how many days it was?
15   A   I believe just one.
16   Q   Okay. Do you remember getting any kind of
17 prep talk or talk from Erin about the transcendental --
18 about the TM instruction?
19   A   Who's Erin?
20   Q   Your teacher from what we recall.
21   MR. MAUCK: It's Erin Levi.
22 BY MS. ROSENBERG:
23   Q   Levi, yeah.
24   A   Any instructions from her?

Page 169

1   Q   Like introductory talk or like information.
2   A   Yeah. So when she first introduced it to me,
3 she didn't give me information about what it was about,
4 but she did give me information such as how to meditate.
5   Q   Okay. She didn't tell you why you guys were,
6 you know, going through this process or what the
7 instruction was about?
8   A   No.
9   Q   Okay. Okay. All right. Did you -- sorry,
10 should we wait till John comes back? John, you back?
11   MR. MAUCK: I'm back. Just ordered two
12   waters.
13   MS. ROSENBERG: Fair enough. I'm sure
14   Jonathan's on it.
15   Q   Did you ask any questions during -- with your
16 time with Erin?
17   A   No, I didn't.
18   Q   Can you describe -- okay. Were you in class
19 or did you go somewhere with Erin to do your TM
20 training?
21   A   We went somewhere alone, in a different
22 classroom.
23   Q   Okay. Where did you go in the school?
24   A   It was a separate classroom.

43 (Pages 166 - 169)

1    Q    Okay.  And were the lights on?
2    A    No, they were off.  It was dark.
3    Q    Were the shades drawn?
4    A    They were pulled down.
5    Q    Okay.  Was there any like lamps or anything?
6    A    No.
7    Q    Okay.  Do you remember what time of day it
8 was?
9    A    It was daytime.
10    Q    Okay.  Do you remember if it was like early in
11 the day or towards the afternoon that you did your
12 training with Erin?
13    A    I'm not sure.
14    Q    Okay.  Did she tell you how long the training
15 would take?
16    A    Again, not sure.
17    Q    Okay.  Did you see -- were there desks and --
18 classroom desks and chairs in the room?
19    A    Yeah, it was, but that wasn't -- they were
20 like pushed back.  So we were sitting like in front of
21 the altar.
22    Q    And when you say altar, was it a normal table
23 or describe what like type of furniture it was on?
24    A    So it was -- it was a table, it was a table,

1 and we were sitting right next to each other.
2    Q    You were standing?
3    A    Sitting.
4    Q    You were sitting?  Was she sitting too or was
5 she standing?
6    A    She was standing.
7    Q    Okay.  Was she dressed in any particular --
8 was she dressed in normal like street clothes?
9    A    I have no idea.  I don't remember that.
10    Q    Okay.  Did you stand up at all during your
11 training that day with Erin?
12    A    After meditating, yeah.
13    Q    Okay.  All right.  And on the table, was the
14 table -- basically the table with the items on it, was
15 that a like teacher table or a desk or a different kind
16 of table?
17    A    A regular table, I believe.
18    Q    I'm sorry?
19    A    A regular -- a regular table.  I can't really
20 remember exactly how the table looked, but I do remember
21 like the stuff that was on top of the table.
22    Q    And describe to me -- oh, do you have asthma?
23    A    Asthma?  I believe I had asthma when I was
24 younger because I had an asthma pump, but I don't think

1 I have it.
2    Q    Okay.  Did you have asthma at Bogan while you
3 were a sophomore?
4    A    No.
5    Q    Okay.  Do you remember if the incense was lit?
6    A    Not that I can remember.
7    Q    Okay.  I think you mentioned that there was
8 fruit on the table, is that accurate?  Is that what you
9 said?
10    A    Yes, there was fruit.  There was rice.
11    Q    Okay.  What --
12    A    Candles.
13    Q    What type of fruit was on the table?
14    A    I believe it was an orange.
15    Q    Were they big oranges or little?
16    A    I don't know.
17    Q    Okay.  How many pieces of fruit were there?
18    A    Don't know.
19    Q    Okay.  How was the rice on the table?
20    A    It was inside this little -- it was just like
21 this little cup.
22    Q    Okay.  Was it a paper cup?
23    A    No.
24    Q    Was it like a plastic cup, was it clear?

1    A    It looked like it was like an antique cup.
2    Q    Okay.  Was it uncooked rice?
3    A    Yes.
4    Q    And what did the candles look like?
5    A    I don't recall.
6    Q    Okay.  Was it one big one?
7    A    I'm not sure.
8    Q    Okay.  Do you remember there being one or more
9 than one?
10    A    Again, I'm not sure.  I just remember there
11 being candles.
12    Q    Okay.  Were they lit?
13    A    Again, I don't remember.
14    Q    Okay.  And you remember there being a picture
15 of a man.  Can you describe the picture of the man?
16    A    He had on like -- he had on like this robe
17 thing, like this robe.
18    Q    Could you -- was the picture in color or black
19 and white?
20    A    It was in color.
21    Q    Okay.  Do you remember any of the colors that
22 were in the picture?
23    A    Orange.
24    Q    Orange.  Any other colors that you recall in

44 (Pages 170 - 173)

Page 174

1 the picture?
2    A    No.
3    Q    Okay.  Was the picture framed?
4    A    I don't recall.
5    Q    Okay.  Was the picture like laying flat on the
6 table or was it up?
7    A    It was up.
8    Q    Okay.  So you could see it just sitting there
9 and looking across onto the table?
10   A    Yes.
11   Q    Okay.  Do you remember any other items on the
12 table?
13   A    The rice, the candles, a tray.
14   Q    Were the items on top of the tray?
15   A    Some were.
16   Q    What was not on the tray?
17   A    I don't remember exactly.  I just remember it
18 being there.
19   Q    Okay.  Do you remember what the tray looked
20 like?
21   A    No.
22   Q    Was it metal?
23   A    Yeah.
24   Q    Okay.  Was it silver?

Page 175

1    A    I don't know.  I know it was metal.  It wasn't
2 like a plastic tray.  It was like a metal tray.  Like I
3 said, it looked like antique items.
4    Q    Did it look ornate, was it fancy?
5    A    I wouldn't say fancy, but it wasn't a paper
6 tray.
7    Q    It wasn't plain?
8    A    Right.
9    Q    Okay.  Okay.  Do you remember -- okay.  Can
10 you walk me through what Erin did when you were in the
11 room with her?
12   A    She -- it sounded like to me she was speaking
13 in tongue.  But then she did something like pouring the
14 rice, like pouring the rice out.  All that I really
15 remember vividly is her saying words that I could not
16 make up, like words that I couldn't understand for
17 anything, you know.
18   Q    Okay.  Did she give you an opportunity at the
19 end to ask you -- to ask questions?
20   A    Yeah.
21   Q    Okay.  Did you ask any questions?
22   A    I didn't have any questions at the time, no.
23   Q    Okay.  If you thought it was weird what she
24 was saying, why didn't you ask her what you -- you know,

Page 176

1 ask her about what she was trying to say and what she
2 was saying?
3    A    I didn't think much of it at first.
4    Q    Okay.  You later became suspicious of the --
5 of what happened?
6    A    Yeah.
7    Q    Okay.  And we'll get to there.  All right.
8 Okay.  So you only recall being in the room with Erin
9 that one time and that being your training?
10   A    Yes.
11   Q    Do you remember meeting with Erin any
12 subsequent days to check in on your meditation?
13   A    I'm not sure.
14   Q    Okay.  And I think you previously said that
15 you liked to meditate actually early on, is that right?
16   A    That's correct.
17   Q    Okay.  I think you mentioned something
18 about -- let's see here.  I think you mentioned earlier
19 that you were in -- I think you were selected to be in
20 some kind of program to advocate the Quiet Time Program,
21 is that right?
22   A    Yes.
23   Q    Okay.  Do you remember if that program was
24 called being a student ambassador?

Page 177

1    A    I don't -- I don't know exactly what it was
2 called, but I feel as if they wanted me to be a student
3 ambassador.  That's what I was, so.
4    Q    Okay.  Do you remember the process of getting
5 selected for that program?
6    A    It was really no process, like they just --
7 someone came up to me and they asked me if I would be
8 willing to and there would be rewards.
9    Q    Okay.  So what did they tell you you had to do
10 to get the rewards?
11   A    To tell my classmates to try to push it on
12 them, to tell them to meditate, to be on them about it.
13   Q    What did that -- what did they tell you that
14 you had to tell your classmates?
15   A    To encourage them to motivate -- to meditate.
16   Q    Did they tell you that you should -- was there
17 a script that you were given?
18   A    No, that I should tell my classmates?
19   Q    Yeah.
20   A    No.
21   Q    Okay.  So when were you first asked to promote
22 meditation to your classmates?
23   A    Shortly after it was introduced.
24   Q    All right.  So -- or after you had been

45 (Pages 174 - 177)

1  trained, is that accurate?
2     A    Yes.
3     Q    Okay.  So if we have, let's go back, I think
4  if you go back to your application, I think the date we
5  have on it is 11/1/18.  Does that refresh your
6  recollection about the timing?
7     A    Again, I don't -- I can't tell you a specific
8  date.
9     Q    Okay.  Did Erin -- was Erin the one that asked
10  you to be part of this program?
11    A    I honestly can't remember.  I don't think she
12  was.
13    Q    All right.  Was it any of your classroom
14  teachers at Bogan?
15    A    It might have been.
16    Q    But you can't recall?
17    A    Correct, can't recall.
18    Q    When were you supposed to tell your classmates
19  about, you know, encouraging them to meditate?
20    A    Right before Quiet Time.
21    Q    Was that while you were in class?
22    A    Yes.
23    Q    Okay.  Were you ever at the front of the room
24  like making an announcement about Quiet Time?

1     A    No.
2     Q    Okay.  They didn't have you stand up in the
3  front of the room and like make announcements, is that
4  right?
5     A    Right.
6     Q    Okay.  Did they -- did they tell you to
7  promote meditation through any other means other than
8  your classroom, like on social media, text, obviously
9  not on the playground but during recess or lunch?
10    A    No.
11    Q    Okay.  Was there any assessment about how well
12  you were doing as an ambassador?
13    A    No, it wasn't.  There wasn't.
14    Q    Do you know -- go ahead.
15    A    There was no way to tell if I was promoting it
16  or not.  But --
17    Q    Were the other members of the ambassador
18  program in your grade?
19    A    Some of them were.
20    Q    Okay.  Were some, you know, not in your grade?
21    A    Yeah, like Turbo, she's not in my grade.  She
22  wasn't in my grade.
23    Q    Okay.  So Turbo was a member.  Anyone else
24  that you recall being a member of this program?

1     A    She's the only one that I was -- that I was
2  familiar with, so.
3     Q    Okay.  Did anyone ever tell you the reason why
4  you were part of this kind of ambassador or advocate
5  program for TM was because you were a good model for
6  meditation?
7     A    Yeah.
8     Q    Okay.  What else did they tell you?
9     A    No, not because I was a good model for
10  meditation, but instead because I was an influence to
11  others.
12    Q    So you were an influencer?
13    A    Exactly.
14    Q    Okay.  Did you have a lot of social influence
15  during your grade?
16    A    I did but without wanting to.  Like I was -- I
17  was popular, but I was low key, if you get what I'm
18  saying like.
19    Q    And was Turbo popular as well?
20    A    Yeah, very popular.
21    Q    Okay.  Do you think you encouraged other kids
22  to meditate during Quiet Time?
23    A    Yeah.
24    Q    Okay.  When you were encouraging kids to

1  meditate, were you -- did you believe the things that
2  you were saying, telling other kids to do?
3     A    Did I believe in asking them to meditate?
4     Q    Yeah.  I mean, did you believe in the program
5  that you were advocating in?
6     A    No.  Like I say, I was doing it because there
7  were rewards for it.
8     Q    So were you just, you know, advocating
9  meditation to get the rewards?
10    A    Yes.
11    Q    Okay.  And you mentioned the rewards being
12  pizza parties.  Were you able to get out of class for
13  being part of this program?
14    A    Yes.
15    Q    Okay.  Were you just telling -- oh, did you
16  tell the people that you were a part of this program
17  that you were advocating so that you could continue to
18  get the rewards?
19    A    Can you restate the question?
20    Q    Sure.  Did you ever tell the people running
21  the meditation advocacy program that the, you know, I'm
22  promoting all meditation -- strike that.
23          Do you know if you could have gotten the
24  rewards just by sitting quietly with your eyes closed

46 (Pages 178 - 181)

Page 182

1 and not promoting the program?
2    A  I wouldn't have.
3    Q  Okay. So you needed to promote the meditation
4 program to get the rewards?
5    A  Correct.
6    Q  Okay. Do you know if you were selected for
7 the program because you were a high performing student?
8    A  I don't believe that's why.
9    Q  Okay. How were you doing academically
10 sophomore year?
11    A  Could have been doing better.
12    Q  Okay. What were your grades your sophomore
13 year, if you recall?
14    A  I recall mostly having like average grades,
15 like A's, B's, C's.
16    Q  Okay. Did you ever do additional meditation
17 or, you know, additional check-ins to get out of class?
18    A  Did I ever do additional meditations to get
19 out of class?
20    Q  Yeah.
21    A  No.
22    Q  All right. I think -- so you were asked about
23 using a, you know, by Miss Homer about using a watch at
24 some point. Do you recall anyone putting like an arm

Page 183

1 cuff on you to measure blood pressure during your time
2 at Bogan?
3    A  I don't recall.
4    Q  All right. Have you ever participated
5 in hypnotherapy or hypnotic suggestion?
6    A  No.
7    Q  Okay. When you said that you felt hypnosis or
8 being in a trance when you practiced TM, can you
9 describe that in a little bit more detail, like how did
10 you feel?
11    A  Well, for me when I say I was in a hypnosis or
12 in a trance, it felt like I didn't have control. So
13 that's like for me, I don't have control over where it
14 was going, you know.
15    Q  Did you ever talk to Amontae about feeling
16 like, you know, you were in hypnosis or not in control?
17    A  No.
18    Q  Okay. Do you know what hypnosis is?
19    A  Not the -- not the -- no.
20    Q  Was the word hypnosis given to you by someone?
21    A  No. I can just recollect on what it -- like
22 put pieces together, you know. I can't tell you what it
23 says in the dictionary, but I can tell you based off of
24 commonsense what it means.

Page 184

1    Q  Did you suffer from any -- did you experience
2 anything else physically after meditating after
3 participating in transcendental meditation?
4    A  Yes.
5    Q  What else did you -- what did you experience?
6    A  I experienced a heavy, heavy sleep, like I was
7 very sleepy all the time after we meditated.
8    Q  Was that during the day and how long would it
9 last?
10    A  During the day and it almost felt like the
11 whole entire day.
12    Q  Did you ever report feeling very sleepy to
13 your TM teacher?
14    A  No.
15    Q  Did you report feeling super sleepy to anyone
16 at Bogan?
17    A  On this I did, but no, not -- not verbally.
18    Q  Okay. What else did you experience other than
19 feeling very sleepy all the time or for the rest of the
20 day?
21    A  That was the main side effect like after the
22 meditation, feeling very sleepy.
23    Q  Okay. How often would you experience the
24 sleepiness?

Page 185

1    A  Every time -- every time we meditated.
2    Q  Okay. Do you stop meditating due to
3 experiencing that sleepiness?
4    A  No.
5    Q  Okay. Did you ever hear voices after
6 meditating?
7    A  Not that I can recall.
8    Q  Okay. Did you ever experience nausea as a
9 result of practicing transcendental meditation?
10    A  Not that I can recall.
11    Q  Okay. What about headaches?
12    A  Well, I had headaches a lot in high school, so
13 it could have been, you know --
14    Q  Did you have headaches before practicing
15 transcendental meditation?
16    A  Yeah, I've always had headaches.
17    Q  Okay. Do you continue to have headaches
18 today?
19    A  On and off. I'm better, but every now and
20 then.
21    Q  All right. Did you experience dizziness as a
22 result of practicing -- as a result of meditating?
23    A  I wouldn't say dizziness but I would say like
24 feeling drained.

47 (Pages 182 - 185)

1    Q    Okay.  Did you feel your heart racing as a
2  result of practicing meditation, transcendental
3  meditation?
4    A    No.
5    Q    Okay.  All right.  Let's see here.  Did you
6  ever light any fires as a result of transcendental
7  meditation?
8    A    No.
9    Q    Okay.  Did you ever hurt yourself as a result
10 of transcendental meditation?
11   A    No.
12   Q    Okay.  Did you feel more sad after
13 participating in transcendental meditation?
14   A    No.
15   Q    Okay.  Did you feel more depressed due to
16 transcendental meditation?
17   A    No.
18   Q    Okay.  Do you feel more anxious after
19 transcendental meditation?
20   A    No.
21   Q    Okay.  Did you ever see a doctor or counselor
22 or social worker to report any physical symptoms as a
23 result of transcendental meditation?
24   A    So at the time I had told you that I was going

1  through like the early stage of depression.  I was in
2  counseling at the time.
3    Q    Okay.  And when did you see a counselor in
4  2018 through June of 2020?
5    A    It was in between.  I was in counseling for I
6  want to say -- from eighth grade to sophomore year.
7    Q    Okay.  When you started at Bogan were you
8  seeing a counselor?
9    A    Yes.
10   Q    When did you stop?
11   A    I stopped seeing the counselor my junior -- my
12 sophomore year.
13   Q    Were you still at Bogan when you stopped
14 seeing a counselor?
15   A    Yes.
16   Q    Okay.  Did you ever tell your counselor about
17 any effects that you had from transcendental meditation?
18   A    We discussed it, but I never told her about
19 the effects, I just --
20   Q    What did you tell your counselor?
21   A    That it was a requirement.
22   Q    And why were you seeing a counselor again?
23   A    Because not only -- because like I say, I was
24 in a state of like being depressed I guess you could

1  say.
2    Q    Was it due to your mom being in prison?
3    A    That had something to do with it, but it was
4  just a lot.
5    Q    Okay.  Was anything else going on that
6  required you -- like in your life that required you to
7  go see a counselor?
8    A    If so, then I would say not at that present
9  moment, but it was just like childhood trauma, things
10 that happened before.
11   Q    Okay.  And what do you mean by childhood
12 trauma?
13   A    Like situations that led up to -- like things
14 that I've been through as a child.
15   Q    Were you abused as a child?
16   A    No.
17   Q    Okay.  Any more details you can give us about
18 your -- the childhood trauma that you were experiencing
19 or that you had experienced?
20   A    No.
21   Q    Did it have to do with any of your family
22 members?
23   A    Yeah.
24   Q    Your father?

1    A    I would just say it was just a recollection of
2  everything.  It wasn't anything specifically, it was
3  just a mixture of things.
4    Q    Like what?
5    A    Like you said, my mom going to jail, not
6  having my father, just not having a sense of purpose,
7  that's all.
8    Q    Did you believe you have an unstable house,
9  household?
10   A    I wouldn't say unstable, but it wasn't the
11 best.
12   Q    Okay.  Going back to the Quiet Time Program,
13 let's see here, so from what I understand is that you
14 had your training with Miss Levi and then there was also
15 the classroom periods.  Is that your understanding of
16 the -- kind of what entailed the Quiet Time Program?
17   A    Can you repeat that?
18   Q    Sure.  You can distinguish that the Quiet Time
19 Program was the classroom periods during, you know, the
20 portion of your classroom periods that happened at
21 second and seventh periods at Bogan, is that accurate?
22   A    Yes.
23   Q    Okay.  And that is not the same as practicing
24 transcendental meditation, is that accurate?

48 (Pages 186 - 189)

Page 190

1    A    What's not the same?  Can you explain that?
2    Q    Sure.  So the Quiet Time Program, which is
3  basically you just needed to be quiet in the classroom
4  for a period of time like during the school day, is that
5  accurate?
6    A    No.  I thought it was more like Quiet Time
7  meant meditation time, meant TM.
8    Q    But I think were there -- so to your
9  understanding Quiet Time is the same as transcendental
10  meditation?
11    A    Then, yes, because if it was quiet time, then
12  it was TM time.
13    Q    And you didn't always meditate during Quiet
14  Time, is that accurate?
15    A    Correct.
16    Q    Okay.  And you could have just sat there and
17  read something or focused on nothing with your eyes
18  closed, is that correct?
19    A    Yeah.
20    Q    Okay.  Let's see here.  I think you mentioned
21  Bogan teachers instructing every day.  Could you clarify
22  what that meant?
23    A    That --
24    Q    Go ahead.

Page 191

1    A    They were -- so basically what they would do
2  is at a certain time they would tell us to put
3  everything away.  It was time to meditate.  We knew it
4  was time -- I mean, we knew when to start.  They rang
5  the bell.  The 15 minutes would go by, they would ring
6  the bell again.
7    Q    Okay.  And was there ever Quiet Time with
8  non-Bogan classroom teachers in the room when they were
9  doing that?
10    A    Yes.
11    Q    Okay.  During your school year was there an
12  announcement over the loud speaker as to when Quiet Time
13  was?
14    A    Yes.
15    Q    When was that, was that your sophomore year?
16    A    When it began.
17    Q    Okay.  So there were loud speaker
18  announcements to the whole school about Quiet Time, is
19  that correct?
20    A    Correct.
21    Q    Were you able to identify basically Quiet Time
22  staff or non-Bogan staff at school?
23    A    Can you repeat that?
24    Q    Sure.  Did you know who the quiet -- basically

Page 192

1  did you know if there were other people other than Bogan
2  administrators, teachers in the school with you?
3    A    I'm not sure.
4    Q    Okay.  You're not sure -- you couldn't
5  identify who was who, is that correct?
6    A    Correct.
7    Q    Okay.  You just knew that your teacher was
8  Erin?
9    A    My TM teacher, yes.
10    Q    Yes.  Okay.  Do you know any other Quiet Time
11  staff at Bogan?
12    A    No.
13    Q    Okay.  Did you know whether they were doing
14  any research at Bogan around the Quiet Time Program?
15    A    No.
16    Q    Okay.  If there were any forms about positive
17  experiences with transcendental meditation, were you
18  honest on those forms?
19    A    Yes.
20    Q    Okay.  All right.  Let's go to your
21  relationship with Amontae.  I think you mentioned that
22  you knew him kind of peripherally when you were at Bogan
23  and he was a senior and you were a sophomore, is that
24  correct?

Page 193

1    A    Yes.
2    Q    Okay.  So how much contact would you say you
3  had -- or strike that.
4        Do you recall kind of the month and year that
5  he invited you to get involved with his music thing?
6    A    I do not.
7    Q    Okay.  Was that an in-person conversation or
8  was through like social media or some kind of messaging?
9    A    In person.
10    Q    Was that at lunch or when was that during the
11  school day?
12    A    It was -- it was in the hallway.
13    Q    Was it in between classes?
14    A    Yes.
15    Q    Was anyone else there during that interaction?
16    A    There were plenty of people there, but no one
17  else was -- was like in the conversation.
18    Q    It was just you and him in the conversation?
19    A    Correct.
20    Q    Had you had, you know, prior contact with
21  Amontae before?
22    A    No.
23    Q    Did you find it surprising that he was asking
24  you to get involved with his music situation?

49 (Pages 190 - 193)

Page 194

1    A    Not really.
2    Q    Why not?
3    A    Because I was pretty popular in high school,
4 like I said, so.
5    Q    Okay.  Did everyone know you in high school?
6    A    If you didn't know me you knew of me.
7    Q    Okay.  Was Amontae popular in high school?
8    A    I didn't really keep up with anyone else in
9 school, but he was -- he was pretty known like.
10    Q    And what was he known of or why he was known
11 to your understanding?
12    A    To my understanding he was known for his
13 music, I guess.  I'm not sure.  Like I said, I didn't
14 keep up with him.
15    Q    Did you ever know him to be -- people refer to
16 him as Rambo?
17    A    No.
18    Q    Okay.  Did you know him to wear like super
19 Goth looking clothing?
20    A    Yeah.
21    Q    Okay.  Did you find that odd?
22    A    No.
23    Q    Okay.  Did you ever let's say hang out with
24 him outside of school when you were a sophomore and he

Page 195

1 was a senior?
2    A    I believe once before.
3    Q    Did you guys have a -- did you and Amontae
4 have a friendly relationship while you were at Bogan,
5 when you and he were at Bogan?
6    A    I wouldn't say friendly, I would just say a hi
7 and bye kind of relationship.  I wouldn't even call
8 it -- we were just associates.  I'd say hey, that's it.
9    Q    Did you have a crush on him your sophomore
10 year?
11    A    I did.
12    Q    Okay.  Did you guys flirt?
13    A    Uhn-uhn.
14    Q    Okay.  Is that not until later?
15    A    Correct.
16    Q    Okay.  So you wouldn't know of, you know, his
17 religious -- did you have any in-depth conversations
18 when you were a sophomore and he was a senior?
19    A    In depth?  No, not really.
20    Q    Okay.  Do you know about Amontae's song
21 Knuckle Up?
22    A    Yes.
23    Q    Have you seen that music video?
24    A    Yes.

Page 196

1    Q    What did you think about it?
2    A    It's creative.
3    Q    Did you think it was weird?
4    A    You could say weird.
5    Q    Okay.  Did you find it offensive?
6    A    No.  I thought music is music.  I don't take
7 it personally.
8    Q    Okay.  What kind of genre would you say is his
9 music?
10    A    Alternative.
11    Q    Okay.  Do you know what that song is about?
12    A    If I had to guess, fighting.
13    Q    Did he -- did you ever have a conversation
14 about Knuckle Up with Amontae?
15    A    No.
16    Q    Did you ever ask him about it?
17    A    No.
18    Q    All right.  When you were at Bogan did you
19 ever talk about the Quiet Time Program with Amontae?
20    A    We never discussed it.
21    Q    Okay.  Did you know about any mental health
22 conditions he was experiencing in that -- while he was
23 at Bogan?
24    A    Not at the time, no.

Page 197

1    Q    Okay.  All right.  And then I think you
2 mentioned that -- we're going to start talking again --
3 remind me when did you start talking to him again or did
4 you never stop?
5    A    No, we had one conversation when I was a
6 sophomore.  And then we didn't end up talking it was
7 probably like two years later.  He had already graduated
8 from school, so it had to be my senior year.
9    Q    Okay.  How did he -- and then you mentioned
10 that he got back in contact with you through Snapchat,
11 is that correct?
12    A    Yes.
13    Q    Okay.  What did he chat you?
14    A    I really don't remember.
15    Q    Do you still have that Snapchat?
16    A    No.
17    Q    Okay.  Is it one of those disappearing 24-hour
18 ones?
19    A    Uh-huh.
20    Q    Okay.  When did you guys start officially
21 dating after that Snapchat?
22    A    Not long after.
23    Q    Were you in Wisconsin at the time when he
24 chatted you?

50 (Pages 194 - 197)

Page 198

1    A    Yes, I was living in Wisconsin.
2    Q    Okay.  How did you -- did you start having
3  phone conversations with him?
4    A    Yeah, we did, but I would go to the city, I
5  would come back to Chicago often, so.
6    Q    How often would you come back?
7    A    Every weekend.
8    Q    Okay.  Where would you stay?
9    A    When I was coming out here I was staying at my
10  grandfather's house.
11    Q    Would Amontae come stay with you at his
12  grandfather's house -- at your grandfather's house?
13    A    Uhn-uhn.
14    Q    Was he still living at his house when you came
15  down?
16    A    Yes.
17    Q    Okay.  Would he ever come stay with you when
18  you were making visits from Wisconsin?
19    A    Yeah.
20    Q    Okay.  And how long would he stay?
21    A    Probably for like a week, a couple weeks, and
22  then he'll go back to Chicago.
23    Q    Oh, so he would come up to Wisconsin, too?
24    A    Yeah.

Page 199

1    Q    Okay.  And do you recall the time period that
2  he was going up to Wisconsin to visit you?
3    A    No, I don't.
4    Q    Okay.  Was it right after you graduated?
5    A    So it was -- I didn't live in Wisconsin after
6  I graduated.  I moved back to Chicago.  He came there to
7  Wisconsin like shortly after we -- shortly after we
8  started dating.
9    Q    Okay.  And when was that?
10    A    That was last year, the beginning of last
11  year.
12    Q    So January 2021?
13    A    Around that time.  I can't say exactly, it was
14  just last year.
15    Q    Where were you going to school at the time?
16    A    Was I in school?  So when I was -- when I
17  moved to Wisconsin I wasn't in school.
18    Q    Okay.  Did you graduate early from McKinley?
19    A    No, I graduated on time.
20    Q    So June 2021?
21    A    Yep.
22    Q    All right.  At some point when you were up in
23  Wisconsin, Amontae was coming to stay with you for four,
24  five days at a time?

Page 200

1    A    Yeah, about.
2    Q    Okay.  So you lived with Amontae for a number
3  of months in 2021.  What was it like living with him?
4    A    It wasn't a bad experience, but we just -- I
5  don't know, I guess having a roommate.
6    Q    Did he ever get angry at you?
7    A    No.
8    Q    Okay.  He never had any anger -- issues with
9  anger?
10    A    Not towards me.
11    Q    Did he ever break any walls or things or items
12  in the house when you were living with him?
13    A    If he did, then it was his.
14    Q    Would you have been mad if he had broken some
15  of your items?
16    A    Yeah.
17    Q    Did you guys have a peaceful relationship or
18  did you fight quite a bit?
19    A    I mean, it was peaceful, but we had our
20  problems here and there.
21    Q    Okay.  What kind of problems did you guys
22  have?
23    A    Mostly financially.
24    Q    Okay.  And what were the financial problems?

Page 201

1    A    Just me needing help like since we were living
2  together, me needing help financially to pay bills and
3  stuff.
4    Q    Did he contribute at all financially when you
5  were living together?
6    A    He tried.
7    Q    Did he spend any of his money on smoking weed?
8    A    I'm not sure.
9    Q    Did he smoke while you were living together?
10    A    I'm not sure about that either.
11    Q    Okay.  Did you ever see him vape marijuana?
12    A    Not sure about that, too.
13    Q    Okay.  Were you present when he broke his hand
14  in a television?
15    A    Yeah.
16    Q    Okay.  Can you tell me about that incident?
17    A    I guess he got upset and he hit the TV and his
18  hand broke.
19    Q    Okay.  Had he done that before that you had
20  seen?
21    A    No.
22    Q    Okay.  Did you observe him -- was he depressed
23  while you were living with him?
24    A    Not depressed but I feel like he's -- I

51 (Pages 198 - 201)

Page 202

wouldn't know how to describe it. I feel like it was -- he probably was not having the best time in life.
Q Could you be more -- what do you mean by that?
A Meaning, like I said, there were issues every now and then, but I wouldn't say that he was depressed.
Q Okay. Was he able to, you know, feed himself regularly?
A Yeah.
Q Did you -- you know, how did you split the household chores, I'm saying chores, but things that need to be done with the house?
A Mostly it was me doing it.
Q Okay. Did Amontae have a car?
A No.
Q Was he able to -- how was he able to get places?
A I would drive him.
Q Okay. Would you drive him to his job?
A Yes.
Q Okay. Did he have trouble finding places?
A Yes.
Q Okay. How would that affect you?
A It wouldn't affect me.
Q Okay. Were you -- let's see here. Did he

Page 203

ever have any -- would he ever go and be alone for multiple days at a time when he was living with you?
A Multiple days at a time? I feel like he would -- yeah, he would have his time by himself.
Q Okay. Did you ever -- when you were living with him, did you observe him with any weapons?
A No.
Q Okay. What about knives?
A No.
Q No, okay. Did you find out later about his mental condition -- mental health conditions?
A Yes.
Q How did you find that out?
A He told me.
Q What did he tell you?
A He was struggling with -- what was it? He had always struggled with like, I don't know the right term for it, but he'd always have issues.
Q Like what kind of issues?
A Just if I had to say like he's a very emotional person.
Q Okay. Did he have as they like to say big emotions?
A Yes.

Page 204

Q Okay. So if he got angry would it be very extreme?
A Well, I don't know because he never got angry at me, but if he did.
Q Okay. And so he's never hit you, is that correct?
A Correct.
Q Okay. When you fight did you get into loud screaming matches or how would you fight?
A It would -- I mean, not -- I feel like before it got to that point I would try to walk away.
Q Would Amontae ever leave during a fight and not come back?
A No.
Q Okay. Did you ever see him punch a wall?
A No.
Q Did you ever see him light any fires?
A No.
Q Did you ever see him try and hurt himself?
A No.
Q Like hit himself or cut himself?
A No.
Q Okay. Did you ever see any marks on his arms which indicated that he had hurt himself before?

Page 205

A Yes.
Q Okay. And did you ever ask him about that?
A Yeah, I did.
Q And what did he say?
A It was self-inflicted.
Q Did he tell you why he did that?
A He never told me. It was self-inflicted.
Q Okay. Did you ever meet Amontae's parents while you were dating?
A Yes.
Q Okay. How many times?
A How many times did I meet them?
Q Yeah.
A I thought you only meet someone once, but I seen them multiple times. I only met them once. I introduced myself once.
Q Okay. And who did you mostly have contact with with Amontae's parents?
A Mostly his mom.
Q Did she like you?
A Who knows.
Q Okay. Did you care what she thought?
A Not really.
Q Okay. Did you ever go to Amontae's parents'

Page 206

1 house?
2   A   Yeah.
3   Q   Like a lot or not so much?
4   A   When we first started dating I was going over
5 there a lot, but then it was we stopped going over
6 there.
7   Q   Okay.  And why is that?
8   A   We just grew up differently, that's all, too
9 different.
10   Q   What do you mean by you grew up differently?
11   A   I just -- as far as with his parents, I was
12 like -- I never had anything against his parents or
13 anything like that, I just felt like they didn't really
14 want me over there, so, yeah.
15   Q   Did they ever tell you they didn't want you
16 over there?
17   A   Uhn-uhn.
18   Q   Did you ever -- strike that.
19       Did Amontae ever tell you that while you guys
20 were dating he wanted to hurt himself or that he wanted
21 to commit suicide in any form or fashion?
22   A   If he did, then I didn't take it seriously.
23   Q   Okay.  Has he made similar -- had he said
24 things like that before to you?

Page 207

1   A   That he wanted to hurt himself?
2   Q   Yeah.
3   A   Not that I recall.
4   Q   Okay.  All right.  Let's go to your -- oh, by
5 the way, did Amontae ever tell you that he felt
6 possessed by the devil after doing meditation?
7   A   I believe he said something like that.
8   Q   Okay.  What did he tell you?
9   A   I don't want to quote him because I'm not -- I
10 don't have a very good memory like that to quote anyone,
11 but I know he was telling me that it felt like he had an
12 out-of-body experience and he felt like it was evil.
13 That's all, yeah.
14   Q   Okay.  Would you be surprised if you had heard
15 that Amontae called you a liar and a cheater?
16   A   Not really.
17   Q   Why?
18   A   Because I've been called worse.
19   Q   Did you lie to him while you were dating?
20   A   About what?
21   Q   Ever.
22   A   Yeah.
23   Q   Did you cheat on him?
24   A   No.

Page 208

1   Q   What did you lie to him about?
2   A   Multiple things.
3   Q   Like?
4   A   Just little white lies.
5   Q   I'm sorry, you said little white lies?
6   A   Yeah.
7   Q   Like what would you lie to him about?
8   A   Probably things like wanting to be bothered,
9 you know, most of the time I didn't want to be bothered,
10 probably lied about stuff like that.  Nothing major,
11 just.
12   Q   Okay.  All right.  Well, let's move to, I
13 think you had told Miss Homer that you were arrested
14 with Amontae.  Had you ever under -- basically have you
15 ever done what you did at that Walmart before?
16   A   No, that was the first time.
17   Q   Okay.  And why did you not ring up all the
18 items in your cart at Walmart?
19   A   I feel like for me it was being reckless, you
20 know, just dumb and young.
21   Q   Did you -- were you having financial
22 difficulties at the time?
23   A   Not necessarily, but I guess you could say
24 that.

Page 209

1   Q   Did you have enough money -- did you have
2 enough income coming in to pay for groceries in
3 September of 2021?
4   A   Yeah, I did have the money.
5   Q   Did Amontae provide a false name and date of
6 birth to Walmart security?
7   A   I'm not sure.
8   Q   Okay.  You knew that you had underrung the
9 merchandise, though, is that right?
10   A   Yeah, I was aware.
11   Q   There was a loaded dart gun in Amontae's
12 pants.  Do you recall that?
13   A   Yeah.
14   Q   What did it look like?
15   A   I'm not exactly sure.
16   Q   Why was he carrying the loaded dart gun in his
17 pants?
18   A   It was more like a toy than anything.
19   Q   Did he have other toy guns that he had at the
20 house that you were living in?
21   A   No.
22   Q   Okay.  And you said you'd never seen him with
23 any other weapons that he had, is that right?
24   A   No.

53 (Pages 206 - 209)

Page 210

1    Q    Okay.
2    A    That's right, I never seen him with any other
3  weapons.
4    Q    You haven't seen him with any guns at the
5  house, right?
6    A    No weapons, periods.
7    Q    Okay. All right. And from what you said is
8  that you pled -- did you plead guilty to the charges for
9  the Walmart arrest?
10   A    Yeah.
11   Q    I'm sorry, you said yes?
12   A    Yes.
13   Q    Okay. Did you spend any time in jail relating
14  to this arrest?
15   A    Probably like a few hours, like six hours.
16   Q    And you mentioned that you have probation. Do
17  you know when your probation ends?
18   A    Two years from now.
19   Q    Okay. Do you know what the terms of your
20  probation are?
21   A    Yes.
22   Q    What are they?
23   A    The terms of my probation is not to get in
24  any more legal trouble, and that's pretty much it. I

Page 211

1  have to check in with my probation officer.
2    Q    Have you been assigned a probation officer?
3    A    Not yet.
4    Q    How often do you have to check in with your
5  probation officer to your understanding?
6    A    To my knowledge whenever anything changes
7  and -- whenever anything changes.
8    Q    Does anything mean moves of basically
9  residential moves?
10   A    Yes.
11   Q    If you want to go out of state do you have to
12  report to your probation officer?
13   A    Yes.
14   Q    And you don't know who your probation officer
15  is, is that correct?
16   A    That's correct.
17   Q    Have you been arrested any other times other
18  than the Walmart arrest in September of 2021?
19   A    No.
20   Q    Okay. All right. We're getting there. Let's
21  see here. You mentioned -- did you go to any meetings
22  with Amontae about this lawsuit?
23   A    No.
24   Q    Okay. Was he on any of the phone calls you

Page 212

1  had with your attorneys related to this lawsuit?
2    A    No.
3    Q    Do you know that his dad, Darryl Williams, is
4  also a plaintiff in this lawsuit?
5    A    Yes.
6    Q    Did he tell you that?
7    A    It's in his -- it's in his --
8    Q    Declaration?
9    A    Yes.
10   Q    Okay. When you were at Bogan, I think you
11  mentioned that you knew Dasha Skinner. Do you know what
12  she looks like?
13   A    I don't know her personally. I've never met
14  her personally. I've just heard of her.
15   Q    Have you ever had any conversations with
16  Miss Skinner?
17   A    She's prayed for me over the phone, but other
18  than that, no.
19   Q    I'm sorry, she prayed for you over the phone?
20   A    Yes.
21   Q    And when did that happen?
22   A    This was a while ago before the case was even
23  introduced to me.
24   Q    Was it while you were still in school?

Page 213

1    A    No, ma'am.
2    Q    Was this when you were at Bogan?
3    A    No.
4    Q    Do you remember what year it was that
5  Miss Skinner prayed for you?
6    A    2020 -- I believe it was -- it was this year.
7  It was the day my mom had passed away, which was on New
8  Year's, so this year.
9    Q    Okay. How did you end up being on the phone
10  with Miss Skinner?
11   A    Because I was just -- I was with Amontae at
12  the time. And -- and I guess he just saw that I was
13  kind of sad, you know, I was really sad. And he -- he
14  was like he just -- she wanted to speak to me, so I was
15  fine with it. She said she just wanted to say a prayer
16  for me. She prayed, and that's it.
17   Q    Did you have any contact with Miss Skinner
18  while you were a student at Bogan?
19   A    No, ma'am.
20   Q    Okay. You were only introduced to her through
21  Amontae?
22   A    Yes.
23   Q    Okay. Did she ever ask you to do any
24  interviews or press for the lawsuit?

54 (Pages 210 - 213)

Page 214

1    A   No.
2    Q   All right.  Did she ever substitute teach any
3  of your classes at Bogan?
4    A   If she did I'm not sure because I don't know
5  how she looks.
6    Q   Okay.  If I showed you -- here, let me see.
7  All right.  I think you have a picture now of what I'm
8  going to report to be is Dasha Skinner.  Have you seen
9  this lady before?
10   A   Yes, I've seen her before.
11   Q   Had you seen her at Bogan when you were a
12  student?
13   A   Yeah, in the hallway.
14   Q   Do you remember any conversations you had with
15  her?
16   A   No.
17   Q   Okay.  Did she ever ask you for your contact
18  information?
19   A   No.
20       MS. ROSENBERG:  Okay.
21       MR. MAUCK:  Is this an exhibit, Christina?
22       MS. ROSENBERG:  Sure, yes.  Christina, are we
23  on 7?
24       THE COURT REPORTER:  Yes, I believe so.

Page 215

1        MS. ROSENBERG:  All right.  Okay.  Here we go.
2        (Photograph marked as Hudgins Deposition
3     Exhibit 7 for identification.)
4    Q   Have you had any contact with a man named
5  Aryeh Siegel about this lawsuit?
6    A   No.
7    Q   No?  Okay.  And I think you mentioned you were
8  first introduced to Mauck & Baker through Amontae, is
9  that accurate?
10   A   Yeah.
11   Q   Okay.  And what did he -- what did Amontae
12  tell you about, you know, getting involved in the Quiet
13  Time lawsuit?
14   A   He told me -- he was just telling what role he
15  played in it.
16   Q   How did the topic come up?
17   A   Him telling me what role he played in it.
18   Q   Did you ask him?
19   A   If so, I don't remember.
20   Q   Or did he -- or did he just volunteer the
21  information?
22   A   I believe -- I believe he just volunteered the
23  information.
24   Q   Did he tell you that his attorneys were

Page 216

1  looking for additional people to be involved in the
2  lawsuit?
3    A   Yes.
4    Q   Then how did you get Mauck & Baker's
5  information?
6    A   I asked him to send my information over.
7    Q   Okay.  And him you mean Amontae?
8    A   Yes.
9    Q   And was this at the same time that you were
10  living with him?
11   A   Yes.
12   Q   Okay.  And then Mauck & Baker then contacted
13  you?
14   A   Yes.
15   Q   Okay.  Did Amontae promise you anything for
16  being a part of the lawsuit?
17   A   No.
18   Q   Okay.  Did Mauck & Baker promise you anything
19  to be a part of the lawsuit?
20   A   No.
21   Q   All right.  Let's see here.  Let's go to --
22  I'm almost there.  Let's do this.  I'm going to go to
23  your declaration.  Sorry guys.  Okay.  So this again is
24  your six-page document that we had previously marked I

Page 217

1  think as Exhibit 1 -- or 3?
2        MR. SIPCHEN:  It's 4.
3        MS. ROSENBERG:  Four.  I'm sorry.  Okay.  All
4     right.
5    Q   So we went through paragraph one.  Let's go
6  through paragraph two.  It reads, a CPS teacher told me
7  and my entire class to sign a consent form.  And I think
8  to clarify from what we understand and you've testified
9  to is that the consent form you're referring to in
10  paragraph two is the TM application, is that accurate?
11   A   Yes.
12   Q   Okay.  And paragraph four states, during the
13  fall of 2016, that is incorrect, that's an incorrect
14  date, is that correct, or were you living with your
15  grandmother the fall of 2016?
16   A   You're still at the second paragraph, right?
17   Q   I'm at four now.  Sorry.
18   A   Right.
19   Q   You were living with your grandmother in the
20  fall of 2016?
21   A   2016 I was with my grandmother, yes.
22   Q   Now, you -- let me see.  So let's go to
23  paragraph five.  You state that you signed a
24  nondisclosure.  Can you describe the document you're

55 (Pages 214 - 217)

Page 218

1 referring to?
2    A    The document that I'm referring to is this
3 here, which is the application.
4    Q    Okay.  So number five you're referring to the
5 nondisclosure form is -- you're referring to the TM
6 application that is the exhibit that was previously
7 referenced?
8    A    Yes.
9    Q    Okay.  All right.  Let's go to number six.
10 You state, part of the consent included a questionnaire
11 which included some questions about my puberty.  I do
12 not know how they were stated.  What are you referring
13 to in the TM application?
14    A    Can you restate that?
15    Q    Sure.  Can you just look at paragraph six?
16 Part of the consent included a questionnaire which
17 included some questions about my puberty, but I do not
18 remember how they were stated.
19    A    Uh-huh.
20    Q    What are you referring to there?
21    A    I'm referring to there was a time where they
22 did ask us about puberty and like bodily changes, things
23 like that.
24    Q    Okay.  I'm going to -- let's see here.  And we

Page 219

1 don't have to -- do you recall signing any documents
2 about a sleep or stress study?
3        MR. MAUCK:  We need to take a break, washroom
4 break, five minutes, please.
5        MS. ROSENBERG:  Sure.
6        MR. SIPCHEN:  Could she answer the question
7 first before we take a break?
8    A    It's actually an emergency, so.
9        MR. SIPCHEN:  All right.
10        MR. MAUCK:  We won't talk.
11        (Recess taken.)
12        MS. ROSENBERG:  We're back on the record.
13    Q    Miss Hudgins, could you remind me what your
14 Snapchat user name is?
15    A    I don't know it by heart, but if you'd like I
16 can look really quickly.
17    Q    Can you do it in like two minutes?
18    A    Sure.
19        MR. MAUCK:  Let me state something for the
20 record.  You asked a question.  You left off
21 questioning poverty -- puberty, excuse me, not
22 poverty.  There was a puberty questionnaire.  I've
23 gone through pretty much all of the documents that
24 have been furnished by CPS and Lynch, and I asked

Page 220

1 my associate if he'd seen any of those puberty
2 questionnaires, and we'd like to see them,
3 particularly if there are ones for Amontae or Kaya.
4        So if you've seen them, Jim or Christina, or
5 University of Chicago, could you search for those
6 and provide those?  Because we don't think they've
7 been provided, but of course there's a lot of
8 documents, so point to where they are if we're --
9 if we've overlooked them.  That's a question for
10 each of the defendants.
11        MS. ROSENBERG:  Sure.  So at least -- and I'll
12 ask the witness to see if these are the actual
13 ones, but yeah.
14        MR. SIPCHEN:  I don't really understand the
15 question.
16        MS. ROSENBERG:  Yeah, I don't either.
17        MR. SIPCHEN:  We've produced what we have.  No
18 puberty forms would come from the David Lynch
19 Foundation anyway.  So I don't even understand what
20 you're asking for.
21        MR. MAUCK:  There are some instructions and
22 correspondence, and I can't be precise, that said
23 we need to ask about puberty because it affects the
24 stress levels of students.  And so we will ask some

Page 221

1 questions like that of the students as --
2        MS. SALISBURY:  John, I'm not sure that this
3 is an appropriate request during the direct exam of
4 a witness.  If you have some kind of document
5 request, you know, 4:49 p.m. on the day of
6 discovery close during the direct examination of a
7 witness is not the time and place to do it.
8        MR. MAUCK:  Yeah, but you're asking her about
9 this stuff which hasn't been furnished.
10        MS. SALISBURY:  Right.  And she's
11 testifying --
12        MR. MAUCK:  You guys --
13        MS. SALISBURY:  She's testifying, not you,
14 John.
15        MS. ROSENBERG:  First of all, let me go
16 through my examination.  And, Miss Hudgins, can you
17 just look for your Snapchat account?  That would be
18 great.  And then we'll continue on.  And, John, I
19 will handle this issue with the witness.
20        THE WITNESS:  I have it pulled up.
21 BY MS. ROSENBERG:
22    Q    Did you find it, Miss Hudgins?
23    A    Yes.
24    Q    Okay.  What is it?  And we're back on the

56 (Pages 218 - 221)

Page 222

1 record, so.
2    A    Kaya Marie and then LUV3, so basically Kaya
3 Marie LUV, that's spelled L-U-V, 3.
4    Q    Okay. Thank you so much. Previously you were
5 asked about questions regarding puberty. I'm going to
6 share -- oh, did you ever complete any questionnaire
7 regarding puberty?
8    A    Yes.
9        MS. ROSENBERG: Okay. This is -- we'll share
10 this screen.
11       (Document marked as Hudgins Deposition
12    Exhibit 8 for identification.)
13    Q    Miss Hudgins, I have put up Exhibit, I guess
14 it's 8. It is Bates Labeled University 27 through 35.
15 And I will purport to tell you that these are -- I'm
16 representing to you that these are permission forms
17 regarding a study about sleep and blood pressure. Do
18 you recall seeing this student assent form?
19    A    Can you zoom in?
20    Q    Sure. It says dear student, so this is page
21 four out of nine.
22    A    Are you asking if I remember seeing this form?
23    Q    Yes.
24    A    Yes.

Page 223

1    Q    Okay. You saw this form. Do you recall
2 completing this form?
3    A    I believe so, yes.
4        MS. ROSENBERG: Okay. All right. That will
5 be 8.
6        MR. MAUCK: Can you give me the Bates number
7 on that?
8        MS. ROSENBERG: Yes. Hold on. The Bates
9 labels are University 27 through 35.
10       MR. MAUCK: 2735?
11       MS. ROSENBERG: Twenty-seven through 35, it's
12 a nine page document. This is Exhibit No. 9.
13       (Document marked as Hudgins Deposition
14    Exhibit 9 for identification.)
15       MS. ROSENBERG: I'll purport to you this is
16 University Bates labels 36 through 53. Let's go
17 through this guy.
18    Q    Miss Hudgins, do you recall seeing this form?
19    A    Yes.
20    Q    Okay. So it asks about your birthday and
21 health questions about exercise. Do you recall
22 completing this form?
23    A    I don't recall if I completed it, but it does
24 look familiar.

Page 224

1    Q    Okay. Is this perhaps what you are referring
2 to when you were talking about puberty? Let's see, I
3 think there's something down here. Here we go. It's
4 right here. Okay. Females, please continue to page
5 five. So we're going to go to page five. Here we go.
6 So there are questions regarding, on this University 40,
7 do you recall seeing questions about your height and
8 body hair and skin changes and your -- and your breasts
9 growing?
10    A    Yes.
11    Q    Do you recall completing this form?
12    A    I believe so.
13    Q    Okay. Let's go back to Exhibit 8. Okay. All
14 right. This is the last page, so University 35 of
15 Exhibit 8. Do you recall giving your consent to give
16 sleep and blood pressure data as regards to this study?
17    A    I do not recall.
18    Q    Okay. Do you recall getting a $20 gift card
19 for completing any study?
20    A    I'm not sure.
21    Q    Okay. It also states that your data will
22 remain confidential and any information that could be
23 individually identifiable will not be shared. Do you
24 recall giving that permission to -- relating to this

Page 225

1 study?
2    A    I'm not sure.
3    Q    Okay. But you do have some -- the
4 questionnaire that is identified in Exhibit 9 looks
5 familiar, Miss Hudgins?
6    A    Yes.
7    Q    Okay. Is that the questionnaire or those
8 questions that you're referring to in paragraph six?
9    A    Yes.
10    Q    Okay. Great. Okay. Let's go to -- back to
11 your declaration. Let's go to paragraph 20. Okay. You
12 state, I complained a few times to my teacher about not
13 wanting to participate in the Quiet Time Program. When
14 you were referring to your teacher, do you mean your TM
15 teacher Erin?
16    A    No, not Erin.
17    Q    What teacher are you referring to?
18    A    I believe she taught -- I believe she taught
19 English.
20    Q    Okay. So it was your English teacher?
21    A    Yes.
22    Q    Okay. Are you also referring to -- so who is
23 the teacher later in that paragraph, once my teacher
24 sent me to the dean's office, who are you referring to

57 (Pages 222 - 225)

Page 226

1 there?
2    A    My -- I believe she teach English.
3    Q    So it's your English teacher?
4    A    Yeah, at the time.
5    Q    What was that in response to?
6    A    I'm not sure what you're asking.
7    Q    It states once my teacher sent me to the
8 dean's office because I was asking why we had to
9 participate in the program. Can you tell me why you
10 were sent to the dean's office?
11   A    Because I didn't want to meditate.
12   Q    Were you trying to leave the classroom during
13 Quiet Time?
14   A    Yeah.
15   Q    Were you trying to ask to pray instead outside
16 of the classroom at this time?
17   A    Yes.
18   Q    Okay. Okay. I think I'm done with this
19 exhibit. Let's go back to your -- let me stop this
20 thing. Okay.
21        Kaya, have you ever seen Amontae's legal
22 services agreement with Mauck & Baker?
23   A    No.
24   Q    Okay. Did Amontae ever tell you what his

Page 227

1 agreement was with Mauck & Baker for him -- for their
2 representation of him?
3    A    No.
4    Q    Okay. Did Amontae tell you why he was suing
5 the Board, David Lynch Foundation and the University of
6 Chicago?
7    A    Yes.
8    Q    What did he tell you?
9    A    Because they were using deception in schools.
10   Q    Where did you first hear the word deception as
11 it relates to Quiet Time?
12   A    Oh, relating to Quiet Time, okay. Since
13 probably when Amontae first like introduced me -- when I
14 first found out about it that he was involved.
15   Q    Okay. If you are named as a class member in
16 this litigation, is your goal to get money?
17   A    No.
18   Q    Did Amontae ever tell you that his reason for
19 suing or his reason for being a plaintiff in this
20 lawsuit is only for justice?
21   A    Correct.
22   Q    Yes?
23   A    Yeah.
24   Q    Okay. Did he ever tell you that the reason he

Page 228

1 was suing was so that no one else had to go through the
2 Quiet Time Program?
3    A    Yes.
4    Q    Did he ever tell you that his goal of this
5 lawsuit was not money?
6    A    He never mentioned money.
7    Q    Okay. Did you ever discuss with Mauck & Baker
8 what constituted illegal acts that may jeopardize your
9 position --
10        MR. MAUCK: I'll object, attorney-client
11   privilege.
12        MS. ROSENBERG: I'm going to -- your client
13   signed the legal services agreement today, so she
14   can speak about any --
15   Q    Miss Hudgins --
16        MR. MAUCK: Your question was ever, right?
17 BY MS. ROSENBERG:
18   Q    Prior to today, have you ever spoken to any
19 member of Mauck & Baker about -- strike that. Let's see
20 here.
21        What is your understanding of what immoral
22 acts you are to avoid to have Mauck & Baker represent
23 you in this litigation?
24   A    As far as immoral acts? I feel like anything,

Page 229

1 like I said, anything that would put -- that would
2 jeopardize.
3    Q    Would that include non-Christian acts? Whose
4 morals is it your understanding that they would be
5 violating?
6    A    Just common morals that we all have,
7 hopefully.
8    Q    Does that include prayer to non-Christian
9 gods?
10   A    I'm not sure what you're asking.
11   Q    Would prayer to a non-Christian god be an
12 immoral act for you to avoid?
13   A    I'm not sure. I'm not sure.
14   Q    Did anyone ever discuss with you what -- how
15 immoral or unethical acts were to be defined as it
16 relates to this -- your legal services agreement with
17 Mauck & Baker?
18   A    Can you restate the question?
19   Q    Sure. Did anyone ever tell you, you know, how
20 immoral or unethical acts were to be defined within the
21 agreement that you signed with Mauck & Baker?
22   A    Again, I'm not understanding.
23   Q    All right. Do you have an understanding of
24 what unethical acts you're to avoid to continue having

58 (Pages 226 - 229)

Page 230

1 Mauck & Baker be your attorneys?
2     A    Any -- anything that would be a immoral act.
3     Q    What are immoral acts?
4     A    Common morals, like you don't go and kill
5 someone or do anything like that.
6     Q    Can you give me some examples of immoral acts?
7     A    To me an immoral act would be to put -- to be
8 dishonest or to be -- to be wrong.
9     Q    Okay.  Would praying to Allah be an act
10 against -- an immoral or unethical act in your agreement
11 with Mauck & Baker?
12    A    Not to my knowledge.
13    Q    What is your understanding of the acts that
14 may jeopardize your position in the lawsuit?
15    A    Only thing for me would be being dishonest.
16    Q    Okay.  Would violating the terms of your
17 probation be an act that jeopardizes your position in
18 the lawsuit?
19        MR. MAUCK:  Objection, calls for legal
20 conclusion.  You can answer the question.
21    A    I'm not sure how to answer that.
22 BY MS. ROSENBERG:
23    Q    Has Mauck & Baker given you a list of
24 additional fees and costs for failure to promptly

Page 231

1 respond?
2     A    No.
3     Q    Did they give you a timeframe for properly
4 responding before you were billed additional fees and
5 costs?
6     A    No.
7     Q    Were you given any information related to
8 billing with regards to Mauck & Baker?
9     A    No.
10    Q    Okay.  Were you given any information about
11 their hourly rate?
12    A    No.
13    Q    Are they -- are Mauck & Baker paying you or
14 reimbursing you any money for your testimony today?
15    A    No.
16    Q    Do you have to -- do you take care of any
17 family members or have any child care responsibilities
18 at this time?
19    A    No.
20    Q    Do you know how much Mauck & Baker charges per
21 hour?
22    A    No.
23    Q    Are you paying for your own parking and gas
24 today?

Page 232

1     A    Yes.
2        MS. ROSENBERG:  I think that's all I have
3 today.
4        MR. SIPCHEN:  Okay.
5        MR. MAUCK:  Jim, how long do you think you'll
6 go?  It's about 5:00 o'clock already.
7        MR. SIPCHEN:  I am going to go as fast as I
8 possibly can.  I don't think I'll have a ton of
9 stuff to cover.  Hopefully, Miss Hudgins, you can
10 understand my questions, answer them quickly, and
11 we can go home, because I understand it's getting a
12 little bit late.
13        Let me introduce myself.  My name's Jim
14 Sipchen.  I'm an attorney for the David Lynch
15 Foundation.  I'm going to ask you a few questions
16 about what the other lawyers asked you and a few
17 other questions about the Quiet Time Program, okay?
18        THE WITNESS:  Okay.
19        MR. SIPCHEN:  And I know it's getting late, so
20 please keep your voice up for me, okay?
21        THE WITNESS:  Okay.
22        MR. SIPCHEN:  And if I ask you a question and
23 you don't understand it, please tell me.  Otherwise
24 if you answer the question, I'll assume you

Page 233

1 understood it, is that fair?
2        THE WITNESS:  Yes.
3            EXAMINATION
4 BY MR. SIPCHEN:
5     Q    Okay.  All right.  I think we finally
6 straightened out what years you went to high school.
7 Would you agree with me that the years that you went to
8 high school are pretty much basic information?
9     A    Yes.
10    Q    It's information that's readily known to you?
11    A    What does that mean?
12    Q    Well, did you ever forget when you went to
13 high school?  Do you ever forget what years you were in
14 high school?
15    A    Not forget but kind of get them mixed up.
16    Q    You got them mixed up in your declarations,
17 right?
18    A    Correct.
19    Q    In fact, you messed them up in your
20 declarations not once but twice, isn't that true?
21    A    We only made changes once, correct?
22        MR. MAUCK:  If you didn't understand the
23 question.
24        MR. SIPCHEN:  Well, here, let's look.  What

59 (Pages 230 - 233)

Page 234

1  was the last exhibit that you marked, Christina,
2  was it --
3      MS. ROSENBERG: It was nine.
4      (Document marked as Hudgins Deposition
5  Exhibit 10 for identification.)
6  BY MR. SIPCHEN:
7      Q   I'm going to show you what I've marked as
8  Exhibit 10 for your deposition. And this is a copy of a
9  declaration. There's no date on it and there's no
10 signature on it. Do you see that?
11     A   Yes.
12     Q   And this is an unsigned declaration that
13 Mauck & Baker sent to you prior to you signing the
14 declaration that we previously marked as Exhibit 4,
15 isn't that correct?
16     A   Yes.
17     Q   So you got a declaration from Mauck & Baker
18 twice, right, you got one that was unsigned and then you
19 got another one which you signed today, isn't that true?
20     A   Correct.
21     Q   And this first declaration that Mauck & Baker
22 sent you, you list that your sophomore and junior years
23 of high school was 2016-2017 and 2017-2018 respectively,
24 is that true?

Page 235

1      A   Yes, that's what's listed.
2      Q   And that's the information that Mauck & Baker
3  sent to you, that's not information you gave to Mauck &
4  Baker, am I correct about that?
5      A   That's not correct.
6      Q   Okay. So had you given Mauck & Baker the
7  years 2016 and 2017 as years that you were in high
8  school?
9      A   Yes.
10     Q   Okay. But you weren't even in high school in
11 2016, am I right about that?
12     A   Correct.
13     Q   So this was incorrect in the declaration that
14 Mauck & Baker sent to you prior to you signing the
15 affidavit that you signed today, correct?
16     A   Yes.
17     Q   And I'll go back to Exhibit 4. This is the
18 declaration that you signed today when you arrived at
19 Mr. Mauck's office, am I right about that?
20     A   Yes.
21     Q   And if we go all the way to the end, this is
22 the one that you signed, that's your signature there?
23     A   Yes.
24     Q   And in this declaration that you signed today,

Page 236

1  you state that you were at Bogan High School during your
2  sophomore and junior years, 2017 through 2018 and 2018
3  through 2019, do you see that?
4      A   Yes.
5      Q   And we already established when Miss Homer was
6  questioning you that these years are also incorrect as
7  to the dates that you attended high school, isn't that
8  true?
9      A   I did attend Bogan in 2019 through 2020 and
10 also 2018 through 2019.
11     Q   But in 2018 and 2019, you were a sophomore at
12 Bogan High School, correct?
13     A   Correct.
14     Q   You weren't a junior, correct?
15     A   Correct.
16     Q   So the information that I'm reading as it's
17 stated here in paragraph one of the declaration you
18 signed today is incorrect, right?
19     A   Yes.
20     Q   After you reviewed the first declaration, the
21 unsigned declaration -- well, let me go back.
22         When you reviewed that first declaration, the
23 unsigned declaration, did you review it carefully for
24 any mistakes?

Page 237

1      A   I did.
2      Q   But you didn't catch the mistakes in it
3  regarding the years that you were a sophomore and junior
4  at Bogan High School, is that true?
5      A   I did, but I was a little confused.
6      Q   What about when you signed your declaration
7  today, did you review that declaration very carefully to
8  see if there were any further mistakes?
9      A   Yes.
10     Q   And one of the mistakes you caught is when
11 Miss Homer was questioning you and you told us that you
12 were at Bogan as a sophomore during your -- during 2018
13 and 2019, is that right?
14     A   That is correct.
15     Q   Okay. What about paragraph seven that says in
16 the fall of 2016 a female transcendental meditation, TM,
17 instructor took me out of class, do you see that?
18     A   Yeah.
19     Q   You weren't at Bogan in 2016, were you?
20     A   No.
21     Q   So that's wrong, too, isn't it? You were
22 never taken out of a class by a TM instructor in 2016,
23 am I correct?
24     A   Correct.

60 (Pages 234 - 237)

Page 238

1    Q   Did you write any of the contents of the
2  affidavit that you signed today?
3    A   I did not write -- I did not write it, no.
4    Q   Prior to getting a copy of what I previously
5  marked as the unsigned affidavit, which was Exhibit 10,
6  did you know that you were going to receive a
7  declaration from Mr. Mauck's office?
8    A   Yes.
9    Q   When did you learn that?
10   A   I'm not sure.
11   Q   Was it a week before today?
12   A   I'm not sure.
13   Q   You can't put any timeframe on it at all for
14 me, is that what you're telling me?
15   A   Correct.
16   Q   Let's talk a little bit about when you were at
17 Bogan in high school.  I think you testified that you
18 were there as a sophomore from 2018 through 2019, is
19 that correct?
20   A   Correct.
21   Q   And I think you also testified that during the
22 2018-2019 school year at Bogan, that's when you learned
23 TM and at times you would practice TM, is that correct?
24   A   Correct.

Page 239

1    Q   And I think what you said is that after you
2  learned TM, at some point during your sophomore year you
3  did some research on TM, is that true?
4    A   Yes.
5    Q   And my question to you is at what point during
6  your sophomore year at Bogan did you do that research?
7    A   That was after it was introduced to me and I
8  became suspicious of it and I started to ask other
9  people what their mantras was.
10   Q   Was that during the first semester of your
11 sophomore year that you first became suspicious and did
12 the research or was that in the second semester?
13   A   I'm not sure.  It was after it was introduced.
14 So I know it was in my sophomore year.
15   Q   Do you remember if it was fall, winter or
16 spring when you started to do your research?
17   A   I do not remember.
18   Q   Do you remember whether it was warm out or
19 cold out?
20   A   I can't remember.
21   Q   Do you remember any classes you were taking
22 when you started to do your research into TM your
23 sophomore year?
24   A   I was taking regular academics.

Page 240

1    Q   And do you remember any of the names of the
2  classes that you were taking when you started your
3  research into TM your sophomore year at Bogan?
4    A   I was taking the basic classes.
5    Q   Right.  I understand there's basic classes.
6  There's English, there's math, there's other classes.
7  My question to you is do you remember the name of any
8  specific class that you were taking at Bogan at the time
9  that you started your research into --
10   A   No.
11   Q   -- TM?
12   A   No.
13   Q   Did you complete your research into TM at the
14 time that you were at Bogan during sophomore year?
15   A   Like I said earlier, I didn't want to get too
16 much into it.  I just -- I partially researched it.  So
17 I didn't dive into it and research it.  I just found out
18 that the name that they were giving us for mantras were
19 the names of Hindu gods.
20   Q   And that's something you found out during your
21 sophomore year at Bogan High School, that the mantras
22 that you were being given as students were names of
23 Hindu gods, is that correct?
24   A   Correct.

Page 241

1    Q   And at that point during your sophomore year
2  having learned that these mantras were the names of
3  Hindu gods, had you determined for yourself that TM was
4  something that was against your religious beliefs?
5    A   Yes.
6    Q   Okay.  So by the end of sophomore year you
7  were uncomfortable with TM and you concluded that it was
8  against your religious beliefs, is that correct?
9    A   That's correct.
10   Q   But you didn't transfer out of Bogan High
11 School your sophomore year, did you?
12   A   Correct.
13   Q   You had a summer break and you came back to
14 Bogan for the 2019-2020 school year, isn't that true?
15   A   Yeah.
16   Q   And when you started back in Bogan in the fall
17 of 2019, there was no more Quiet Time Program at the
18 school, am I right about that?
19   A   When I transferred back the next year, my
20 junior year?
21   Q   When you came back to Bogan your junior year
22 for the 2019-2020 school year, the Quiet Time Program
23 wasn't at the school any longer, isn't that true?
24   A   Could have been.  I'm not sure.

61 (Pages 238 - 241)

Page 242

1    Q    You're not sure if it was there or not?
2    A    Right.
3    Q    When you came back for your junior year at
4  Bogan, 2019-2020, did you see any of the David Lynch
5  people at the school?
6    A    I don't remember.
7    Q    Did you see Erin, your TM teacher, did you
8  ever see her at the school during the junior year that
9  you were there, 2019-2020?
10   A    I'm not sure.
11   Q    What about you personally and what you would
12  do during school hours, was there a Quiet Time period at
13  all at Bogan your junior year starting in 2019?
14   A    Again, I'm not sure if there was Quiet Time my
15  junior year.
16   Q    You mentioned a period of homelessness where
17  you weren't in school your junior year, is that correct?
18   A    Correct.
19   Q    And can you tell me again when that period of
20  homelessness started, was it November of 2019?
21   A    I don't know the exact dates.  I know that I
22  was a junior in high school.
23   Q    And how long was this period of homelessness?
24   A    For about a year.

Page 243

1    Q    For about a year?
2    A    About.
3    Q    Do you remember whether that period started
4  before or after you started your junior year at Bogan
5  High School?
6    A    A little bit before that.
7    Q    And, I'm sorry, I don't want to get too
8  personal here, but I have to ask unfortunately for your
9  deposition, but by period of homelessness, do you mean
10  that you didn't have a place to live?
11   A    Correct.
12   Q    And so were you on the street?
13   A    Pretty much.
14   Q    And were you by yourself?
15   A    No, I was with my older sister.
16   Q    And what about your grandmother, Miss Watkins,
17  at that time where was she?
18   A    She had moved to Wisconsin.
19   Q    And when your grandmother moved to Wisconsin,
20  did she contact anyone for you to stay with after she
21  had moved?
22   A    No.
23   Q    How did it end as far as you living at your
24  grandmother's house, her moving to Wisconsin and then

Page 244

1  you having no place to live, did she just tell you
2  goodbye?
3    A    Pretty much.
4    Q    Do you have a relationship with your
5  grandmother today?
6    A    Yeah.
7    Q    Did your grandmother abandon you, is that what
8  you're telling me, your junior year in high school?
9    A    Abandon?  I wouldn't say abandon, but she did
10  leave, I mean.
11   Q    So your grandmother left you junior year in
12  high school, left you in Chicago with no place to live,
13  am I right about that?
14   A    Correct.
15   Q    You said you transferred out of Bogan High
16  School because Quiet Time was going against your
17  beliefs, but you can't tell me whether you ever
18  participated in Quiet Time at all during your junior
19  year, isn't that right?
20   A    Because like I stated, my junior year I was in
21  and out of school really.  I wasn't -- I wasn't there a
22  lot because, like I say, I was experiencing
23  homelessness.  So even though I was enrolled, I was not
24  going to school.

Page 245

1    Q    And if you weren't going to school, you
2  weren't meditating, am I right about that?
3    A    Correct.
4    Q    And if you weren't going to school you weren't
5  participating in Quiet Time, right?
6    A    Correct.
7    Q    And the period that you weren't going to
8  school started in September of 2019 and extended into
9  the year 2020, is that right?
10   A    Yes.
11   Q    How often, give me a percentage, were you in
12  school during your junior year versus not being in
13  school?
14   A    Probably went like about five days out of the
15  month.
16   Q    Five days out of a month?
17   A    Uh-huh.
18   Q    Were you ever approached by any truant officer
19  or anything about not being in school?
20   A    No.
21   Q    And I think you said that you had some
22  conversations with the school about not being in school
23  and being homeless, am I right about that?
24   A    Correct.

62 (Pages 242 - 245)

Page 246

1    Q    And were any sort of accommodations made for
2   you during that time because you weren't in school that
3   much?
4    A    No.
5    Q    So I believe you stated in about March of 2020
6   is when you transferred out of Bogan, is that correct?
7    A    I'm not sure if it was March.
8    Q    I thought you said that you were there, you
9   were at Bogan your junior year about three-fourths of
10  the year, is that right?
11   A    My junior year?  I stayed there, like I was --
12  like I said, I was enrolled, but I wasn't going.
13       MR. SIPCHEN:  Is Carolyn still on?
14       MS. HOMER:  Yes, I think you're looking for
15  what I marked as Exhibit 2.
16       MR. SIPCHEN:  I am.
17       MS. HOMER:  Do you want me to share it?
18       MR. SIPCHEN:  Yeah, can you share it for me?
19       MS. HOMER:  There you go.
20  BY MR. SIPCHEN:
21   Q    Okay.  This was previously marked for your
22  deposition today, Miss Hudgins, as Exhibit 2.  And this
23  is your enrollment history at the various high schools
24  and other schools that you attended, okay?  Do you see

Page 247

1   this?
2    A    Yes.
3    Q    Okay.  And what I want to refer you to, okay,
4   is in March, March 5, 2020, you were no longer enrolled
5   at Bogan High School.  Is that consistent with your
6   recollection?
7    A    2020?
8    Q    Correct.
9    A    Yeah.
10   Q    And you didn't attend high school for the rest
11  of the year anywhere in the spring of 2020, am I correct
12  about that?
13   A    Correct.
14   Q    And then next year you enrolled in McKinley
15  Lakeside --
16   A    Yes.
17   Q    -- in September of 2020, am I right about
18  that?
19   A    Yes.
20   Q    How was it determined that you were going to
21  enroll in McKinley?
22   A    How was it determined?
23   Q    You were what?  I'm sorry.
24   A    You're asking how did that happen?

Page 248

1    Q    Yeah, how was it determined that you would go
2   to --
3    A    I spoke to -- I spoke to my mother and I told
4   her that I no longer wanted to go to Bogan, but I had
5   previously been telling her that since my sophomore
6   year.  I just happened to have to go back to Bogan my
7   junior year because we lived closer there.  McKinley
8   Lakeside is on the low end of Chicago.  So I pretty much
9   had to stay at Bogan until I didn't.
10   Q    As of September of 2020 were you still
11  homeless or were you living somewhere again?
12   A    I can't recall.
13       MR. SIPCHEN:  Caroline, you can take it down.
14  Thanks.
15   Q    Okay.  Miss Hudgins, I'm going to show you
16  what was previously marked as Exhibit 3, it was part of
17  Exhibit 3.  And this is the Quiet Time Student
18  Application for Transcendental Meditation Instruction,
19  Bogan High School, do you remember this document?
20   A    Yes.
21   Q    And again, that's your signature at the bottom
22  of this document that you signed on November 1, 2018, is
23  that correct?
24   A    Yes.

Page 249

1    Q    Did you read this document before you signed
2   it?
3    A    Yes.
4    Q    Did you understand the document before you
5   signed it?
6    A    At the time I'm not sure.  I may have
7   understood it, may have not.
8    Q    Did you tell anybody that you didn't
9   understand the document at the time you signed it?
10   A    No.
11   Q    In the narrative here it says I understand
12  that learning TM technique is an optional activity, do
13  you see that?
14   A    Yes.
15   Q    You understood that by optional activity, that
16  meant that you didn't have to do TM if you didn't want
17  to, isn't that correct?
18   A    It says that, but we did, or else there would
19  be disciplinary action.  That's what we were told
20  verbally.
21   Q    But according to the form that you signed, the
22  form says that TM -- learning the TM technique is an
23  optional activity, is that correct?
24   A    Right.

63 (Pages 246 - 249)

Page 250

1    Q   Now, I think you said that you were part of an
2  ambassador program at some point while you were at
3  Bogan, is that correct?
4    A   Correct.
5    Q   And how long after November 1, 2018 did you
6  start being an ambassador for TM?
7      MR. MAUCK:  Objection, asked and answered by
8    both prior questioners, but you can answer the
9    question if you want.
10   A   I'm not sure.
11 BY MR. SIPCHEN:
12   Q   Was it in the first semester of your sophomore
13 year that you were an advocate for the program or an
14 ambassador?
15   A   It was soon after it was introduced to me.
16   Q   So it would have been during that first
17 semester, am I correct about that?
18   A   I'm not sure.
19   Q   How soon after you learned TM did you become
20 an ambassador for TM or an advocate for the program as
21 you put it previously?
22   A   Quickly after.
23   Q   So less than a month?
24   A   Most likely, yes.

Page 251

1    Q   And I think you told us that as an advocate
2  for the program, as an ambassador, one of the things
3  that you would do is you would go around and try to
4  encourage others to sign up to learn to meditate, am I
5  right about that?
6    A   Yes.
7    Q   So in going around and asking people or
8  encouraging them to sign up to meditate, you understood
9  that not all people were meditating at Bogan, isn't that
10 true?
11   A   Can you repeat the question?
12     MR. SIPCHEN:  Read it back, please?
13     (Question read.)
14   A   Correct.
15   Q   And for the people that weren't meditating
16 that you as an ambassador were trying to encourage to
17 learn, they weren't being forced to participate at the
18 time that you were talking to them because they weren't
19 participating, would you agree with that?
20   A   Slightly, yeah, I slightly disagree with it
21 because, again, if we didn't participate, there would be
22 disciplinary action, but some people would rather have
23 disciplinary action than to participate.
24   Q   So why was there a need for an ambassador to

Page 252

1  go around the school and encourage people to meditate if
2  students who weren't meditating were going to be
3  disciplined by the school anyway?
4    A   Can you rephrase that?
5      MR. SIPCHEN:  You can read it back again.
6      (Question read.)
7      MR. MAUCK:  I'll object to the form of the
8    question.  You can ask what thoughts she may have
9    had, but --
10     MR. SIPCHEN:  No, I'm going to ask the
11   question that I've asked, and she can answer it if
12   she understands it, okay?
13   A   I don't understand the question.
14 BY MR. SIPCHEN:
15   Q   Go ahead.  I'm sorry.
16   A   I don't understand the question.
17   Q   Okay.  So you do understand that you were
18 going around the school and as an ambassador you were
19 asking students, fellow students, to learn meditation,
20 correct?
21   A   Not asking but encouraging.
22   Q   Okay.  You were encouraging students to learn
23 meditation when you were going around the school as an
24 ambassador, am I right about that?

Page 253

1    A   Correct.
2    Q   But you also told me that meditating at the
3  school was mandatory, that you had to do it or you'd get
4  in trouble, isn't that something you already told me?
5    A   Correct.
6    Q   So as far as you understood, why were you
7  going around and asking or encouraging students to
8  meditate if they were already required to do it by the
9  school?
10   A   I was doing it for the reward.
11   Q   Did you yourself understand that there would
12 be any purpose in encouraging somebody to do something
13 like meditate or learning to meditate that they were
14 already required to do?
15   A   I'm not sure what you're asking.
16   Q   Well, if somebody's required to do something,
17 they have to do it regardless if you encourage them or
18 not, would you agree with that?
19   A   I disagree.
20   Q   So did students have to meditate at Bogan when
21 you were going around as an ambassador to encourage them
22 or did they not have to meditate?
23   A   If they didn't meditate, then there would be
24 disciplinary action.

64 (Pages 250 - 253)

Page 254

1     Q    When you encouraged people to meditate or
2  learn to meditate as an ambassador, is that what you
3  were doing, going around and encouraging them to
4  meditate so they wouldn't get into trouble?
5     A    I was doing it for the reward.
6     Q    What did you say to your fellow students who
7  weren't meditating when you were an ambassador when you
8  were encouraging them to learn meditation?
9     A    I wouldn't say anything.  Like I said, I
10  wouldn't -- I wouldn't tell them to meditate, I would
11  just lead by example.
12     Q    Okay.  Tell me how you did that.
13     A    Meditating myself.
14     Q    So pretend I'm a student at Bogan and I don't
15  meditate and you're an ambassador and you're going to
16  encourage me to meditate.  How would you approach me
17  while you were an ambassador at Bogan and encourage me
18  to do that?
19     A    By leading by example.
20     Q    And how do you do that?
21     A    By meditating myself.
22     Q    Okay.  So would you actually approach me?
23     A    It would be senseless to.
24     Q    Okay.  So when you say you were an ambassador

Page 255

1  to encourage others to meditate, the only thing you
2  would do is meditate yourself, is that right?
3     A    Yeah, and maybe from time to time talk about
4  it.
5     Q    Okay.  Tell me how you talked about it.  Did
6  you approach students directly and talk to them about
7  learning to meditate?
8     A    No, just whenever it came up I would put my
9  two cents in.
10     Q    Okay.  Well, when would it come up for you to
11  put your two cents in?
12     A    If I heard someone talking about it or
13  complaining about it.
14     Q    What would you do?
15     A    I would just tell them like nothing in
16  particular, nothing in particular, because I don't feel
17  like I ever put someone aside and said hey, you should
18  participate or you should do this or anything like that.
19  It was just more so, okay, you see me, you see me doing
20  it and maybe you'll want to do it.
21     Q    You would tell fellow students that, you would
22  tell them you see me doing it, maybe you want to do it,
23  too?
24     A    I wouldn't tell them anything.  I would just

Page 256

1  lead by example.
2     Q    How is it determined if you got your pizza if
3  you didn't tell students anything?
4     A    I guess if -- if they saw you meditating or
5  they saw you doing it, that's how you'll get the reward.
6     Q    So you would agree with me that you could be
7  meditating, somebody could see you meditating, and you
8  wouldn't be encouraging anybody by doing that practice,
9  right?
10     A    I personally feel like I would encourage
11  because, again, I was very known in high school.  So a
12  lot of people took what I did and they did it as well.
13     Q    So you felt that you encouraged students to
14  meditate or learn to meditate as an ambassador by
15  meditating yourself, is that what you're telling me?
16     A    Correct.
17     Q    And did you ever offer other students any
18  incentives if they would learn to meditate, such as a
19  snack or tell them they'd get a pizza or anything like
20  that?
21     A    No.
22     Q    On this first page of Exhibit 3 it says I
23  understand the purpose of TM practice is to provide the
24  mind and body deep rest, which helps reduce stress,

Page 257

1  improve health, increase energy, focus, and success,
2  correct?
3     A    Yes.
4     Q    And you read that before you signed this
5  document, which is the first page of Exhibit 3, the
6  Student Application for Transcendental Meditation
7  Instruction, correct?
8     A    Correct.
9     Q    And that's what the people from the Quiet Time
10  Program and the David Lynch Foundation told you, that
11  the purpose for you learning the TM practice is to help
12  reduce your stress, isn't that true?
13     A    Correct.
14     Q    Nobody from the Quiet Time Program or the
15  David Lynch Foundation ever told you that to learn TM
16  you had to believe in anything, correct?
17     A    I'm not sure.
18     Q    Nobody from the David Lynch Foundation or
19  anybody with the Quiet Time Program told you that in
20  learning TM you were going to be learning anything
21  religious, correct?
22     A    Correct, because they -- we were told that it
23  was meaningless.
24     Q    When did you stop being an ambassador to try

65 (Pages 254 - 257)

Page 258

1 to encourage other students to learn meditation?
2     MR. MAUCK: Objection, asked and answered. Go
3 ahead.
4    A  Can you restate the question?
5 BY MR. SIPCHEN:
6    Q  When did you stop being an ambassador to
7 encourage other students to meditate?
8    A  After I did my own research and decided that I
9 didn't want to go with the practice.
10   Q  But you don't remember when that was, correct,
11 specifically?
12   A  My sophomore year.
13   Q  Yeah, but you don't remember when during your
14 sophomore year you started doing your research?
15   A  I know it was after I was introduced to it.
16   Q  How long were you an ambassador that
17 encouraged other students to meditate?
18   A  Not long.
19   Q  Was it more than a week?
20   A  Yes.
21   Q  Was it more than a month?
22   A  Probably for a month if I had to guess.
23   Q  Probably how many months?
24   A  Probably for one month if I had to guess.

Page 259

1   Q  Probably for one month, is that what you said?
2   A  Uh-huh.
3   Q  And then when you stopped being an ambassador
4 to encourage other students to learn TM, was that right
5 at the same time that you were doing your research that
6 you previously spoke of?
7   A  It was right afterwards.
8   Q  Right afterwards. And did you yourself ever
9 completely stop practicing TM?
10   A  Yes.
11   Q  When was that?
12   A  After I did my research.
13   Q  During your sophomore year at Bogan High
14 School?
15   A  Yes.
16   Q  And again, you can't give me a month when you
17 did your research regarding TM at Bogan High School,
18 correct?
19   A  Correct.
20   Q  You can't even tell me what season it was,
21 whether it was winter, spring, summer or fall, right?
22   A  Correct.
23   Q  You never talked to anybody from the David
24 Lynch Foundation about any concerns that you had with

Page 260

1 practicing TM, am I correct about that?
2   A  Correct.
3   Q  You mentioned that you had a counselor I think
4 maybe starting in eighth grade. What was the
5 counselor's name?
6   A  I'm not sure.
7   Q  Was it a school counselor or was it a
8 counselor, somebody that you saw outside of school?
9   A  I had a school counselor and a counselor that
10 I saw outside of school.
11   Q  Do you remember either of those person's
12 names?
13   A  No, I don't.
14   Q  As far as the counselor that you saw outside
15 of school, do you remember where you would go see that
16 counselor?
17   A  It was at a facility.
18   Q  Do you remember the name of the facility?
19   A  I do not. I know it was for children.
20   Q  Do you know where the facility was located?
21   A  Here in Chicago.
22   Q  Do you know where in Chicago the facility was
23 located that you'd go see the counselor outside of
24 school?

Page 261

1   A  No.
2   Q  Did you ever get in trouble at school for
3 sitting in a classroom quietly and not distracting
4 others?
5   A  No.
6   Q  And that would include any Quiet Time
7 sessions, right? If you were sitting in Quiet Time and
8 you were sitting still and you were quiet, you never got
9 in any trouble, am I right about that?
10   A  Either we were participating and we were
11 meditating or we had to sit there with our heads down.
12   Q  So my question to you, just because I want
13 to understand it is if you were sitting in Quiet Time
14 and you were sitting still and being quiet, there was no
15 time that you got in trouble for doing that, am I right
16 about that?
17   A  Correct.
18   Q  And I think you said earlier that sometimes
19 when you would sit in Quiet Time you'd meditate and
20 sometimes you would not, correct?
21   A  Correct.
22   Q  You never told anybody whether you were
23 meditating or whether you were not meditating when you
24 were sitting in the Quiet Time sessions, am I correct?

66 (Pages 258 - 261)

Page 262

1    A    Sometimes I would.
2    Q    Who would you tell?
3    A    Just associates, people who were around me.
4    Q    Fellow students?
5    A    Yes.
6    Q    What about any teachers or instructors, would
7 you tell them during the Quiet Time period whether you
8 were meditating or not meditating?
9    A    No, because there's just really no way to
10 tell.
11    Q    Right.  You can fake it if you want to, right,
12 you can fake meditating by just sitting here, sitting
13 still and closing your eyes, right?
14    A    Correct.
15    Q    That's something you did on occasion, isn't
16 it?
17    A    Just sit there?
18    Q    Sit there with your eyes closed?
19    A    Most of the time I was -- after I -- after I
20 did my research, most of the time I would ask to be
21 removed from the classroom.  And if not, then I would
22 just deal with the disciplinary consequences that came
23 with not meditating.
24    Q    When you say there were disciplinary

Page 263

1 consequences without meditating, tell me what you mean
2 by that.
3    A    I mean that if we did not meditate or if we --
4 if our teachers felt like we weren't meditating, then we
5 would get sent to the dean's office.
6    Q    And did you personally have that experience
7 where --
8    A    Yes.
9    Q    -- a teacher felt that you weren't meditating?
10    A    I had that experience because I told my
11 teacher that I did not want to meditate.
12    Q    And what did the teacher tell you in response?
13    A    To go to the dean's office.
14    Q    Did the teacher say if you don't want to
15 meditate today you can simply sit in the classroom but
16 you have to stay in the classroom and you have to be
17 quiet?
18    A    No.
19    Q    So it's your testimony under oath that when
20 you told a teacher that you didn't want to meditate that
21 day, you were sent to the dean's office, correct?
22    A    Correct.
23    Q    And that's the only thing that you were sent
24 to the dean's office for, simply telling a teacher that

Page 264

1 you didn't want to meditate, not because you were out of
2 your seat or out of the room or didn't want to sit in
3 the classroom, you were sent to the dean's office
4 according to your testimony solely because you told the
5 teacher you didn't feel like meditating that day, is
6 that right?
7    A    Me and the teacher got into a debate because I
8 told the teacher that I did not want to meditate, and
9 she was going against that.  So I felt as if I had every
10 right to say how I felt, and I guess that made her
11 upset.
12    Q    After you -- was this debate before or after
13 class?
14    A    During class.
15    Q    Was it during Quiet Time?
16    A    Yeah.
17    Q    Do you remember who the teacher was?
18    A    She taught English.  I don't remember her
19 name.
20    Q    Did the teacher tell you that you should go
21 sit down and just sit still and be quiet?  Did she give
22 you that option, that English teacher?
23    A    I'm not sure.  I just remember her removing
24 me, telling me I had to leave her class.

Page 265

1    Q    Is that because you were being disruptive,
2 because you weren't being quiet around the other
3 students?
4    A    I wouldn't say disruptive, I feel like if
5 anything serious.
6    Q    Before you were taken to the dean's office by
7 that English teacher, did you ever sit down in your
8 seat, be quiet and sit still?
9    A    Yeah, I was at first.  I was at first.
10    Q    Okay.  And then you had a debate with the
11 English teacher about meditating in Quiet Time, correct?
12    A    Correct.
13    Q    And then after that debate did you ever go
14 back to your seat, sit down, sit still and be quiet?
15    A    No, she put me out.  No, she put me out.
16    Q    Your answer is no, you did not go back to your
17 seat, sit still and be quiet after you had the debate
18 with the teacher, am I correct?
19    A    Correct.
20    Q    Did the teacher tell you to go sit down and
21 please be quiet?
22    A    She put me out.
23    Q    I understand she put you out, but before she
24 put you out did she tell you to go sit down in your seat

67 (Pages 262 - 265)

Page 266

1 and just be quiet?
2    A   No.
3    Q   Did she ask you to do that?
4    A   No.
5    Q   So when did the teacher put you out, was it
6 while you were debating or was it while you were sitting
7 in your seat?
8    A   As we were -- after we got done debating and I
9 told her that I didn't want to meditate.
10    Q   And at that point she escorted you out of the
11 classroom, is that what you're telling me?
12    A   Correct.
13    Q   When was that?
14    A   This was my sophomore year.
15    Q   I understand.  Sophomore year is a long time.
16 Can you give me a month or even a year that this
17 happened?
18    A   I'm not sure.
19    Q   You can't tell me whether this incident
20 happened your first semester of junior year or your
21 second -- I'm sorry, your first semester of sophomore
22 year or your second semester?
23    A   Most likely the second semester because this
24 was after doing my research.

Page 267

1    Q   I want to show you another part of Exhibit 3,
2 and you were shown this previously.  This is your first
3 day of instruction form, do you see that?
4    A   Yes.
5    Q   And you were shown this previously.  And I
6 think you previously testified that you filled out all
7 of your forms regarding your TM training honestly,
8 correct?
9    A   Yes.
10    Q   You were truthful, you didn't lie in any of
11 those forms, correct?
12    A   I really wouldn't remember.  I was 15 at the
13 time.
14    Q   But you were an honest person when you were
15 15, weren't you?
16    A   For the most part.
17    Q   You wouldn't lie to a teacher when you were
18 15, would you?
19    A   Yeah.
20    Q   Would you lie about what happened in a
21 classroom when you were 15?
22    A   What do you mean?
23    Q   I mean would you lie when you were 15 about
24 something that occurred in a classroom?  Is that

Page 268

1 something would you do?
2    A   No.  Why would I lie?  No.
3    Q   This first instruction day form is dated
4 November 5, 2018, correct?
5    A   Yes.
6    Q   And that was your first day that you were
7 instructed in TM, correct?
8    A   Yes.
9    Q   And that's after you signed the participation
10 form in which you agreed to volunteer to learn the
11 technique, is that correct?
12    A   Correct.
13    Q   And I think you talked about during that day
14 you went with an instructor and you went into a room and
15 there was a picture there and she stood and said some
16 things in a language that you didn't understand and
17 there was a bowl of fruit and a bowl of rice, do you
18 remember that testimony?
19    A   Yes.
20    Q   How long did the whole thing last in front of
21 the picture where the teacher was just saying something
22 that you couldn't understand, was that about three
23 minutes?
24    A   It was a few minutes, yeah.

Page 269

1    Q   And prior to doing this thing in front of the
2 picture that you described, did the instructor tell you
3 that she was going to do something that was going to be
4 an expression of gratitude or respect for prior teachers
5 that had taught the TM practice?
6    A   Yes.
7    Q   You didn't have to say anything while the
8 teacher was in front of the picture, is that correct?
9    A   Correct.
10    Q   You didn't have to do anything, you just had
11 to sit there and watch?
12    A   Yes.
13    Q   And then I think you said that you were given
14 a mantra?
15    A   Yes.
16    Q   And you were told the mantra was meaningless,
17 I think you said that as well, correct?
18    A   Yes.
19    Q   And then for the rest of the time you were in
20 the room with the instructor that first day, she
21 instructed you and you guys practiced trying to
22 meditate, am I describing that correctly?
23    A   Can you restate that?  Can you repeat that?
24       MR. SIPCHEN:  Can you read it back?

68 (Pages 266 - 269)

Page 270

1       (Question read.)
2    A   So you said for the rest of the time.
3    Q   Right.  After the time that she did the thing
4  in front of the picture, she gave you the mantra after
5  that, correct?
6    A   Correct.
7    Q   And then after she gave you the mantra for the
8  rest of the time you were in the room that day with the
9  instructor, did she instruct you how to use the mantra
10  and did you practice trying to meditate for the rest of
11  the time you were there?
12    A   Yes.
13    Q   You testified earlier that you were told to
14  keep the mantra private, correct?
15    A   Yes.
16    Q   Did anyone specifically tell you that you
17  couldn't tell your parents about the -- any aspect of
18  TM?
19    A   Yes.
20    Q   Who told you you couldn't tell your parents?
21    A   A teacher did.  I believe it was Erin.
22    Q   You believe Erin told you that you couldn't
23  tell your parents about --
24    A   Not to tell anyone and especially if we have

Page 271

1  religious parents.  That's what we were told.  If you
2  have really religious parents, don't go home and mention
3  TM.
4    Q   Who said that to you, who said that if you
5  have religious parents don't go home and mention any
6  aspect of TM?
7    A   I've heard that -- I've heard that from
8  multiple people --
9    Q   I want to know who told you.  Did anyone tell
10  you that?  Did anyone specifically tell you that if you
11  have religious parents don't go home and tell them
12  anything about TM?
13    A   That was a statement made to us, to all of our
14  classmates, not just me.  But I was told by Erin
15  individually myself not to go and say anything about my
16  mantra or say anything about TM, period.  My whole
17  class was told that not to go home and if we have
18  religious parents and not to tell them about TM.
19    Q   Okay.  Let's talk about both those things.  So
20  Erin told you not to share your mantra with anyone else,
21  is that what you're telling me?
22    A   Correct.
23    Q   And that was a conversation just with you and
24  nobody else, am I correct about that?

Page 272

1    A   Correct.
2    Q   And when did Erin tell you that?
3    A   After, afterwards.
4    Q   After the first instruction day?
5    A   No, when she gave me my mantra.  So after the
6  little altar thing.
7    Q   That was the first instruction day of TM,
8  correct?
9    A   Correct.
10    Q   And did Erin ever specifically tell you not to
11  tell your parents your mantra?
12    A   No.
13    Q   Now, you said that your whole class was told
14  not to tell your parents about TM, especially if they
15  were religious, do I have that right?
16    A   Correct.
17    Q   When did that happen?
18    A   When we were first introduced to it.
19    Q   So before you were trained in TM, your whole
20  class was told don't tell your parents about TM if
21  they're religious, do I have that right?
22    A   Not to mention it because before she pulled me
23  aside, before she pulled me aside and we did the thing
24  individually, it was like kind of like a class thing

Page 273

1  when they first introduced it.
2    Q   I understand.  Just listen to my question very
3  carefully.  We can get through this, okay?
4    A   Yeah.
5    Q   So before you were trained in TM with Erin in
6  the room with the picture, there was a presentation in
7  front of your whole class where someone told the whole
8  class don't go tell your parents about TM, especially if
9  those parents are religious --
10    A   Correct.
11    Q   -- is that what you're telling me?
12    A   Correct.
13    Q   And that was before you signed up to volunteer
14  to learn TM, correct?
15    A   It was the same time.  It was the same day.
16  That's what I was getting to.
17    Q   Okay.  I understand.  Now, how many people
18  were in the room when the person told the whole class
19  that they should not tell their parents anything about
20  TM especially if they were religious?
21    A   It was a full class of people.
22    Q   So more than 20?
23    A   If that's the full class.
24    Q   You tell me.  You were there.  How many people

69 (Pages 270 - 273)

Page 274

1 were sitting in the classroom?
2    A    I'm not sure.  It was a full class.  I can
3 tell you that.  It was a full class.
4    Q    Was it more than 10 people?
5    A    Yes.
6    Q    Was it more than 15 people?
7    A    It may have been.
8    Q    And give me some of the names of the other
9 students in the class who overheard this person tell you
10 that you shouldn't tell your parents anything about TM
11 especially if they were religious?
12    A    Like I said, I'm not familiar with anyone that
13 I went to school with.  I was very to myself.
14    Q    You can't give me the name of a single person
15 who witnessed an instruction that was given to you not
16 to tell your parents about TM especially if they were
17 religious, am I correct about that?
18    A    Correct.
19    Q    Who was the person who --
20    A    That told us that?
21    Q    Yeah, let me finish my question, please.  Who
22 was the person that told this class of people that they
23 should not tell their parents about TM, especially if
24 they were religious?

Page 275

1    A    I don't know them.  I don't know who the
2 person was.  I just know that they came here one day.
3 They introduced it to us.  They had us sign the
4 paperwork, and they told us not to tell our parents if
5 they were religious.
6    Q    Did you think it was odd that somebody told
7 you not to tell your parents about TM, especially if
8 they were religious, and then gave you a form to sign to
9 volunteer to participate that said it's an optional
10 activity, did you think anything was strange about that?
11    A    Yeah, it was confusing to me.
12    Q    So who did you ask when you were confused
13 about it?
14    A    I didn't ask anyone at the time.
15    Q    You just signed the form and went on your way
16 and started to learn TM, is that what you're telling me?
17    A    Correct.
18    Q    I think you testified earlier that one of the
19 things after doing TM was that you felt sleepy?
20    A    Yeah.
21    Q    And you said that you always felt sleepy?
22    A    Exhausted after --
23    Q    You always felt exhausted after participating
24 in transcendental meditation, correct?

Page 276

1    A    Yes.
2    Q    Looking back at this portion of Exhibit 3,
3 this is your first instructional day form dated
4 November 5, 2018, you were asked a question do you feel
5 sleepy now after the practice and you said no, didn't
6 you?
7    A    Correct.
8    Q    So you didn't feel sleepy after your first
9 instructional day of TM, am I right about that?
10    A    At the time I felt drained, drained.
11    Q    You didn't write on this form that you felt
12 drained, correct?
13    A    So above the question that you just read it
14 says did you feel sleepy during your meditation, I
15 answered to that yes.
16    Q    Okay.  That's during the meditation.
17    A    Uh-huh.
18    Q    What I'm asking you is about your prior
19 testimony that you said that after you did TM you always
20 felt sleepy.  And I think you just said you felt
21 exhausted.
22    A    Correct.
23    Q    Okay.  So what I'm asking you is during your
24 first day of instruction when you were asked do you feel

Page 277

1 sleepy now after the practice, you truthfully answered
2 no, correct?
3    A    Correct.
4    Q    The handwriting on this form is yours,
5 correct, on the instructional day on Exhibit 3 dated
6 11/5/18?
7    A    Correct.
8    Q    This is your instructional day form for the
9 following day, the first day following instruction and
10 day two, do you see that?
11    A    Yes.
12    Q    And there's a date on it of November 6, 2018?
13    A    Yeah.
14    Q    And this is again part of Exhibit 3 that I'm
15 showing you.  And the handwriting on this document is
16 yours, correct?
17    A    Yes.
18    Q    When you were asked anything else you want to
19 tell us, any questions, you put a smiley face, correct?
20    A    Yeah.
21    Q    What does that mean when you use a smiley
22 face?
23    A    I don't think -- at the time this is probably
24 something that I just rushed through and hurry up and

70 (Pages 274 - 277)

Page 278

1  did, you know, probably didn't want too much to do with
2  it, just like okay, let me get it out of the way.
3     Q   But why did you put a smiley face on it is the
4  question?
5     A   No particular reason, just because I didn't
6  have anything -- any --
7     Q   You didn't have any questions or any further
8  comments that you wanted your TM instructor to know when
9  you filled out the first day following instruction form
10  dated 11/6/18, correct?
11     A   If I did, then I didn't think to put it down.
12     Q   Question number six says did you feel some
13  happiness inside during your meditation, you said yes.
14  That was truthful?  Sorry, I didn't get your answer.
15     A   I believe so, you know.  I can't really
16  recall.  I can't recall.  I mean, being 15 years old, I
17  can't recall that.
18     Q   But again, even though you were 15 years old,
19  you filled out this form truthfully, right?
20     A   To my knowledge.
21     Q   Let's look at the last form that's a part of
22  Exhibit 3 that you filled out, this is your third and
23  final day of instruction for TM.  And it was on
24  November 13, 2018, correct?

Page 279

1     A   Yes.
2     Q   And you said that you felt great when you were
3  asked how do you feel today, correct?
4     A   Uh-huh.  Yes.
5     Q   You were also asked have you noticed any
6  effects from morning meditation that continues
7  throughout the day, if yes, what kind, and you say more
8  focused, correct?
9     A   Yes.
10     Q   And that was true, after you had gone through
11  the initial instruction and then the remaining three
12  training days, you had found that throughout the day you
13  were more focused after doing TM, am I right about that?
14     A   I wouldn't say more focused but more -- more
15  relaxed.
16     Q   Okay.  On the form, though, you said more
17  focused, right?
18     A   Yeah, that's what it says on the form.
19     Q   And for question number 10, after TM do you
20  feel sleepy or awake, you said sleepy, correct?
21     A   Correct.
22     Q   But even though you said sleepy, you were
23  still more focused that continued throughout the day, am
24  I right about that?  That's what you put down here.

Page 280

1     A   Right, that's what I put down.
2     Q   Is it fair to say that during the time that
3  you were being instructed in TM and with these answers
4  that you're giving on the forms that this was the time
5  that you were talking about earlier where you were
6  enjoying TM?
7     A   Yes.
8     Q   And during this time when you were trained in
9  TM, you felt that TM was having some positive impacts,
10  am I right about that?
11     A   Correct.
12        MR. SIPCHEN:  We're getting close, okay?
13     Q   Going back to when you were an ambassador, and
14  I just want to make sure I understand, because your
15  testimony was a little confusing to me, tell me
16  everything that you did as an ambassador for the TM
17  program to encourage students.  I think one thing you
18  mentioned is that you would lead by example by
19  meditation.  What else did you do?
20     A   Nothing in particular, you know, nothing in
21  particular.  Like I say, I would communicate.  Like if I
22  heard someone bring it up, that's only if -- I wasn't
23  pushing it, like oh, yeah, you should participate in
24  Quiet Time, like you really need to, I wasn't doing

Page 281

1  that.  But if I heard somebody say oh, I don't want to
2  do that Quiet Time, and I would be like you should do
3  it.  You should do it.  You may like it, you know, just
4  suggesting it, like not --
5     Q   So as an ambassador, if somebody brought up
6  the subject to you and said, you know, I don't think I
7  want to do TM, I don't want to learn it, you would
8  encourage them and say you should try it and learn it,
9  that's one of the things you would do as an ambassador
10  for the TM program, am I understanding that correctly?
11     A   Correct.
12     Q   Anything else besides leading by example and
13  if somebody approached you you encouraging them to maybe
14  learn TM that you did as an ambassador?
15     A   No.
16     Q   Were you given any materials or anything to
17  give to students as far as being an ambassador for
18  learning TM?
19     A   No.
20     Q   Were you given any materials yourself to read
21  or study in connection with you being an ambassador for
22  the TM program?
23     A   If so, I don't remember.
24     Q   Were there any special meetings with any of

71 (Pages 278 - 281)

Page 282

1 the Quiet Time or David Lynch people to talk to
2 specifically those who were going to be ambassadors for
3 the program and what that meant or entailed?
4     A    During the -- during the parties -- I mean,
5 during the gatherings where we had like the pizza and
6 stuff like that, but they never talked to us in groups.
7 Someone came up to me by myself, you know.
8     Q    Who asked you to be an ambassador for the TM
9 program?
10    A    I have no idea.
11    Q    Do you know if it was somebody from the David
12 Lynch Foundation?
13    A    Might have been.
14    Q    And did you have to sign up for it anywhere?
15    A    No.
16    Q    Did you have to sign a sheet or anything like
17 that?
18    A    No, there was no sign up for it.  It was
19 either we wanted to participate or we didn't.
20        MR. SIPCHEN:  Do we know what exhibit we're
21 on?  I lost track.
22        MS. ROSENBERG:  I think we're on 11.  Ten was
23 the unsigned declaration I think, is that correct?
24        MR. SIPCHEN:  I think that's correct.

Page 283

1        (Document marked as Hudgins Deposition
2        Exhibit 11 for identification.)
3 BY MR. SIPCHEN:
4     Q    I'm going to show you what we've marked as
5 Exhibit 11 for your deposition.  And this document is a
6 letter, a permission form, and a question and answer
7 sheet regarding the Quiet Time Program at Bogan.  And I
8 want you to take a look at it.  I'm going to scroll
9 through it.  You tell me when you want me to scroll down
10 or, you know, what you want to --
11        MR. MAUCK:  Can you enlarge it, Jim, please?
12        MR. SIPCHEN:  Enlarge it?
13        MR. MAUCK:  Yes.
14        MR. SIPCHEN:  Okay.  Is that better?
15        MR. MAUCK:  Yeah, but now you can't see all
16 the way across.
17        MR. SIPCHEN:  I'm going to try to fix that.
18 There we go.
19        MR. MAUCK:  That's fine.  Take your time and
20 read it before you answer the questions.
21 BY MR. SIPCHEN:
22    Q    Go ahead and just look through it.  So the
23 first document is the letter.  Tell me when you want me
24 to keep going, okay?

Page 284

1        MS. SALISBURY:  Jim, as a housekeeping item,
2 can you put the Bates numbers in the record, too?
3        MR. SIPCHEN:  Yes.  I can do it now.  For the
4 record it starts at BOE 17004 and it ends -- it's
5 through BOE 17006.
6     Q    Okay.  You want me to go to the next page?
7     A    Just a moment.
8     Q    Sure.  You tell me when, okay?
9     A    Okay.  You can go to the next page.  Okay.
10 I've read that.  Okay.
11    Q    That's the last page of the document.
12    A    Okay.
13    Q    Okay.  So what I want to ask you is were you
14 given these documents during your sophomore year at
15 Bogan to be taken home to your grandmother who was your
16 guardian at the time?
17    A    No.
18    Q    Were you given any of these documents in
19 Exhibit 11?
20    A    No.
21    Q    Is this the first time you've seen these
22 documents that we've marked as Exhibit 11?
23    A    This is the very first time of me seeing this.
24    Q    How would you describe your relationship with

Page 285

1 your grandmother at the beginning of your sophomore year
2 at Bogan, were you guys close?
3     A    Yeah, for the most part.
4     Q    You trust each other?
5     A    Yeah.
6     Q    You talk about school?
7     A    Yeah.
8     Q    You talk about your grades?
9     A    Yeah.
10    Q    Talk about what classes you took?
11    A    Not really.
12    Q    Did you talk about friends or any social
13 things that were going on at school?
14    A    Not really.
15    Q    Did you have any conversations with your
16 grandmother in November of 2019 regarding your learning
17 TM?
18    A    No.
19    Q    You never told your grandmother in November of
20 2019 that you decided to sign a form to learn
21 transcendental meditation?
22    A    I'm not sure if it was in November, but that's
23 why I'm saying I don't know exactly when, I just know
24 that -- remembering that was me letting her know that I

72 (Pages 282 - 285)

Page 286

1 no longer wanted to participate. That was my first time
2 ever bringing it up to her, which was before I
3 transferred schools.
4    Q   Okay. So listen to my question, okay, and we
5 can get through this really easy. What I want to know
6 is when you started learning to practice TM when you
7 were being trained, did you have any conversations with
8 your grandmother during that time to let her know that
9 that's what you were doing?
10   A   No.
11      MR. MAUCK: All right. Jim, just to clarify,
12 you asked November 2019, but the form says that the
13 initiation was 2018, so --
14      MR. SIPCHEN: You're right.
15      MR. MAUCK: -- there's confusion there.
16 Straighten that out, which exactly is your
17 question.
18      MR. SIPCHEN: I apologize because I misspoke,
19 so thanks for correcting me, John.
20   Q   At the time that you were being trained in TM
21 when you were learning it in November of 2018, did you
22 have any conversations with your grandmother during
23 which you let her know that you had signed up to learn
24 the practice?

Page 287

1    A   No.
2    Q   The first time you told your grandmother about
3 it was much later when you were going to be transferring
4 schools?
5    A   Correct.
6    Q   And would that have been after your junior
7 year at Bogan?
8    A   During my junior year.
9    Q   And I know your grandmother moved to
10 Wisconsin. When was that during your junior year that
11 you had a conversation with your grandmother about you
12 participating in TM?
13   A   This was when I decided that I wanted to
14 move -- change schools.
15   Q   2019 was when you were going through that
16 issue with your homelessness, right?
17   A   Correct.
18   Q   And your grandmother wasn't around during
19 2019, she'd moved to Wisconsin, correct?
20   A   Correct.
21   Q   And she wasn't around from January through
22 March of 2020 when you ceased to be enrolled at Bogan
23 High School, correct?
24   A   Correct.

Page 288

1    Q   So when did you reconnect with your
2 grandmother to talk to her about TM and that you were
3 participating in TM, was that after your junior year was
4 over?
5    A   No, that was right after my sophomore year.
6 And then I went back to Bogan and I wanted to leave
7 there. I wanted to leave Bogan. So that's when I told
8 her about the transcendental meditation.
9    Q   You told your grandmother about the
10 transcendental meditation before you started your junior
11 year at Bogan, is that what you're telling me?
12   A   During my junior year.
13   Q   At what point during your junior year did you
14 tell your grandmother that you were participating in TM?
15   A   I don't know.
16   Q   Was it the beginning of the year, middle of
17 the year?
18   A   About the middle, about the beginning, middle.
19   Q   But I thought your grandmother wasn't around
20 during the middle of your junior year because you were
21 homeless. Did I miss something?
22   A   No, you didn't. Correct, she was not around,
23 but she was still in my life. She was still -- we never
24 lost contact.

Page 289

1    Q   So you would call her?
2    A   Right, exactly. I would call her, go down
3 there to see her. She still had to come back up here to
4 enroll me in school.
5    Q   Okay. And was that the first time that you
6 told your grandmother about your participation in TM and
7 that you wanted to transfer in or about the middle of
8 your junior year in 2019?
9    A   Yes.
10   Q   And you told your grandmother that you wanted
11 to transfer out of Bogan because of the TM program in
12 the middle of 2019 even though the TM program wasn't
13 going on in the school at Bogan in 2019, am I right
14 about that?
15   A   Right, not only because of that, because I
16 didn't -- not only because of that but the personal
17 issues as well that I was dealing with, like the
18 homelessness and stuff like that and then not being able
19 to, at the time when I was with them, not being able to
20 pray at school. That was my main concern of why I
21 wanted to switch schools.
22   Q   Okay. So your main concern in wanting to
23 switch schools wasn't that the school had a Quiet Time
24 or TM program anymore, because that program was gone,

73 (Pages 286 - 289)

Page 290

1 right?
2    A    In my junior year?
3    Q    Right.
4    A    Correct.
5    Q    The reason that you wanted to transfer schools
6 was for other reasons unrelated to TM, that's what
7 you're telling me, those other personal reasons?
8    A    Personal reasons as well.
9    Q    Would you agree with me that in the middle of
10 your junior year transcendental meditation was no longer
11 an issue because it wasn't a program in the school you
12 were attending?
13   A    Correct.
14   Q    Is there any particular reason you didn't tell
15 your grandmother earlier that you were learning
16 transcendental meditation?
17   A    Yes.
18   Q    What was that?
19   A    Because we were told not to tell our parents
20 if they were religious.
21   Q    You were told not to tell anybody, right,
22 about TM?
23   A    Not to tell anyone my mantra.
24   Q    Were you told by anyone to not tell anybody

Page 291

1 else anything else about TM?
2    A    I was told not to tell anyone my mantra.  I
3 was told not to go home and tell me family about TM if
4 they were religious.
5    Q    Okay.  But you did tell other students about
6 your mantra, didn't you?
7    A    Yeah.
8    Q    So when you were told by others don't tell
9 your mantra to other people, you didn't listen to them,
10 right?
11   A    At first I did, but then I started to become
12 suspicious.
13   Q    So when you became suspicious about your
14 mantra, you started discussing that with other students,
15 correct?
16   A    Yes.
17   Q    Did you discuss that within the confines of
18 the school, while you were at school?
19   A    Yes.
20   Q    But during that time when you were suspicious
21 about your mantra, you didn't share anything about your
22 mantra or TM with your grandma, is that right?
23   A    Correct.
24   Q    So you talked to your fellow students inside

Page 292

1 the school, but you didn't go home and privately talk to
2 your grandma, your guardian, about TM at all, am I right
3 about that?
4    A    Yeah, you're right.
5    Q    So when the school told you don't tell anybody
6 else about your mantra, you didn't listen when you told
7 other students?
8    A    Correct.
9        MR. MAUCK:  Asked and answered several times.
10       MR. SIPCHEN:  I just want to make sure I got
11 this right.
12   A    Correct.
13 BY MR. SIPCHEN:
14   Q    But when the school told you not to tell your
15 parents if they were religious about TM, you did listen,
16 and you followed that to the letter, is that what you're
17 telling me?
18   A    Correct.
19   Q    So you obeyed one thing that the school asked
20 you to do but you disobeyed the other thing, am I right
21 about that?
22   A    Yeah, you can say that, yeah.
23   Q    What did your grandma tell you when you told
24 her about you participating in TM?

Page 293

1    A    That I should have said something sooner.
2    Q    And did your grandma go to the school to talk
3 to anybody?
4    A    I wasn't going to the school at the time.
5 Well, I wasn't going to school.  I was enrolled, but I
6 wasn't going to school, so.
7    Q    But you were enrolled at Bogan High School at
8 the time you told your grandmother that you were
9 participating in TM, I'm right about that?
10   A    Right.
11   Q    And I'm also right that your grandmother
12 didn't go to the school to talk to anybody about any TM
13 program while you were enrolled, that never happened?
14   A    Correct.
15   Q    During January of 2019 were you still
16 meditating at home, practicing TM at home?
17   A    2019?  Yeah, a little, a few times.  That's my
18 sophomore year, then yeah.  You said 2017.
19   Q    Yeah, you're right.  Was there a point that
20 you stopped practicing TM at home?
21   A    Yeah.
22   Q    And was that the same time that you stopped
23 practicing TM at home that you stopped practicing TM at
24 school?

74 (Pages 290 - 293)

Page 294

1   A   Yes.
2   Q   You didn't stop one before the other, you
3  stopped practicing TM altogether at the same time, am I
4  correct about that?
5   A   Correct.
6   MR. SIPCHEN:  Okay.  Give me just a minute and
7  I think we're probably done.
8   MS. HOMER:  While you're checking your notes,
9  John, I don't know, I doubt you have any questions,
10  but if you don't, I have less than 90 seconds of
11  something I just need to clean up, so you know.
12   MS. ROSENBERG:  And I have four questions.
13  BY MR. SIPCHEN:
14   Q   I wanted --
15   MR. MAUCK:  We're on eight hours, you know,
16  less than 15 minutes, and then we're done.
17   MR. SIPCHEN:  Well, I don't think that's an
18  adequate reflection of the time.  We've taken a
19  number of breaks and everything else, but I'm going
20  to be done in literally two minutes.  I have just a
21  few more questions.
22   Q   You mentioned earlier that you were a Muslim,
23  correct?
24   A   Yes.

Page 295

1   Q   And when you prayed as a Muslim, did you use
2  like a prayer rug or anything like that?
3   A   Yes, a prayer mat.
4   Q   Prayer mat?  Okay.  In your declaration that
5  you signed, you said that the Quiet Time Program was
6  graded including participation, and not participating
7  negatively affected our grades.  Is that true?
8   A   Yes.  That's what we were told.  That's what
9  we were told would happen.
10   Q   Okay.  Let me ask you about Quiet Time -- not
11  participating in Quiet Time negatively affecting your
12  grade.  Did that ever happen to you?
13   A   Not to my knowledge.
14   Q   What kind of grade did you think you were
15  getting in Quiet Time?
16   A   A grade for participating.
17   (Document marked as Hudgins Deposition
18   Exhibit 12 for identification.)
19   Q   I'm going to show you what we marked as
20  Exhibit 12 real quickly.  And this is a copy that we got
21  from the Chicago Public Schools of your high school
22  record, your transcript.  Have you ever seen this
23  before?
24   A   Yes.

Page 296

1   Q   We'll look at sophomore year.  That's when you
2  were at Bogan and that's when you were participating in
3  Quiet Time and had learned TM, is that correct?
4   A   Correct.
5   Q   Can you show me on this transcript where you
6  received a grade for Quiet Time?
7   MR. MAUCK:  Do you want to enlarge that for my
8   older eyes, please?
9   A   I don't see a grade for TM.
10  BY MR. SIPCHEN:
11   Q   Not even a participation grade on your
12  transcript for Quiet Time, is there?
13   A   Right.  But like I said, we were told that.
14  So I'm not sure if that's what actually happened, but I
15  know we were told that we would be graded for
16  participating.
17   Q   You didn't say in your declaration that you
18  were told that you would be graded for Quiet Time
19  including participation, you stated that you were graded
20  including participation and that not participating
21  negatively affected our grades, correct?
22   A   Yes.
23   Q   That's not true, correct?  You weren't graded
24  on your transcript and your grades on your transcript

Page 297

1  were not negatively affected by participating in Quiet
2  Time or not, am I right about that?
3   A   Well, obviously, but.
4   MR. SIPCHEN:  Okay.  All right.  I don't have
5   any more questions for you.  Thank you.
6   MS. HOMER:  John, is it all right if I ask my
7   just handful of questions right now?
8   MR. MAUCK:  Yeah, sure, go ahead, Carolyn.
9   MS. HOMER:  Thank you.
10   FURTHER EXAMINATION
11  BY MS. HOMER:
12   Q   Miss Hudgins, earlier this afternoon
13  Ms. Rosenberg, the attorney for the Board of Education,
14  showed you a form about a sleep study that had some
15  questions about puberty, do you remember that?
16   A   Yes.
17   Q   Okay.  And you said you thought you had seen
18  that form before today, is that right?
19   A   Yes.
20   Q   But you don't really remember one way or
21  another if you had seen a copy of that form, do you?
22   A   I do remember vividly that we were -- we were
23  questioned about puberty.  But on the questions exactly,
24  like I'm not going to know word from word what was said,

75 (Pages 294 - 297)

Page 298

1  you get what I'm saying?  I was 15 at the time, but yes.
2  Q  Okay.  And to your memory, you were questioned
3  about puberty at Bogan High School, is that right?
4  A  Correct.
5  Q  Okay.  And you enrolled in Bogan High School
6  in September of 2018, is that correct?
7  A  Yes, I believe so.
8  Q  You weren't at Bogan High School in April of
9  2018, right?
10  A  What does it say on the record?  I can't -- I
11  can't -- I didn't --
12  Q  I will show you the record very quickly.
13  Sorry, it's loading.  This was Exhibit 2.  Do you see
14  here that it says you were enrolled in Bogan on
15  September 10th, 2018?
16  A  Yes.
17  Q  Okay.  So prior to that, that's when you were
18  at the charter school your freshman year?
19  A  Wentworth is a elementary school.
20  Q  Right.  So there's a gap, we don't have any
21  record for 2017 because you were at a charter school,
22  right?
23  A  Correct.
24  Q  So you were not at Bogan in April of 2018,

Page 299

1  right?
2  A  No.
3  MS. HOMER:  Okay.  That's it.  That's all I
4  have.
5  MS. ROSENBERG:  John, I've got two also,
6  actually it's three.
7  FURTHER EXAMINATION
8  BY MS. ROSENBERG:
9  Q  Kaya, do you have any evidence as you sit here
10  today that you were disciplined for failing to meditate?
11  A  If I was to try to come in contact with any --
12  with people that I went to school with, then yeah.
13  Q  No, you personally, were you ever disciplined
14  for failing to meditate?
15  A  For not meditating?  Yes.
16  Q  And are you referring to when you got sent to
17  the principal's office?
18  A  Correct, when I got sent to the dean's office.
19  Q  Okay.  But you never received an in-school
20  suspension or any marks on any of your records, is that
21  correct?
22  A  Correct.
23  Q  Okay.  And you never received any
24  out-of-school suspension for failure to meditate, is

Page 300

1  that correct?
2  A  Correct.
3  Q  Okay.  You testified earlier that your
4  grandmother did your enrollment.  You don't know all
5  the, you know, pieces of paper she may have received or
6  that she was provided upon when she was enrolling you in
7  school, is that correct?
8  A  Correct.
9  Q  Okay.  And do you know that CPS has
10  discontinued the Quiet Time Program as of the school
11  year 2019-2020?
12  A  Yes.
13  Q  Okay.  And where did you learn that from?
14  A  Just recently.
15  Q  Okay.  Was that in connection with your
16  participation -- or in your communications with Amontae?
17  A  No.
18  Q  Where did you learn that from?
19  A  Just when you -- when Jim said it.
20  Q  Okay.  So today at today's deposition?
21  A  Yes.
22  MS. ROSENBERG:  Okay.  That's all I have.
23  MR. MAUCK:  All right.  Good job, everybody.
24  Thank you all.  Any more questions?  All right.

Page 301

1  Thank you, Kaya.  And we'll look forward to a
2  transcript.  We'd like one, Christina, no
3  emergency.  Anything else?
4  MR. SIPCHEN:  Do you want to explain
5  signature?
6  MS. SALISBURY:  I was just going to say.
7  MR. MAUCK:  We'll go over it before we sign
8  it.  We're not going to just waive signature.  And
9  we'll correct the declaration with those dates.
10  Thank you for helping out.  Everybody got a little
11  bit confused there.  I think we got it straightened
12  out with the help of the written records.  So thank
13  you all.  We'll sign off.
14
15  (WITNESS EXCUSED.)
16
17
18
19
20
21
22
23
24

76 (Pages 298 - 301)

Page 302

1 STATE OF ILLINOIS)
) SS.
2 COUNTY OF C O O K)
3       The within and foregoing deposition of the
4 aforementioned witness was taken before Christina M.
5 Cummins, C.S.R., and Notary Public, at the place, date
6 and time aforementioned.
7       There were present during the taking of the
8 deposition the previously named counsel.
9       The said witness was first duly sworn and was
10 then examined upon oral interrogatories; the questions
11 and answers were taken down in shorthand by the
12 undersigned, acting as stenographer and Notary Public;
13 and the within and foregoing is a true, accurate and
14 complete record of all of the questions asked of and
15 answers made by the aforementioned witness, at the time
16 and place herinabove referred to.
17       The signature of the witness was not waived,
18 and the deposition was submitted, pursuant to Rules
19 30(e) and 32(d)4 of the Rules of Civil Procedure for the
20 United States District Court, to the deponent per copy
21 of the attached letter.
22       The undersigned is not interested in the
23 within case, nor of kin or counsel to any of the
24 parties.

Page 303

1       I further certify that the deposition
2 terminated at 6:40 p.m.
3       Witness my official signature and seal as
4 Notary Public in and for Cook County, Illinois on this
5 24th day of March, A.D. 2022.
6
7
8       [signature]
9       Christina Cummins
        Notary Public
10      License No. 084-003157
        One North Franklin Street
11      Suite 3000
        Chicago, Illinois  60606
12      Phone:  312.442.9087
13
14
15
16
17
18
19
20
21
22
23
24

Page 304

1                    Veritext Legal Solutions
                     1100 Superior Ave
2                    Suite 1820
                     Cleveland, Ohio 44114
3                    Phone: 216-523-1313
4
     March 25, 2022
5
     To: John Mauck, Esq.
6
     Case Name: Williams, Amontae, et al. v. The Board Of Education Of The
7    City Of Chicago, et al
8    Veritext Reference Number: 5124837
9    Witness:  Kaya Hudgins        Deposition Date:  3/11/2022
10
     Dear Sir/Madam:
11
12   Enclosed please find a deposition transcript.  Please have the witness
13   review the transcript and note any changes or corrections on the
14   included errata sheet, indicating the page, line number, change, and
15   the reason for the change.  Have the witness' signature notarized and
16   forward the completed page(s) back to us at the Production address
     shown
17
     above, or email to production-midwest@veritext.com.
18
19   If the errata is not returned within thirty days of your receipt of
20   this letter, the reading and signing will be deemed waived.
21
     Sincerely,
22
     Production Department
23
24   NO NOTARY REQUIRED IN CA

Page 305

1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
      ASSIGNMENT REFERENCE NO: 5124837
3      CASE NAME: Williams, Amontae, et al. v. The Board Of
     Education Of The City Of Chicago, et al
       DATE OF DEPOSITION: 3/11/2022
4      WITNESS' NAME: Kaya Hudgins
5      In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7      I have made no changes to the testimony
     as transcribed by the court reporter.
8
     _____
9    Date        Kaya Hudgins
10     Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12
     They have read the transcript;
13   They signed the foregoing Sworn
         Statement; and
14   Their execution of this Statement is of
         their free act and deed.
15
     I have affixed my name and official seal
16
     this _____ day of_____, 20____.
17
18   _____
     Notary Public
19
     _____
     Commission Expiration Date
20
21
22
23
24
25

77 (Pages 302 - 305)

Page 306

1          DEPOSITION REVIEW
           CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 5124837
3        CASE NAME: Williams, Amontae, et al. v. The Board Of
     Education Of The City Of Chicago, et al
         DATE OF DEPOSITION: 3/11/2022
4        WITNESS' NAME: Kaya Hudgins
5        In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7        I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
8    well as the reason(s) for the change(s).
9        I request that these changes be entered
     as part of the record of my testimony.
10
         I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____
     Date          Kaya Hudgins
14
         Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17       They have read the transcript;
         They have listed all of their corrections
18         in the appended Errata Sheet;
         They signed the foregoing Sworn
19         Statement; and
         Their execution of this Statement is of
20         their free act and deed.
21       I have affixed my name and official seal
     this _____ day of _____, 20____.
22
23   _____
         Notary Public
24
25   _____
         Commission Expiration Date

Page 307

1          ERRATA SHEET
           VERITEXT LEGAL SOLUTIONS MIDWEST
2          ASSIGNMENT NO: 5124837
3    PAGE/LINE(S) /       CHANGE       /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19
     _____  _____
20   Date          Kaya Hudgins
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23   _____
         Notary Public
24
     _____
25   Commission Expiration Date

**[& - 299]**

| **&** |
|---|
| **&** 2:2,11,16 23:14 75:14 100:21 102:10,21 103:16 107:16,22 108:8 131:24 215:8 216:4,12,18 226:22 227:1 228:7,19,22 229:17,21 230:1 230:11,23 231:8 231:13,20 234:13 234:17,21 235:2,3 235:6,14 |

| **0** |
|---|
| **000001** 108:18 |
| **013500** 64:18 |
| **017080** 27:19 |
| **04540** 1:7 |
| **084-003157** 303:10 |

| **1** |
|---|
| **1** 2:3 3:12 9:12,17 21:15 109:9 217:1 248:22 250:5 |
| **10** 3:22 234:5,8 238:5 274:4 279:19 |
| **100** 3:6 |
| **103** 3:17 |
| **10:00** 128:7 131:5 |
| **10:37** 1:22 |
| **10th** 298:15 |
| **11** 3:17,23 103:8 103:19 108:16 114:14 282:22 283:2,5 284:19,22 |
| **11/1/18** 156:2 178:5 |

**11/5/18** 277:6
**11/6/18** 278:10
**1100** 304:1
**11th** 1:22 76:4 104:16
**12** 3:24 52:18 295:18,20
**13** 278:24
**1409** 119:7,10
**15** 37:16 80:5,7 84:18 191:5 267:12,15,18,21 267:23 274:6 278:16,18 294:16 298:1
**152** 3:18
**16** 80:1
**17** 84:20
**17004** 3:23 284:4
**17006** 3:23 284:5
**18** 84:19 120:11 128:11 129:10
**1820** 304:2
**19** 65:20
**1:15** 99:19
**1:20** 1:7

| **2** |
|---|
| **2** 3:13 27:15,21 155:17 246:15,22 298:13 |
| **20** 37:16 52:18 148:20 154:15 224:18 225:11 273:22 305:16 306:22 307:22 |
| **20,000** 132:14 154:19 |
| **2003** 65:18 |
| **2016** 29:3 79:19 217:13,15,20,21 235:7,11 237:16 |

237:19,22
**2016-2017** 234:23
**2017** 29:3,14,15,19 29:20 79:19 235:7 236:2 293:18 298:21
**2017-2018** 234:23
**2018** 28:21 29:4 65:23 79:16 113:1 113:21 114:4 119:2,6,12 120:3,9 121:2,6 135:2 140:2 143:9,10 144:2 160:22 187:4 236:2,2,10 236:11 237:12 238:18 248:22 250:5 268:4 276:4 277:12 278:24 286:13,21 298:6,9 298:15,24
**2018-2019** 238:22
**2019** 69:13,15 124:6 140:2 159:10 236:3,9,10 236:11 237:13 238:18 241:17 242:13,20 245:8 285:16,20 286:12 287:15,19 289:8 289:12,13 293:15 293:17
**2019-2020** 79:4 241:14,22 242:4,9 300:11
**2020** 26:1 28:24 29:24 30:22 31:3 79:13,16 119:2 121:12,23 124:6 125:4 126:1 187:4 213:6 236:9 245:9

246:5 247:4,7,11
247:17 248:10
287:22
**2021** 8:18,21 27:9
27:11 30:19 79:7
79:13 86:18 126:1
126:22 127:3
128:16 154:8,18
154:19,22 155:10
166:22 199:12,20
200:3 209:3
211:18
**2022** 1:23 76:4
103:18 104:16,17
106:21 110:11
137:16 303:5
304:4
**20454** 303:8
**215** 3:19
**216-523-1313** 304:3
**21st** 103:18 104:16
106:20 110:13
**222** 3:20
**223** 3:21
**22nd** 65:18
**233** 2:18 3:7
**234** 3:22
**24** 101:19,22 197:17
**24th** 303:5
**25** 154:16 304:4
**2500** 2:12
**27** 3:13,20 222:14 223:9
**2735** 223:10
**283** 3:23
**295** 3:24
**297** 3:5
**299** 3:6

**[2:45 - addresses]**

**2:45** 148:21

**3**

**3** 3:14 64:5,16,20
155:22,24 217:1
222:3 248:16,17
256:22 257:5
267:1 276:2 277:5
277:14 278:22
**3/11/2022** 304:9
305:3 306:3
**30** 64:11 130:12
302:19
**300** 97:24 136:10
**3000** 303:11
**312** 112:23
**312.346.1973** 2:13
**312.442.9087**
303:12
**312.726.1243** 2:4
**312.876.7700** 2:19
**32** 302:19
**35** 3:20 222:14
223:9,11 224:14
**36** 3:21 223:16
**3:00** 148:22 149:2

**4**

**4** 3:5,16 75:3,3,13
75:18 103:3 217:2
234:14 235:17
302:19
**40** 224:6
**44114** 304:2
**4:49** 221:5

**5**

**5** 3:17 103:3,4,6
154:23,23 247:4
268:4 276:4
**500** 137:7
**5124837** 304:8
305:2 306:2 307:2

**53** 3:21 223:16
**5800** 2:17
**5:00** 232:6

**6**

**6** 3:18 152:5
153:20 277:12
**600** 2:3 137:7
**60602** 2:3,8
**60606** 2:18 303:11
**60606-4673** 2:13
**64** 3:14
**6:00** 128:7,7,8
131:6
**6:40** 303:2

**7**

**7** 3:19 214:23
215:3
**7,000** 154:23
**709-8671** 112:23
**71st** 119:7,10
121:10 122:12
123:1
**73rd** 91:23 92:3,11
92:21
**74** 3:16
**773.553.1700** 2:8

**8**

**8** 3:20 222:12,14
223:5 224:13,15
**89** 104:8
**89-1** 104:7,12

**9**

**9** 3:12,21 223:12
223:14 225:4
**9/9/21** 108:19
**90** 294:10
**900** 2:7

**a**

**a.d.** 1:23 303:5
**a.m** 128:7
**a.m.** 1:22 128:7,8
**abandon** 244:7,9,9
**able** 10:20 42:22
70:1 103:22
143:13,19,21,24
145:8 181:12
191:21 202:6,15
202:15 289:18,19
**absence** 124:18
**absent** 124:14
**absolutely** 89:13
**abused** 188:15
**academically**
32:14 60:3,4
182:9
**academics** 239:24
**academy** 27:6,8,11
79:3,13
**accepted** 128:1
**access** 103:1,22
116:6,6,9,12,13,14
**accommodate**
145:8
**accommodations**
246:1
**account** 94:22
115:5,6,9,21 116:8
116:21 117:4,7,10
117:15,24 221:17
**accounts** 93:17
95:4 115:4,11
116:2,4,10,17,18
117:15,18,20,23
**accuracy** 124:15
**accurate** 100:22
102:18 103:16
104:17 111:14
119:3 121:7,13,24

125:4 145:23
155:2 158:1
160:17 161:18
172:8 178:1
189:21,24 190:5
190:14 215:9
217:10 302:13
**acknowledge**
305:11 306:16
**acquainted** 86:9
**act** 39:3 229:12
230:2,7,9,10,17
305:14 306:20
**acting** 302:12
**action** 12:17,20,21
13:6,9,12,14 59:23
59:24 63:12
101:15 108:20,23
249:19 251:22,23
253:24
**active** 53:10,12
129:2
**activity** 249:12,15
249:23 275:10
**acts** 22:7,9 228:8
228:22,24 229:3
229:15,20,24
230:3,6,13
**actual** 220:12
**additional** 182:16
182:17,18 216:1
230:24 231:4
**address** 10:6
91:10 94:3,7,10,13
94:15 119:5
121:10,13 123:1,8
125:8,15 126:7
304:16
**addresses** 94:18
125:3

adequate 294:18
administration
  34:19
administrators
  192:2
advocacy 181:21
advocate 50:13
  51:1,5 53:22,23
  57:24 71:15
  176:20 180:4
  250:13,20 251:1
advocates 51:21
  58:4
advocating 52:22
  55:22 181:5,8,17
affect 32:14 60:2,4
  60:6 101:19,22
  202:22,23
affidavit 235:15
  238:2,5
affiliated 24:1,21
  25:1,17
affiliation 26:3
affixed 305:15
  306:21
aforementioned
  302:4,6,15
afternoon 37:24
  170:11 297:12
age 84:11 120:12
  120:13
ago 7:23 8:17
  24:11,11 27:13
  78:4,5,5,6,7 80:15
  82:14 88:7 92:6
  96:9,10,12,13
  110:5 118:13
  166:7,24 167:1
  212:22
agree 233:7
  251:19 253:18

256:6 290:9
agreed 268:10
agreement 3:12
  9:10,22 21:17
  100:21 226:22
  227:1 228:13
  229:16,21 230:10
ahead 15:13 23:19
  36:14 44:13 52:9
  56:9 63:2 65:3
  99:10 133:4
  143:16 151:6
  155:13 158:9
  179:14 190:24
  252:15 258:3
  283:22 297:8
ahm 160:5,5
al 304:6,7 305:3,3
  306:3,3
alcohol 101:21
  146:16
alerted 145:5
align 149:19,20
aligned 147:3
allah 140:18,19
  146:5,8 230:9
allegedly 97:23
allow 18:13,15
  50:15
altar 44:20 46:7
  46:12,13,24 47:12
  56:13 170:21,22
  272:6
alternative 30:17
  30:18 196:10
altogether 294:3
amandla 26:16,17
  26:18 79:18
ambassador
  176:24 177:3
  179:12,17 180:4

250:2,6,14,20
251:2,16,24
252:18,24 253:21
254:2,7,15,17,24
256:14 257:24
258:6,16 259:3
280:13,16 281:5,9
281:14,17,21
282:8
ambassadors
  282:2
ambiguous 132:20
amended 104:8
  107:1,5,6 108:20
  108:23
amontae 1:3 7:20
  7:21 9:1 12:6
  14:11,21 15:4,22
  23:23 24:3 33:24
  34:2 81:20,21
  82:20 83:7,17
  84:4,10,14,18,24
  85:13 86:7,13
  87:2,23 88:2,14,23
  89:7,20 90:11,17
  90:19 91:20 92:3
  92:18 93:20 94:2
  94:5,8,19 95:1,7
  95:10,14 96:19
  97:6,10,18 98:12
  98:18 99:5 100:3
  104:7 105:14,18
  108:4,5,8,12,17,22
  109:10 110:8
  111:1,13,23
  115:18 116:20
  117:3 118:7,17
  125:7,12 127:13
  128:18 129:2
  134:12,19 135:6
  135:24 137:18

166:10 183:15
192:21 193:21
194:7 195:3
196:14,19 198:11
199:23 200:2
202:13 204:12
206:19 207:5,15
208:14 209:5
211:22 213:11,21
215:8,11 216:7,15
220:3 226:24
227:4,13,18
300:16 304:6
305:3 306:3
amontae's 83:11
  104:12,13,19,22
  105:9 107:18
  109:18,22 110:4
  110:15 195:20
  205:8,18,24
  209:11 226:21
amount 58:8
  136:23
angels 149:16
anger 200:8,9
angry 200:6 204:1
  204:3
announcement
  178:24 191:12
announcements
  179:3 191:18
answer 5:12 15:13
  20:14 23:4,20
  36:15 44:1,4 63:2
  63:3 67:20 108:14
  145:17 154:7
  155:13 159:15
  219:6 230:20,21
  232:10,24 250:8
  252:11 265:16
  278:14 283:6,20

**[answered - back]**                                                    Page 4

**answered** 71:2
  94:10 98:17
  143:16 250:7
  258:2 276:15
  277:1 292:9
**answering** 44:8
  70:23
**answers** 5:20
  280:3 302:11,15
**antique** 173:1
  175:3
**anxious** 186:18
**anybody** 43:24
  249:8 256:8
  257:19 259:23
  261:22 290:21,24
  292:5 293:3,12
**anymore** 24:23
  54:19 100:9 117:9
  289:24
**anyplace** 134:6
**anyway** 106:23
  220:19 252:3
**apartment** 91:4,20
  92:3,12,22 134:12
  134:16,19
**apologize** 286:18
**app** 145:4
**apparently** 65:22
**appear** 4:20
  305:11 306:15
**appeared** 2:1,5,10
  2:15,20
**appears** 103:20
**appended** 306:11
  306:18
**apple** 114:24
**application** 3:14
  155:19 156:1
  167:8,13 168:12
  178:4 217:10

**218**:3,6,13 248:18
  257:6
**applied** 127:22
**apply** 127:24
**approach** 254:16
  254:22 255:6
**approached**
  245:18 281:13
**appropriate** 221:3
**approximate**
  137:4
**april** 65:18 298:8
  298:24
**arizona** 120:7
  161:20
**arm** 182:24
**arms** 204:23
**arrest** 210:9,14
  211:18
**arrested** 22:24
  97:18 125:14
  208:13 211:17
**arrived** 235:18
**artist** 83:16
**aryeh** 107:23
  215:5
**aside** 41:12 50:22
  51:4 71:22 255:17
  272:23,23
**asked** 26:8 33:9
  40:19 43:3 51:4
  81:4 89:20 96:23
  143:16 145:16,20
  150:8 158:17
  177:7,21 178:9
  182:22 216:6
  219:20,24 222:5
  232:16 250:7
  252:11 258:2
  276:4,24 277:18
  279:3,5 282:8

**286**:12 292:9,19
  302:14
**asking** 4:15 8:9
  23:1 28:10 40:8
  44:15 45:9 47:16
  56:19 72:19 81:19
  82:9 89:11 100:16
  109:12 181:3
  193:23 220:20
  221:8 222:22
  226:6,8 229:10
  247:24 251:7
  252:19,21 253:7
  253:15 276:18,23
**asks** 223:20
**aspect** 270:17
  271:6
**assent** 222:18
**assessment** 179:11
**assigned** 211:2
**assignment** 305:2
  306:2 307:2
**assistant** 31:22
  32:1
**associate** 220:1
**associates** 195:8
  262:3
**assume** 232:24
**asthma** 171:22,23
  171:23,24 172:2
**athletic** 85:6,7
**attached** 104:4
  107:4 108:16
  302:21 306:7
**attachments**
  103:20 106:14
**attend** 26:14,22
  27:1,4 29:7 32:24
  55:2 236:9 247:10
**attendance** 26:12
  28:2,9,13 124:13

**138**:3,23 140:7
**attended** 20:6
  28:18 29:11 68:14
  79:3,12,15,18
  236:7 246:24
**attending** 28:23
  29:16 31:13 41:5
  58:6 68:17,19
  138:11 290:12
**attorney** 5:7,9
  106:21 228:10
  232:14 297:13
**attorneys** 76:20,23
  77:4,9,14,17 80:14
  80:17,23 81:6
  100:14 101:24
  102:4 107:15
  212:1 215:24
  230:1
**audio** 44:7
**august** 97:10,16
  97:19
**aunt** 126:5
**aunt's** 122:18
  126:5
**authority** 120:16
**authorize** 306:11
**ave** 304:1
**average** 182:14
**avoid** 22:6 228:22
  229:12,24
**awake** 279:20
**aware** 33:22 37:1
  209:10
**awhile** 87:10
  96:11 162:6

**b**

**b** 3:10 58:20
**b's** 182:15
**back** 7:14 8:15
  21:16 24:13,24

**[back - board]**

25:11 29:6 36:20
43:6 48:17 62:6
64:13 70:22 73:24
75:21 78:14 81:4
92:12,22 96:9
99:23 106:5,7,9,23
122:9 123:1
135:24 138:2
142:2 143:9
148:16,20 149:2
151:19 162:9
167:14 168:1
169:10,10,11
170:20 178:3,4
189:12 197:10
198:5,6,22 199:6
204:13 219:12
221:24 224:13
225:10 226:19
235:17 236:21
241:13,16,19,21
242:3 248:6
251:12 252:5
265:14,16 269:24
276:2 280:13
288:6 289:3
304:16
**bad** 11:23 84:7
89:6 131:24 200:4
**baker** 2:2 23:15
75:14 100:21
102:10,21 103:16
107:16,22 108:8
215:8 216:12,18
226:22 227:1
228:7,19,22
229:17,21 230:1
230:11,23 231:8
231:13,20 234:13
234:17,21 235:2,4
235:6,14

**baker's** 216:4
**ballpark** 154:11
**based** 12:4,11
19:19 157:24
183:23
**basic** 233:8 240:4
240:5
**basically** 4:21
12:22 18:16 22:13
32:18 35:11 69:6
88:11 89:3 102:10
120:11 122:6
126:11 127:16
135:12 136:12
138:21 140:2,6
146:9 149:23
151:7,8 152:19,23
157:23 159:10,16
161:15 171:14
190:3 191:1,21,24
208:14 211:8
222:2
**basics** 5:6
**basis** 122:14
**bates** 27:19 64:17
103:8,19 222:14
223:6,8,16 284:2
**bathroom** 135:8
**battling** 151:5
**bearing** 27:19
64:17
**beat** 5:11
**beauty** 127:12,17
**bedroom** 135:8
**began** 191:16
**beginning** 58:1
137:5 140:7
199:10 285:1
288:16,18
**behalf** 2:5,10,15
2:20 150:2

**belief** 149:8,12
**beliefs** 30:9 56:4
59:10 70:1 88:20
143:9 146:4,19
147:6,24 149:9,17
149:22 150:6
241:4,8 244:17
**believe** 7:23 9:6
16:11,11 17:9,11
17:15 18:8 20:11
29:1 31:4 40:6
41:20 56:2 77:18
83:12 84:6,20
88:21,22 89:1
92:20 97:11,15
101:6 102:14
104:2 119:7
126:23 127:12
128:5 130:16
131:2 135:21
143:2 147:2,9,11
147:14,16,18,20
149:14,14,16
150:11,17,21,22
151:12,15 153:24
156:9 159:24
161:5 168:15
171:17,23 172:14
181:1,3,4 182:8
189:8 195:2 207:7
213:6 214:24
215:22,22 223:3
224:12 225:18,18
226:2 246:5
257:16 270:21,22
278:15 298:7
**believed** 142:21
**bell** 46:21 48:16
191:5,6
**bells** 125:8

**benefited** 156:24
**benefits** 67:11,18
**best** 72:16 83:1
87:22 160:16
189:11 202:2
**better** 5:21 25:15
29:13 182:11
185:19 283:14
**beyond** 36:13
107:18 138:19
143:2
**big** 172:15 173:6
203:22
**biggest** 150:10
**billed** 231:4
**billing** 101:10
231:8
**bills** 201:2
**bipolar** 162:16
**birth** 209:6
**birthday** 65:18
203:20
**bit** 8:17 26:11
103:10 119:9
183:9 200:18
232:12 238:16
243:6 301:11
**black** 85:20 86:3
173:18
**block** 118:22
**blocked** 37:17
118:21,23
**blood** 81:16 183:1
222:17 224:16
**bloom** 67:21,23
**blow** 29:12
**board** 1:8 2:7,10
27:17 32:22
100:14 108:17,17
109:9,10,18,23
110:4,8,15 227:5

**[board - certain]**                    Page 6

297:13 304:6
305:3 306:3
**bodily** 218:22
**body** 71:3 81:17
207:12 224:8
256:24
**boe** 3:23,23 27:19
284:4,5
**bogan** 14:1,3
15:18 16:11,11,23
17:15,15 26:24
27:3 28:18,20,23
29:10,21 30:3,22
31:3,13,23 34:10
36:10,14,19 37:1
41:5 43:16 46:2
50:7 51:7,8 53:6
53:10,16 55:23
57:1,5 58:22 66:2
68:14,17 69:22
73:22,24 79:15
81:22 82:20 84:18
85:7,10,14,16,20
85:23 86:7 87:6
95:24 100:15
113:21 118:24
119:2 122:16
124:13 138:2,3
139:5 142:6,11
143:12,20 145:3,7
148:8 160:3 161:1
161:16 163:9,17
163:22 166:14
172:2 178:14
183:2 184:16
187:7,13 189:21
190:21 191:8,22
192:1,11,14,22
195:4,5 196:18,23
212:10 213:2,18
214:3,11 236:1,9

236:12 237:4,12
237:19 238:17,22
239:6 240:3,8,14
240:21 241:10,14
241:16,21 242:4
242:13 243:4
244:15 246:6,9
247:5 248:4,6,9,19
250:3 251:9
253:20 254:14,17
259:13,17 283:7
284:15 285:2
287:7,22 288:6,7
288:11 289:11,13
293:7 296:2 298:3
298:5,8,14,24
**book** 38:7 107:23
108:1,5
**books** 81:7
**bothered** 208:8,9
**bottom** 66:12
248:21
**boujee** 131:24
**bowl** 46:14 268:17
268:17
**boy** 83:4,5
**braid** 136:12,17
**brand** 100:7
**break** 41:13,15,22
42:3,4 43:1 64:11
88:4,8 89:11,14
99:16 148:11,20
200:11 219:3,4,7
241:13
**breaks** 294:19
**breasts** 224:8
**breathe** 48:9
**brief** 64:14 106:8
**briefly** 106:15
168:13

**bright** 85:4
**brightstar** 166:9
**bring** 280:22
**bringing** 286:2
**brochures** 81:7
**broke** 92:6 96:20
97:3 201:13,18
**broken** 135:24
200:14
**brought** 12:4
281:5
**brown** 82:24
**browser** 72:12
**bunch** 108:8
**business** 151:20
152:21 153:6,9,13
154:18,21 155:1
155:10
**buy** 152:21
**bye** 195:7

**c**

**c** 302:2
**c's** 182:15
**c.s.r.** 302:5
**ca** 304:24
**cafeteria** 70:14
**call** 20:20 84:1
138:6,7,8,19
161:13 164:7,9
195:7 289:1,2
**called** 15:22 32:6
41:20 127:11
130:18 131:24
135:20 176:24
177:2 207:15,18
**calls** 63:1 102:3
211:24 230:19
**calm** 50:2,5 71:16
156:21 157:11,12
**campus** 20:9

**canceled** 31:7
**candles** 172:12
173:4,11 174:13
**car** 78:19 129:7
202:13
**card** 224:18
**care** 205:22
231:16,17
**career** 84:3
**carefully** 236:23
237:7 273:3
**caroline** 248:13
**carolyn** 2:17 23:7
44:5 64:8 102:24
155:18,22 246:13
297:8
**carolyn's** 23:10
44:4
**carrier** 113:8,10
113:12 114:2
**carriers** 114:10
**carrying** 209:16
**cart** 208:18
**case** 1:7 5:3,12 8:3
14:15 22:3 24:7
98:2,8,12,19 111:9
111:18 112:6
212:22 302:23
304:6 305:3 306:3
**cases** 13:6,10
**casually** 93:6
**catch** 237:2
**caught** 237:10
**caused** 40:3
**ceased** 287:22
**cellphone** 100:3
**cents** 255:9,11
**ceremony** 56:8
80:10,13
**certain** 191:2

certificate 306:11
certification 305:1
  306:1
certify 303:1
chairs 170:18
challenge 14:12
challenging 13:19
  14:5 15:7
change 26:11 55:8
  113:3 138:1
  146:19 287:14
  304:14,15 306:8
  307:3
changed 65:9
  71:18 114:10
  123:4
changes 211:6,7
  218:22 224:8
  233:21 304:13
  305:7 306:7,9
charges 210:8
  231:20
charter 26:18,19
  26:19 29:11,16,20
  298:18,21
chartered 2:11
chat 197:13
chatted 197:24
cheat 207:23
cheater 207:15
cheating 61:10
check 106:4
  115:16 176:12
  182:17 211:1,4
checked 100:2
  156:7
checking 294:8
chemicals 81:17
chicago 1:9,10 2:3
  2:7,8,10,13,18,20
  11:11 12:2 19:5,8

19:11,17 20:4,7,12
21:3,7,10 26:13,17
26:20 27:18 28:2
28:12,13 29:19
31:7,10 32:22
41:1,24 42:10
76:7,10 78:23
90:21 91:21,22
92:14,16 122:5
126:6 161:19
164:5 198:5,22
199:6 220:5 227:6
244:12 248:8
260:21,22 295:21
303:11 304:7
305:3 306:3
child 188:14,15
  231:17
childhood 188:9
  188:11,18
children 119:24
  260:19
choices 137:24
choose 150:13,15
chores 202:10,10
christ 24:6 150:17
christian 23:15
  24:14 147:6 149:9
  164:14,15 165:1
  165:22,23 229:3,8
  229:11
christianity 23:18
  24:1 26:6,9
  149:11,13,23
  150:2,7 165:4
christians 57:6,7
  149:14 164:18
christina 1:19 2:6
  3:6 75:4 99:9,12
  100:13 108:14
  153:19 155:18

158:18 214:21,22
220:4 234:1 301:2
302:4 303:9
church 88:14,16
  88:19 165:7,14,24
  166:3,5,6,8,10,13
  166:18,23
circle 82:20
city 1:9 2:10 198:4
  304:7 305:3 306:3
civil 1:20 302:19
  305:5 306:5
claim 106:18
claiming 159:9
clarify 149:21
  154:7 190:21
  217:8 286:11
class 12:17,19,21
  12:22 13:6,9,11,11
  13:12,14,17,19
  14:4 17:7 37:5
  38:6,23 46:3
  51:15,18,20 52:14
  60:15,16,21 82:2
  85:14 101:15,15
  108:20,23 139:5,7
  139:10,19,22
  140:7,8,12 142:2,5
  142:13 145:23
  159:8 169:18
  178:21 181:12
  182:17,19 217:7
  227:15 237:17,22
  240:8 264:13,14
  264:24 271:17
  272:13,20,24
  273:7,8,18,21,23
  274:2,3,9,22
classes 82:3
  126:12,14 145:15
  193:13 214:3

239:21 240:2,4,5,6
285:10
classmates 15:24
  33:4 57:12,20
  158:8 177:11,14
  177:18,22 178:18
  271:14
classroom 17:3
  39:19 40:3,19
  43:19 44:17 49:13
  49:21 51:22 52:1
  52:3 60:1,14,17
  61:17,23 62:20,24
  63:17 138:8,20
  142:9 145:6,21
  159:16 169:22,24
  170:18 178:13
  179:8 189:15,19
  189:20 190:3
  191:8 226:12,16
  261:3 262:21
  263:15,16 264:3
  266:11 267:21,24
  274:1
classrooms 48:20
clean 294:11
cleaning 134:1,2
  136:7,12,14
clear 109:17
  110:21 112:4
  142:24 155:4
  172:24
cleveland 304:2
client 21:20,22
  22:6 23:2 36:13
  106:21 228:10,12
client's 22:8
close 48:9 81:19
  89:14 110:2 130:9
  130:11 156:15
  221:6 280:12

285:2

**closed** 39:5 143:4
181:24 190:18
262:18

**closer** 248:7

**closest** 158:14,21

**closing** 262:13

**clothes** 85:1 86:3
171:8

**clothing** 85:20
194:19

**coffee** 43:5

**cold** 239:19

**college** 19:9,10,10
19:13,14,15,17

**color** 173:18,20

**colors** 173:21,24

**come** 7:8 8:15
50:23 51:20,21
52:1 87:17 97:7
136:11 148:20
198:5,6,11,17,23
204:13 215:16
220:18 255:10
289:3 299:11

**comes** 13:10 59:16
106:7 136:19
169:10

**comfortable**
139:14

**coming** 35:8
122:20 124:19
143:23 198:9
199:23 209:2

**comments** 278:8

**commission**
305:19 306:25
307:25

**commit** 206:21

**common** 62:2,7
82:17,24 229:6

230:4

**commonsense**
183:24

**communicate**
87:21 94:8,19
114:22 115:17
118:21 280:21

**communicated**
47:15 95:7,10,14

**communication**
115:1

**communications**
99:4,6 300:16

**companies** 131:17
131:19

**company** 127:11
129:24 130:14,15
130:17,19 131:1
131:24 132:12,17
132:24 133:12,16
133:19 134:2
136:7 154:8

**company's** 131:21

**compare** 105:1,4

**complain** 31:16,21
32:1,21 33:5,6

**complained** 31:19
34:2 62:22 63:6
225:12

**complaining** 33:1
33:11,15,23 40:14
40:17 53:3 54:3,6
62:10,15,18 63:18
63:22 255:13

**complaint** 104:8
107:1,5,6 108:20
108:23

**complaints** 31:12
34:19

**complete** 5:22
222:6 240:13

302:14

**completed** 223:23
304:16

**completely** 98:8
135:22 167:23
259:9

**completing** 223:2
223:22 224:11,19

**computer** 72:12
145:12

**concern** 289:20,22

**concerns** 69:16
259:24

**concluded** 241:7

**conclusion** 230:20

**conclusions** 23:2

**condition** 148:1,2
203:11

**conditions** 196:22
203:11

**conference** 6:2

**confidential**
224:22

**confines** 291:17

**confirm** 100:1

**conflict** 139:16
140:3 147:6,8
149:17,18,22
157:12

**conflicts** 149:9,10

**confused** 112:2
237:5 275:12
301:11

**confusing** 8:10
42:18 79:2 275:11
280:15

**confusion** 286:15

**connection** 13:1,6
18:23 21:5 81:11
81:15 281:21
300:15

**consent** 35:10,11
35:20,21,23,24
36:2,5,6 66:9
79:24 80:3,8
167:10,18 217:7,9
218:10,16 224:15

**consequences**
262:22 263:1

**consider** 13:16,18
14:3,9 26:2

**considered** 25:17

**consistent** 247:5

**constituted** 228:8

**contact** 87:6,18
93:1 95:23 117:7
117:9,10 163:22
193:2,20 197:10
205:17 213:17
214:17 215:4
243:20 288:24
299:11

**contacted** 118:7
216:12

**content** 76:24

**contents** 77:9
238:1

**continue** 125:2
181:17 185:17
221:18 224:4
229:24

**continued** 165:24
279:23

**continues** 279:6

**contribute** 201:4

**contributed** 74:23

**control** 48:14
183:12,13,16

**convenience**
108:24

**conversation** 24:8
40:12 46:23 54:17

62:11 77:8,12,16
86:11 118:19
193:7,17,18
196:13 197:5
271:23 287:11
**conversations**
34:12 40:22 76:23
77:3 93:13 195:17
198:3 212:15
214:14 245:22
285:15 286:7,22
**convert** 164:19,22
165:13
**converted** 164:17
**cook** 303:4
**cooperate** 21:23
**cooperation** 21:20
**copies** 106:1 109:1
**copy** 64:23,24
65:3,4 75:7 77:19
98:22 99:1,6
102:15 107:12,22
108:21 110:7
234:8 238:4
295:20 297:21
302:20
**core** 146:3,11
**corporate** 116:17
**corporation**
132:24
**correct** 4:22,23
9:10 11:7,12
12:15 14:5,6 15:8
16:24 20:5 21:17
25:21,22 28:18,24
29:22 30:20 34:22
34:23 38:1 42:13
46:4 47:8 48:21
48:22 49:1 53:2
55:1,6,14,15,20
59:5,11 61:9 62:4

62:21 63:8,24
64:3 65:24 67:7
69:3 71:3,13,16,17
72:18,20 73:8,12
74:6,12,13 76:5,10
76:16 77:10 79:7
79:13,20 80:9
89:21 90:8 92:13
92:23 97:1 105:13
120:17 134:21
145:24 150:23,24
155:3,17 160:20
160:21 164:16
176:16 178:17
182:5 190:15,18
191:19,20 192:5,6
192:24 193:19
195:15 197:11
204:6,7 211:15,16
217:14 227:21
233:18,21 234:15
234:20 235:4,5,12
235:15 236:12,13
236:14,15 237:14
237:23,24 238:15
238:19,20,23,24
240:23,24 241:8,9
241:12 242:17,18
243:11 244:14
245:3,6,24 246:6
247:8,11,13
248:23 249:17,23
250:3,4,17 251:14
252:20 253:1,5
256:16 257:2,7,8
257:13,16,21,22
258:10 259:18,19
259:22 260:1,2
261:17,20,21,24
262:14 263:21,22
265:11,12,18,19

266:12 267:8,11
268:4,7,11,12
269:8,9,17 270:5,6
270:14 271:22,24
272:1,8,9,16
273:10,12,14
274:17,18 275:17
275:24 276:7,12
276:22 277:2,3,5,7
277:16,19 278:10
278:24 279:3,8,20
279:21 280:11
281:11 282:23,24
287:5,17,19,20,23
287:24 288:22
290:4,13 291:15
291:23 292:8,12
292:18 293:14
294:4,5,23 296:3,4
296:21,23 298:4,6
298:23 299:18,21
299:22 300:1,2,7,8
301:9
**correcting** 286:19
**corrections** 304:13
306:17
**correctly** 269:22
281:10
**correspondence**
220:22
**costs** 230:24 231:5
**counsel** 22:9 75:15
105:24 154:7
302:8,23
**counseling** 187:2,5
**counselor** 186:21
187:3,8,11,14,16
187:20,22 188:7
260:3,7,8,9,9,14
260:16,23

**counselor's** 260:5
**county** 302:2
303:4 305:10
306:15
**couple** 110:5
127:6,8 128:14
129:15 151:20
198:21
**course** 80:22
99:18 145:17
146:15 220:7
**court** 1:1 4:17,19
4:20 5:3,16 6:14
13:6,10 18:7 44:3
103:2 107:19
214:24 302:20
305:7
**courts** 1:21
**cover** 232:9
**cps** 18:17,20,24
100:15 217:6
219:24 300:9
**cps.edu** 2:9
**creative** 196:2
**crosenberg** 2:9
**crossing** 111:12
**crush** 195:9
**csr** 1:19
**cuff** 183:1
**cummins** 1:19
302:5 303:9
**cup** 172:21,22,24
173:1
**curious** 45:2 49:7
**current** 113:10
114:8 149:22
**currently** 65:20
76:9 87:11 112:22
131:14 136:3
163:13

[cut - deposition]                                                        Page 10

cut  139:5,7,10
    141:1 148:16
    204:21
cutting  142:5,13
cv  1:7

**d**

d  3:1 4:9 302:19
dad  137:2 163:6,9
    163:23 164:11
    212:3
daily  40:16 41:2,6
    42:21 122:14
damage  100:7
    103:24 113:4
darien  130:20,22
dark  170:2
darryl  1:4 212:3
dart  209:11,16
dasha  34:5,7,8,8
    34:12,15,18
    212:11 214:8
data  224:16,21
date  76:4 86:23
    178:4,8 209:5
    217:14 234:9
    277:12 302:5
    304:9 305:3,9,19
    306:3,13,25
    307:20,25
dated  90:2 104:15
    156:2 268:3 276:3
    277:5 278:10
dates  78:12,14
    236:7 242:21
    301:9
dating  86:14,20
    87:3 88:2,13,20
    90:4,7,16,20
    166:11 197:21
    199:8 205:9 206:4
    206:20 207:19

david  1:9 2:15
    17:21,23 18:2,10
    18:14,19,23 64:7
    64:17 220:18
    227:5 232:14
    242:4 257:10,15
    257:18 259:23
    282:1,11
day  1:22 37:16,19
    37:20 38:1,22,24
    40:8 41:3 48:21
    56:7,18,22 62:1
    63:17 66:5 70:2,6
    70:7 82:13 118:20
    131:8,9 135:16
    138:12,17,18
    139:3,19,22 144:5
    144:6 165:10,11
    170:7,11 171:11
    184:8,10,11,20
    190:4,21 193:11
    213:7 221:5
    263:21 264:5
    267:3 268:3,6,13
    269:20 270:8
    272:4,7 273:15
    275:2 276:3,9,24
    277:5,8,9,9,10
    278:9,23 279:7,12
    279:23 303:5
    305:16 306:22
    307:22
days  39:1 49:2,6
    79:9 122:21,23
    127:7,8 128:12
    129:16 168:14
    176:12 199:24
    203:2,3 245:14,16
    279:12 304:19
daytime  170:9

deal  98:7 262:22
dealing  289:17
dean  31:24 32:2,3
    40:13,18,23
    123:14 142:3,12
    145:7
dean's  40:11 63:13
    85:17 225:24
    226:8,10 263:5,13
    263:21,24 264:3
    265:6 299:18
dear  222:20
    304:10
dearborn  2:7
debate  264:7,12
    265:10,13,17
debating  266:6,8
deception  56:5
    68:3,4,10 107:23
    227:9,10
decide  133:2
decided  55:12,13
    132:18 137:23
    258:8 285:20
    287:13
decision  120:15
decisions  22:17
declaration  3:16
    3:22 75:8,13
    76:12,16,24 77:4
    77:10,19 80:14,18
    80:23 102:15,16
    104:12,13,20,20
    104:23 105:2,9,11
    105:15,15 107:18
    108:22 110:1
    111:7,16,21 212:8
    216:23 225:11
    234:9,12,14,17,21
    235:13,18,24
    236:17,20,21,22

236:23 237:6,7
    238:7 282:23
    295:4 296:17
    301:9
declarations
    233:16,20
deed  305:14
    306:20
deemed  304:20
deep  256:24
defendant  2:10,15
    2:20 14:14
defendants  1:11
    220:10
defined  229:15,20
demons  147:18
    151:12,15
department
    304:22
depends  60:23
    131:10,12 133:22
    133:24 139:11
deponent  302:20
deposed  4:12
deposition  1:18
    3:11 4:14 9:16
    27:20 64:19 75:16
    75:17 95:9 98:19
    101:18 102:1,4,7
    102:11 103:5
    110:23 111:2,3,13
    111:16,19,24
    112:6 152:4
    155:20 215:2
    222:11 223:13
    234:4,8 243:9
    246:22 283:1,5
    295:17 300:20
    302:3,8,18 303:1
    304:9,12 305:1,3
    306:1,3

depositions 1:22
depressed 148:5,6
　186:15 187:24
　201:22,24 202:5
depression 160:23
　187:1
depth 195:17,19
describe 35:5
　43:12,22 44:15
　48:13 51:16 54:13
　69:21 82:8 86:5
　105:20 156:13
　169:18 170:23
　171:22 173:15
　183:9 202:1
　217:24 284:24
described 269:2
describing 71:14
　269:22
desk 38:18 39:7
　171:15
desks 170:17,18
detail 183:9
details 8:7,16
　18:22 188:17
determined 241:3
　247:20,22 248:1
　256:2
device 81:12
devices 115:1
devil 88:24 147:16
　149:16 151:12,16
　207:6
diagnosed 148:4
　162:15
dictionary 183:23
difference 150:10
different 10:20
　49:11,11 57:5
　69:19 86:6 91:20
　113:23 114:2

115:10 129:24
　132:23 150:7
　169:21 171:15
　206:9
differently 206:8
　206:10
difficult 146:14,15
difficulties 208:22
direct 221:3,6
direction 164:24
directly 255:6
disagree 251:20
　253:19
disappearing
　197:17
disciplinary 59:23
　59:24 63:12
　249:19 251:22,23
　253:24 262:22,24
disciplined 252:3
　299:10,13
discontinued
　300:10
discovery 221:6
discuss 228:7
　229:14 291:17
discussed 28:17
　112:5 187:18
　196:20
discussing 52:4
　291:14
dishonest 230:8,15
dismissed 40:18
disobeyed 292:20
disorder 162:16
dispute 124:9,15
disruptive 61:15
　265:1,4
distinguish 189:18
distracting 261:3

district 1:1,1,21
　302:20
dive 240:17
division 1:2
dizziness 185:21
　185:23
doctor 186:21
document 9:16
　27:17,20,22 29:12
　64:6,16,19 65:13
　75:17 76:1,7,18,21
　77:13 99:17 103:5
　103:13 104:7
　105:17,20 107:3,9
　108:18,19,21
　109:6,9 152:4
　156:3 167:9,11,12
　167:17 216:24
　217:24 218:2
　221:4 222:11
　223:12,13 234:4
　248:19,22 249:1,4
　249:9 257:5
　277:15 283:1,5,23
　284:11 295:17
documenting
　124:13
documents 28:5
　100:10 102:6,9,20
　103:21 104:3,9
　107:15,19,19
　108:15 109:19
　110:17,19,22
　167:22 219:1,23
　220:8 284:14,18
　284:22
doing 33:20 38:12
　40:2,5,9,15 42:20
　49:10 51:1 62:14
　73:21 74:17 80:21
　89:5 127:5,15

129:20 133:4
　158:4 160:16
　179:12 181:6
　182:9,11 191:9
　192:13 202:12
　207:6 253:10
　254:3,5 255:19,22
　256:5,8 258:14
　259:5 261:15
　266:24 269:1
　275:19 279:13
　280:24 286:9
doubt 28:12 294:9
downtown 20:12
drained 185:24
　276:10,10,12
drawing 38:9
drawn 170:3
dressed 46:15,16
　46:17 85:19 171:7
　171:8
drink 101:23
drive 2:12,18
　11:21 129:1,6
　202:17,18
driver's 129:2
drugs 101:18,20
　146:16
du 121:19,20
due 155:12 185:2
　186:15 188:2
duly 4:2 302:9
dumb 208:20

**e**

e 3:1,10 41:20
　66:19,19 302:19
eager 23:9
earlier 40:14
　43:18 48:23 59:1
　66:22 71:14 79:6
　94:16 96:24

100:20 121:22
150:8 164:16
167:9 176:18
240:15 261:18
270:13 275:18
280:5 290:15
294:22 297:12
300:3
**early** 170:10
176:15 187:1
199:18
**earnings** 133:18
**earth** 151:8,9,11
151:13,16
**eastern** 1:2
**easy** 71:6 96:17
286:5
**eat** 51:22
**edits** 78:10
**education** 1:8 2:7
2:10 27:18 100:15
108:18 109:9,18
123:10 126:10
161:3 297:13
304:6 305:3 306:3
**effect** 6:13 49:15
63:6 184:21
**effects** 187:17,19
279:6
**effort** 7:11
**eight** 294:15
**eighteen** 65:21,22
**eighth** 164:20
187:6 260:4
**either** 101:10
123:15,15 201:10
220:16 260:11
261:10 282:19
**elaborate** 76:14
124:11

**elementary** 29:7,9
29:21 298:19
**elements** 149:10
**eliminate** 7:7
**else's** 5:2 59:6,9
**email** 10:6 94:2,7
94:9,10,13,15,18
95:8,9 98:22 99:2
103:8,19 104:1,4,6
104:11,15 106:3
106:13 107:4
110:10,18 111:2
164:7 304:17
**emailed** 98:18
111:13
**emails** 94:4,5,20
94:21 95:3
**emergency** 219:8
301:3
**emotional** 167:4
203:21
**emotions** 203:23
**employed** 16:8,23
17:12,14,15,17
34:10 133:24
134:3
**employee** 103:15
134:4
**enclosed** 304:12
**encountered** 43:15
**encourage** 177:15
251:4,16 252:1
253:17,21 254:16
254:17 255:1
256:10 258:1,7
259:4 280:17
281:8
**encouraged**
180:21 254:1
256:13 258:17

**encouraging**
178:19 180:24
251:8 252:21,22
253:7,12 254:3,8
256:8 281:13
**ended** 53:13,14
73:19 92:8 128:21
**ends** 210:17 284:4
**energy** 257:1
**enforce** 39:17
**english** 47:4
225:19,20 226:2,3
240:6 264:18,22
265:7,11
**enjoy** 49:16
**enjoying** 280:6
**enlarge** 103:10
152:1 283:11,12
296:7
**enroll** 247:21
289:4
**enrolled** 28:20
244:23 246:12
247:4,14 287:22
293:5,7,13 298:5
298:14
**enrolling** 300:6
**enrollment** 3:13
28:1,8 246:23
300:4
**entailed** 189:16
282:3
**entered** 306:9
**entire** 13:14 53:7
63:17 132:17
154:20 155:12
156:8 184:11
217:7 305:5 306:5
**entrepreneur**
152:12

**eric** 17:10
**erin** 17:9,10,11
66:18,22 67:5,6
168:17,19,21
169:16,19 170:12
171:11 175:10
176:8,11 178:9,9
192:8 225:15,16
242:7 270:21,22
271:14,20 272:2
272:10 273:5
**erin's** 66:24
**errands** 131:10,13
**errata** 304:14,19
306:7,10,18 307:1
**escorted** 266:10
**especially** 26:13
270:24 272:14
273:8,20 274:11
274:16,23 275:7
**esq** 2:6 304:5
**established** 236:5
**et** 304:6,7 305:3,3
306:3,3
**event** 101:14
**everybody** 108:21
108:24 300:23
301:10
**everyday** 16:13
141:11
**everyone's** 61:1
**evidence** 299:9
**evil** 151:7 207:12
**exact** 39:23 242:21
**exactly** 35:15 50:6
52:16 55:1 77:5
80:7 87:1 107:9
126:7 139:17
154:10,12 158:20
158:23 171:20
174:17 177:1

180:13 199:13
209:15 285:23
286:16 289:2
297:23
**exam**  221:3
**examination**  4:4
44:5 100:18 221:6
221:16 233:3
297:10 299:7
**examined**  3:4 4:2
302:10
**example**  22:23
41:13 61:11,16
124:12 138:19
254:11,19 256:1
280:18 281:12
**examples**  230:6
**excuse**  4:13 43:24
219:21
**excused**  301:15
**executed**  306:10
**execution**  305:14
306:19
**exercise**  223:21
**exhausted**  275:22
275:23 276:21
**exhibit**  3:12,13,14
3:16,17,18,19,20
3:21,22,23,24 9:12
9:17 16:17 21:15
27:15,21 64:5,16
64:20 70:20 71:22
75:3,13,18 103:4,6
104:7,12 108:22
152:5 153:20
155:17,22,24
214:21 215:3
217:1 218:6
222:12,13 223:12
223:14 224:13,15
225:4 226:19

234:1,5,8,14
235:17 238:5
246:15,22 248:16
248:17 256:22
257:5 267:1 276:2
277:5,14 278:22
282:20 283:2,5
284:19,21 295:18
295:20 298:13
**expect**  148:13
**expectation**  26:6
**expecting**  10:22
10:24
**expenses**  136:6
**experience**  43:22
44:16,18 49:11,14
49:16 59:13
156:17,19 184:1,5
184:18,23 185:8
185:21 200:4
207:12 263:6,10
**experienced**  81:1
184:6 188:19
**experiences**
156:18 192:17
**experiencing**
30:14 121:23
122:17 123:23
124:3 160:23
185:3 188:18
196:22 244:22
**expiration**  305:19
306:25 307:25
**explain**  44:6 190:1
301:4
**explaining**  35:9
**expression**  269:4
**extended**  135:7,10
135:19 245:8
**extreme**  204:2

**eyelashes**  152:13
**eyes**  39:4 48:9
68:10 143:4
156:15 181:24
190:17 262:13,18
296:8

**f**

**f**  1:8
**face**  277:19,22
278:3
**facebook**  3:18
93:18,19 95:16,21
115:21 116:1,7,10
116:21 117:4,8,15
117:20 151:22
152:9
**facetime**  164:9
**facility**  162:16,17
260:17,18,20,22
**fact**  124:13 233:19
**factors**  74:21
**failing**  299:10,14
**failure**  230:24
299:24
**fair**  8:10 19:1 22:3
25:11 28:9 59:4
60:24 63:20
169:13 233:1
280:2
**fake**  262:11,12
**fall**  8:18,18,21
48:11 162:21
217:13,15,20
237:16 239:15
241:16 259:21
**false**  209:5
**familiar**  44:19
58:13 84:2 109:11
109:13 180:2
223:24 225:5
274:12

**family**  123:17
139:12,13 164:18
188:21 231:17
291:3
**fancy**  175:4,5
**far**  59:15,15,18
116:7 130:11
206:11 228:24
243:23 253:6
260:14 281:17
**fashion**  85:23 86:1
160:8 206:21
**fast**  232:7
**father**  120:6,6
136:19,21 163:14
188:24 189:6
**father's**  123:17
**february**  9:5,6
103:18 104:16
106:20 110:11,13
114:17
**federal**  1:20
**feed**  202:6
**feel**  25:7 42:14
49:8 55:23 56:1
57:11 65:3 67:22
71:3,16 86:2
139:14 143:23
147:22 149:12
150:10 156:21
177:2 183:10
186:1,12,15,18
201:24 202:1
203:3 204:10
208:19 228:24
255:16 256:10
264:5 265:4 276:4
276:8,14,24
278:12 279:3,20
**feeling**  47:23 50:5
71:10,11 183:15

184:12,15,19,22
185:24
**fees** 133:11 230:24
231:4
**fellow** 252:19
254:6 255:21
262:4 291:24
**felt** 32:12 33:20
42:19 48:13,14
49:9,9 50:14 56:3
57:7 69:23,24
71:8 157:8 164:23
183:7,12 184:10
206:13 207:5,11
207:12 256:13
263:4,9 264:9,10
275:19,21,23
276:10,11,20,20
279:2 280:9
**female** 46:10
237:16
**females** 224:4
**fight** 150:2 200:18
204:8,9,12
**fighting** 196:12
**figure** 160:16
**figured** 50:17
**file** 107:20 133:2
**filed** 12:7 14:18,18
15:1,4 107:15
108:19 132:24
**filled** 65:23 267:6
278:9,19,22
**filling** 66:8
**final** 278:23
**finally** 75:3 233:5
**financial** 200:24
208:21
**financially** 200:23
201:2,4

**find** 49:18 59:14
100:2 153:1
158:21 193:23
194:21 196:5
203:10,13 221:22
304:12
**finding** 202:20
**fine** 70:2 99:20
213:15 283:19
**finish** 5:11 126:22
274:21
**finishes** 23:7
**fires** 186:6 204:17
**firm** 21:23 22:9
23:15,15 75:14
100:21 103:16
106:3
**first** 4:2 5:6 7:19
32:21 42:8,8
43:15 44:21 50:15
50:18 52:21 66:5
68:20 78:1,2 79:1
80:11 82:5 84:24
90:19 91:2 98:6
102:22 104:22
109:22 110:3,6,6
110:10,14,18
111:8,9,9,10,15,17
111:18 115:17
127:1 132:23
149:13 152:6
154:21 156:5,7,20
161:16 169:2
176:3 177:21
206:4 208:16
215:8 219:7
221:15 227:10,13
227:14 234:21
236:20,22 239:10
239:11 250:12,16
256:22 257:5

265:9,9 266:20,21
267:2 268:3,6
269:20 272:4,7,18
273:1 276:3,8,24
277:9 278:9
283:23 284:21,23
286:1 287:2 289:5
291:11 302:9
**fitbit** 81:12
**five** 25:15 40:8,16
41:2,6 42:21 43:1
43:6 58:9,10
64:21 70:1,6
89:14 114:6 144:7
199:24 217:23
218:4 219:4 224:5
224:5 245:14,16
**fix** 283:17
**flat** 174:5
**flirt** 195:12
**floor** 99:10
**flow** 23:12
**focus** 55:3 61:13
257:1
**focused** 190:17
279:8,13,14,17,23
**follow** 24:6 146:15
151:20
**followed** 292:16
**following** 277:9,9
278:9
**follows** 4:3
**fond** 121:19,20
**food** 130:4,5,14
131:1
**forced** 59:18,20
251:17
**foregoing** 302:3
302:13 305:13
306:18

**foremost** 149:13
**forget** 233:12,13
233:15
**forgot** 98:18
116:16 129:18,18
**form** 12:22,23
35:20,21,23,24
36:2,5,6 66:5,8
67:1,6 79:24 80:3
80:8 156:6 160:7
206:21 217:7,9
218:5 222:18,22
223:1,2,18,22
224:11 249:21,22
252:7 267:3 268:3
268:10 275:8,15
276:3,11 277:4,8
278:9,19,21
279:16,18 283:6
285:20 286:12
297:14,18,21
**formal** 86:12
**former** 78:23
**forms** 192:16,18
220:18 222:16
267:7,11 280:4
**forward** 301:1
304:16
**found** 45:4,13
72:10 158:22
227:14 240:17,20
279:12
**foundation** 1:9
2:15 17:21,24
18:3,11,15,19,24
36:12 64:7,17
220:19 227:5
232:15 257:10,15
257:18 259:24
282:12

four  84:15,16
  91:18 114:6
  116:12 135:18
  166:24 199:23
  217:3,12,17
  222:21 294:12
fourths  53:19
  246:9
framed  174:3
franklin  303:10
free  65:3 305:14
  306:20
freezing  44:1
frequently  118:22
  163:9
freshman  26:14
  29:12 123:6
  131:23 132:17
  133:6 154:21
  156:9,10,14,18,22
  157:1,4,10,12,14
  157:15 161:20
  298:18
friend  83:1,6
  167:1
friend's  136:13,17
friendly  195:4,6
friends  33:12,22
  36:21 50:5,7,11
  57:4 73:18 82:15
  82:17,19,19 86:7
  95:20 166:7
  285:12
front  6:3,6 75:7,8
  111:6,7 170:20
  178:23 179:3
  268:20 269:1,8
  270:4 273:7
fruit  46:20 172:8
  172:10,13,17
  268:17

full  273:21,23
  274:2,3
fully  6:17 21:23
fund  18:8,12
funny  85:4
furnished  219:24
  221:9
furniture  170:23
further  98:9 110:3
  237:8 278:7
  297:10 299:7
  303:1

**g**

g  4:9
gain  67:11,19
gap  29:3 74:9,14
  124:2 298:20
gas  231:23
gatherings  282:5
general  161:3
generally  22:2
  25:13
genre  196:8
getting  8:5 11:16
  44:1 46:3 52:14
  53:21 54:11,23
  60:1,10 61:22
  62:23 87:18 89:14
  90:2 125:19,22
  142:5,15 153:10
  168:16 177:4
  211:20 215:12
  224:18 232:11,19
  238:4 273:16
  280:12 295:15
gift  224:18
girl  15:22 82:24
  83:4 96:3
give  5:20 9:14,20
  35:11 65:3 66:9
  76:20 80:18 81:6

81:11 95:4 125:14
  136:21 154:11
  169:3,4 175:18
  188:17 223:6
  224:15 230:6
  231:3 245:11
  259:16 264:21
  266:16 274:8,14
  281:17 294:6
given  34:24 64:23
  101:13 104:15
  107:11 158:7
  177:17 183:20
  230:23 231:7,10
  235:6 240:22
  269:13 274:15
  281:16,20 284:14
  284:18
giving  68:7 75:10
  105:9 136:7
  224:15,24 240:18
  280:4
gmail  94:2,9,11,22
gmail.com  10:7
  103:9
gmail.com.  94:14
go  4:10 5:5 15:13
  22:5 23:19 36:14
  40:9 42:1,11,24
  43:3,4 44:12 47:9
  51:22 52:9 56:9
  62:6 63:2 64:12
  65:3 70:10 77:4,9
  79:1 88:14,16
  98:5,8 99:10,11,13
  99:23 103:11
  105:4 106:6,9
  115:3 122:8,18
  123:1,13 138:2
  139:18,20,21,21
  140:16,21 141:2,2

141:19 142:2
  143:9,16 144:10
  145:16 149:23
  150:12 151:6,19
  155:13,16 156:5
  158:9,11 161:6,8
  162:9,17 165:18
  165:24 166:3,5,8
  166:10,13 167:5
  169:19,23 178:3,4
  179:14 188:7
  190:24 191:5
  192:20 198:4,22
  203:1 205:24
  207:4 211:11,21
  215:1 216:21,22
  217:5,22 218:9
  221:15 223:16
  224:3,5,5,13
  225:10,11 226:19
  228:1 230:4 232:6
  232:7,11 235:17
  235:21 236:21
  246:19 248:1,4,6
  251:3 252:1,15
  258:2,9 260:15,23
  263:13 264:20
  265:13,16,20,24
  271:2,5,11,15,17
  273:8 283:18,22
  284:6,9 289:2
  291:3 292:1 293:2
  293:12 297:8
  301:7
goal  10:21 11:6,8
  11:10 227:16
  228:4
goals  23:18
god  72:9 88:22
  146:5 147:9,11,14
  149:14,14 150:18

**[god - hallway]**

150:20 159:23
229:11
**gods** 45:16 158:8
159:12,19,23,24
229:9 240:19,23
241:3
**goes** 166:1,1
**going** 4:10 5:5
8:15 10:13 21:14
22:2 27:15 30:8
30:10,13 31:2,10
36:13 43:2,4
45:22 54:16,18
57:12 69:8,24
70:24 71:21 72:2
81:10 82:10,11
92:8 97:6 101:17
106:6,23 111:8,11
124:23 139:15
141:15,16 142:12
148:11,12 151:19
157:15,17 158:10
164:23 165:14
166:16 169:6
183:14 186:24
188:5 189:5,12
197:2 199:2,15
206:4,5 214:8
216:22 218:24
222:5 224:5
228:12 232:7,15
234:7 238:6
244:16,24 245:1,4
245:7 246:12
247:20 248:15
251:7 252:2,10,18
252:23 253:7,21
254:3,15 257:20
264:9 269:3,3
280:13 282:2
283:4,8,17,24

285:13 287:3,15
289:13 293:4,5,6
294:19 295:19
297:24 301:6,8
**good** 4:6 5:10
31:20 71:10,11
84:7 91:14 134:14
151:7 180:5,9
207:10 300:23
**goodbye** 244:2
**goods** 97:24
**goth** 194:19
**gotten** 33:21
181:23
**grab** 149:1
**grade** 164:21
179:18,20,21,22
180:15 187:6
260:4 295:12,14
295:16 296:6,9,11
**graded** 295:6
296:15,18,19,23
**grades** 60:6,7
182:12,14 285:8
295:7 296:21,24
**graduate** 27:7
166:21 199:18
**graduated** 25:24
27:10 30:19 55:11
55:14 79:6 86:20
146:22 166:17,21
197:7 199:4,6,19
**graduating** 127:1
**graduation** 126:21
**grandfather**
120:20 123:16
**grandfather's**
198:10,12,12
**grandma** 68:15
69:15 74:4 92:16
120:23 122:12

123:2,9 125:4
134:2,15 154:14
161:12,23 165:21
291:22 292:2,23
293:2
**grandmother**
68:12,13,16 69:2
90:14,16 92:10,12
92:15 119:13
120:9 121:6,15
122:6,7,9 123:16
133:15,16 134:20
134:23 136:1
162:6,13 164:13
165:3,5 217:15,19
217:21 243:16,19
244:5,7,11 284:15
285:1,16,19 286:8
286:22 287:2,9,11
287:18 288:2,9,14
288:19 289:6,10
290:15 293:8,11
300:4
**grandmother's**
119:18 120:3,18
134:17 243:24
**gratitude** 269:4
**great** 5:15 6:1,8
10:11 99:21
106:12,14 149:3
156:5 161:6
221:18 225:10
279:2
**grew** 143:10 146:4
206:8,10
**groceries** 209:2
**gross** 132:21 155:5
**group** 55:3
**groups** 25:16
282:6

**growing** 24:24
25:5,18 165:7,19
224:9
**grown** 165:1
**guardian** 120:9,12
162:2 284:16
292:2
**guardianship**
162:7
**guess** 72:16 84:1
87:20 88:9 89:6
103:15 106:6
107:14 132:6,13
137:24 154:12,15
157:7,20 187:24
194:13 196:12
200:5 201:17
208:23 213:12
222:13 256:4
258:22,24 264:10
**guessing** 160:11
**guilty** 210:8
**gun** 209:11,16
**guns** 209:19 210:4
**guy** 46:15 223:17
**guys** 103:7 151:23
169:5 195:3,12
197:20 200:17,21
206:19 216:23
221:12 269:21
285:2

| **h** |
| --- |

**h** 3:10 4:9 41:20
**hair** 136:13,17
224:8
**half** 5:11 84:21
161:16
**hall** 38:13 142:10
144:21
**hallway** 42:5 63:7
63:11 141:3,19

144:12 193:12
214:13
**hallways** 82:4
**hand** 109:20
201:13,18
**handful** 297:7
**handle** 115:8,13
221:19
**handles** 154:14
**handwriting** 10:9
65:15 67:15 70:20
277:4,15
**hang** 194:23
**happen** 9:4 39:21
61:20 63:10 86:16
87:17 141:19
151:8 212:21
247:24 272:17
295:9,12
**happened** 4:21
35:13 36:4,9
39:24 43:14 46:23
54:14 56:17 69:6
80:24 81:3 86:17
98:2 122:8 140:23
141:22 157:16
176:5 188:10
189:20 248:6
266:17,20 267:20
293:13 296:14
**happening** 24:9
53:13
**happens** 13:11
**happiness** 71:8,9
278:13
**hard** 23:9 96:4
103:11 128:11
**harder** 21:1
**he'll** 198:22
**head** 5:21 38:17
39:7

**headaches** 185:11
185:12,14,16,17
**heads** 261:11
**headset** 20:24
**health** 6:20 160:24
196:21 203:11
223:21 257:1
**healthier** 137:23
**hear** 30:15 44:3
57:20,23 80:11
85:13 163:5 185:5
227:10
**heard** 8:21 17:20
80:13 207:14
212:14 255:12
271:7,7 280:22
281:1
**hearing** 20:24
44:8
**heart** 186:1
219:15
**heaven** 147:20,22
150:8,12,14,21,22
**heavy** 184:6,6
**height** 224:7
**held** 120:15
**hell** 147:21,22
150:9,12,14,16
**help** 8:2 10:19
22:3 51:5 96:24
134:4 136:5,15
201:1,2 257:11
301:12
**helped** 15:11
16:23 67:23 71:16
73:14 80:17
**helpful** 20:20
**helping** 21:10
34:11 301:10
**helps** 61:10,13
256:24

**herinabove** 302:16
**hey** 64:8 73:1
87:16 153:19
195:8 255:17
**hi** 195:6
**high** 3:24 15:18
16:23 25:24 26:13
26:14,16,17,22
27:1,4 28:18,21,24
29:10,21 30:1,3,4
30:16,19,22 31:3
31:14,23 36:11
37:2 41:5 43:16
46:2 50:8 53:6,10
53:16 55:8,11,14
55:16,17,20 57:1,5
58:22 66:2 68:14
68:17 69:22,22
70:5 78:11,13
79:15,18 82:20,21
85:8,10 86:11,21
86:24 87:6 95:24
113:21 118:14
122:11 123:5,6,8
123:10 126:11,18
126:21 127:1
131:22,23 133:5,6
146:12,22 162:10
162:13 164:6
166:13 182:7
185:12 194:3,5,7
233:6,8,13,14
234:23 235:7,10
236:1,7,12 237:4
238:17 240:21
241:10 242:22
243:5 244:8,12,15
246:23 247:5,10
248:19 256:11
259:13,17 287:23
293:7 295:21

298:3,5,8
**higher** 147:2
**hindu** 45:16 46:16
72:9 158:8 159:11
159:19 240:19,23
241:3
**hinduism** 157:19
157:23 158:3
159:22
**hip** 83:24
**history** 26:12
246:23
**hit** 11:23 201:17
204:5,21
**hold** 9:20 75:2
89:9 97:12 223:8
**home** 49:20,23
74:22 139:18,20
140:3 157:10
168:1,4,7 232:11
271:2,5,11,17
284:15 291:3
292:1 293:16,16
293:20,23
**homeless** 245:23
248:11 288:21
**homelessness**
30:14 74:22
121:23 122:18
123:24 242:16,20
242:23 243:9
244:23 287:16
289:18
**homer** 2:17 3:5
4:5 9:12 15:16
16:19,21 20:15,23
23:13,22 27:15
36:17 37:13 42:24
43:6,11 44:13,14
56:11 63:4 64:5,9
64:12,15 65:2,6,12

75:2,6,12,19 89:13
89:18 97:12 99:8
103:4 182:23
208:13 236:5
237:11 246:14,17
246:19 294:8
297:6,9,11 299:3
**homework**  38:12
39:11
**honest**  192:18
267:14
**honestly**  7:1 8:19
82:13 105:2
113:16 122:1
178:11 267:7
**hop**  83:24
**hopefully**  229:7
232:9
**hoping**  10:14,16
10:18
**hotel**  135:11
**hour**  43:2 129:10
197:17 231:21
**hourly**  231:11
**hours**  101:19,22
128:6 131:5
210:15,15 242:12
294:15
**house**  119:18
120:3,20 122:12
122:19 125:9,10
126:5 130:9
139:16 157:12,17
189:8 198:10,12
198:12,14 200:12
202:11 206:1
209:20 210:5
243:24
**household**  33:19
136:6 189:9
202:10

**housekeeping**
284:1
**hudgins**  1:18 3:3
3:11,16,17,24 4:1
4:8,9 9:16 10:2
20:18 21:2,16
23:14 27:20,22
43:12 64:19 65:13
65:16 75:13,17,20
89:19 100:1,13
103:5,8,19 106:2
106:22,24 108:16
109:2 112:8,20
126:8 149:6 152:4
156:3 215:2
219:13 221:16,22
222:11,13 223:13
223:18 225:5
228:15 232:9
234:4 246:22
248:15 283:1
295:17 297:12
304:9 305:4,9
306:4,13 307:20
**hudgins's**  155:24
**huh**  5:21 14:20
20:13 22:1 53:5
61:2,12 197:19
218:19 245:17
259:2 276:17
279:4
**hundreds**  57:1
**hurry**  277:24
**hurt**  186:9 204:19
204:24 206:20
207:1
**hypnosis**  48:12
49:9,14 50:2
156:17,19 183:7
183:11,16,18,20

**hypnotherapy**
183:5
**hypnotic**  183:5

**i**

**idea**  5:10 134:14
159:4 171:9
282:10
**identifiable**
224:23
**identification**  9:17
27:21 64:20 75:18
103:6 152:5 215:3
222:12 223:14
234:5 283:2
295:18
**identified**  109:20
225:4
**identify**  109:5
191:21 192:5
**illegal**  22:7 228:8
**illinois**  1:1 2:3,8
2:13,18 91:9
130:8,20 302:1
303:4,11
**immoral**  22:7
228:21,24 229:12
229:15,20 230:2,3
230:6,7,10
**impacts**  280:9
**important**  5:18
**improve**  257:1
**inaudible**  18:6
**incense**  46:14
172:5
**incentives**  256:18
**incident**  201:16
266:19
**include**  229:3,8
261:6
**included**  110:17
218:10,11,16,17

304:14
**includes**  100:15
**including**  70:6
295:6 296:19,20
**income**  133:21
136:11,19 155:1,5
155:9 209:2
**incorporated**
306:12
**incorrect**  217:13
217:13 235:13
236:6,18
**increase**  257:1
**independently**
163:3
**indicated**  204:24
**indicating**  102:13
156:4 304:14
**individual**  153:9
**individually**  1:3,4
224:23 271:15
272:24
**inflicted**  205:5,7
**influence**  180:10
180:14
**influencer**  180:12
**informal**  6:13
**information**  80:18
80:20,20 87:6
101:9,13 103:23
168:3,6 169:1,3,4
214:18 215:21,23
216:5,6 224:22
231:7,10 233:8,10
235:2,3 236:16
**informed**  76:24
**initial**  43:12 48:19
56:13 112:13
279:11
**initiation**  286:13

**ink** 64:11
**ins** 182:17
**insensitive** 25:13
**inside** 70:13
  172:20 278:13
  291:24
**inspired** 24:4,5
**instagram** 93:18
  93:19 95:15,21
  96:7 116:4,7,7
  117:22,24 118:3,7
**institution** 162:24
**instruct** 21:10
  270:9
**instructed** 268:7
  269:21 280:3
**instructing** 16:13
  190:21
**instruction** 3:15
  16:24 156:2
  167:14 168:13,18
  169:7 248:18
  257:7 267:3 268:3
  272:4,7 274:15
  276:24 277:9
  278:9,23 279:11
**instructional**
  276:3,9 277:5,8
**instructions**
  168:24 220:21
**instructor** 43:19
  44:16 46:10 47:17
  48:3 66:12 237:17
  237:22 268:14
  269:2,20 270:9
  278:8
**instructors** 16:1,7
  16:9,12 262:6
**instruments** 83:20
**intentionally**
  62:23

**inter** 16:15
**interact** 15:17
**interacted** 16:9
  21:3
**interaction** 193:15
**interested** 153:12
  302:22
**interfering** 30:7
**internet** 72:12,15
  73:14 81:7 159:5
**interpretations**
  23:3
**interrogatories**
  302:10
**interrupt** 5:19
  16:16 44:5
**interruption** 18:7
**interview** 35:1,1
**interviews** 213:24
**intro** 83:12,14
**introduce** 9:1
  83:15 232:13
**introduced** 46:1
  111:9,18 156:20
  169:2 177:23
  205:16 212:23
  213:20 215:8
  227:13 239:7,13
  250:15 258:15
  272:18 273:1
  275:3
**introductory**
  169:1
**invited** 54:23
  193:5
**involved** 7:8,10
  8:1,2,5 15:18 19:1
  34:16 35:6,12
  50:20 58:14 69:17
  95:24 96:18,23,24
  97:4 111:10 123:9

  123:11 133:16
  193:5,24 215:12
  216:1 227:14
**involvement** 8:16
  10:13
**iphone** 114:14,16
**islam** 24:22 25:1,8
  25:14 140:17
  143:14,19,24
  146:19,23
**issue** 146:11 150:1
  221:19 287:16
  290:11
**issues** 70:4 139:12
  139:13 160:24
  200:8 202:4
  203:18,19 289:17
**item** 284:1
**items** 130:2
  153:15 171:14
  174:11,14 175:3
  200:11,15 208:18

## j

**j** 83:3
**jail** 189:5 210:13
**james** 2:12
**january** 9:5
  137:15,21 199:12
  287:21 293:15
**jaylon** 82:24 83:2
  83:4,6
**jb** 32:6,7,9,16
**jehovah's** 165:6
  165:22
**jeopardize** 22:8,21
  22:21 228:8 229:2
  230:14
**jeopardizes**
  230:17
**jesus** 150:17

**jim** 99:9 220:4
  232:5,13 283:11
  284:1 286:11
  300:19
**jmauck** 2:4
**job** 126:16,18,20
  127:1,21 129:13
  129:13,14,15,16
  129:17,19 131:14
  134:1 136:12
  202:18 300:23
**jobs** 126:20
  136:14
**john** 2:2 23:6
  100:11 169:10,10
  221:2,14,18
  286:19 294:9
  297:6 299:5 304:5
**jonathan** 103:9,15
**jonathan's** 169:14
**journalists** 34:21
**jsipchen** 2:14
**judge** 1:8
**jump** 23:9
**june** 27:11 30:19
  79:7 126:22
  166:22,22 187:4
  199:20
**junior** 27:2 28:17
  53:10,15,17,20
  68:24 69:1,12
  73:22 74:1,3,19
  123:19 161:12,17
  163:8,17,21
  187:11 234:22
  236:2,14 237:3
  241:20,21 242:3,8
  242:13,15,17,22
  243:4 244:8,11,18
  244:20 245:12
  246:9,11 248:7

266:20 287:6,8,10
288:3,10,12,13,20
289:8 290:2,10
**justice** 227:20

**k**

**k** 4:8 112:11,13,13
302:2
**kaitlin** 2:22
**kay** 112:10,13
**kaya** 1:18 3:3,16
3:24 4:1,8,8 10:1
65:16 75:13
103:13 112:20
117:12 118:4,5
151:21 152:6
220:3 222:2,2
226:21 299:9
301:1 304:9 305:4
305:9 306:4,13
307:20
**kayahudgins28**
10:7 94:14,22
103:9
**keep** 145:2 194:8
194:14 232:20
270:14 283:24
**kennelly** 1:8
**kept** 49:10 73:5,11
**key** 180:17
**kicked** 38:6 62:19
62:23
**kids** 180:21,24
181:2
**kill** 230:4
**kin** 302:23
**kind** 39:9 42:18
45:2 46:16,17
48:17 49:11 57:13
73:3,4 83:15
87:16 107:20
111:10 114:12

133:14 134:2
145:7 148:5
151:24 152:12
168:12,16 171:15
176:20 180:4
189:16 192:22
193:4,8 195:7
196:8 200:21
203:19 213:13
221:4 233:15
272:24 279:7
295:14
**kinds** 84:8
**kingdom** 150:20
**kitchen** 135:8
**knew** 33:19 34:2
57:12,14 67:2,2
110:6 142:15
158:7 191:3,4
192:7,22 194:6
209:8 212:11
**knives** 203:8
**know** 5:6 6:1,20
8:20 9:19 12:7,17
12:24 13:12 14:11
14:14,17 15:4
17:14,23 18:1,22
19:4,7,13,22,24
20:23 23:4,5,6,12
24:6 25:10,13,13
30:8 32:23 33:3,7
33:8,24,24 34:5,8
36:18 37:4,15
38:14 40:10 42:19
44:22,23,24,24
45:11 46:16 47:4
47:11 48:16,20
49:8 50:2,18,20,23
50:23 51:2,6 52:6
52:16 53:14 57:7
57:10 58:12,14,16

58:18,19 59:5,7,8
60:7 62:11,13,13
63:3 68:11 72:3,4
72:9 73:2,5 74:14
80:5,5 82:22,23
83:2,21 84:3 86:1
86:4 87:20 88:22
89:4,24 90:1
91:14,15 92:18
94:20 98:12,15
99:14 100:12
105:3 107:9
109:12 111:8,24
117:19 118:21
122:2 123:12
124:23 127:18
129:4 130:20
131:5,10,12
133:22 135:9,15
136:5,6,13 137:23
138:16 139:12
140:7 142:12
143:10,13 146:13
146:14,17 147:3,4
147:4 150:11,15
150:20 151:1,5
152:13,22,22
154:13,16 156:12
157:19 158:23
159:21,22 160:1
160:19 161:11
162:19 167:18,24
168:12 169:6
172:16,18 175:1,1
175:17,24 177:1
178:19 179:14,20
181:8,21,23 182:6
182:17,23 183:14
183:16,18,22
185:13 189:19
191:24 192:1,10

192:13 193:20
194:5,6,15,18
195:16,16,20
196:11,21 200:5
202:1,6,9 203:17
204:3 207:11
208:9,20 210:17
210:19 211:14
212:3,11,13
213:13 214:4
215:12 218:12
219:15 221:5
229:19 231:20
232:19 238:6
239:14 242:21,21
258:15 260:19,20
260:22 271:9
275:1,1,2 278:1,8
278:15 280:20
281:3,6 282:7,11
282:20 283:10
285:23,23,24
286:5,8,23 287:9
288:15 294:9,11
294:15 296:15
297:24 300:4,5,9
**knowledge** 13:4
24:5 31:6 34:14
36:21 40:24 58:24
83:21 85:9 129:4
157:23 211:6
230:12 278:20
295:13
**known** 80:21
194:9,10,10,12
233:10 256:11
**knows** 36:14 37:22
82:23 205:21
**knuckle** 195:21
196:14

**l**

**l** 41:20 66:19 83:3
222:3
**labeled** 103:8,19
104:7 107:4
222:14
**labels** 223:9,16
**lac** 121:19,20
**lack** 25:15
**lady** 214:9
**lakeside** 27:6,8,10
79:3,13 247:15
248:8
**lamps** 170:5
**landlord** 135:4
**language** 268:16
**laptop** 114:20
**large** 58:8
**lasalle** 2:3
**lashes** 131:24
132:1 133:7
**late** 11:24 232:12
232:19
**latham** 2:16
**law** 21:23 23:15
23:15 75:14
**lawsuit** 7:16,19,22
8:22 10:13,17
11:3 12:5,8 14:18
15:1,5 23:18,24
26:5,9 34:16
96:19 97:4 101:15
102:10,22 107:14
107:16,20 150:2
155:13 211:22
212:1,4 213:24
215:5,13 216:2,16
216:19 227:20
228:5 230:14,18
**lawsuits** 13:1

**lawyer** 9:2 23:3
95:4
**lawyers** 9:10 22:3
89:15 98:23 99:2
99:6 232:16
**laying** 174:5
**lead** 254:11 256:1
280:18
**leading** 254:19
281:12
**learn** 17:7 46:3
158:3 238:9 251:4
251:17 252:19,22
254:2,8 256:14,18
257:15 258:1
259:4 268:10
273:14 275:16
281:7,8,14 285:20
286:23 300:13,18
**learned** 66:6 71:18
73:13 111:8 119:1
238:22 239:2
241:2 250:19
296:3
**learning** 67:11,19
249:12,22 253:13
255:7 257:11,20
257:20 281:18
285:16 286:6,21
290:15
**lease** 134:22 135:1
**leave** 122:24
124:17 139:2
140:8 145:22
204:12 226:12
244:10 264:24
288:6,7
**led** 7:9 188:13
**left** 30:9,22,23
89:19 92:11,21
133:14 219:20

244:11,12
**legal** 3:12 23:2,3
100:20 107:15,19
120:13 210:24
226:21 228:13
229:16 230:19
304:1 307:1
**leitha** 120:19
**letter** 104:7
105:18,22,23
108:16 109:9,18
109:23 110:4,7,15
283:6,23 292:16
302:21 304:20
**letting** 100:12
124:23 285:24
**levels** 220:24
**levi** 66:19 168:21
168:23 189:14
**liar** 207:15
**library** 70:15
139:23,24 140:21
140:24
**license** 129:3
303:10
**lie** 207:19 208:1,7
267:10,17,20,23
268:2
**lied** 208:10
**lies** 208:4,5
**life** 89:6 156:8
157:10 163:6
164:23 188:6
202:2 288:23
**lifestyle** 137:23
**light** 186:6 204:17
**lights** 170:1
**liked** 57:21 176:15
**line** 122:7 155:12
304:14 306:7
307:3

**lines** 149:7
**links** 81:7
**list** 3:13 28:1
106:13 153:1,10
153:13,16 154:4
158:11,23 230:23
234:22
**listed** 235:1 306:7
306:17
**listen** 48:9 83:18
273:2 286:4 291:9
292:6,15
**listened** 84:4
**listing** 306:7
**lists** 28:9
**lit** 172:5 173:12
**literally** 294:20
**litigation** 227:16
228:23
**little** 6:12 8:16
57:14 59:2 103:10
132:13 172:15,20
172:21 183:9
208:4,5 232:12
237:5 238:16
243:6 272:6
280:15 293:17
301:10
**live** 89:7,23 92:2
121:4,9 122:6
126:5 135:13
136:3 150:14,15
165:21 199:5
243:10 244:1,12
**lived** 89:20,24
90:11 121:5 125:7
135:5 200:2 248:7
**lives** 92:14,15,18
92:20 126:6
**living** 68:13,15
90:10,13,15,19,22

[living - marking]

91:6 92:5,9 97:9
97:15 119:11,14
119:17 120:2,7,7
120:20 137:19
150:14,16 161:22
162:13 163:2
198:1,14 200:3,12
201:1,5,9,23 203:2
203:5 209:20
216:10 217:14,19
243:23 248:11
**llc** 2:2 133:1,8
**llp** 2:16
**load** 99:16
**loaded** 209:11,16
**loading** 298:13
**located** 130:7,15
260:20,23
**locations** 125:24
**long** 64:22 74:14
87:12 91:16 92:2
113:17 121:9
123:20 132:2
135:17 144:13,14
148:12,13 170:14
184:8 197:22
198:20 232:5
242:23 250:5
258:16,18 266:15
268:20
**longer** 25:20 54:15
54:21 241:23
247:4 248:4 286:1
290:10
**look** 47:9 59:24
66:11,11 67:9
71:24 78:13 81:7
106:15 159:14
173:4 175:4
209:14 218:15
219:16 221:17

223:24 233:24
278:21 283:8,22
296:1 301:1
**looked** 44:23
45:10 80:3 171:20
173:1 174:19
175:3
**looking** 67:5 80:10
106:10 152:20
174:9 194:19
216:1 246:14
276:2
**looks** 44:22 64:24
78:19 104:6
212:12 214:5
225:4
**losing** 20:19
**lost** 23:10,11 119:8
154:1 282:21
288:24
**lot** 5:21 8:15 57:11
94:20,24 140:3
180:14 185:12
188:4 206:3,5
220:7 244:22
256:12
**lots** 57:4
**loud** 61:3,16 62:18
63:18 64:2 89:10
144:17 191:12,17
204:8
**low** 180:17 248:8
**lunch** 41:13,15,22
42:3,4 138:14,20
148:12,14 149:4
179:9 193:10
**lunchtime** 41:17
**luv** 222:3
**luv3** 222:2
**lynch** 1:9 2:15
17:21,23 18:2,10

18:14,19,23 64:7
64:17 219:24
220:18 227:5
232:14 242:4
257:10,15,18
259:24 282:1,12

### m

**m** 1:19 302:4
**ma'am** 5:4,14 6:4
14:13 28:15 31:1
35:3 47:19 49:4
51:6,12 55:7
60:13 66:23 78:11
81:9 85:15 101:23
102:5 112:2,7
113:2 114:9 120:1
213:1,19
**mad** 11:5 200:14
**madam** 304:10
**mail** 80:15 122:19
125:19,22
**mailed** 78:3,8
105:12
**main** 10:21 150:10
184:21 289:20,22
**major** 208:10
**majority** 136:18
136:18 137:20
**making** 72:14
120:15 129:9
178:24 198:18
**man** 173:15,15
215:4
**mandated** 39:14
39:16
**mandatory** 36:8
37:18 38:15 39:12
40:8 253:3
**mantra** 45:3,6,7,9
47:13,15,18 48:2
56:3,13 57:18

68:8 69:9 72:4,6
72:16,23 73:7,11
156:10 158:7,22
158:24,24 160:3
160:17 269:14,16
270:4,7,9,14
271:16,20 272:5
272:11 290:23
291:2,6,9,14,21,22
292:6
**mantras** 45:14,19
45:20 71:24 72:20
72:22 73:13
158:12 159:8,11
159:18 239:9
240:18,21 241:2
**march** 1:23 28:24
76:4 104:16 119:2
124:6 246:5,7
247:4,4 287:22
303:5 304:4
**marie** 112:18
117:12 118:4,5
222:2,3
**marijuana** 137:9
147:23 161:7
201:11
**mark** 9:12 64:5,16
**marked** 9:16
27:20 64:19 75:17
103:5 152:4
155:22 215:2
216:24 222:11
223:13 234:1,4,7
234:14 238:5
246:15,21 248:16
283:1,4 284:22
295:17,19
**marking** 75:12
153:22

**marks** 204:23
299:20
**married** 126:8
**masjid** 166:16
**mat** 295:3,4
**matches** 204:9
**materials** 108:11
281:16,20
**math** 60:16 61:1,4
65:22 240:6
**matter** 27:18
104:13 107:1,6
**matters** 22:8
**matthew** 1:8
**mauck** 2:2,2 15:12
16:16,20 20:14
23:1,14,19 36:12
37:12 43:4,8 44:6
44:11 56:9 63:1
64:23 65:5,9
75:10,14 89:9
99:24 100:21,21
102:10,21 103:10
103:16 106:4,7,9
106:15 107:15,22
108:8,14 109:8,19
132:19 143:15
148:11,22 149:1
151:24 155:4,11
168:21 169:11
214:21 215:8
216:4,12,18 219:3
219:10,19 220:21
221:8,12 223:6,10
226:22 227:1
228:7,10,16,19,22
229:17,21 230:1
230:11,19,23
231:8,13,20 232:5
233:22 234:13,17
234:21 235:2,3,6

235:14 250:7
252:7 258:2
283:11,13,15,19
286:11,15 292:9
294:15 296:7
297:8 300:23
301:7 304:5
**mauck's** 235:19
238:7
**mauckbaker.com**
2:4
**mckinley** 27:6,7
27:10 30:1,4,15,19
55:17,19 69:22
70:2,5,9 74:7,11
74:23 79:3,7,11
124:2 199:18
247:14,21 248:7
**mean** 7:5 11:4
18:14 22:12,13,18
37:8 57:23 59:21
66:15 88:10 96:11
96:12 107:15
116:9 118:12
128:7 137:14
139:13 146:3
147:1 151:3 181:4
188:11 191:4
200:19 202:3
204:10 206:10
211:8 216:7
225:14 233:11
243:9 244:10
263:1,3 267:22,23
277:21 278:16
282:4
**meaning** 45:11
63:16 68:7 135:7
147:2 202:4
**meaningless** 45:3
45:15 257:23

269:16
**means** 4:20,22
19:20 22:2,20
179:7 183:24
**meant** 159:18,18
164:16 167:17
190:7,7,22 249:16
282:3
**measure** 81:12,17
183:1
**media** 93:16 95:4
115:4 118:21
179:8 193:8
**meditate** 17:7 37:5
37:19 38:15,22
43:20 44:17 48:6
48:7,24 49:5,20
50:20,24 55:24
60:19 62:10,19
145:16 156:14
157:3 169:4
176:15 177:12,15
178:19 180:22
181:1,3 190:13
191:3 226:11
251:4,8 252:1
253:8,13,13,20,22
253:23 254:1,2,4
254:10,15,16
255:1,2,7 256:14
256:14,18 258:7
258:17 261:19
263:3,11,15,20
264:1,8 266:9
269:22 270:10
299:10,14,24
**meditated** 49:3,9
49:13 56:6 156:8
156:21 157:1
184:7 185:1

**meditating** 37:9
39:2,19 40:16
48:24 49:23 50:5
56:5 63:20,23,23
71:12 142:20,23
143:7 156:16,18
171:12 184:2
185:2,6,22 245:2
251:9,15 252:2
253:2 254:7,13,21
256:4,7,7,15
261:11,23,23
262:8,8,12,23
263:1,4,9 264:5
265:11 293:16
299:15
**meditation** 3:15
35:10 36:23 37:2
42:20 43:13 46:3
47:23 48:20 50:8
51:5,11 56:18
57:8 59:9 63:19
66:16 67:12,19,22
68:17,21 69:2
70:24 71:5,8,15
80:19,24 81:8,11
108:9,12 156:1,6
156:11 158:1
167:14 176:12
177:22 179:7
180:6,10 181:9,21
181:22 182:3,16
184:3,22 185:9,15
186:2,3,7,10,13,16
186:19,23 187:17
189:24 190:7,10
192:17 207:6
237:16 248:18
252:19,23 254:8
257:6 258:1
275:24 276:14,16

278:13 279:6 280:19 285:21 288:8,10 290:10 290:16
**meditations** 182:18
**meet** 81:21,23 82:8 101:24 205:8 205:12,14
**meeting** 47:11 97:13 176:11
**meetings** 33:1 211:21 281:24
**member** 101:15 179:23,24 227:15 228:19
**members** 179:17 188:22 231:17
**memory** 6:19 16:22 21:9 37:17 87:22 207:10 298:2
**mental** 160:24 162:16,17,24 196:21 203:11,11
**mentally** 157:2
**mention** 271:2,5 272:22
**mentioned** 17:2 43:18 89:1 94:11 111:1,13 115:4,20 121:22 125:6 126:2,4 129:12 135:23 143:8,10 143:11 146:2 152:13 160:22 161:7,10 172:7 176:17,18 181:11 190:20 192:21 197:2,9 210:16 211:21 212:11

215:7 228:6 242:16 260:3 280:18 294:22
**mentioning** 69:4 89:2
**mentions** 152:11
**merchandise** 209:9
**message** 116:20
**messaged** 117:3
**messages** 95:11 117:1,5
**messaging** 118:16 193:8
**messed** 233:19
**met** 81:6 82:5 84:16,18 85:1 205:15 212:13
**metal** 174:22 175:1,2
**metaphorical** 149:15
**mid** 124:6
**middle** 67:9 112:16,17 123:7 123:19 139:2 140:8 288:16,18 288:18,20 289:7 289:12 290:9
**midwest** 304:17 307:1
**mind** 16:17 67:20 71:2 99:15 256:24
**mindset** 147:22 150:9,13
**mine** 104:24 105:4 105:10 111:17
**mink** 131:24
**minute** 35:5 37:16 41:12 43:1 56:17 64:13 89:14 99:16

148:20 294:6
**minutes** 43:6 130:12 144:15 191:5 219:4,17 268:23,24 294:16 294:20
**missed** 139:19
**misspoke** 286:18
**mistakes** 236:24 237:2,8,10
**mixed** 233:15,16
**mixture** 189:3
**mobile** 113:11
**model** 180:5,9
**mom** 161:10,13,17 188:2 189:5 205:19 213:7
**moment** 9:14 44:12 126:17 188:9 284:7
**money** 10:22 11:3 11:6 100:24 132:11 137:2 154:17 201:7 209:1,4 227:16 228:5,6 231:14
**month** 9:7 39:23 52:11 77:18 78:5 88:6 91:12 92:6 135:15 136:10,16 136:22 137:6,7 157:8 162:19 164:3 193:4 245:15,16 250:23 258:21,22,24 259:1,16 266:16
**months** 7:23 8:17 24:11,11,12 27:13 74:14 88:7 90:1,2 90:7,9 91:18 92:4 96:15 110:5

135:18 164:1 166:7,24,24 200:3 258:23
**morals** 229:4,6 230:4
**morning** 4:6 9:9 9:23 37:23 75:9 75:15 76:2 77:14 279:6
**mornings** 42:6
**mother** 120:7 122:4,5 123:16 162:9 248:3
**motivate** 177:15
**move** 121:18 134:9,14 146:24 151:18 162:12 208:12 287:14
**moved** 90:8 91:1,2 91:13,19 92:12,16 92:22 121:12,13 121:15 125:3 135:24 161:3 199:6,17 243:18 243:19,21 287:9 287:19
**moves** 211:8,9
**moving** 122:9 243:24
**multiple** 15:20 61:21 117:14,17 117:19 159:23,24 168:11 203:2,3 205:15 208:2 271:8
**music** 82:10,11 83:7,8,9,11,17,19 84:3,4,7,8 193:5 193:24 194:13 195:23 196:6,6,9

**[muslim - officer]**                                                                    Page 25

**muslim**  24:16,19
  25:1,6,10,10,12,14
  25:14,21,23 30:8
  40:7 55:6,10,13,24
  143:10 146:4
  147:24 164:13,18
  164:19,22 165:13
  166:15 294:22
  295:1
**muslims**  146:7

**n**

**n**  3:1 4:9 66:19
  83:3
**name**  4:7 17:8,9
  32:5 34:5 41:17
  58:16,18 65:15
  66:18,24 67:5,6
  91:24 112:16,16
  112:17 115:14
  118:3 120:18
  129:18,18 138:7
  209:5 219:14
  240:7,18 260:5,18
  264:19 274:14
  304:6 305:3,4,15
  306:3,4,21
**name's**  232:13
**named**  66:21
  215:4 227:15
  302:8
**names**  15:21 16:4
  31:19,20 45:16
  51:6 58:11,14
  91:14 112:9,15
  158:8 160:1 240:1
  240:19,22 241:2
  260:12 274:8
**narrative**  249:11
**nation**  24:22 25:1
  25:14

**nausea**  185:8
**near**  70:14,14
**necessarily**  208:23
**need**  9:14 95:13
  99:16 135:17
  137:3 202:11
  219:3 220:23
  251:24 280:24
  294:11
**needed**  8:2,3,11
  136:24 182:3
  190:3
**needing**  201:1,2
**needs**  136:15
**negatively**  295:7
  295:11 296:21
  297:1
**neutral**  84:8
**never**  20:6 34:21
  34:24 56:7,17
  86:1 88:17,17,19
  93:23,23 96:5
  123:4 148:4
  187:18 196:20
  197:4 200:8 204:3
  204:5 205:7
  206:12 209:22
  210:2 212:13
  228:6 237:22
  259:23 261:8,22
  282:6 285:19
  288:23 293:13
  299:19,23
**new**  5:6 90:24
  100:7 103:4 113:5
  113:6,8 213:7
**newspaper**  35:1
**nickname**  58:17
  58:17,19
**night**  128:9

**nights**  122:23
**nine**  27:13 222:21
  223:12 234:3
**non**  191:8,22
  229:3,8,11
**nondisclosure**
  217:24 218:5
**normal**  60:21
  170:22 171:8
**normally**  60:15
**north**  2:3,7 303:10
**northern**  1:1
**notarized**  304:15
**notary**  1:19 302:5
  302:12 303:4,9
  304:24 305:10,18
  306:15,23 307:23
**note**  29:2 304:13
**notes**  6:3 65:7
  112:5 154:1 294:8
**nothing's**  65:9
**noticed**  279:5
**november**  65:23
  124:6 242:20
  248:22 250:5
  268:4 276:4
  277:12 278:24
  285:16,19,22
  286:12,21
**number**  10:4 22:5
  22:10 27:19 58:9
  64:18 112:22,24
  113:6,14,18,20,23
  113:24 154:11
  200:2 218:4,9
  223:6 278:12
  279:19 294:19
  304:8,14
**numbers**  113:3
  114:8 284:2 306:7

**o**

**o**  58:20 83:3 302:2
  302:2
**o'clock**  148:22
  232:6
**oath**  6:9 263:19
**obeyed**  292:19
**object**  5:10 23:8
  64:24 109:2
  132:19 143:15
  146:9 155:11
  228:10 252:7
**objection**  5:12
  15:12 23:1,11,19
  36:12 56:9,12
  63:1 230:19 250:7
  258:2
**observe**  60:10
  201:22 203:6
**obviously**  146:19
  179:8 297:3
**occasion**  262:15
**occurred**  37:15
  77:12 267:24
**odd**  194:21 275:6
**offense**  98:6
**offenses**  98:9
**offensive**  196:5
**offer**  256:17
**offering**  44:22
**office**  6:13 11:20
  40:11 63:13 70:18
  76:9 85:17 142:13
  225:24 226:8,10
  235:19 238:7
  263:5,13,21,24
  264:3 265:6
  299:17,18
**officer**  211:1,2,5
  211:12,14 245:18

| | | | |
|---|---|---|---|
| **official** 124:17 | 30:3,12,18 31:5,9 | 92:21 93:3,10,12 | 142:19 143:8,9 |
| 134:3 303:3 | 31:12,18,21 32:9 | 93:14,16 94:7 | 144:4,13,17,20,23 |
| 305:15 306:21 | 32:20,20,24 33:11 | 95:7,10 96:8,18,23 | 145:2,6,10,22 |
| **officially** 77:13 | 33:22 34:2,15,24 | 97:15,18 98:7,17 | 146:1,1,6,10,18,21 |
| 124:21,22 197:20 | 35:4,13,16,19 36:2 | 98:22 99:8 101:3 | 146:23 147:18,20 |
| **officials** 124:18 | 37:1,11 38:3,17 | 101:9 102:6,9,12 | 147:23 148:2,6 |
| **oglesby** 125:8 | 39:1,18,21,23 | 102:17,20 103:15 | 149:21 150:6,17 |
| **oh** 9:20 16:19 | 40:22 41:1,11,15 | 104:11,15,19 | 151:1,6 152:3,11 |
| 41:14 42:16 62:12 | 41:15 42:3,10,14 | 105:6,11,14,24 | 153:5,18 154:6 |
| 64:12 66:11 72:7 | 42:17,24 43:7,8 | 108:1,7,11 109:8 | 155:18,23 156:21 |
| 85:24 89:13 | 44:2,6,10,14 45:18 | 109:22 110:2,10 | 156:24 157:3,10 |
| 112:16 123:6 | 46:2,9,19,22 47:6 | 110:17,21 111:1 | 157:16,19,23 |
| 136:8,9 141:16 | 47:11,15,20 48:19 | 111:11,23 112:8 | 158:3 159:7 |
| 146:2 151:14 | 49:2,16,23 50:4,16 | 112:14,24 113:3 | 160:22 161:3,6,22 |
| 158:23 171:22 | 51:19,24 52:13,18 | 113:10,12,20 | 162:1,9,12,19,23 |
| 181:15 198:23 | 52:21 53:6,9,16,20 | 114:7,10,12,18,20 | 163:2,11,13,16,21 |
| 207:4 222:6 | 53:23 54:8,13 | 115:3,8,13,20 | 164:4,7,10,13,22 |
| 227:12 280:23 | 55:13,16,22 56:1,6 | 116:1,4,17,20 | 165:3,9,13,16,24 |
| 281:1 | 56:8,12,16 57:10 | 117:1,19,22 118:1 | 166:5,13,17 167:3 |
| **ohio** 304:2 | 58:6,10,21 61:1,15 | 118:3,12,24 119:5 | 167:7,21,24 168:3 |
| **okay** 4:6,10 5:5,9 | 62:17 63:18 64:2 | 119:11,20 120:11 | 168:10,16 169:5,9 |
| 5:17 6:5,12,16,19 | 65:5,6,11,12,15,18 | 120:15,18,23 | 169:9,18,23 170:1 |
| 6:23 7:2,5,8,19,21 | 66:11,15,18 67:4,9 | 121:5,22 122:11 | 170:5,7,10,14,17 |
| 7:24 8:4,7,10 9:1 | 67:14 68:4 69:1 | 123:4,9,12,22 | 171:7,10,13 172:2 |
| 9:4,7,9,12,21 10:1 | 69:15,21 70:5,19 | 124:17,24 125:3,6 | 172:5,7,11,17,19 |
| 10:9,11 11:1,6,14 | 70:22 71:2,5,11 | 125:17 126:4,8,10 | 172:22 173:2,6,8 |
| 11:16 12:3,7 13:1 | 72:8,14,19 73:17 | 126:14,16,20,24 | 173:12,14,21 |
| 13:5,13,21 14:2,11 | 73:20,24 74:9,17 | 127:5,11,15,21 | 174:3,5,8,11,19,24 |
| 14:14,17,24 15:17 | 75:2,12 76:1,20 | 128:3,6,12,15,18 | 175:9,9,9,18,21,23 |
| 15:21 16:1,6,15,20 | 77:19 78:4,13,16 | 128:21,24 129:2,7 | 176:4,7,8,14,17,23 |
| 16:22 17:2,8,12,17 | 78:22 79:12,21,22 | 129:9,12,17,22 | 177:4,9,21 178:3,9 |
| 17:20 18:2,10,22 | 80:3,7,10,22 81:4 | 130:12,14,17,24 | 178:23 179:2,6,11 |
| 19:4,7,16 20:3,6 | 81:15,19,23 82:5 | 131:5,8,14,16,19 | 179:20,23 180:3,8 |
| 20:24 21:2,5,19,22 | 82:11 83:6,14 | 132:2,11,15 | 180:14,21,24 |
| 22:5,15,18,23 | 84:10,21,24 85:5 | 133:18 134:5,9,22 | 181:11,15 182:3,6 |
| 23:17,23 24:13,16 | 85:10,13 86:13,18 | 135:1,19,23 136:5 | 182:9,12,16 183:4 |
| 24:18,21,24 25:3 | 86:23 87:2,9,22 | 136:11,21 137:12 | 183:7,18 184:18 |
| 25:20 26:2,11,22 | 88:2,8,13,19 89:11 | 137:14 138:23 | 184:23 185:2,5,8 |
| 27:1,7,15 28:1,5 | 90:4,10,15,19,22 | 139:2,5,7,18,21 | 185:11,17 186:1,5 |
| 28:11,16,17,20 | 91:5,8,12,16,19,22 | 140:6,12,17 141:1 | 186:9,12,15,18,21 |
| 29:2,6,9,18,24 | 92:2,5,9,11,15,18 | 141:4,12,18,22 | 187:3,7,16 188:5 |

188:11,17 189:12
189:23 190:16,20
191:7,11,17 192:4
192:7,10,13,16,20
193:2,7 194:5,7,18
194:21,23 195:12
195:14,16,20
196:5,8,11,21
197:1,9,13,17,20
198:2,8,17,20
199:1,4,9,18 200:2
200:8,21,24
201:11,13,16,19
201:22 202:6,13
202:18,20,22,24
203:5,8,10,22
204:1,5,8,15,23
205:2,8,11,17,22
205:24 206:7,23
207:4,8,14 208:12
208:17 209:8,22
210:1,7,13,19
211:20,24 212:10
213:9,20,23 214:6
214:17,20 215:1,7
215:11 216:7,12
216:15,18,23
217:3,12 218:4,9
218:24 221:24
222:4,9 223:1,4,20
224:1,4,13,13,18
224:21 225:3,7,10
225:10,11,20,22
226:18,18,20,24
227:4,12,15,24
228:7 230:9,16
231:10 232:4,17
232:18,20,21
233:5 235:6,10
237:15 241:6
246:21,24 247:3,3

248:15 252:12,17
252:22 254:12,22
254:24 255:5,10
255:19 265:10
271:19 273:3,17
276:16,23 278:2
279:16 280:12
283:14,24 284:6,8
284:9,9,10,12,13
286:4,4 289:5,22
291:5 294:6 295:4
295:10 297:4,17
298:2,5,17 299:3
299:19,23 300:3,9
300:13,15,20,22
**old** 65:20 80:1
83:1 118:16
128:11 278:16,18
**older** 84:11,13,14
84:16 119:22,23
121:5 243:15
296:8
**once** 37:19,23,24
52:11,11,12 71:18
77:7,8 78:9 84:6
93:4 107:7,11
136:16 137:6
141:9 157:6,8
164:1,2,3 167:2
195:2 205:14,15
205:16 225:23
226:7 233:20,21
**ones** 197:18 220:3
220:13
**opening** 56:8
**opinion** 22:20 59:6
**opportunity**
175:18
**option** 264:22
**optional** 249:12,15
249:23 275:9

**oral** 138:19 302:10
**orange** 172:14
173:23,24
**oranges** 172:15
**order** 145:21
153:13,14
**ordered** 169:11
**organization**
25:12
**organizations** 15:1
15:10,13
**ornate** 175:4
**outgoing** 85:4
**outside** 43:3 51:8
60:20 61:23 146:8
194:24 226:15
260:8,10,14,23
**overbroad** 15:12
**overheard** 274:9
**overlooked** 220:9
**overnight** 131:3,6
**overwhelmed**
157:9
**owned** 134:20
135:6
**owns** 134:2

**p**

**p.m.** 128:7 221:5
303:2
**packer** 128:5
**packet** 108:7
**packets** 168:7
**packing** 129:22
130:3
**page** 3:4,11,18
9:19,21 27:19
64:17 67:10 70:19
70:23 72:15 75:22
78:14,16 79:23
111:6,7,15,17
117:12 151:22

152:9 216:24
222:20 223:12
224:4,5,14 256:22
257:5 284:6,9,11
304:14,16 306:7
307:3
**pages** 64:21
168:12
**paid** 11:16 101:4
101:10,14 127:8
133:11,18 152:18
154:24 155:9
**pandemic** 6:2
**pants** 209:12,17
**paper** 38:10
172:22 175:5
300:5
**papers** 167:24
**paperwork** 57:15
275:4
**paragraph** 78:22
79:23 217:5,6,10
217:12,16,23
218:15 225:8,11
225:23 236:17
237:15
**parent** 33:1
**parents** 33:3,6,7,8
33:9,15,23 34:3
57:17 68:8,9,11,14
69:18 90:23 92:20
92:22 120:2,5
205:8,18,24
206:11,12 270:17
270:20,23 271:1,2
271:5,11,18
272:11,14,20
273:8,9,19 274:10
274:16,23 275:4,7
290:19 292:15

parking 231:23
part 7:13,16 13:13
    13:16,18 14:4,10
    14:12 18:1,3
    23:10,11 26:5,9
    52:9 53:17 68:6,6
    79:1 82:9 83:9,10
    106:2 134:10
    138:9 165:16
    178:10 180:4
    181:13,16 216:16
    216:19 218:10,16
    248:16 250:1
    267:1,16 277:14
    278:21 285:3
    306:9
partially 240:16
participate 14:8,9
    15:23 32:12,13,15
    36:11 59:16,17,18
    59:21,22 60:2,5
    62:15 63:5,7,15,15
    141:15 225:13
    226:9 251:17,21
    251:23 255:18
    275:9 280:23
    282:19 286:1
participated 36:18
    183:4 244:18
participating
    36:22 53:21 55:6
    60:8 112:1 141:20
    142:18 184:3
    186:13 245:5
    251:19 261:10
    275:23 287:12
    288:3,14 292:24
    293:9 295:6,11,16
    296:2,16,20 297:1
participation
    10:23 11:3 268:9

289:6 295:6
    296:11,19,20
    300:16
particular 24:18
    171:7 255:16,16
    278:5 280:20,21
    290:14
particularly 25:7
    25:19,20 140:22
    220:3
parties 2:1 58:7
    181:12 282:4
    302:24
parts 147:7,8
    149:22
party 52:5
passed 163:4
    213:7
password 116:16
path 125:2
paths 138:1
pause 44:11 132:6
paused 132:9
pay 11:18 100:24
    101:7 134:6 136:8
    136:9,9 153:6,7,16
    154:2 201:2 209:2
paying 231:13,23
pays 153:5,9
peace 150:15
peaceful 71:6
    200:17,19
penalty 76:13
pending 98:2,3,13
people 13:10
    14:24 15:20 33:1
    35:8 42:20 57:16
    58:8 60:16 69:7
    72:6 82:21,23
    114:22 127:18
    152:20 153:16

159:13 181:16,20
    192:1 193:16
    194:15 216:1
    239:9 242:5 251:7
    251:9,15,22 252:1
    254:1 256:12
    257:9 262:3 271:8
    273:17,21,24
    274:4,6,22 282:1
    291:9 299:12
percentage 245:11
percenters 25:15
performing 182:7
period 11:15
    37:16,19,21 56:18
    60:12 61:16,24
    62:18 124:5,9,14
    132:9 145:15,19
    148:15 161:15
    190:4 199:1
    242:12,16,19,23
    243:3,9 245:7
    262:7 271:16
periodically 87:14
    136:7 161:13
periods 38:23
    140:13 141:2
    142:9 144:9
    189:15,19,20,21
    210:6
peripherally
    192:22
perjury 76:13
permission 41:10
    68:9 222:16
    224:24 283:6
permit 41:1
permitted 41:9
person 14:18,21
    17:5 93:8 95:12
    95:18 112:20

146:9 153:10,12
    193:7,9 203:21
    267:14 273:18
    274:9,14,19,22
    275:2
person's 17:8
    260:11
personal 30:10,12
    70:4 116:18,19,21
    243:8 289:16
    290:7,8
personality 86:4
personally 21:2
    38:22 52:13 60:9
    153:2,3 196:7
    212:13,14 242:11
    256:10 263:6
    299:13 305:11
    306:15
persons 1:4,5
pertaining 1:21
    43:14 117:2
petey's 125:9,10
    125:15
phenomenal 67:21
    67:23
phone 6:5 10:4
    93:10,13 95:18
    100:2,6,8 102:3
    103:23 112:22,24
    113:3,4,6,14,17,20
    113:23 114:12,23
    145:4 164:7,9
    198:3 211:24
    212:17,19 213:9
    303:12 304:3
phones 38:4 114:5
photo 46:14,15,21
    56:3 78:16 111:15
    111:15,17

[photograph - printed]                                                    Page 29

**photograph** 3:19
  215:2
**physical** 186:22
**physically** 184:2
**picture** 173:14,15
  173:18,22 174:1,3
  174:5 214:7
  268:15,21 269:2,8
  270:4 273:6
**pictures** 152:7
**piece** 38:10
**pieces** 172:17
  183:22 300:5
**pizza** 51:14,17,22
  52:7,9,10 54:11,24
  58:7 181:12 256:2
  256:19 282:5
**place** 90:24 125:21
  135:19 150:12,22
  221:7 243:10
  244:1,12 302:5,16
**places** 122:15
  202:16,20
**plain** 175:7
**plaintiff** 212:4
  227:19
**plaintiffs** 1:6 2:5
**plastic** 172:24
  175:2
**play** 7:12 83:20
  85:7,10
**played** 85:9
  215:15,17
**playful** 85:4
**playground** 179:9
**playing** 38:4
**plead** 210:8
**pleadings** 107:14
  107:14
**please** 4:6 20:18
  37:12 65:3 219:4

224:4 232:20,23
  251:12 265:21
  274:21 283:11
  296:8 304:12,12
**pled** 210:8
**plenty** 193:16
**point** 8:17 54:2
  84:10 86:13 146:1
  146:18 182:24
  199:22 204:11
  220:8 239:2,5
  241:1 250:2
  266:10 288:13
  293:19
**points** 155:12
**police** 125:15
**popular** 180:17,19
  180:20 194:3,7
**portion** 189:20
  276:2
**position** 22:8
  127:24 128:4
  228:9 230:14,17
**positive** 58:22
  192:16 280:9
**possessed** 207:6
**possibility** 11:2
**possible** 55:24
**possibly** 232:8
**posted** 95:19
**pot** 137:8,18
**pouring** 175:13,14
**poverty** 219:21,22
**power** 147:3
**practice** 42:19
  67:23 72:8 141:17
  143:14,19,24
  238:23 256:8,23
  257:11 258:9
  269:5 270:10
  276:5 277:1 286:6

286:24
**practiced** 183:8
  269:21
**practicing** 146:19
  146:23 165:3
  185:9,14,22 186:2
  189:23 259:9
  260:1 293:16,20
  293:23,23 294:3
**pray** 40:10,19
  42:1,4,6 70:1,6,10
  140:16,17 141:2,2
  141:20 144:2,4,8
  144:11,20,24
  145:17,19,23
  226:15 289:20
**prayed** 144:18
  212:17,19 213:5
  213:16 295:1
**prayer** 41:17 42:8
  140:23 144:13
  145:3,8 213:15
  229:8,11 295:2,3,4
**prayers** 40:16
  41:2,6 42:11,21
**praying** 40:8
  50:15 142:10
  143:11 159:19
  230:9
**precise** 220:22
**preliminaries** 4:11
**prep** 168:17
**preparation**
  101:17 102:7
  110:22,24
**prepare** 6:23
  80:17 102:1,4
**presence** 151:16
**present** 2:1,22
  13:22,23 14:2,8
  188:8 201:13

302:7
**presentation**
  273:6
**presented** 112:19
**press** 213:24
**pressure** 183:1
  222:17 224:16
**presume** 100:17
**pretend** 56:16
  254:14
**pretended** 48:24
**pretty** 20:1 57:13
  58:12 159:20
  194:3,9 210:24
  219:23 233:8
  243:13 244:3
  248:8
**pretzel** 2:11,14
**prevent** 6:20
  61:10
**preventing** 144:1
**previously** 4:16
  10:18 67:2 80:21
  81:1 109:20
  118:10,10 155:19
  157:21 161:7,10
  176:14 216:24
  218:6 222:4
  234:14 238:4
  246:21 248:5,16
  250:21 259:6
  267:2,5,6 302:8
**price** 152:24,24
  153:15
**priest** 46:17
**principal** 31:21,22
  31:24 32:1
**principal's** 70:18
  142:13 299:17
**printed** 65:1,2

**prior** 8:21 101:24
104:16,20 105:9
106:19 111:12
113:12,14 114:8
159:7 160:13
167:8 193:20
228:18 234:13
235:14 238:4
250:8 269:1,4
276:18 298:17
**prison** 162:5,6,9
188:2
**private** 19:13 20:1
20:4 270:14
**privately** 292:1
**privilege** 106:19
228:11
**privileged** 106:16
**probably** 21:12
52:12 58:8 63:19
75:6 88:7 90:1
91:18 96:13 110:5
110:5 114:6
122:18,23 129:10
131:9,13 136:15
137:6,7 157:7
164:2,2 166:23
197:7 198:21
202:2 208:8,10
210:15 227:13
245:14 258:22,23
258:24 259:1
277:23 278:1
294:7
**probation** 98:4,8
210:16,17,20,23
211:1,2,5,12,14
230:17
**problem** 44:7,12
150:4

**problems** 6:19,20
30:6,10,12 200:20
200:21,24
**procedure** 1:20
302:19 305:5
306:5
**proceeding** 111:20
**process** 47:22
132:4 169:6 177:4
177:6
**produce** 127:16
**produced** 27:17
64:6,16 220:17
**production** 127:7
304:16,17,22
**products** 127:17
132:3
**profit** 132:20
154:17 155:6
**program** 7:4,6,11
7:15,17 8:6,8,12
8:23 10:19 11:9
11:11 12:11 13:15
13:19 14:3,5,12
15:6,8,11,19 16:2
16:10 17:16,18
18:5,6,9,12,15,19
21:6 30:7,24 31:2
31:6,9,13,22 32:10
33:2 34:3,11,13,22
35:2,4,7 36:11,19
37:6,14 42:12,15
57:21,24 58:4
59:2,9 66:6,9
68:21 69:24 74:4
74:11 77:17 95:8
95:11,15,20 96:1,1
102:21 117:4
142:8 158:5 161:4
167:19,22 168:1,4
168:8 176:20,20

176:23 177:5
178:10 179:18,24
180:5 181:4,13,16
181:21 182:1,4,7
189:12,16,19
190:2 192:14
196:19 225:13
226:9 228:2
232:17 241:17,22
250:2,13,20 251:2
257:10,14,19
280:17 281:10,22
282:3,9 283:7
289:11,12,24,24
290:11 293:13
295:5 300:10
**promise** 216:15,18
**promote** 23:18
177:21 179:7
182:3
**promoting** 50:18
50:19 51:11,21
54:15,21 154:3
179:15 181:22
182:1
**promptly** 230:24
**pronouncing**
158:21
**properly** 231:3
**provide** 99:1,6
107:22 152:19,19
152:23 209:5
220:6 256:23
**provided** 75:14
98:22 220:7 300:6
**puberty** 218:11,17
218:22 219:21,22
220:1,18,23 222:5
222:7 224:2
297:15,23 298:3

**public** 1:20 11:11
20:1,4 26:13,17
27:18 28:3,13,13
29:19 31:7,10
32:22 41:1,24
42:10 78:23
115:23 118:1
295:21 302:5,12
303:4,9 305:10,18
306:15,23 307:23
**puja** 80:10,11,13
**pulled** 46:3 50:21
51:4,14 52:14
170:4 221:20
272:22,23
**pump** 171:24
**punch** 204:15
**punished** 63:14
**puppy** 43:2
**purchase** 153:3
**purchased** 153:2
**purchasing** 153:12
**pure** 154:13
**purport** 222:15
223:15
**purpose** 150:1
189:6 253:12
256:23 257:11
**purposes** 153:22
**pursuant** 1:20
302:18
**push** 50:22 177:11
**pushed** 170:20
**pushing** 280:23
**put** 18:16,19 38:16
38:17 39:7,12
50:1 64:10 71:22
75:7 102:24
167:14 183:22
191:2 222:13
229:1 230:7

**[put - really]**                                                           Page 31

238:13 250:21
255:8,11,17
265:15,15,22,23
265:24 266:5
277:19 278:3,11
279:24 280:1
284:2
**putting** 182:24

**q**

**question** 5:10,11
8:10 10:12 15:14
15:15 21:15 23:8
23:10,21 26:7
44:1,4,8 56:10
62:8 63:21 67:10
89:10 107:2
108:15 124:11
126:22 132:19,23
132:23 142:14
143:17 149:6
154:8 155:7 156:5
158:15,18,19
159:15 181:19
219:6,20 220:9,15
228:16 229:18
230:20 232:22,24
233:23 239:5
240:7 250:9
251:11,13 252:6,8
252:11,13,16
258:4 261:12
270:1 273:2
274:21 276:4,13
278:4,12 279:19
283:6 286:4,17
**questioned** 297:23
298:2
**questioners** 250:8
**questioning**
155:12 219:21
236:6 237:11

**questionnaire**
218:10,16 219:22
222:6 225:4,7
**questionnaires**
220:2
**questions** 4:15
70:23 89:16 99:9
100:16 151:21
169:15 175:19,21
175:22 218:11,17
221:1 222:5
223:21 224:6,7
225:8 232:10,15
232:17 277:19
278:7 283:20
294:9,12,21 297:5
297:7,15,23
300:24 302:10,14
**quick** 99:16
115:16
**quickly** 27:16
219:16 232:10
250:22 295:20
298:12
**quiet** 7:4,5,11,15
7:17 8:6,8,12,16
8:22 10:19 11:8
11:10 12:5,11
13:15,19,24 14:2,5
14:12 15:6,8,11,18
16:1,9,24 17:16,18
18:1,3,6,8,11,15
18:19 21:5,10
30:6,24 31:2,6,9
31:13,22 32:10
33:2 34:3,11,13,22
35:1,4,6,8 36:11
36:19,22 37:5,14
37:24 41:12 42:12
42:14 43:15 52:4
52:22 53:6,10,21

54:3 55:3,6,19,22
56:18,21 57:21
58:22 59:8,13,22
60:8,11 61:7,16,24
62:3,7,18 63:19
66:6,9 68:16,20
69:2,7 74:10
77:17 79:24 81:15
95:8,11,15,20 96:1
96:1,15,19 97:1
99:5 102:21 117:4
140:13 141:1,20
142:7,9 144:1
145:19 158:4
159:17 167:22
168:1,4,8 176:20
178:20,24 180:22
189:12,16,18
190:2,3,6,9,11,13
191:7,12,18,21,24
192:10,14 196:19
215:12 225:13
226:13 227:11,12
228:2 232:17
241:17,22 242:12
242:14 244:16,18
245:5 248:17
257:9,14,19 261:6
261:7,8,13,14,19
261:24 262:7
263:17 264:15,21
265:2,8,11,14,17
265:21 266:1
280:24 281:2
282:1 283:7
289:23 295:5,10
295:11,15 296:3,6
296:12,18 297:1
300:10
**quietly** 37:5 64:3
143:3 181:24

261:3
**quit** 128:23
**quite** 200:18
**quote** 207:9,10

**r**

**r** 58:20 66:19
**racine** 91:23 92:1
92:2,11,21
**racing** 186:1
**raise** 31:12
**raised** 24:16,18
**rambo** 194:16
**ran** 64:11
**random** 62:11
**rang** 48:16 191:4
**range** 154:20
**rap** 83:24
**rate** 101:10 231:11
**reach** 96:4,17
**react** 69:10
**reactions** 58:22
**read** 21:16 67:17
103:11 108:5
109:13 140:1
158:19 190:17
249:1 251:12,13
252:5,6 257:4
269:24 270:1
276:13 281:20
283:20 284:10
305:5,6,12 306:5,6
306:17
**readily** 233:10
**reading** 38:7
236:16 304:20
**reads** 217:6
**real** 58:18 115:16
295:20
**really** 7:1 19:22
30:7 37:10 38:14
45:22 62:2 83:18

83:18 84:1 91:14
93:13 94:20
125:19,20 147:4
167:4 171:19
175:14 177:6
194:1,8 195:19
197:14 205:23
206:13 207:16
213:13 219:16
220:14 244:21
262:9 267:12
271:2 278:15
280:24 285:11,14
286:5 297:20
**reason** 6:16 11:4
28:12 29:18 51:2
134:5,10,11
142:11 162:1
180:3 227:18,19
227:24 278:5
290:5,14 304:15
306:8 307:3
**reasons** 30:9,23
290:6,7,8
**rec** 153:10
**recall** 104:8,12
105:8,17,19,21,22
105:23 113:17
123:18 124:5
130:17,19,24
138:2 156:3
158:20,20 162:22
168:9,20 173:5,24
174:4 176:8
178:16,17 179:24
182:13,14,24
183:3 185:7,10
193:4 199:1 207:3
209:12 219:1
222:18 223:1,18
223:21,23 224:7

224:11,15,17,18
224:24 248:12
278:16,16,17
**receipt** 304:19
**receive** 104:1
108:11 154:17
238:6
**received** 43:13
47:12 102:9,12,20
155:1,10 296:6
299:19,23 300:5
**receiving** 103:21
104:20
**recess** 43:10 64:14
89:17 99:22 106:8
149:4 179:9
219:11
**recite** 47:21
**recited** 47:22
**reciting** 47:3
**reckless** 208:19
**recognize** 65:13
**recollect** 183:21
**recollection**
103:21 106:24
109:3,7 178:6
189:1 247:6
**reconnect** 288:1
**record** 4:7 5:20
9:13 28:12 29:19
43:1 64:6,13
75:13 98:5,9
99:23 100:1
102:15 106:7,9,23
109:17 149:21
155:23 219:12,20
222:1 284:2,4
295:22 298:10,12
298:21 302:14
306:9

**recorded** 5:16
84:5 138:11
**records** 95:4 100:2
124:8,10,12,13,15
138:16 299:20
301:12
**reduce** 256:24
257:12
**refer** 194:15 247:3
**reference** 304:8
305:2 306:2
**referenced** 218:7
305:11 306:15
**referencing**
110:11
**referred** 302:16
**referring** 72:11
167:10,11 217:9
218:1,2,4,5,12,20
218:21 224:1
225:8,14,17,22,24
299:16
**reflection** 294:18
**refresh** 109:6
178:5
**refreshes** 109:3
**regarding** 222:5,7
222:17 224:6
237:3 259:17
267:7 283:7
285:16
**regardless** 253:17
**regards** 224:16
231:8
**register** 133:9
**registering** 133:11
**regular** 171:17,19
171:19 239:24
**regularly** 85:19
87:9 202:7

**rehab** 161:8
**reimbursing**
231:14
**related** 28:2
102:21 107:20
111:23 158:4
212:1 231:7
**relates** 227:11
229:16
**relating** 102:10
157:24 167:22
168:1 210:13
224:24 227:12
**relationship** 81:20
88:12 106:22
163:13 164:11
192:21 195:4,7
200:17 244:4
284:24
**relaunch** 132:18
133:4
**relaunched** 132:7
**relaunching** 132:4
**relaxed** 279:15
**relaxing** 49:18
156:12
**relevance** 23:19
155:11
**religion** 25:8
42:15 56:23 57:8
57:13 59:4,6,15,18
86:8 88:22 143:24
**religions** 55:8 57:5
**religious** 26:3
33:19 56:4 59:9
59:13 70:1 88:20
143:9 149:22
165:18 195:17
241:4,8 257:21
271:1,2,5,11,18
272:15,21 273:9

273:20 274:11,17
274:24 275:5,8
290:20 291:4
292:15
**remain** 224:22
**remaining** 279:11
**remember** 15:21
16:4,6,8 17:5,6,6,8
17:12 21:6 24:8
31:18 32:5,9,11,16
35:5,8,13,16,17,18
35:21,22 40:2,12
40:17 41:16 45:18
45:20 46:2,6,12,22
47:2,3,20,21,23
51:4,7,24 52:2,6,8
52:14 54:5,8,10,17
58:7,11 61:22
66:8,24 68:23
69:1 73:21 77:3
77:16 82:5,13
83:10 85:19,21,22
89:2 91:10,12,22
113:16 114:7
122:1 160:5,5
162:21 168:6,14
168:16 170:7,10
171:9,20,20 172:5
172:6 173:8,10,13
173:14,21 174:11
174:17,17,19
175:9,15 176:11
176:23 177:4
178:11 197:14
213:4 214:14
215:19 218:18
222:22 239:15,17
239:18,20,21
240:1,7 242:6
243:3 248:19
258:10,13 260:11

260:15,18 264:17
264:18,23 267:12
268:18 281:23
297:15,20,22
**remembered** 67:4
**remembering**
285:24
**remind** 80:23 81:2
197:3 219:13
**remote** 1:18 6:1
**remotely** 2:1
**remove** 145:21
**removed** 262:21
**removing** 264:23
**rent** 134:6 136:8,9
**rented** 134:15
**repeat** 189:17
191:23 251:11
269:23
**repented** 89:5
**rephrase** 16:7
132:22 252:4
**report** 184:12,15
186:22 211:12
214:8
**reporter** 5:16 18:7
44:3 103:2 214:24
305:7
**represent** 27:16
228:22
**representation**
21:24 101:1,7
227:2
**representative** 1:3
1:5
**representing**
100:14 101:4,11
222:16
**request** 106:1
221:3,5 306:9,11

**required** 42:21
188:6,6 253:8,14
253:16 304:24
**requirement**
39:15 187:21
**reread** 158:18
**research** 45:4,13
50:16 54:7 71:23
71:24 72:10 73:14
73:18,21,21 74:10
74:18 80:21
141:14 157:24
158:4 159:8
160:14 192:14
239:3,6,12,16,22
240:3,9,13,17
258:8,14 259:5,12
259:17 262:20
266:24
**researched** 157:21
159:1 240:16
**researching** 45:18
45:20 72:7,15
73:7 160:9
**reside** 151:10,11
**residences** 123:4
134:9
**residential** 211:9
**resonates** 149:13
**respect** 18:11 22:9
269:4
**respectively**
234:23
**respond** 96:8
231:1
**responding** 231:4
**response** 8:13
32:17 67:14 226:5
263:12
**responsibilities**
231:17

**rest** 131:10,13
164:18 184:19
247:10 256:24
269:19 270:2,8,10
**restate** 56:10
63:21 107:2 119:8
143:17 158:15
181:19 218:14
229:18 258:4
269:23
**restroom** 89:12
144:10
**result** 185:9,22,22
186:2,6,9,23
**results** 12:23
73:17
**retention** 106:19
**returned** 304:19
**revenue** 154:9
155:5
**review** 77:22,24
78:7 102:6 104:3
104:22 105:8
107:5,18 109:22
110:21 236:23
237:7 304:13
305:1 306:1
**reviewed** 104:19
105:14 107:7,13
109:18,24,24
110:3,15,19
236:20,22
**reviewing** 104:13
106:24
**revisit** 107:12
**reward** 54:16
62:24 253:10
254:5 256:5
**rewarded** 51:1,10
**rewards** 51:13
52:15 53:21 54:11

**[rewards - saying]**

54:19 177:8,10
181:7,9,11,18,24
182:4
**rice** 46:13,14,20
172:10,19 173:2
174:13 175:14,14
268:17
**right** 5:7 12:11
14:19 17:3 19:2,9
20:4,12 24:16
28:21 29:3 33:12
37:14 39:24 40:1
41:21 43:4,16,20
44:8 52:22 55:17
56:14 57:2,3,24
58:23 59:10,14
61:8,13 63:6
64:13 65:8 67:15
70:16,16,17,17
72:12,17 73:15
74:1,2,5,19,24
75:4,15 77:14
78:17,20,23 80:4
84:19 89:19 92:14
94:11,16 96:9
98:4,10,20 101:17
105:8 106:4,5
111:20,22 112:4
113:10 114:4,12
118:9 121:8
122:23 123:5,18
125:2 126:24
130:20 133:21
134:1 138:1 142:4
142:20 143:6,8
146:18 148:23
150:21 151:18
153:12 155:16
156:4 159:22
161:4 167:7,16
168:10 169:9

171:1,13 175:8
176:7,15,21
177:24 178:13,20
179:4,5 182:22
183:4 185:21
186:5 192:20
196:18 197:1
199:4,22 203:17
207:4 208:12
209:9,23 210:2,5,7
211:20 214:2,7
215:1 216:21
217:4,16,18 218:9
219:9 221:10
223:4 224:4,14
228:16 229:23
233:5,17 234:18
235:11,19 236:18
237:13 240:5
241:18 242:2
244:13,19 245:2,5
245:9,23 246:10
247:17 249:24
251:5 252:24
255:2 256:9 259:4
259:7,8,21 261:7,9
261:15 262:11,11
262:13 264:6,10
270:3 272:15,21
276:9 278:19
279:13,17,24
280:1,10 286:11
286:14 287:16
288:5 289:2,13,15
290:1,3,21 291:10
291:22 292:2,4,11
292:20 293:9,10
293:11,19 296:13
297:2,4,6,7,18
298:3,9,20,22
299:1 300:23,24

**ring** 125:8 191:5
208:17
**rises** 42:9
**robe** 173:16,17
**role** 7:12 128:4
138:8 215:14,17
**roll** 138:19
**room** 6:2 42:1
46:9,10 70:9,12
170:18 175:11
176:8 178:23
179:3 191:8 264:2
268:14 269:20
270:8 273:6,18
**roommate** 200:5
**rosenberg** 2:6 3:6
20:18 44:2 75:5
99:13,18,21,23
100:11,13,19
102:24 103:3,7,12
105:24 106:6,12
106:18 109:5,15
132:22 143:18
148:15,18 149:3,5
151:18 152:2
153:21,24 155:7
155:15,23 168:22
169:13 214:20,22
215:1 217:3 219:5
219:12 220:11,16
221:15,21 222:9
223:4,8,11,15
228:12,17 230:22
232:2 234:3
282:22 294:12
297:13 299:5,8
300:22
**rosenthal** 103:9
106:10 109:1
110:18

**rosenthal's** 104:1
**rotate** 9:15,19
**rug** 295:2
**rules** 1:20 302:18
302:19 305:5
306:5
**run** 11:11 15:11
131:9,13 149:1
**running** 55:19
181:20
**rushed** 277:24

**s**

**s** 3:10 4:9 41:20
304:16 306:8,8
307:3
**sad** 186:12 213:13
213:13
**safari** 72:2,11
**sales** 132:21
133:19
**salhet** 41:18,20,21
41:22
**salisbury** 2:22
221:2,10,13 284:1
301:6
**saliva** 81:16
**sample** 81:16
**sat** 190:16
**save** 106:5
**savvy** 9:19
**saw** 28:8 31:24
54:21 94:15
155:19 168:11
213:12 223:1
256:4,5 260:8,10
260:14
**saying** 32:16,18
48:10,18 89:4,5
109:17 116:22
122:7 132:6
159:11 161:17

175:15,24 176:2
180:18 181:2
202:10 268:21
285:23 298:1
**says** 21:19,23 22:6
28:20,23 66:12
67:17,18 71:9
79:2,3 183:23
222:20 237:15
249:11,18,22
256:22 276:14
278:12 279:18
286:12 298:14
**scanned** 9:14
**schedule** 145:2
**schizophrenia**
162:15
**school** 3:24 15:18
16:23 20:2 26:1
26:13,14,17,18,19
26:20,22 27:1,4
28:7,8,18,21,24
29:7,9,11,11,16,20
29:21 30:1,4,4,16
30:17,18,19,22
31:3,14,23 32:22
33:12,20 34:19
35:9 36:11 37:2
41:2,6,7 42:7
43:16 46:2 50:8
53:6,9,11,14,17
55:2,8,11,14,17,17
55:20 56:7,7,18,22
57:1,5 58:22
62:14 63:16 66:3
68:14,18 69:18,20
69:22,22 70:5,7,13
73:18 78:12,14,23
79:16,18 82:20,22
85:8,11 86:11,21
86:24 87:7 95:24

113:21 118:14
122:11 123:5,6,7,8
123:10,20 124:1,2
124:18,18,19,23
126:11,14,18,21
127:1 131:22,23
133:5,6 138:11,13
138:17,21,24
139:15 142:3
143:11,14 144:2,4
146:12,22 162:10
162:14 164:6
165:12,16 166:14
169:23 185:12
190:4 191:11,18
191:22 192:2
193:11 194:3,5,7,9
194:24 197:8
199:15,16,17
212:24 233:6,8,13
233:14 234:23
235:8,10 236:1,7
236:12 237:4
238:17,22 240:21
241:11,14,18,22
241:23 242:5,8,12
242:17,22 243:5
244:8,12,16,21,24
245:1,4,8,12,13,19
245:22,22 246:2
247:5,10 248:19
252:1,3,18,23
253:3,9 256:11
259:14,17 260:7,8
260:9,10,15,24
261:2 274:13
285:6,13 287:23
289:4,13,20,23
290:11 291:18,18
292:1,5,14,19
293:2,4,5,6,7,12

293:24 295:21
298:3,5,8,18,19,21
299:12,19,24
300:7,10
**schools** 7:7 10:20
11:11,15 18:16,17
18:20,24 26:13
27:18 28:3,13,14
29:19 31:7,10
32:22 41:1,24
42:10 69:19
165:18 227:9
246:23,24 286:3
287:4,14 289:21
289:23 290:5
295:21
**science** 145:12
**scope** 36:13
**scratch** 11:1 36:19
**screaming** 204:9
**screen** 21:14
222:10
**screenshot** 3:18
151:22
**script** 177:17
**scroll** 64:21 79:22
283:8,9
**seal** 303:3 305:15
306:21
**search** 95:3
158:21 159:4
220:5
**searched** 158:13
158:14
**season** 259:20
**seat** 145:19 264:2
265:8,14,17,24
266:7
**second** 9:20 16:16
37:16,19 64:11
75:2 81:10 89:9

91:24 97:12 104:8
105:17 107:1,4,5
108:19,20,23
129:13,13,14,15
138:1 189:21
217:16 239:12
266:21,22,23
**seconds** 294:10
**secretary** 133:1
**section** 80:11
**secure** 125:21
**security** 142:1,10
209:6
**see** 5:7 9:18 16:18
21:19,22,24 22:6
22:10 29:4,13
38:4,7,9,12,17,20
61:20 66:13,19
67:10,14 77:19
78:2 79:2,4,23
85:13 88:13 93:7
103:1,7,13 107:9
108:3,7 109:3
112:2 115:3
118:19 138:10
142:24 148:10
151:22,23,24
152:2 154:2,19
161:13 163:9
168:10 170:17
174:8 176:18
186:5,21 187:3
188:7 189:13
190:20 201:11
202:24 204:15,17
204:19,23 211:21
214:6 216:21
217:22 218:24
220:2,12 224:2
228:19 234:10
236:3 237:8,17

**[see - signing]** Page 36

242:4,7,8 246:24
249:13 255:19,19
255:22 256:7
260:15,23 267:3
277:10 283:15
289:3 296:9
298:13
**seeing** 104:8 168:6
187:8,11,14,22
222:18,22 223:18
224:7 284:23
**seen** 27:22 28:1,5
44:21 67:1 78:1
82:4 85:3 101:9
108:1 160:13
195:23 201:20
205:15 209:22
210:2,4 214:8,10
214:11 220:1,4
226:21 284:21
295:22 297:17,21
**select** 72:23
**selected** 176:19
177:5 182:6
**self** 73:5 126:17
205:5,7
**selfie** 78:19
**sell** 152:14
**selling** 131:23
132:3 133:7
152:18
**semester** 239:10
239:12 250:12,17
266:20,21,22,23
**send** 106:17 111:2
111:5 142:2 216:6
**sending** 109:1
**sends** 137:7
**senior** 27:5 79:4
192:23 195:1,18
197:8

**sense** 29:21 85:23
189:6
**senseless** 254:23
**sent** 39:18 40:3,11
60:1,13,17 61:17
61:23 63:13 65:10
75:11 80:14 85:17
95:9 103:19 106:2
106:20 107:12
108:15 110:9
111:1,6,17,23
112:5 225:24
226:7,10 234:13
234:22 235:3,14
263:5,21,23 264:3
299:16,18
**sentence** 79:3
**sentences** 5:22
**separate** 25:9
51:22 52:1,3 70:9
92:8 169:24
**separating** 134:11
134:12,13
**separation** 25:9
**september** 28:21
29:24 119:2,5,12
121:1,6,12 125:4
140:2 144:2 209:3
211:18 245:8
247:17 248:10
298:6,15
**serious** 265:5
**seriously** 206:22
**service** 106:13
**services** 3:12
100:20 226:22
228:13 229:16
**session** 37:24
**sessions** 38:3
261:7,24

**set** 41:11 44:20
136:23 144:23
**seven** 90:2 223:11
237:15
**seventh** 37:21
189:21
**shades** 170:3
**shake** 5:21
**share** 9:13 21:15
45:6,7 73:17
103:1 151:19
155:16 222:6,9
246:17,18 271:20
291:21
**shared** 224:23
**sharing** 71:21
81:10
**she'd** 287:19
**sheet** 282:16 283:7
304:14 306:7,10
306:18 307:1
**sheets** 168:3
**shia** 25:14
**shift** 128:9 130:24
131:2
**shocked** 69:11,11
**short** 148:15
**shorthand** 302:11
**shortly** 45:24,24
127:2 177:23
199:7,7
**show** 27:15 109:2
124:20 234:7
248:15 267:1
283:4 295:19
296:5 298:12
**showed** 72:7 214:6
297:14
**showing** 102:14
109:6 125:1
277:15

**shown** 267:2,5
304:16
**sibling** 121:5
**siblings** 119:15,20
121:1,3,4
**side** 4:21 70:17
71:10 123:17
184:21
**siegel** 215:5
**siegel's** 107:23
**sign** 35:10,22,24
36:2,4,6 68:8 76:1
134:22 167:21,21
168:2 217:7 251:4
251:8 275:3,8
282:14,16,18
285:20 301:7,13
**signature** 10:1
75:23 234:10
235:22 248:21
301:5,8 302:17
303:3,8 304:15
**signed** 3:16 9:9,22
21:17 36:8 75:6,8
76:7,12 77:13,14
79:24 80:8 100:20
102:17 135:1
217:23 228:13
229:21 234:19
235:15,18,22,24
236:18 237:6
238:2 248:22
249:1,5,9,21 257:4
268:9 273:13
275:15 286:23
295:5 305:13
306:18
**significance** 45:12
46:18 47:24
**signing** 57:15
64:15 167:18

219:1 234:13
235:14 304:20
silently 144:20
silver 174:24
similar 67:3 105:7
131:5 206:23
similarly 1:4,5
79:22 163:6
simply 263:15,24
sincerely 304:21
sing 83:22
single 138:8
274:14
sings 83:23
siphen 2:12 3:7
23:6 43:9,24 44:3
64:8,10 65:7,11
99:11,14,20
148:16 153:19,22
155:21 217:2
219:6,9 220:14,17
232:4,7,14,19,22
233:4,24 234:6
246:13,16,18,20
248:13 250:11
251:12 252:5,10
252:14 258:5
269:24 280:12
282:20,24 283:3
283:12,14,17,21
284:3 286:14,18
292:10,13 294:6
294:13,17 296:10
297:4 301:4
sir 304:10
sister 162:7
243:15
sit 17:16 37:4 48:8
48:8 63:16 261:11
261:19 262:17,18
263:15 264:2,21

264:21 265:7,8,14
265:14,17,20,24
269:11 299:9
sitting 9:2 39:4
64:3 76:10 100:22
143:3 170:20
171:1,3,4,4 174:8
181:24 261:3,7,8
261:13,14,24
262:12,12 266:6
274:1
situated 1:4,5
situation 122:4
193:24
situations 188:13
six 7:23 8:17 24:11
52:18 58:9,10
75:22 90:1,2
96:15 210:15
216:24 218:9,15
225:8 278:12
sixth 37:21
skin 224:8
skinner 34:6,7,8,9
34:13,15,18
212:11,16 213:5
213:10,17 214:8
skip 140:12
skipping 85:14
sleep 184:6 219:2
222:17 224:16
297:14
sleepiness 184:24
185:3
sleeping 38:20
81:13
sleepy 184:7,12,15
184:19,22 275:19
275:21 276:5,8,14
276:20 277:1
279:20,20,22

slightly 251:20,20
slowly 48:9
small 118:19
152:1,24
smiley 277:19,21
278:3
smoke 137:8,18,20
201:9
smoked 161:7
smoking 137:21
147:23 148:3,7
161:8 201:7
snack 256:19
snacks 51:14,23
52:7,8,10
snap 48:17
snapchat 87:4,5,5
87:10,13,18 93:14
93:17 95:15,20
115:5,5,9,11,18
197:10,15,21
219:14 221:17
soccer 85:9,10
social 93:16 95:3
115:4 118:21
179:8 180:14
186:22 193:8
285:12
sold 88:24 152:13
solely 264:4
solutions 304:1
307:1
solve 44:12
somebody 17:2
51:8 61:3,22
63:18,22 253:12
256:7 260:8 275:6
281:1,5,13 282:11
somebody's
253:16

song 195:20
196:11
soon 250:15,19
sooner 293:1
sophomore 26:23
28:17 29:10 35:17
35:19 53:7,15,24
54:2,5 55:23 66:2
73:22,23 74:18
81:23 139:8 140:3
141:5 143:12,20
144:3 145:3
157:17 161:1,12
161:16,20,23
162:18,23 163:8
163:17,21 172:3
182:10,12 187:6
187:12 191:15
192:23 194:24
195:9,18 197:6
234:22 236:2,11
237:3,12 238:18
239:2,6,11,14,23
240:3,14,21 241:1
241:6,11 248:5
250:12 258:12,14
259:13 266:14,15
266:21 284:14
285:1 288:5
293:18 296:1
sorry 16:19 18:5
20:17 30:15 44:5
52:10 53:5 62:6
84:17 97:12 98:18
110:12 112:3
118:5,10 119:8
123:7 126:21
127:23 130:19
131:11 133:23
140:10,19 146:2
147:11 152:16

153:3 155:21
163:5 169:9
171:18 208:5
210:11 212:19
216:23 217:3,17
243:7 247:23
252:15 266:21
278:14 298:13
**sort**  30:15 46:6
83:14,17 148:1,2
159:17 160:7
246:1
**sorts**  50:10
**soul**  88:24
**sounded**  160:4
175:12
**south**  2:12,18
**space**  151:9
**speak**  20:19 37:12
59:11 64:1 86:10
213:14 228:14
**speaker**  191:12,17
**speakers**  21:1
**speaking**  175:12
**special**  30:16
281:24
**specific**  8:20 54:17
145:20 178:7
240:8
**specifically**  189:2
258:11 270:16
271:10 272:10
282:2
**speculation**  63:1
154:13
**spell**  4:7 41:19
58:16,19 72:3,4,5
72:16 83:2 112:11
158:14
**spelled**  4:8 160:19
222:3

**spend**  201:7
210:13
**spent**  55:16
**spiritual**  150:6
151:1,4,10,13
**spirituality**  146:24
147:1,5 149:8,10
149:12
**split**  97:12 202:9
**spoke**  40:14 248:3
248:3 259:6
**spoken**  34:21
46:23 228:18
**sports**  85:7
**spring**  54:9 87:23
90:5 159:10
239:16 247:11
259:21
**springs**  135:21
**ss**  302:1
**staff**  138:23 145:7
191:22,22 192:11
**stage**  187:1
**stamped**  107:20
**stand**  171:10
179:2
**standing**  171:2,5,6
**stare**  39:9
**start**  25:3 62:17
74:1 86:13,20
87:3 109:8 133:9
141:12 152:20
153:13 157:17
164:10 191:4
197:2,3,20 198:2
250:6
**started**  29:10 35:6
42:7 45:1,3,8,12
45:21,21 48:11,20
50:16 52:21 53:3
54:3,6 60:16

62:18 72:5,10
73:2,20 74:10,17
87:21 90:4,16,20
100:17 131:22,23
141:15,15 143:13
154:21 158:4
187:7 199:8 206:4
239:8,16,22 240:2
240:9 241:16
242:20 243:3,4
245:8 258:14
275:16 286:6
288:10 291:11,14
**starting**  242:13
260:4
**starts**  61:3 284:4
**state**  4:6 19:14,15
19:17 20:2 50:2
99:24 133:1,12
187:24 211:11
217:23 218:10
219:19 225:12
236:1 302:1
305:10 306:15
**stated**  159:16
167:9 218:12,18
236:17 244:20
246:5 296:19
**statement**  86:1
271:13 305:13,14
306:19,19
**states**  1:1,21
104:11 217:12
224:21 226:7
302:20
**stating**  109:16
**stay**  22:13,18
122:12,21 125:12
135:7,10,19
161:11 198:8,11
198:17,20 199:23

243:20 248:9
263:16
**stayed**  122:15
123:7 127:6
129:14,16 134:7
135:17 162:7
246:11
**staying**  87:18 91:3
122:19 125:17,18
125:20,21 126:1
130:10 134:17
198:9
**stealing**  97:23
**stenographer**
302:12
**stepping**  25:11
**stood**  268:15
**stop**  25:23 54:11
55:13 71:21 81:10
133:3 137:12,21
146:19,23 155:16
162:13 165:13
185:2 187:10
197:4 226:19
257:24 258:6
259:9 294:2
**stopped**  10:21
28:23 50:18 54:23
187:11,13 206:5
259:3 293:20,22
293:23 294:3
**stopping**  33:14,17
**stouffer**  2:11
**stouffer.com**  2:14
**stove**  135:9
**straight**  79:22
**straighten**  286:16
**straightened**
233:6 301:11
**strange**  275:10

**street** 2:3,7 91:24
92:3 119:7,10
121:10 122:12
123:1 171:8
243:12 303:10
**stress** 219:2
220:24 256:24
257:12
**stretch** 123:20
**strike** 122:14
134:18 135:4
146:2 160:12
163:7 181:22
193:3 206:18
228:19
**struggled** 203:17
**struggling** 203:16
**student** 3:14 15:21
32:24 36:10,14
62:17 78:23
118:24 119:1
155:19,24 167:13
176:24 177:2
182:7 213:18
214:12 222:18,20
248:17 254:14
257:6
**students** 14:4
15:20 21:10 32:3
33:4 35:11,22
37:1,4 50:23 57:2
58:3,6,10,21 59:1
59:13,17 61:13
62:2,7,22 63:10
72:20,22,23 73:1,4
73:6,10,14 159:9
159:11,16 220:24
221:1 240:22
252:2,19,19,22
253:7,20 254:6
255:6,21 256:3,13

256:17 258:1,7,17
259:4 262:4 265:3
274:9 280:17
281:17 291:5,14
291:24 292:7
**studio** 91:3,6,8,13
91:17,20 125:7
135:5,7
**study** 38:13 219:2
222:17 224:16,19
225:1 281:21
297:14
**stuff** 56:3 141:14
146:16,17 171:21
201:3 208:10
221:9 232:9 282:6
289:18
**style** 85:24 86:5
**subconscious**
67:20
**subject** 281:6
**submitted** 302:18
**subscribed** 305:10
306:14 307:21
**subsequent** 176:12
**substitute** 214:2
**success** 22:22
257:1
**successful** 67:21
67:23
**sued** 14:11
**suffer** 184:1
**suffered** 60:7
**suggesting** 281:4
**suggestion** 183:5
**suicide** 206:21
**suing** 12:10,14
15:11 227:4,19
228:1
**suite** 2:3,7,12,17
303:11 304:2

**summer** 87:23
90:5 127:3 128:16
241:13 259:21
**sun** 42:9
**sunday** 165:16
**sunni** 25:5,7,14
**super** 184:15
194:18
**superior** 304:1
**supplier** 152:24
153:14
**suppliers** 152:20
152:22
**supplies** 153:15
**support** 26:6,8
124:8
**supports** 136:19
**supposed** 45:6
61:7 178:18
**sure** 11:10 12:9
18:21 19:21,24
20:1,3,19 21:12,13
24:10 28:10 36:7
36:8,16 38:8,11,14
38:19,21 39:16,22
39:23 51:9 52:16
52:20 53:12 57:14
59:19 67:3,5
72:14 74:16 79:21
80:12 83:18,23
84:2 85:12,18,21
88:17 98:14 99:14
99:18,18 101:5
104:5 106:16
107:3 109:5,16
113:19 117:17
122:21 124:12
126:6 129:11
132:22 133:13,13
135:22 139:1
143:19 148:18

154:10,13,16
155:14 158:17,23
159:20 160:6
167:23 169:13
170:13,16 173:7
173:10 176:13
181:20 189:18
190:2 191:24
192:3,4 194:13
201:8,10,12 209:7
209:15 214:4,22
218:15 219:5,18
220:11 221:2
222:20 224:20
225:2 226:6
229:10,13,13,19
230:21 238:10,12
239:13 241:24
242:1,10,14 246:7
249:6 250:10,18
253:15 257:17
260:6 264:23
266:18 274:2
280:14 284:8
285:22 292:10
296:14 297:8
**surprised** 207:14
**surprising** 193:23
**suspension** 142:3
299:20,24
**suspicion** 57:16
159:6,7
**suspicious** 45:21
45:22 53:1 74:10
176:4 239:8,11
291:12,13,20
**swipe** 138:12
**swiping** 138:20
**switch** 289:21,23
**switching** 144:9

**[swore - telling]** Page 40

swore  76:15
sworn  4:2 6:9
  302:9 305:10,13
  306:14,18 307:21
symptoms  186:22
system  149:12

**t**

t  3:10 41:20 58:20
  113:11
table  170:22,24,24
  171:13,14,14,15
  171:16,17,19,20
  171:21 172:8,13
  172:19 174:6,9,12
tablet  114:18
tabs  108:8
take  7:4,5,11,15
  10:19 11:8 13:12
  13:14 21:16 34:11
  52:1 64:11 81:16
  89:11,14 96:24
  99:10,15 124:17
  148:19 165:7
  167:24 168:3,7
  170:15 196:6
  206:22 219:3,7
  231:16 248:13
  283:8,19
taken  1:19 4:14
  43:10 89:17 99:22
  138:3 219:11
  237:22 265:6
  284:15 294:18
  302:4,11
talk  32:20 35:4
  50:4,7,10 57:20
  82:22 86:8 88:21
  88:23 93:2,3,5,10
  93:19 95:17 96:1
  117:15 123:13
  145:10 168:17,17

169:1 183:15
196:19 219:10
238:16 255:3,6
271:19 282:1
285:6,8,10,12
288:2 292:1 293:2
293:12
talked  62:2,7
  106:10 145:11
  167:7 168:10
  255:5 259:23
  268:13 282:6
  291:24
talking  21:6 45:5,8
  48:10 60:11,16,19
  60:22,23 61:3,16
  61:23 64:2 66:22
  87:9,13 107:10
  142:7 154:20
  197:2,3,6 224:2
  251:18 255:12
  280:5
taught  225:18,18
  264:18 269:5
taxable  155:5
taxes  133:18
  154:24 155:9
teach  43:19 44:17
  48:7 214:2 226:2
teacher  40:6,9
  51:7 138:6 145:11
  145:12 168:20
  171:15 184:13
  192:7,9 217:6
  225:12,14,15,17
  225:20,23,23
  226:3,7 242:7
  263:9,11,12,14,20
  263:24 264:5,7,8
  264:17,20,22
  265:7,11,18,20

266:5 267:17
268:21 269:8
270:21
teacher's  39:15
teachers  16:12,13
  16:23 31:17,18
  60:5 123:14 145:7
  178:14 190:21
  191:8 192:2 262:6
  263:4 269:4
teaching  48:6
team  85:11
technically  9:19
technique  67:12
  67:20 249:12,22
  268:11
television  34:24
  201:14
tell  4:21 6:10 7:21
  7:24 8:12 23:23
  24:3 33:9 37:7,8
  37:10 45:1,14
  47:17 48:1,3,3
  50:23 51:3 57:17
  57:18 59:17 68:9
  68:16,20 69:5,8,16
  72:22,23,24 73:3,4
  73:6,10 76:15
  97:6,13 122:3
  123:22 124:18
  126:24 128:3
  131:21 138:5
  142:2,4,11,22
  143:6,12 145:18
  149:9 156:7 159:2
  169:5 170:14
  177:9,11,12,13,14
  177:16,18 178:7
  178:18 179:6,15
  180:3,8 181:16,20
  183:22,23 187:16

187:20 191:2
201:16 203:15
205:6 206:15,19
207:5,8 212:6
215:12,24 222:15
226:9,24 227:4,8
227:18,24 228:4
229:19 232:23
242:19 244:1,17
249:8 254:10,12
255:5,15,21,22,24
256:3,19 259:20
262:2,7,10 263:1
263:12 264:20
265:20,24 266:19
269:2 270:16,17
270:20,23,24
271:9,10,11,18
272:2,10,11,14,20
273:8,19,24 274:3
274:9,10,16,23
275:4,7 277:19
280:15 283:9,23
284:8 288:14
290:14,19,21,23
290:24 291:2,3,5,8
292:5,14,23
telling  32:9,11
  36:7 40:15 45:9
  48:8 50:19 57:16
  57:18 60:6 68:9
  69:2 73:1 149:7
  181:2,15 207:11
  215:14,17 238:14
  244:8 248:5
  256:15 263:24
  264:24 266:11
  271:21 273:11
  275:16 288:11
  290:7 292:17

**[ten - time]**

ten  99:16 282:22
term  203:17
terminated  303:2
terms  8:4 210:19
  210:23 230:16
terrible  12:2
test  60:24 61:1,4
testified  4:2,17
  217:8 238:17,21
  267:6 270:13
  275:18 300:3
testify  4:19,20,22
  6:16,23 8:6,11
  97:7
testifying  6:14,21
  155:5 221:11,13
testimony  101:19
  101:22 105:9
  111:12 121:22
  231:14 263:19
  264:4 268:18
  276:19 280:15
  305:6,7 306:6,9,12
tests  61:8
texas  120:7 121:4
  163:11
text  93:12 94:24
  95:11,13 164:8
  179:8
texted  95:1
texting  6:6
thank  4:10 16:21
  20:20 28:16 99:20
  100:11 106:12
  222:4 297:5,9
  300:24 301:1,10
  301:12
thanks  23:12
  99:21 248:14
  286:19

theirs  72:7
thing  42:9 59:3
  82:11 87:16
  109:11 127:16
  129:21 141:11
  146:9 173:17
  193:5 226:20
  230:15 255:1
  263:23 268:20
  269:1 270:3 272:6
  272:23,24 280:17
  292:19,20
things  16:18 23:12
  50:10 80:23
  146:14,15 149:15
  149:16 151:5
  152:21 157:16
  181:1 188:9,13
  189:3 200:11
  202:10 206:24
  208:2,8 218:22
  251:2 268:16
  271:19 275:19
  281:9 285:13
think  11:2,4 22:24
  23:10,10 31:9
  44:2 68:4 69:9
  73:1 75:3 84:7
  89:15 98:17 99:8
  111:11 115:20
  125:6 126:4
  142:17 146:1
  149:6 151:20
  153:21 154:6,6
  155:17,21,21
  156:16,24 159:13
  159:13 160:22
  161:6,10 167:7,8
  171:24 172:7
  176:3,14,17,18,19
  178:3,4,11 180:21

182:22 190:8,20
  192:21 196:1,3
  197:1 208:13
  212:10 214:7
  215:7 217:1,7
  220:6 224:3
  226:18 232:2,5,8
  233:5 238:17,21
  239:1 245:21
  246:14 250:1
  251:1 260:3
  261:18 267:6
  268:13 269:13,17
  275:6,10,18
  276:20 277:23
  278:11 280:17
  281:6 282:22,23
  282:24 294:7,17
  295:14 301:11
thinking  45:10
  47:23 59:3
third  107:3 108:21
  131:2 278:22
thirty  304:19
thought  44:21
  48:2 56:8,21 59:2
  66:21 72:24 100:5
  100:9 134:14
  154:20 156:22
  159:14 175:23
  190:6 196:6
  205:14,22 246:8
  288:19 297:17
thoughts  252:8
three  22:5,10
  24:11,12 53:19
  79:23 84:17,17
  88:7 91:18 103:20
  110:19 116:12,15
  119:21 135:18
  144:7 164:1 166:7

166:24,24 246:9
  268:22 279:11
  299:6
tiktok  93:22
till  23:7 55:12
  156:19 169:10
time  7:4,6,11,15
  7:17 8:6,8,12,16
  8:19,20,20,22
  10:19 11:8,11
  12:5,11 13:15,19
  13:24 14:1,2,5,12
  15:6,8,11,18 16:2
  16:10,24 17:16,18
  18:1,3,6,8,12,15
  18:19 21:5,11
  30:6,7,10,14,24
  31:2,6,9,13,22
  32:10 33:2,18
  34:3,11,13,22 35:1
  35:4,6,8 36:11,19
  36:22 37:6,14,17
  37:24 38:15 40:7
  40:17,18 41:4,8,11
  41:12 42:12,14,15
  43:15 49:13 50:12
  52:4,22 53:6,10,21
  54:3 55:3,5,6,19
  55:22 57:21 58:22
  59:8,14,22 60:8,11
  60:19 61:16,24
  62:3,7,9,18 63:19
  66:6,9 68:15,17,21
  69:2,7 72:7 73:1
  74:11 77:17 79:24
  80:1,6,8 81:15
  82:5 86:22 87:20
  87:21 88:23 89:4
  89:5,6 95:8,11,15
  95:20 96:1,1,15,19
  97:1 99:5 100:4

**[time - told]** Page 42

102:21 105:2
106:5,22 110:2,3
110:10,14,18
117:4 119:13
120:8,21 122:17
122:22 123:20,23
123:24 124:1,3,5,8
124:14,19 125:17
125:18,22,22
128:17,19 132:9
134:5 138:2,15
139:11,15 140:4
140:13,17,23
141:2,20 142:7,9
144:1 145:5,19
146:21,22 148:5,7
148:8,9,12,15,17
156:20 158:4,16
159:17 161:15,15
162:2 165:8 166:6
166:15,23 167:22
168:1,4,8 169:16
170:7 175:22
176:9,20 178:20
178:24 180:22
183:1 184:7,19
185:1,1 186:24
187:2 189:12,16
189:18 190:2,4,6,7
190:9,11,12,14
191:2,3,4,7,12,18
191:21 192:10,14
196:19,24 197:23
199:1,13,15,19,24
202:2 203:2,3,4
208:9,16,22
210:13 213:12
215:13 216:9
218:21 221:7
225:13 226:4,13
226:16 227:11,12

228:2 231:18
232:17 240:8,14
241:17,22 242:12
242:14 243:17
244:16,18 245:5
246:2 248:17
249:6,9 251:18
255:3,3 257:9,14
257:19 259:5
261:6,7,13,15,19
261:24 262:7,19
262:20 264:15
265:11 266:15
267:13 269:19
270:2,3,8,11
273:15 275:14
276:10 277:23
280:2,4,8,24 281:2
282:1 283:7,19
284:16,21,23
286:1,8,20 287:2
289:5,19,23
291:20 293:4,8,22
294:3,18 295:5,10
295:11,15 296:3,6
296:12,18 297:2
298:1 300:10
302:6,15
**timeframe** 132:16
231:3 238:13
**times** 40:8 52:8,13
52:18,18,18 57:11
60:20 61:21 70:2
70:6 91:15 144:6
144:23 145:3
166:17 205:11,12
205:15 211:17
225:12 238:23
292:9 293:17
**timing** 178:6

**title** 128:3
**tm** 66:12,15 69:24
141:14 156:20
168:13,18 169:19
180:5 183:8
184:13 190:7,12
192:9 217:10
218:5,13 225:14
237:16,22 238:23
238:23 239:2,3,22
240:3,11,13 241:3
241:7 242:7
249:12,16,22,22
250:6,19,20
256:23 257:11,15
257:20 259:4,9,17
260:1 267:7 268:7
269:5 270:18
271:3,6,12,16,18
272:7,14,19,20
273:5,8,14,20
274:10,16,23
275:7,16,19 276:9
276:19 278:8,23
279:13,19 280:3,6
280:9,9,16 281:7
281:10,14,18,22
282:8 285:17
286:6,20 287:12
288:2,3,14 289:6
289:11,12,24
290:6,22 291:1,3
291:22 292:2,15
292:24 293:9,12
293:16,20,23,23
294:3 296:3,9
**today** 4:15 6:9,17
6:24 7:3,8 9:2
11:16,20 12:14
64:24 66:24 67:3
67:4,6 68:11 77:1

77:20,22 94:16
95:5 97:7 100:20
101:1,4,7,11,19,22
102:1,4,7,18
104:16 105:9
106:20 112:1
114:4 132:3 135:2
136:3 167:9
185:18 228:13,18
231:14,24 232:3
234:19 235:15,18
235:24 236:18
237:7 238:2,11
244:5 246:22
263:15 279:3
297:18 299:10
300:20
**today's** 76:4
101:18 110:22
300:20
**told** 7:14,19 8:1
24:5 40:10 45:6
45:14 46:17 50:22
54:18 60:2 69:6,6
69:7,9 74:4 79:6
81:3 117:12 150:9
158:24 186:24
187:18 203:14
205:7 208:13
215:14 217:6
237:11 248:3
249:19 251:1
253:2,4 257:10,15
257:19,22 261:22
263:10,20 264:4,8
266:9 269:16
270:13,20,22
271:1,9,14,17,20
272:13,20 273:7
273:18 274:20,22
275:4,6 285:19

287:2 288:7,9
289:6,10 290:19
290:21,24 291:2,3
291:8 292:5,6,14
292:23 293:8
295:8,9 296:13,15
296:18
**ton** 232:8
**tongue** 175:13
**top** 65:16 171:21
174:14
**topic** 215:16
**topics** 26:11
**total** 154:9
**touch** 96:2,3,6,14
**tower** 2:17
**toy** 209:18,19
**track** 282:21
**trade** 126:14
**traffic** 11:23
**traffic's** 12:2
**trained** 36:23 37:2
178:1 272:19
273:5 280:8 286:7
286:20
**training** 43:13
46:4 48:19 56:13
168:13 169:20
170:12,14 171:11
176:9 189:14
267:7 279:12
**trance** 48:11,13
183:8,12
**transaction** 153:5
**transcendental**
3:14 66:16 67:12
67:19,22 70:24
80:19,24 81:8
107:23 108:9,12
156:1 158:1
167:13 168:17

184:3 185:9,15
186:2,6,10,13,16
186:19,23 187:17
189:24 190:9
192:17 237:16
248:18 257:6
275:24 285:21
288:8,10 290:10
290:16
**transcribed** 305:7
**transcript** 3:24
111:2 295:22
296:5,12,24,24
301:2 304:12,13
305:5,12 306:5,11
306:17
**transfer** 30:3
53:16 69:19,19
241:10 289:7,11
290:5
**transferred** 30:1
69:21 74:7,11,18
124:2,21,22
241:19 244:15
246:6 286:3
**transferring** 53:14
73:19 74:23 287:3
**transportation**
11:18 127:24
**trauma** 188:9,12
188:18
**tray** 174:13,14,16
174:19 175:2,2,6
**tried** 72:3 95:23
96:14 154:7 201:6
**trouble** 22:14,19
32:12 33:21 60:22
61:4,18 74:22
85:16 123:13
141:23 142:5,15
143:5 202:20

210:24 253:4
254:4 261:2,9,15
**truant** 245:18
**true** 150:18
233:20 234:19,24
236:8 237:4 239:3
241:14,23 251:10
257:12 279:10
295:7 296:23
302:13
**trust** 285:4
**truth** 6:10 76:15
**truthful** 267:10
278:14
**truthfully** 6:17,21
74:16 277:1
278:19
**try** 5:19 18:16
47:9 81:16 96:2,3
96:5 106:11 142:1
142:2 156:15
177:11 204:11,19
251:3 257:24
281:8 283:17
299:11
**trying** 25:12 40:6
41:16 51:3 72:2,5
158:20 176:1
226:12,15 251:16
269:21 270:10
**turbine** 146:12
**turbo** 15:22 58:12
58:17 82:24 96:3
96:14 179:21,23
180:19
**turn** 60:17 70:19
75:22 78:14
**tv** 201:17
**twenty** 223:11
**twice** 37:19 48:21
136:16 233:20

234:18
**twitter** 93:24
**two** 9:7 38:23
70:19 78:5 79:23
82:21 84:21 88:7
90:24 91:5 93:1
98:4,10 99:17
105:5 109:19
112:2 116:14
118:13 119:23
121:3,11 122:23
126:23 129:16
134:7 144:15
169:11 197:7
210:18 217:6,10
219:17 255:9,11
277:10 294:20
299:5
**type** 24:18 72:2,3
170:23 172:13
**types** 130:2

**u**

**u** 4:9 58:20 222:3
**uh** 5:21 14:20
20:13 22:1 53:5
61:2,12 197:19
218:19 245:17
259:2 276:17
279:4
**uhn** 140:9,9
195:13,13 198:13
198:13 206:17,17
**uncle** 125:9,10,15
**uncomfortable**
44:18,23 45:17
241:7
**uncooked** 173:2
**underrung** 209:8
**undersigned**
302:12,22

**understand** 6:8,14
7:16 12:3,13
13:13 14:17,21
15:2,7,10,14,15
17:17 18:10,24
19:2 22:12,13
23:8,14,17,21 47:6
48:17 50:3 56:19
66:15 70:23 106:1
117:14 135:11
175:16 189:13
217:8 220:14,19
232:10,11,23
233:22 240:5
249:4,9,11 252:13
252:16,17 253:11
256:23 261:13
265:23 266:15
268:16,22 273:2
273:17 280:14
**understanding** 7:2
10:12 12:4,6,10,19
12:21 13:2,3,5,8,9
18:18 19:16,19
31:5 37:15 101:3
107:17 147:5
189:15 190:9
194:11,12 211:5
228:21 229:4,22
229:23 230:13
281:10
**understands**
252:12
**understood** 233:1
249:7,15 251:8
253:6
**unethical** 22:7,16
229:15,20,24
230:10
**unfortunately**
243:8

**unique** 86:6
**unit** 135:6
**united** 1:1,21
302:20
**university** 1:9
2:20 3:20,21 19:4
19:7,17 20:4,6
21:3,7,10 126:11
220:5 222:14
223:9,16 224:6,14
227:5
**unlogical** 22:16
**unrelated** 290:6
**unseen** 151:5
**unsigned** 3:22
234:12,18 236:21
236:23 238:5
282:23
**unstable** 189:8,10
**unsure** 159:20
**upbringing** 147:24
**upset** 40:11
201:17 264:11
**use** 5:22 89:12
93:19,24 94:7,13
117:15 270:9
277:21 295:1
**user** 219:14
**usually** 5:10 6:1

**v**

**v** 1:7 66:19 222:3
304:6 305:3 306:3
**vaguely** 67:4
**vape** 201:11
**variety** 13:10
**various** 246:23
**vendor** 153:6,14
154:2
**vendors** 152:15,16
152:18 153:1,11
153:13,16

**verbally** 5:20
184:17 249:20
**veritext** 304:1,8
307:1
**veritext.com.**
304:17
**verizon** 113:13,18
113:24
**versus** 245:12
**video** 195:23
**viewed** 104:24
105:10
**violate** 22:24
**violated** 42:15
56:22 57:8 59:3
**violating** 229:5
230:16
**visit** 164:5 199:2
**visited** 20:9
**visits** 198:18
**vividly** 160:5
175:15 297:22
**voice** 232:20
**voices** 185:5
**volume** 20:23
**volunteer** 215:20
268:10 273:13
275:9
**volunteered**
215:22
**voyant** 127:12,15
127:19 128:4,6,12
129:9,14 130:7

**w**

**wacker** 2:12,18
**wait** 5:11 23:7
169:10
**waive** 301:8
**waived** 302:17
304:20

**walk** 26:12 175:10
204:11
**walking** 142:24
143:2
**wall** 39:9 204:15
**walls** 200:11
**walmart** 97:21,24
208:15,18 209:6
210:9 211:18
**wandered** 20:10
**wandering** 60:11
**want** 9:12 10:11
21:14 22:5 25:24
26:11,12 28:11
32:11,13,14 41:11
41:12 56:16 59:16
59:17 62:12,12
63:5,14 67:9 75:7
78:13 79:1 81:19
88:11 89:9 99:11
114:17 128:13,14
133:3 137:15
148:16,19 152:12
152:21 157:11
158:6 159:17
167:14 187:6
206:14,15 207:9
208:9 211:11
226:11 240:15
243:7 246:17
247:3 249:16
250:9 255:20,22
258:9 261:12
262:11 263:11,14
263:20 264:1,2,8
266:9 267:1 271:9
277:18 278:1
280:14 281:1,7,7
283:8,9,10,23
284:6,13 286:5
292:10 296:7

**[want - wrong]**

301:4
**wanted** 7:12,13
8:1,2 50:17,22,24
70:1,19 79:21
82:9 83:9,12 88:9
133:3,9 146:24
151:21 177:2
206:20,20 207:1
213:14,15 248:4
278:8 282:19
286:1 287:13
288:6,7 289:7,10
289:21 290:5
294:14
**wanting** 180:16
208:8 225:13
289:22
**wants** 99:9
**warehouse** 127:7
**warfare** 151:1,4
151:10,13
**warm** 239:18
**washroom** 219:3
**watch** 114:24
182:23 269:11
**water** 100:7
103:24 113:4
**waters** 169:12
**watkins** 2:16
120:19 243:16
**way** 19:22 20:24
24:1 36:13 37:7,8
46:17 49:8 53:17
53:19 107:13
130:7 143:6
156:16 159:5,17
160:12 162:8
179:15 207:5
235:21 262:9
275:15 278:2
283:16 297:20

**ways** 92:8
**we've** 43:2 110:11
111:24 220:9,17
283:4 284:22
294:18
**weapons** 203:6
209:23 210:3,6
**wear** 81:12 85:1
86:2 146:11,12
194:18
**website** 158:11
**weed** 148:7 201:7
**week** 52:11,12
78:4,6,7 80:15
93:4 141:10 157:6
198:21 238:11
258:19
**weekend** 198:7
**weeks** 78:5 122:22
128:14 129:15
198:21
**weird** 9:14 57:19
175:23 196:3,4
**went** 47:22 63:7
63:11 78:9 87:18
88:17,19 91:3
105:2 133:4,8
141:19 159:1
162:5,5,16,19,24
166:7,9 168:13
169:21 217:5
233:6,7,12 245:14
268:14,14 274:13
275:15 288:6
299:12
**wentworth** 29:7,9
29:20 298:19
**west** 119:7,10
**white** 173:19
208:4,5

**wholesale** 152:21
153:14,15
**williams** 1:3,4
7:20,21 12:6
14:11,22 15:22
23:23 81:20,21
108:17,22 212:3
304:6 305:3 306:3
**williamsamonta...**
94:9,11
**willing** 8:14 73:4,6
73:10 99:1,5
177:8
**willis** 2:17
**willow** 135:21
**willowbrook** 91:9
91:13,17 130:8,10
130:16,21
**winter** 54:8
239:15 259:21
**wiped** 98:5,9
**wires** 111:12
**wisconsin** 90:12
90:13,16 92:13
121:16,18 122:10
125:3 197:23
198:1,18,23 199:2
199:5,7,17,23
243:18,19,24
287:10,19
**witness** 3:2 5:2
12:14 20:22 27:16
44:10 100:5
148:24 165:6,22
220:12 221:4,7,19
221:20 232:18,21
233:2 301:15
302:4,9,15,17
303:3 304:9,12
305:1,4,11 306:1,4
306:15

**witnessed** 274:15
**witnesses** 8:3,11
**witness'** 304:15
**woman** 66:21
67:21,24
**wonder** 62:22
**wonderful** 71:3
**wondering** 25:16
**word** 25:15 80:11
80:13 132:20
183:20 227:10
297:24,24
**words** 46:22
175:15,16
**work** 22:2 25:12
127:13 128:12,18
128:21,21,24
129:5,6 136:7
**worked** 19:2 127:9
127:18 128:9,13
**worker** 186:22
**working** 24:6
128:23 131:1
153:7
**worse** 207:18
**worship** 146:7
**wrist** 81:12
**write** 34:18 75:20
76:18 160:7,17
238:1,3,3 276:11
**writing** 65:7 80:22
**writings** 108:9
**written** 66:18
76:21 160:13
301:12
**wrong** 155:18
164:24 230:8
237:21

**[x - zoom]**

| x | | | |
|---|---|---|---|

**x**   3:1,10

**y**

**y**   4:8 83:3 112:11
112:13
**yeah**   7:10 12:1,2
13:18 14:20,23
16:19 18:8 24:12
26:8 29:15 39:10
39:14 41:5,14,14
42:8,16 43:15
46:21 47:17 52:11
56:12 58:12 59:8
60:21 61:14 63:5
63:22 64:9,12
65:2 70:5,14
72:23 73:6 74:8
76:15 84:23 87:12
87:17 88:15 89:13
93:2,7,11,18 94:5
95:2,2 99:20
115:15 117:13
121:14 123:3,7
127:4 128:23
131:7 134:8 137:1
138:9 140:5,19,24
141:8,11,16,21
142:9 143:22
144:16 148:24
151:14 153:24
157:18,21 160:9
162:3 164:2 166:4
167:1,4,17 168:23
169:2 170:19
171:12 174:23
175:20 176:6
177:19 179:21
180:7,20,23 181:4
182:20 185:16
188:23 190:19

194:20 198:4,19
198:24 200:1,16
201:15 202:8
203:4 205:3,13
206:2,14 207:2,13
207:22 208:6
209:4,10,13
210:10 214:13
215:10 220:13,16
221:8 226:4,14
227:23 237:18
241:15 244:6
246:18 247:9
248:1 251:20
255:3 258:13
264:16 265:9
267:19 268:24
273:4 274:21
275:11,20 277:13
277:20 279:18
280:23 283:15
285:3,5,7,9 291:7
292:4,22,22
293:17,18,19,21
297:8 299:12
**year**   26:15,23 27:2
27:5 28:21 29:12
29:14 35:13,17,18
35:19 39:24 53:7
53:9,10,15,18,20
53:24 54:2,6
55:10,16,23 66:2
68:23,24 69:1,12
73:22,22,23 74:1,4
74:18,19 79:4,10
81:24 86:17 88:1
89:24 90:1 91:15
96:11 98:4 118:13
123:6,19 128:11
132:12,15,17
137:5,22 139:8

140:3 141:5
143:12,20 144:3
145:3 154:21
156:10,10,14,18
156:22 157:1,4,10
157:13,14,15,17
161:1,17,21,23
162:18,23 163:4
164:12 182:10,13
187:6,12 191:11
191:15 193:4
195:10 197:8
199:10,11,14
213:4,6,8 238:22
239:2,6,11,14,23
240:3,14,21 241:1
241:6,11,14,19,20
241:21,22 242:3,8
242:13,15,17,24
243:1,4 244:8,11
244:19,20 245:9
245:12 246:9,10
246:11 247:11,14
248:6,7 250:13
258:12,14 259:13
266:14,15,16,20
266:22 284:14
285:1 287:7,8,10
288:3,5,11,12,13
288:16,17,20
289:8 290:2,10
293:18 296:1
298:18 300:11
**year's**   213:8
**years**   28:18 65:20
79:10 80:1 82:14
84:15,16,17,17,22
87:14 96:12,13
98:10 118:13
121:11 122:11,16
123:8 134:7

161:12 163:8,17
163:21 197:7
210:18 233:6,7,13
234:22 235:7,7
236:2,6 237:3
278:16,18
**yep**   113:7 118:6
129:23 199:21
**young**   208:20
**younger**   84:12
119:22,23 121:3
171:24

| z | | | |
|---|---|---|---|

**zoom**   1:18 23:7
222:19

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# Exhibit H

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SEPARATION OF HINDUISM FROM OUR SCHOOLS, an unincorporated association, CIVIL LIBERTIES FOR URBAN BELIEVERS, an unincorporated association, DASIA SKINNER, AMONTAE WILLIAMS, and DARRYL WILLIAMS, | ) ) ) ) ) ) ) ) ) | |
| *Plaintiff,* | ) ) | |
| v. | ) ) | Case No. |
| CHICAGO PUBLIC SCHOOLS, City of Chicago School District #299; THE DAVID LYNCH FOUNDATION, and THE UNIVERSITY OF CHICAGO, | ) ) ) ) ) | Honorable Judge |
| *Defendants.* | ) | |

**DECLARATION OF ARYEH SIEGEL**



I, Aryeh Siegel, make this declaration upon my personal knowledge and as I would testify if called as a witness in open court.

1. I practiced Transcendental Meditation ("TM") for eleven years, from 1970 – 1981. I was a

1

TM instructor from 1975 – 1981. From 1978 – 1981, I practiced TM's advanced meditation techniques, known as the TM-Sidha program, for four hours every day.

2. From 1974 – 1978, I directed TM's Institute for Social Rehabilitation, which promoted TM as a treatment in the rehabilitation of at-risk individuals. Also from 1974 – 1978, I held a senior position at the World Plan Executive Council, TM's national organization in the US.

3. In 1978, I co-authored a peer-reviewed study on TM at Folsom prison that was published in Criminal Justice and Behavior. The research used psychological tests and prison infraction data to compare anxiety, neuroticism, hostility, insomnia and behavioral infractions between prisoners who were taught TM and a control group that did not receive TM training.

4. I stopped practicing TM in 1981 because I believed TM had become a cultic organization and I was no longer getting benefits from the practice that seemed worth the time invested.

5. In 2018, I published a book titled, <u>Transcendental Deception: Behind the TM curtain – bogus science, hidden agendas, and David Lynch's campaign to push a million public school kids into Transcendental Meditation</u>. In the book, I expose TM as a religious practice based on Hinduism and the veil of secrecy, deception, and lies used to hide TM's religiosity from prospective students. Also in 2018, I published an article

titled, "Deception in Transcendental Meditation" that was published by the International Cultic Studies Association on the same issues as my book.

6. I present the following information based on what I have learned and experienced first-hand from practicing TM, in the TM teacher certification process, and as a TM leader.

7. TM was founded by Maharishi Mahesh Yogi in the 1950s. He was originally raised Hindu and trained under Hindu master Guru Dev. Later, Maharishi Mahesh Yogi created TM on the foundation of the Hindu scriptures called Veda, which teach various aspects of the way Hindu deities, called Devata, organize the universe and maintain it in perfect order.

8. According to the current TM leader, Tony Nader, as quoted from his book Human Physiology – Expression of Veda and the Vedic Literature, "The Devata are integral aspects of our own human physiology. They are embodied in every human being with the same forms and functions described in the Vedic literature.[1]" Nader's quote is consistent with what I have learned about the Vedic roots of TM and is an accurate representation of TM beliefs and teachings relating to the Vedic Hindu scriptures.

9. To become a TM teacher, I was required to attend a teacher training course conducted by the TM organization. At the end of the course, I, along with all other

---

[1] http://www.peterffreund.com/freeservers/stotram.htm#pdf

3

graduates from the course, were given a TM instruction manual called "Jai Guru Dev Our Tradition." Although I do not have my original, Exhibit A is an accurate version of the manual I was given at the end of my teacher training course. In the manual, Maharishi Yogi identifies different states of consciousness and claimed that TM practice results in higher levels of consciousness beyond the waking state:

> (a) Deep sleep state consciousness;
>
> (b) Dream state consciousness;
>
> (c) Waking state consciousness;
>
> (d) Transcendental consciousness;
>
> (e) Cosmic consciousness;
>
> (f) G-d consciousness; and
>
> (g) Supreme Knowledge / Unity Consciousness. Some TM teachers refer to this state as Brahma consciousness (Brahma is a Hindu G-d). Practitioners may achieve full enlightenment in this form of consciousness, although I was never aware of anyone achieving this, or any other, state of higher consciousness. state. Exhibit A, p 11. (Page numbers added).

10. Among its teachers, previously called "initiators" and currently known as "governors of the age of enlightenment," TM is commonly described as 'watering the tree of universal religion.' From the TM perspective, all the world's religions are merely offshoots of the universal religion. By analogy, all the world's religions are the branches

4

of a tree and TM is the act of watering the tree's roots. TM allegedly enables all other religions to come into being and grow like branches nurtured from a tree trunk.

11. TM teachers believe they are spreading the Light of God and they are representatives of Holy Tradition.

12. To become a TM teacher (aka, an "Initiator"), I was required to enter into a written agreement with Maharishi Yogi to teach TM. I was presented with the agreement at the end of the teacher training course and it contained the following or very similar language[1]:

> It is my fortune, Guru Dev [the Maharishi's dead master], that I have been accepted to serve the Holy Tradition and spread the Light of God to all those who need it. It is my joy to undertake the responsibility of representing the Holy Tradition in all its purity as it has been given to me by Maharishi and I promise on your altar, Guru Dev, that with all my heart and mind I will always work within the framework of the Organisations founded by Maharishi. And to you, Maharishi, I promise that as a Meditation Guide I will be faithful in all ways to the trust that you have placed in me. Exhibit B

13. The top level TM leadership positions are referred to as Rajas ("one who rules"). They wear a gold crown, long white robes and necklaces. See Exhibit C. The Rajas allegedly have divine intelligence, set all life into evolutionary direction, and radiate divine light from which everyone can draw. According to TM beliefs, divine intelligence and the constitution of the universe flow through the Rajas. Given such

divine attributes, it is no wonder TM practitioners exult Rajas in a religious-like manner, as evident in the Exhibit C photo, especially how some of the men present themselves to the Raja with their hands in a prayer orientation.

14. Maharishi Yogi weaved Hinduism into a two-step process to create TM: First, TM practitioners are initiated by teachers through the "Puja" initiation ceremony. Second, TM practitioners are led through meditation sessions using their mantras provided by the teachers. Mantras are words that the practitioner silently repeats in his or head. The TM mantra words were specifically chosen because they invoke particular Hindu G-ds. See ¶ 23.

15. The "Puja" initiation ceremony is intended to tie the initiate's soul to Guru Dev, Maharishi's former teacher, to Maharishi Yogi himself, and to a multitude of Hindu deities.

16. Maharishi Yogi taught that the "Puja" initiation ceremony was "preparing the soil for planting the seed." The seed is the mantra and the soil is the initiate's soul. Planting seeds, or sowing, is a common metaphor used in religious literature to illustrate a spiritual reality, e.g., from the Holy Bible:

> For thus says the LORD to the men of Judah and to Jerusalem, 'Break up your fallow ground, And do not sow among thorns. Circumcise yourselves to the LORD And remove the foreskins of your heart, Men of Judah and inhabitants of Jerusalem, Or else My wrath will go forth like fire And burn with none to quench it, Because of the evil of your deeds.' Jeremiah 4:3-4.

17. The "Puja" initiation ceremony is one-on-one between the TM teacher and the new TM practitioner (or "initiate"). Both individuals stand in front of an altar on which rests a picture of Maharishi Yogi's master Guru Dev. See Exhibit D photo which is an accurate depiction of a Guru Dev picture displayed on a "Puja" altar.

18. The "Puja" initiation ceremony has three simultaneous portions. One portion is a hymn that is chanted by the instructor in Sanskrit. Exhibit A provides the "Invocation of the Holy Tradition," which is the Sanskrit hymn chanted by TM teachers during "Puja" initiation ceremony. Although TM teachers do not translate the hymn for the initiates, the document does contain an English translation as well as the original Sanskrit. The opening line of the hymn reads, "To Lord Narayan, to lotus-born Brahma the Creator, to Vashistha, to Shakti, and his son Parashar." Another excerpt reads:

> To Shankaracharaya the emancipator, hailed as Krishna and Badarayana, the commentator of Brahma Sutras, I bow down; to the Lord I bow again and again. At whose door the whole galaxy of Gods pray for perfection day and night. Adorned by immeasurable glory, preceptor of the whole world, bowing down to Him, we gain fulfillment. Exhibit A, pp 4-5.

19. Initiates who do not understand Sanskrit are <u>unwittingly</u> submitting themselves to Hindu G-ds!

20. Another portion of the "Puja" ceremony involves the TM instructor conducting a series of physical movements while chanting the Sanskrit hymn. The TM instructor

7

places various items on the altar in front of both the instructor and initiate. These items are meant as offerings to the Hindu G-ds named in the Sanskrit hymn. For instance, the TM instructor will use his or her hands to sprinkle water on the altar while contemplating the continuity between the outer world and the Inner Being. Exhibit A, p 3.

21. The other portion of the "Puja" initiation ceremony is called the "Puja-feeling." TM instructors had to memorize how we were supposed to emotionally feel about each portion of the ceremony. The feeling between sprinkling the water and contemplating the outer world and Inner Being is supposed to feel very pleasing and elevating. Exhibit A, p 3.

22. In my experience with TM, initiates were required to bring fruit, a flower, and a handkerchief that were used during the "Puja" initiation ceremony. They were also required to pay a course fee. The handkerchief represents an offering of the initiate's soul. The flower represents blossoming of the Lord's presence in the initiate's heart. And the fruit represents all the manifestations of the initiate's TM practice, such as material wealth, success, happiness, etc.

23. The second step in TM is meditation. After being initiated in the "Puja" ceremony, students are ready to use their mantras in a series of regular meditation sessions. The students, allegedly, are able to receive daily grace and blessings from the Hindu G-d invoked by their mantras:

- Mantras "eng," "em," "enga," ema," "aign," "aim," "ainga," and "aima" invoke the Hindu G-d Saraswati, the G-d of learning, music, speech, and fine arts;
- Mantras "shiring" and "shirim" invoke the Hindu G-d Mahalakshmi or Lakshmi, the G-d of wealth;
- Mantras "hiring" and "hirim" invoke the Hindu G-ds Bhuvanesvari and Mahamaya; and
- Mantras "kiring" and "kirim" refer to the Hindu G-d Devi Kalika

24. TM intentionally markets itself to the general public through celebrity endorsements and as a secular means of relaxing and relieving stress. TM's Hindu roots and its underlying religious doctrine are intentionally not discussed until a person visits a TM center or attends special seminars.

25. For first level learners, TM is presented as a solution to many health issues that are stress related. For those who attend lectures offered at TM centers or presentations, they are exposed to Maharishi Yogi's Hindu path to offer a way to higher states of consciousness.

26. TM is very esoteric and has a strict hierarchy of information and the truth about TM is deliberately concealed from the public.

27. Even low level TM teachers may not be privileged to all TM beliefs. Maharishi Yogi often would begin lectures by having Hindu pundits chant in Sanskrit. Most of the TM teachers in attendance did not understand Sanskrit. When asked about this lack of understanding, Maharishi Yogi said it did not matter. TM students do not receive translations.

9

28. TM teachers, in our training, were told to takes notes on the mantras phonetically and to memorize them. After memorizing the mantra sounds, we were told to burn our notes and strew the ashes in the ocean. It was taboo to speak the mantras aloud. If we had questions about the mantras, we must whisper to Maharishi Mahesh Yogi in private.

29. For the aforementioned reasons, and based upon my personal experience with and knowledge of the framework of TM, it is my opinion that the practice of TM is religious in nature and based in Hindu traditions, despite any assertions to the contrary.

Under penalties as provided by law, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

_Aryeh Siegel_

Aryeh Siegel

# Exhibit I

## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| SEPARATION OF HINDUISM FROM OUR SCHOOLS, an unincorporated association, CIVIL LIBERTIES FOR URBAN BELIEVERS, an unincorporated association, DASIA SKINNER, AMONTAE WILLIAMS, and DARRYL WILLIAMS, | ) ) ) ) ) ) ) ) ) |
| *Plaintiff,* | ) ) |
| v. | ) ) |
| CHICAGO PUBLIC SCHOOLS, City of Chicago School District #299; THE DAVID LYNCH FOUNDATION, and THE UNIVERSITY OF CHICAGO, | ) ) ) ) ) |
| *Defendants.* | ) |

Case No. 1-20-CV-04540

Honorable Judge Kennelly

---

### DECLARATION OF MARIYAH GREEN

---



DocuSign Envelope ID: 29CC315E-40B8-4AD1-A79E-62814582353E

## DECLARATION OF MARIYAH GREEN

I, Mariyah Green, make this declaration upon my personal knowledge and as I would testify if called as a witness in open court.

1.  I am a former student at Bogan High School.

2.  As I am a believer in Jesus Christ as the Son of God, I believe that the only One I am to kneel down before is God when I pray to Him.  In my opinion:  "Although it is on you, if you don't believe in God, I don't play about God."

3.  I was 16 years old when I first learned about the "Quiet Time" program at the beginning of my junior year, in the fall of 2018, when I transferred to Bogan High School from Chicago International Charter School since Bogan High School had a better basketball program.

4.  During September, 2018, the first month I started my junior year at Bogan High School, I noticed that the principal would make an announcement of "Quiet Time" each day during the last 15 minutes of the second and seventh periods.

5.  At or around Sept. 25, 2018, I was pulled out of my classes by a Quiet Time instructor, with 4 to 5 other students, and led to a darkened classroom for "Instruction Time" on how to learn to meditate.

6.  When I first entered the classroom for the "Instruction Time", the lights were off, there were candles lit, and a statue in the middle of the classroom.  Our instructor was a

DocuSign Envelope ID: 29CC315E-40BB-4AD1-A79F-62814F82353E

woman (someone who was unfamiliar to me) with a dark shawl covering the majority of her hair but her face was visible.

7.   On the first instruction day, the woman pulled each of the students to the side separately to tell us a word to meditate on and we were told to keep repeating the word silently to ourselves and "Don't force it."  I was told not to let anyone know the word that I was told.  I do not remember the word that I was told to repeat since I have blocked it from my memory.  We were also told to sit up straight in our chairs with our hands crossed for the whole instruction time. I now know the "instruction time" was an initiation worship ceremony.

8.   On the second day of instruction, the students including myself were told to repeat the word (or mantra) to ourselves and meditate on the word that we had been given the day before, and also kneel down before the altar of the image of a man in a photograph on a table in the middle of the room who looked like Buddha.

9.   As I was raised a Christian, and regularly attended services at my church, In The Throne Room Ministries, my mother, pastor, and other church leaders taught me not to kneel to anyone or anything other than when I am talking to God.

10. Since I felt that I could not kneel before this image, I stated to the instructor that I had hurt my knee in basketball practice and would not be able to kneel.  In response, the instructor told me to take a seat and remember my mantra and repeat it to myself.

DocuSign Envelope ID: 29CC315E-40BB-4AD1-A79F-62814E82353E

11. I felt extremely uncomfortable that I was told to kneel before the altar of an image of a man, who was not God, and repeat a word after hearing the instructor repeat a chant that was never explained to me.

12. After this second day of instruction on meditation, I called my mother, Shavon Gibson, from school and told her what had happened. My mother told me not to kneel before that altar and to call my Auntie and Pastor, Tracey Lee.

13. On the third day of instruction, I deliberately went to class late in order to avoid being taken out of class with the rest of the group for the final date of instruction time.

14. At no time, were there any consent forms given to either myself or to my knowledge to my mother explaining what the meditation was or the purpose of this meditation.

15. During the initial instruction time, I felt scared and uncomfortable as it was mandatory that I be present in this darkened room. We were told that we could not talk with each other and our phones had to be off. When I felt uncomfortable, I did not have the option of leaving the room. I felt like my religion was being tested and that I was being pressured to meditate in a manner that was against my Christian faith.

16. I was told by the teachers at Bogan High School for my second and seventh period, that I would be graded with Participation Points which was supposed to measure how much I cooperated with the transcendental meditation time. This Participation grade had nothing to do with my performance in the subject matter.

DocuSign Envelope ID: 29CC315E-40B8-4AD1-A79F-62814F82353E

17. At the last 15 minutes of Art (my second period), and a class about introduction to law (my seventh period), the Bogan High School instructors would give us instructions to put our books away and get ready for "Quiet Time."  My Art teacher in my second period class would play waterfall music every day when it was time to meditate.

18. We were also told that our cooperation during the first five minutes of "Quiet Time", by sitting up straight in our chairs, with no slouching, would count towards our grade for that subject. Additionally, we were told to remember our mantra during this "Quiet Time" since it would be good for us.

19.  Since I could not play basketball if I received bad grades, I felt like I was forced to participate in this "Quiet Time" twice a day.

20. Once the principal made the announcement over the intercom for all the students at Bogan High School to have "Quiet Time", during the last 15 minutes of the second and seventh period, I knew that if I didn't cooperate with this meditation that I didn't agree with, my grades would be adversely affected.

21. During the regular 15 minutes of "Quiet Time" per day in each of the eight classes, I would just keep my eyes closed and fall asleep instead of repeating the mantra.  However, I could not slouch down in my chair the first five minutes or I knew it would affect my grades.

4

22. The hallway of Bogan High School had a billboard with an ad that promoted the benefits of this "Quiet Time", and a couple of things it stated was that by participating in "Quiet Time", there is "ease of mind", and "the day will go better."

23. When other teachers approached me to remind me to meditate to "ease my mind", I told them such things as "I am not supposed to be meditating. It is against my rights and not normal. Why are we not learning?"

24. When I asked a fellow student the reasons why we had to participate in "Quiet Time", she told me that she just did it because she thought it was mandatory.

25. During basketball games against other high school students, I would ask them if they were forced to have "Quiet Time", and they said "no."

26. Many times I felt like it was me vs. the school. I felt like I was not listened to when I expressed my opinion, and I felt angry that the instruction time and "Quiet Time" was mandatory and a part of my grades.

27. I would also talk with other students and tell them my opinion that the meditation was not right and against my religion.

28. I believe that the three-day instruction time, along with the regular meditation time was religious. I was not given a choice in whether I wanted to participate in this religious ceremony or not.

29. I felt upset that I was forced to participate in this transcendental meditation religious ritual that was against my Christian faith, my religious beliefs, and the religious beliefs of our family.

30. I am willing to be a class representative of the students in this case.

Under penalties as provided by law, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that she verily believes the same to be true.

Date: December 6, 2022

Mariyan Green

# Exhibit J

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

WILLIAMS, et al.,                          )
                                           )
    *Plaintiffs,*                          )
                                           )
    v.                                     )    Case No. 1:20-cv-04540
                                           )
BOARD OF EDUCATION FOR                     )    Honorable Judge Matthew F. Kennelly
THE CITY OF CHICAGO,  et al.,          )
                                           )
    *Defendants.*                          )

## DECLARATION OF KAYA HUDGINS

I, Kaya Hudgins, make this declaration upon my personal

knowledge and as I would testify if called as a witness in open

court.



1.  I am a former Chicago Public Schools ("CPS") student. I

attended Amandla High School for my freshman year, 2015-2016.

I then attended Bogan High School during my sophomore and

junior years, 2017-2018 and 2018-2019. I attended McKinley

Lakeside Academy for my senior year, 2019-2020. I was first introduced to the Quiet Time

program in the fall of my sophomore year at Bogan High School.

### CONSENT

2.  A CPS teacher told me and my entire class to sign a consent form to participate in Quiet

Time. My entire class and I signed the consent because we felt pressure to sign. Our teach told us

that we would get in trouble and sent to the dean if we did not consent. The teacher also told us

1

that not signing the consent would affect our academics. We also received the same kind of pressure to participate in the Quiet Time program on a regular basis.

3. I signed the consent and was 16 years-old at the time.

4. During the fall of 2016, I was living with my grandmother who was my legal guardian. I never gave her a permission slip relating to my participation in the Quiet Time program, and to my knowledge she never gave her permission.

5. Additionally, I, like many of my classmates, signed a nondisclosure not to tell anyone, including our parents, about the program. My classmates and I were particularly warned by a DLF representative not to tell our parents if our parents were "religious." I do not remember the name of the representative or have a copy of the nondisclosure.

6. Part of the consent included a questionnaire which included some questions about my puberty, but I do not remember how they were stated.

## PUJA CEREMONY

7. In the fall of 2016, a female Transcendental Meditation ("TM") instructor took me out of class and brought me into a darkened room for the one-on-one Puja ceremony. Nobody else was present in the room. The blinds were shut and the windows were covered.

8. In the room was a table on which was a variety of items which seemed ritualistic. On the table was a picture of a man dressed like a Hindu priest, which is accurately depicted by the picture in the Second Amended Complaint. Docket number 89, page 7. It is the same man I remember from my Puja ceremony as the picture in the Complaint. Also on the table were rice, lights, and fruit.

9.  The instructor had me sit in front of the table with the items and told me to relax. She gave me an orange. She then told me to place the orange in front of the picture on the table. The instructor told me that nothing they were doing was wrong.

10. She then rang a little bell and began chanting in another language I was unfamiliar with. I felt like I was in a trance, similar to hypnosis.

11. The chanting was a minority of the ceremony, about 15-20 minutes. The total ceremony lasted around 45 minutes to 1 hour. Most of it was spent by the instructor telling me how to meditate.

## MANTRAS AND MEDITATION SESSIONS

12. It was during this time relating to instruction about meditation when the instructor whispered my mantra into my ear, which sounded similar to "ahm." She told me the mantra had no meaning. The instructor also told me not to tell my mantra to anyone.

13. However, many of my classmates and I discussed our mantras with each other. Eventually I researched on the internet many of our mantras and they turned out to be the names of Hindu gods. My classmates and I were very hurt to learn how the school and the instructor had us participating in a religious practice without even knowing it.

14. My classmates and I mentally recited our mantras during the twice-daily meditation sessions. My homeroom teacher implemented most sessions, but sometimes it was the TM instructor.

15. Our meditation sessions began when the teacher or instructor rang the little handheld bell. We had to participate in Transcendental Meditation by keeping our eyes closed and repeating our mantras.

16. These meditation sessions, like the Puja ceremony, felt like hypnosis or being in a trance. I felt like I was not under my own control or had a choice. I felt like I was forced into practicing TM. The meditation sessions felt abnormal.

## INCENTIVES

17. The TM instructor encouraged my classmates and me to participate in and to promote TM. She would pull us out of our regular class and give us pizza if we promoted TM. The instructor referred to it as "following orders." She gave me the title of Student Ambassador for my role in promoting TM. Although I do not have a recollection of what I may have said to other students.

18. I am aware of one incident when the TM people offered $100 to a friend nicknamed Turbo for the purpose of getting Turbo to participate in and promote Quiet Time.

19. The Quiet Time program was graded, including participation. Not participating negatively affected our grades. We were not told exactly how the TM grading would affect our academic record but I was thoroughly informed that not participating would have a negative effect.

## COMPLAINTS

20. I complained a few times to my teacher about not wanting to participate in the Quiet Time program. I do not remember my teacher's name but she was a female. My teacher would get upset in response to my complaints. Once, my teacher sent me to the dean's office because I was questioning why we had to participate in the program.

21. I felt angry and hurt because the school did not care whether or not I wanted to participate.

## MY RELIGION

22. During high school I was a Muslim and TM affected my religious views. The school and TM people were pushing TM which contradicted my religious Islamic beliefs, particularly whenever they said that there was a different higher power than the Islamic God I believed in. This was extremely offensive and very confusing.

23. The picture of the man at the Puja ceremony bothered me as a Muslim because Muslims are not to worship men. It made me feel guilty and sinful.

24. As a Muslim, I was supposed to pray five times a day. Although the school made me take time away from class to practice in TM, it would not allow me to take time away from class for those five daily prayers.

25. I am no longer a Muslim. I consider myself practicing spirituality. TM did not cause me to leave Islam, however it did make me question my Islamic beliefs.

Under penalties as provided by law, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that she verily believes the same to be true.

Kaya Hudgins

6

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| WILLIAMS, et al., | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-04540 |
| | ) | |
| BOARD OF EDUCATION FOR | ) | Honorable Judge Matthew F. Kennelly |
| THE CITY OF CHICAGO,   et al., | ) | |
| | ) | |
| *Defendants.* | ) | |

---

## AMENDED DECLARATION OF KAYA HUDGINS

I, Kaya Hudgins, make this declaration upon my personal knowledge and as I would testify if called as a witness in open court.



1. I am a former Chicago Public Schools ("CPS") student. I attended Amandla High School for my freshman year, 2017-2018. I then attended Bogan High School during my sophomore and junior years, 2018-2019 and 2019-2020. I attended McKinley Lakeside Academy for my senior year, 2020-2021. I was first introduced to the Quiet Time program in the fall of my sophomore year at Bogan High School. In my prior declaration I did not remember accurately the years I was at each particular school but I have corrected my recollection on various dates based upon written records I reviewed at my deposition.

### CONSENT

2. A CPS teacher told me and my entire class to sign a consent form to participate in Quiet Time. My entire class and I signed the consent because we felt pressure to sign. Our teach told us

1

DocuSign Envelope ID: 982148AB-9016-4424-AE27-EE75D72A51CB

that we would get in trouble and sent to the dean if we did not consent. The teacher also told us that not signing the consent would affect our academics. We also received the same kind of pressure to participate in the Quiet Time program on a regular basis.

3. I signed the consent and was 15 years-old at the time.

4. During the fall of 2018, I was living with my grandmother who was my legal guardian. I never gave her a permission slip relating to my participation in the Quiet Time program, and to my knowledge she never gave her permission.

5. Additionally, I, like many of my classmates, were asked to sign two consent forms in which we were instructed to keep certain information about the program confidential. My classmates and I were particularly warned by a DLF representative not to tell our parents if our parents were "religious." I do not remember the name of the representative. A copy of the contested and nondisclosure form is Exhibit A.

6. An additional consent included a questionnaire which included some questions about my puberty including my menstrual development and whether I was pregnant. Exhibit B. I remember seeing that form but I do not recall if I signed it.

**PUJA CEREMONY**

7. In the fall of 2018, a female Transcendental Meditation ("TM") instructor took me out of class and brought me into a darkened room for the one-on-one Puja ceremony. Nobody else was present in the room. The blinds were shut and the windows were covered. Again I have corrected this date due to a document shown at my deposition "…student application for Transcendental Meditation…" DLF doc 13500 and I now recollect my TM instructor was a woman named Erin Levi.

DocuSign Envelope ID: 982148AB-9016-4424-AE27-5E75D72A51CB

8.   In the room was a table on which was a variety of items which seemed ritualistic. On the table was a picture of a man dressed like a Hindu priest, which is accurately depicted by the picture in the Second Amended Complaint. Docket number 89, page 7. It is the same man I remember from my Puja ceremony as the picture in the Complaint. Also on the table were rice, lights, and fruit.

9.   The instructor had me sit in front of the table with the items and told me to relax. She gave me an orange. She then told me to place the orange in front of the picture on the table. The instructor told me that nothing they were doing was wrong.

10. She then rang a little bell and began chanting in another language I was unfamiliar with. I felt like I was in a trance, similar to hypnosis.

11. The chanting was a minority of the ceremony, about 15-20 minutes. The total ceremony lasted around 45 minutes to 1 hour. Most of it was spent by the instructor telling me how to meditate.

## MANTRAS AND MEDITATION SESSIONS

12. It was during this time relating to instruction about meditation when the instructor whispered my mantra into my ear, which sounded similar to "ahm." She told me the mantra had no meaning. The instructor also told me not to tell my mantra to anyone.

13. However, many of my classmates and I discussed our mantras with each other. Eventually I researched on the internet many of our mantras and they turned out to be the names of Hindu gods. My classmates and I were very hurt to learn how the school and the instructor had us participating in a religious practice without even knowing it.

14. My classmates and I mentally recited our mantras during the twice-daily meditation sessions. My homeroom teacher implemented most sessions, but sometimes it was the TM instructor.

15. Our meditation sessions began when the teacher or instructor rang the little handheld bell. We had to participate in Transcendental Meditation by keeping our eyes closed and repeating our mantras.

16. These meditation sessions, like the Puja ceremony, felt like hypnosis or being in a trance. I felt like I was not under my own control or had a choice. I felt like I was forced into practicing TM. The meditation sessions felt abnormal.

**INCENTIVES**

17. The TM instructor encouraged my classmates and me to participate in and to promote TM. She would pull us out of our regular class and give us pizza if we promoted TM. The instructor referred to it as "following orders." She gave me the title of Student Ambassador for my role in promoting TM. Although I do not have a recollection of what I may have said to other students, for several weeks I did get the pizza together with other students who promoted TM.

18. I am aware of one incident when the TM people offered $100 to a friend nicknamed Turbo for the purpose of getting Turbo to participate in and promote Quiet Time.

19. I and my classmates were told that the Quiet Time program would be graded, including participation. We were told that not participating would negatively affect our grades. We were not told exactly how the TM grading would affect our academic record but I was thoroughly informed that not participating would have a negative effect. Having reviewed a transcript of my high school record at my deposition it does not appear that I received a grade for my

participation nor my subsequent rejection of the TM program and I therefore conclude that the statements about grading were deliberate deception emanating from DLF or CPS.

## COMPLAINTS

20. I complained a few times to my teacher about not wanting to participate in the Quiet Time program. I do not remember my teacher's name but she was a female. My teacher would get upset in response to my complaints. Once, my teacher sent me to the dean's office because I was questioning why we had to participate in the program.

21. I felt angry and hurt because the school did not care whether or not I wanted to participate.

## MY RELIGION

22. During high school I was a Muslim and TM affected my religious views. The school and TM people were pushing TM which contradicted my religious Islamic beliefs, particularly whenever they said that there was a different higher power than the Islamic God I believed in. This was extremely offensive and very confusing.

23. The picture of the man at the Puja ceremony bothered me as a Muslim because Muslims are not to worship men. It made me feel guilty and sinful.

24. As a Muslim, I was supposed to pray five times a day. Although the school made me take time away from class to practice in TM, it would not allow me to take time away from class for any of those five daily prayers.

25. I am no longer a Muslim. I consider myself practicing spirituality. TM did not cause me to leave Islam, however it did make me question my Islamic beliefs.

Under penalties as provided by law, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that she verily believes the same to be true.

Kaya Hudgins

# Exhibit K

## MASTER RESEARCH SERVICES AGREEMENT
[The University of Chicago, for its Urban Labs]

THIS MASTER RESEARCH SERVICESAGREEMENT ("**Agreement**") is entered into as of this 1st day of October, 2015 ("**Effective Date**") is by and between The Board of Education of the City of Chicago (the "**BOARD**"), a body corporate and politic commonly known as the Chicago Public Schools ("**CPS**"), and The University of Chicago ("**University**"), an Illinois not for profit corporation, for its Urban Labs ("**Urban Labs**").

### RECITALS

A.      The Board desires to enter into a master research services agreement with University in order for University's Urban Labs to conduct research projects;

B.      The University of Chicago's Urban Labs consist of the following five (5) Labs:

> 1.      Crime Lab;
> 2.      Education Lab;
> 3.      Poverty Lab;
> 4.      Health Lab; and
> 5.      Energy and Environment Lab

C.      The Board desires that University, through its Urban Labs, conduct new research projects for the Board from time to time, to (i) provide rigorous evaluation of academic and social/emotional programs and interventions, (ii) develop research-based policy and programmatic recommendations (iii) otherwise assist the Board with applied research and strategic planning as hereinafter set forth and not otherwise;

NOW THEREFORE, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### AGREEMENT

1.      **INCORPORATION OF RECITALS:** The recitals first set forth above are hereby incorporated into and made a part of this Agreement.

2.      **TERM AND OPTIONS TO RENEW:** This Agreement is for a term ("Term") commencing on the Effective Date and terminating on July 31, 2020, unless terminated sooner as specified in this Agreement. Upon mutual written agreement, the parties hereto may renew this Agreement (each a "**Renewal Term**").

3.      **RESEARCH SERVICES; GENERAL SCOPE OF SERVICES; RESEARCH STUDY AND DATA POLICY; AND RESEARCH PROPOSALS AND STATEMENTS OF WORK:**

A.      **Research Services -** From time to time, and as agreed upon by the parties hereto, UNIVERSITY shall provide research services to the Board ("**Research Services**"), in accordance with the terms and conditions of this Agreement and any executed Statement of Work. "Research Services" means, collectively, the services, deliverables, duties and responsibilities described in this Agreement and any executed Statement of Work, and any and all work necessary to complete them or carry them out fully and to the standard of performance required in this Agreement. It is anticipated that the majority of the Research Services provided under this

BOE 001231

Agreement will be conducted by either the Crime Lab, the Education Lab, and/or the Poverty Lab, though projects by other Labs may be possible when the research is of benefit to the Board and relevant to educational or social-emotional outcomes for students or staff.

i. **General Scope of Services:** A general description of the types of Research Services that UNIVERSITY shall perform under this Agreement is set forth in the "General Scope of Services" attached hereto and incorporated herein by reference as Exhibit A. Any and all Research Services to be conducted under this Agreement shall fall within the approved parameters set forth in the attached General Scope of Services (Exhibit A). Either party may request changes to the General Scope of Services. Any such changes shall be documented by a written amendment to this Agreement as described in Section 28 (Entire Agreement and Amendment) herein below.

B. **Research Proposals and Statements of Work:**

i. Any and all Research Services performed pursuant to this Agreement and an executed Statement of Work shall be subject to the Board's Research Study and Data Policy (hereinafter referred to as the "**Research Policy**") approved November 14, 2007 (authorized by Board Report #07-1114-PO3), as amended on July 28, 2010 as such Research Policy may be further amended by the Board from time to time. Board policies and any updates thereto can be accessed through the following website: http://policy.cps.k12.il.us.

ii. Prior to performing any Research Services, UNIVERSITY shall submit a written research services proposal to the Board (the "**Research Services Proposal**") in compliance with the Research Policy and any other applicable Board Rules, Policies and Procedures. Each Research Services Proposal shall identify and fully describe the Research Services proposed to be undertaken by UNIVERSITY and the specific Lab that will conduct the Research Services. All Research Services Proposals shall contain sufficient detail to allow the Board to evaluate, among other things, the nature and scope of the proposed Research Services, the purpose and proposed use of the Research Services, and the Confidential Information and other data and information that UNIVERSITY will need to perform the Research Services. Prior to the Board granting approval of the Research Services Proposal, the Board shall have the right to (a) request additional information and/or (b) require UNIVERSITY to modify its Research Services Proposal. The Board shall determine if the Research Services Proposal requires approval from the Board's Research Review Board ("RRB") or Chief Accountability Officer or his/her designee. If the Research Services Proposal requires RRB approval, UNIVERSITY shall submit any information requested by the RRB to evaluate the Research Services Proposal. A Research Services Proposal that has received the approval of the Board shall be referred to as an "**Approved Research Services Proposal.**"

iii. Prior to the commencement of any Research Services described in Approved Research Services Proposal, the parties will develop a "**Statement of Work**" that incorporates the Approved Research Services Proposal. Prior to the commencement of any Research Services, this Statement of Work must be signed by an authorized representative of each party hereto. In the case of the Board, all Statements of Work must be signed by the Board's Chief Accountability Officer or his/her designee. All Research Services shall be conducted in accordance with the terms and conditions of this Agreement, the Approved Research Services Proposal, and the applicable Statement of Work. Each Statement of Work shall be incorporated into this Agreement by reference, as if fully set forth herein. All Statements of Work shall be conducted under the purview of an assigned CPS Project

BOE 001232

Manager ("**CPS Project Manager**"). As reasonably requested by the Board from time to time, UNIVERSITY shall report on the progress of each Statement of Work.

iv.  The terms and conditions of a Statement of Work may supplement, but may not modify the provisions of this Agreement. In the case of any conflict of terms between this Agreement and any Approved Research Services Proposal or Statement of Work, this Agreement shall control. Appended hereto as Exhibit B is the **Statement of Work Form** to be used for all Research Services conducted hereunder.

v.  The Board retains final authority with respect to any and all Research Services physically occurring on any property owned or controlled by the Board; any activity that negatively affects the safety or welfare of CPS students or Board Staff; and any dissemination of personally-identifiable student- of Staff-level data. Subject to Section 4.D. below, the Board retains final authority with respect to any and all dissemination of identifiable or de-identified student-level Confidential Information.

vi.  Either party may, from time to time, request changes in individual Statements of Work. Any and all such changes must be documented by a written amendment to such Statement of Work and must be signed by authorized representatives of each party hereto. In the case of the Board, amendments to Statements of Work must be signed by the Board's Chief Accountability Officer or his/her designee, and if the Research Services Proposal was subject to RRB approval, the amendment to the Statement of Work may require additional RRB approval.

vii.  It is understood and agreed that any executed Statements of Work under the Master Research Services Agreement entered into on June 15, 2012 ("**Prior Agreement**") between the Board and the University of Chicago are hereby incorporated into this Agreement by reference and made a part hereof and are subject to the terms and conditions included in this Agreement, not the terms of the Prior Agreement under which they were executed.

4.  **CONFIDENTIAL INFORMATION; CPS DATA; UNIVERSITY-COLLECTED DATA; USE OF CONFIDENTIAL INFORMATION; AND THIRD PARTY CONFIDENTIAL AND PROPRIETARY INFORMATION:**

A.  **Confidential Information:** In the performance of the Agreement, University may have access to or receive certain information that is not generally known to others ("Confidential Information" or "CPS Data"). Such Confidential Information may include, but is not limited to Staff Data, Student Data and School Level Data (each as defined in Section 4.B below) including, but not limited to: name, address, student identification number, social security number, phone number, email address, gender, date of birth, ethnicity, race, foster care status, disabilities, school, grade, grade point average, standardized test scores, Illinois Standards Achievement Test ("ISAT") scores, assessment data, after school activities, highest grade completed, discipline history, criminal history, free or reduced lunch qualifications, housing status, income, household income or payroll information, college enrollment records, Free Application for Federal Student Aid ("FAFSA") information; and unpublished school information, CPS financial information, and CPS business plans. It is understood and agreed that Confidential Information also includes proprietary or confidential information of third parties provided by the Board to University. Confidential Information does not include UNIVERSITY-Collected Data (as defined in Section 4.C Below).

B.  **CPS Data:** Pursuant to a fully executed Statement of Work, the BOARD may provide

BOE 001233

UNIVERSITY with Confidential Information. Such information may include (i) **"Student Data"** comprised of (a) personally identifiable student level data, (b) de-identified student level data, or (c) aggregate level student data; (ii) **"Staff Data"** comprised of (a) personally-identifiable staff level data, (b) de-identified staff level data, or (c) aggregated staff level data; and (iii) **"School Level Data"** comprised of information or data not generally known to the public which identifies or could reasonably be used to identify a particular CPS school and which is not Student Data or Staff Data. For purposes of this Agreement, any reference to Confidential Information shall be inclusive of Student Data, Staff Data, and School Level Data. For the purposes of this Agreement, the term **"Staff"** shall mean individuals employed by the Board.

C.    **Data Collected by UNIVERSITY:** In the course of performing research services (**"Research Services"**) in accordance with the terms of this Agreement and an executed statement of work (**"Statement of Work"**), as detailed in section 3.B ii above, UNIVERSITY may be permitted to collect certain information concerning CPS students, CPS Staff, and individual Chicago Public Schools. UNIVERSITY shall strictly adhere to the procedures specified in this Agreement and the applicable Research Services Proposal when collecting any and all such data and shall obtain all necessary written consents to collect such data. UNIVERSITY's failure to strictly adhere to the procedures specified in this Agreement and the applicable Research Services Proposal when collecting data shall be considered a material breach of this Agreement. Data collected by UNIVERSITY pursuant to this Paragraph 4.C. shall be collectively referred to as **"UNIVERSITY-Collected Data."**

D.    **Use of Confidential Information:**

i.    UNIVERSITY warrants and represents that (a) it shall not use any Confidential Information for any purpose not specifically identified in the associated Statement of Work; (b) it shall not access Confidential Information of any other Lab(s) without the prior written consent of the Board's Chief Accountability Officer or his/her designee; and (c) it shall not use any Confidential Information for any other research project or purpose, regardless of whether such research project or purpose is internal (within another Lab or department) or external to UNIVERSITY, unless such other research project or purpose is explicitly described in the associated Statement of Work. Any use of the Confidential Information not specifically contemplated in the associated Statement of Work shall be considered a material breach of this Agreement. UNIVERSITY

ii.    UNIVERISTY shall not disclose the Confidential Information except to those of its agents, employees, and subcontractors who have a need to know the Confidential Information.

iii.    Subject to the provisions of the applicable Statement of Work, the terms of this Agreement, all applicable state, federal and local laws, executive orders, and ordinances, and all applicable BOARD Rules and Policies, UNIVERSITY may do the following:

a.    Perform the Research Services explicitly described in the applicable Statement of Work; and

b.    Use aggregated data in publications and presentations resulting directly from the Research Services performed from an executed Statement of Work without written approval from the Board, provided that no such publication or presentation shall contain individually identifiable Confidential Information or references the Board and that the Board receive a preview copy prior to publication of any and all such

BOE 001234

publications and an opportunity to comment within thirty (30) days of receipt; and UNIVERSITY agrees to consider all such comments. Further, UNIVERSITY may analyze aggregated data generated across multiple executed Statements of Work in publications and presentations without additional written approval from the Board provided that the designated CPS Project Manager a preview copy of any and all such publications and an opportunity to comment within thirty (30) days of receipt; and UNIVERSITY agrees to consider all such comments. The Board shall also have the right to inspect publications for inadvertent disclosures of individually identifiable information or Confidential Information. If any such information is identified during the Board's review, University shall remove the information to ensure confidentiality and compliance with the obligations outlined in this Agreement. Any such removal shall be final and University agrees that the publication of any individually identifiable information or Confidential Information the Board requested be removed in writing shall be considered a material breach of this Agreement. UNIVERSITY shall give the designated CPS Project Manager and the Chief Accountability Officer copies of the final publications on a timely basis.

c.   No less than ten (10) business days prior to the dissemination of any press release related to any Research Services provided pursuant to this Agreement or any executed Statement of Work, UNIVERSITY shall provide copies of such press releases to the Board's Office of Communications for written approval. University use any intellectual property belonging to the Board, including but not limited to the CPS logo or the logos of any schools, during or after the performance or the delivery of Research Services, nor may University photograph or film within any CPS school or facility without the express written consent of an authorized representative of the Board's Office of Communications.

5.   **DISSEMINATION OF INFORMATION; TRANSMITTING AND STORING CONFIDENTIAL INFORMATION; OWNERSHIP; STAFF AND SUBCONTRACTORS; FREEDOM OF INFORMATION ACT; AND SURVIVAL:**

A.   **Dissemination of Information:** Unless otherwise specified in a particular Statement of Work, and except as otherwise permitted in this Agreement, UNIVERSITY shall not disseminate any Confidential Information to a third party without the prior written consent of the Board.   If UNIVERSITY is presented with a request for documents by any administrative agency or with a *subpoena duces tecum* regarding any Confidential Information which may be in UNIVERSITY's possession, UNIVERSITY shall immediately give notice to the Board and its General Counsel with the understanding that the Board shall have the opportunity to contest such process by any means available to it prior to submission of any documents to a court or other third party.   UNIVERSITY shall not be obligated to withhold delivery of documents beyond the time ordered by a court of law or administrative agency, unless the request for production or subpoena is quashed or withdrawn, or the time to produce is otherwise extended. UNIVERSITY shall cause its UNIVERSITY Staff and subcontractors, if any, to undertake the same obligations regarding confidentiality and dissemination of information as agreed to by UNIVERSITY under this Agreement. Notwithstanding the above, UNIVERSITY may share Confidential Information with collaborators in the research described in the Approved Research Proposal ("**Non-University Collaborators**") provide that such Non-University Collaborators are listed on the Approved Research Proposal and have agreed, in writing, to be bound by the confidentiality and non-use obligations herein.

BOE 001235

B.      **Transmitting and Storing Confidential Information:**

When transmitting Confidential Information, UNIVERSITY shall do the following:

i.      When mailing physical copies of Confidential Information, send the Confidential Information in a tamper-proof, labeled container, with a tracking number and a delivery confirmation receipt;

ii.     Only mail Confidential Information on electronic media, such as CDs, DVDs, electronic tape, etc., if the Confidential Information is encrypted. Encryption must utilize the Advanced Encryption Standard ("**AES**") algorithm with a key of 256 bits or greater ("**Encrypt**"). The Confidential Information shall only be mailed in accordance with the provisions of Section i, above;

iii.    Encrypt all Confidential Information prior to transmitting it electronically. UNIVERSITY shall not transmit any unencrypted Confidential Information via email, blackberry, blackjack, instant messages or any other unencrypted protocols.

iv.     Not send any password or other information sufficient to allow decryption of Confidential Information with the Encrypted Confidential Information;

v.      Keep all physical copies (paper or other physical representations) of Confidential Information under lock and key, or otherwise have sufficient physical access control measures to prevent unauthorized access. UNIVERSITY shall not leave Confidential Information unsecured and unattended at any time;

vi.     Encrypt any and all Confidential Information stored on portable or removable electronic media, such as CDs, DVDs, tape, flash drives, etc. Further, such electronic media shall be kept locked, or otherwise have sufficient physical access control measures to prevent unauthorized access. UNIVERSITY shall not leave Confidential Information in any electronic format unsecured and unattended at any time;

vii.    UNIVERSITY shall password protect any laptop or workstation that contains Confidential Information. Additionally, any laptop or workstation that contains Confidential Information shall have its full hard drive Encrypted. UNIVERSITY shall not leave any laptop or workstation unattended without enabling a screen-lock or otherwise blocking access to the laptop or workstation. UNIVERSITY shall ensure that no password or other information sufficient to access a laptop or workstation containing Confidential Information is attached to or located near the laptop or workstation at any time.

viii.   UNIVERSITY shall store Confidential Information on a proprietary file server that is located in the continental United States and not shared by other entities, including but not limited to other Labs or departments of the University. UNIVERSITY shall ensure the security of the Confidential Information stored on the server by employing adequate security measures to prevent unauthorized access to that information. These measures include policies, procedures, and technical elements relating to data access controls. In addition, UNIVERSITY shall use standard security

BOE 001236

protocols and mechanisms to protect the exchange and transmission of Confidential Information.

C.  **Ownership:**

   i.    Any and all Confidential Information provided by the Board shall at all times be and remain the property of the Board. Any and all intellectual property developed by the Board shall at all times be and remain the property of the Board.

   ii.   Unless otherwise specified in a particular Statement of Work, the Board acknowledges and agrees that all intellectual property developed by UNIVERSITY shall be and remain the property of University. All UNIVERSITY-Collected Data that was obtained in accordance with this Agreement and with parental consent pursuant to RRB approval shall at all times be and remain the property of the University.

D.  **UNIVERSITY Staff and Subcontractors:** UNIVERSITY agrees to cause its personnel, staff, research interns, Non-University Collaborators and its subcontractors (collectively, **"UNIVERSITY Staff"**) to undertake the same obligations of confidentiality and ownership agreed to herein by UNIVERSITY; and it shall train such UNIVERSITY Staff on the proper methods to be used for safeguarding the Confidential Information.

E.  **Destruction of Confidential Information:** UNIVERSITY shall, upon the termination or expiration of this Agreement, cease using and destroy all Confidential Information furnished by the Board in performance under this Agreement. UNIVERSITY shall destroy all Confidential Information within ten (10) business days of termination or expiration of the Agreement. UNIVERSITY shall confirm by written affidavit to the Board that UNIVERSITY has complied with the requirement of this provision to destroy such items.

F.  **Unauthorized Access.** If University has knowledge of any unauthorized access and/or use of shared Confidential Information, it shall: (i) notify the Board immediately, which in no event shall be longer than twenty four (24) hours from the University receiving notice of the unauthorized access and use; (ii) take prompt and appropriate action to prevent further unauthorized access or use; (iii) cooperate with the Board and any government authorities with respect to the investigation and mitigation of any such unauthorized access and use, including the discharge of the Board's duties under the law; and (iv) take such other actions required under any federal or state law, such as providing notification to the affected persons. The University shall include the Unauthorized Access provision in any and all agreements they execute with subcontractors under this Agreement.

G.  **Freedom of Information Act:** UNIVERSITY acknowledges that this Agreement and all documents submitted to the BOARD related to this contract award are a matter of public record and are subject to the Illinois Freedom of Information Act (5 ILCS 140/1) and any other comparable state and federal laws and that this Agreement is subject to reporting requirements under 105 ILCS 5/10-20.44. UNIVERSITY further acknowledges that this Agreement shall be posted on the BOARD'S Internet website at www.cps.edu.

H.  **Survival:** The provisions of this Section shall survive the termination or expiration of this Agreement.

BOE 001237

6. **FINGERPRINT BASED CRIMINAL HISTORY RECORDS CHECKS:** UNIVERSITY represents and warrants that, at its own cost and expense, it shall have a complete fingerprint-based criminal history records check ("**Records Check**") conducted on any and all UNIVERSITY Staff who may have direct, daily contact with CPS students under this Agreement or any Statement of Work in accordance with the Illinois School Code (§105 ILCS 5/34-18.5); the *Sex Offender and Child Murderer Community Notification Law*, created under Illinois Public Act 94-219, eff. August 2005; and the *Child Murderer Violent Offender Against Youth Notification Law*, created under Public Act 94-945. Such complete Records Check consists of the following:

- fingerprint-based checks through the Illinois State Police (ISP) and the FBI;
- check of the Illinois Sex Offender Registry (IL-SOR); and
- check of the Violent Offender Against Youth Registry (see below).

The purpose of the Records Check is to confirm that none of these persons have been convicted of any of the criminal or drug offenses enumerated in subsection (c) of §105 ILCS 5/34-18.5 or any offenses enumerated under the *Sex Offender and Child Murderer Community Notification Law*, or the *Child Murderer Violent Offender Against Youth Notification Law*, or have been convicted within the past seven (7) years of any other felony under the laws of Illinois or of any offense committed or attempted in any other state or against the laws of the United States that, if committed or attempted in the State of Illinois, would have been punishable as a felony under the laws of Illinois.

UNIVERSITY shall not allow any of its employees or subcontractors performing Research Services hereunder to have direct daily contact with a CPS student until a Records Check has been conducted for such person and the results of the Records Check satisfies the requirements of §105 ILCS 34-18.5 and the requirements of the Acts and Laws referenced in the preceding paragraph, as amended from time to time.

UNIVERSITY's non-compliance with this Section will constitute a material breach of this Agreement, and the Board also will have the right to withhold payments due hereunder until UNIVERSITY remedies such non-compliance to the Board's reasonable satisfaction, or take any other action or remedy available under this Contract or by law

7. **COMPENSATION AND PAYMENT:** The Board shall not pay University for any Services under this Agreement, nor shall the Board reimburse University for any expenses under this Agreement. UNIVERSITY shall either pay the Board an annual fee ("**Annual Fee**") to cover the Board's costs associated with providing Confidential Information to UNIVERSITY pursuant to Research Services performed under this Agreement and the associated Statements of Work, or, the UNIVERSITY shall provide a University employee to CPS and the University employee with work under the supervision of the Chief Officer of Accountability, or his/her designee, to prepare the approved Confidential Information. The Annual Fee shall be paid upon execution and annually no later than June 30, and will include, but not be limited to, costs associated with the preparation and transferring of Confidential Information to UNIVERSITY. Notwithstanding the foregoing, it is understood and agreed that the complexity of a Data request may be extraordinary and the fulfillment of such request may require unanticipated Board resources. In such event, the Board shall have notify UNIVERSITY that it must assess an additional data fee for such request and the Board will give UNIVERSITY a written quote for such project(s). The Annual Fee for the first year of the Term shall be Fifteen Thousand and 00/100 Dollars ($15,000). Each year of the Term, and each year of any Renewal Term, the Board shall have the right to increase the Annual Fee by an amount not to exceed 20% per year. UNIVERSITY shall pay the Annual Fee Net 30 days of its receipt of an invoice from the Board. UNIVERSITY shall have the right to terminate this Agreement within thirty (30) days after receipt of invoice from the BOARD in the event that UNIVERSITY does not have available

BOE 001238

funding for the payment of the Annual Fee.

8.   **RESEARCH FUNDING:**   UNIVERSITY is responsible for funding all Research Services provided pursuant to this Agreement and shall, upon request, give the Board proof of such funding.

9.   **DATA TO BE SHARED BY UNIVERSITY:** From time to time, UNIVERSITY will provide to the Board certain data as mutually agreed by the parties and in accordance with The University of Chicago Institutional Review Board approval(s).   This data and other information (collectively, the **"UNIVERSITY Information"**) will be provided in an electronic format as mutually agreed by the parties.

10.  **COMPLIANCE WITH LAWS, RULES, ORDINANCES, AND POLICIES:**   UNIVERSITY represents and warrants that it is and shall remain in compliance with all applicable local, state and federal laws, ordinances, regulations and statutes relating to this Agreement including, but not limited to, the *Illinois School Student Records Act*, the *Family Education Rights and Privacy Act of 1974* ("**FERPA**"), otherwise known as the *Buckley Amendment*, and the *Health Insurance Portability and Accountability Act* ("**HIPAA**"), and those relating to non-discrimination.   Further, UNIVERSITY represents and warrants that it is and shall remain in compliance with all applicable Board policies and rules including, but not limited to, the CPS Research Study and Data Policy, as such policy may be amended by the BOARD from time to time, regarding the use of Confidential Information. UNIVERSITY agrees to be responsible for the compliance of its UNIVERSITY Staff and subcontractors, if any, with the obligations agreed to by UNIVERSITY under this Agreement.

11.  **INDEMNIFICATION:**

   A.   **Indemnification by UNIVERSITY:** UNIVERSITY agrees to protect, defend, indemnify, keep, save, and hold the Board, its officers, officials, CPS Staff and agents free and harmless from and against any and all liabilities, losses, penalties, damages, settlements, costs, charges, professional fees (including reasonable attorney's fees) or other expenses or liabilities of every kind, nature and character, including but not limited to, expenses of the enforcement of this indemnification provision, arising out of or relating to any and all claims, liens, demands obligations, actions, suits, judgments or settlements, proceedings or causes of action of every kind, nature and character in connection with or arising directly or indirectly out of UNIVERSITY 's unauthorized or negligent use, access or handling of the Confidential Information, or the negligent acts or omissions or willful misconduct of UNIVERSITY, its officers, officials, agents, UNIVERSITY Staff, and subcontractors hereunder.

   B.   **Non-Liability of Board Members and CPS Staff:** UNIVERSITY agrees that no Member of the Chicago Board of Education, nor any CPS Staff, agent, officer or official shall be personally charged by UNIVERSITY, its members if a joint venture, or any subcontractors with any liability or expense under this Agreement or be held personally liable under this Agreement to UNIVERSITY, its members if a joint venture, or any subcontractors.

12.  **EVENTS OF DEFAULT:** Events of default by UNIVERSITY ("**Events of Default**") include, but are not limited to, the following:

   A.   Any material misrepresentation by UNIVERSITY in the inducement or the performance of this Agreement;

   B.   Breach of any term, condition, representation or warranty made by UNIVERSITY in this

BOE 001239

Agreement;

C.    Failure of UNIVERSITY to perform any of its obligations under this Agreement;

D.    Action or failure to act by UNIVERSITY which negatively affects the safety or welfare of students or CPS Staff; and

E.    Failure to conduct the Research Services is a manner that is consistent with the Approved Research Services Proposal.

13. .   **REMEDIES:**  The occurrence of any event of default permits the Board, to declare UNIVERSITY in default. The Board shall give UNIVERSITY an opportunity to cure the default within not less than 30 days unless extended by the Board ("**Cure Period**").  Whether to declare UNIVERSITY in default is within the sole discretion of the Board.

The BOARD shall give UNIVERSITY written notice of the default in the form of a cure notice ("**Cure Notice**"). The Board shall also indicate any present intent it may have to terminate this Agreement, subject to UNIVERSITY's right to cure.  It is understood and agreed that any such decision to terminate the Agreement in whole or in part is final and effective upon giving the notice, subject to UNIVERSITY's right to cure. The Board may give a default notice ("**Default Notice**") if UNIVERSITY fails to effect a cure within the Cure Period given in the applicable Cure Notice.  When a Default Notice with intent to terminate is given, as provided in this Section, UNIVERSITY must discontinue all Research Services, unless otherwise directed in the notice.   Following the giving of notice hereunder and the expiration of any Cure Period, if no adequate cure is made, the Board may invoke any or all of the following remedies:

A.    Terminate this Agreement in whole or in part or any Statements of Work, effective at a time specified by the Board;

B.    Suspend current Research Services in whole or in part during the designated Cure Period if the default results from an action or failure to act by UNIVERSITY which affects the safety or welfare of students or CPS Staff; or

C.    Receive from UNIVERSITY any and all damages incurred as a result or in consequence of an Event of Default as finally determined and awarded by a court of competent jurisdiction.

If the Board's election to terminate this agreement for default under this Section is determined by a court of competent jurisdiction to have been wrongful, then in that case the termination is to be considered an early termination pursuant the Section 14 below.

14.    **EARLY TERMINATION:**  Either party may terminate this Agreement at any time by not less than 30 days' notice to the other party in accordance with the notice provisions of this Agreement.  The effective date of termination shall be the date stated in the notice.

After a termination notice is received under this Section, UNIVERSITY must restrict its activities and those of its subcontractors, to winding down any Research Services, reports, analyses, or other activities previously begun.

BOE 001240

UNIVERSITY must include in its contracts with subcontractors an early termination provision in form and substance equivalent to this early termination provision to prevent claims against the Board arising from termination of subcontracts after the early termination of this Agreement.

UNIVERSITY shall not be entitled to make any early termination claims against the Board resulting from any subcontractor's claims against UNIVERSITY.

15. **ASSIGNMENT:** This Agreement shall be binding on the parties and their respective successors and assigns, provided however, that neither party may assign this Agreement or any obligations imposed hereunder without the prior written consent of the other party.

16. **SURVIVAL AND SEVERABILITY:** All express warranties, representations and indemnifications made or given in this Agreement shall survive the expiration or termination of this Agreement, for any reason, and the completion of any Research Services authorized under any Statement of Work executed hereunder. If any provision or part of this Agreement is held to be unenforceable, this Agreement will be considered divisible and such provision will be deemed inoperative to the extent it is deemed unenforceable, and in all other respects this Agreement will remain in full force and effect: provided, however, that if any such provision may be made enforceable by limitation thereof, then such provision will be deemed to be so limited and will be enforceable to the maximum extent permitted by applicable law.

17. **INJUNCTIVE RELIEF:** In the event of a breach or threatened breach of Sections 3, 4 or 5 of this Agreement, UNIVERSITY acknowledges and agrees that the Board would suffer irreparable injury not compensable by money damages and would not have an adequate remedy at law. Accordingly, UNIVERSITY agrees that the Board shall be entitled to immediate injunctive relief to prevent or curtail any such breach, threatened or actual. The foregoing shall be in addition and without prejudice to such rights that the Board may have in equity, by law or statute.

18. **TURNOVER OF DOCUMENTS AND RECORDS:** Upon demand of the BOARD or upon termination of this Agreement for any reason or upon the expiration of this Agreement by its terms, UNIVERSITY shall turn over to the Board or its designee within five (5) business days of demand, all Confidential Information. Upon written permission from the Board's Chief Performance Officer, UNIVERSITY shall be entitled to retain a copy of all such materials, including Confidential Information (but excluding individually identifiable Confidential Information) until no longer needed for the purposes for which the study was conducted.

19. **GOVERNING LAW:** This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois without regard to any conflict of law or choice of law principles. The University irrevocably submits itself to the original jurisdiction of those courts located in the County of Cook, State of Illinois, with regard to any controversy arising out of or relating to or in any way concerning the execution or performance of this Agreement. University agrees that service of process on University may be made, at the option of the Board, by either registered or certified mail addressed to the office identified in Notice Section above, by registered or certified mail addressed to the office actually maintained by University, or by personal delivery on any officer, director, or managing or general agent of the University. If any action is brought by the University against the Board concerning this Agreement, the action shall only be brought in those courts located within the County of Cook, State of Illinois.

20. **WAIVER:** No delay or omission by either party to exercise any right hereunder shall be construed as a waiver of any such right and each party reserves the right to exercise any such right from time

BOE 001241

to time as often and as may be deemed expedient.

21. **NOTICES:** All notices required under this Agreement shall be in writing and sent to the addresses and persons set forth below, or to such other addresses as may be designated by a Party in writing. Any notice involving non-performance or termination shall be sent by hand delivery or recognized overnight courier. All other notices may also be sent by facsimile or email, confirmed by mail. All notices shall be deemed to have been given when received, if hand delivered; when transmitted, if transmitted by facsimile or email; upon confirmation of delivery, if sent by recognized overnight courier; and upon receipt if mailed. Refusal to accept delivery has the same effect as receipt.

**IF TO THE BOARD:**

Originals:
Chief Accountability Officer
The Board of Education of the City of Chicago
42 West Madision, 3rd Floor
Chicago, IL 60602

Copy:
General Counsel
The Chicago Board of Education
Law Department
1 North Dearborn, Suite 900
Chicago, IL 60602
Fax: 773/553-1701

**IF TO UNIVERSITY:**

Originals:
The University of Chicago
6030 S. Ellis Ave., Room 114
Chicago, IL 60637
Fax: 773-702-8669
Email: io-ura@lists.uchicago.edu

Copy:
The University of Chicago
Vice President and General Counsel
5801 S. Ellis Avenue, Suite 619
Chicago, Illinois 60637
Fax: 773-702-0934

22. **CONFLICT OF INTEREST:** This Agreement is not legally binding on the Board if entered into in violation of the provisions of 105 ILCS 5/34-21.3, which restricts the employment of, or the letting of contracts to, former members of the Chicago Board of Education within a one-year period following expiration or other termination of their office.

23. **DISCRIMINATION:** It shall be an unlawful employment practice for UNIVERSITY or any of its subcontractors to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to compensation, or other terms, conditions, or privileges of employment, because of such individual's race, color, ancestry, religion, sex, sexual orientation, age, disability, marital status, parental status, military discharge status, or national origin, or to limit, segregate, or classify UNIVERSITY Staff or applicants for employment from equal employment opportunities or otherwise adversely affect an individual's status as an employee because of such individual's race, color, ancestry, religion, sex, sexual orientation, age, disability, marital status, parental status, military discharge status, or national origin. UNIVERSITY shall comply with the Civil Rights Act of 1964, 42 U.S.C.A, §2000, *et seq.*, as amended, the Age Discrimination in Employment Act, 29 U.S.C.A. §621, *et seq.* The Rehabilitation Act of 1973, 29 U.S.C.A. §701, *et seq.*, as amended, the Americans with Disabilities Act, 42 U.S.C.A. §12101, *et seq.*, the Illinois Human Rights Act, 775 ILCS 5/1-10, as amended, and the Chicago Human Rights Ordinance, MCC ch. 2-160.

24. **INSPECTOR GENERAL:** Each party to this Agreement hereby acknowledges that in accordance with 105 ILCS 5/34-13.1, the Inspector General of the Chicago Board of Education has the authority to

BOE 001242

conduct certain investigations and that the Inspector General shall have access to all information and personnel necessary to conduct those investigations.

26. **COUNTERPARTS:** This Agreement may be executed in any number of counterparts, each of which will be deemed to be an original, but all of which together will constitute but one instrument.

27. **FACSIMILES:** This Agreement will be considered accepted once it has been executed by both parties. A signature delivered by facsimile or electronic means will be considered binding for both parties.

28. **ENTIRE AGREEMENT AND AMENDMENT:** This Agreement, including all exhibits attached to it and individual Statements of Work executed by the parties from time to time in accordance with the provisions contained hereinabove, constitutes the entire agreement of the parties with respect to the matters contained herein. All attached exhibits and subsequently executed Statements of Work are incorporated into and made a part of this Agreement. No modification of or amendment to this Agreement shall be effective unless such modification or amendment is in writing and signed by both parties hereto. Any prior agreements or representations, either written or oral, relating to the subject matter of this Agreement are of no force or effect.

29. **RIGHT OF ENTRY:** In the event that any of the Research Services requires UNIVERSITY or any of its UNIVERSITY Staff, subcontractors or agents, conducting such Research Services hereunder to enter upon Board property in connection with the performance of the Research Services, UNIVERSITY and such UNIVERSITY Staff, subcontractors or agents shall be permitted to enter upon Board property for the limited purposes of performing the Research Services, subject to the terms and conditions contained herein and those rules established by the Board and the subject school principal. UNIVERSITY shall provide advance notice to the Board whenever applicable, of any such intended entry. Consent to enter upon a site given by the Board shall not create, nor be deemed to imply, the creation of any additional responsibilities on the part of the Board. UNIVERSITY shall use, and shall cause each of its officers, staff and agents to use, the highest degree of care when entering upon any property owned by the Board in connection with the Research Services. Any and all claims, suits or judgments, costs, or expenses, including reasonable attorney fees, arising from, by reason of, or in connection with any such entries shall be treated in accordance with the applicable terms and conditions of this Agreement.

30. **INSURANCE.** UNIVERSITY hereby warrants and represents that it is insured or self-insured, and that it has and shall maintain during the term of this Agreement adequate coverage for all Research Services being performed under this Agreement. Coverage under such self-insurance shall be at least as broad as the Board's minimum insurance requirements which are:

- **Workers' Compensation and Employers' Liability Insurance -** Workers' Compensation and Employers' Liability insurance covering all staff who are to provide Research Services under this Agreement and Employers' Liability coverage with limits of not less than Five hundred thousand and 00/100 Dollars ($500,000.00) per occurrence. Evidence of Workers' Compensation and Employers' Liability insurance is not necessary if coverage is not required under Illinois law.

- **Commercial General Liability Insurance -** Commercial General Liability Insurance with a combined single limit of One Million and 00/100 dollars ($1,000,000) per occurrence and Two Million and 00/100 dollars ($2,000,000) in the aggregate for personal injury and property damage liability inclusive of independent contractors, contractual liability for the insured Agreement and products/completed operations coverage maintained for not less than two (2)

BOE 001243

years following termination of the Agreement or completion of the Research Services.

- **Automobile Liability Insurance** - When any motor vehicle (owned, non-owned and hired) is used in connection with the Research Services to be performed, UNIVERSITY shall provide Automobile Liability Insurance with limits of not less than Five Hundred Thousand and 00/100 Dollars ($500,000.00) per occurrence and One Million and 00/100 dollars ($1,000,000.00) in the aggregate for bodily injury and property damage.

- **Cyber Liability And Privacy & Security Coverage.** Cyber Liability and Privacy & Security Coverage for damages arising from a failure of computer security, or wrongful release of Confidential Information, including expenses for notification as required by local, state or federal guidelines, with limits of liability not less than One Million and 00/100 Dollars ($1,000,000.00) per claim and Two Million and 00/100 Dollars ($2,000,000.00) in the aggregate. **Coverage shall include failure to prevent transmission of malicious code. The Policy will be a claims-made program with any prior acts exclusion predating both the date of this Agreement and any earlier commencement of Services. Such coverage shall either be maintained continuously for a period of 2 years after expiration or termination of this Agreement or proposer must secure a 2-year extended reporting provision.**

**Insurance- Additional Insureds** – UNIVERSITY shall have their general liability insurance endorsed to provide that the Board of Education of the City of Chicago, a body corporate and politic, and its staff, the Public Building Commission of Chicago and such other entities as may be designated by the Board are listed as "Additional Insureds" on a primary basis without recourse or right of contribution for liability arising from the work.

**Insurance Certificate.** UNIVERSITY shall require their insurer(s) to submit insurance certificate(s) evidencing coverage maintained by the UNIVERSITY indicating that the Board, and its members, staff and agents, the Public Building Commission of Chicago and its commissioners, officers, staff and agents and such other parties as may be designated by the BOARD are additional insureds on the general liability insurance. University shall annually submit a letter of self-insurance evidencing all coverage as required hereunder to:

> Board of Education of the City of Chicago
> Office of Risk Management
> 42 West Madison, 2nd Floor
> Chicago, IL 60602
> Attn: Risk Manager

UNIVERSITY's failure to carry or document required insurance shall constitute a breach of the Agreement and any failure by the Board to demand or receive proof of insurance coverage shall not constitute a waiver of UNIVERSITY's obligation to obtain the required insurance. The Board reserves the right to obtain copies of insurance policies and insurance records by written request at any time from UNIVERSITY or their subcontractors, and to modify, delete, alter or change insurance requirements at any time.

UNIVERSITY shall require any subcontractors performing Research Services hereunder to maintain comparable insurance which shall name UNIVERSITY, the Board inclusive of its members, staff and agents, and any other entity designated by the Board as Additional Insureds. UNIVERSITY will maintain a file of their subcontractors' insurance certificates evidencing compliance with these requirements.

BOE 001244

IN WITNESS WHEREOF, the parties hereto have caused this Master Research Services Agreement to be executed by their duly authorized representatives as of the latest date below.

THE BOARD OF EDUCATION OF THE
CITY OF CHICAGO

By: _____

Janice Jackson, Chief Education Officer

Date: _10/23/15_

Approved by: _____

John Barker, Chief Accountability Officer

Approved as to Legal Form: _____

Cheryl J. Colston,
Acting General Counsel

THE UNIVERSITY OF CHICAGO

By: _____

Print Name: __Michael R. Ludwig__

Print Title: _Assoc. Vice President for Research Administration_

Date: _10/19/15_

Table of Exhibits and Attachments:

Exhibit A:    General Scope of Services for UNIVERSITY

Exhibit B:    Statement of Work Template

BOE 001245

**Exhibit A**

**GENERAL SCOPE OF SERVICES**

**THE UNIVERSITY OF CHICAGO, Urban Lab**

The University of Chicago Urban Lab seeks to improve understanding of how to reduce crime and violence by helping government agencies and non-profit organizations rigorously evaluate new pilot programs. This work includes:

- Rigorous evaluation of pilot programs and interventions
- Providing research-based programmatic and policy recommendations
- Communicating findings and recommendations to diverse audiences to maximize the impact of the research.

The scope of research to be undertaken by UNIVERSITY is consistent with this mission. It will be determined together by our public agency partners. The CPS Data obtained through research projects that have been approved by the BOARD will allow UNIVERSITY to work with CPS and with city, county, and state agencies to better analyze the well-being of children and youth and understand how the programs in Chicago improve the well-being of children, youth, and their families. UNIVERSITY is primarily concerned with how programs and interventions impact a student's academic performance and other school outcomes.

Specifically, UNIVERSITY will conduct various evaluations of instructional, social/emotional and violence prevention programs and interventions to determine their impact on student performance, student behavior and other key outcomes. UNIVERSITY will provide the BOARD with evaluation reports and recommendations based on the research findings. UNIVERSITY will also support efforts to communicate the results to various stakeholder groups.

BOE 001246

**Exhibit B.**

## STATEMENT OF WORK # ▨
### RESEARCH PROPOSAL FORM

### MASTER AGREEMENT FOR RESEARCH SERVICES

### [THE UNIVERSITY OF CHICAGO, URBAN LABS – EDUCATION LAB, CRIME LAB, POVERTY LAB, HEATH LAB, OR ENERGY AND ENVIRONMENT LAB]

Name of Research Project: _____

CPS Research Project Manager: _____

       Phone: 773-_____    E-Mail: _____

UNIVERSITY Research Project Manager: _____

       Phone: _____    E-Mail: _____

Lab research will be conducted in: _____

Period of Performance: _____ until _____

University IRB number: _____

CPS RRB number, if applicable: _____

This Statement of Work #____, dated _____, which includes the attached Research Services Proposal, shall be conducted pursuant to the terms and conditions of the Master Agreement for Research Services ("**Agreement**") dated October 1, 2015 by and between The Board of Education of the City of Chicago (the "**BOARD**"), commonly known as the Chicago Public Schools ("**CPS**"), and The University of Chicago ("**University**"), on behalf of its Urban Labs. Defined terms used in this Statement of Work shall have the same meanings as those ascribed to such terms in the Agreement.

    1.This Statement of Work shall be subject to the terms and conditions of the Agreement and all work and Research Services performed hereunder shall be conducted as described in the Research Services Proposal that was approved by the BOARD (the "**Approved Research Services Proposal**"). [Note: If the above-named Research Services only involves the exchange of Confidential Information and does not require that University have contact with CPS students or CPS Staff, the signature of the BOARD'S Chief Accountability Officer or his/her designee on this Statement of Work evidences the BOARD'S approval of the Research Services Proposal. If the Research Services Proposal was subject to the BOARD'S RRB process, a copy of the signed RRB approval letter for this Research Services Proposal must be attached to this Statement of Work to evidence the BOARD's approval of the Research Services Proposal.]

BOE 001247

**Check the applicable box:**

☐ This Research Services Proposal only involves the exchange of Confidential Information/Existing Secondary Data.

☐ This Research Services Proposal also involves primary research data collection and was subject to the RRB process.
- Attached hereto and incorporated herein by reference as <u>Attachment 2</u> is a copy of the RRB approval letter for the above-named Research Services.
- Attached hereto and incorporated herein as <u>Attachment 3</u> is a summary of the Approved Research Services Proposal. Such "Proposal Summary" is subject to the approval of the BOARD'S Chief Performance Officer or her designee.

Either party may request changes to this Statement of Work, but any such changes must be documented by a written amendment to this Statement of Work and must be signed by an authorized representative of each party hereto. In the case of the BOARD, any such amendment must be signed by the BOARD'S Chief Accountability Officer or his/her designee, and if the underlying Research Services Proposal was subject to RRB approval, the BOARD will determine whether the Amendment to this Statement of Work requires additional RRB approval.

BOE 001248

**RESEARCH SERVICES PROPOSAL**

Research Study Name: _____

to be conducted by

The _____ Lab at the

UNIVERSITY OF CHICAGO URBAN LABS

**Instructions:**

➢ Please provide the information requested in **Items 1-5** below. The information provided should be accurate and complete. If you wish, you may use text from your Research Review Board ("**RRB**") submission materials.

➢ Your Research Services Proposal must be approved, signed and dated by an authorized representative of UNIVERSITY; and it must be approved, signed and dated by the BOARD'S Chief Performance Officer or his/her designee to be valid.

➢ If this Research Study involves more than obtaining Student Data, Staff Data, and School Level Data directly from the Board, you must append a copy of the RRB Approval Letter to this Research Services Proposal.

The Statement of Work for this Research Study cannot be executed until this Research Services Proposal has been signed by an authorized representative of the UNIVERSITY and by the Chief Accountability Officer of the Board or his/her designee. A signed copy of this Research Services Proposal must be attached to the subject Statement of Work.

At a minimum, such overview should include the following information:

1.  Provide the Research Questions to be addressed by the Study, and Project Overview.

2.  Describe and list the existing CPS data sources that _____ Lab wishes to analyze and describe any new data that _____ Lab wants to collect.

3.  Describe the analytic techniques to be employed to answer the Research Questions.

4.  Describe the data collection activities that _____ Lab will employ and provide an approximate schedule for these activities to occur.

Page **3** of **5**

5.   Provide the Research Study timeline, including the reporting and deliverable schedule.

**[Signature page to follow]**

BOE 001250

**IN WITNESS WHEREOF,** the parties hereto have caused this Statement of Work # ▓▓▓ /Research Proposal Form to be executed by their duly authorized representatives as of the date first set forth above.

**THE BOARD OF EDUCATION
OF THE CITY OF CHICAGO**

**THE UNIVERSITY OF CHICAGO**

By: _____
     John Barker
     Chief Accountability Officer

By: _____

Print Name: _____

Print Title: _____

Date: _____


**Lab Director:**

_____**Lab**

Signature: _____

Print Name : _____

Page **5** of **5**

BOE 001251

# Exhibit L

CHICAGO

Urban Education Lab

33 North LaSalle Street
Suite 1600
Chicago IL 60602

## Quiet Time Evaluation: Memorandum of Understanding

**Participants**: The University of Chicago Education Lab, David Lynch Foundation, Chicago Public Schools

Improving the schooling outcomes of disadvantaged youth is a top priority in every American city, including Chicago. But how can we expect students to reach their full potential when the pressures of school can pale in comparison to the safety concerns in their neighborhoods or the family pressures they face every day? We all know what it's like to feel fear or anxiety in response to stressful situations: our heart pounds, our hands sweat, our mouths go dry. Our bodies also respond in ways we can't see. A normal immune system reacts to stress by producing inflammatory proteins and chemicals, causing the fight-or-flight response, that then dissipate once the stressful situation resolves. However, if individuals are constantly bombarded by one stressful situation after another, such as in an abusive household or a dangerous neighborhood, their bodies never get a chance to reset.

This constant assault of stress can lead to what's known as "toxic stress" which has been shown to cause permanent changes in brain structure and function. Impaired development of cognitive and social-emotional skills, damage to memory and mood related-functions, and weakening of contextual learning -leading to difficulty in distinguishing between danger and safety- are only a few of the detrimental impacts associated with toxic stress. Past research has shown that when students are constantly exposed to community violence, like many students in Chicago, they "spend about one week out of every month functioning at a low level" (Sharkey, 2014). For too many students in Chicago's public high schools, toxic stress is a pressing problem.

The University of Chicago Crime and Education Labs are partnering with Chicago Public Schools (CPS) and the David Lynch Foundation (a non-profit organization) to evaluate a promising intervention designed to address this problem of toxic stress via an in-school meditation program. The Labs will use a Randomized Controlled Trial (RCT) —the gold standard for evidence in medicine— in three CPS high schools during the 2016-17 academic year to understand if and how the program impacts academic achievement and pro-social behaviors in students. The David Lynch Foundation's (DLF) Quiet Time program allows students to opt in to short daily meditation periods, supervised by regular classroom teachers. After being trained by on-site DLF instructors, students practice a meditation technique known as Transcendental Meditation (TM), allowing them to rest their minds and reset the stress response cycle in their bodies.

As part of the evaluation, all students will participate in Quiet Time, while half of the student population and all faculty in each school will be offered the chance to learn TM. All students will have an equal chance at being presented this opportunity which is determined by a random lottery. TM has been shown to counteract the body's physiological response to stress, creating a period of calm for students that could potentially reduce violence and improve academic outcomes. The Labs' research design will generate empirical evidence about whether this type of physiological rest can positively affect the stress response enough to meaningfully impact students: leading to reduced negative behaviors and improved academic performance.

Can Quiet Time reduce in-school misconducts and out of school arrests? Can Quiet Time improve GPA and test scores? The answers to these questions could change how urban public school systems across the country—or even around the world— focus their efforts to improve the lives of young people and their communities.

We are hopeful that delivering this intervention in CPS high schools will enable impressive gains for students. While these services would be free to the students within your school who are selected by our team to participate, delivering these services successfully requires **careful coordination between DLF, the research team, and school partners**. The specific logistical requirements we would ask of your school are explained on the following page.

For more information on the University of Chicago evaluation, please contact John Wolf, Senior Project Manager, at wolfj@uchicago.edu or at 773-405-7581.

BOE 002773

| Services Provided by the UC Education Lab: | Requirements of the participating school: |
|---|---|
| Identify students who are eligible for study based on grades, test scores, attendance, age, and other criteria. | Deliver student level data directly to Education Lab. |
| Monitor students' attendance, grades, test scores, behavior to evaluate the effectiveness of the Quiet Time intervention. | Allow University of Chicago researchers to visit schools occasionally to observe implementation and troubleshoot any issues related to the delivery of the study. |
| The University of Chicago pledges to preserve the anonymity of all students selected to participate in this project. <ul><li>The project is approved by the University of Chicago's Institutional Review Board and the CPS Research Review Board.</li><li>We will not publish results that enable any individual student to be identified.</li><li>We will not publish results without first sharing them with the schools to ensure no confidentiality concerns arise.</li></ul> | Describe additional support programs that are operating within the school to all students. |

| Services Provided by David Lynch Foundation: | Non-negotiable requirements of the participating school: |
|---|---|
| <ul><li>DLF will train the administrators, teachers, and students selected by the Education Lab in Transcendental Meditation (TM) and provide continuous meditation support.</li><li>DLF will provide written materials and presentations on the Quiet Time program to parents and community members who are interested about the program.</li><li>DLF will also give ongoing guidance to the participating school and parents on any issue relevant to the implementation of student meditation in the school or meditation at home.</li></ul> | <ul><li>The participating school will build two Quiet Time periods into the regular school day bell schedule. One period will be in the morning and the other will be in the afternoon.</li><li>The participating school will need to have space reserved for (1) initial meditation instruction as well as follow-up group meetings with students and (2) the provision of office space for the Quiet Time team.</li></ul> |
| <ul><li>TM instructors will rotate through Quiet Time sessions to provide support and continuous coaching for teachers' supervision of Quiet Time.</li><li>DLF will also help collect data on students' meditation practice for the purposes of grading Quiet Time and implementing incentive programs to encourage both meditators and non-meditators participation in Quiet Time.</li></ul> | <ul><li>Schools will plan for all teachers and staff to be introduced to the Quiet Time program and will organize all teachers and administrators to receive a 1hr training program provided by DLF on how to supervise Quiet Time.</li></ul> |
| <ul><li>DLF will provide curriculum material for students that offers an explanation of the value of meditation. Participating students will engage with TM instructors in periodic check-ins, and every 3 months, they will receive on-site individual or small group meditation tune-ups.</li></ul> | <ul><li>Schools will organize to get parents' permission for students to learn meditation.</li></ul> |

BOE 002774

We, the undersigned, have read and agree with this MOU, and furthermore, have reviewed the proposed project and approve it.

School: __Daniel Hale Williams High School__

Title: __Principal__

Name (printed): __Jullanar Naselli__

Signature: _____

Date: __8.2.16__


Organization: __David Lynch Foundation__

Title: __Regional Director__

Name (printed): __Julia Busch__

Signature: _____

Date: __8/3/2016__


Organization: __UChicago Urban Labs: Education Lab__

Title: __Senior Program Manager__

Name (printed): __John Wolf__

Signature: _____

Date: __8/2/2016__

# Exhibit M

11/29/21, 3:14 PM
Case: 1:23-cv-00218 Document #: 2 Filed: 01/13/23 Page 283 of 454 PageID #:316
Chicago Public Schools Mail - Quiet Time program - next steps



**Chicago Public Schools**

**Rosenberg, Christina <crosenberg@cps.edu>**

---

## Fwd: Quiet Time program - next steps
1 message

---

**Aziz-Sims, Alahrie** <aaaziz@cps.edu>                              Mon, Nov 29, 2021 at 2:26 PM
To: "Barton, Elizabeth" <ekbarton@cps.edu>, "Rosenberg, Christina" <crosenberg@cps.edu>, Kaitlin Salisbury
<ktsalisbury@cps.edu>


---------- Forwarded message ---------
From: **Flores, Jose** <jrflores@cps.edu>
Date: Mon, Mar 27, 2017 at 3:40 PM
Subject: Re: Quiet Time program - next steps
To: Chris Busch <chris@davidlynchfoundation.org>
Cc: Aziz-Sims, Alahrie <aaaziz@cps.edu>


915AM IS GOOD

On Mon, Mar 27, 2017 at 3:22 PM, Chris Busch <chris@davidlynchfoundation.org> wrote:

> Sounds good Mr. Flores.
>
> Any chance we could start at 9:15? If not, 9:30 will work.
>
> John Wolf from the University of Chicago Crime Lab will be joining us.
>
> Thanks
>
> Chris
>
>
> **From:** Flores, Jose [mailto:jrflores@cps.edu]
> **Sent:** Monday, March 27, 2017 2:10 PM
> **To:** Chris Busch <chris@davidlynchfoundation.org>
> **Cc:** Aziz-Sims, Alahrie <aaaziz@cps.edu>
>
> **Subject:** Re: Quiet Time program - next steps
>
> Hello,
>
> I'm available the rest of the week. Let's meet at 930am tomorrow. Are you good?
>
> On Mon, Mar 27, 2017 at 12:29 PM, Chris Busch <chris@davidlynchfoundation.org> wrote:

BOE 002486

Dear Mr. Flores,

Hoping that we, (David Lynch Foundation and our colleagues from the UC Urban Labs), can get on your calendar to meet for 20-30 minutes this week. Bogan High School will be partnering with us for the 2017-2018 school year for a meditation-based program called Quiet Time. It would involve some scheduling steps, already reviewed with Principal Sims and her team. The scheduler at Julian H.S. (also partnering with us next year) had a suggestion for how to make the thing even better. We'd like to discuss that with you first, and if you think it is manageable at Bogan, then we would run it by Principal Sims for her review. We thought this would be most efficient given the demands on Principal Sims' availability.

Will this be OK? Looking forward to meeting you.

Chris Busch

David Lynch Foundation Chicago

**From:** Aziz-Sims, Alahrie [mailto:aaaziz@cps.edu]
**Sent:** Friday, March 17, 2017 9:38 AM
**To:** Chris Busch <chris@davidlynchfoundation.org>
**Cc:** Sharon Dixon <sddixon@cps.edu>; Margaret Loranger <mmloranger@cps.edu>; Jonathan Rivera <jrivera192@cps.edu>; Julia Busch <julia@davidlynchfoundation.org>; Flores, Jose <jrflores@cps.edu>

**Subject:** Re: Quiet Time program - next steps

Our scheduler is Jose Flores.  I will add him to the e-mail.  Please cc me because we plan the schedule together.

I have cc'd him on this e-mail.

On Fri, Mar 17, 2017 at 9:17 AM, Chris Busch <chris@davidlynchfoundation.org> wrote:

No worries Ms. Sims. Thank you.

We know that running a school you face many demanding priorities for your attention.

BOE 002487

# Exhibit N



**Rosenberg, Christina <crosenberg@cps.edu>**

---

## Fwd: Mid-Year Administrative Expectations
1 message

**Aziz-Sims, Alahrie** <aaaziz@cps.edu>                                    Mon, Nov 15, 2021 at 6:21 PM
To: "Rosenberg, Christina" <crosenberg@cps.edu>, Kaitlin Salisbury <ktsalisbury@cps.edu>, "Barton, Elizabeth"
<ekbarton@cps.edu>

---------- Forwarded message ---------
From: **Loranger, Margaret** <mmloranger@cps.edu>
Date: Fri, Mar 2, 2018 at 12:32 PM
Subject: Mid-Year Administrative Expectations
To: Aaron Petrovich <apetrovich2@cps.edu>, Alahrie Aziz-Sims <aaaziz@cps.edu>, Beth-Anne Sterchele
<bhnielsen@cps.edu>, Betty Wiley <bjwiley2@cps.edu>, Brian Gaffen <bgaffen@cps.edu>, Bridgette Mason
<brmason@cps.edu>, Cali Flanagan <cflanagan2@cps.edu>, Carolyn Kasprowicz <CJZurkawicz@cps.edu>, Catherine
Holt <cmholt@cps.edu>, Cecilia Falconi <cdfalconi@cps.edu>, Charles Kumkoski <cdkumkoski@cps.edu>, Christine
Laadimi <cmtoben@cps.edu>, Christopher Zbasnik <czbasnik@cps.edu>, Damian Petty <djpetty@cps.edu>, Daniel
Robinson <dkrobinson4@cps.edu>, Danielle Watkins <dmcamarillo@cps.edu>, David Abed <dabed@cps.edu>, David
Finkle <dtfinkle@cps.edu>, Decarla Jackson <dajackson8@cps.edu>, Elsie Artis <eajones2@cps.edu>, Fanny Escamilla
<fescamilla@cps.edu>, Gonzalez, Angel <agonzalez628@cps.edu>, Holly Moore <hjmoore1@cps.edu>, Irena Kania
<itkania@cps.edu>, Jake Work <javandyke@cps.edu>, Jennifer Maali <jemaali@cps.edu>, Jessica Magana
<jmagana17@cps.edu>, Jim Budewitz <jrbudewitz@gmail.com>, Joanna Kawecka <jkawecka@cps.edu>, John Barnes
<jebarnes@cps.edu>, John Ogundele <jhogundele@cps.edu>, Jorge Solorio <jlsolorio1@cps.edu>, Kari Kolda
<kkolda@cps.edu>, Kathleen Danner <kjsmith16@cps.edu>, Katina Garcia Hermida <kvgarciahermida@cps.edu>, Kelly
Burke <klburke1@cps.edu>, La Shonne Henderson <lhenderson1@cps.edu>, Leonor Salas <lsalas@cps.edu>, Lindsay
Grockis <lpgrockis@cps.edu>, Lola Allums <ljallums@cps.edu>, Lorraine Sullivan <lasullivan@cps.edu>, Lubertha
Barden <lbarden@cps.edu>, Margaret Loranger <mmloranger@cps.edu>, Marilen Corres <mbcorres@cps.edu>,
Marlene Vincenty <MJVincenty@cps.edu>, Maureen Waters <mwaters1@cps.edu>, Mechelle Mathis
<mamathis1@cps.edu>, Monica Griffin-Monroe <mrgriffin@cps.edu>, Na'Tasha Nelson <ndsmith2@cps.edu>, Pearl
Foucher <pfoucher@cps.edu>, Rebecca Solomon <rsolomon@cps.edu>, Reginald Holmes <rkholmes@cps.edu>,
Remus Ristin <rristin@cps.edu>, Rondria Escobedo <rnreed@cps.edu>, Shabana Malik <snaeem@cps.edu>, Sharon
Dixon <sddixon@cps.edu>, Sophie Henderson <sgelaw@cps.edu>, Sylvia Jachymiak <sjachymiak@cps.edu>, Vickie
Woods <vrwoods@cps.edu>, Caitlin Garant <crgarant@cps.edu>, Elva Campos <ecampos26@cps.edu>, Erica Miner
<eminer@cps.edu>, Francisco Lopez <frlopez3@cps.edu>, Jalisa Olive <jolive1@cps.edu>, Jewel Smith
<JMSmith4@cps.edu>, Jose Reyes <jreyes@cps.edu>, Patricia Cephas <pacephas@cps.edu>, Stacey Johnston
<smjohnston1@cps.edu>, Aaron Becker <abecker1@cps.edu>, Beth Corbett <bacorbett@cps.edu>, Gary Bell
<gabell@cps.edu>, Jonathan Rivera <jrivera192@cps.edu>, Jose Flores <jrflores@cps.edu>, Leticia Rodriguez
<lrodriguez127@cps.edu>, Tasheena Thomas <tathomas@cps.edu>



# **Mid-Year Administrative Expectations**

Please review these notes and reminders.  They are really important for us to keep to as a
team.

BOE 002226

Commit to:

- Bell to bell instruction, using rubrics throughout the class period. Grades should be regularly updated.

- Stand in hallways between class periods. More eyes provide support, prevents bullying and other behavior issues.

- Implement Quiet Time with fidelity. Students should be quiet during Quiet Time - using cellphones is not an allowable activity. Student may read, draw, or close their eyes during this period. Please support the QT team in moving/transitioning students. We are a team.

- Door 13 (aka the Dock Doors) - DO NOT place anything on the dock doors to prop them open while you step outdoors. No cardboard, water bottles, etc. This is a security breach. We all want to stay safe.

## Things work best when we work together!

**Margaret Loranger**
Assistant Principal, Bogan Computer Technical High School
3939 West 79th Street
Chicago, IL 60652
(773) 535-2180 / (773) 535-2261

"So that's my wish for you, and all of us, and my wish for myself. Make New Mistakes. Make glorious, amazing mistakes. Make mistakes nobody's ever made before. Don't freeze, don't stop, don't worry that it isn't good enough, or it isn't perfect, whatever it is: art, or love, or work or family or life.
Whatever it is you're scared of doing, Do it."
— Neil Gaiman

--
Alahrie Aziz-Sims
Principal, William J. Bogan High School
3939 W 79th St.
(773) 535-2180

Experience the Bengal "B.I.T.E." - Bengals Integrating Technology into Education - visit boganhs.org.
FOLLOW US: BoganBengal79@Twitter, Facebook, Instagram, or Tumblr. FOLLOW ME: @Aziz-Sims.

ATTENTION: PRIVILEGED AND CONFIDENTIAL COMMUNICATION - This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail (or the person responsible for delivering this document to the intended recipient), you are hereby notified that any dissemination, distribution, printing or copying of this e-mail, and any attachment thereto, is strictly prohibited. If you have received this e-mail in error, please respond to the individual sending the message, and permanently delete the original and any copy of any e-mail and printout thereof.

BOE 002227

# Exhibit O



**Barton, Elizabeth <ekbarton@cps.edu>**

---

## Fwd: Quiet Time

**Brizuela, Gabriela** <gbrizuela1@cps.edu>                    Tue, Aug 4, 2020 at 10:55 AM
To: Elizabeth Barton <ekbarton@cps.edu>

**Gabriela Brizuela | Deputy General Counsel**
Board of Education of the City of Chicago | Law Department
One North Dearborn | Suite 900 | Chicago, Illinois 60602
Phone: (773) 553-1700  | Direct: (773) 553-5711

NOTICE: This e-mail message and any attachment(s) transmitted with it may contain attorney-client privileged, attorney work-product privileged, or otherwise confidential and privileged information intended solely for the use of the individual or entity named above. Receipt of this e-mail message or attachment(s) by any person or entity that is not the intended recipient does not constitute a waiver of any applicable legal privilege. If you are not the intended recipient of this e-mail or attachment(s), dissemination, distribution, or copying of this e-mail or attachment(s) is strictly prohibited. Please contact the sender immediately if you received this message in error, and permanently delete the original and any printout of the e-mail.

---------- Forwarded message ---------
From: **Brizuela, Gabriela** <gbrizuela1@cps.edu>
Date: Tue, Sep 10, 2019 at 9:43 AM
Subject: Re: Quiet Time
To: Bill Goldstein <bgoldstein@mum.edu>

Bill,

Upon further review, it has been brought to my attention that the services agreement with your organization expired in June 2018. As such, there is no entitlement for your organization to continue in the District's schools. For the reasons articulated in my previous email, CPS will only continue a partnership with your organization if the ceremony component is removed from the program. Please advise whether you are amenable to this.

Best,
**Gabriela Brizuela | Senior Assistant General Counsel**
Board of Education of the City of Chicago | Law Department
One North Dearborn | Suite 900 | Chicago, Illinois 60602
Phone: (773) 553-1700  | Direct: (773) 553-5711

NOTICE: This e-mail message and any attachment(s) transmitted with it may contain attorney-client privileged, attorney work-product privileged, or otherwise confidential and privileged information intended solely for the use of the individual or entity named above. Receipt of this e-mail message or attachment(s) by any person or entity that is not the intended recipient does not constitute a waiver of any applicable legal privilege. If you are not the intended recipient of this e-mail or attachment(s), dissemination, distribution, or copying of this e-mail or attachment(s) is strictly prohibited. Please contact the sender immediately if you received this message in error, and permanently delete the original and any printout of the e-mail.

[Quoted text hidden]

BOE 005018

# Exhibit P



**Rosenberg, Christina <crosenberg@cps.edu>**

## Fwd: CPS Statement on Quiet Time + QT Education Research
1 message

**Aziz-Sims, Alahrie** <aaaziz@cps.edu>                                                     Mon, Nov 15, 2021 at 6:15 PM
To: "Rosenberg, Christina" <crosenberg@cps.edu>, Kaitlin Salisbury <ktsalisbury@cps.edu>, "Barton, Elizabeth"
<ekbarton@cps.edu>

---------- Forwarded message ---------
From: **Julia Busch** <julia@davidlynchfoundation.org>
Date: Tue, Apr 24, 2018 at 6:27 PM
Subject: CPS Statement on Quiet Time + QT Education Research
To: Aziz-Sims, Alahrie <aaaziz@cps.edu>, Loranger, Margaret <mmloranger@cps.edu>
Cc: Chris Busch <chris@davidlynchfoundation.org>, Mike Weisensee <mike@davidlynchfoundation.org>

Dear Ms. Aziz-Sims and Ms. Loranger,

We have truly enjoyed and value our partnership with you and everyone at Bogan high school. *What a model school!*

The first year of Quiet Time at a new school, especially a large one like Bogan, can take time to launch and stabilize, especially under a research design like the one we had this year. We thank you for your patience and all the support you provided our team. We are excited to offer to the program to all the students next year, if that is in your plan for next year.

We understand that the school bell schedule vote is happening this Thursday. We wanted to know if you have planned for the Quiet Time to be incorporated into the school day, twice a day for the 2018-2019 school year.

For your information, I've attached a white paper with research, including from the San Francisco Unified School District, showing significant improvements in academic performance and education improvements. The UChicago RCT research for Year 1 is very encouraging and promising and has inspired CPS to begin funding our program under their Department of Social and Emotional Learning (SEL) this spring. Also attached is the letter from CPS' Office of College and Career Success stating their position that the Quiet Time program has educational value and therefore is considered as instructional minutes. Our partnership with CPS states that the program is implemented twice a day for 15 – 20 minutes.

We expect that funding support will continue next year from CPS and private donors who have already committed. Please let us know your latest thoughts with regards to Quiet Time next year as soon as possible, as we are finalizing our budgets, staffing, and fundraising deadlines for next year's programs.

Much appreciation,

*Julia Busch*

**David Lynch Foundation**

BOE 002247

# Exhibit Q



(Date)

Dear Parent or Guardian,

As the end of school year approaches, we are grateful to you for your support in continuing the Quiet Time program at (School). Our own internal program evaluation, aimed at continually improving and adapting the Quiet Time program to the school's needs, will be conducting post-testing with students over the next several weeks.

In response to some of the faculty members' requests to provide feedback on the Quiet Time program, we invite you to participate in our brief faculty feedback survey at a time of your convenience. We welcome your impressions and insights to diversify the perspectives of the program's effectiveness, strengths, and areas for improvement.

Please find listed below a link that will take you to the survey, where you will be given information about the purpose of the survey, your rights as a participant and how any information that you will be given will be kept private and non-identifiable.

We can also provide you a paper copy if you prefer. If you have any questions, please contact our Senior Manager, Program Evaluations: Sean Slifer at 212-644-9880 or by email: sean@davidlynchfoundation.org

We look forward to receiving your feedback and integrating your insights into our partnership with (School) as part of the Quiet Time program.

Kind regards,

Quiet Time Program Evaluation Team

SURVEY LINK:

# Exhibit R

## Memorandum of Understanding

This agreement identifies specific responsibilities of the Service Provider (David Lynch Foundation) and the School Site (Chicago Board of Education on behalf of Bogan High School). For the purpose of this document, Service Provider is defined as an agency providing services to students and faculty individually or in small groups on the school site.

Name of School Site: _____ Chicago Board of Education (on behalf of Bogan High School)

Name of Service Provider: _____ David Lynch Foundation

**Part 1: Responsibilities of the Service Provider.** The Service Provider provides the following:

1. **TM instruction and support for school administrators and teachers.** The Service Provider will provide support staff and qualified, certified teachers of the Transcendental Meditation program to instruct administrators and teachers in the TM program and provide on-going meditation support. Sufficient Quiet Time staff will be assigned to the school to support the program.

2. **Information for parents.** The Service Provider will attend Enrollment Events and will provide parent permission slips. As needed, the Service Provider will also provide a presentation and written materials on the Quiet Time program to all parents who want information on the program at the start of the 2017-18 school year.

3. **Supervision of teacher and/or administrator training in QT leadership.** The Service Provider will provide a training program to the teachers and administrators who supervise Quiet Time.

4. **Instruction of the students.** The Service Provider will organize and provide instruction to participating students in the Transcendental Meditation program.

5. **Follow-up meetings with students.** The Service Provider will provide each participating student with at least 4 on-site individual or small group follow-up meetings (30 minutes each), every school year. If students are having difficulty with their meditation practice, or in school in general, more individual follow-up sessions may be necessary.

6. **Support for Quiet Time Supervision:** The Service Provider will rotate through Quiet Time sessions to provide support and refine teachers' Quiet Time/meditation leadership as well as ensure quality control.

7. **Support for Quiet Time Grading and Incentive Programs:** The Service Provider will an online grading tool, and incentive programs, as well as help to structure special support initiatives for student meditation.

8. **Provide knowledge and curriculum.** The Service Provider will provide classes for students that offer intellectual understanding of the value of meditation. The Service Provider will provide instruction in these classes. This may be done in the context of a wellness, life skills, or health education class.

9. **Ongoing guidance.** The Service Provider will provide ongoing guidance to the school and parents on any issue relevant to the implementation of student meditation in the school or meditation at home.

## Part 2: Responsibilities of the School Site

1. **Organize for all teachers and staff to be introduced to the Quiet Time program** and help organize the time for teachers and staff to learn Transcendental Meditation, if they choose to do so. The training will be held at mutually agreeable times, with as much advance notice provided to the Service Provider as possible. Teachers may also opt to learn TM at the DLF office during the summer if this is preferable.

2. **Organize to get parent permissions for students to learn meditation.** In addition to getting permission slips to parents, the school will help to secure parent permissions and help set up an information meeting for those parents interested in finding out more about Quiet Time. DLF and Bogan High School will both keep copies of parent permission slips on file.

3. **Organize for all teachers or administrators who will lead Quiet Time to receive the one-hour Service Provider's training program** on how to effectively supervise the Quiet Time period. This training will be part of the beginning-of-program staff orientation and will serve as a review for continuing faculty. We recommend being able to speak briefly with faculty at monthly Staff Development sessions to check-in on Quiet Time.

4. **Organize two Quiet Time periods in the school schedule.** The School will provide two periods of 15-20 minutes at the beginning and end of each school day. Quiet Time will begin from the start of the school year. Once classroom randomization occurs, students will engage in meditation practice or the designated control activity.

5. **Allow time for the initial training of students in meditation.** This training involves an orientation on meditation, where students sign an agreement to learn, one session of personal instruction which is done individually and takes about 50 minutes, and three consecutive days meeting in a group for 60-75 minutes each day. In addition, a follow-up class of

approximately 50 minutes will be held in the middle of the week following the initial course to confirm students' understanding of meditation practice.

6. **Organize, in cooperation with the Quiet Time staff, an efficient schedule of individual or small-group check-in sessions during school hours** with all participating students. 4 check-ins per student are recommended through the 10-month school year. Additional check-ins will be provided to students at the request of Bogan High School staff. Priority will be for student in sub classes. Student check-ins will also happen during content area classes–with one-week advanced approval from teachers or from recess, advisory, or enrichment as needed. Bogan High School will alert the Service Provider when there is a student in need who might benefit from a check-in. In this case, they can be pulled from recess, advisory or enrichment without advanced notice–or a content area class if the teacher agrees.

7. **Commit to upholding the integrity of the Quiet Time periods.** Teachers will set up properly for Quiet Time and begin on time. During Quiet Time, teachers will maintain a safe environment for meditation and silently monitor the students and not do any other work. (We will review with admin a tracking system that permits faculty to input grades or scoring for Quiet Time compliance during the two-three minutes of rest and then give appropriate feedback to students.) If the Service Provider has any concerns about a teacher's conduct during Quiet Time, he or she will coach the teachers first orally and then offer support in writing if there is no improvement. If there is still no improvement, the Service Provider will pose the concern to school administration. The school will support Quiet Time by not interrupting Quiet Time sessions with phone calls or announcements. In addition, on field trip or other special-schedule days Quiet Time will be maintained, unless logistically impossible.

8. **Establish accountability and incentive system for encouraging meditation.** Ideally, we establish a method for providing a separate grade in Quiet Time on students' report cards, as well as a corresponding system for recognition. Quiet Time grades will be distributed on the same schedule as citizenship scores. DLF has an online grading system we can preview for Bogan leadership.

9. **Structure time for Quiet Time curricular content** to promote intellectual understanding of the value of meditation. This can be done within wellness, life skills or health education classes. Additional special events or content may be held during the school year.

**10. Establish a Quiet Time Committee** to discuss the progress and needs of the Quiet Time program. The committee will be represented by administration and faculty members, and the DLF Quiet Time site leader. This committee will meet once a month, or more often if needed. The Quiet Time site leader will coordinate the committee, and will schedule an initial meeting during staff orientation. An annual meeting schedule will be established at the beginning of the year.

**11. Provide appropriate rooms and times for initial meditation instruction and individual and group follow-up meetings with the students.** The School will provide a room or office that is quiet, with comfortable seating, for the individual follow-up meetings with the participants; and a room for the follow-up group meetings. On instruction days, one room will be needed per teacher. The School will provide a schedule of available rooms to the Service Provider, who will be responsible for reserving the space accordingly.

**12. Provide office space** for the Quiet Time team.

**13. Encourage and support teacher and staff meditation** as a core tool of effective teaching and faculty wellness. Regularly scheduled group meditation for the adult meditators, with a monthly video or guest speaker.

**Part 3: Financial Commitments**

The UC Crime Lab, with support from private and institutional funders, will provide funding for the implementation of the Quiet Time Program at the School.

UNIVERSITY_000406

**David Lynch Foundation**                    **Bogan High School**

_____              _____
Authorized Signature                          School Site Principal

Christopher   Busch   –   Director   David    Alaharie Aziz-Sims, Principal,
Foundation - Chicago                          Bogan High School

Print Name and Title of Signatory             Print Name and Title of Signatory

Date:    6 - 15 - 17                          Date:   6/15/17

# Exhibit S

# Memorandum of Understanding

**Scope of Duties for Service Provider at School Site**

This agreement identifies specific responsibilities of the Service Provider (David Lynch Foundation) and the School Site (Amundsen High School). For the purpose of this document, Service Provider is defined as an agency providing services to students and faculty individually or in small groups on the school site.

Name of School Site:          <u>Amundsen High School</u>

Name of Service Provider:     <u>David Lynch Foundation</u>

**Part 1: Responsibilities of the Service Provider**. The Service Provider provides the following:

1. **TM instruction and support for school administrators and teachers.** The Service Provider will provide qualified, licensed teachers of the Transcendental Meditation program to instruct administrators and teachers in the TM program and provide on-going meditation support.

2. **Information for parents.** The Service Provider will attend Enrollment Events and will provide written materials and information to parents, as well as permission slips. As needed, the Service Provider will also provide a presentation and written materials on the Quiet Time program to all parents who want information on the program at the start of the 2015-16 school year.

3. **Supervision of teacher and/or administrator training in QT leadership**. The Service Provider will provide a training program to the teachers and administrators who supervise Quiet Time.

4. **Instruction of the students.** The Service Provider will organize and provide instruction to participating students in the Transcendental Meditation program. When there are adequate numbers of students with permission slips to fill a course, courses will be scheduled 2 weeks ahead of time. When the numbers are not sufficient, students will be added within the two week window, but only with Amundsen teacher approval.

5. **Follow-up meetings with students.** The Service Provider will provide each participating student with 1 or 2 on-site individual or small group tune-ups, every 3 months. If students are having difficulty with their meditation practice, or in school in general, more individual follow-up sessions will be provided.

BOE005905

6. **Support for Quiet Time Supervision:** The Service Provider will rotate through Quiet Time sessions to provide support and refine teachers' Quiet Time/meditation leadership as well as ensure quality control.

7. **Support for Quiet Time Incentive Programs:** The Service Provider will help collate information on student meditation to contribute to grading and incentive programs, as well as help to structure special support initiatives for student meditation.

8. **Provide curriculum support.** The Service Provider will offer at least 6 classes for students that provide intellectual understanding of the value of meditation and provide ongoing support to teachers for integration into their classes over the course of the school year.  The Service Provider will provide instruction in these classes. This may be done in the context of a wellness, life skills, or health education class.

9. **Ongoing guidance**. The Service Provider will provide ongoing guidance to the school and parents on any issue relevant to the implementation of student meditation in the school or meditation at home.


**Part 2: Responsibilities of the School Site**

1. **Organize for all teachers and staff to be introduced to the Quiet Time program** and help organize the time for teachers and staff to learn Transcendental Meditation, if they choose to do so. The training will be held at mutually agreeable times, with as much advance notice provided to the Service Provider as possible. New teachers may also opt to learn TM at the DLF office during the summer if this is preferable.

2. **Organize to get parent permissions for students to learn meditation at Amundsen enrollment events to provide information and distribute permission slips.** In addition to getting permission slips to parents, the school will set up an information meeting for those parents interested in finding out more about Quiet Time. DLF and Amundsen will both keep copies of parent permission slips on file.


3. **Organize for all teachers or administrators who will lead Quiet Time to receive the one-hour Service Provider's training program** on how to effectively supervise the Quiet Time period. This training will be part of the beginning-of-program staff orientation and will serve as a review for continuing faculty. There will be two follow-up trainings/check-in during subsequent meetings. In addition, there will be one check-in meeting with each department on Quiet Time during each trimester.

4. **Organize two Quiet Time periods in the school schedule.** The School will provide two periods of about 15 minutes, in the morning and afternoon, during which participating students meditate or do their chosen Quiet Time activity. The specific scheduling of the Program will be at the discretion of the school, working in consultation with the Service Provider.

5. **Allow time for the initial training of students in meditation.** This training involves an orientation class on meditation, where students sign an agreement to learn, one session of personal instruction which is done individually and takes about 50 minutes, and three consecutive days meeting in a group for 60-75 minutes each day. In addition, a follow-up class of approximately 50 minutes will be held in the middle of the week following the initial course to confirm students' understanding of meditation practice.

6. **Organize, in cooperation with the Quiet Time staff, an efficient schedule of individual or small-group check-in sessions during school hours** with all participating students. 2 check-ins per term will be provided to students who have been previously trained, and 3-6 will be provided to new students. Additional check-ins will be provided to students at the request of Amundsen staff. Student check-ins will happen during content area classes–with one week advanced approval from teachers or from recess, advisory, or enrichment as needed, with 24-hour notice when at all possible. Amundsen will alert the Service Provider when there is a student in need who might benefit from a check-in. In this case, they can be pulled from recess, advisory or enrichment without advanced notice–or a content area class if the teacher agrees.

7. **Commit to upholding the integrity of the Quiet Time periods.** Teachers will set up properly for Quiet Time and begin on time. During Quiet Time, teachers will maintain a safe environment for meditation and silently monitor the students and not do any other work. At the end of Quiet Time, teachers will input grades electronically during the three minutes of rest and then give appropriate feedback to students. If the Service Provider has any concerns about a teacher's conduct during Quiet Time, he or she will coach the teachers first orally and then offer support in writing if there is no improvement. If there is still no improvement, the Service Provider will pose the concern to the Quiet Time Committee. The school will support Quiet Time by not interrupting Quiet Time sessions with phone calls or announcements. In addition, on field trip or other special-schedule days Quiet Time will be maintained, unless logistically impossible.

8. **Commit to establishing accountability and incentive system for encouraging meditation.** The School will establish a method for providing a separate grade in Quiet

Time on students' report cards, as well as a corresponding system for recognition. Quiet Time grades will be distributed on the same schedule as citizenship scores.

9. **Structure time for Quiet Time curricular content** to promote intellectual understanding of the value of meditation. Six class periods for each class per year will be structured for this. This can be done within wellness, life skills or health education classes. Additional special events or content may be held during the school year.

10. **Establish a Quiet Time Committee** to discuss the progress and needs of the Quiet Time program. The committee will be represented by administration and faculty members, and the DLF Quiet Time site leader. This committee will meet once a month, or more often if needed. The Quiet Time site leader will coordinate the committee, and will schedule an initial meeting during staff orientation. An annual meeting schedule will be established at the beginning of the year.

11. **Provide appropriate rooms and times for initial meditation instruction and individual and group follow-up meetings with the students.** The School will provide a room or office that is quiet, with comfortable seating, for the individual follow-up meetings with the participants; and a room for the follow-up group meetings. On instruction days, one room will be needed per teacher. The School will provide a schedule of available rooms to the Service Provider, who will be responsible for reserving the space accordingly.

12. **Provide office space** for the Quiet Time team if full-time team is on site. This may not be required of Amundsen until the program grows to include more participants. If there is going to be less than one full time staff member on site at any given point during the year, DLF will notify Amundsen of such as early as possible so as to adjust office space scheduling.

13. **Make school data available for evaluation of the Quiet Time program.** The school will share anonymous data relevant to potential impact of the Quiet Time program, including attendance, truancy, suspensions, grades, and standardized test performance. As a new program, it is important to evaluate its effects.

14. **Encourage and support teacher and staff meditation** as a core tool of effective teaching and faculty wellness. Regularly scheduled group meditation for the adult meditators, with a monthly video or guest speaker.

BOE005908

**Part 3: Financial Commitments**

The David Lynch Foundation, with support from the UC Crime Lab, Pritzker Pucker Family Foundation and MacArthur Foundation, will provide funding for the first year implementation of the Quiet Time Program at the School. It is expected that for the 2016-17 school year, conditional on satisfactory outcomes and the program continuing at the School, the School will work with the David Lynch Foundation to help raise funds for subsequnet Program administration costs.

**David Lynch Foundation**                    **Amundsen High School**

_____              _____

   Authorized Signature                       School Site Principal

Christopher Busch – Director David Lynch       Anna Pavichevich, Principal,
Foundation - Chicago                           Amundsen High School

Print Name and Title of Signatory              Print Name and Title of Signatory

Date:_____          Date: _____

BOE005909

# Exhibit T

# Distribution of responsibilities



BOE 002584

# EXHIBIT U-1

# Research Review Board Modification
# & Continuing Review Application

Please complete and submit this form, and also mail one (1) printed copy along with supplemental
materials and $50 processing fee to the RRB. See checklist at the bottom of the form and RRB
guidelines to ensure a complete application package. Incomplete applications will not be reviewed.



Chicago Public Schools
Office of Accountability Attn: RRB
42 W. Madison Street
Chicago, Illinois 60602
Phone: 773-553-4444
Email: research@cps.edu
www.cps.edu/research/

Date: March 27, 2018          RRB Project ID#: 1236

Proposal Title: David Lynch Foundation Quiet Time Program Evaluation

Subject: Other          Original Approval Date: January 27, 2017

Application type(s):  ☐ Continuing Review     CPS Board Contracted    ☐ Yes
                      ☒ Proposal Modification  Research Proposal?      ☐ No

Primary Contact: Lydia Jessup

Organization: University of Chicago Crime Lab

Address: 33 N LaSalle St., Suite 1600

City: Chicago     State: IL     Zip Code: 60602

Phone: 773-702-2854     Email: ljessup@uchicago.edu

Proposed Study Participants:

Proposed Number and List of Participating Schools:

Three CPS high schools in SY 2016-2017: Bowen, Daniel Hale Williams and Gage Park and three CPS high schools in SY 2017-2018 (Bogan, Julian and TEAM Englewood).

☒ Students
☐ Teachers
☐ Other Staff
☐ Parents

Executive Summary or Abstract:

The University of Chicago Crime Lab, with the support of Get IN Chicago, the John D. and Catherine T. MacArthur Foundation, and the Pritzker Pucker Family Foundation, launched the Chicago Design Competition: Reducing Youth Violence in February 2015 to identify, fund, and evaluate a promising and innovative youth violence prevention program. The David Lynch Foundation (DLF) was selected as one of the winners and was awarded a grant to pilot their Quiet Time (QT) Program for the first time in Chicago. The Quiet Time Program incorporates two 15-minute silent periods into the school day, which are designed to create a space where students have the option to practice a form of mantra-based meditation called Transcendental Meditation.

Following a successful pilot year in SY2015-16, we increased the number of schools and students enrolled in the study and randomized roughly half of the students to be offered the opportunity to learn TM in each of the schools. We are currently analyzing the impact of the Quiet Time program in three CPS high schools,

UNIVERSITY_000018

Bowen, Daniel Hale Williams and Gage Park that implemented the program in SY 2016-2017. As previously shared with CPS, preliminary results show reduced rates of arrest and improved attendance among the meditating group. Although we find these initial results extremely encouraging, they are confidential and subject to change, so please do not cite or share. We are continuing to study the program in three additional CPS public high schools in SY 2017-2018: Bogan, Julian, and TEAM Englewood. At the end of this school year, we will be able to add data from these schools to our analyses once data are available and calculate final results on the effects of Quiet Time on student outcomes. Approximately 2,800 total students will be enrolled in the study over this period, 1,400 offered the chance to meditate and 1,400 participating in control activities. Academic and justice outcomes will be measured using administrative data from CPS and CPD.

In developing this study, we worked with CPS to identify high schools with student populations coming from low-income and high violence neighborhoods, factors that have been shown to be chronic stressors that impede student learning. We hypothesize that lower stress caused by meditation during Quiet Time will mediate any changes in academic and behavioral outcomes, as measured using administrative data, which serve as our primary outcome measures for the full-scale study. As previously approved, we will measure participation through aggregate data collected by the program provider, the David Lynch Foundation, in order to get an accurate estimate for the impact of the treatment on the treated (TOT). Classroom observations will allow us to monitor fidelity to the model more generally so that we can confidently describe the program we are evaluating. There will be no changes to these activities.

In this application, we are proposing changes to our Quiet Time research protocol that emerged from recent meetings with schools, community members and parents of participants, CPS central staff (in particular, Justina Schlund at the Office of Social and Emotional Learning).

After receiving approval from the UChicago IRB and this RRB to move forward with salivary cortisol collection to measure student stress, we worked with CPS to develop a community engagement plan. As part of this, we held a series of school and community meetings during January and February to assess any possible community questions and concerns regarding salivary collection. Both we and CPS wanted to be sure that the community and parents of adolescents involved in this study fully approved of the procedures even prior to initiating the informed consent process with parents and youth. Community reactions at the completed meetings were mixed, with administrators and some parents being in support of the biomarker collection and other parents raising questions and concerns regarding the saliva sampling.

To be as responsive as possible to parents and community members, we propose to substitute alternative options for measurement of biological stress that do not involve removal of biological samples. While we believe there are ways to collect cortisol and other biological samples that would be fully supported by participants and their families, we want to proceed with the utmost of caution. The two alternative options we propose to employ in order to measure student stress and understand the mechanisms through which Quiet Time may be impacting student academic and behavioral outcomes include:
>    1) sleep measurement, by way of a wrist-based actiwatch (similar to consumer activity monitors that students and parents may already be familiar with) and
>    2) blood pressure measurement.

We also plan to provide students with a health summary report of these measures prepared by our Northwestern University research team members Dr. Emma Adam and Dr. Heard-Garris.

We propose to carry out this procedure in the spring of 2018 with approximately 20-25 classrooms (between 400-480 students) from Bogan and/or Julian High School.

Study Timeline (note any and all changes to original):

**RCT Timeline:**
There will be no changes to the RCT timeline (randomization, implementation, observations). In terms of the previously approved cortisol sampling, we did not carry out these procedures in the fall of 2017 and here are proposing to continue with the original timeline for measuring student stress in the spring of 2018, but change the procedures as described in the next section below.

UNIVERSITY_000019

**Stress Measurement Timeline:**

*April 2018- Week 1:* Selected classrooms, with permission from school administration and classroom teachers will be approached to participate in the collection of key stress indicators including sleep and blood pressure. The study team will visit these classrooms to explain the procedures and distribute parent consent and assent forms to students. The study team will visit the school a few times over the course of one to two weeks to pick up consent forms.

*April/May 2018- Week 2- Day 1 of collection*: Final consent and assent forms will be collected from students. Students who have agreed to participate in the study will attend a 30-40 minute orientation explaining step by step the study procedures they will undergo which will be led by research personnel. Students will complete a health questionnaire during this time as well that will take no more than 20 minutes.  Please see the attached questionnaire for more details. We have added modification to ask about perceived discrimination, exposure to violence, and a measure of positive youth development.

*April/May 2018-Week 2-Day 1 to 3 of Collection*: Study personnel will administer actiwatches to students. Students will press a button before going to bed and again when they wake up in the morning to mark the collection period. Students will also fill out a mood diary at the beginning and the end of each day of the stress measurement period.  Please see the attached mood diary document for more details. We have also added modifications in order to ask about sleep hygiene, sleep quality, and daily mood states and experiences. Watch data will be collected by research staff and immediately transferred to Dr. Adam's lab at Northwestern.

*April/May 2018-Week 2-Day 3 to Post-Sample Collection*: Each student's blood pressure will be measured on one day of study participation. Students will be moved to a separate room, where the study team will collect blood pressure readings.  Blood pressure measurement will be conducted using standard research protocols and professional grade automatic blood pressure monitors (the OMRON HEM705 CP) by the research team. Students will be sitting in a chair with arms, and asked to sit quietly and present their left arm for blood pressure measurement.  Bulky sweaters or jackets will be removed, and the arm will be measured to determine the appropriate size of blood pressure cuff to use (four different sizes, extra small through extra-large will be available). The cuff will inflate 3 times and the average of the last two readings will be used.  We expect the blood pressure measurement to take about 15 minutes per student.

Students who participate any day with at least one stress indicator test or survey will receive a $20 visa gift card.  We further plan to offer a personized health report to each participating student, including information on their sleep quantity and quality, exercise, blood pressure, and stress levels relative to other students, with tips for ways to improve their health and wellbeing.

Following the completion of sample collection, watches will be collected and data analyzed and the success of the procedure will be assessed. Recommendations will be made to improve the study procedure to ensure that the procedures run smoothly, adequately addresses and accounts for potential problems in addition to collecting useful data.

UNIVERSITY_000020

Description of
Research Activities
and Preliminary
Results to Date:

During SY2015-16, we conducted with DLF a successful pilot of QT at Amundsen and Gage Park high schools. At Amundsen, a cohort of 60 juniors learned to meditate and at Gage Park, 59 of the 90 eligible sophomores elected to learn. We held four focus groups with a total of 24 students. Overall, students reported benefits in four main areas: sleep, self-awareness and self-control, ability to focus on schoolwork, and mood and relationships. We also conducted eight interviews with school administrators, teachers, and staff from the DLF who shared similar reports. Notably, the principals at both schools requested that the program return to their schools, believing that QT benefited both individual students and the school culture. Based on this successful program delivery, we secured agreements with DLF, principals, and CPS to conduct a full-scale evaluation over two years.

SY2016-17 marked the launch of the first year of the randomized controlled trial (RCT) study. Three high schools (Daniel Hale Williams, Bowen and Gage Park) voted to change their bell schedules so that all students could have QT twice a day. Classrooms were randomly selected to learn to meditate, and those not selected did other activities chosen by the schools, such as silent sustained reading or study hall. Across the three schools, 779 students and 41 classrooms were included in the study with 399 randomized to treatment and 380 to control. Notably, 80% of eligible students chose to learn and were trained in TM during the first year of the RCT.

SY2017-18 marked the start of the second year of the RCT. Three additional schools (Bogan, Julian and TEAM Englewood) voted to incorporate the program and participate in the research study. In total, 1,389 students across 59 classrooms were included with 695 students randomized to the treatment group and 694 to the control group. To date, DLF has successfully carried out the first semester of QT programming. To date, approximately 550 students – over 80% of the eligible population – have been trained in TM. During this program implementation, we have been consistently conducting site visits to schools to observe both meditating and non-meditating classrooms.

We have been able to do an initial analysis to measure the effects of the Quiet Time program on academic and behavioral outcomes using CPS and Chicago Police Department (CPD) data. *The following results are preliminary, confidential and subject to change – please do not cite or share.* Preliminary evidence from the first year of the study shows a 45% reduction in arrests among students chosen for the meditation group compared to those assigned to control activities (significant at the 10% level). This effect is concentrated within the "other" arrest category, a catchall for arrests that do not qualify as "violent", "property" or "drug". In terms of schooling outcomes, we also see approximately a three day increase in attendance among the meditation group. Although this is a preliminary look at the data based on less than half of the full study sample, we find these initial results extremely encouraging. Following the conclusion of SY2017-18, we will be able to add data from the second year of the study. This will give us sufficient statistical power to be able to detect with greater confidence and precision the effects QT has on academic achievement, student behavior and violence involvement.

UNIVERSITY_000021

Indicate Proposed
Modification(s):

☒ Research Question or Hypothesis

☒ Study Timeline

☐ Study Population

☐ Recruitment Methods or Advertising

☒ Study Methodology and/or Research Activities

☒ Consent Form(s) or Consent Process

☒ Survey/Instrument(s)

☒ Type of Data Collected

☐ Other

☐ None

Detailed
Explanation of
Indicated
Modification(s):

**Research Activities**
Observations
The observation protocol will not change.

Participation Tracking
The Crime Lab previously received participation data from CPS under this RRB but will now be receiving participation data from the David Lynch Foundation under an executed data sharing agreement and with agreement from CPS.

Stress Measurement
We propose to collect and analyze sleep data and blood pressure outcomes to answer the same research question and hypothesis proposed previously with the cortisol sampling procedures:

      1) Does participation in QT reduce student stress levels?

We propose these changes because sleep patterns and blood pressure are well regarded stress indicators for youth that can be used in place of cortisol to investigate the effect of meditation on stress. The proposed stress measurement procedures would take place over four consecutive school days (and three nights) of the same week (Monday – Thursday). In order to get a full and accurate picture of the student stress response during the collection period, we will also collect information via two short self-report surveys. This would start in the April of 2018 with approximately 400-480 students (about 20-25 classrooms depending on class size) at Bogan and/or Julian high schools. In this application, we have included the most recent amendment approval for the study from the IRB. We will share the approval letter for the modified stress measurement procedures once it is finalized as it is currently under review.

If approved, this work will be led by research team member Dr. Emma Adam (Professor of Human Development and Social Policy, Northwestern University). Sleep measurement is a primary topic of study by Dr. Adam, and she is a leading expert on the ways sleep and stress interact to affect the body's functioning; she has served as a consultant and on NIH review boards as a recognized expert on child and adolescent sleep. Adam has multiple published papers on sleep and using actigraphy (Adam, Snell, & Pendry, 2007; DeSantis, Adam, Mendelsohn, & Doane, 2010; Heissel, Levy, & Adam, 2017; Heissel, Sharkey, Torrats-Espinosa, Grant, & Adam, 2017; Levy, Heissel, Richeson, & Adam, 2016; Tavernier & Adam, 2017; Tavernier, Choo, Grant, & Adam, 2016; Tavernier, Heissel, Sladek, Grant, & Adam, 2017; Zeiders, Doane, & Adam, 2011). In one recent paper published in Child Development, Adam and colleagues collected sleep information on CPS students, and predicted day-to-day changes in sleep timing and quality from exposure to neighborhood violence each day, coded from police records (available upon request).

The research activities proposed here will follow the same previously approved protocol for the cortisol sampling, but will measure blood pressure and sleep patterns instead. Students will undergo the following procedures:

a. The Crime Lab will work with the David Lynch Foundation, Bogan and Julian to coordinate school visits to present the stress measurement procedures to classrooms already participating in Quiet Time. Students will be informed by research staff that they are invited to participate and the procedures will be explained in full. Students will be given assent and parental consent forms to be taken home. Only classrooms with teachers who consent to allow research staff to observe and assist students in carrying out the procedures will be approached to participate in this research procedure. Classroom teachers or school staff will not be asked to collect data. Students will turn in their signed consent and assent forms to the David Lynch Foundation TM instructors.

b. The collection procedures will be scheduled for one to two weeks after consent forms are sent home to allow for adequate response time. Students who have returned signed consent forms will be invited to participate in the stress measurement activities. During the week(s) before sampling begins, the study team will visit the schools several times to collect consent forms from the David Lynch Foundation TM instructors.

c. Research personnel will give a 30-40 min orientation on the first day of the four day stress measure collection period to the students who have consented. Students will be pulled out of their classroom during their normal morning Quiet Time period in order to attend so that students who are not participating are not disturbed or made to feel uncomfortable. Students will also complete the health questionnaire during this time (see below for survey details). If possible, the students will complete this survey on computers in their school's computer lab or on their smart phone. If the computer lab or a smart phone is not available, the survey will be given on paper.

d. On the first day of sampling, youth will be administered actiwatches and sleep information will be recorded over the course of three nights (four school days). We will ensure that students understand how to operate and handle the technology by the time of data collection and that all questions are answered.

e. On one day during the stress measurement period, study personnel will conduct blood pressure readings. Blood pressure will be recorded using standard research protocols and professional grade automatic blood pressure monitors (the OMRON HEM705 CP) by the research team. Students will be sitting in a chair with arms, and asked to sit quietly and present their left arm for blood pressure measurement. Bulky sweaters or jackets will be removed, and the arm will be measured to determine the appropriate size of blood pressure cuff to use (four different sizes, extra small through extra-large will be available). The cuff will inflate 3 times and the average of the last two readings will be used. Students will be pulled into a separate room for the BP collection. Students will miss up to 15 minutes of direct instructional time if unable to be pulled out during other times. Students will not be pulled out when taking an assessment.

f. We will also collect information via two different surveys in order to get a full and accurate picture of the student stress response during the stress indicator collection period. The surveys are designed to measure stressors, mood, health and puberty, which are correlated with stress system functioning. This will help us better understand the blood pressure and sleep data and variation in the outcome data. This work will also be led by Dr. Adam. The students will undergo the following procedures:

- Mood Diary: First, the students will complete a "daily diary" at the beginning and end of each day during the stress measurement period. The diary questionnaires will be online and students will be sent a link via text or email each morning and evening during the collection period to complete the daily survey. Students will also have the option to opt for paper copies of the diaries as well. This daily diary is a short survey that asks about the emotions students are feeling at the moment (such as sad, relaxed, nervous, awake, tired; a copy of the survey is included in the attached materials). From our previously approved materials, we have made the following changes: (1) Mood state questions were adapted from the Positive and Negative Affect Schedule (PANAS) and have been used in Dr. Adam's prior published research (Adam, 2006; Doane & Adam, 2010; Watson & Tellegen, 1988).(2) Additional questions about sleep hygiene and quality were added to support the interpretation of sleep data gathered through the actiwatches.

- Health Questionnaire: Second, at the beginning of the four-day collection period, the students will be asked to complete a health questionnaire because stress functioning is linked to health and puberty (Adam & Kumari, 2009). This questionnaire asks about typical mood states, somatic symptoms such as headaches and stomachaches, sleep hours and quality, and puberty (see attached materials for a copy of this survey). Although most questions are not sensitive, some questions may bring up uncomfortable feelings. Questions ask about health habits, somatic symptoms, puberty, sleep and mood such as "How often do you do mild exercise per week?" and "Do you think your development is any earlier or later than most girls/boys your age?" and "In the past two weeks I felt miserable or unhappy – not true, sometimes, or true?". The questionnaire has been used in Dr. Adam's prior published research (Adam, 2006; DeSantis et al., 2007). The survey includes questions on sleep from the Pittsburgh sleep quality index and Peterson's Pubertal Development Scale, asking about health habits, puberty and mood (Buysse & Reynolds, 1989; Peterson, 1988). This survey should take no more than 15-20 minutes. From our previously approved materials, we have made the following changes: we propose adding a short questionnaire taken from the Positive Youth Development literature to our health measure that focuses on child strengths, including competence, confidence, character,

connection and caring, referred to as the Five C's model of Positive Youth Development (Geldhof et al., 2014). In prior studies evaluating youth programs, higher scores on the Five C's have been associated with more positive youth outcomes. We also added measures that ask about students' perceived discrimination and exposure to violence.

Physical survey responses will be stored in a locked drawer in the locked Crime Lab office and coded data will be stored on the Crime Lab secure servers. We do not ask questions about child abuse/neglect, suicidality or planned violence against others, so we do not expect students' free responses to deal with these topics. However, in the case that a student does indicates child abuse/neglect, suicidality or planned violence against others, these surveys will be flagged and referred to study team member Jennifer Tackett (Northwestern University) for immediate follow-up. Dr. Tackett is a trained clinical psychologist and the Director of Clinical Training at Northwestern University. Surveys will be reviewed within a week of completion to check for these types of concerns.

g. Students who participate in these procedures will be eligible to receive $20. If they participate in at least one stress measurement activity and return the actiwatch, they will receive this money in the form of a visa gift card at the end of the data collection period.

h. Finally, youth will have the option to receive a health report, summarizing their blood pressure and sleep findings. The health reports will be prepared by our team, and reviewed and signed by Emma Adam, as well as by a pediatrician Nia Heard-Garris on the research team. We will also provide a list of community mental and physical health resources for parents and teens. Based on our conversations with schools and parents thus far, we believe students will find the information, particularly the information on their sleep quality, to be both interesting and useful.

---

Modification & Continuing Review Application Checklist:

☐ Application Form

☐ Updated Institutional Review Board approval letter

☐ Updated survey or other instruments (if applicable)

☐ Updated informed consent forms for parents and/or teachers as appropriate (if applicable)

☐ Updated informed consent forms for students ages 18 or over as appropriate (if applicable)

☐ Updated assent form for 6th grade/age 12+ students (if applicable)

☐ Processing Fee of $50.00

UNIVERSITY_000025

# EXHIBIT U-2

# Research Review Board Modification
# & Continuing Review Application

Please complete and submit this form, and also mail one (1) printed copy along with supplemental materials and $50 processing fee to the RRB. See checklist at the bottom of the form and RRB guidelines to ensure a complete application package. Incomplete applications will not be reviewed.



Chicago Public Schools
Office of Accountability Attn: RRB
42 W. Madison Street
Chicago, Illinois 60602
Phone: 773-553-4444
Email: research@cps.edu
www.cps.edu/research/

| | | | |
|---|---|---|---|
| Date: | 10/17/2018 | RRB Project ID#: | 1236 |

Proposal Title: David Lynch Foundation Quiet Time Evaluation

| | | | |
|---|---|---|---|
| Subject: | Social-emotional Learning | Original Approval Date: | 12/1/2015 |

Application type(s):
- [ ] Continuing Review
- [X] Proposal Modification

CPS Board Contracted Research Proposal?
- [ ] Yes
- [X] No

Primary Contact: Jalisia Taylor-Singleton

Organization: University of Chicago Crime Lab

Address: 33 N Lasalle

City: Chicago    State: IL    Zip Code: 60602

Phone:    Email: jalisia@uchicago.edu

Proposed Study Participants:
- [X] Students
- [X] Teachers [ ]
- Other Staff [X]
- Parents

Proposed Number and List of Participating Schools:

Three CPS high schools including:
Gage Park High School
Bogan High School
Bowen High School

Executive Summary or Abstract:

The University of Chicago Crime Lab has been partnering with the David Lynch Foundation (DLF) since 2015 to evaluate the effectiveness of the Quiet Time (QT) program, which gives students the time and training to practice Transcendental Meditation (TM) during two short periods built into the school day. In school years 2016/2017 and 2017/2018, we conducted randomized controlled trial (RCT) studies in six Chicago Public Schools high schools (Gage Park, Daniel Hale Williams, Bowen, Bogan, Julian, and TEAM Englewood). After successful previous implementation and evaluation of the Quiet Time program, Gage Park and Bogan high schools voted to bring the program back to their students in SY2018-2019, transitioning to a whole-school implementation.

Preliminary evidence from the first year of the RCT study in Gage Park, Daniel Hale Williams and Bowen high schools shows promise among students chosen for the meditation group compared to those assigned to control activities. If we want to see these encouraging results among a greater student population, it is important to know how to scale the program. We believe the best process for doing so would be to use the 2018-19 school year to begin to learn about what the program looks like at scale at returning schools. While our conclusions about the effects of the Quiet Time program will be drawn from the RCT study, the qualitative data will support our understanding of the staff and student experience and how the program scales.

UNIVERSITY_000054

To better understand how Quiet Time might operate at scale, we propose collecting qualitative data to supplement the RCT study by answering the following questions:

1) How does the Quiet Time program scale-up? How might the implementation and effects change as the program scales up?

    a. What are facilitators and barriers to implementation?

    b. How does implementation vary by school, if at all?

2) How do key stakeholders – including students, teachers, administrators, and other school personnel – perceive Quiet Time?

3) How does Quiet Time influence school climate or culture?

Data collection methods would involve research activities previously approved during the pilot and RCT phases of the Quiet Time evaluation and will include classroom observations, interviews and focus groups with students, teachers, administrators, and other school personnel. These methods will allow us to describe the implementation in schools and to understand the staff and student experience. Interviews and observations beginning the second semester will examine how well the program integrates into the school culture and how effectively the program is implemented. We plan to interview two student focus groups of 4-6 students at each school at two points throughout the school year. We will also interview two classroom teachers, the principal, assistant principal, and TM teachers at each school at the beginning and end of the school year. Classroom observations of the QT sessions will be recorded using the observation rubric.

Study Timeline (note any and all changes to original):

Classroom meditation observations will occur at least monthly and may be as frequent as weekly or bi-weekly beginning in November/December 2018 through April/May 2019. The Quiet Time student focus groups and teacher/principal/administrator/school staff interviews are planning to take place between December 2018/January 2019 and April/May of 2019.

Description of Research Activities and Preliminary Results to Date:

During SY2015-16, we conducted with DLF a successful pilot of QT at Amundsen and Gage Park high schools. At Amundsen, a cohort of 60 juniors learned to meditate and at Gage Park, 59 of the 90 eligible sophomores elected to learn. We held four focus groups with a total of 24 students. Overall, students reported benefits in four main areas: sleep, self-awareness and self-control, ability to focus on schoolwork, and mood and relationships. We also conducted eight interviews with school administrators, teachers, and staff from the DLF who shared similar reports. Notably, the principals at both schools requested that the program return to their schools, believing that QT benefited both individual students and the school culture. Based on this successful program delivery, we secured agreements with DLF, principals, and CPS to conduct a full-scale evaluation over two years.

SY2016-17 marked the launch of the first year of the randomized controlled trial (RCT) study. Three high schools (Daniel Hale Williams, Bowen and Gage Park) voted to change their bell schedules so that all students could have QT twice a day. Classrooms were randomly selected to learn to meditate, and those not selected did other activities chosen by the schools, such as silent sustained reading or study hall. Across the three schools, 779 students and 41 classrooms were included in the study with 399 randomized to treatment and 380 to control. Notably, 80% of eligible students chose to learn and were trained in TM during the first year of the RCT.

SY2017-18 marked the start of the second year of the RCT. Three additional schools (Bogan, Julian and TEAM Englewood) voted to incorporate the program and participate in the research study. In total, 1,389 students across 59 classrooms were included with 695 students in the treatment group and 694 to the control group. To date, DLF has successfully carried out the first semester of QT programming. To date, approximately 550 students – over 80% of the eligible population – have been trained in TM. During this program implementation, we have been consistently conducting site visits to schools to observe both meditating and non-meditating classrooms.

We have been able to do an initial analysis to measure the effects of the Quiet Time program on academic and behavioral outcomes using CPS and Chicago Police Department (CPD) data. The following results are preliminary, confidential and subject to change – please do not cite or share. Preliminary evidence from the first year of the study shows a 45% reduction in arrests among students chosen for the meditation group compared to those assigned to control activities (significant at the 10% level). This effect is concentrated within the "other" arrest category, a catchall for arrests that do not qualify as "violent", "property" or "drug". In terms of schooling outcomes, we also see approximately a three day increase in attendance among the meditation group. Although this is a preliminary look at the data based on less than half of the full the study sample, we find these initial results extremely encouraging. Following the conclusion of SY2017-18, we will be able to add data from the second year of the study. This will give us sufficient statistical power to be able to detect with greater confidence and precision the effects QT has on academic achievement, student behavior and violence involvement.

Indicate Proposed Modification(s):

- ☐ Research Question or Hypothesis
- ☒ Study Timeline
- ☒ Study Population
- ☒ Recruitment Methods or Advertising
- ☒ Study Methodology and/or Research Activities
- ☒ Consent Form(s) or Consent Process
- ☐ Survey/Instrument(s)
- ☒ Type of Data Collected
- ☐ Other
- ☐ None

UNIVERSITY_000056

| | |
|---|---|
| Detailed Explanation of Indicated Modification(s): | **Qualitative Data Collection SY2018-19**

Data collection will occur in Bogan, Gage Park and Bowen high schools. Bogan and Gage Park are both introducing whole-school implementation allowing any student who is interested to be trained in TM. Bowen will begin with training 8 classrooms with the option for other teachers who are interested to be trained in the spring. We will compare scale-up, school culture, and student engagement in the whole-school environment to the limited implementation. We expect data collection to occur between November 2018 and April 2019.

The meditation observation rubric, student focus group, and school staff interview protocols are attached to this modification. Updated consent and student assent forms are also included in this update.

**Observations**

Observations will take place in each school at least twice monthly using the observation rubric. Observations will last the full duration of the TM session (15-20 minutes). Observations will occur in any classroom in Bogan and Gage Park and in TM classrooms in Bowen. We expect to observe approximately 48-52 classrooms for a total of 96 observations between November 2018 and April 2019. The observation protocol will not change from the previous protocol during the RCT implementation of the study.

**Student Focus Groups**

The student focus group protocol will remain the same as the pilot study year. The student focus groups will take place in the school where the students attend in a private area where the participants are comfortable. The focus groups will be made up of at least 4-6 students who are participating in the Quiet Time program at their school. Focus groups will not last more than 1 hour. Each focus group will meet for at least one session and no more than two sessions during the 2018-2019 school year. Students will be compensated with the option between a University of Chicago t-shirt, mug or other gift shop souvenir upon completion of the focus group sessions. Incentives are pending IRB approval and we will submit the approval letter upon its receipt. We expect to conduct approximately 12-18 focus groups across the three schools between January 2019 and April 2019.

**Staff Interviews**

Interviews will take place in each school using the interview protocols. Interviews will last approximately one hour and will be recorded and transcribed. Interviews will be conducted with principals, administrators, safety/security officers, teachers in TM classrooms, and teachers in non-TM classrooms (Bowen). We may also interview TM teachers given availability. We expect to conduct approximately 36-50 interviews between January 2019 and April 2019. The school staff interviews for the 2018-19 whole school implementation will take place in the school in a private area where the interviewee is comfortable.

If the interviewee is not available to conduct the interview in person, it may be done over the phone in a private room. Each school staff and DLF QT member selected to participate will be interviewed at least once and no more than twice during the 2018-2019 school year. The interview will not last longer than 1 hour and is designed to take less time. Staff who are interviewed will be compensated with a $20 gift card upon completion of the interview. We have received IRB approval and have attached it to this submission. Interviews are expected to take place between January 2019 and April 2019. |

| | |
|---|---|
| Modification & Continuing Review Application Checklist: | [X] Application Form
[X] Updated Institutional Review Board approval letter
[ ] Updated survey or other instruments (if applicable)
[X] Updated informed consent forms for parents and/or teachers as appropriate (if applicable)
[X] Updated informed consent forms for students ages 18 or over as appropriate (if applicable)
[ ] Updated assent form for 6th grade/age 12+ students (if applicable)
[ ] Processing Fee of $50.00 |

# EXHIBIT U-3

# Research Review Board Modification & Continuing Review Application

Please complete and submit this form, and also mail one (1) printed copy along with supplemental materials and $50 processing fee to the RRB. See checklist at the bottom of the form and RRB guidelines to ensure a complete application package. Incomplete applications will not be reviewed.



Chicago Public Schools
Office of Accountability Attn: RRB
42 W. Madison Street
Chicago, Illinois 60602
Phone: 773-553-4444
Email: research@cps.edu
www.cps.edu/research/

| Date: | April 14, 2017 | RRB Project ID#: | 1236 |
|---|---|---|---|

Proposal Title: David Lynch Foundation Quiet Time Program Evaluation

Subject: Other

Original Approval Date: January 27, 2017

Application type(s):  ☐ Continuing Review   ☒ Proposal Modification

CPS Board Contracted Research Proposal?  ☐ Yes   ☐ No

Primary Contact: Lydia Jessup

Organization: University of Chicago Crime Lab

Address: 33 N LaSalle St., Suite 1600

City: Chicago   State: IL   Zip Code: 60602

Phone: 773-702-2854   Email: ljessup@uchicago.edu

Proposed Study Participants:
☒ Students
☐ Teachers
☐ Other Staff
☐ Parents

Proposed Number and List of Participating Schools:

Three CPS high schools in SY 2016-2017: Bowen, Daniel Hale Williams and Gage Park and approximately four CPS high schools in SY 2017-2018 (schools that have expressed interest so far include Bogan, Bronzeville, Julian and TEAM Englewood).

Executive Summary or Abstract:

The University of Chicago Crime Lab, with the support of Get IN Chicago, the John D. and Catherine T. MacArthur Foundation, and the Pritzker Pucker Family Foundation, launched the Chicago Design Competition: Reducing Youth Violence in February 2015 to identify, fund, and evaluate a promising and innovative youth violence prevention program. The David Lynch Foundation (DLF) was selected as one of the winners and was awarded a grant to pilot their Quiet Time (QT) Program for the first time in Chicago. The Quiet Time Program incorporates two 15-minute silent periods into the school day, which are designed to create a space where students have the option to practice a form of mantra-based meditation called Transcendental Meditation.

Following a successful pilot year, we increased the number of schools and students enrolled in the study and randomized roughly half of the students to be offered the opportunity to learn TM in each of the schools. We are analyzing the impact of the Quiet Time program in three CPS high schools, Bowen, Daniel Hale Williams and Gage Park, during SY 2016-2017 and plan to add three or four additional CPS public high schools for SY 2017-

UNIVERSITY_000091

2018. Approximately 2,800 total students will be enrolled in the study over this period, 1,400 offered the chance to meditate and 1,400 participating in control activities. Academic and justice outcomes will be measured using administrative data from CPS and CPD.

As a complement to this on-going efficacy study of the Quiet Time program, we propose to incorporate three other data sources:
1) Classroom observations to monitor program model fidelity
2) Quiet Time participation data to measure compliance and take-up
3) Cortisol and alpha-amylase (hormones produced by the body) markers collected through saliva sampling, to understand the impact that QT has on student stress
4) Short self-report mood and health surveys to be completed during the saliva sampling period

In addition to our previously stated hypotheses in the original RRB application, we hypothesize that students who meditate during Quiet Time will have lower stress levels, as measured by salivary cortisol and alpha-amylase, compared to control students who do not meditate. To collect saliva samples, students will be instructed to spit through a straw into a sterile vial, a non-invasive procedure that is well-established and has previously been employed in school settings. The hormones we plan to measure in the saliva samples are important markers for biological stress responses and have been linked to both acute and long term health, cognitive, and behavioral outcomes.

We have chosen high schools with student populations coming from low-income and high violence neighborhoods, factors that have been shown to be chronic stressors that impede student learning. We expect that lower stress caused by meditation during Quiet Time will mediate any changes in academic and behavioral outcomes, as measured using administrative data, which serve as our primary outcome measures for the full-scale study. We will measure participation through aggregate data collected by the program provider, the David Lynch Foundation, in order to get an accurate estimate for the impact of the treatment on the treated (TOT). Classroom observations will allow us to monitor fidelity to the model more generally so that we can confidently describe the program we are evaluating.

Because the cortisol collection procedure has not been incorporated into this study previously, we propose to pilot this procedure in the spring of 2017 with two to four classrooms of students (approximately 50-100 students) from Bowen and/or Daniel Hale Williams. This pilot will be exploratory and used primarily to inform adequate sample collection study procedures in SY 2017-2018. Following a successful pilot, we will carry out sampling of a larger population in the fall of 2017 and spring of 2018 (pending IRB and RRB approval)

Study Timeline (note any and all changes to original):

**RCT Timeline:**

In SY 2016-2017 randomization of morning classrooms to treatment and control groups occurred approximately one month into the school year. For SY 2017-18 randomization will occur in the spring or summer before the school year starts if the scheduling system for the school allows or approximately one month into the school year. These strategies will enable us to randomize classrooms once classroom composition is set.

To check the fidelity of program implementation, Crime Lab staff will visit each of the schools enrolled in the study up to twice a month to conduct classroom observations and record classroom-level behavior. These observations will begin when we receive approval and will continue until June 2017 for the first year and follow the same schedule for the second year of the program.

Participation data aggregated by grade will be shared by David Lynch Foundation at the end of each semester after being reviewed by CPS.

UNIVERSITY_000092

The pilot cortisol collection will occur in the spring of 2017 and if approved for a larger scale, will occur in the fall of 2017 and spring of 2018.

Analysis of outcomes will occur after the study of the program ends in June 2018.

**Detailed cortisol collection timeline:**
*Spring 2017- Week 1:* Selected classrooms, with permission from school administration and classroom teachers will be approached to participate in the pilot collection of salivary cortisol. The study team will visit these classrooms to explain the procedure and distribute consent and assent forms to students. The study team will visit the school a few times over the course of the week to pick up consent forms.

*Spring 2017- Week 2- One or two days before collection begins*: Final consent and assent forms will be collected from students. Students who have agreed to participate in the study will attend a saliva sampling demonstration and practice sample led by research personnel and complete a short health questionnaire. Students will be pulled out of class during their morning Quiet Time period and taken to a designated room in order to complete these procedures.

*Spring 2017-Week 2-Day 1 of Collection*: Study personnel will pull consented students out of class and take them to a different classroom for their morning and afternoon Quiet Time periods. Students will collect salivary samples in the designated classroom immediately prior to their morning QT period, 15 minutes after their morning QT period, immediately prior to their afternoon QT period and 15 minutes after their afternoon QT period. Students will also fill out a mood diary before each sample collection. Each of these collection periods will be supervised by research staff. Samples will be collected by research staff and immediately transferred to Dr. Adam's lab at Northwestern.

*Spring 2017-Week 2-Day 2 of Collection*: Study personnel will pull consented students out of class and take them to a different classroom for their morning and afternoon Quiet Time periods. Supervised and assisted by research staff, students will collect salivary samples immediately prior to their morning QT period, 15 minutes after their morning QT period, immediately prior to their afternoon QT period and 15 minutes after their afternoon QT period. Students will complete the mood diary before each sample collection. Samples will be collected by research staff and immediately transferred to Dr. Adam's lab at Northwestern.

*Spring 2017-Week 2-Day 3 of Collection*: Study personnel will pull consented students out of class and take them to a different classroom for their morning and afternoon Quiet Time periods. Supervised and assisted by research staff, students will collect salivary samples in their classrooms immediately prior to their morning QT period, 15 minutes after their morning QT period, immediately prior to their afternoon QT period and 15 minutes after their afternoon QT period. Students will complete the mood diary before each sample collection. Samples will be collected by research staff and immediately transferred to Dr. Adam's lab at Northwestern. All students who participated in at least one day of sample collection will receive a $20 visa gift card.

Spring 2017-Post-Sample Collection: Following the completion of sample collection, samples will be assayed (analyzed) and the success of the procedure will be assessed. Recommendations will be made to improve the study procedure to ensure that when sample collection is expanded to a larger study population in SY2017-2018 (pending IRB and RRB approval), that the procedure runs smoothly, adequately addresses and accounts for potential problems and collects useful data.

Description of
Research Activities
and Preliminary
Results to Date:

In school year 2015-16 we piloted Quiet Time in Amundsen and Gage Park high schools with 150 students (RRB #1122). Based on the success of the pilot year, in the spring of 2016 three schools voted to change their bell schedule to adopt the program and agreed to participate in an evaluation by the Crime Lab. In September of 2016 Quiet Time started at Bowen, Gage Park and Daniel Hale Williams. In October 2016, half of the morning classrooms at each school were selected to have the opportunity to be trained in meditation by the David Lynch Foundation and the other half of classrooms continued doing other activities selected by the school. So far, over 80% of eligible students have opted to learn TM. We have been working with the David Lynch Foundation throughout the year to ensure successful implementation of the program and research design.

During the pilot year, we conducted site visits, focus groups with students, and interviews with teachers. We compiled this information into a report, which we have previously shared with CPS. We find the take-up, compliance and benefits reported by students during both the pilot and first semester of the RCT very promising at this stage. During the pilot, students reported improvements in four main areas; sleep, self-awareness and self-control, schoolwork and ability to focus, and mood and relationships. We expect to have preliminary academic and behavior outcome results from the RCT once the administrative data from this school year are analyzed in the fall of 2017.

Indicate Proposed
Modification(s):

☒ Research Question or Hypothesis

☒ Study Timeline

☐ Study Population

☐ Recruitment Methods or Advertising

☒ Study Methodology and/or Research Activities

☒ Consent Form(s) or Consent Process

☒ Survey/Instrument(s)

☒ Type of Data Collected

☐ Other

☐ None

UNIVERSITY_000094

Detailed Explanation of Indicated Modification(s):

**Research Activities**

Observations

The general observation protocol will not change. As described in the original submission, similar to the pilot year, study staff will conduct observational site visits to each study school up to twice a month. During these visits, staff will use the standardized observation rubric developed for the pilot year to provide data on the level of compliance with the Quiet Time program during Quiet Time periods. This will be used to collect aggregate qualitative data such as duration of the QT period, TM leader, total instances of disturbances and encouragement, and transitions in and out of Quiet Time.

Participation Tracking

As part of the Quiet Time program, the David Lynch Foundation and classroom teachers record student participation during QT using a tracking system maintained by DLF. DLF regularly shares summaries of these data with the schools, which they use to monitor and improve the program. In order to understand student participation, DLF will share participation data with the Crime Lab at the end of each semester. The data will be aggregated by week and grade and will first be approved by CPS before it is shared with the Crime Lab. Please see the attached materials for a table showing the format for these data.

Cortisol Sampling

This pilot of salivary cortisol collection will be exploratory. We propose to collect and analyze salivary cortisol and alpha-amylase to inform future study procedures that will help us to understand the impact of Quiet Time on students' biological stress levels. Specifically, we will seek to answer the following research question:

> 1) Does participation in QT reduce biological stress levels?

This pilot will be used primarily to inform adequate sample collection study procedures in SY 2017-2018. This future research procedure will complement our research questions for the on-going efficacy study of Quiet Time assessing the effect of Quiet Time of academic and behavioral outcomes.

We hypothesize that QT will help students reset their body's fight-or-flight response to stressors, reducing biological stress which will lead to a reduction in school misconduct, arrests, and improved academic achievement in two ways:
> 1) with less toxic stress, students may change their responses to perceived threats and high-stakes situations that have led to school misconduct and arrests in the past
> 2) the regular practice of meditation and the benefits it can bring in working memory and executive functioning (previous research has shown that properly regulated cortisol levels have positive effects on these outcomes, see Levy et al, 2016), will help student improve on academic outcomes such as grade point average and attendance.

We propose measuring cortisol and alpha amylase across the day for youth in the study in order to investigate the effect of meditation on stress. To track students' full stress response, we will record both cortisol and alpha-amylase (alpha-amylase has been shown to be a marker of the sympathetic nervous system activity, which stimulates the body's fight-or-flight response, and is associated with high arousal emotions (Adam et al. 2011)) daily rhythms and will examine cortisol and alpha amylase responses to Quiet Time. The sampling procedures will take place over three consecutive days of the same week. In order to get a full and accurate picture of the student stress response during the cortisol collection period, we will also collect information via two short self-report surveys. This will start in the spring of 2017 with two to four classrooms in Bowen and/or Daniel Hale Williams high schools (approximately 50-100 students). Based on this first phase we will sample a larger population of students in the fall of 2017 and in the spring of 2018, pending IRB and RRB approval.

This work will be led by Dr. Emma Adam (Professor of Human Development and Social Policy, Northwestern University) who is an expert on adolescents and the effect of stress and stress biology on adolescent health and wellbeing. Dr. Adam has a breadth of experience conducting cortisol sampling in CPS and around the U.S. and internationally (Tavernier, Choo, Grant, Adam, 2016; Hoyt, Craske, Mineka, Adam, 2015; Zeiders, Hoyt, Adam, 2014).

Students will undergo the following procedures:

a. The Crime Lab will work with the David Lynch Foundation, Bowen and Daniel Hale Williams to coordinate school visits to present the cortisol sampling procedures to classrooms already participating in Quiet Time. Students will be informed by research staff that they are invited to participate and the procedures will be explained in full. Students will be given assent and parental consent forms to be taken home. For the pilot year, only classrooms with teachers who consent to allow research staff to observe and assist students in collecting saliva samples during Quiet Time periods will be approached to participate in this research procedure. Classroom teachers or school staff will not be asked to collect data. Students will turn in their signed consent and assent forms to the David Lynch Foundation TM instructors.

b. The collection procedures will be scheduled for one to two weeks after consent forms are sent home to allow for adequate response time. Students who have returned signed consent forms will be invited to participate in the saliva collection. During the week(s) before sampling begins, the study team will visit the schools several times to collect consent forms from the David Lynch Foundation TM instructors.

c. One or two days before the first sampling procedure, the students who have consented and who have obtained parental consent will attend a saliva sampling demonstration and practice sample led by the research personnel. Students will be pulled out of their classroom during their normal morning Quiet Time period in order to attend so that students who are not participating are not disturbed or made to feel uncomfortable. Students will also complete the health questionnaire during this time (see below for survey details). If possible, the students will complete this survey on computers in their school's computer lab. If the computer lab is not available, the survey will be given on paper.

d. The sampling procedures will take place over three consecutive days of the same week. On each of these sampling days, the study personnel will bring collection materials to gather saliva samples at the following times: before morning QT, after morning QT, before afternoon QT and after afternoon QT. The research team will lead all collection activities, assist students as necessary and answer any questions. Students will use a passive drool technique by expressing unstimulated saliva through a small straw into a small polypropylene vial. This procedure will take no more than 5 minutes for each sample. This procedure is safe, simple and allows the students to complete the sample without assistance. Tissues and hand sanitizer will be made available to all participating students. After students complete the procedure, they will give the sample to the research personnel. All samples will be labeled with study ID numbers and time. No participant names will be used on labels. Saliva is not considered hazardous and does not require special handling or transportation. All research personnel will have completed human subjects training prior to assisting on the study team.

To facilitate the sample collection and minimize classroom disruption, the students who have consented will be pulled out of their classroom during Quiet Time. This system will ensure that students who did not consent will be able have a normal Quiet Time experience and will not feel uncomfortable during the collection procedures. Students who do not consent to participate will not be made to feel pressured to do so and will not be penalized in any way. This will also allow teachers to lead Quiet Time normally. Schools have previously pulled students out of classrooms to facilitate Quiet Time, so this protocol is consistent with precedent.

When students arrive in the designated study room, they will first provide a saliva sample and fill out the mood diary before beginning Quiet Time. When the bell rings to signal the end of Quiet Time, the students will complete the mood survey and then listen to a 5-10 minute lecture on health or complete a worksheet activity, led by the study team. After this lecture, the students will complete another saliva sample. Students will be given a hall pass to go to their next class 10-15 minutes late. Because the alpha amylase and cortisol responses are measurable about 15 minutes after a stressful

UNIVERSITY_000096

or calming event, it is necessary to keep the students in the room for 15 minutes after Quiet Time so that the saliva samples capture the effect of Quiet Time. If the students were to give a sample immediately after Quiet Time, the results would show their cortisol levels just before Quiet Time. Students will only be late to class during the three study days and the study team will work with the administration and teachers at each school to ensure that this procedure goes smoothly.

Students who participate in the cortisol sampling will be eligible to receive $20. If they complete at least one sample they will receive this money in the form of a visa gift card at the end of the three day sampling period.

The specimens will be immediately refrigerated and delivered to Northwestern University. Specifically, the saliva samples from the 2017 spring pilot will be stored in at -80 degrees in a freezer in a locked laboratory at Northwestern until assayed (analyzed). Samples will be assayed for cortisol and alpha-amylase only. Access will be given to Dr. Emma Adam and will also be granted to graduate students assisting Emma Adam with her work, and to the laboratory analyzing the samples. Samples will be identified by a unique sample ID number only, and the lab will not have access to any identifying data other than the sample ID number. A master list to link sample study identification numbers to identifying information will be kept on the Crime Lab secure server or in a locked file cabinet in the locked office. Access will be granted by the PI or research manager on an "as-needed" basis for any data management, collection or analysis procedures. Assayed data files will be stored on the secure Crime Lab server. The study team has successfully used these procedures in the past and we have high confidence that they will effectively protect confidentiality for this evaluation.

e. Health and Mood Surveys

As part of the exploratory cortisol procedures, we will also collect information via two different surveys in order to get a full and accurate picture of the student stress response during the cortisol collection period. The surveys are designed to measure stressors, mood, health and puberty, which are correlated with stress system functioning. This will help us better understand the cortisol and alpha-amylase data and variation in the outcome data. This work will also be led by Dr. Adam. The students will undergo the following procedures:

- Mood Diary: First, the students will complete a "mood diary", before and after each Quiet Time period. This mood diary is a short survey that asks about the emotions students are feeling at the moment (such as sad, relaxed, nervous, awake, tired) and if they feel nervous about anything (such as friends, homework, and chores (a copy of the survey is included in the attached materials). Mood state questions were adapted from the Positive and Negative Affect Schedule (PANAS) and have been used in Dr. Adam's prior published research (Adam, 2006; Doane & Adam, 2010; Watson & Tellegen, 1988).

- Health Questionnaire: Second, at the beginning of the three-day collection period, the students will be asked to complete a health questionnaire because cortisol levels and stress functioning are linked to health and puberty (Adam & Kumari, 2009). This questionnaire asks about typical mood states, somatic symptoms such as headaches and stomachaches, sleep hours and quality, and puberty (see attached materials for a copy of this survey). Although most questions are not sensitive, some questions may bring up uncomfortable feelings. Questions ask about health habits, somatic symptoms, puberty, sleep and mood such as "How often do you do mild exercise per week?" and "Do you think your development is any earlier or later than most girls/boys your age?" and "In the past two weeks I felt miserable or unhappy – not true, sometimes, or true?". The questionnaire has been used in Dr. Adam's prior published research (Adam, 2006; DeSantis et al., 2007). The survey includes questions on sleep from the Pittsburgh sleep quality index and Peterson's Pubertal Development Scale, asking about health habits, puberty and mood (Buysse & Reynolds, 1989; Peterson, 1988). This survey will take no more than 15 minutes.

Physical survey responses will be stored in a locked drawer in the locked Crime Lab office and coded data will be stored on the Crime Lab secure servers. There are no designated spaces on the diaries or surveys to write free responses. However, in the case that a student indicates child abuse/neglect, suicidality or planned violence against others, these surveys will be flagged and referred to study team member Jennifer Tackett (Northwestern University) for immediate follow-up. Dr. Tackett is a trained clinical psychologist and the Director of Clinical Training at Northwestern University. Surveys will be reviewed within a week of completion to check for these types of concerns.

UNIVERSITY_000097

**Literature**

The RCT design will allow us to measure the impact of QT on academic performance and behavior, but will not allow us to see into the "black box" of the intervention to understand *why* outcomes are changing. Therefore, we propose to add measures of biological stress to understand *how and why* Quiet Time is helping youth. Understanding the mechanisms at work would allow educators and policymakers translate this program to different locations or identify other promising similar interventions.

Growing evidence shows that simply witnessing a violent act can have a profound effect on a young person's ability to regulate emotions and positively engage with peers (Margolin & Gordis, 2000). Since the biggest source of variation in exposure to violence and traumatic events is one's neighborhood, residence is correlated with other outcomes linked to trauma and stress (Grant et al., 2014) and externalizing behaviors such as aggression, delinquency and somatization (Katz et al., 2012). This is because the effects of repeated traumatic experiences compound over time (Margolin & Gordis, 2000). Constant exposure to one stressful situation after another, particularly in social or environmental settings, such as an abusive household or a dangerous neighborhood, with low levels of social and community support can cause a dysregulation of the stress response system (McEwen, 1998, 1999, 2005). This leads to a condition known as chronic or toxic stress (Shonkoff et al., 2009). Recent evidence supporting this theory indicates that broader systemic adversity in terms of lower socioeconomic status (measured by maternal education, household income, and neighborhood deprivation) has an impact on the stress response (as measured by cortisol, a hormone produced by the body) as early as middle childhood (Tackett et al., 2017).

For adolescents with developing brains, the disruption of normal stress functioning can result in psychological and physiological impairments, particularly in areas of the brain that influence learning and behavior (Shonkoff et al., 2012). This dysregulation can present as an inappropriately dampened cortisol reaction or an exaggeration of the cortisol response, depending on biological and environmental factors (Adam et al. 2007). Structural changes to the brain caused by chronic stress can result in symptoms that often lead to behavioral problems such as increased anxiety, impaired mood control, and hyperresponsive physiologic stress response, often related to fear and anxiety. Toxic stress also limits contextual learning, making it more difficult to distinguish between danger and safety (Shonkoff et al., 2012). Chronic and toxic stress can also lead to biological stress hyporesponsivity (underresponsivity), which in turn has been associated with greater risk-taking and increased externalizing behaviors like aggression or criminal behaviors (Adam, 2007).

Based on this literature, leading stress researchers have called for more evidence on interventions that could help youth reduce their levels of experienced and perceived stress, which in turn may help improve biological stress functioning and cognitive and behavioral outcomes (Adam et al., 2007). Measuring biological stress using cortisol and alpha amylase is the most accurate way to understand daily stress rhythms and changes in the stress response system. Including these measures in the Quiet Time evaluation will allow us to determine if 1) reduced stress is an outcome of participating in Quiet Time and 2) if stress is the pathway that is leading to improved academic and behavioral outcomes.

Although the link between trauma and negative life outcomes is well established, there is little evidence on what programs may work at scale to improve coping mechanisms (Ryan & Deci, 2001). As of July 2016, the Institute of Education Science's What Works Clearinghouse began a systematic review of the literature to identify research assessing the efficacy of preventive interventions designed to support student well-being and improve problem behavior (WWC Review Protocol, 2016). The review is ongoing, but to this date, effective school-based programs only serve a few high-risk students or particular classrooms (WWC Intervention Report, 2016). Despite their efficacy, the cost of delivering these programs is prohibitive to scaling. Furthermore, their targeted approach may be stigmatizing. Our approach recognizes that people with trauma and chronic stress often go undiagnosed and face barriers to treatment in some of the most violent and disadvantaged urban neighborhoods (Primm et al., 2010). By treating all students in a school, the Quiet Time program avoids stigmatizing individual needs and provides a community-based solution for a community-wide public health and educational challenge. The unprecedented increase in violence in Chicago in 2016 that has continued into 2017 also means that both the number of students affected and the level of environmental stressors experienced has increased. Given how urgent the need is and how long it may take to reduce violence and poverty, there would be great policy value in finding ways to

equip young people with effective tools to immediately combat chronic stress and reduce their risk of behavioral incidents inside and outside the classroom.

Modification & Continuing Review Application Checklist:

☐ Application Form

☐ Updated Institutional Review Board approval letter

☐ Updated survey or other instruments (if applicable)

☐ Updated informed consent forms for parents and/or teachers as appropriate (if applicable)

☐ Updated informed consent forms for students ages 18 or over as appropriate (if applicable)

☐ Updated assent form for 6th grade/age 12+ students (if applicable)

☐ Processing Fee of $50.00

## References and Works Cited

Adam, Emma K. "Transactions among adolescent trait and state emotion and diurnal and momentary cortisol activity in naturalistic settings." *Psychoneuroendocrinology* 31.5 (2006): 664-679.

Adam, Emma K., Bonnie Klimes-Dougan, and Megan R. Gunnar. "Social regulation of the adrenocortical response to stress in infants, children, and adolescents." *Human behavior, learning, and the developing brain: Atypical development* (2007): 264-304.

Adam, Emma K., and Meena Kumari. "Assessing salivary cortisol in large-scale, epidemiological research." *Psychoneuroendocrinology* 34.10 (2009): 1423-1436.

Adam, Emma K., Lindsay Till Hoyt, and Douglas A. Granger. "Diurnal alpha amylase patterns in adolescents: Associations with puberty and momentary mood states." *Biological psychology* 88.2 (2011): 170-173.

Buysse, Daniel J., et al. "The Pittsburgh Sleep Quality Index: a new instrument for psychiatric practice and research." *Psychiatry research* 28.2 (1989): 193-213.

DeSantis, Amy S., et al. "Racial/ethnic differences in cortisol diurnal rhythms in a community sample of adolescents." *Journal of Adolescent Health* 41.1 (2007): 3-13.

Doane, Leah D., and Emma K. Adam. "Loneliness and cortisol: Momentary, day-to-day, and trait associations." *Psychoneuroendocrinology* 35.3 (2010): 430-441.

Grant, Kathryn E., et al. "The influence of stressors on the development of psychopathology." *Handbook of developmental psychopathology*. Springer US, 2014. 205-223.

Hoyt, Lindsay T., et al. "Positive and negative affect and arousal: cross-sectional and longitudinal associations with adolescent cortisol diurnal rhythms." *Psychosomatic medicine* 77.4 (2015): 392.

Katz, Brian N., et al. "Intervening processes in the relationship between neighborhood characteristics and psychological symptoms in urban youth." *The Journal of Early Adolescence* 32.5 (2012): 650-680.

Levy, Dorainne J., et al. "Psychological and biological responses to race-based social stress as pathways to disparities in educational outcomes." *American Psychologist* 71.6 (2016): 455.

Margolin, Gayla, and Elana B. Gordis. "The effects of family and community violence on children." *Annual review of psychology* 51.1 (2000): 445-479.

McEwen, Bruce S. "Protective and damaging effects of stress mediators." *New England journal of medicine* 338.3 (1998): 171-179.

McEwen, Bruce S., and Teresa Seeman. "Protective and damaging effects of mediators of stress: elaborating and testing the concepts of allostasis and allostatic load." *Annals of the New York Academy of Sciences* 896.1 (1999): 30-47.

McEwen, Bruce S. "Stressed or stressed out: what is the difference?."*Journal of psychiatry & neuroscience: JPN* 30.5 (2005): 315.

Petersen, Anne C., et al. "A self-report measure of pubertal status: Reliability, validity, and initial norms." *Journal of Youth and Adolescence* 17.2 (1988): 117-133.

Primm, Annelle B, et al. "The role of public health in addressing racial and ethnic disparities in mental health and mental illness." Prev Chronic Dis 2010;7(1).

Ryan, Richard M., and Edward L. Deci. "On happiness and human potentials: A review of research on hedonic and eudaimonic well-being." *Annual review of psychology* 52.1 (2001): 141-166.

Shonkoff, Jack P., et al. "The lifelong effects of early childhood adversity and toxic stress." *Pediatrics* 129.1 (2012): e232-e246.

Tackett, J. L., et al. "Does Socioeconomic Status Mediate Racial Differences in the Cortisol Response in Middle Childhood?." *Health psychology: official journal of the Division of Health Psychology, American Psychological Association* (2017).

Tavernier, Royette, et al. "Daily affective experiences predict objective sleep outcomes among adolescents." *Journal of sleep research* 25.1 (2016): 62-69.

Watson, David, Lee A. Clark, and Auke Tellegen. "Development and validation of brief measures of positive and negative affect: the PANAS scales." *Journal of personality and social psychology* 54.6 (1988): 1063.

What Works Clearinghouse. "Intervention Report-Functional Behavioral Assessment." *What Works Clearinghouse*. Institute of Education Sciences, Dec. 2016. Web.

What Works Clearinghouse. "Review Protocol for Studies of Preventive Interventions to Support Student Mental Health and Well-Being, Version 3.0." *What Works Clearinghouse*. Institute of Education Sciences, July 2016. Web

Zeiders, Katharine H., Lindsay T. Hoyt, and Emma K. Adam. "Associations between self-reported discrimination and diurnal cortisol rhythms among young adults: The moderating role of racial–ethnic minority status." *Psychoneuroendocrinology* 50 (2014): 280-288.

UNIVERSITY_000101

# EXHIBIT U-4

# Research Review Board Modification & Continuing Review Application

Please complete and submit this form, and also mail one (1) printed copy along with supplemental materials and $50 processing fee to the RRB. See checklist at the bottom of the form and RRB guidelines to ensure a complete application package. Incomplete applications will not be reviewed.



Chicago Public Schools
Office of Accountability Attn: RRB
42 W. Madison Street
Chicago, Illinois 60602
Phone: 773-553-4444
Email: research@cps.edu
www.cps.edu/research/

| Date: | July 21, 2017 | RRB Project ID#: | 1236 |
|---|---|---|---|

Proposal Title: David Lynch Foundation Quiet Time Program Evaluation

Subject: Other   Original Approval Date: January 27, 2017

Application type(s):
- [ ] Continuing Review
- [x] Proposal Modification

CPS Board Contracted Research Proposal?
- [ ] Yes
- [ ] No

Primary Contact: Lydia Jessup

Organization: University of Chicago Crime Lab

Address: 33 N LaSalle St., Suite 1600

City: Chicago   State: IL   Zip Code: 60602

Phone: 773-702-2854   Email: ljessup@uchicago.edu

Proposed Study Participants:
- [x] Students
- [ ] Teachers
- [ ] Other Staff
- [ ] Parents

Proposed Number and List of Participating Schools:

Three CPS high schools in SY 2016-2017: Bowen, Daniel Hale Williams and Gage Park. And three CPS high schools in SY 2017-2018: Bogan, Julian and TEAM Englewood

Executive Summary or Abstract:

The University of Chicago Crime Lab, with the support of Get IN Chicago, the John D. and Catherine T. MacArthur Foundation, and the Pritzker Pucker Family Foundation, launched the Chicago Design Competition: Reducing Youth Violence in February 2015 to identify, fund, and evaluate a promising and innovative youth violence prevention program. The David Lynch Foundation (DLF) was selected as one of the winners and was awarded a grant to pilot their Quiet Time (QT) Program for the first time in Chicago. The Quiet Time Program incorporates two 15-minute silent periods into the school day, which are designed to create a space where students have the option to practice a form of mantra-based meditation called Transcendental Meditation.

Following a successful pilot year, we increased the number of schools and students enrolled in the study and randomized roughly half of the students to be offered the opportunity to learn TM in each of the schools. We are analyzing the impact of the Quiet Time program in three CPS high schools, Bowen, Daniel Hale Williams and Gage Park, during SY 2016-2017 and plan add three additional CPS public high schools for SY 2017-2018 (Bogan,

Julian and TEAM Englewood). Approximately 2,200 total students will be enrolled in the study over this period, 1,100 offered the chance to meditate and 1,100 participating in control activities. Academic and justice outcomes will be measured using administrative data from CPS and CPD.

As a complement to this on-going efficacy study of the Quiet Time program, we propose to incorporate four other data sources:

1) Classroom observations to monitor program model fidelity
2) Quiet Time participation data to measure compliance and take-up
3) Cortisol and alpha-amylase (hormones produced by the body) markers collected through saliva sampling, to understand the impact that QT has on student stress
4) Short self-report mood and health surveys to be completed during the saliva sampling period

In addition to our previously stated hypotheses in the original RRB application, we hypothesize that students who meditate during Quiet Time will have lower stress levels, as measured by salivary cortisol and alpha-amylase, compared to control students who do not meditate. To collect saliva samples, students will be instructed to spit through a straw into a sterile vial, a non-invasive procedure that is well-established and has previously been employed in school settings. The hormones we plan to measure in the saliva samples are important markers for biological stress responses and have been linked to both acute and long term health, cognitive, and behavioral outcomes.

We have chosen high schools with student populations coming from low-income and high violence neighborhoods, factors that have been shown to be chronic stressors that impede student learning. We expect that lower stress caused by meditation during Quiet Time will mediate any changes in academic and behavioral outcomes, as measured using administrative data, which serve as our primary outcome measures for the full-scale study. We will measure participation through aggregate data collected by the program provider, the David Lynch Foundation, in order to get an accurate estimate for the impact of the treatment on the treated (TOT). Classroom observations will allow us to monitor fidelity to the model more generally so that we can confidently describe the program we are evaluating.

Because the cortisol collection procedure has not been incorporated into this study previously, we propose to pilot this procedure in September 2017 with two to four classrooms of students (approximately 50-100 students) from Bowen, Daniel Hale Williams, or Gage Park. This pilot will be exploratory and used primarily to inform adequate sample collection study procedures later in the year. Following a successful pilot, we will carry out sampling of a larger population in October 2017 and spring of 2018 in Bogan, Julian and TEAM Englewood.

Study Timeline (note any and all changes to original):

**RCT Timeline:**
In SY 2016-2017, randomization of morning classrooms to treatment and control groups occurred approximately one month into the school year. For SY 2017-18, randomization will occur approximately one week into the academic year. Over the summer, we will first randomize students individually into two groups (A and B) based on preliminary student rosters received from the schools. The school schedule programmer will use these groupings to create schedules such that classrooms with QT periods are homogenous by group (all group A or group B). We will then randomize the two groups to the treatment or control conditions during the first week in September. This will allow TM training to start earlier in the school year than it did in SY 2016-17.

There will be no changes to the site visit protocol or schedule.

There will be no changes to the schedule for receiving participation data.

UNIVERSITY_000137

The pilot cortisol sampling collection planned for spring 2017 was postponed and will now occur in September of 2017. The larger scale sampling will occur in October of 2017 and spring of 2018.

There will be no changes to the timeline for analysis.

**Detailed cortisol collection timeline:**

**As mentioned above, the pilot originally planned for spring of 2017 has been postponed to September 2017. The pilot and the full-scale sampling in October 2017 and the spring of 2018 will follow the below timeline:**

*Week 1:* Selected classrooms, with permission from school administration and classroom teachers will be approached to participate in the pilot collection of salivary cortisol. The study team will visit these classrooms to explain the procedure and distribute consent and assent forms to students. The study team will visit the school a few times over the course of the week to pick up consent forms.

*Week 2-One or two days before collection begins*: Final consent and assent forms will be collected from students. Students who have agreed to participate in the study will attend a saliva sampling demonstration and practice sample led by research personnel and complete a short health questionnaire. If students are unavailable to do this one or two days before the collection begins, the demonstration and survey may be given on the first day of the sampling. Students will be pulled out of class during their morning Quiet Time period and taken to a designated room in order to complete these procedures.

*Week 2-Day 1 of Collection*: Study personnel will pull consented students out of class and take them to a different classroom for their morning and afternoon Quiet Time periods. Students will collect salivary samples in the designated classroom immediately prior to their morning QT period, 15 minutes after their morning QT period, immediately prior to their afternoon QT period and 15 minutes after their afternoon QT period. Students will also fill out a mood diary after each sample collection. Each of these collection periods will be supervised by research staff. Samples will be collected by research staff and immediately transferred to the UChicago Urban Labs office.

*Week 2-Day 2 of Collection*: Study personnel will pull consented students out of class and take them to a different classroom for their morning and afternoon Quiet Time periods. Supervised and assisted by research staff, students will collect salivary samples immediately prior to their morning QT period, 15 minutes after their morning QT period, immediately prior to their afternoon QT period and 15 minutes after their afternoon QT period. Students will complete the mood diary after each sample collection. Samples will be collected by research staff and immediately transferred to the UChicago Urban Labs office.

*Week 2-Day 3 of Collection*: Study personnel will pull consented students out of class and take them to a different classroom for their morning and afternoon Quiet Time periods. Supervised and assisted by research staff, students will collect salivary samples in their classrooms immediately prior to their morning QT period, 15 minutes after their morning QT period, immediately prior to their afternoon QT period and 15 minutes after their afternoon QT period. Students will complete the mood diary after each sample collection. Samples will be collected by research staff and immediately transferred to the UChicago Urban Labs office. All students who participated in at least one day of sample collection will receive a $20 visa gift card.

Post-Sample Collection: Following the completion of sample collection, samples will be assayed (analyzed) and the success of the procedure will be assessed. Recommendations will be made to improve the study procedure to ensure that when sample collection is expanded to a larger study population later in the fall of 2017 and in the spring of 2018 that the procedure runs smoothly, adequately addresses and accounts for potential problems and collects useful data.

Description of
Research Activities
and Preliminary
Results to Date:

---

Activities:
In school year 2015-16 we piloted Quiet Time in Amundsen and Gage Park high schools with 150 students (RRB #1122). Based on the success of the pilot year, in the spring of 2016 three schools voted to change their bell schedules to adopt the program and agreed to participate in an evaluation by the Crime Lab. In September of 2016, Quiet Time started at Bowen, Gage Park and Daniel Hale Williams. In October 2016, half of the morning classrooms at each school were selected to have the opportunity to be trained in meditation by the David Lynch Foundation and the other half of classrooms continued doing other activities selected by the school. Over 80% of eligible students opted to learn TM at these schools. We worked with the David Lynch Foundation throughout the year to ensure successful implementation of the program and research design. In the spring of 2018 three additional schools, Bogan, Julian and TEAM Englewood, voted to incorporate QT into their bell schedules for school year 2017-18. We look forward to working with DLF and these schools over the coming school year to continue the evaluation of the research and support the expansion of the Quiet Time program.

Preliminary Results:
During the pilot year, we conducted site visits, focus groups with students, and interviews with teachers. We compiled this information into a report, which we have previously shared with CPS. We find that take-up, compliance and benefits reported by students during both the pilot and first semester of the RCT very promising at this stage. During the pilot, students reported improvements in four main areas; sleep, self-awareness and self-control, schoolwork and ability to focus, and mood and relationships. We expect to have preliminary academic and behavior outcome results from the first year of the RCT once the administrative data from this school year are analyzed in the fall of 2017.

---

Indicate Proposed
Modification(s):

- ☐ Research Question or Hypothesis
- ☒ Study Timeline
- ☒ Study Population
- ☐ Recruitment Methods or Advertising
- ☒ Study Methodology and/or Research Activities
- ☒ Consent Form(s) or Consent Process
- ☐ Survey/Instrument(s)
- ☐ Type of Data Collected
- ☐ Other
- ☐ None

UNIVERSITY_000139

Detailed
Explanation of
Indicated
Modification(s):

**Research Activities**
Observations
The observation protocol will not change.

Participation Tracking
The sharing of participation data will not change.

Cortisol Sampling
The pilot cortisol sampling procedure that was approved in spring of 2017 was delayed and will now occur in September 2017 at one or two of the returning schools (Bowen, Daniel Hale Williams or Gage Park). In October 2017 and in the spring of 2018, we plan to do the full-scale sampling at the new study schools (Bogan, Julian and TEAM Englewood). The sample size for this full-scale sampling will be approximately 240 students across the three schools (approximately 80 students at each school – half of which will be treatment and the other half control).

There will be no changes to the procedures that were approved in the spring of 2017 except the below:

1.  To address the concern about students eating too close to the sampling time, students participating in the study will be asked not to eat in the half hour before before Quiet Time. If they do eat within this window, they will be asked to rinse their mouth with water before giving the saliva sample.
2.  As explained above, saliva sampling is an easy to do, non-invasive and safe procedure. It is extremely important to us to ensure student comfort during the sampling. All research team members have tried and feel comfortable with the procedure. In order to get a measure of student comfort, during the pilot and larger scale study we will analyze the mood state surveys to check for any abnormal declines in mood directly after spitting.
3.  If there is not time to pull students out of class during QT a day or two before the sampling procedure starts to complete the health survey and do the sampling demonstration, the survey and demonstration may be given on the first day of sampling.
4.  We have modified the parent consent and student consent forms to explicitly state that students will miss 10-15 minutes of class time after each QT period during the three-day sampling period.
5.  All samples will be stored in a freezer in the locked Urban Labs office instead of Dr. Emma Adam's lab at Northwestern University. Access will be given to the PI and granted to the study team and research partners on Dr. Emma Adam's team at Northwestern University as necessary.

Modification &
Continuing Review
Application
Checklist:

☐ Application Form

☐ Updated Institutional Review Board approval letter

☐ Updated survey or other instruments (if applicable)

☐ Updated informed consent forms for parents and/or teachers as appropriate (if applicable)

☐ Updated informed consent forms for students ages 18 or over as appropriate (if applicable)

☐ Updated assent form for 6th grade/age 12+ students (if applicable)

☐ Processing Fee of $50.00

UNIVERSITY_000141

# EXHIBIT U-5

# Research Review Board Modification & Continuing Review Application

Please complete and submit this form, and also mail one (1) printed copy along with supplemental materials and $50 processing fee to the RRB. See checklist at the bottom of the form and RRB guidelines to ensure a complete application package. Incomplete applications will not be reviewed.



Chicago Public Schools
Office of Accountability Attn: RRB
42 W. Madison Street
Chicago, Illinois 60602
Phone: 773-553-4444
Email: research@cps.edu
www.cps.edu/research/

| Date: | 01/14/2019 | RRB Project ID#: | 1236 |

Proposal Title: David Lynch Foundation Quiet Time Evaluation

Subject: Social-emotional Learning      Original Approval Date: 12/1/2015

Application type(s):   ☐ Continuing Review      CPS Board Contracted      ☐ Yes
                       ☒ Proposal Modification      Research Proposal?      ☒ No

Primary Contact: Jalisia Taylor-Singleton

Organization: University of Chicago Crime Lab

Address: 33 N Lasalle

City: Chicago      State: IL      Zip Code: 60602

Phone: _____      Email: jalisia@uchicago.edu

Proposed Study Participants:   ☒ Students   ☒ Teachers ☐   Other Staff ☒   Parents

Proposed Number and List of Participating Schools:

Three CPS high schools including:
Gage Park High School
Bogan High School
Bowen High School

Executive Summary or Abstract:

The University of Chicago Crime Lab has been partnering with the David Lynch Foundation (DLF) since 2015 to evaluate the effectiveness of the Quiet Time (QT) program, which gives students the time and training to practice Transcendental Meditation (TM) during two short periods built into the school day. In school years 2016/2017 and 2017/2018, we conducted randomized controlled trial (RCT) studies in six Chicago Public Schools high schools (Gage Park, Daniel Hale Williams, Bowen, Bogan, Julian, and TEAM Englewood). After successful previous implementation and evaluation of the Quiet Time program, Gage Park and Bogan high schools voted to bring the program back to their students in SY2018-2019, transitioning to a whole-school implementation.

Preliminary evidence from the first year of the RCT study in Gage Park, Daniel Hale Williams and Bowen high schools shows promise among students chosen for the meditation group compared to those assigned to control activities. If we want to see these encouraging results among a greater student population, it is important to know how to scale the program. We believe the best process for doing so would be to use the 2018-19 school year to begin to learn about what the program looks like at scale at returning schools. While our conclusions about the effects of the Quiet Time program will be drawn from the RCT study, the qualitative data will support our understanding of the staff and student experience and how the program scales.

UNIVERSITY_000158

To better understand how Quiet Time might operate at scale, we are collecting qualitative data (previously approved by the RRB) to supplement the RCT study by answering the following questions:

1) How does the Quiet Time program scale-up? How might the implementation and effects change as the program scales up?

    a. What are facilitators and barriers to implementation?

    b. How does implementation vary by school, if at all?

2) How do key stakeholders – including students, teachers, administrators, and other school personnel – perceive Quiet Time?

3) How does Quiet Time influence school climate or culture?

For this part of the study, we are introducing a modification to conduct focus groups not only with active student mediators but also two groups of non-meditators: students who were offered to learn TM and declined to learn, and those who learned TM but no longer actively participate.

In addition, many students at one of the samples sites, Bogan HS, come from primarily Spanish-speaking households. We have included parent and student consent and assent documentation as part of this modification to reflect the needs of this population to ensure that students and their families have full and complete knowledge of the research activities they would be consenting to.

| Study Timeline (note any and all changes to original): | Classroom meditation observations will occur at least monthly and may be as frequent as weekly or bi-weekly beginning in November/December 2018 through April/May 2019. The Quiet Time student focus groups and teacher/principal/administrator/school staff interviews are planned to take place between January 2019 and April/May of 2019. |
| --- | --- |

UNIVERSITY_000159

**Description of Research Activities and Preliminary Results to Date:**

During SY2015-16, we conducted with DLF a successful pilot of QT at Amundsen and Gage Park high schools. At Amundsen, a cohort of 60 juniors learned to meditate and at Gage Park, 59 of the 90 eligible sophomores elected to learn. We held four focus groups with a total of 24 students. Overall, students reported benefits in four main areas: sleep, self-awareness and self-control, ability to focus on schoolwork, and mood and relationships. We also conducted eight interviews with school administrators, teachers, and staff from the DLF who shared similar reports. Notably, the principals at both schools requested that the program return to their schools, believing that QT benefited both individual students and the school culture. Based on this successful program delivery, we secured agreements with DLF, principals, and CPS to conduct a full-scale evaluation over two years.

SY2016-17 marked the launch of the first year of the randomized controlled trial (RCT) study. Three high schools (Daniel Hale Williams, Bowen and Gage Park) voted to change their bell schedules so that all students could have QT twice a day. Classrooms were randomly selected to learn to meditate, and those not selected did other activities chosen by the schools, such as silent sustained reading or study hall. Across the three schools, 779 students and 41 classrooms were included in the study with 399 randomized to treatment and 380 to control. Notably, 80% of eligible students chose to learn and were trained in TM during the first year of the RCT.

SY2017-18 marked the start of the second year of the RCT. Three additional schools (Bogan, Julian and TEAM Englewood) voted to incorporate the program and participate in the research study. In total, 1,389 students across 59 classrooms were included with 695 students in the treatment group and 694 to the control group. To date, DLF has successfully carried out the first semester of QT programming. To date, approximately 550 students – over 80% of the eligible population – have been trained in TM. During this program implementation, we have been consistently conducting site visits to schools to observe both meditating and non-meditating classrooms.

We have been able to do an initial analysis to measure the effects of the Quiet Time program on academic and behavioral outcomes using CPS and Chicago Police Department (CPD) data. The following results are preliminary, confidential and subject to change – please do not cite or share. Preliminary evidence from the first year of the study shows a 45% reduction in arrests among the meditation group compared to those assigned to control activities (significant at the 10% level). This effect is concentrated within the "other" arrest category, a catchall for arrests that do not qualify as "violent", "property" or "drug". In terms of schooling outcomes, we also see approximately a three day increase in attendance among the meditation group. Although this is a preliminary look at the data based on less than half of the full the study sample, we find these initial results extremely encouraging. Following the conclusion of SY2017-18, we will be able to add data from the second year of the study. This will give us sufficient statistical power to be able to detect with greater confidence and precision the effects QT has on academic achievement, student behavior and violence involvement.

**Indicate Proposed Modification(s):**

- ☐ Research Question or Hypothesis
- ☐ Study Timeline
- ☒ Study Population
- ☐ Recruitment Methods or Advertising
- ☐ Study Methodology and/or Research Activities
- ☒ Consent Form(s) or Consent Process
- ☒ Survey/Instrument(s)
- ☒ Type of Data Collected
- ☐ Other
- ☐ None

Detailed
Explanation of
Indicated
Modification(s):

Qualitative Data Collection SY2018-19

Data collection will occur in Bogan, Gage Park and Bowen high schools. Bogan and Gage Park are both introducing whole-school implementation allowing any student who is interested to be trained in TM. Bowen will begin with training 8 classrooms with the option for other teachers who are interested to be trained in the spring. We will compare scale-up, school culture, and student engagement in the whole-school environment to the limited implementation. We expect data collection to occur between November 2018 and April 2019.

Student Focus Groups

We have included additional focus group protocol documentation for the additional youth populations that will be sampled (non-mediators): youth who were offered but opted not to learn TM, and youth who opted to learn and were trained in TM but no longer actively participate in the Quiet Time program. The student focus groups will take place in the school where the students attend in a private area where the participants are comfortable. The consent process will remain the same, however, for students who come from primarily Spanish-speaking households, there will be an option to receive consent materials in Spanish. These translations will be identical to the consents that will be administered in English. The focus groups will be made up of at least 4-6 students. Focus groups will not last more than 1 hour. Each focus group will meet for at least one session and no more than two sessions during the 2018-2019 school year. Students will be compensated with the option between a University of Chicago t-shirt, mug or other gift shop souvenir upon completion of the focus group sessions. We expect to conduct approximately 12-18 focus groups across the three schools between January 2019 and April 2019.

There will be no other changes to the focus group implementation at this time. The research team has received IRB approval for these activities which is attached to this submission.

Modification &
Continuing Review
Application
Checklist:

☒ Application Form

☒ Updated Institutional Review Board approval letter

☒ Updated survey or other instruments (if applicable)

☒ Updated informed consent forms for parents and/or teachers as appropriate (if applicable)

☒ Updated informed consent forms for students ages 18 or over as appropriate (if applicable)

☒ Updated assent form for 6th grade/age 12+ students (if applicable)

☐ Processing Fee of $50.00

UNIVERSITY_000161

# EXHIBIT U-6

# Research Review Board Modification & Continuing Review Application

Please complete and submit this form, and also mail one (1) printed copy along with supplemental materials and $50 processing fee to the RRB. See checklist at the bottom of the form and RRB guidelines to ensure a complete application package. Incomplete applications will not be reviewed.



Chicago Public Schools
Office of Accountability Attn: RRB
42 W. Madison Street
Chicago, Illinois 60602
Phone: 773-553-4444
Email: research@cps.edu
www.cps.edu/research/

| | | | |
|---|---|---|---|
| Date: | 3.20.20 | RRB Project ID#: | 1236 |

Proposal Title: David LynchFoundation Quiet Time Program Evaluation

| | | | |
|---|---|---|---|
| Subject: | Health and Wellness | Original Approval Date: | 1/12/2017 |

Application type(s):  ☐ Continuing Review  ☒ Proposal Modification

CPS Board Contracted Research Proposal?  ☐ Yes  ☐ No

Primary Contact: Puja Patel

Organization: University of Chicago Education Lab

Address: 33 N. LaSalle St, Suite 1600

City: Chicago   State: IL   Zip Code: 60602

Phone: 773.834.7478   Email: patelp@uchicago.edu

Proposed Study Participants:
☒ Students
☐ Teachers
☐ Other Staff
☐ Parents

Proposed Number and List of Participating Schools: Three CPS high schools in SY 2016-2017: Bowen, Daniel Hale Williams and Gage Park and three CPS high schools in SY 2017-2018 (Bogan, Julian and TEAM Englewood).

Executive Summary or Abstract:

The University of Chicago Crime Lab, with the support of Get IN Chicago, the John D. and Catherine T. MacArthur Foundation, and the Pritzker Pucker Family Foundation, launched the Chicago Design Competition: Reducing Youth Violence in February 2015 to identify, fund, and evaluate a promising and innovative youth violence prevention program. The David Lynch Foundation (DLF) was selected as one of the winners and was awarded a grant to pilot their Quiet Time (QT) Program for the first time in Chicago. The Quiet Time Program incorporates two 15-minute silent periods into the school day, which are designed to create a space where students have the option to practice a form of mantra-based meditation called Transcendental Meditation. Following a successful pilot year in SY2015-16, we increased the number of schools and students enrolled in the study and randomized roughly half of the students to be offered the opportunity to learn TM in each of the schools. We are currently analyzing the impact of the Quiet Time program in 6 CPS high schools, Bowen, Daniel Hale

Study Timeline (note any and all changes to original):

There will be no changes to the RCT timeline (randomization, implementation, observations) or the Stress Measure data collection as these activities are done and we are in the analysis stage.

| Description of Research Activities and Preliminary Results to Date: | During SY2015-16, we conducted with DLF a successful pilot of QT at Amundsen and Gage Park high schools. At Amundsen, a cohort of 60 juniors learned to meditate and at Gage Park, 59 of the 90 eligible sophomores elected to learn. We held four focus groups with a total of 24 students. Overall, students reported benefits in four main areas: sleep, self-awareness and self-control, ability to focus on schoolwork, and mood and relationships. We also conducted eight interviews with school administrators, teachers, and staff from the DLF who shared similar reports. Notably, the principals at both schools requested that the program return to their schools, believing that QT benefited both individual students and the school culture. Based on this successful program delivery, we secured agreements with DLF, principals, and CPS to conduct a full-scale evaluation over two years. |
|---|---|

**Indicate Proposed Modification(s):**

☐ Research Question or Hypothesis

☐ Study Timeline

☐ Study Population

☐ Recruitment Methods or Advertising

☒ Study Methodology and/or Research Activities

☒ Consent Form(s) or Consent Process

☐ Survey/Instrument(s)

☐ Type of Data Collected

☐ Other

☐ None

| Detailed Explanation of Indicated Modification(s): | In our original proposal, we stated that all data will be stored on the UChicago server or physically at the UChicago office in our protocol and consents. Given our collaboration with Northwestern University we are proposing to modify the data storage procedures to allow Northwestern University to house the stress measure data on their server and locked on their campus as well. Similar to University of Chicago, Northwestern has a mutli-level secure server that is constantly monitored by computer security specialists. As all participants were previously consented and this simply entails data storage at a different secure server, we believe this change is minimal and imposes no added risks or benefits on study subjects. |
|---|---|

**Modification & Continuing Review Application Checklist:**

☐ Application Form

☐ Updated Institutional Review Board approval letter

☐ Updated survey or other instruments (if applicable)

☐ Updated informed consent forms for parents and/or teachers as appropriate (if applicable)

☐ Updated informed consent forms for students ages 18 or over as appropriate (if applicable)

☐ Updated assent form for 6th grade/age 12+ students (if applicable)

☐ Processing Fee of $50.00

UNIVERSITY_000163

Exhibit V

# Guidelines for External Research and Data Collection in Chicago Public Schools

BOE 002909

**I.OVERVIEW**…………………………………………………………………………………….3

*PURPOSE OF THIS DOCUMENT*

*TYPES OF RESEARCH/DATA COLLECTION*

*PRIMARY RESEARCH*

*SECONDARY RESEARCH (DATA REQUESTS)*

*LEGAL AND POLICY FRAMEWORK*

*RESEARCH REVIEW BOARD*

**II. TYPES OF RESEARCH AND DEFINITIONS**…………………………………………….................................................6

*TYPES OF PRIMARY RESEARCH*

*TYPES OF SECONDARY RESEARCH (DATA REQUESTS)*

**III. CONDUCTING PRIMARY RESEARCH**………………………………………………....7

*PROCESS*

*CRITERIA FOR EVALUATING RESEARCH PROPOSALS*

*APPLICATION MATERIALS*

*TYPES OF STUDY APPROVAL*

*RESTRICTIONS*

**IV. REQUESTING SECONDARY DATA**…………………………………………………..12

*PROCESS*

*REQUEST FORM*

*REQUEST FULFILLMENT*

*RESTRICTIONS*

**V. ESSENTIAL GUIDANCE**………………………………………………………………...14

*CONSENT*

*CONSENT FORM CHECKLIST*

*CPS EMPLOYEES/RESEARCH BY CPS EMPLOYEES*

*GRADUATE STUDENT RESEARCH*

*COMPENSATION FOR RESEARCH PARTICIPATION*

*DATA USE*

*IRB APPROVAL*

*PAYMENT TO CPS*

*USE OF CPS RESOURCES*

*BACKGROUND CHECKS*

*ONLINE PDF APPLICATION*

*APPENDIX A: AVAILABLE DATA*

BOE 002910

# I. Overview

## A. Purpose of this document

These guidelines are meant to provide researchers with a clear understanding of the research encouraged within CPS, procedures for submitting a research proposal for review, as well as the procedures for requesting secondary data. The Research Review Board (RRB) acts on behalf of the Chief Education Officer to review research proposed. The RRB is comprised of members from various Chicago Public Schools (CPS) offices.

There is no right to access Chicago Public School's students, staff or data for research purposes. Access may be granted when determined to be in the best interests of the Board. If access is granted, researchers may only access schools, students, staff and data relevant to the research as approved by the RRB.

## B. Types of research/data collection

Research includes various evaluation, measurement and inquiry activities that may be comprised of, but are not limited to: (1) the systematic investigation, including research development, testing and/or evaluation, designed to develop or contribute to general knowledge; (2) collecting and analyzing of information aimed at discovering new facts and their correct interpretation to draw conclusions; and (3) quantitative and qualitative study activities such as observations, interviews, case studies, ethnographic analysis, analysis of written materials, secondary analysis of data, achievement testing, surveys, experimental designs to examine causal relationships, product testing and analysis of cost and management records. Click here to review the CPS Board Research Study and Data Policy.

## C. Primary Research

The RRB process is used to review primary research studies. These are studies in which researchers are collecting research data from or about research participants. Data collection activities may take a variety of forms such as surveys, interviews, focus groups or observations. Page 7 explains the process for submitting primary research requests. In studies involving primary data collection, the Board **requires** active informed consent for all research participants, and in the case of minor aged students, active parental consent. Further information regarding consent form requirements and suggestions can be found on page 14.

Approval of a research study is valid for one (1) calendar year (including multi-year studies); at the end of one year from the date of approval, research activities must cease unless researchers request and are granted an extension by submitting a request. RRB approval of an external research project may be withdrawn for any reason at any time.

## D. Secondary Research (Data Requests)

Secondary research is defined as the summary, collation, synthesis and/or analysis of data that have already been collected by another party. Secondary data can be either non-personally identifiable (aggregate data or data where the number of students is greater than 10 and *any*

3

*identifying information* is removed) OR personally identifiable (where the data are minimally aggregated at 10 or fewer students or are tied to students' personal identifying information).

CPS makes available a large amount of school and district level data on our website without any required approval or action by the researcher. These files are accessible at www.cps.edu/schooldata. These data sets may be downloaded and used for secondary research purposes. For data not publically available online, researchers must submit a formal data request, as explained on page 12. Please note that CPS reserves the right to deny a portion or the entirety of a data request.

==Research and program evaluation involving student-level secondary CPS data requires active parental consent==. For some programs providing direct services to students, with no primary data collection, it is possible to request existing secondary data from CPS when parental consent has been secured. However, parental consent forms must meet the requirements outlined on page 15. Programs are strongly advised NOT to begin attempting to implement consent forms for secondary data requests until they have reviewed this information thoroughly. Any cases where requests are placed using forms that do not meet these criteria can be rejected. If the research or program evaluation only uses existing secondary data (see list below), it is not required to fill out an application to conduct primary research (i.e. RRB application) since there are no direct research activities occurring.

Data available for request:
- The following data may be requested from the cohort of SCHOOL, GRADE LEVEL and/or SCHOOL YEAR
  - Assessments
  - Attendance
  - Misconduct and discipline data
  - Demographics
  - Grades and performance
  - Graduation and enrollment status

See Appendix A for a more detailed list of data available for request.

When filling out the External Data Request Application you must be as specific as possible in describing the type of data you need. We can only release student-level data that has been explicitly named in the consent form. Please review Section IV: Requesting Secondary Data for more information on the data request process.

## E. Legal and Policy Framework

Research activities conducted in CPS schools, or research where participants are recruited through or in connection with a CPS school, are covered by the CPS Research Study and Data Policy (link below). Research subjects who are covered by the research policies and review process include: students (both minors and students who are 18 years or older), parents/guardians and families, teachers, principals and other CPS staff members.

4

Research proposals must be compliant with all relevant state and federal laws, as well as CPS board policies. Essential policies which are highly encouraged for review include:

CPS Research Study and Data Policy
https://policy.cps.edu/download.aspx?ID=178

CPS Parents and Student Rights of Access to and Confidentiality of Student Records (706.3)
http://policy.cps.edu/download.aspx?ID=122

Family Educational Rights and Privacy Act (FERPA)
http://www.ed.gov/policy/gen/guid/fpco/ferpa/index.html

The Protection of Pupil Rights Amendment (PPRA)
http://familypolicy.ed.gov/ppra

The Health Insurance Portability and Accountability Act (HIPPA) Privacy Rule
https://privacyruleandresearch.nih.gov/

## F. Research Review Board

The Research Review Board (RRB) reviews research proposed on behalf of the Board of Education. No research activities may be conducted without obtaining approval from the RRB. The RRB is a cross-departmental committee facilitated by the Department of Research and Evaluation. The RRB meets approximately every six (6) weeks to review new research proposals and make a determination of approval, non-approval or request further information and/or identify specific changes required to seek approval, based on the criteria outlined in these guidelines.

5

BOE 002913

# II. Types of Research and Definitions

## A. Types of Primary Research

*Internal Research* involves board employees who plan to conduct research on how to improve Board services and programs within their area of supervision or contract as part of a work assignment or as part of their general job duties. Internal researchers must obtain the prior approval of their supervisor prior to commencement of research activities. This explicitly **excludes** research towards a master's thesis or dissertation. While research to improve Board services and programs does not require the approval of the CPS Research Review Board, student level data must be requested through the formal data request form available online.

*External Research* includes (1) independent research conducted by individuals, organizations, or agencies not affiliated with the Board; (2) research conducted by Board employees for personal purposes outside of their work duties and/or work hours (e.g., research for the completion of a master's thesis or doctoral dissertation or for any other personal purposes); or (3) product research conducted by company or entity to study a product's effectiveness.

*Special note on Contract school staff*: Although Contract school staff are not CPS employees, students at these schools are CPS students and therefore research on these students must follow these guidelines. External Researchers must submit a full proposal to the CPS RRB if they wish to conduct research.

*Board Contracted Research* is research conducted by board contractors in accordance with their contract with the Board or a memorandum of understanding with a CPS department or school. All board contracted researchers must submit a full proposal to the CPS RRB. In addition to the research proposal requirements, board contracted researchers must include a copy of their board contract or memorandum of understanding detailing the research activities.

## B. Types of Secondary Research (Data Requests)

*Aggregate Data* is group level data (school, district, statewide, etc.) containing average statistics on the group where the subgroup(s) is/are greater than 10. All aggregate level data is de-identified and active parental consent is not required.

*Student Level Data* is identifiable information on any subgroup of students and/or data on subgroups that contain fewer than ten (10) students. CPS adheres to, and uses, the definition of personally identifiable information provided by the Family Educational Rights and Privacy Act (FERPA). FERPA defines personally identifiable information to include the name and address of the student and the student's family; a personal identifier, such as the student's Social Security Number, student ID number, or biometric record; other indirect information, such as the student's date and place of birth and mother's maiden name; other information that, alone or in combination with other factors, is linked or linkable to a specific student that would allow a reasonable person in the school community, who does not have personal knowledge of relevant circumstances, to identify a student with reasonable certainty; and information based on a targeted request. Requests for identifiable student level data requires active parental consent.

6

BOE 002914

# III. Conducting Primary Research

## A. Process

The Research Review Board is comprised of members representing various Central Office Departments. The RRB meets approximately every six weeks to evaluate all new requests to conduct research. RRB modifications and re-submissions for existing projects are reviewed on a rolling basis (i.e. not on the same six week schedule for new submissions). The RRB calendar containing the deadlines for new submissions can be found on the CPS Research Website. Decisions resulting from the research review process will be emailed to the applicant of the request, as well as appropriate CPS staff, between 2 to 8 weeks after the review meeting. It is in the researcher's best interest to submit RRB proposals only after securing approval from the respective department at CPS. For example, if a proposal contains a strong early education focus, it would be advisable to first secure partnership and approval from the early education department at CPS, and provide proof of that partnership in the RRB application. External researchers may not begin any research activities, or obtain data for research purposes, without first following the procedures outlined in this policy, and securing the necessary approvals.

## B. Criteria for Evaluating Research Proposals

In addition to complying with CPS Board policy, and federal / state laws and regulations, proposed research must also:

1. Demonstrate educational value, either to Chicago Public Schools directly or as a contribution to the field of education.
2. Address an identified research priority of the District and not duplicate research already occurring in the District.
3. Document that the researcher or organization has the capacity and experience to successfully complete the project.
4. **Protect the privacy of students, families and staff members and ensure compliance with state and federal laws and well as CPS board policy**. The Federal Educational Rights and Privacy Act (FERPA) and the Illinois School Student Records Act are based on the premise that information about an individual student is private and confidential and generally may only be accessed with parental consent.
5. Manifest a sound research methodology using valid and reliable techniques and the research capacity and experience to successfully complete the project. Studies judged as poorly designed or justified may be rejected by the committee.

**Please Note:** In addition to the criteria above it is strongly encouraged that Research Proposals are submitted only after a CPS stakeholder or department has been identified. Finding an appropriate stakeholder after the formal RRB review process increases the likelihood of an extended response time, and decreases the likelihood of project approval.

BOE 002915

## C. Application Materials

All requests to conduct research within Chicago Public Schools must be submitted via **email** and in **paper** by the posted submission date in order to be reviewed at the scheduled meeting. Four identical paper copies of the application must be submitted; a digital copy of all proposal materials must also be emailed to research@cps.edu. A $50 processing fee should be delivered with the four paper copies, payment must be check or money order and addressed to Chicago Public Schools. Paper copies and processing fee can be mailed or dropped off at the front desk of our Loop Office at 42 W. Madison.

Mail paper copies and processing fee to:
Chicago Public Schools
Office of Planning and Data Management | Attn: RRB
42 W. Madison St
Garden Level
Chicago, IL 60602

The following information is required on the application:

1) Executive Summary or Abstract:
   Synopsis of the proposed research including research purpose, individuals (i.e., students, teacher, etc.) included in research and length of time data collection is to take place (200 words maximum).
2) Researcher Status and Title:
   Statement naming primary investigator, title and status (i.e., student, professor, director, etc.) within institution or organization. Any CPS employees must disclose CPS employment status and position in this section.
3) Research Question, Hypothesis and Methodology:
   Brief summary of the research questions to be addressed and a description of the hypothesis must be provided. Appropriate research methods for the research questions must be used.
4) Purpose of the Research and Literature Review/Justification of Research:
   Brief (500 words maximum) summary of literature supporting the proposed research must be provided.
5) Description of the Direct Benefit to the Chicago Board of Education and/or CPS and/or the Profession of Education:
   Clearly describe why research is valuable to CPS specifically and how it would contribute to the profession of education (200 words maximum). If the project has already been discussed with CPS departments or stakeholders, it should be noted in this section.
6) Description of Research Activities and School/Student/Staff Involvement:
   Thorough description of the research protocol, including how data is to be collected and by whom, from whom data will be collected, and any involvement that CPS staff may have in the actual collection of data. Additionally, a detailed plan for data security, storage, and destruction should be discussed in this section. Time needed to participate in each research activity must be detailed. This also includes a detailed description of who is to be recruited to participate and how recruitment will take place. Lastly, a description of all consenting processes must be clearly described in this section (i.e. student assent,

8

BOE 002916

parental consent, staff consent, etc.).

7) Timeline of Research:

Timeline of research must include start and end date of all research activities and data collection. Researcher should also clearly outline the amount of time necessary to complete data collection. We strongly encourage submission of requests at least sixty (60) days in advance of proposed research commencement.

8) Institutional Review Board (IRB) Approval:

If the research includes an intervention or interaction with a living person (i.e., student, teacher or parent) that would not occur but for the research, or if the researcher will obtain identifiable private data or information, then the researcher must get advance approval from an IRB. Surveys, interviews, videotaped observations, questionnaires and reviews of student files are all interventions or interactions that would require IRB review and approval. Research that is typically exempted from IRB approval must include an exemption letter see page 20 for more information about IRB approval.

9) Copy of all study instruments:

This includes, but is not limited to, protocols for any planned survey, interview, observation, or focus group. This also includes any assessments administered to students. Any instrument planned for digital administration (i.e. online surveys) is not exempt from this review; the content of digital instruments must be provided to the RRB via a web link, or it can be transposed onto a Word or PDF document.

10) IRB approved and stamped copy of the informed parental consent form(s):

All external research surveys, assessments, analyses or evaluations require the prior written and *active* informed consent of a parent, or legal guardian, on behalf of a minor student before data collection commences.

11) IRB approved and stamped copy of the student assent form(s):

Students who are between the ages of 12 (6th grade) and 17 are required to sign an assent form. This form should include many of the elements described in the parental consent form and the text of the form should be at an appropriate reading level to ensure students understand their participation in the research project.

12) IRB approved and stamped copy of the staff/adult consent form:

Active informed consent forms must also be signed by any CPS staff, parent, or student at least 18 years of age asked to participate in research. If your study includes students who are ages 18 or older, they must be provided with informed consent forms. The informed consent forms for students ages 18 or over must include all of the elements described for a parental consent form (except for the PPRA language).

## D. Types of Study Approval

The RRB's approval/acknowledgement of any external research study should be considered conditional and subject to further approval by the school principal(s) and research subject(s) that form the basis for the proposed study. A principal may place restrictions on an External Researcher's access to students and staff to minimize disruption to school activities. All external research is limited approval and requires the approval of the principal and of the study participants. Participation in research activities is voluntary.

BOE 002917

*Notice of Approval or Acknowledgement*
If a research proposal is approved, the RRB will issue a research approval letter to the Researcher. The RRB's approval of a research proposal is limited to the study scope and methods outlined in the proposal or Board contract. The Researcher must provide a copy of the research approval letter (or acknowledgement letter) to principals whose schools will be affected by the research project to notify them of the RRB's approval and, if applicable, the Board contract authorizing the research.

*Resubmission Request*
Research proposals may be approved by the RRB with the condition that the researcher modifies their proposal where requested by the RRB to be in accordance with CPS and Board policy. When these modifications are complete, the Researcher may resubmit their proposal for additional review before a final decision of acceptance of approval is released. Research cannot begin until final approval is given. Resubmission materials can be submitted via email to research@cps.edu and are reviewed on a rolling basis.

*Limited Approval*
The RRB's approval/acknowledgement of an external research study is conditional and subject to further approval by the school principal(s) and research subject(s) that form the basis for the proposed study. A principal may place restrictions on an External Researcher's access to students and staff to minimize disruption to school activities. All external research is limited approval and requires the approval of the principal and of the study participants.

*Modifications*
If a Researcher wishes to modify the research scope, methods or materially change the research activities (including instruments or consent forms), the Researcher must obtain prior written approval of the modification from the RRB. If applicable, the RRB may request an updated IRB approval letter for the submitted modifications. For board contracted researchers, this obligation shall exist in addition to any other requirements regarding project modifications that may be specified in their contract or memorandum of understanding. The modification application can be found online and can be submitted via email, traditional mail, or both. Modification applications are reviewed on a rolling basis.

*Rejected Proposals*
Proposals that are rejected by the Research Review Board are deemed by the Board as having serious issues that cannot be addressed with a resubmitted proposal. Because of this, researchers whose proposals are rejected are not encouraged to resubmit their proposals. Should a Researcher insist on re-submitting a proposal, s/he cannot do so until two full review cycles elapse.

*Duration*
The RRB's approval of an external research project will only be valid for a period of one year. If research activities extend beyond one year, the external researcher must request approval for an extension from the RRB. Requests for extensions are submitted via the same modification application described above. The RRB modification application can be found online and can be

BOE 002918

submitted by either email or traditional mail. Modifications are reviewed on a rolling basis. Please note, the RRB's approval of a board contracted research project will be valid for the duration of the contract.

*Final Report*

Upon completion of the research study, the Researcher must send a letter to the RRB notifying the committee of completion of the study. A copy of the final report or summary of the results must be provided to the RRB, to the principal of the school studied, and the CPS central office that provided a letter of support for the research proposal. The Chicago Public Schools Board of Education reserves the right to use the information in the research report or summary for educational programming or services, planning, solicitation of grants, staff development and any other purposes to improve instruction or services to students of the Chicago Public Schools.

# E. Restrictions

The following are important CPS and RRB policies to consider in selecting participating schools, in determining recruitment and data collection procedures, and in providing compensation for participation.

1. There must be minimal interference with school instruction and operations, and relationships between students, parents and school and district staff. Personal, social, psychological or medical research that may be in conflict with the rights of individuals or groups will not be approved.
2. It is important to note that no CPS staff time or resources (i.e., CPS email or mail run) maybe used to solicit participation in the research study.
3. CPS cannot be used to recruit participants for research. School staff may not be utilized to collect data.
4. Any compensation provided for participation in research must be described. It is acceptable for proposals to include reasonable incentives for CPS students who participate in research projects (see page 18 for more information). However, it is against CPS Board Policy for CPS staff to receive compensation for their participation in research projects during school hours. CPS staff participating in research activities *outside* contract hours may receive a total reward of up to $50. If the research takes place in schools, any compensation exceeding this amount may be given to the school. Note that for proposals that include professional development outside of contract hours for teachers, it is appropriate to provide reasonable compensation for participation. See page 18 for more information on compensation.
5. Research conducted by a CPS employee (see page 17 for more information):
   a. Must occur outside of normal work requirements including for the completion of a master's thesis or dissertation, and data collection cannot occur in any school in which the employee has authority.
   b. May not include research on individuals known to the researcher. Researchers must use independent research subjects in their studies. For example, principals cannot collect data from staff in their schools because this would present a conflict of interest. Similarly, teachers cannot collect data from their current or former students or parents of their current or former students.

11

BOE 002919

The RRB may place additional conditions on an external researcher as deemed necessary, including, but not limited to requirements related to insurance and criminal background checks. The RRB's approval of an external research project may be withdrawn for any reason at any time.

# IV. Requesting Secondary Data

## A. Process

Unlike research proposals, requests for secondary data are processed by the Research Manager and Data Team on a rolling basis. Requests for secondary data are sometimes part of an approved research project (i.e. RRB). Even if your project was approved through the RRB, you will still need to submit an additional request for the relevant secondary data, and those data should be noted in the original RRB application. Generally, our office responds requests within 30 days. If approved, request fulfillment takes an additional 30 days. However, the timeline to process each request can vary based on the nature of the request. All requests for secondary data must be submitted using the electronic External Data Request Form. There should be a clear link between the research question(s) and the data requested. Consent forms must also be explicit about the data that will be requested (see page 14).

## B. Request Form

The electronic External Data Request Form requires researchers to provide the information listed below. Please note, as of March 2019, the request form is hosted by Google and must be completed and submitted electronically. Accompanying attachments, such as RRB approval letters or consent forms, should ALWAYS be submitted to research@cps.edu. Additionally, payment for submissions is required to be mailed to the CPS Central Office. See the "Essential Guidance" section of this document for more information on payment submission.

**Special Note:** This form is reserved for use by CPS partners working in collaboration with the district. That can include program providers evaluating program implementation, or RRB approved researchers. This form IS NOT to be used by students, undergraduate, graduate or otherwise (excluding RRB approved graduate student researchers). If you submit this as a student, solely for the purposes of your education the request will be denied.

Please ensure that you have thought about the following categories of information before completing the External Data Request Form:

1. ***RRB and other agreements:***
   If your research is connected to an RRB-approved research proposal or an executed data-sharing agreement, you must upload proof of approval and/or the agreement/contract. Additionally, there is a place on the application where you will input the applicable RRB number.

2. ***Project description:***
   Analysis to be completed, intended audience, dissemination of results and end date. Also, be

BOE 002920

sure to clearly explain how the requested data will allow you to reach your projects goals.

3. **Sample population:**
In order to process your request for student level identifiable data, we will require the submission of your consented sample for the extract. Ideally this will include CPS student ID, or enough information (i.e. Full name, date of birth, school attended for year in question, etc.) to allow us to match to student in our records. You will also need to provide a description of the sample (grades, school, years, etc.).

4. **Data requested for analysis:**
See Appendix A at the bottom of this document for a list of data available for request. You will be asked to be as specific as possible about the type of data you are looking for. For example, if you want student assessment data, you must specify which assessment, the specific fields from said assessment, and the applicable academic years and/or grade levels. Please review the public data page and other CPS web resources if you are unsure about the elements that constitute a typical data file.

5. **If requesting student-level data (see definition on page 6) the following is required:**
   - A copy of the IRB approved consent forms. Submit at the time of the request.
   - A list of students for whom parental consent has been attained. Submit ONLY after request receives approval.

   **Consent Form: DO NOT** submit consent forms that have been filled in by participants. Please submit a blank copy/template of the form that was used. Consent forms should be emailed to research@cps.edu at the time of the request, and the study title must be included in the subject line of the email.

   **Student Sample List:** Student lists should not be submitted until your request receives approval. Student lists are preferred in a password protected Excel spreadsheet, with the password submitted in a separate email. Student lists should always be submitted via email to research@cps.edu and the study title must be included in the subject line of the email.

6. **CPS Stakeholders:**
If applicable, this section should include a brief history of your project within CPS, including a description of the CPS stakeholders (either individuals or departments) that have knowledge of your project.

7. **Connection to the CPS Mission and Initiatives:**
Provide details which highlight how this project is connected to the CPS Research Agenda, the CPS Mission and Vision, or other specific goals of the District.

8. **Requested file format:**
SAS datasheet OR Excel Spreadsheet

BOE 002921

## C. Request Fulfillment

Upon submitting a completed data request, you will be contacted by a member of the data team to discuss the details of your request. CPS reserves the right to deny your request. If it is fulfilled, upon completion, data will be sent securely through the CPS secure file sharing site. **CPS cannot provide the data through your organizations SFTP.** Please expect data delivery no sooner than six (6) weeks after being contacted by the CPS data team about your request.

## D. Restrictions

1. In accordance with Board policy, Researchers may not request data directly from schools or departments. All data requests must be submitted to Central Office for handling (i.e., the process outlined here).
2. Researchers may not receive personally identifiable student-level data unless the Researcher also provides the central office with written evidence that the parent or student, as appropriate, has consented to the release of student records. Student-level data is defined on page 6.

# V. Essential Guidance

## A. Consent

In studies involving student participants, Board Policy requires that active parental consent be obtained for students who are under 18 years old. _**Studies with passive consent designs will not be approved.**_ Many common errors occur in consent forms. Consent forms must _specifically_ support active consent (per CPS Board Policy, even if you are granted exemption by an Institutional Review Board). Consent forms should include yes/no checkboxes for all subjects to indicate their consent.

If your proposal includes any multimedia research data collection (i.e. audio or video recordings) you must also include consent for these activities as separate yes/no checkboxes (e.g., separate sections for participation in the research and/or for audio or videotaping). Additionally, many researchers fail to include the protection of Pupil Rights Act language as written; this should not be modified in any way. For your benefit, it is as follows:

> "Parents please be aware that under the Protection of Pupil Rights Act. 20 U.S.C. Section 1232(c)(1)(A), you have the right to review a copy of the questions asked of or materials that will be used with your students. If you would like to do so, you should contact [INSERT APPROPRIATE CONTACT] at (TOLL) FREE-or-LOCAL NUMBER to obtain a copy of the questions or materials."

Consent and study description may _not_ be printed on any CPS letterhead. Research documents cannot imply that research activities are being conducted in conjunction with CPS or suggest

14

BOE 002922

CPS support or approval.

It must be clear to parents and guardians that these research activities are not related to their student's school activities nor are they obligated to participate in your research in order to participate in any activities (e.g., if conducting a program evaluation, it must be clear that students may still participate in the program if they opt out of participating in the evaluation activities).

In order to ensure fully informed consent as needed for the recruited population, consent forms must also be provided in appropriate languages should the primary language of parents or students be something other than English.

## B. Consent Form Checklist

___ Title of the study and identification of the researcher(s) conducting the study (e.g., professor at Loyola University)

___ Brief, clear purpose(s) for collecting data (e.g., to learn about foreign language acquisition in primary school students)

___ Description of what participants will be asked to do (e.g., complete a written survey, participate in a focus group interview with other students)

___ Amount of time required of participants for various research activities

___ Commitment that all information will remain confidential

___ Notice that participation is entirely voluntary and participants may withdraw from the study at any time, without negative consequences

___ Notice of any reasonably foreseeable risks or benefits to the participant

___ A local (312/773/XXX) or toll-free telephone number of researcher(s), so that the parent or participant may call if there are questions or concerns (note: email is not sufficient; a local or toll-free number must be included)

___ PPRA statement, verbatim, as previously indicated (required for studies where students are asked specific questions or in cases where data is collected using research instruments such as surveys, interview questions, pre/post assessments, etc.)

___ (If applicable) Description of any individually-identifiable student data to which the researcher seeks access (specifically indicated e.g., state assessment test scores in Math, attendance records, gender or other demographic variables, etc.). Information must also be

15

included on who will access the data, how data confidentiality will be maintained and how/when data will be destroyed. There must also be separate yes/no checkboxes for the release of student level data.

____ (If applicable) Description of any collected student class work or artifacts (i.e. art projects, journal entries, program specific assessment sheets, etc.). Information must also be included on how artifacts will be acquired, what they will be used for, and how/when those artifacts will be returned or destroyed. There must also be separate yes/no checkboxes, on the parental consent form, for the release of work or artifacts.

____ Space and lines for the student's name and parent/guardian signature. There must be a check-box for both consent and refusal to participate. The parent signature must refer to this such as "Yes, I agree to have my child participate" or "No, I do not give consent for my child to participate". Active consent, i.e., signature approving participation, is required under the Federal Protection of Human Services regulations and CPS Board of Education policy. Passive consent, which is failure to object after receiving notice, is not sufficient. Even if your IRB determines passive consent is feasible, passive consent is not allowable under CPS board policy

____ (If applicable) If student participants are ages 18 or over, the researcher must provide active consent forms for their participation (e.g. parental consent is not appropriate as the students are of legal age)

____ (If applicable) Consent checkboxes if researcher is seeking to audio or videotape participants with an explanation of how the recordings will be used and what happens to the tapes after the research is completed.

**Service Provider or Community Based Organization Consent for Secondary Data**
Although every program is unique in the supports they provide and the outcomes they intend to affect, there are some universal suggestions and requirements for consent to release administrative data.

- Allow a separate area for parental consent for the release of administrative data. Participation in the program must not be contingent on agreement to release student records.
  - For example, consent to participate in the program including program specific activities like field trips or events would have one signature line for consent. A separate statement explains the request for administrative data release and provides parents the opportunity to consent. It must be clear that students' participation is neither contingent nor predicated on the parent's decision to allow release of administrative data.
- Provide clear, targeted descriptions of the data you are requesting to access. The data must be relevant and related to your intervention and/or program.
  - For example, if the program is a literacy intervention, a partner might

16

request final course grades in reading/language arts and state test scores for reading/language arts.

- o Use the same size font for parental consent for release of administrative data as you do for other text in your form. Avoid having the consent in significantly smaller type size so that it is legible for parents.

## C. CPS Employees/Research by CPS Employees

If you are a CPS employee and are considering conducting research strictly within your area of responsibility, role, or as a work assignment, it is likely that you do not need to apply for RRB review. A determination of whether one's research activities fall within the scope of existing roles is made on a case-by-case basis; contact our office at research@cps.edu for clarification and speak with your supervisor.

If you answer YES to either of the following questions, then it is likely that your research requires submission to and approval from before you may proceed:

1. Is the research planned for purposes *beyond* those outlined in your job duties or current role (for example, for personal reasons such as the completion of a master's degree, dissertation, conference presentation, or other professional activities not directly part of your current job)?
2. For the proposed research, would you require access to information or data that you would not typically access as part of your current responsibilities or duties or which is unrelated to your current role (for example, access to nonpublic performance data from a different school)?

If you are an employee, also note that **any research activities must take place outside of contract/work hours and may not include research conducted on subjects known to the Researcher** (such as teachers, students or staff at your school or at a school you directly support). Research sites and subjects must be independent of your existing role and places where you are not in a position of authority. Studies in which there is a possible conflict of interest will not be approved. For example, principals cannot collect data from staff members in their schools. Similarly, teachers cannot collect data from current, former, or future students.

## D. Graduate Student Research

***Graduate Student Screening Process:***
If you are a graduate (Masters, Doctoral, etc.) student, you must complete the Graduate Student Research Screening Form prior to, and in addition to, applying (i.e. RRB application) to conduct research in CPS. This form can be found on our website (www.cps.edu/research) and must be submitted to research@cps.edu. In your submission, please do not provide any additional attachments beyond the application. If your Graduate Student Research Screening Form is not approved, you may not apply to the RRB, nor conduct the proposed research within CPS. Alternatively, if your Graduate Student Research Screening Form is approved, you may then subsequently submit a full RRB application. Our office typically responds to these applications

17

within 30 days or less. **Approval of your Graduate Student Research Screening Form does not guarantee that your research will be approved by the Research Review Board**.

*Important tips and details regarding the Graduate Student Screening Process:*

- Complete the application fully and ensure enough detail is provided. Conversely, avoid providing every detail surrounding the project. Do not provide examples of your instruments, consent forms, or any other supplemental documentation beyond the Screening Form itself. Graduate Student Screening Forms are reviewed by one individual (i.e. not the full Research Review Board), and as such, it is not appropriate for that one person to review and reach a decision on the full scope of your project.
- Applications are reviewed to ensure the project is thoughtfully constructed, beneficial to the district, and could potentially contribute to the greater world of education. If these basic requirements are not met, or if there are other noted issues, the application will not be approved.
- You will receive a formal response to your submission via email, in the form of a decision letter.
- Ensure the project has been properly reviewed and approved by your institution. If approved, the RRB will request your IRB approval in the full application.
- Be intentional in your decision to engage with CPS for your research. If the benefit to CPS cannot be clearly articulated, it may be best to reach out to alternative districts.
- Be aware of the types of projects already occurring within CPS to avoid submissions which duplicate work. One source for such information is the University of Chicago Consortium on School Research, and other analogous institutions with a long history of collaboration with CPS.
- It is strongly encouraged to make a submission at least 3 months prior to the date in which you hope to begin activities. Please keep in mind that if your application is approved, a new application must be submitted and reviewed by the RRB, which meets every 6 weeks. Please visit cps.edu/research for a copy of the most recent RRB calendar.

*Graduate Student Research by CPS Employees:*

If you are a CPS employee and you are conducting research for a graduate degree or a course, you need to be sure to separate your graduate student work from your role as a CPS employee. Any access that you have to CPS students, information, and staff in your role as a CPS employee cannot be used for coursework, class projects, papers, dissertations, or any other type of school research without obtaining consent from research subjects and approval from the RRB. Action research projects, in which the primary investigator is evaluating their own performance within their school or authority, are sometimes partially exempt, depending on the full scope of the project.

## E. Compensation for Research Participation

It is acceptable for proposals to include compensation for individuals who participate in research projects. However, it is against CPS Board policy for **CPS staff** to receive compensation for their participation in research projects during school hours. CPS staff participating in research

BOE 002926

activities outside contract hours may receive a total incentive payment of up to $50. Rarely, exceptions may be made for payments in excess of $50 if the research requires extensive additional professional development outside school contract hours as part of the study. These situations must be fully and explicitly detailed in order to be approvable. If approved, our department will reach out with the appropriate action steps. If the research takes place in schools, any compensation exceeding the $50 limit must be given to the school.

It is acceptable to include in your research proposal incentives for CPS students or families who return consent forms (provided the incentive is given simply for return, regardless of affirmative consent), and for completion of research activities, such as surveys and interviews. If researchers are considering the use of gift cards or food items as participation incentives for students or families, consider the following recommendations and requirements:

- Any foods or beverages offered before, during, or after school must follow the CPS Healthy Snack and Beverage Policy: https://policy.cps.edu/download.aspx?ID=120.  In light of this policy we strongly recommend that research proposals consider the use of non-food incentives or rewards such as school supplies, books, gift cards, or other items. These may take a variety of forms and should be age appropriate for the population being studied.
- Researchers may consider providing choices to students and families for gift card incentives to ensure that the provided incentive is useful and in alignment with the student or family needs.
- Pre-paid gift cards that can be used at any store accepting credit or debit cards (such as pre-paid Visa cards or MasterCards) are appropriate. Researchers should review fee policies for such cards and ensure that they select cards with no fees or penalties and where the value of the card does not expire.
- Gift cards to stores should focus on stores in the local area of the student's school or home neighborhood which the student or family may frequent and where many items, including groceries, are available for purchase (such as food stores, drug stores, large retail stores, etc.).
- Gift cards to stores where the average cost of items exceeds the amount provided as an incentive are strongly discouraged and may ultimately not be approved (i.e., a $5 incentive to a store in which the average item costs $15 is not approvable). Furthermore, incentives such as music, game or app download gift cards which necessitate access to a specific device, computer or game system are discouraged.
- Gift cards to restaurants should also be offered in consideration of CPS' commitment to health and wellbeing for students and families. We strongly discourage offering gift cards for fast food options.

## F. Data Use

It is the district's responsibility to protect student information. Although there is no right to access, data may be shared for approved purposes and when requirements are met. Data cannot be used for purposes beyond the approved project, and data requests are only approved in the interest of research, or in the interest of improving service delivery. ***Therefore, the use of data for other purposes such as marketing, recruitment, or advertising is not allowed and would be in conflict with the District's policies***. The District retains ultimate control over the data once it is shared, meaning that data remains protected by relevant student privacy laws: student level

BOE 002927

data cannot be shared with third parties and must be secured and protected. It is our expectation that any analytic reporting or data analysis will be done in a methodologically and scientifically sound way. Data must be destroyed following the completion of the research. Concern over the methods to be used to analyze and report data are grounds for CPS to reject a data request.

## G. IRB Approval

If the research includes an intervention or interaction with a living person (e.g., student, teacher or parent) that would not occur but for the research, or if the researcher will obtain identifiable private data or information, then the **researcher must submit approval from an Institutional Review Board (IRB)**. Surveys, interviews, videotaped observations, questionnaires and reviews of student files are all interventions or interactions that would require IRB review. Research that is typically exempted from IRB review must include an exemption letter from the IRB. **This requirement is non-negotiable.**

An IRB is generally associated with colleges or universities, although there are privately run IRBs which may provide reviews for fees. The IRB evaluates whether the risk to the subjects of the research is reasonable in relation to the potential benefit [21 CFR 56.111(a)(2)] and, if the research is approved, will specify whether the researcher needs to obtain informed consent from the subjects of the research. **A researcher's lack of affiliation with a college, university, or other institution with an IRB, does not remove the IRB review requirement from the Research Review process.**

There have been a few isolated cases where IRBs have indicated that *they* require district approval prior to their review. In these rare cases, we suggest you share these guidelines or have your IRB contact our office.

The fact that an IRB has approved a proposal for research **does not mean** that CPS must approve it. IRB approval only means that the proposed research design complies with federal regulations regarding human subject research (which are consistent with Illinois law and CPS policy). CPS may determine that IRB-approved research does not warrant CPS support.

IRB Documents Checklist:
- IRB approval letter or exemption letter
- IRB approval on consent and assent forms
- IRB approval on all surveys, and all other instruments or forms

## H. Payment to CPS

All applications to conduct primary research or requests for secondary data are subject to a $50 processing fee. This fee must be received before review of the application can commence. Acceptable forms of payment include check, or money order. All checks must be made out to Chicago Public Schools. **Cash, credit card, or online payments are not accepted.** CPS assumes no financial contribution to the project by the district. Acceptable forms of payment should be mailed to the following address:

BOE 002928

Chicago Public Schools
Office of Planning and Data Management
42 W. Madison Street 2nd Floor
Chicago, IL 60602

## I. Use of CPS Resources

CPS resources may not be used for the completion of any research activities. Similarly, CPS staff may not be used to assist researchers in recruitment or selection of research participants. Teachers may engage in minimal supportive activities as appropriate, such as distributing and collecting consent forms provided that these activities present minimal disruption to instruction.

## J. Background Checks

Depending on the research activities, the board may deem that a background check is necessary to conduct the research activities. Generally, a background check is required for any instance where a researcher is conducting activities with students, staff, or within a CPS facility. If deemed necessary based on the research activities, the RRB will provide the researcher with information on the background check process. Please note background checks completed for other organizations do not suffice (e.g., even if the researcher has received a background check through his or her employer or university, a CPS criminal background check must still be performed).

## K. Online RRB PDF Application

If you are having trouble filling out the editable online RRB PDF application (for the initial RRB submission, or subsequent modifications), application materials may be completed in an alternative document (such as a Microsoft Word file) and attached to the PDF with the phrase "see attached" in each section of the PDF. The attached file must follow a similar format to the PDF and answer all questions clearly and completely. Be sure you have tried the print to file option if you still have trouble.

BOE 002929

# Appendix A: Available Data

The following types of data are available for request through the secondary data request form. While this table does not encompass all data that external researchers may be interested in requesting, it does represent the most typical types of data requests. As such, this data is more readily available and we will be more likely able to fulfill your request if your data is listed here. Also, there is no right to access student data. Active parental consent is required for student level data. The more specific your consent form is, the more likely we will be able to fulfill your request.

| Type of Data | Common Requests |
|---|---|
| Assessment | <ul><li>NWEA (MPG, MAP):Score, Percentile, Test date</li><li>PARCC: Score, Percentile, Test date</li><li>TRC/DIBELS: BOY results, MOY results, EOY results</li><li>SAT/ PSAT: Subj score, Test date</li><li>ACT/EPAS: Subj score, Test date</li><li>mCLASS: BOY results, MOY results, EOY results</li></ul> |
| Attendance | <ul><li>Enrollment days (by school)</li><li>Annualized school (EOY)</li><li>Attendance days (by school)</li><li>Annualized attendance rate (by school)</li><li>Enrollment history</li></ul> |
| Misconduct & Discipline | <ul><li>Misconduct level (1-6)</li><li>Suspensions (OSS, ISS)</li><li>Expulsion</li><li>Detention</li><li>Restorative Conversations</li></ul> |
| Demographic | <ul><li>Gender</li><li>Race/ethnicity</li><li>FRL (Y/N)</li><li>ELL (Y/N)</li><li>IEP Status (Y/N)</li><li>DOB</li><li>Address</li></ul> |
| Graduation & Enrollment Status | <ul><li>School (point in time)</li><li>Graduation status</li><li>Active/inactive status</li></ul> |

BOE 002930

| Grades & Performance | <ul><li>Elementary School<ul><li>Semester grades (class)</li><li>Final grades (class)</li></ul></li><li>High School<ul><li>Semester GPA</li><li>Semester grades (Course IDs required)</li><li>Cumulative unweighted GPA</li><li>Freshman on Track (FOT)</li></ul></li></ul> |
| --- | --- |
| Other | Explain what data are requested. Be specific and ensure the data you are seeking is not listed in any other category. |

23

**STATEMENT OF WORK #028**

**RESEARCH PROPOSAL FORM**

**MASTER AGREEMENT FOR RESEARCH SERVICES**

**[THE UNIVERSITY OF CHICAGO, URBAN LABS - EDUCATION LAB, CRIME LAB, POVERTY LAB, HEATH LAB, OR ENERGY AND ENVIRONMENT LAB]**

Name of Research Project:   2015 Chicago Design Competition: Reducing Youth Violence in Chicago – Quiet Time Program Pilot Evaluation

CPS Research Project Manager: _ Kylie Klein_____

       Phone: 773-553-3483_____     E-Mail: _kklein@cps.edu_____

UNIVERSITY Research Project Manager: __Lydia Jessup_____

       Phone: _773-702-2854_____     E-Mail: __ljessup@uchicago.edu_____

Lab research will be conducted in: __Crime Lab and Urban Education Lab_____

Period of Performance __June 2015_____ until ___September 2016_____

University IRB number:  _IRB 15-0980_____

CPS RRB number, if applicable: _____

This Statement of Work # 028, dated November 6, 2015, which includes the attached Research Services Proposal, shall be conducted pursuant to the terms and conditions of the Master Agreement for Research Services ("**Agreement**") dated October 1, 2015 by and between The Board of Education of the City of Chicago (the "**BOARD**"), commonly known as the Chicago Public Schools ("**CPS**"), and The University of Chicago ("**University**"), on behalf of its Urban Labs. Defined terms used in this Statement of Work shall have the same meanings as those ascribed to such terms in the Agreement.

1.  This Statement of Work shall be subject to the terms and conditions of the Agreement and all work and Research Services performed hereunder shall be conducted as described in the Research Services Proposal that was approved by the BOARD (the "Approved Research Services Proposal"). [Note: If the above-named Research Services only involves the exchange of Confidential Information and does not require that University have contact with CPS students or CPS Staff, the signature of the BOARD'S Chief Accountability Officer or his/her designee on this Statement of Work evidences the BOARD'S approval of the Research Services Proposal. If the Research Services Proposal was subject to the BOARD'S RRB process, a copy of the signed RRB approval letter for this Research Services Proposal must be attached to this Statement of Work to evidence the BOARD's approval of the Research Services Proposal.]

BOE 002932

Check the applicable box:

☒ This Research Services Proposal only involves the exchange of Confidential Information/Existing Secondary Data.

☐ This Research Services Proposal also involves primary research data collection and was subject to the RRB process.
- Attached hereto and incorporated herein by reference as Attachment 2 is a copy of the RRB approval letter for the above-named Research Services.
- Attached hereto and incorporated herein as <u>Attachment 3</u> is a summary of the Approved Research Services Proposal. Such "Proposal Summary" is subject to the approval of the BOARD'S Chief Performance Officer or her designee.

Either party may request changes to this Statement of Work, but any such changes must be documented by a written amendment to this Statement of Work and must be signed by an authorized representative of each party hereto. In the case of the BOARD, any such amendment must be signed by the BOARD'S Chief Accountability Officer or his/her designee, and if the underlying Research Services Proposal was subject to RRB approval, the BOARD will determine whether the Amendment to this Statement of Work requires additional RRB approval.

# RESEARCH SERVICES PROPOSAL

**Research Study Name:**  _ Quiet Time Program Pilot Evaluation _____

## to be conducted by

## The Crime Lab at the

## UNIVERSITY OF CHICAGO

---

**Instructions:**

➢ Please provide the information requested in **Items 1-5** below. The information provided should be accurate and complete. If you wish, you may use text from your Research Review Board ("RRB") submission materials.

➢ Your Research Services Proposal must be approved, signed and dated by an authorized representative of UNIVERSITY; and it must be approved, signed and dated by the BOARD'S Chief Performance Officer or his/her designee to be valid.

➢ If this Research Study involves more than obtaining Student Data, Staff Data, and School Level Data directly from the Board, you must append a copy of the RRB Approval Letter to this Research Services Proposal.

The Statement of Work for this Research Study cannot be executed until this Research Services Proposal has been signed by an authorized representative of the UNIVERSITY and by the Chief Accountability Officer of the Board or his/her designee. A signed copy of this Research Services Proposal must be attached to the subject Statement of Work.

At a minimum, such overview should include the following information:

1. Provide the Research Questions to be addressed by the Study, and Project Overview.

2. Describe and list the existing CPS data sources that Lab wishes to analyze and describe any new data that Crime Lab and Urban Education Lab wants to collect.

3. Describe the analytic techniques to be employed to answer the Research Questions.

4. Describe the data collection activities that Crime Lab and Urban Education Lab Lab will employ and provide an approximate schedule for these activities to occur.

5. Provide the Research Study timeline, including the reporting and deliverable schedule.

**[Signature page to follow]**

3

BOE 002934

**Description of Research Project**

**1. Overview of Study and Benefits to CPS**

Motivated a need for rigorous evidence on what works to reduce youth violence, the University of Chicago Crime Lab, with the support of Get IN Chicago, the John D. and Catherine T. MacArthur Foundation, and the Pritzker Pucker Family Foundation, launched the Chicago Design Competition: Reducing Youth Violence in February 2015 to identify, fund, and evaluate a promising and innovative youth violence prevention program. The David Lynch Foundation was selected as one of the winners and was awarded a grant to pilot their Quiet Time (QT) Program for the first time in Chicago. The Quiet Time Program incorporates two 15-minute silent periods into the school day, which are designed to create a space where students have the option to practice an evidence-based meditation called Transcendental Meditation. This program has been successfully implemented in more than 30 schools across the country with promising results. These schools have cited decreases in suspension rates, increases in attendance, improvements in GPA and test scores, and improvements in school safety and culture.

The Crime Lab proposes evaluating a Quiet Time pilot program in Chicago Public Schools in school year 2015-2016 in order to prepare to conduct a rigorous evaluation of this promising program the following year. The full scale evaluation in SY 2016-2017 would build on previous research conducted by the Crime Lab on the remediation of social-cognitive skills and automatic responses that often lead to violent behavior and other negative outcomes among disadvantaged youth. The Crime Lab's evaluation of Youth Guidance's Becoming a Man (BAM) program found that this mentoring and social-cognitive skill development program led to large declines in violent crime arrests and improved school outcomes among at-risk youth. Similarly, the goal of the Quiet Time program is to reduce criminal and violent behavior and improve academic achievement by using meditation as a tool to decrease stress and the effects of trauma.

In the pilot year, the David Lynch Foundation expects to train approximately 250 to 350 students across three CPS high schools. These students' practice will be supported by certified Transcendental Meditation teachers who, in addition to training students and teachers, will act as a resource for support and continued learning throughout the year.

The goals of the pilot year are the following:

1. Show that QT can be implemented with fidelity in CPS schools
2. Assess feasibility of a future full scale randomized control trial with DLF, CPS, and schools that are interested
3. Provide an initial assessment of outcomes
4. Plan for scale up and randomized controlled trial evaluation in school year 2016-2017

We will achieve these goals by working simultaneously on three different fronts. First, the Crime Lab will evaluate the implementation of the QT program in three CPS schools: Amundsen,

4

BOE 002935

Fenger and Gage Park. The first semester will not involve randomization; the main goal will be to determine feasibility of program implementation. In the second semester we plan to work to understand the feasibility of an evaluation by introducing an element of randomization into the recipient selection process (this is contingent upon a successful first semester and approval by each individual school). Second, the Crime Lab will conduct data analysis and perform outreach to appropriate schools in order to plan for the scale up and full evaluation in school year 2016-2017. The goal of this second activity is to understand research and implementation feasibility in a greater number of schools.

Finally, the Crime Lab will include a qualitative component in order to collect information on program implementation. This report will inform the future scale up and any future qualitative evaluation. During this preliminary step, the Crime Lab will collect information using the following methods (these activities are further outlined in the appendix):

1. Observations by CPS, DLF, or other authorized visitors, documented with a standardized rubric (see appendix for draft)
2. Observations by Crime Lab staff, documented with the standardized rubric mentioned above and a more detailed descriptive narrative
3. Bi-annual interviews with principals, teachers and administrators (see appendix for draft)

A successful pilot year will put CPS, the Crime Lab, and the David Lynch Foundation in a position to confidently scale up and rigorously evaluate the QT program in the 2016-2017 school year. This large scale study would be designed to generate causal evidence that would allow us to understand if the QT program improves life outcomes for at-risk youth, and if so, for whom, how, and why.

**Research Questions to be Addressed by the Study**

The 2015-2016 pilot and following full-scale study in the 2016-2017 school year will seek to address the following questions:

1. What are the impacts of the Quiet Time program on anti- and pro-social behavior among practicing students? Specific outcomes of interest include in-school disciplinary infractions and out-of-school arrests.

2. What are the impacts of the Quiet Time program on school engagement among practicing students? Specific outcomes of interest include GPA, test scores, and attendance.

The Quiet Time program has already been successfully implemented in a diverse array of schools from San Francisco to Washington, D.C., but this will be the first time it has been tested in Chicago Public Schools. The pilot phase will help the Crime Lab and our partners at the David Lynch Foundation and CPS refine the design and implementation of the larger full-scale experiment in 2016-2017 that will generate rigorous evidence to answer these research questions.

5

BOE 002936

**2. Data Sources**

The Crime Lab requests the data outlined in the table below from the schools listed below.

Pilot: 3 schools, 2015/2016 school year

- Amundsen
- Fenger
- Gage Park

Full Scale Evaluation Planning: 17 schools, 2009/2010-2015/2016 school years

- Aldridge (ES)
- Amundsen
- Bogan
- Bowen
- Clemente
- CVCA
- Dunbar
- Fenger
- Gage Park
- Juarez
- Kennedy
- King College Prep
- Marshall
- North-Grand
- North Lawndale College Prep
- Telpochcalli (ES)
- Washington

6

BOE 002937

| Metric | Full Scale Evaluation Planning (17 schools) | Pilot Semester 1 (3 schools) | | | Pilot Semester 2 (3 schools) | |
|---|---|---|---|---|---|---|
| | Pull 1 - Sept 2015 | Pull 1 - Sept 2015 | Pull 2 - January 2016 | Pull 3 - June 2016 | Pull 1 - Dec 2015 | Pull 2 - June 2016 |
| **Classroom Level Data** | | | | | | |
| School IDs | x | x | | | x | |
| Course numbers | x | x | | | x | |
| Course names | x | x | | | x | |
| Section numbers | x | x | | | x | |
| Teacher IDs | x | x | | | x | |
| Teacher Names | x | x | | | x | |
| Class Start and End Times | x | x | | | x | |
| | | | | | | |
| **Individual Level Data** | | | | | | |
| Student IDs | x | x | x | x | x | x |
| Date of Birth (to determine age) | x | x | x | x | x | x |
| Gender | x | x | x | x | x | x |
| Race | x | x | x | x | x | x |
| Presence of IEP | x | x | x | x | x | x |
| Medical disability or medically fragile | x | x | x | x | x | x |
| Enrollment history | x | x | x | x | x | x |
| Enrollment status | x | x | x | x | x | x |
| GPA - at each term, both weighted and unweighted | x | x | x | x | x | x |
| Standardized test scores (Explore/Plan/PSAE/ACT) | x | x | x | x | x | x |
| Middle School tests: ISAT, NWEA | x | | | | | |
| Credits attempted and earned (by semester) | x | x | x | x | x | x |
| Days of excused, unexcused and total absences | x | x | x | x | x | x |
| Member days | x | x | x | x | x | x |
| Misconduct incidents and resolutions | x | x | x | x | x | x |

7

BOE 002938

**Pilot Analysis**

3. Analytic techniques

Semester 1: Pre-post evaluation, matched control at same or other school

Each of the three schools we plan to work in has selected a group of 40-60 students who are eligible for the QT program and to whom the administration would like to offer QT in the first semester. We will evaluate the effect of the Quiet Time program on individual student outcomes by looking at de-identified metrics such as GPA, attendance, and misconduct, before and after the student started participating in the Quiet Time program. In order to create a comparison group to isolate the effects of QT, we will also compare the outcomes of this group to a similar group of students in the same grade at that school from the previous year or students in other grades at that school from the same year. These control groups will be selected by analyzing de-identified administrative data. In order to identify a population that has the same demographics on average, we will need to use the data requested above. Using this method, we will be able to evaluate this program as accurately as possible.

In addition to the components of the pilot analysis focused on student outcomes, the qualitative elements of the analysis will allow researchers to evaluate the implementation in schools. Interviews and observations will examine how well the program integrates into the classroom, how effectively the program is implemented, and what adjustments might help the scale-up of the program run optimally.

Semester 2: Random assignment

If possible, each school will identify a group of students eligible for the program, and the Crime Lab will randomly select half to be offered the QT program in the second semester. The other half may have the option of being offered the program the following school year if the program continues. Data will be collected on both populations (the group that was offered the program and the group that was not) and outcomes will be compared between the two groups. We will look in particular to understand if the QT program improved outcomes for the students who learned to meditate. We will measure outcomes by looking at changes in GPA, test scores, attendance, and misconduct. With these data we hope to start to answer the question: Does meditation improve school performance among at-risk youth? And if so, how, why, and for whom? Identifying how the program impacts student outcomes will aid in effectively assessing and evaluating any large scale study of the program.

4. Data collection

The student or classroom selection and outcome evaluation for the Quiet Time pilot will rely on on existing CPS administrative data. An RRB will be submitted in order to conduct the data collection for the qualitative evaluation described in the overview.

BOE 002939

**Full Scale Evaluation Planning**

3. Analytic techniques

In order to prepare for the full scale evaluation of the QT program in the 2016-2017 school year, the Crime Lab will need to identify the best implementation strategy and research design during the 2015-2016 school year. The QT program is best delivered at the classroom level (versus the student level), so it is important to plan the best possible research design to make sure that we have a good understanding of how classrooms operate. We will use descriptive statistics on classroom and student-level data to answer the following two questions:

1. How much do student schedules overlap during the school day at different schools?

2. How correlated are "outcomes" within classrooms?

The Crime Lab will answer these questions by using administrative data from the list of 15 high schools and two elementary schools (see above list in section B) from school years 2009/20010 to 2014/2015 to document the similarities and differences in the profiles of classrooms. Understanding these patterns will allow the Crime Lab to determine how best to implement the study of the QT program at scale.

4. Data collection

The student or classroom selection and outcome evaluation for the Quiet Time pilot will rely on on existing CPS administrative data. An RRB will be submitted in order to conduct the data collection for the qualitative evaluation described in the overview.

**5. Research Study Timeline and Key Deliverables**

- June/July 2015 – Selection of pilot schools
- August/September 2015 – Training of teachers and faculty at pilot schools
- September/December 2015 – Analysis of classroom-level data for full-scale evaluation
- September/October 2015 – Start of school/program implementation
- Sept/Oct-December 2015 – Monitoring and collection/tracking of data
- November 2015 – In-school interviews with principals, administrators and teachers
- December 2015 – Randomization for second semester
- January 2016 – Second semester program implementation and check-in report to CPS
- January-June 2016 – Monitoring and collection/tracking of data
- March 2016 – First semester evaluation
- May 2016 – In-school interviews with principals, administrators and teachers
- June 2016 – Check-in report to CPS
- July-September 2016 – Analysis work and first year evaluation
- September 2016 – Final report to CPS

These activities are outlined in greater detail in the appendix.

9

BOE 002940

10

BOE 002941

**IN WITNESS WHEREOF,** the parties hereto have caused this Statement of Work # $28$ to be executed by their duly authorized representatives as of the date first set forth above.

**THE BOARD OF EDUCATION OF THE**
**CITY OF CHICAGO**

By: _____

John Barker

Chief Accountability Officer

**THE UNIVERSITY OF CHICAGO**

Stefan Jellicoe
Grants & Contracts Manager
Acting on behalf of Michael R. Ludwig

By: _____

Print Name: _____ **Michael R. Ludwig** _____

Print Title: _____ Assoc. Vice President for Research Administration

Date: _____ $11-11-15$ _____

Lab Director:

Crime Lab

Signature: _____

Print: Jens Ludwig _____

22

BOE 002942

BOE 002943

STATEMENT OF WORK #028

Amendment #2

RESEARCH PROPOSAL AMENDMENT FORM

MASTER AGREEMENT FOR RESEARCH SERVICES

[THE UNIVERSITY OF CHICAGO, URBAN LABS - EDUCATION LAB, CRIME LAB, POVERTY LAB, HEATH LAB, OR ENERGY AND ENVIRONMENT LAB]

Name of Research Project: __2015 Chicago Design Competition: Reducing Youth Violence in Chicago – Quiet Time Program Pilot Evaluation__

CPS Research Project Manager: _____Sarah Dickson_____

     Phone:                      E-Mail: skdickson@cps.edu

UNIVERSITY Research Project Manager: __Lydia Jessup_____

     Phone: __773-702-2854_____ E-Mail: __ljessup@uchicago.edu_____

Lab research will be conducted in: ___Crime Lab and Urban Education Lab_____

Period of Performance __September 2016_____ until __July 2020_____

University IRB number: ___ IRB 15-0980_____

CPS RRB number, if applicable: _____1122_____

This Amendment to Statement of Work #028, dated August 17 2016, shall be conducted pursuant to the terms and conditions of the Master Agreement for Research Services ("Agreement") dated October 1, 2015 by and between The Board of Education of the City of Chicago (the "BOARD"), commonly known as the Chicago Public Schools ("CPS"), and The University of Chicago ("University"), on behalf of its Urban Labs. Defined terms used in this Statement of Work shall have the same meanings as those ascribed to such terms in the Agreement.

1. This Statement of Work shall be subject to the terms and conditions of the Agreement and all work and Research Services performed hereunder shall be conducted as described in the Research Services Proposal that was approved by the BOARD (the "**Approved Research Services Proposal**"). Note: If the above-named Research Services only involves the exchange of Confidential Information and does not require that UEL have contact with CPS students or CPS Staff, the signature of the BOARD'S Chief Performance Officer or his/her designee on this Statement of Work evidences the BOARD'S approval of the Research Services Proposal. If the Research Services Proposal

was subject to the BOARD'S RRB process, a copy of the signed RRB approval letter for this Research Services Proposal must be attached to this Statement of Work to evidence the BOARD's approval of the Research Services Proposal.

**Check the applicable box:**

☒ This Research Services Proposal Amendment only involves the exchange of Confidential Information/Existing Secondary Data.

☐ This Research Services Proposal Amendment also involves primary research data collection and was subject to the RRB process.
- Attached hereto and incorporated herein by reference as <u>Attachment 2</u> is a copy of the RRB approval letter for the above-named Research Services.
- Attached hereto and incorporated herein as <u>Attachment 3</u> is a summary of the Approved Research Services Proposal. Such "Proposal Summary" is subject to the approval of the BOARD'S Chief Performance Officer or her designee.

2. Either party may request changes to this Statement of Work, but any such changes must be documented by a written amendment to this Statement of Work and must be signed by an authorized representative of each party hereto. In the case of the BOARD, any such amendment must be signed by the BOARD'S Chief Performance Officer or his/her designee, and if the underlying Research Services Proposal was subject to RRB approval, the BOARD will determine whether the Amendment to this Statement of Work requires additional RRB approval.

BOE 002945

Attachment 3.

### RESEARCH SERVICES PROPOSAL AMENDMENT

Research Study Name:   2015 Chicago Design Competition: Reducing Youth Violence in Chicago —
Quiet Time Program Pilot Evaluation

to be conducted by

The __Crime and Education____ Lab at the

UNIVERSITY OF CHICAGO

Instructions:

> Please provide the information requested below. The information provided should be
> accurate and complete.

> Your amendment must be approved, signed and dated by an authorized representative of
> University of Chicago; and it must be approved, signed and dated by the BOARD'S
> Chief Performance Officer or his/her designee to be valid.

> If this Research Study amendment involves more than obtaining Student Data, Staff Data,
> and School Level Data directly from the Board, you must append a copy of the RRB
> Approval Letter to this Research Services Proposal Amendment.

The Amended Statement of Work for this Research Study cannot be executed until this Research
Services Proposal Amendment has been signed by an authorized representative of University
and by the Chief Performance Officer of the Board or his/her designee.

At a minimum, such overview should include the following information:

1.   **Provide a brief summary of the initial proposed work and the Research Questions to
     be addressed by the Amendment, if new.**

     The research questions are the same as the SOW that was submitted originally for the pilot year
     of the Quiet Time program. The purpose of this amendment is to extend the duration of the
     research timeline to include a two year randomized controlled trial starting in three to four
     schools next year (SY 2016-17): Bowen, Gage Park, Daniel Hale Williams, and Julian.

BOE 002946

2.   Describe and list the existing CPS data sources that the _Crime and Ed___ Lab wishes to analyze. Indicate if this amendment asks for additional administrative data.

We originally requested data through 2016 for both individual student data and school level schedule data (in Amendment #1). In this amendment we would like to request the same data through July 2020 and request both individual level and school level data for each school. This will allow us to track outcomes at the RCT processes and make the most informed decision on how many students we will need to participate in year two of the RCT in order to accurately measure outcomes.

To summarize, the schools for which we are now requesting both individual level and school classroom level data are:

- Aldridge (ES)
- Amundsen
- Bogan
- Bowen
- Bronzeville
- Clemente
- CVCA
- Daniel Hale Williams
- Dunbar
- Fenger
- Gage Park
- Hancock
- Juarez
- Julian
- Kelvin Park
- Kennedy
- King College Prep
- Marshall
- North-Grand
- North Lawndale College Prep
- Sullivan
- Telpochcalli (ES)
- Tilden
- Washington

3.     Describe the analytic techniques to be employed to answer the Research Questions.

The original SOW described two types of analytic techniques: a matched control analysis and random assignment. Going forward, in the schools we will begin working in in the fall, we plan to use random assignment in order to carry out a randomized controlled trial (RCT). At Gage Park, Daniel Hale Williams, and Bowen (and possibly on a subset of the student population Julian, but most likely this pilot will not involve randomization) we will randomize by morning classroom period in order to split the student populations into control and treatment groups. The schools have changed their bell schedules so that all students can receive the Quiet Time program, but only the treatment group will be offered to learn to meditate while the control group will participate in an activity chosen by the school. As described in the original SOW, we will collect data on both groups and outcomes will be compared between the two. We will look specifically at changes in GPA, test scores, attendance, and misconduct. By conducting statistical power calculations with the previous data provided by CPS, we were able to determine that after the second year of the study we will be able to causally determine whether and by how much Quiet Time impacts student education and behavior outcomes.

4.     Describe the data collection activities that __Crime and Ed___ Lab will employ and provide an approximate schedule for these activities to occur.

No new data collection will occur. This evaluation will rely on existing CPS administrative data. If at a future date we decide to conduct data collection activities such as program participation tracking, an RRB will be submitted at that time.

5.     Provide the (new) Research Study timeline, including the reporting and deliverable schedule.

- August 2016– Preparation and planning with schools and DLF
- September 2016 – Quiet Time begins and student program orientation occurs
- October 2016 – Randomization occurs and student TM training begins for treatment group
- November 2016-June 2017– Program runs in three schools, ongoing participation and program fidelity monitoring and data collection through observations
- January 2017- Check-in report to CPS
- June 2017– End of school year check-in report to CPS
- July-September 2017– first year analysis and preparation for second year
- September 2017 – Final Year 1 Report to CPS

If additional schools agree to adopt the program in 2017-18 and there is funding to continue the research, the second year of research activities will follow the same timeline described above.

[Signature page to follow]

BOE 002949

IN WITNESS WHEREOF, the parties hereto have caused this Statement of Work # 28 to be executed by their duly authorized representatives as of the date first set forth above.

THE BOARD OF EDUCATION OF THE
CITY OF CHICAGO

THE UNIVERSITY OF CHICAGO

By: _____

By: _____

~~John Barker~~

Istvan Fekete
Assistant Director, Contracts Management
Acting on behalf of Michael R. Ludwig

Jeff Brown
~~Chief Accountability Officer~~

Print Name: _____ Michael R. Ludwig

Director of Research &
Data Analytics

Assoc. Vice President for Research Administration

Print Title: _____

Date: _____ 11/17/16

Lab Director:

Education Lab

Signature: _____

Print: Jens Ludwig

BOE 002951

STATEMENT OF WORK #028 –
Amendment #1

RESEARCH PROPOSAL AMENDMENT FORM

MASTER AGREEMENT FOR RESEARCH SERVICES

[THE UNIVERSITY OF CHICAGO, URBAN LABS - EDUCATION LAB, CRIME LAB, POVERTY
LAB, HEATH LAB, OR ENERGY AND ENVIRONMENT LAB]

Name of Research Project: ___2015 Chicago Design Competition: Reducing Youth Violence in Chicago –
Quiet Time Program Pilot Evaluation

CPS Research Project Manager: __ Kylie Klein_____

    Phone: 773-553-3483_____ E-Mail: __ kklein@cps.edu _____

UNIVERSITY Research Project Manager: _Lydia Jessup _____

    Phone: _____773-702-2854_____ E-Mail: ___ ljessup@uchicago.edu _____

Lab research will be conducted in: _Crime Lab and Urban Education Lab_____

Period of Performance ___June 2015_____ until _September 2016_____

University IRB number: ____IRB 15-0980_____

CPS RRB number, if applicable: _1122_____

This Amendment to Statement of Work #028, dated March 4, 2016, shall be conducted pursuant
to the terms and conditions of the Master Agreement for Research Services ("**Agreement**") dated
October 1, 2015 by and between The Board of Education of the City of Chicago (the
"**BOARD**"), commonly known as the Chicago Public Schools ("**CPS**"), and The University of
Chicago ("**University**"), on behalf of its Urban Labs. Defined terms used in this Statement of
Work shall have the same meanings as those ascribed to such terms in the Agreement.

1. This Statement of Work shall be subject to the terms and conditions of the Agreement
   and all work and Research Services performed hereunder shall be conducted as described
   in the Research Services Proposal that was approved by the BOARD (the "**Approved
   Research Services Proposal**"). Note: If the above-named Research Services only
   involves the exchange of Confidential Information and does not require that UEL have
   contact with CPS students or CPS Staff, the signature of the BOARD'S Chief
   Performance Officer or his/her designee on this Statement of Work evidences the
   BOARD'S approval of the Research Services Proposal. If the Research Services Proposal
   was subject to the BOARD'S RRB process, a copy of the signed RRB approval letter for
   this Research Services Proposal must be attached to this Statement of Work to evidence

BOE 002952

the BOARD's approval of the Research Services Proposal.

**Check the applicable box:**

☒ This Research Services Proposal Amendment only involves the exchange of Confidential Information/Existing Secondary Data.

☐ This Research Services Proposal Amendment also involves primary research data collection and was subject to the RRB process.
- Attached hereto and incorporated herein by reference as <u>Attachment 2</u> is a copy of the RRB approval letter for the above-named Research Services.
- Attached hereto and incorporated herein as <u>Attachment 3</u> is a summary of the Approved Research Services Proposal. Such "Proposal Summary" is subject to the approval of the BOARD'S Chief Performance Officer or her designee.

2. Either party may request changes to this Statement of Work, but any such changes must be documented by a written amendment to this Statement of Work and must be signed by an authorized representative of each party hereto. In the case of the BOARD, any such amendment must be signed by the BOARD'S Chief Performance Officer or his/her designee, and if the underlying Research Services Proposal was subject to RRB approval, the BOARD will determine whether the Amendment to this Statement of Work requires additional RRB approval.

BOE 002953

Attachment 3.

## RESEARCH SERVICES PROPOSAL AMENDMENT

Research Study Name: ___Quiet Time Program Pilot Evaluation___

to be conducted by

The ___Crime and Education___ Lab at the

### UNIVERSITY OF CHICAGO

**Instructions:**

➢ Please provide the information requested below. The information provided should be accurate and complete.

➢ Your amendment must be approved, signed and dated by an authorized representative of University of Chicago; and it must be approved, signed and dated by the BOARD'S Chief Performance Officer or his/her designee to be valid.

➢ If this Research Study amendment involves more than obtaining Student Data, Staff Data, and School Level Data directly from the Board, you must append a copy of the RRB Approval Letter to this Research Services Proposal Amendment.

The Amended Statement of Work for this Research Study cannot be executed until this Research Services Proposal Amendment has been signed by an authorized representative of University and by the Chief Performance Officer of the Board or his/her designee.

At a minimum, such overview should include the following information:

1. Provide a brief summary of the initial proposed work and the Research Questions to be addressed by the Amendment, if new.
2. Describe and list the existing CPS data sources that the Crime and Education Lab wishes to analyze. Indicate if this amendment asks for additional administrative data.
3. Describe the analytic techniques to be employed to answer the Research Questions. Describe the data collection activities that Crime and Education Lab will employ and provide an approximate schedule for these activities to occur.
4. Provide the (new) Research Study timeline, including the reporting and deliverable schedule.

BOE 002954

**Summary of Proposed Work**

A. Provide the Research Questions to be addressed by the Amendment.

The research questions are the same as the original SOW.

B. Describe and list the existing CPS data sources that CCSR wishes to analyze. Indicate if this amendment asks for additional administrative data.

We have two changes we would like to make to the original SOW data request.

First, we originally requested student level data from Amundsen, Fenger and Gage Park from the current school year (2015-16). In this amendment we would like to extend this request to prior years. We request individual student data from the three pilot schools from 2009/10-2015/16. This will allow us to get a more complete picture of changes in student outcomes due to the Quiet Time program.

Second, we originally requested school schedule files from the 17 schools below from 2009/2010-2015/2016:

- Aldridge (ES)
- Amundsen
- Bogan
- Bowen
- Clemente
- CVCA
- Dunbar
- Fenger
- Gage Park
- Juarez
- Kennedy
- King College Prep
- Marshall
- North-Grand
- North Lawndale College Prep
- Telpochcalli (ES)
- Washington

In this amendment we would like to extend this request to the additional schools below for the same years, 2009/2010-2015/2016:

- Daniel Hale Williams
- Bronzeville

BOE 002955

- Hancock
- Julian
- Tilden
- Sullivan
- Kelvin Park

These new schools have expressed interest in the Quiet Time program next year, so analyzing these data will allow us to make more accurate calculations for the research design.

**C. Describe the analytic techniques to be employed to answer the Research Questions.**

The same analytic techniques will be used.

**D. Describe the data collection activities that CCSR will employ and provide an approximate schedule for these activities to occur.**

No new data collection will occur as part of this amendment.

**E. Provide the (new) Research Study timeline, including the reporting and deliverable schedule.**

The Research Study timeline, including the reporting and deliverable schedule has not changed.

**[Signature page to follow]**

BOE 002956

IN WITNESS WHEREOF, the parties hereto have caused this **Statement of Work # 28 Amendment 1** to be executed by their duly authorized representatives as of the date first set forth above.

THE BOARD OF EDUCATION OF THE
CITY OF CHICAGO

By: _____

~~John Barker~~  Stacy Norris

~~Chief Accountability Officer.~~
Director of Data Analytics

THE UNIVERSITY OF CHICAGO

By: _____

Print Name: _____Michael R. Ludwig_____

Print Title: __Assoc. Vice President for Research Administration__

Date: _____3, 7, 16_____

Istvan Fekete
Assistant Director, Contracts Management
Acting on behalf of Michael R. Ludwig

Lab Director:

Crime Lab

Signature: _____

Print: Jens Ludwig

STATEMENT OF WORK #028

Amendment #3

RESEARCH PROPOSAL AMENDMENT FORM

MASTER AGREEMENT FOR RESEARCH SERVICES

THE UNIVERSITY OF CHICAGO, URBAN LABS - EDUCATION LAB

Name of Research Project:    2015 Chicago Design Competition: Reducing Youth Violence in Chicago –
Quiet Time Program Evaluation

CPS Research Project Manager: _____Sarah Dickson _____

Phone: 773- (773) 553 3828    E-Mail: _ skdickson@cps.edu

UNIVERSITY Research Project Manager: __Lydia Jessup_____

          Phone: __773-702-2854_____ E-Mail: _ljessup@uchicago.edu_____

Lab research will be conducted in: ___Crime Lab and Urban Education Lab_____

Period of Performance __September 2016_____ until __December 2020_____

University IRB number: ___ IRB 15-0980_____

CPS RRB number, if applicable: _____1122, 1236_____

This Amendment to Statement of Work #028, dated November 22, 2017, shall be conducted pursuant to the terms and conditions of the Master Agreement for Research Services ("**Agreement**") dated October 1, 2015 by and between The Board of Education of the City of Chicago (the "**BOARD**"), commonly known as the Chicago Public Schools ("**CPS**"), and The University of Chicago ("**University**"), on behalf of its Urban Labs. Defined terms used in this Statement of Work shall have the same meanings as those ascribed to such terms in the Agreement.

1. This Statement of Work shall be subject to the terms and conditions of the Agreement and all work and Research Services performed hereunder shall be conducted as described in the Research Services Proposal that was approved by the BOARD (the "**Approved Research Services Proposal**"). Note: If the above-named Research Services only involves the exchange of Confidential Information and does not require that UEL have contact with CPS students or CPS Staff, the signature of the BOARD'S Chief Performance Officer or his/her designee on this Statement of Work evidences the BOARD'S approval of the Research Services Proposal. If the Research Services Proposal was subject to the BOARD'S RRB process, a copy of the signed RRB approval letter for

BOE 002958

this Research Services Proposal must be attached to this Statement of Work to evidence the BOARD's approval of the Research Services Proposal.

**Check the applicable box:**

☒ This Research Services Proposal Amendment only involves the exchange of Confidential Information/Existing Secondary Data.

☐ This Research Services Proposal Amendment also involves primary research data collection and was subject to the RRB process.
- Attached hereto and incorporated herein by reference as <u>Attachment 2</u> is a copy of the RRB approval letter for the above-named Research Services.
- Attached hereto and incorporated herein as <u>Attachment 3</u> is a summary of the Approved Research Services Proposal. Such "Proposal Summary" is subject to the approval of the BOARD'S Chief Performance Officer or her designee.

2. Either party may request changes to this Statement of Work, but any such changes must be documented by a written amendment to this Statement of Work and must be signed by an authorized representative of each party hereto. In the case of the BOARD, any such amendment must be signed by the BOARD'S Chief Performance Officer or his/her designee, and if the underlying Research Services Proposal was subject to RRB approval, the BOARD will determine whether the Amendment to this Statement of Work requires additional RRB approval.

TEAM Englewood and Bogan high schools have also adopted the program and we would like to add them to this list. Finally, we would like to include data from the My School, My Voice survey as an additional data source to answer the research questions.

2. **Describe and list the existing CPS data sources that the _Crime and Ed___ Lab wishes to analyze. Indicate if this amendment asks for additional administrative data.**

We would like to request to analyze the results (all variable fields) of the My School, My Voice survey for the schools listed in the previous SOW protocols (also included below). We request all measure fields in order to get a complete and accurate picture of school climate in addition to classroom and student level changes. We request data on student and school level answers starting two years before the Quiet Time intervention (2013-2020) so that we can include an analysis of these data in our pilot analysis and in the RCT evaluation going forward. Analyzing data from two years before the start of Quiet Time in schools will allow us to look at changes in trends in addition to changes in levels of measures of school climate.

We hypothesize that the Quiet Time program could impact student behavior and academic performance, and this survey on school safety, climate and culture will help us build a more complete picture of how the Quiet Time program impacts school life outcomes for youth. School-level data would allow us to understand any changes that happen in wider school culture. Student-level data will help us measure differences between students who are randomly assigned to the meditation treatment group, or to the control group. Thanks to random assignment, we will be able to attribute any differences in responses to the Quiet Time program. We will check that response rates are similar across treatment groups to validate these analyses. We acknowledge that students transfer schools and that for 9th graders we will not have pre-intervention survey responses comparable at the high school level. We will mark where data are missing and take this into account in our analyses.

Below is the full list of schools from which we request these data. We are requesting the My Voice My School survey responses for schools in that list, so that we can explore whether there are differences in school culture overall between schools that had the Quiet Time program and schools that did not. We acknowledge the differences between schools that received Quiet Time and schools that did not, but this comparison will allow us to get a better picture of the survey responses and school climate at other schools that expressed interest in the QT program. The list is the same as the previous amendment with the exception of one additional school - we would like to request to add TEAM Englewood to this list in order to access the administrative data fields requested in previous SOWs in addition to the My Voice My School data.

My Voice My School Data Measures:
The analysis of the My Voice My School data will be exploratory and as such, we hope to be able to rule out measures that we do not think will be affected by Quiet Time. Using measures we think unlikely to be affected as a benchmark will help us better understand the changes in other more primary outcomes. In order to carry out this analysis, we request access to all the

BOE 002960

measures in the survey. This will allow us to look at measures we have hypothesized could be affected by Quiet Time (such as emotional health and academic engagement) and also measures that others may think would be affected, but we do not expect to change (such as parent supportiveness). We hypothesize that the main movement will be in perception of school safety and class disruption. We are requesting the school-level measures in order to assess changes in school climate and culture. The student level fields will help us understand how student behavior and perceptions have changed.

School list:
- Aldridge (ES)
- Amundsen
- Bogan
- Bowen
- Bronzeville
- Clemente
- CVCA
- Daniel Hale Williams
- Dunbar
- Fenger
- Gage Park
- Hancock
- Juarez
- Julian
- Kelvin Park
- Kennedy
- King College Prep
- Marshall
- North-Grand
- North Lawndale College Prep
- Sullivan
- TEAM Englewood
- Telpochcalli (ES)
- Tilden
- Washington

3. **Describe the analytic techniques to be employed to answer the Research Questions.**

Our analytic techniques will be the same as described in our previous SOW. These data from the My School, My Voice survey will be used in both the pilot analysis and randomized controlled trial evaluation.

4.  **Describe the data collection activities that __Crime and Ed___ Lab will employ and provide an approximate schedule for these activities to occur.**

Classroom observations and collection of stress measures (to get an accurate picture of student biological stress) have been approved by the RRB. Classroom observations will occur throughout the year and the stress measure sampling will occur in the spring of 2018 in the participating schools. This will not change the study timeline listed below. Please see the RRB (#1236) for a more a detailed timeline and description of activities.

5.  **Provide the (new) Research Study timeline, including the reporting and deliverable schedule.**

We are updating the timeline to reflect CPS data delivery schedules. Instead of September, the first year report will be delivered in January of the following year so that data from the school year delivered in October/November can be incorporated:

*   June 2017 – Quiet Time in year 1 study schools ends
*   August 2017– Preparation and planning for year 2 with schools and DLF
*   September 2017 – Quiet Time begins and student program orientation occurs
*   October 2017 – Randomization occurs and student TM training begins for treatment group
*   November 2017-June 2018– Program runs in three schools, ongoing participation and program fidelity monitoring and data collection through observations
*   December 2017 – First year analysis
*   **January 2018- Final year 1 report to CPS**
*   June 2018– End of school year check-in report to CPS
*   July-December 2018– Second year analysis
*   **January 2019 – Final Year 2 Report to CPS**

**[Signature page to follow]**

BOE 002962

Amendment #3

IN WITNESS WHEREOF, the parties hereto have caused this Statement of Work # _28_ to be executed by their duly authorized representatives as of the date first set forth above.

THE BOARD OF EDUCATION OF THE
CITY OF CHICAGO

By: _____

Jeff Broom, Director,
Department of School Quality
Measurement and Research

THE UNIVERSITY OF CHICAGO

By: _____

Print Name: ____ **Michael R. Ludwig**

Print Title: ____ Assoc. Vice President for Research Administra

Date: ____ 8/6/18

**Istvan Fekete**
**Assistant Director, Contracts Management**
**Acting on behalf of Michael R. Ludwig**

Lab Director:

Education Lab

Signature: _____

Print: Jens Ludwig

BOE 002964

**STATEMENT OF WORK #028**

**Amendment #4**

**RESEARCH PROPOSAL AMENDMENT FORM**

**MASTER AGREEMENT FOR RESEARCH SERVICES**

**THE UNIVERSITY OF CHICAGO, URBAN LABS - EDUCATION LAB**

Name of Research Project:   2015 Chicago Design Competition: Reducing Youth Violence in Chicago –
Quiet Time Program Evaluation

CPS Research Project Manager:   Sarah Dickson

Phone: 773- (773) 553 3828     E-Mail:  skdickson@cps.edu

UNIVERSITY Research Project Manager:   Jalisia Singleton

      Phone:   773-702-2854      E-Mail:   jalisia@uchicago.edu

Lab research will be conducted in:   Crime Lab and Urban Education Lab

Period of Performance   September 2016      until   July 2020

University IRB number:   IRB 15-0980

CPS RRB number, if applicable:   1122, 1236

This Amendment to Statement of Work #028, dated _____, shall be conducted pursuant to the terms and conditions of the Master Agreement for Research Services ("**Agreement**") dated October 1, 2015 by and between The Board of Education of the City of Chicago (the "**BOARD**"), commonly known as the Chicago Public Schools ("**CPS**"), and The University of Chicago ("**University**"), on behalf of its Urban Labs. Defined terms used in this Statement of Work shall have the same meanings as those ascribed to such terms in the Agreement.

1. This Statement of Work shall be subject to the terms and conditions of the Agreement and all work and Research Services performed hereunder shall be conducted as described in the Research Services Proposal that was approved by the BOARD (the "**Approved Research Services Proposal**"). Note: If the above-named Research Services only involves the exchange of Confidential Information and does not require that UEL have contact with CPS students or CPS Staff, the signature of the BOARD'S Chief Performance Officer or his/her designee on this Statement of Work evidences the BOARD'S approval of the Research Services Proposal. If the Research Services Proposal was subject to the BOARD'S RRB process, a copy of the signed RRB approval letter for

this Research Services Proposal must be attached to this Statement of Work to evidence the BOARD's approval of the Research Services Proposal.

**Check the applicable box:**

☒ This Research Services Proposal Amendment only involves the exchange of Confidential Information/Existing Secondary Data.

☐ This Research Services Proposal Amendment also involves primary research data collection and was subject to the RRB process.
- Attached hereto and incorporated herein by reference as <u>Attachment 2</u> is a copy of the RRB approval letter for the above-named Research Services.
- Attached hereto and incorporated herein as <u>Attachment 3</u> is a summary of the Approved Research Services Proposal. Such "Proposal Summary" is subject to the approval of the BOARD'S Chief Performance Officer or her designee.

2. Either party may request changes to this Statement of Work, but any such changes must be documented by a written amendment to this Statement of Work and must be signed by an authorized representative of each party hereto. In the case of the BOARD, any such amendment must be signed by the BOARD'S Chief Performance Officer or his/her designee, and if the underlying Research Services Proposal was subject to RRB approval, the BOARD will determine whether the Amendment to this Statement of Work requires additional RRB approval.

Attachment 3.

**RESEARCH SERVICES PROPOSAL AMENDMENT**

**Research Study Name:**   2015 Chicago Design Competition: Reducing Youth Violence in Chicago –
Quiet Time Program Pilot Evaluation

**to be conducted by**

**The Crime and Education Lab at the**

**UNIVERSITY OF CHICAGO**

**Instructions:**

➢ Please provide the information requested below.  The information provided should be
accurate and complete.

➢ Your amendment  must be approved, signed and dated by an authorized representative of
University of Chicago; and it must be approved, signed and dated by the BOARD'S
Chief Performance Officer or his/her designee to be valid.

➢ If this Research Study amendment involves more than obtaining Student Data, Staff Data,
and School Level Data directly from the Board, you must append a copy of the RRB
Approval Letter to this Research Services Proposal Amendment.

The Amended Statement of Work for this Research Study cannot be executed until this Research
Services Proposal Amendment has been signed by an authorized representative of University
and by the Chief Performance Officer of the Board or his/her designee.

1.     **Provide a brief summary of the initial proposed work and the Research Questions to
be addressed by the Amendment, if new.**

The research questions are the same as the SOW that was submitted originally for the pilot year
of the Quiet Time program and the two amendments submitted to extend the work to include the
two-year randomized controlled trial (RCT). In Amendment 2, we listed Bowen, Gage Park,
Daniel Hale Williams and Julian as the schools participating in the RCT evaluation of Quiet

BOE 002967

Time. TEAM Englewood and Bogan high schools have also adopted the program and we would like to add them to this list. In Amendment 3, we sought to include the My School, My Voice survey as an additional data source to the analysis.

In this amendment, we ask for CPS's approval to grant access to youth academic engagement outcome data covered by SOW 28 (and its amendments) to our research partners at Northwestern University. Northwestern has been involved in this effort from its inception (although staff have not required direct data access until now), and this data will enhance analyses concerning the Quiet Time Quiet Biology (QTQB) study in which the research team seeks to assess whether participation in the Quiet Time program leads to improved biological responses to stress. As proxies for stress measurement, the Northwestern research team, comprised of experts on stress and sleep, collected data on sleep and blood pressure outcomes during the spring semester of the 2017-2018 school year at Bogan HS, with approval from the CPS RRB. Linking to CPS data will offer greater insight into how the Quiet Time program and stress biology may be linked to key academic engagement indicators.

2. **Describe and list the existing CPS data sources that the _Crime and Ed___ Lab wishes to analyze. Indicate if this amendment asks for additional administrative data.**

We hypothesize that the Quiet Time program could impact student behavior, academic performance, and stress response by transforming youth's biological response to stress. In addition to student's Quiet Time study randomization status and randomization block, the CPS data that we propose to share with the Northwestern Quiet Time Quiet Biology team were previously approved for use in this study under to the original SOW 28 submission, and are as follows:

1. First and Last Name
2. SID
3. Gender
4. Birth Date
5. Ethnicity and Race Codes
6. Enrollment Status
7. Member Days
8. Attendance History
9. School Name and School ID
10. Home Address
11. Grade
12. IEP and Disability Indicator
13. Free or Reduced Lunch Status
14. Suspensions and Misconduct Incidents
15. GPA by Semester
16. Cumulative GPA
17. Standardized Test Scores

18. Exit / Leave Codes
19. Grades in all courses
20. Homeless/STLS Indicator
21. Number and Type of Disciplinary Infractions
22. Days of in and out of school suspensions
23. Expulsions
24. English Language Learner Status

All these data are routine, and no additional administrative data is requested at this time.

3.  **Describe the analytic techniques to be employed to answer the Research Questions.**

Our analytic techniques will be the same as described in our previous SOW for the Quiet Time evaluation. For the QTQB study, Northwestern researchers will be linking student-level data on key health outcomes that will shed light on youth's response to stress including sleep and blood pressure from data collection that was carried out in the Spring of semester of SY 2017-2018 (that operated under the approval of the RRB) to key CPS baseline data including demographics and grade level, in addition to key academic engagement outcomes. We intend to provide CPS with key updates as they become available on the insights from the research findings.

4.  **Describe the data collection activities that __Crime and Ed___ Lab will employ and provide an approximate schedule for these activities to occur.**

There are no changes to our data collection activities under this amendment. Collection of stress measures completed in the spring semester of SY 2017-2018 and our research partners at Northwestern University are working on preliminary analyses of this data which will be shared with CPS as they become available. Classroom observations (as detailed and approved in RRB #1236) began in the fall of SY 2016-2017, and will continue through June 2019. Additional qualitative work including student focus groups and teacher interviews will take place in the spring semester of SY 2018-2019 (also approved in RRB #1236).

5.  **Provide the (new) Research Study timeline, including the reporting and deliverable schedule.**

We are updating the timeline to reflect CPS data delivery schedules:

- June 2017 – Quiet Time in year 1 study schools ends
- August 2017– Preparation and planning for year 2 with schools and DLF
- September 2017 – Quiet Time begins and student program orientation occurs
- October 2017 – Randomization occurs and student TM training begins for treatment group
- November 2017-June 2018– Program runs in three schools, ongoing participation and program fidelity monitoring and data collection through observations
- December 2017 – First year analysis
- January 2018- Final year 1 report to CPS

BOE 002969

- June 2018– End of school year check-in report to CPS
- July-March 2019– Second year analysis
- Fall 2019 – Final Year 2 Report to CPS

**[Signature page to follow]**

BOE 002970

IN WITNESS WHEREOF, the parties hereto have caused this Amendment Statement of Work # 28 to be executed by their duly authorized representatives as of the date first set forth above.

THE BOARD OF EDUCATION OF THE CITY OF CHICAGO

By: _____

Jeff Broom, Director,
Department of School Quality
Measurement and Research

THE UNIVERSITY OF CHICAGO

By: _____

Print Name: _____ Michael R. Ludwig

Print Title: Assoc. Vice President for Research Administration

Date: _____

Lab Director:

Education Lab

Signature: _____

Print: Jens Ludwig

# Exhibit W

**UChicago**
**Urban Labs**          **Crime**
                        **Lab**

33 N. LaSalle St., Suite 1600
Chicago, IL 60602
urbanlabs.uchicago.edu



## MEMORANDUM

**To:**      **Stacy Norris, Chair, Research Review Board**
             **Chicago Public Schools, Office of Accountability**

**From:**    Kelly Hallberg, Ph.D., Scientific Director
             University of Chicago Crime Lab

**Subject:** RRB #1122

**Date:**    January 4, 2015

---

Thank you for your feedback on our proposal submission for the David Lynch Foundation Quiet Time Qualitative Program Evaluation (Project ID #1122). This memo is a follow-up to the RRB decision letter. Below are the RRB's questions and comments in bold followed by our responses:

**1. Provide additional clarity regarding the number of planned evaluations/frequency and the number of interviews anticipated. Also provide additional information regarding the number of focus groups and the number of individuals participating in the focus groups.**

Observations will occur bi-weekly at the beginning of the observation period starting in January 2016 and may be shifted to monthly towards the end of the school year. We will plan to conduct an interview with one to two administrators, at least one TM teacher, and at least two teachers at each school. We will plan to conduct two interviews per interviewee, one at the start of the semester and one at the end. We plan to hold one focus group per group of kids. Each group will have four to six participants. We will plan to do at least two focus groups at each school, one at the beginning of the semester and one at the end.

**2. Please provide information regarding when focus groups with students will occur (e.g. before or after school).**

Focus groups will occur after school with an incentive such as pizza.

**3. The committee would like to note that for some questions, participants may inadvertently disclose student names or other identifiable details. Please remind participants not to use student names or identifiable details prior to asking them questions: CPS teacher interview protocol question 11 and CPS administrator interview question 16.**

A new version of the interview template is attached.

**DLF Quiet Time Program**

**TM Teacher Interview Protocol**

Greeting and Introduction

Reminder: When answering these questions, please do not use student names or identifiable details.

*Background*

1. How long have you been a TM teacher?

2. Have you taught TM in schools before? Which ones?

3. In which schools in Chicago do you help teach TM? Is this program at this/these school(s) implemented differently than other programs you have been involved with? If yes, how is it different?

4. What is the setting in which you usually teach TM?

*Program Implementation*

5. Describe your typical day working in the school.

6. How were you selected to teach TM at these schools? Briefly describe the process.

7. Describe your relationship with the teachers you assist in implementing TM and Quiet Time. How would you describe your relationship with the students?

8. Are there any specific practices you have implemented in the classroom to encourage students to meditate or participate in QT more generally?

9. Have you experienced any instances of student resistance to participating in TM or Quiet Time? How have you responded to these moments?

10. Have you done anything differently in the way you teach TM since teaching students TM at these schools?

11. Could you describe the level of student participation in the Quiet Time program? Do most students participate? Based on your observations, how would you describe your students' interest in participating in the Quiet Time program?

1

*School Culture*

12. Have you noticed any changes in school culture in any of the schools after implementing the TM/Quiet Time program? Which ones? How would you describe the change?

13. Have you received any feedback from parents about the Quiet Time program? How would you describe the nature of these conversations?

14. Those are all the questions we have prepared. Is there anything else you would like to share with us?

Thank you for taking the time to share your thoughts.

2

UNIVERSITY_000166

**DLF Quiet Time Program**

**Teacher Interview Protocol**

Greeting and Introduction

Reminder: When answering these questions, please do not use student names or identifiable details.

*Teacher Background*

1.  How long have you been teaching? Probe for subject and grade if not mentioned.

2.  How long have you been teaching at this school?

3.  What courses do you teach at this school? Which of those courses include Quiet Time?

4.  Prior to the implementation of this program, had you heard about TM or meditation? If so, how did you perceive these practices?

*Program Implementation*

5.  What were your reactions when you heard that the Quiet Time program would be delivered at your school?

6.  What type of training and support did you receive prior to implementing Quiet Time in your classrooms?

    a.  What types of on-going training and support are provided to you?

7.  Have you personally tried TM? What did you think of it? Do you currently meditate? If so, how often?

    a.  Has this experience impacted how you understand or implement the program?

8.  Could you describe the role of the TM staff in your classroom according to your observations?

    a.  How would you describe your relationship with them? How would you describe their relationship with your students?

3

9.    Could you describe the level of student participation in the Quiet Time program? Do most students participate? Based on your observations, how would you describe your students' interest in participating in the Quiet Time program?

10.   Have you used any techniques to encourage students to participate in Quiet Time or TM specifically? How have the students responded to these techniques? What would you say are the most impactful strategies a teacher can use to encourage students to meditate?

11.   Before I ask this next question, I would like to remind you to please refrain from using student names or identifiable details in your answer. Have you noticed a difference in the classroom climate or your students between those that meditate and those that don't?

*Impact on School Culture*

12.   Have you observed any changes in how students learn?

13.   Have you observed any changes in student engagement (e.g. attendance, misconduct)?

14.   Have you noticed any changes in school culture after adopting the Quiet Time program?

15.   Do you think that the parents of your students view your school differently after adopting the Quiet Time program into your school? If so, what have you heard or observed? Has feedback from parents changed since the program was introduced?

Program Strengths

16.   How do you think the Quiet Time program fits into your school given the mission, culture and procedures that are currently in place?

17.   How would you describe the experience of leading Quiet Time program in your classrooms? What additional resources or support are needed in order facilitate better implementation?

18.   What advice would you give to teachers at schools that are thinking about starting the Quiet Time program?

19.   Those are all the questions we have prepared. Is there anything else you would like to share with us?

Thank you for taking the time to share your thoughts.

4

UNIVERSITY_000168

**DLF Quiet Time Program**

**Principal and Administrator Interview Protocol**

Greeting and Introduction

Reminder: When answering these questions, please do not use student names or identifiable details.

*Program Implementation*

1. Could you briefly describe the process for adopting the Quiet Time program at your school?

    a. Who was involved in the decision making process?

2. What were your initial expectations for the Quiet Time program? How have they changed since the program has been implemented?

3. Have you tried TM? What did you think of it? Has this experience impacted how you understand or have implemented the program? Do you currently mediate? If so, how often?

4. How were teachers identified to implement Quiet Time TM in their classrooms? What has been your experience getting these teachers on board?

    a. What kind of feedback has staff involved in the program provided?

    b. What kind of feedback has staff not involved in the program provided?

5. Have you ever attempted to implement similar interventions in this school since you have been principal? How would you say this program compares?

6. Have you experienced any challenges to implementation?

*Impact on Teacher Instructional Practice*

7. Are there any specific practices that teachers are implementing in the classroom to drive students to meditate in the Quiet Time program?

8. Have you observed any changes in teacher-student interactions since the introduction of the Quiet Time Program? How have things changed?

9. Have you noticed any differences or changes between the teachers who practice TM and those that don't?

5

10. How would you describe the role of the TM teachers and support staff?

    a. How have they fulfilled that role in your opinion?

11. What is your relationship to the TM staff? How would you describe the relationship of the TM teachers and your teachers? The relationship between TM teachers and students?

*Impact on School Culture*

12. How would you describe the interest of students and teachers to participate in the Quiet Time program and in TM specifically?

13. Have you noticed any changes in school culture after adopting the Quiet Time program?

14. Have you observed any changes in how students learn?

15. Have you observed any changes in student engagement (e.g. attendance, misconduct)?

16. Before I ask this next question, I would like to remind you to please refrain from using student names or identifiable details in your answer. Have you noticed any difference in behavior between the students who are assigned to Quiet Time TM periods and those who are not? How does behavior differ?

17. Do you think that parents or community partners view your school differently after adopting the Quiet Time program into your school? If so, what have you heard or observed?

*Program Strengths*

18. How do you think the Quiet Time program fits in your school given the school culture and procedures that are already in place?

19. What additional resources or support are needed in order to facilitate better implementation?

20. What advice would you give to schools that are thinking about starting the Quiet Time program? What would you say have been the most effective strategies in implementing Quiet Time in your school?

21. Those are all the questions we have prepared. Is there anything else you would like to share with us?


Thank you for taking the time to share your thoughts.

6

# Exhibit X



**Rosenberg, Christina <crosenberg@cps.edu>**

## Fwd: TM/Quiet Time
1 message

**Aziz-Sims, Alahrie** <aaaziz@cps.edu>                                    Mon, Nov 15, 2021 at 6:33 PM
To: "Rosenberg, Christina " <crosenberg@cps.edu>, Kaitlin Salisbury <ktsalisbury@cps.edu>, "Barton, Elizabeth"
<ekbarton@cps.edu>


---------- Forwarded message ---------
From: **Chris Busch** <chris@davidlynchfoundation.org>
Date: Wed, May 24, 2017 at 10:12 PM
Subject: TM/Quiet Time
To: Aziz-Sims, Alahrie <aaaziz@cps.edu>



Thanks for the encouraging news....I will sleep soundly tonight....



**From:** Aziz-Sims, Alahrie [mailto:aaaziz@cps.edu]
**Sent:** Wednesday, May 24, 2017 10:08 PM
**To:** Chris Busch <chris@davidlynchfoundation.org>
**Cc:** Sharon Dixon <sddixon@cps.edu>; Margaret Loranger <mmloranger@cps.edu>; Julia Busch
<julia@davidlynchfoundation.org>
**Subject:** Re: TM/Quiet Time


Thank you!


Our Union leadership is pretty confident the vote will go through without any issues.


The vote will be officially next Friday (we had to move it back due to the administration completing some year end
activities).


Looking forward to seeing you again and getting our teachers started.


On Wed, May 24, 2017 at 9:59 PM, Chris Busch <chris@davidlynchfoundation.org> wrote:

Dear Bogan Leadership,

BOE 002320

We will be eager to hear the good news following the bell schedule vote for 2017-2018. John Wolf was to send you sample bell schedules that incorporate the Quiet Time program into the school day.

We also wanted to make sure you have the attached letter from Alan Mather of CPS' Office of College and Career Success, stating that Quiet Time has been classified as "instructional time".

Two of the three schools we're currently in, Gage Park High and Williams Prep Academy, have had their bell votes and unanimously voted to have the Quiet Time program return for the next school year.

We look forward to an opportunity to address the faculty at-large, to acquaint them more thoroughly with the program and invite any who wish to learn TM to enjoy the training.

We look forward to working with the students and staff of Bogan.


Chris and Julia


--

Alahrie Aziz-Sims

Principal, William J. Bogan High School

3939 W 79th St.

(773) 535-2180


Experience the Bengal "B.I.T.E." - Bengals Integrating Technology into Education - visit boganhs.org.
FOLLOW US: BoganBengal79@Twitter, Facebook, Instagram, or Tumblr.  FOLLOW ME: @Aziz-Sims.


ATTENTION: PRIVILEGED AND CONFIDENTIAL COMMUNICATION - This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail (or the person responsible for delivering this document to the intended recipient), you are hereby notified that any dissemination, distribution, printing or copying of this e-mail, and any attachment thereto, is strictly prohibited. If you have received this e-mail in error, please respond to the individual sending the message, and permanently delete the original and any copy of any e-mail and printout thereof.


--
Alahrie Aziz-Sims
Principal, William J. Bogan High School
3939 W 79th St.
(773) 535-2180

BOE 002321

# Exhibit Y

| Date: | Wednesday, September 23 2015 11:12 PM |
|---|---|
| Subject: | David Lynch Documentary - Meditation, Creativity, Peace |
| From: | Julia Busch <julia@davidlynchfoundation.org> |
| To: | John Wolf <wolfj@uchicago.edu>; Lydia Jessup <ljessup@uchicago.edu>; Chelsea Hanlock <chanlock@uchicago.edu>; |
| CC: | 'Chris Busch' <chris@davidlynchfoundation.org>; |
| Attachments: | Meditation Screening Poster.pdf |

Hi John, Lydia and Chelsea,

We'd like to schedule a brief "check-in" and meditate together, answer any questions, etc. This is recommended a few weeks after completing the TM training. Would you all be available Saturday October 3rd?

Also, wanted to give you a heads up about the film screening of David Lynch's documentary about his 16 country tour in Europe a few years ago. It is a real art piece and a very interesting look at TM, from the artist's perspective. The film is being hosted by the School of the Art Institute of Chicago at 11:30 am on Saturday, Oct. 3rd.
We could do the TM check-in at the TM Center before or after the screening.

Let us know if this works.

Julia

UNIVERSITY_004349

# Exhibit Z

**DLF Quiet Time Observation Rubric**

School:_____ Date:_____ Day of the Week:_____

Period:_____ Time Observed: Start_____ End_____ Room # & Type:_____

Number of students present at start of meditation:_____ At end of meditation:_____

Observer Name:_____

*Mark Yes or No*

TM teacher leading QT_____ Regular classroom teacher leading QT_____

TM Leader clearly states the expectations of QT for the Students _____

| Transition into Quiet-Time | | | | | | |
|---|---|---|---|---|---|---|
| Describe how TM teacher or supervisor of QT begins Quiet-time | | | | | | |
| Time it takes for students to begin Quiet-time (mediation or other approved activity) | About 1 min. (along with first bell) | About 3 mins. (slight disorg during trans.) | About 5 mins. (lots of disorg during trans.) | About 10 mins. (loss of control) | About 15 mins. (Quiet-time period never begins) | |
| Behavior during Quiet-Time | | | | | | |
| Room is quiet during Quiet-Time Period | No (Students talk/make noise all throughout Quiet-time) | | 25% of time | 50% of time | 75% of time | 90%-entire period |
| Teacher is observing students during Quiet-Time and modeling expected Quiet-Time behavior | No (Teacher does other activities during QT) | | 25% of time | 50% of time | 75% of time | 90%-entire period |
| Proportion of students facing forward in the same direction at their desk | None | Single individual | ~ 25% | ~ 50% | ~ 75% | 90%+/All |
| Proportion of students with desks, hands, and mouth clear | None | Single individual | ~ 25% | ~ 50% | ~ 75% | 90%+/All |
| Proportion of students actively meditating (eyes closed, sitting up, not interacting with other students) | None | Single individual | ~ 25% | ~ 50% | ~ 75% | 90%+/All |
| Proportion of students participating in approved other Quiet-time activity (quiet reading, etc.) | None | Single individual | ~ 25% | ~ 50% | ~ 75% | 90%+/All |
| Describe if and how students transition into other activities throughout Quiet-Time and the activities that students choose to do if they are not meditating | | | | | | |
| Reactions to Quiet-Time | | | | | | |
| Students or teachers encourage or discourage students to participate before or during Quiet-Time | None | Single instance | 2-3 instances | | 4-5 instances | 6+ |
| Describe any instances of student or teacher to student encouragement or discouragement | | | | | | |

UNIVERSITY_000185

# Exhibit AA

| | |
|---|---|
| **Date:** | Wednesday, September 30 2015 12:03 PM |
| **Subject:** | FW: Edited Rubrics for review tomorrow |
| **From:** | Julia Busch <julia@davidlynchfoundation.org> |
| **To:** | Chelsea Hanlock <chanlock@uchicago.edu>; |
| **CC:** | Lydia Jessup <ljessup@uchicago.edu>; John Wolf <wolfj@uchicago.edu>; Aurelie Ouss <aouss@uchicago.edu>; 'Chris Busch' <chris@davidlynchfoundation.org>; Jamie Grant <jamie@davidlynchfoundation.org>; |
| **Attachments:** | TM teacher Interview Guide Update 9-22-15.docx; Teacher Interview Guide Update 9-22-15.docx; Principal and Administrator Interview Guide Updated 9-22-15 (2).docx; DLF Student Focus Group Questions Update.docx; DLF Quiet Time Observation Rubric Update 9-22-15.docx |

Ccing Chelsea too!

**From:** Jamie Grant [mailto:jamie@davidlynchfoundation.org]
**Sent:** Wednesday, September 30, 2015 11:36 AM
**To:** ljessup@uchicago.edu; aouss@uchicago.edu
**Cc:** wolfj@uchicago.edu; Chris Busch <chris@davidlynchfoundation.org>; Julia Busch <julia@davidlynchfoundation.org>
**Subject:** Edited Rubrics for review tomorrow

Dear Aurelie, Lydia, and John:

Please find the rubrics you sent attached with edits. We look forward to going over these with you tomorrow. We were impressed with the care and attention that went into preparing them.

All the best,

Jamie

James Grant, Ed.D.
National Director of Programs
David Lynch Foundation
216 E. 45th Street
Suite 1301
New York, NY 10017
www.davidlynchfoundation.org
Office: 212-644-9880
Mobile: 831-325-7637

CONFIDENTIAL

**DLF Quiet Time Observation Rubric**

School:_____ Date:_____ Day of the Week:_____

Period:_____ Time Observed: Start_____ End_____ Room # & Type:_____

Number of students present at start of meditation:_____ At end of meditation:_____

Observer Name:_____

Mark Yes or No

TM teacher leading QT_____ Regular classroom teacher leading QT_____

| Transition into Quiet-Time | | | | | | | |
|---|---|---|---|---|---|---|---|
| Describe how TM teacher or supervisor of QT begins Quiet-time | | | | | | | |
| Time it takes for students to begin meditation XXXXX | About 2 min. | About 4 mins. (slight disorg during trans.) | About 5 mins. (lots of disorg during trans.) | About 10 mins. (loss of control) | About 15 mins. (Quiet-time period never begins) | | **Deleted:** 1  **Deleted:** 3  **Deleted:** Quiet-time  **Deleted:** (along with first bell) |
| Behavior during Quiet-Time | | | | | | | |
| Room is quiet during Quiet-Time Period | No (Students talk/make noise all throughout Quiet-time) | | 25% of time | 50% of time | 75% of time | 90%-entire period | |
| Teacher is observing students during Quiet-Time and modeling expected Quiet-Time behavior | No (Teacher does other activities during QT) | | 25% of time | 50% of time | 75% of time | 90%-entire period | **Deleted:** attentively |
| Proportion of students facing forward in the same direction at their desk | None | Single individual | ~25% | ~50% | ~75% | 90%+/All | |
| Proportion of students with desks, hands, and mouth clear | None | Single individual | ~25% | ~50% | ~75% | 90%+/All | **Deleted:** and |
| Proportion of meditators actively meditating (eyes closed, sitting up, not interacting with other students) | None | Single individual | ~25% | ~50% | ~75% | 90%+/All | **Deleted:** group  **Deleted:** engaged in Quiet-time TM |
| Proportion of students who haven't learned to meditate participating in approved other Quiet-time activity (quiet reading, etc., not interacting with other students) | None | Single individual | ~25% | ~50% | ~75% | 90%+/All | **Deleted:** group |
| Reactions to Quiet-Time | | | | | | | |
| Not expected behavior | None | Single instance | 2-3 instances | | 4-5 instances | 6+ | **Deleted:** Students encourage other students to participate before and or during Quiet-Time |
| Describe any instances of student to student encouragement | | | | | | | |

1

UNIVERSITY_004126

| | | | | | |
|---|---|---|---|---|---|
| Teacher or TM supervisor encourages students to meditate before and or during (silently) Quiet-time | None | Single instance | 2-3 instances | 4-5 instances | 6+ |
| Describe any instances of teacher to student encouragement | | | | | |
| Students discourage other students from participating before and or during Quiet-Time | None | Single instance | 2-3 instances | 4-5 instances | 6+ |
| Describe any student to student discouragement | | | | | |
| Teacher or TM supervisor discourages other students from participating before and or during  Quiet-Time | None | Single instance | 2-3 instances | 4-5 instances | 6+ |
| Describe any teacher to student discouragement | | | | | |
| Disruptions | | | | | |
| Tally number of substantial disruptions during the Quiet-Time period | | | | | |
| Describe any student disruptions during Quiet-time period. | | | | | |
| Describe any disruptions from outside of the classroom during Quiet-time. | | | | | |
| Describe how disruptions are addressed | | | | | |

**Deleted:** participate

2

UNIVERSITY_004127

| Proportion of students addressed by the instructor for causing disruptions during Quiet-Time | None | Single individual | ~ 25% | ~ 50% | ~ 75% | 90%+/All |
|---|---|---|---|---|---|---|
| Tally number of students entering or exiting the classroom during the Quiet-Time Period | | | | | | |
| Proportion of students who resume Quiet-Time after a disruption | None | Single individual | ~ 25% | ~ 50% | ~ 75% | 90%+/All |
| Transition out of Quiet-Time | | | | | | |
| Describe how TM teacher or supervisor of QT closes the group (or N/A). Does teacher give feedback to the group on Quiet Time performance? | | | | | | |
| Time it takes for students to transition out of Quiet-time | About 1 min, after meditation | About 3 mins. (slight disorg during trans.) | About 5 mins. (lots of disorg during trans.) | About 10 mins. (loss of control). | | |

**Deleted:** . (along with first bell)

Classroom Physical Setting: *Mark Yes or No*

\_\_\_\_\_ Door is Closed        _____ Room provides adequate privacy        \_\_\_\_\_ Lights are off or low

\_\_\_\_\_Temperature in the room is comfortable        \_\_\_\_\_No students are using electronic devices

\_\_\_\_\_No students are eating or chewing gum        \_\_\_\_\_Classroom procedures are followed

\_\_\_\_\_Students respect Quiet-Time        \_\_\_\_Teachers respect Quiet-Time_____ Halls are quiet

Notes about **school climate** (security, students, hallways, interactions, décor, physical structure) observed going to/from observation:

**Any other notes:**

3

UNIVERSITY_004128

**DLF Quiet-Time Program**

**TM Teacher Interview Protocol**

Greeting and Introduction

*Background*

1. How long have you been a TM teacher?

2. Have you taught TM in schools before? Which ones?

3. In which schools in Chicago do you help teach TM? Is this program at this/these school(s) Jimplemented differently than other programs you have been involved with? If yes, how is it different?

| Deleted: |
|----------|
| Deleted: |

4. What is the setting in which you usually teach TM?

UNIVERSITY_004108

*Program Implementation*

5. Describe your typical day working in the school.

6. How were you selected to teach TM at these schools? Briefly describe the process.

7. Describe your relationship with the teachers you assist in implementing TM and Quiet-Time. How would you describe your relationship with the students?

8. Are there any specific practices you have implemented in the classroom to encourage students to meditate?

> **Deleted:** drive students to participate in Quiet-Time

9. Have you experienced any instances of student resistance to participating in TM or Quiet-Time. How have you responded to these moments?

CONFIDENTIAL

10. Have you done anything differently in the way you teach TM since teaching students TM at these schools?

11. Could you describe the level of student participation in the Quiet-Time program? Do most students meditate? Based on your observations, how would you describe your students' interest in participating in the Quiet-Time program

> **Deleted:** participate
>
> **Commented [JG1]:** ? Note: All students must participate in QT. It is a school-wide program. Meditation is the option.
>
> **Deleted:** ?

*School Culture*

12. Have you noticed any changes in school culture in any of the schools after implementing the TM/Quiet-Time program? Which ones? How would you describe the change?

> **Deleted:** and

13. Have you received any feedback from parents about the Quiet-Time program? How would you describe the nature of these conversations?

UNIVERSITY_004110

14. Those are all the questions we have prepared. Is there anything else you would like to share with us?

Thank you for taking the time to share your thoughts with us!

CONFIDENTIAL

UNIVERSITY_004111

**DLF Quiet-Time Program**

**Teacher Interview Protocol**

Greeting and Introduction

*Teacher Background*

1. How long have you been teaching? Probe for subject and grade if not mentioned.

2. How long have you been teaching at this school?

3. What courses do you teach at this school? Which of those courses include Quiet-Time?

4. Prior to the implementation of this program, had you heard about TM or meditation? If so, how did you perceive these practices?

> **Deleted:** mediation

*Program Implementation*

UNIVERSITY_004112

5. What were your reactions when you heard that the Quiet-Time program would be delivered at your school?

6. What type of training and support did you receive prior to implementing Quiet-Time in your classrooms?

   a. What types of on-going training and support are provided to you?

7. Have you personally tried TM? What did you think of it? Do you currently meditate? If so, how often?

Deleted: ¶

   a. Have you experienced personal benefits from the program? If so, what?

Formatted: Normal, No bullets or numbering

   b. Has this experience impacted how you understand or implement the program?

Deleted: ¶

Deleted: ¶

8. Could you describe the role of the TM staff in your classroom according to your observations?

UNIVERSITY_004113

    a.   How would you describe your relationship with them?  How would you describe their relationship with your students?

9.    Could you describe the level of student participation in the Quiet-Time program? Do most students meditate? Based on your observations, how would you describe your students' interest in participating in the Quiet-Time program?

<div style="float:right; border:1px solid #000; padding:2px;">**Deleted:** participate</div>

10.   Have you used any techniques to encourage students to participate in Quiet-Time or TM specifically? How have the students responded to these techniques?  What would you say are the most impactful strategies a teacher can use to encourage students to meditate?

11.   Have you noticed a difference in the classroom climate or your students between those that meditate and those that don't?

<div style="border:1px solid #000; padding:2px;">**Formatted:** List Paragraph, Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.25" + Indent at: 0.75"</div>
<div style="border:1px solid #000; padding:2px;">**Deleted:** have a Quiet-Time period and those that don't? ¶</div>

*Impact on School Culture*

12.   Have you observed any changes in how students learn?

UNIVERSITY_004114

13. Have you observed any changes in student engagement? (e.g., attendance, misconduct)?

14. Have you noticed any changes in school culture after adopting the Quiet-Time program?

15. Do you think that the parents of your students view your school differently after adopting the Quiet-Time program into your school? If so, what have you heard or observed? Has feedback from parents changed since the program was introduced?

Program Strengths

16. How do you think the Quiet-Time program fits into your school given the mission, culture and procedures that are currently in place?

17. How would you describe the experience of leading Quiet Time program in your classrooms? What additional resources or support are needed in order facilitate better implementation?

CONFIDENTIAL

18. What advice would you give to teachers at schools that are thinking about starting the Quiet-Time program?

19. Those are all the questions we have prepared. Is there anything else you would like to share with us?

Thank you for taking the time to share your thoughts.

UNIVERSITY_004116

**DLF Quiet-Time Program**

**Principal and Administrator Interview Protocol**

Greeting and Introduction

*Program Implementation*

1. Could you briefly describe the process for adopting the Quiet-Time program at your school?

   Probes:
   a. Who was involved in the decision making process?

2. What were your initial expectations for the Quiet-Time program? How have they changed since the program has been implemented?

3. Have you tried TM? What did you think of it? Has this experience impacted how you understand or have implemented the program? Do you currently mediate? If so, how often? | **Deleted:** to

UNIVERSITY_004117

4. How were teachers identified to implement Quiet-Time TM in their classrooms? What has been your experience getting these teachers on board?

    a. (Probe if not answered above) What kind of feedback have staff involved in the program provided?

    b. (Probe if not answered above) What kind of feedback have staff not involved in the program provided?

5. Have you ever attempted to implement similar interventions in this school since you have been principal? How would you say this program compares?

UNIVERSITY_004118

6. Have you experienced any challenges to implementation?

Impact on Teacher Instructional Practice

7. Are there any specific practices that teachers are implementing in the classroom to drive students to meditate in the Quiet-Time program?

> **Deleted:** participate

8. Have you observed any changes in teacher-student interactions since the introduction of the Quiet-Time Program? How have things changed?

> **Deleted:** instructional practices

9. Have you noticed any differences or changes between the teachers who practice TM and those that don't?

> **Deleted:** teach

10. How would you describe the role of the TM teachers and support staff?

UNIVERSITY_004119

a. How have they fulfilled that role in your opinion?

11. What is your relationship to the TM staff? How would you describe the relationship of the TM teachers and your teachers? The relationship between TM teachers and students?

*Impact on School Culture*

12. How would you describe the interest of students and teachers to participate in the Quiet-Time program and in TM specifically?

13. Have you noticed any changes in school culture after adopting the Quiet-Time program?

14. Have you observed any changes in how students learn?

CONFIDENTIAL

15. Have you observed any changes in student engagement (e.g., attendance, misconduct)?

16. Have you noticed any difference in behavior between the students who are assigned to Quiet-Time TM periods and those who are not? How does behavior differ?

17. Do you think that parents or community partners view your school differently after adopting the Quiet-Time program into your school? If so, what have you heard or observed?

*Program Strengths*

18. How do you think the Quiet-Time program fits in your school given the school culture and procedures that are already in place?

CONFIDENTIAL

UNIVERSITY_004121

19. What additional resources or support are needed in order to facilitate better implementation?

20. What advice would you give to schools that are thinking about starting the Quiet-Time program? What would you say have been the most effective strategies in implementing Quiet-Time in your school?

21. Those are all the questions we have prepared. Is there anything else you would like to share with us?

Thank you for taking the time to share your thoughts.

UNIVERSITY_004122

**DLF Student Focus Group Questions**

Ideally held with a group of 4-6 students.

Greeting and introduction.

Explain reason for meeting and encourage everyone to share their thoughts, both negative and positive about the program and their experience. Encourage students to speak one at a time and respect the responses of other participants. Let students know their responses will be recorded.

Before the Quiet Time program was introduced to your school, had you ever heard of meditation? Did you know what it was? What did you think of meditation?

When you first learned that you were going to learn TM and practice it during the school day, what was your reaction?

What do you think of the Quiet-Time and TM program now that it has been in your school for a while?

CONFIDENTIAL

UNIVERSITY_004123

Think back to the first days after learning TM. How did you feel after learning to meditate?

During the Quiet-Time period, do you usually meditate, or do you participate in other activities?

**Commented [JG1]:** Meditation isn't supposed to be a choice. If one has learned, the expectation is that one should meditate

**Deleted:** choose to

**Formatted:** Highlight

For those of you who choose not to meditate during Quiet-Time, why do you want to do other activities during the period? If you don't meditate in QT, why is this?

For those of you who have been meditating regularly, do you find the practice easy and comfortable? Has your view of TM changed since you learned?

**Deleted:**

**Deleted:** can you describe your experience meditating

**Deleted:** Has your experience meditating changed in any way since you first learned? Do you feel differently about

Have you noticed any changes in yourself since learning TM?

CONFIDENTIAL

UNIVERSITY_004124

If you had friends or classmates who knew nothing about Quiet Time, what would you tell them about the program?  Would you encourage them to meditate?  Why or why not?

Why do you meditate in Quiet Time? What are the things that motivate you most to meditate?

**Formatted:** Font: Not Bold

UNIVERSITY_004125

# Exhibit BB



42 W. Madison | 2ⁿᵈ Floor | Chicago, IL 60602
Telephone: (773) 553-4444
Fax: (773) 553-2421

January 27, 2017

Lydia Jessup
University of Chicago
33 N LaSalle St. | Suite 1600
Chicago, IL 60602-

Dear Ms. Jessup,

Thank you for your interest in conducting research in The Chicago Public Schools.  The Research Review Board has reviewed your proposal for research, titled: David Lynch Foundation Quiet Time Qualitative Program Evaluation.

The Research Review Board has completed the review of your proposal and has either identified changes which would need to be made to your proposal and/or materials, or has questions or needs clarification in regard to your proposal. Should you seek to resubmit, these are the issues which would need to be addressed:

1. Active parental consent is required for observations that are focused on students and student behavior. Please clarify what the observations will entail, and if the purpose of the observations is to observe students and student behavior, please provide a parental consent form.
2. Please provide a notification letter for parents, informing them about the implementation observations.
3. The teacher logs that teachers are asked to keep seem burdensome to the teacher; additionally, there are concerns that the logs would not be anonymous. We also do not prefer CPS staff to be participants in research activities; please either justify teacher activities, or amend the tasks.
4. A background check will be necessary for any research members conducting classroom observations.  Please note, the background check process for CPS has changed.  Given that the review committee has determined a background check is necessary, impacted study members would follow this link and enter the appropriate information to start the process:

   http://tinyurl.com/CPSResearchBackgroundCheck

If you decide to resubmit in accordance with the feedback provided above, please submit relevant documents by mail or email to our office.  Submitted materials will be reviewed on a rolling basis (you do not need to wait for the next deadline date).

Please note that your study has been assigned Project ID #1236. If you have any questions, please contact our office by email at research@cps.edu.

Sincerely,

Sarah Dickson

Sarah Dickson
Co-Chair, Research Review Board

UNIVERSITY_000207

# Exhibit CC



Dear Parent or Guardian,

We are pleased to inform you that for the 2019-2020 school year, Bogan High School is continuing the "Quiet Time" program to students in 9th through 12th grades.

This program builds two 15-minute periods of quiet into each school day to help students re-set and get ready to learn.

Quiet Time has been at Bogan High School as part of a large-scale research project led by the University of Chicago. This research seeks to confirm whether Quiet Time can positively impact areas such as graduation rates, standardized test scores, attendance, negative behaviors, student anxiety and trauma-induced stress, as well as teacher burn-out.

Preliminary results show a substantial reduction in misconduct incidents and violent and aggressive behaviors, as well as improvements in physical health.

Students are given the opportunity to learn Transcendental Meditation© (TM), which they can choose to practice during assigned Quiet Time periods. TM is non-religious and research has shown that it helps students reduce stress and improve learning readiness.

Learning and practicing meditation during Quiet Time is voluntary. Students will be trained by TM instructors and Quiet Time periods will be supervised by their regular classroom teachers. Students who do not learn to meditate will participate in another appropriate quiet activity.

**If you wish for your child to enjoy the benefits of the meditation practice there is nothing more you need to do. Please only return the attached form if you do not wish for your child to participate in TM. There is no cost to you for your child's participation.**

We are very pleased to have this program at our school. If you have any questions in the meantime, please call me at school.

Sincerely Yours,


Alahrie Aziz-Sims
Principal

BOE 000942