**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KAYA HUDGINS, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 23-cv-218 |
| | ) | |
| BOARD OF EDUCATION FOR | ) | Re-Assigned to: |
| THE CITY OF CHICAGO, et al., | ) | Honorable Judge Matthew F. Kennelly |
| | ) | |
| *Defendants.* | ) | |

**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
FOR THE STUDENTS OF THE CHICAGO PUBLIC SCHOOLS
WHO ATTENDED THE QUIET TIME PROGRAM**

Table of Contents

PROCEDURAL BACKGROUND ........................................................................................ 1

INTRODUCTION ................................................................................................................ 1

ARGUMENT: THE PROPOSED CLASS FULFILLS ALL PREREQUISITES FOR
CERTIFICATION ............................................................................................................... 3

    I.      Principles applicable to class certification. ...........................................................3

    II.    The requirements of Rule 23(a) and both 23(b)(1) and 23(b)(3) are satisfied. ...........................4

        A.     Numerosity – Federal Rule of Civil Procedure 23(a)(1). .............................................................4

        B.     Commonality – Rule 23(a)(2). .......................................................................................................5

            a.     Quiet Time Non-Meditators Should Be Part of the Class ..................................................8

        C.     Typicality – Rule 23(a)(3). ...........................................................................................................10

            b.     Students subjected to wrongful conduct to which they were unable to consent. ...............11

            c.     Students were denied parental protection. ........................................................................11

            d.     Students were denied CPS in loco parentis protection. ......................................................12

            e.     The young people were deceived by the Defendants. ........................................................12

            f.     The Quiet Time Program created humiliation, guilt, confusion and fear .............................13

            g.     Coercion and Incentives......................................................................................................13

            h.     The students were conditioned to continue Transcendental Meditation beyond school and for years
                 to come. .............................................................................................................................14

            i.     Deprivation of Education .....................................................................................................14

            j.     Illinois Constitutional and Illinois Religious Freedom Restoration Act damages. ..............15

        D.     Adequacy of Representation – Rule 23(a)(4). ...............................................................................16

    III.   Having satisfied the requirements of Rule 23(a)(1), (2), (3) and (4). Plaintiffs argue that both
    23(b)(1)(A) and 23(b)(1)(3) are satisfied ...........................................................................17

        E.     23(b)(1) Risk of Inconsistent Adjudication ..................................................................................17

        F.     Predominance and Superiority – Federal Rule of Civil Procedure 23(b)(3). ...............................17

    CONCLUSION ................................................................................................................... 19

Plaintiff KAYA HUDGINS, by her attorneys, Mauck & Baker, LLC, under Fed R. Civ. P. 23(a), 23(b)(1), and 23(b)(3), respectfully requests this Court, pursuant to Fed. R. Civ. P. 23(c)(1), grant this Motion for Class Certification for certain students of the Chicago Public Schools. In support, Plaintiff avers:

## PROCEDURAL BACKGROUND

An Amended Class Action Complaint was filed on September 25, 2020, in the Northern District, case 20-cv-04540, for the purpose of presenting a class action against Defendants on behalf of students wronged by the Quiet Time program in the public schools. On December 15, 2022, Honorable Judge Matthew F. Kennelly denied Plaintiff's motion to intervene in said case as a substitute class representative and instructed the parties that a new Complaint by the Plaintiff named herein (and possibly others) might be the best next procedural step. Hence, this case is filed. The bates document identification numbers and docket numbers refer to those used in 20-cv-04540.

## INTRODUCTION

Plaintiff Kaya Hudgins incorporates by reference all of the facts, declarations, allegations, and exhibits contained in the First Amended Complaint. This motion addresses only the class certification of the students in eight Chicago public high schools. Her First Amended Complaint alleges that the facilitation and operation of the "Quiet Time" (QT) program within CPS schools violated the Establishment Clause, the Free Exercise Clause, the Illinois Religious Freedom Restoration Act, the Illinois Constitution and the Illinois common law and that it was conducted by the Board of Education in partnership, sponsorship and collaboration with the David Lynch Foundation ("DLF") and University of Chicago ("University").

The practice of "Transcendental Meditation" (TM), a primary component of Quiet Time program, mandates participation in an initiation ceremony, (sometimes referred to as a "Puja," which means "worship" in Hindi) and is led by a TM instructor, who must be certified by Maharishi Foundation USA. During the ceremony, CPS students were asked to sit or stand facing a photo image of Guru Dev (a title meaning "divine teacher"), a former teacher of Maharishi Mahesh Yogi—the founder of TM. The students remained present while the certified instructor chanted Sanskrit words coordinated with the placement of various items such as candles, candy, flowers, etc. Some students were told to place certain objects in front of the picture. The room was darkened, no CPS personnel were present and each student was alone or in a small group except for the TM instructor. The Sanskrit words (translated in *Malnak v. Yogi* 440 F.Supp. 1284 at pp. 1306-07) contain, among other things, an "invocation" recognizing the power possessed by various Hindu deities and an invitation to those same Hindu deities to channel their powers through those present for the ceremony.



Certified TM instructors gave each CPS student a specific mantra at their respective initiation ceremony. Students were forbidden to choose a mantra of their own. The names and authority scope of the various Hindu deities whose names were given as mantras were easily available to CPS students on the internet. The practice of "Transcendental Meditation" in the classroom after the Puja then involved silent and/or whispered meditation, with repeated encouragement to utilize the assigned mantra.

The practice of "Transcendental Meditation" requires secrecy. CPS students were instructed to keep their TM experiences secret from their parents and others. (*See* Exhibit A at ¶55—also previously attached in Dkt. 156-2 and Exhibit B at ¶12—also previously attached in Dkt. 156-3).

The Quiet Time program, "QT," which included TM students and a non-meditating control group, took place during regular school hours and utilized dedicated space on school property. This program deprived students of fundamental constitutional rights and inflicted mental, emotional, and spiritual harm. The students experienced guilt, fear and religious confusion and must carry within themselves the possibility of long-term irreparable harm. Plaintiff now alleges that the "Quiet Time" program violated Plaintiff's rights, and the rights of all students, under the Establishment Clause, Free Exercise Clause, the Illinois Religious Freedom Restoration Act, Illinois Constitution, and Illinois common law. Kaya Hudgins seeks damages, for herself and her classmates, no injunctive relief is sought. Therefore, Plaintiff now moves this Court to certify, pursuant to Fed. R. Civ. P. 23, this class:

> All students who participated in the Quiet Time program in Chicago Public Schools during Chicago Public School's academic calendar for 2015-16, 2016-17, 2017-18, and 2018-19.

Plaintiff also asks the Court to appoint Mauck & Baker, LLC, as class counsel pursuant to Fed. R. Civ. P. 23(g) and then appoint Kaya Hudgins the class representative for all students.

## ARGUMENT: THE PROPOSED CLASS FULFILLS ALL PREREQUISITES FOR CERTIFICATION

### I. Principles applicable to class certification.

"The purpose of class action litigation is to avoid repeated litigation of the same issue and to facilitate prosecution of claims that any one individual might not otherwise bring on her own."

3

*Chicago Tchrs. Union, Loc. No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 433 (7th Cir. 2015). Class certification is solely a procedural issue, and the court's inquiry is limited to determining whether the proposed class satisfies the requirements of Rule 23. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177-78 (1974)*.* The party seeking certification bears the burden of demonstrating that certification is proper by a preponderance of the evidence. *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 811 (7th Cir.2012). "If there are material factual disputes that bear on the requirements for class certification, the court must receive evidence if only by affidavit and resolve the disputes before deciding whether to certify the class." *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 377 (7th Cir. 2015) (internal quotations omitted).

## II.      The requirements of Rule 23(a) and both 23(b)(1) and 23(b)(3) are satisfied.

A district court has "broad discretion" in determining whether to certify a class. *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993) (citing *United Indep. Flight Officers, Inc. v. United Air Lines, Inc.,* 756 F.2d 1274, 1283 (7th Cir. 1985)). Rule 23(a) requires numerosity, commonality, typicality, and adequacy of representation. Rule 23(b)(1) requires a risk of inconsistent adjudications. Rule 23(b)(3), discussed further in, requires predominance and superiority.

## A.      Numerosity – Federal Rule of Civil Procedure 23(a)(1).

The numerosity requirement is satisfied where "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *Cavin v. Home Loan Center, Inc.*, 236 F.R.D. 387, 391 (N.D. Ill. 2006) ("Although there is no bright-line test for numerosity, a class of at least forty members is generally sufficient to satisfy Rule 23(a)(1).").

4

While the exact numbers have yet to be determined, the QT program was instituted in at least eight CPS schools for one to four years. A conservative estimate would be over 3,000. Numerosity clearly is satisfied.

**B.      Commonality – Rule 23(a)(2).**

Commonality requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Otherwise said: Do the class members' grievances "derive from a 'common nucleus of operative fact'"? *In re Hartmarx Sec. Litig.*, No. 01 C 7832, 2002 WL 31103491, at *10 (N.D. Ill. Sept. 19, 2002) (quoting *Rosario v. Livaditis,* 963 F.2d 1013, 1017–18 (7th Cir. 1992). Such a common nucleus exists where "defendants have engaged in standardized conduct towards members of the proposed class." *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998). "A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)." *Id.* (citation omitted). "[F]actual variations among class members' grievances" do not themselves defeat the certification of a class. *Rosario v. Livaditis*, 963 F.2d 1013, 1017 (7th Cir. 1992), *cert. denied*, 506 U.S. 1051 (1993).

In a related case, *Williams et al., v. Board*, 20-cv-04540, testimony and multitudes of documents show Defendants joined in facilitating, requiring, incentivizing and/or coercing students to participate in the religious elements of TM. *Each* student in the Quiet Time program underwent the same regimen. (*See* Exhibit C at Allegation #7: also previously attached in Dkt. 156-4).  Defendant, DLF admits that the practice of TM is uniform not only throughout the eight Chicago Public Schools but wherever TM is taught. Kaya Hudgins and *each* student were required to attend a ceremony which had these elements:

1.   A lighted picture of Guru Dev on a table;

2.   Darkened room;

3. Isolation solely with the TM instructor (or sometimes 3 or 4 students together);

4. Offerings placed in front of Guru Dev's image (Kaya Hudgins and some students were told to place fruit in front of the guru's photo while other students were instructed to kneel before the photo);

5. Containing an understanding imparted at the ceremony or thereafter by the internet or social media that "Guru Dev" meant "Divine Teacher";

6. Association of robe worn by Guru Dev with the robing of religious leaders who would be familiar to students e.g. nuns, Christian clergy, monks, choirs and the authority expressed by judicial robing;

7. Incense; and

8. Chanted invocation prayer in Sanskrit with the translation thereof known to the instructor and also findable by students on the internet e.g. https://www.courageouschristiansunited.org/SiteData/ccu/an%20english%20translation%20of%20transcendental%20meditation's%20initiatory%20puja.pdf.

Kaya Hudgins and *each* student were also required:

9. To receive and use a mantra;

10. To keep the mantra secret;

11. To "meditate" twice daily during school days for 15 minutes equating to 352 meditation sessions each school year. (*See* Exhibit D)



12. According to Exhibit E—also previously attached in Dkt. #156-5, almost all students had poverty in common. Between 92.4 percent and 97.6 percent of the students were categorized as 'low income." Thus students commonly lacked the means or community connections to consult lawyers to fully recognize, much

less stand up to these constitutional violations. Exploitation by defendants of these students' vulnerability is a further commonality;

13. Having to meditate for 30 minutes every school day each student was deprived of two and one half hours of instructional or study time every week. (School hours were not extended to accommodate the Quiet Time Program).

So, Kaya has alleged that her free exercise and establishment rights were violated in the same way other TM students were violated—commonality. Rule 23(a)(2) requires, "questions of law *or* fact common to the class." [italics supplied]. Kaya has alleged *both* common legal claims and common factual bases for those claims.

An additional common question of law is the joint and several liability of the Defendants for violation of the rights of Kaya and her fellow students. Kaya has adequately alleged: (a) partnership between Defendants resulting in: (b) a violation of her constitutional rights. Supporting that question of law common to all students are:

(1) On University letterhead, the "Quiet Time Evaluation…" (*See* Exhibit F), which states, "In partnership with the Chicago Public Schools and the David Lynch Foundation, the University of Chicago and Northwestern University are doing a study…" and;

(2) Also on University letterhead, the "Quiet Time Evaluation: Memorandum of Understanding." (*See* Exhibit G; also previously attached in Dkt. 214-1) which lists all Defendants as participants detailing on the second page the explicit services to be provided by the University and the David Lynch Foundation, and the requirements (some "non-negotiable") of each participating school.

Kaya, in common with her "Quiet Time" classmates, all have in common that identical question of law—the joint liability of Defendants.

### a. Quiet Time Non-Meditators Should Be Part of the Class

Defendants may argue "only students actually instructed in TM through the Puja ceremony should be part of any certified class. However, all students, whether in a "control group" or not, were an essential component of the academic study violating the rights of all "Quiet Time" students, agreed to, by, and among all three Defendants. Without their school mandated participation, the measurement of the reduction of what DLF called "toxic stress" among high schoolers could never be made. The effectiveness, *vel non*, of TM training and daily meditation could never be evaluated. So control group students were herded by the Board, the University, and DLF as "guinea pigs" in common with TM meditators who were also "guinea pigs." A further commonality was that control and non-control groups were both deprived daily of 30 minutes of instructional time.

Both control group and TM-required meditation students had to submit a Health Questionnaire (*See* Exhibit H), which contained questions certainly embarrassing to adolescents and seeking information about sexual development, asking about weight, growth of body hair, including pubic hair, comparison to classmates—and for girls' menstruation and breast development. Although this document was developed by the Urban Labs to "analyze your data," it was distributed in the CPS schools as part of the DLF "Quiet Time" rubric (the document is titled "Quiet Time Study – Student Health Form"). No parental approvals for use of the questionnaire have been furnished by Defendants in the *Williams* litigation and no request for approval—even an "opt-out"—has been produced by any Defendant. Although the form says that questions can be skipped, these questions should never have been thrust on adolescents! This

8

questionnaire supports both Kaya's qualification under commonality per 23(a)(2) to represent her classmates (all suffered similar abuse from Defendants), but also her qualifications under typicality per 23 (a)(3) (all have the same claims as Plaintiffs) to represent her classmates.

Some control group students may not have been violated as severely as TM taught students, but they were all exposed to TM in the following wrongful ways:

1. The certified TM instructors who led Quit Time observation during class time, certainly said positive things to all students about Transcendental Meditation;

2. That CPS teachers or TM instructors who would supervise the Quiet Time meditation would ring the Ghanta to begin and end the meditation session, *per se* conveys a message of CPS endorsement;

3. The scheduling by CPS administrators and principals of Quiet Time meditation in lieu of instructional time told all students "CPS—and the University and DLF—all believe TM is a good practice." Consider CPS providing prayer rugs, ringing a bell during class time, and announcing that selected students should pray towards Mecca. Would not the remaining students have their rights violated by exposure to such a policy under Elmbrook?

4. The control group students were in common with the TM meditators, and by deliberate intent of all Defendants, effectively denied fully informed parental positive consent.

5. School-wide assemblies were instituted at some or all schools to promote TM.

6. Posters were put in the hallways and student "ambassadors" were recruited to extol TM to all students.

9

Although the impact, and hence, the amount of damages per student, may vary. That evaluation should be made by the trier of fact. The CPS and University records as to whether a student went through "Quiet Time" or TM, and for one, two, or three years, and whether a student was designated TM or Control Group, facilitates a reasonable apportionment of damages among class members who submit claims. The predominating commonalities of "Quiet Time" in violating legal protection for the students thus satisfy Rule 23(a)(2).

## C.     Typicality – Rule 23(a)(3).

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). A claim "is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983). Typicality is closely related to commonality, *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998), and, as in the case of commonality, factual distinctions between the claims of class members will not necessarily defeat a claim of typicality. *De La Fuente*, 713 F.2d at 233.[1] Otherwise said: Do "the named representatives' claims have the same essential characteristics as the claims of the class at large"? *In re Hartmarx Sec. Litig.*, 2002 WL 31103491, at *14 (quoting *Retired Chicago Police Ass'n*, 7 F.3d at 596-97). Foremost, because this is a civil rights lawsuit, all students share the same constitutional protections.

---

[1] The Seventh Circuit *en banc* ruling in *Doe ex rel. v. Elmbrook*, 687 F.3d 840 (7th Cir. 2012) is an Establishment Clause case involving high school students which helpfully illustrates the synergy between commonality and typicality. Although there was no class action certification apparently sought because numerosity was absent (seven students were affected) the commonality was all students in order to attend a graduation ceremony had to do so in a church sanctuary with many Christian symbols. The typicality was a harmful feeling of alienation, exclusion and "an impermissible aspect of coercion." *Id.* at 856. In other words the *en banc* court found that harm had been inflicted and remanded the case to the trier of fact for "proceedings consistent there with." Settlement of $9,000 per student ensued.

"Typical does not mean identical, and the typicality requirement is liberally construed."
*In re Neopharm, Inc. Sec. Litig.*, 225 F.R.D. 563, 566 (N.D. Ill. 2004).

Kaya Hudgins' claims are quintessentially typical because she was subjected to the same Puja ritual and Quiet Time meditation regimen as every other potential class member. She is also typical because she was a minor, as were most other students, when they went through "Quiet Time" or TM. After she decided that TM was deceitful and she resigned as an "ambassador," she continued to be exposed to it during the twice-daily "Quiet Time" meditation sessions. Plaintiff's damage claims here are typical of the claims of the other Class members because all were treated similarly by defendants' actions. Every "Quiet Time" student was exposed—twice daily—to "impermissible aspect [s] of coercion" *Elmbrook* at 856. Kaya and all or almost all students were minors during a portion of their QT participation. And neither Kaya nor any CPS student, including 18-20 year olds, could "consent" to an unconstitutional religious program in a public school. The Quiet Time Program was uniform throughout the schools. (See Exhibit C at ¶7—also previously attached in Dkt. 156-4).

Typical claims that arise from the Quiet Time Program:

> **b. Students subjected to wrongful conduct to which they were unable to consent.**

Whenever a student was under 18, he or she was legally unable to consent to the religious ceremony, indoctrination and conditioning imposed by TM.

**c. Students were denied parental protection.**

Because parents were never fully informed of the TM program and because the students were required to take the secrecy oath, the teenager's right to adult protection was violated.

11

### d. Students were denied CPS in loco parentis protection.[2]

By collaborating to deny this protection, the University of Chicago and DLF joined in failure to provide *in loco parentis* protection.

### e. The young people were deceived by the Defendants.

Even if students could not legally have consented they still had the right to honest and full disclosure. Nevertheless, DLF and CPS agreed to disregard the CPS policy and implication of the U.S. Supreme Court's ruling in *Wisconsin v. Yoder*, 406 U.S. 205 (1972) that positive and informed parental consent be required. The University benefitted from such disregard by gathering otherwise impermissible data for its studies. Typically, Kaya and her classmates were harmed by deficient information and/or deliberate deception as to the true nature of TM. Each had the right to and honest and full disclosure and were harmed by the deceitful disclosure they were given. Deceived because: (1) Religious nature of the Puja worship ceremony was not disclosed; (2) instructors knew the meaning of the Sanskrit invocation at the Puja but as a matter of practice refused to tell students the meaning; (3) mantras as names of Hindu deities was not disclosed; (4) the holding in *Malnak v. Yogi*, 592 F.2d 197 (2nd Cir. 1979) and the consequent removal of TM from all public schools in New Jersey as a constitutional violation was never disclosed; and (5) defendants failed to even create a website where students could comment, confer and learn about advantages and criticisms of TM. Such deceit was not only tortious, but it was pervasive and Kaya's exposure to that deception was typical.

---

[2] Instead of protecting students, CPS allowed them all to be abused. To their belated credit, CPS after teacher, parent and student complaints did oust TM from its schools. In ousting TM from its schools, CPS effectively conceded that the Establishment Clause was violated as to its students.

**f.    The Quiet Time Program created humiliation, guilt, confusion and fear[3]**

As in *Elmbrook*, some damages were emotional, spiritual and/or psychological. Impermissible endorsement and coercion occurred both in *Elmbrook* at page 1328 and the CPS schools. Students were burdened with guilt being told TM wouldn't "work" if they disclosed their mantra. Some students decided to boycott the program. Much like sexual abuse victims, all wounds from Defendants' abuse may not manifest in the students' lives until years down the road. So Kaya and all her classmates may experience the negative effects in the future. Following the guidance of *Elmbrook* it appears the CPS students were clearly uniformly and typically hurt. Plaintiffs will support the typicality of emotional scarring through the expert testimony of a psychologist, Doug Duncan, who has treated many cult victims and has submitted an expert opinion in Case 20-CV-04540. (*See* Exhibit I). The expert retained by Defendants, Dr. Louis Kraus, whose expert opinion in a similar case, *Sherman v. Township High School*, 2008 WL 7728024, N. Dist. Ill. 2008, opined that the observance of only one "moment" a day of silence practice "would not be in the child's best interest, nor would it assist with their basic educational needs." (*See* Exhibit J) The extent of governmental imposition in *Sherman* was far less intrusive in time, content, and governmental endorsement than Quiet Time meditation in this case.  Therefore, both Duncan's and Kraus's expert opinions support the typicality requirement of Rule 23(a) (3).

**g.  Coercion and Incentives**

---

[3] The *en banc* opinion and other rulings in *Elmbrook* treat the harm to students as self-evident and not requiring special proof and at least meriting nominal damages.

13

Students were *graded,* or at least told they would be graded, for their participation in the Quiet Time program.[4] Students also were given incentives such as pizza to participate in the program. (*See* Exhibit D and Exhibit K—also previously attached in Dkt. 156-6). A sampling of the line item Quiet Time budget for four schools, Gage Park, Julian, Bogan, and Daniel Hale William, for just one year shows: Totals $52,200 for "Student/faculty incentives, retreats, celebrations, curriculum supplies." (*See* Exhibit L—also previously attached in Dkt. 156-7).

Students who had been taught to trust CPS teachers, were told by their "trusted teachers" to participate in the school-sanctioned religion. (*See* Exhibit M), Typical of other students, Kaya experienced such pressure/inducements to practice TM (*See* Exhibit D)

### h. The students were conditioned to continue Transcendental Meditation beyond school and for years to come.

Twice daily, every school day. DLF representatives were imposing their Hinduistic beliefs and practices enabled and endorsed by CPS and the University. All students who were trained in TM became eligible to purchase training sessions with the Maharishi Foundation and seek ever "higher consciousness" after the school trainings that the TM program extends to had ended. (See Exhibit N—also previously attached in Dkt. 156-9).

### i. Deprivation of Education

Kaya and each student who was put into Quiet Time was damaged by diminution of their fundamental right to education: Article X of the Illinois Constitution § 1, "A fundamental goal of the People of State is the educational development of all persons to the limits of their capacities."

---

[4] Given that students know their college and employment prospects and eligibility to play high school sports are based upon their grades, "grading" is not even a subtle coercion: it operates both as an inducement and as a threat.

Kaya Hudgins and the other students were deprived of unreplaceable hours of instruction or study time each year displaced by multiple hours per week of Transcendental Meditation.

### j. Illinois Constitutional and Illinois Religious Freedom Restoration Act damages.

A person deprived of a federal constitutional right has no abstract damage claim (*Memphis v. Stachura*, 477 U.S. 299, 308 (1986)) but must show damage cognizable under state law. Illinois cognizable damages have been shown in the preceding (a) – (h) nine itemizations of typicality under Illinois law. However, unlike federal law, an Illinois constitutional violation may also be *per se* actionable for damages.

> ARTICLE I.
>
> SECTION 3. RELIGIOUS FREEDOM The free exercise and enjoyment of religious profession and worship, without discrimination, shall forever be guaranteed…No person shall be required to attend or support any ministry or place of worship against his consent, nor shall any preference be given by law to any religious denomination or mode of worship.
>
> SECTION 12. RIGHT TO REMEDY AND JUSTICE Every person shall find a certain remedy in the laws for all injuries and wrongs which he receives to his person, privacy, property or reputation. He shall obtain justice by law, freely, completely, and promptly.

cf. *Walinski v. Morrison and Morrison*, 60 Ill. App. 3d 616, inferring a civil rights damage remedy based on explicit protection in the Illinois constitution and records from the constitutional convention. In this case, the Constitution itself does more than infer damages. Section 12, provides for "a certain remedy…for all injuries and wrongs."

Furthermore, the Illinois Religious Freedom Restoration Act *775 ILCS 35/20* also secures "appropriate relief against a government" when religious rights are violated. "Appropriate relief" would encompass provable, consequential, nominal, and punitive damages in this case, because they are a customary legal remedy for tortious conduct alleged.

15

In summation, Kaya and all prospective Class members were comparably injured and Kaya's Verified Complaint details other Illinois Constitutional and common law damages probably resulting from the actions of all Defendant's uniform misconduct as set forth in the aspects of "typicality". Further, there are no defenses available to the Defendant that are unique to Plaintiff. Thus, the typicality requirement of Rule 23(a)(3) is satisfied.

**D.      Adequacy of Representation – Rule 23(a)(4).**

The adequacy of representation requirement is satisfied where "the representative parties will fairly and adequately protect the interests of the class." Kaya Hudgins is an adequate Class representative because she underwent the Puja worship ceremony and Quiet Time meditations regimen at Bogan High School in her sophomore and junior years. She has no interests antagonistic to the interests of absent Class members (i.e. former classmates or other CPS students) and there are no material conflicts between Plaintiff's interests in this litigation and those of the Class members that would make class certification inappropriate.

Adequacy of representation requires that the class representative's attorneys be qualified, and that the class representative not have interests conflicting with the class in the litigation at hand. *Sosna v. Iowa*, 419 U.S. 393, 403 (1975). It must appear that the named plaintiffs will "vigorously pursue the litigation on behalf of the class" and their attorneys must be "qualified, experienced and able to conduct the litigation." *Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181, 186 (citing *Secretary of Labor v. Fitzsimmons*, 805 F.2d 682, 697 (7th Cir. 1986)). ??? sets forth the qualifications of the primary attorneys working on this case (*See* Exhibit O).

Proposed Class Counsel has already demonstrated the will and ability to commit the necessary rsesources to assure a strong and well-supported case on behalf of Class members and the named Plaintiff. If a class is certified, Mauck & Baker LLC intends to retain a class action

16

administration firm to handle notifications and other necessary processing. Thus, through appointment of Mauck & Baker, LLC as Class Counsel, the adequacy of representation requirement of Rule 23(a)(4) is satisfied.

**III.    Having satisfied the requirements of Rule 23(a)(1), (2), (3) and (4). Plaintiffs argue that both 23(b)(1)(A) and 23(b)(1)(3) are satisfied**

**E.    23(b)(1) Risk of Inconsistent Adjudication**

"(b) Types of Class Actions. A class action may be maintained if Rule 23(a) is satisfied and if:

(1) prosecuting separate action by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

Subsection (b)(1) includes two alternatives either of which satisfy 23(b). Subsection (A) applies because there are so many components to discover and prove in this case – free exercise, establishment, Illinois law, etc. – that it would be amazing if all possible Plaintiff attorneys, defendants or judges saw all arguments through the same lenses. For example, some juries could swallow the mantra "TM is not religious" while another could agree with Plaintiff's argument. Different rulings would present CPS, the University of Chicago, DLF, students, and other institutions, with "incompatible standards of future conduct." Plaintiffs do not argue 23(b)(1)(B).

**F.    Predominance and Superiority – Federal Rule of Civil Procedure 23(b)(3).**

"(3) the court finds that the questions of law *or* fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. [italics added]. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

17

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action."

"The requirement of predominance is met where . . . there is a showing of predominance of common questions at the liability stage of the litigation, rather than at the damages stage." *In re Natural Gas Commodities Litig., 231 F.R.D. 171, 180-81 (S.D.N.Y. 2005) (certifying a three-year class of both long and short sellers) (citation omitted).* The most predominant legal issues is whether Malnak was rightly decided. Another way to state the predominate legal issue is whether such conduct constitutes violations of the Establishment Clause, the Free Exercise Clause, the Illinois Religious Freedom Restoration Act, Illinois Constitution, and/or Illinois common law. *Elmbrook* and *Malnak* are the precedents applicable to all the students put in QT and so there are few if any "questions affecting individual class members." A predominate factual issue in this litigation is whether defendants used their positions of control to influence, require and/or pressure the CPS students, especially as minors, to participate in "Quiet Time" and TM.

The superiority requirement is satisfied where the "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Superiority is readily satisfied because several thousand members of the Class are likely to have "relatively small claims making it expensive to seek recovery through individual litigation," and, thus, where a "class action would be the most efficient use of judicial resources in resolving the common issues." *In re Neopharm, Inc. Sec. Litig.*, 225 F.R.D. at 568.

The complex legal and factual issues of establishment and free exercise jurisprudence, the presence of three colluding defendants and the claims of TM make individual representations effectively impractical. By contrast, the class action device presents far fewer management

18

difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Moreover, Defendants in the *Williams* case have never argued there are different claims by the class member—only different damages, except perhaps the possible different claims of meditators and non-meditators. Plaintiffs do not see (and Defendants have never proposed) a way superior to a class action to adjudicate the harm done to students. As in any class action, each member has the option of litigating separately or declining to litigate and the Court has authority to create separate QT sub-classes: meditators and non-meditators.

Finally, since the Defendants engaged in a similar course of conduct directed to all CPS teenagers in the Quiet Time program, the critical factual issues are essentially identical. There is no reason to have these identical issues developed repeatedly in separate cases by individual claimants. Because it would be economically unreasonable for Plaintiff and the other Class members to adjudicate their identical claims individually, the superiority requirements of Rule 23(b)(3) are satisfied.

## CONCLUSION

For the reasons set forth, the Court should certify the proposed class of all students who went through "Quiet Time," appoint Kaya Hudgins as class representative, appoint Mauck & Baker as class counsel, and direct Plaintiff to submit a proposed certification order in compliance with the Court's judgment order and in compliance with Rule 23(c). (If the Court decides that non-meditating students lack class action eligibility or have significantly different claims, the Court may narrow the class to Puja/TM participants or may create two sub-classes).

Dated: February 24, 2023

KAYA HUDGINS,

By: */s/ John. W. Mauck*
One of their attorneys

John W. Mauck
Judith A. Kott
**MAUCK & BAKER, LLC**
1 N. LaSalle St., Suite 600
Chicago, IL, 60602
312-726-1243
jmauck@mauckbaker.com
jkott@mauckbaker.com

20