**L IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KAYA HUDGINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 23-cv-00218 |
| v. | ) | |
| | ) | Judge Matthew F. Kennelly |
| BOARD OF EDUCATION OF THE CITY | ) | |
| OF CHICAGO, et al | ) | |
| | ) | |
| Defendants. | ) | |

---

**KAYA HUDGINS' REVISED MOTION FOR CLASS CERTIFICATION FOR THE
STUDENTS OF THE CHICAGO PUBLIC SCHOOLS PLACED IN THE QUIET TIME
PROGRAM**

---

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................................i

TABLE OF AUTHORITIES ..........................................................................................................ii

PROCEDURAL BACKGROUND....................................................................................................1

INTRODUCTION ........................................................................................................................ 1

FACTUAL BACKGROUND .......................................................................................................... 4

ARGUMENT: THE PROPOSED CLASS FULFILLS ALL PREREQUISITES ...................................... 6

FOR CERTIFICATION.................................................................................................................. 6

    I.    Principles applicable to class certification. ......................................................................... 6

    II.    The requirements of Rule 23(a) and 23(b)(3) are satisfied. .............................................. 6

    III.    Numerosity – Federal Rule of Civil Procedure 23(a)(1)................................................... 7

    IV.    Commonality – Rule 23(a)(2) – Generally ..................................................................... 7

        a.    Common Questions of Fact................................................................................. 7

        b.    Common Questions of Law ................................................................................. 9

        c.    "Control Group" Students Should Be a Sub-Class ...................................................... 14

    V.    Typicality – Rule 23(a)(3)............................................................................................ 16

        a.    Students subjected to wrongful conduct to which they were unable to consent......................... 18

        b.    Students were denied parental protection. ............................................................... 18

        c.    Students were denied CPS *in loco parentis* protection................................................... 18

        d.    Students were deceived by the Defendants................................................................ 18

        e.    The Quiet Time Program created humiliation, guilt, confusion and fear ................................ 19

*Excursus:* Are Demons Real? .................................................................................................... 20

        f.    Coercion and Incentives ................................................................................. 23

        g.    The students were groomed to continue Transcendental Meditation beyond school *and for years to come*................................................................................................................. 24

        h.    Deprivation of Education.................................................................................. 24

    VI.    Rule 23(a)4) Adequacy of Representation...................................................................... 24

    VII.    Having satisfied the requirements of Rule 23(a)(1), (2), (3) and (4). Plaintiff now argues that 23(b)(3) "predominance and superiority" is satisfied. .......................................................... 25

CONCLUSION........................................................................................................................... 31

CERTIFICATE OF SERVICE ....................................................................................................... 32

# TABLE OF AUTHORITIES

### CASES

*Bell v. PNC Bank, Nat. Ass'n*,
    800 F.3d 360 (7th Cir. 2015) ----------------------------------------------------------------- 6

*Cavin v. Home Loan Center, Inc.,*
    236 F.R.D. 387 (N.D. Ill. 2006)------------------------------------------------------------- 7

*Chapman v. First Index 92 Fed R.Serv.*
    3d, 783, 785 (2015) ----------------------------------------------------------------------- 2

*Chicago Tchrs. Union, Loc. No. 1 v. Bd. Of Educ. Of City of Chicago*,
    797 F.3d 426 (7th Cir. 2015) ----------------------------------------------------------- 6

*De La Fuente v. Stokely-Van Camp, Inc.*,
    713 F.2d 225 (7th Cir. 1983) -----------------------------------------------------------16

*Doe ex rel. v. Elmbrook*,
    687 F.3d 840 (7th Cir. 2012 *en banc*) -------------------------------------------15, 16, 17, 21, 26

*Eddings v. Oklahoma*,
    455 U.S. 104 (1982) --------------------------------------------------------------------29

*Eisen v. Carlisle & Jacquielin*,
    417 U.S. 156 (1974) ------------------------------------------------------------------- 6

*Freedom From Religion Found, Inc. v. Concord Cmty. Sch.,*
    885 F.3d 1038, 1048 (7th Cir. 2018) -------------------------------------------------17, 18, 26

*Hendel v. World Plan Exec. Council and Maharishi Foundation, USA*
    (1996 WL 34420369) ------------------------------------------------------------------11

*In re Hartmarx Sec. Litig.*,
    No. 01 C 7832, 2002 WL 31103491 (N.D. Ill. Sept. 19, 2002) -------------------------7, 17

*In re Natural Gas Commodities Litig.*,
    231 F.R.D. 171 (S.D.N.Y. 2005)------------------------------------------------------------26

*In re Neopharm, Inc. Sec. Litig.*,
    225 F.R.D. 563 (N.D. Ill. 2004)---------------------------------------------------------- 17, 26

*In re: College Athlete NIL Litigation*,
    case 20-cv-03919CW -------------------------------------------------------------------30

*Iskander v. Forest Park*,
    690 F2d 126, 128 (7th Cir 1982)------------------------------------------------------------- 3

*Janus v. American Federation of State, County & Municipal Employees,* 942 F3d 352 (7th Cir 2019) -------------------------------------------------------------------------------------------------- 4, 9

*Keele v. Wexler,*
149 F.3d 589 (7th Cir. 1998) ------------------------------------------------------------------------7, 16

*Malnak v. Yogi,* 440 F. Supp. 1284 (D.N.J. 1977), aff'd,
592 F.2d 197 (3d Cir. 1979) ------------------------------------------------------------------------ 3, 5

*Malnak v. Yogi,*
592 F.2d 197, 199 (3d Cir. 1979) --------------------------------------------- 3, 9, 10, 18, 19, 26

*Memphis v. Stachura,*
477 U.S. 299 (1986) ----------------------------------------------------------------------------------23

*Messner v. Northshore Univ. HealthSystem,*
669 F.3d 802 (7th Cir. 2012) ----------------------------------------------------------------------- 6

*Monell v. Department of Social Services of City of New York,*
436 U.S. 65898 S.Ct. 2018 (1978)----------------------------------------------------------------3, 14

*Mullins v. Direct Digital, LLC,*
795 F.3d 654 (7th Cir. 2015) ----------------------------------------------------------------------28

*Price v. Charlotte,*
93 F3d 1241, 1245 (4th Cir 1996) ----------------------------------------------------------------22

*Retired Chicago Police Ass'n v. City of Chicago,*
7 F.3d 584 (7th Cir. 1993) ------------------------------------------------------------------------7, 17

*Rosario v. Livaditis,*
963 F.2d 1013 (7th Cir. 1992), *cert. denied,* 506 U.S. 1051 (1993) ------------------------- 7

*Scholes v. Stone, McGuire & Benjamin,* 143 F.R.D. 181 (N.D. Ill. 1992)-------------------------25

*Sherman v. Township High School,*
2008 WL 7728024, N. Dist. Ill. 2008 --------------------------------------------------------------22

*Shields v. Ill. Dept. Cor,*
746 F3d 782 (7th Circ 2014) ----------------------------------------------------------------------- 3

*Sosna v. Iowa,*
419 U.S. 393 (1975) ----------------------------------------------------------------------------------25

*Spiegel v. McClintic,*
916 F3d 611 (7th Cir. 2019)----------------------------------------------------------------------- 4

*Swart et al v. Chicago,*
440 F. Supp. 3d 926 (N.D. Ill. 2020)--------------------------------------------------------------25

iii

*Whiting v. Wexford*,
      839 F3d 658 (7th Circ 2016) ------------------------------------------------------------------- 3

*Williams et al., v. Board*, 20-cv-04540 ------------------------------------------------------------ 8

*Wilson v. Warren County*,
      830 F3d 464 (7th Cir. 2016) ------------------------------------------------------------------- 4, 9

*Wisconsin v. Yoder,*
      *406 U.S. 205, 92 S. Ct. 1526* (1972) ----------------------------------------------------------- 2

STATUTES

775 Ill. Comp. Stat. Ann. 35/1 --------------------------------------------------------------------- 2

RULES

Fed R. Civ. P. 23 ------------------------------------------------------- 1, 6, 7, 14, 15, 16, 23, 25, 26

CONSTITUTIONAL PROVISIONS

Ill. Const. art. I, § 3 -------------------------------------------------------------------------------- 2

U.S. Const. amend. I -------------------------------------------------------------------------------- 2



Plaintiff KAYA HUDGINS, ("Hudgins"), by her attorneys,
Mauck & Baker, LLC, under Fed R. Civ. P. 23(a), 23(b)(1), and
23(b)(3), respectfully requests this Court, pursuant to Fed. R. Civ.
P. 23(c)(1), to Certify a Class Action for Chicago Public School
students put in the Quiet Time program:

## PROCEDURAL BACKGROUND

In a related case, a Complaint by Amontae Williams was filed on September 25, 2020, in case 20-cv-04540, to present a class action against Defendants on behalf of students wronged by the Quiet Time program. On December 15, 2022 in Dkt. 220, this Court denied Hudgins' Motion to Substitute for Amontae Williams as a class representative. On Feb. 25, 2023, Hudgins therefore filed her Motion for Class Certification (Hudgins Dkt. 11) and on June 20, 2023 the Court denied her Motion for Class Certification without prejudice and granted leave for her Motion to be refiled by November 8, 2023. (Hudgins, Dkt. 52).

## INTRODUCTION

Plaintiff herein alleges that the Board of Education of the City of Chicago, the David Lynch Foundation, and the University of Chicago through the "Quiet Time" program violated her rights, and the rights of all students, under the Establishment and Free Exercise Clauses. Hudgins is seeking damages for herself and her classmates, and now moves this Court to certify, pursuant to Fed. R. Civ. P. 23, this class:

> All students who participated in the Quiet Time program in Chicago Public Schools during Chicago Public School's academic calendar for 2015-16, 2016-17, 2017-18, and 2018-19.

Plaintiff also asks the Court to appoint Mauck & Baker, LLC, as class counsel pursuant to Fed. R. Civ. P. 23(g) and then appoint Kaya Hudgins the class representative for all students.

1

This motion addresses only the class certification of the students in eight Chicago public high schools. Plaintiff KAYA HUDGINS incorporates by reference all of the facts, declarations, allegations, and exhibits contained in her First Amended Complaint (Hudgins, Dkt. 2). Hudgins' First Amended Complaint alleges that the facilitation and operation of the "Quiet Time" (QT) program within CPS schools violated the Establishment Clause, the Free Exercise Clause, the Illinois Religious Freedom Restoration Act (RFRA), the Illinois Constitution and the Illinois common law and that it was conducted by the Board of Education in partnership, sponsorship and collaboration with the David Lynch Foundation ("DLF") and University of Chicago ("University"), because this Court has dismissed Hudgins' IRFRA, Illinois Constitution, and common law arguments, this Motion for Class Certification addresses only the remaining allegations of the First Amended Complaint, namely the constitutional violations of the Establishment Clause and Free Exercise Clauses. (Hudgins, Dkt. 52). Likewise, no argument is made for parental class certification, but Hudgins will argue, *infra*, as an element of common damages, that the University and other Defendants deliberately colluded to deny students the benefit of parental protection as necessarily embodied in *Wisconsin v. Yoder, 406 U.S. 205, 92 S. Ct. 1526* (1972). The Court has also dismissed the University of Chicago from all of Plaintiffs' allegations in all three TM lawsuits. [1] Thus, this Motion for Class Certification begins by arguing the University was what the Seventh Circuit has called a "moving force" in the Quiet Time program in order to establish its joint and several liability with the other Defendants as state

---

[1] Hudgins, in agreement with the Seventh Circuit *Chapman v. First Index 92 Fed R.Serv.* 3d, 783, 785 (2015) sees no need to file a separate document amending the Complaint to remind the University it still is a defendant in Hudgins First Amended Complaint because Hudgins incorporates that Complaint by reference and the Court instructed the University to proceed as if it was still in the litigation. However, if the Court sees the procedures otherwise, Hudgins requests, in addition to Certification, the Court's leave to file a Second Amended Complaint.

actors. *Iskander v. Forest Park*, 690 F2d 126, 128 (7th Cir 1982); *Whiting v. Wexford*, 839 F3d

658 (7th Circ 2016); *Shields v. Ill. Dept. Cor*, 746 F3d 782 (7th Circ 2014); all applying *Monell* to

private action. *See generally Monell v. Department of Social Services of City of New York*, 436

U.S. 65898 S.Ct. 2018 (1978) (holding that local governments are "persons" subject to §1983

liability). Therefore, Hudgins will present evidence, much newly set forth, that the University

was not only a moving, but sometimes the *dominant* force in the Quiet Time program. To

facilitate the Court's evaluation, Hudgins has identified 15 components or key aspects of the

program:

1.  University written partnership acknowledgement
2.  University Memorandum of Understanding
3.  Origination of Chicago program
4.  Purposes of program collaborators
5.  Funding obtained by University
6.  First Round vetting by University
7.  Lynch disclosure of *Malnak v. Yogi*[2] to Board and University of Chicago
8.  John Wolf, University's TM coordinator, had extensive knowledge of TM
9.  Recruiting by the University of CPS Schools to adopt Quiet Time
10. Second Round vetting of TM by the University to the Board
11. Implementing the Quiet Time program
12. Evaluating Quiet Time for participating schools
13. University takes lead in more recruiting
14. Third round vetting by University of the effects of TM on students
15. Supporting, incentivizing, and benefitting from the Quiet Time program

Hudgins will elaborate on each of these components in her analysis of common questions

of facts and law. Thus, the above components, in addition to "moving force" analysis, can be

considered as they relate to three additional Seventh Circuit cases, which have articulated

---

[2] *See Malnak v. Yogi*, 440 F. Supp. 1284 (D.N.J. 1977), aff'd, 592 F.2d 197 (3d Cir. 1979); *See also Malnak v. Yogi*, 592 F.2d 197, 199 (3d Cir. 1979) ("We agree with the district court's finding that the [Transcendental Meditation] course was religious in nature. Careful examination of the textbook, the expert testimony elicited, and the uncontested facts concerning the puja convince us that religious activity was involved and that there was no reversible error in the district court's determination.")

multiple routes or conceptualizations to establish Monell liability for private actors:

1. *Janus v. American Federation of State, County & Municipal Employees,* 942 F3d 352, 363-64 (7th Cir 2019) because the University (and co-defendants) knew, *or should have known,* students were coerced into a program violating their establishment and free exercise rights [italics added];

2. *"a concerted effort* between a state actor and that individual" (italics in original) *Spiegel v. McClintic,* 916 F3d 611, 616 (7th Cir. 2019), citing *Fries v. Helspen*, 146 F3d. 452, 457 (7th Circ. 1998); *or*

3. a "meeting of the minds." *Wilson v. Warren County*, 830 F3d 464, 468 (7th Cir. 2016). *See* also this Court's Opinion, (Williams, Dkt. 250 at 11).

This revised motion will also address the inevitable variability and severity of emotional damages and proposes a workable solution to the manageability of claims by these former students as a Class Action.

## FACTUAL BACKGROUND

The practice of "Transcendental Meditation" (TM), the core component of the Quiet Time program, mandates participation in an initiation ceremony, (sometimes referred to as a "Puja," which means "worship" in Hindi) and is led by a TM instructor. The Chicago Quiet Time program required all instructors to be certified by the Maharishi Foundation USA. Part of that training required candidate instructors to flawlessly memorize the Sanskrit invocation and know its meaning in English. During the darkened Puja ceremony, CPS students were asked to sit or stand facing an illuminated photo image of Guru Dev (a title meaning "divine teacher"), a former teacher of Maharishi Mahesh Yogi—the founder of TM. The students remained present while the certified instructor chanted the Sanskrit words for three or four minutes coordinated with hand and body movements and bowing by the instructor to the image of Guru Dev. The instructors would also place various items such as candles, candy, flowers, etc., in front of the Guru Dev picture. Regularly, students were told to place certain objects in front of the picture or otherwise participate in the ceremony. Hudgins was told to place an orange. *See Ex. 1*; Mariyah Green was

4

told to kneel. *See Ex. 2*. After Amontae Williams' TM instructor chanted in a language Amontae had not heard before, his instructor declined to tell Williams the English meaning of those words. *See Ex. 3*. Aryeh Siegel, a certified TM instructor and expert witness identified in the *Williams* case[3], will testify that TM instructors were taught to always use hand and body gestures to invite the initiates to make obeisance to the image. *See Ex. 4*. No CPS personnel were present and except for the TM instructor, each student was alone in the dark or in a small group.  The Sanskrit invocation (translated in *Malnak v. Yogi*, 440 F.Supp. 1284 at pp. 1306-1307) expresses and acknowledges among other things, the power possessed by various Hindu deities and conjures those same Hindu deities to channel their powers through the CPS student or other initiate.

The certified TM instructors then gave each CPS student a specific and personal mantra by whispering in his or her ear at their respective Pujas. Although the instructors would lie and say the mantras were "meaningless," students were forbidden to choose a mantra of their own. The names and scope of the authority of the various Hindu deities whose names were given as mantras were easily available to CPS students on the internet.

The practice of "Transcendental Meditation" requires secrecy. Hudgins and all CPS students were instructed to keep their Pujas, mantras, and other TM experiences secret from their parents and all others. *See Ex. 3 at 12; Ex 5 at 55*. The implementation of "Transcendental Meditation" in the classroom after the Puja then involved meditation, with the TM instructor or CPS teacher encouragement to mentally repeat "continually" the assigned mantra during a fifteen-minute class time, twice daily.

---

[3] Siegel's Declaration in the Williams case and his expert report are Ex 4 hereto. Paragraph 20 of Ex. 4 references the hand movements but does not specify the "invitation" to which he will testify.

The Quiet Time program, "QT," which included TM students and a non-meditating "Control Group," took place during regular school hours and utilized dedicated space on school property. This program coercively deprived students of fundamental constitutional rights and inflicted mental, emotional, and spiritual harm. Because the twice daily mediation sessions usurped regular class time, both groups were damaged by loss of thirty minutes of academic instructional benefit every day. According to an expert for Plaintiff and expert report by an adolescent psychiatrist retained by Defendants in the Williams case and submitted in a similar case, the guilt, fear, exposure to ridicule from peers, and/or religious confusion experienced by students will cause them to carry within themselves the risk and possibility of long-term harm.

### ARGUMENT: THE PROPOSED CLASS FULFILLS ALL PREREQUISITES FOR CERTIFICATION

### I. Principles applicable to class certification.

"The purpose of class action litigation is to avoid repeated litigation of the same issue and to facilitate prosecution of claims that any one individual might not otherwise bring on her own." *Chicago Tchrs. Union, Loc. No. 1 v. Bd. Of Educ. Of City of Chicago*, 797 F.3d 426, 433 (7th Cir. 2015). Class certification is solely a procedural issue, and the court's inquiry is limited to determining whether the proposed class satisfies the requirements of Rule 23. *Eisen v. Carlisle & Jacquielin*, 417 U.S. 156, 177-78 (1974). The party seeking certification bears the burden of demonstrating that certification is proper by a preponderance of the evidence. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). "If there are material factual disputes that bear on the requirements for class certification, the court must receive evidence if only by affidavit and resolve the disputes before deciding whether to certify the class." *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 377 (7th Cir. 2015) (internal quotations omitted).

### II. The requirements of Rule 23(a) and 23(b)(3) are satisfied.

A district court has "broad discretion" in determining whether to certify a class. *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993). Rule 23(a) requires numerosity, commonality, typicality, and adequacy of representation. Rule 23(b)(3) requires predominance and superiority.

### III.     Numerosity – Federal Rule of Civil Procedure 23(a)(1).

The numerosity requirement is satisfied where, "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *Cavin v. Home Loan Center, Inc.,* 236 F.R.D. 387, 391 (N.D. Ill. 2006) ("Although there is no bright-line test for numerosity, a class of at least forty members is generally sufficient to satisfy Rule 23(a)(1)."). Estimates regarding the size of the proposed class range from 2,000 to 3,000, assuming both the TM meditation and control group are certified. Thus, numerosity is satisfied.

### IV.     Commonality – Rule 23(a)(2) – Generally

Commonality requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Otherwise said: Do the class members' grievances "derive from a 'common nucleus of operative fact'"? *In re Hartmarx Sec. Litig.*, No. 01 C 7832, 2002 WL 31103491, at \*10 (N.D. Ill. Sept. 19, 2002) (quoting *Rosario v. Livaditis,* 963 F.2d 1013, 1017–18 (7th Cir. 1992). Such a common nucleus exists where, "Defendants have engaged in standardized conduct towards members of the proposed class." *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998). "A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)." *Id*. (citation omitted). "[F]actual variations among class members' grievances" do not themselves defeat the certification of a class. *Rosario v. Livaditis*, 963 F.2d 1013, 1017 (7th Cir. 1992), *cert. denied*, 506 U.S. 1051 (1993).

#### a.   Common Questions of Fact

In *Williams et al., v. Board*, 20-cv-04540, deposition testimony and multitudes of documents show Defendants joined in facilitating, incentivizing, and/or coercing students to participate in the religious elements of TM. Hudgins and each student in the TM portion of the Quiet Time program underwent the same Puja and training required of the particularized mediation practice. *See Ex. 6 at Allegation 7*. DLF admits that the practice of TM is uniform not only throughout the eight Chicago Public Schools but wherever TM is taught. In addition to the participatory aspects of the Puja set forth above, *each* initiation ceremony contained these common elements:

1. A lighted picture of Guru Dev on a table in a darkened room;
2. Isolation solely with the TM instructor (or sometimes 3 or 4 students together);
3. Offerings placed in front of Guru Dev's image by the instructors and offerings, or obeisance requested of the student;
4. Containing an understanding imparted at the ceremony or thereafter by the internet or social media that "Guru Dev" meant "Divine Teacher";
5. Association of robe worn by Guru Dev with the garb of religious leaders who would be familiar to students, e.g., nuns, Christian clergy, monks, and choirs.
6. Association with the authority expressed by judicial robing;
7. Reinforcement of the idea or sense that *Transcendental* Meditation was somehow spiritual (i.e., "religious"), magical, or mystical (i.e., literally *transcendent*).
8. Incense; and
9. Chanted invocation prayer in Sanskrit with the translation thereof known to the instructor and also findable by students on the internet, e.g., https://www.courageouschristiansunited.org/SiteData/ccu/an%20english%20translation%20of%20transcendental%20meditation's%20initiatory%20puja.pdf.

Kaya Hudgins and *each* student were also told:



10. To receive and use a mantra;
11. To keep the mantra secret;
12. To "meditate" twice daily during school days for 15 minutes equating to 352 meditation sessions each school year. *See Ex. 7 at "QUIET TIME" Column.*
13. Almost all students had poverty in common. Between 92.4 percent and 97.6 percent of the students were from families categorized as "low income." Thus exploitation by Defendants of the vulnerability of defenseless minors from low-income families is a further commonality. *See Ex. 8.*

14. Having to meditate or sit quietly for 30 minutes every school day in a darkened class-room, each student was deprived of academic instructional time every week.
15. Hudgins and many of the students were presented with the "Quiet Time Study - Student Health Form," containing sexual development questions, certainly embarrassing to any adolescent who had insecurities, and told to complete it (more *infra*). *See Ex. 9.*

### b. Common Questions of Law

Rule 23(a)(2) requires, "questions of law *or* fact common to the class." [italics supplied]. Having alleged the facts are substantially in common and largely undisputed, Hudgins also alleges common legal questions. For example, the applicability of *Malnak* to the Board, are common to every student. Being instructed in how to worship is, in the first instance, an *establishment* transgression, but also simultaneously, it confuses a minor's existing understanding of God and the way to relate to God, and thus violates her or his *free exercise of religion.*

Another common question of law is the joint and several liability of the Defendants for violation of the rights of Hudgins and her fellow students. She has alleged (a) partnership between Defendants resulting in: (b) a violation of her establishment and free exercise rights. This Court has already held that a reasonable jury could find DLF was a "moving force" in the constitutional violation, so this motion focuses more on the joint liability question especially as it pertains to the University and is *in common*, a legal question affecting every student in Quiet Time:

1. On **University letterhead**, the "Quiet Time Evaluation…", which states, "In partnership[4] with the Chicago Public Schools and the David Lynch Foundation, the University of Chicago and Northwestern University are doing a study…" *See Ex. 10.* and;
2. Also on **University letterhead**, the "Quiet Time Evaluation: Memorandum of

---

[4] Certainly a meeting of minds as contemplated in *Wilson*, 830 F3d at 468. The "rigorous evaluation" mandated of the University in its contracts with the Board also supports the conclusion that the University of Chicago *should have known* that TM was imposing religion on the students. *See Janus*, 942 F3d at 363-64.

Understanding." which lists all Defendants as participants detailing[5] on the second page the explicit services to be provided by the University and the David Lynch Foundation, and the requirements (some explicitly "non-negotiable") of each participating CPS school. *See Ex. 11.*

3. The University **originated**[6] the Chicago Quiet Time by contacting DLF and requesting they submit a proposal to bring TM to the Chicago Public Schools. In adjudicating the "moving force" test for private *Monell* liability, *origination* seems logically to be a primary factor, because until something is initiated, all the harm (or benefit) which follow would not occur.

4. Their expressed ***purpose***[7] in doing so was to facilitate an academic study on the effects of TM training on black and brown adolescents from poverty backgrounds;

5. It was the University of Chicago only[8]—not DLF or the Board—which applied for and obtained **funding** from the MacArthur Foundation and other sources.

6. At the Quiet Time program initiation stage, it was the University which interviewed[9] other out-of-state school districts (**first round vetting**) about the effect of TM on students. Hudgins asserts the University should have, but did not, consider the extensive literature, studies, and internet warnings about TM being a religion and harmful, and should have alerted the danger to parents, students, and the Board.

7. In 2014 and 2016, DLF expressly disclosed the *Malnak* holding to the University and the Board. However, they did so with a letter from the Sidley Austin Law Firm, arguing QT was not religious. *See Exs. 12 and 13.* The disclosure of *Malnak* to both the Board and to UC means both organizations knew the religious controversy over TM, but chose to ignore it. The April 9, 2007 Sidley Opinion speaks for itself. *See Ex. 12.* However, Plaintiff views it as a sad example of hired gun legal advocacy. The Seventh Circuit in *Janus*, 942 F3d at 363-364 stands for the proposition that reliance on a legal opinion (especially one furnished by an interested party) is no excuse for ignoring settled law such as *Malnak* and Amendment One. In any event, the University failed to submit a lick of discovery indicating they investigated the negatives of TM.

8. University leadership not only knew about the Puja *but were trained in the TM program*: **John Wolf**, the University research leader for the Quiet Time Program was trained in TM in the DLF Chicago Office, was given background information on meditation, the goals of TM, and how the technique was supposed to work, was instructed on the meditation process, and was given a mantra. *See Ex. 14 at*

---

[5] Obviously a "concerted effort."

[6] The "moving" force.

[7] Again, "meeting of the minds."

[8] Again, the University of Chicago is the "moving force."

[9] The University "knew—or should have known" when they vetted TM, especially since their contracts required "rigorous evaluation."

*42:4-19*[10]. Jaureese Gaines, Lydia Jessup, Kelly Hallberg, Aurélie Ouss and Chelsea Hemlock, associates and/or subordinates to Wolf, on Nov. 10th, 2016 jointly wrote a seven-page detailed instruction to CPS on the role of CPS teachers, TM classroom scheduling, and implementation timeline *See Ex. 16*. On information and belief, Wolf, Gaines, Jessup, and Hemlock all took TM training. *UNIVERSITY_004349.*

9. **Recruiting.** Schools were not automatically enrolled in Quiet Time but had to be recruited through their respective principals. Although the Board green-lighted Quiet Time in principle, the University had to convince individual principals to sign up. John Wolf led that team "…so we would communicate how that research structure would need to be set up between the David Lynch Foundation which was delivering the program and CPS, the high schools that would be offering the program" (*See Ex. 14 at 30:2-24, 31:1-4*), "…we'll offer to invite potential particip[ants] in an evaluation to learn more in a setting where they can ask questions and hear details" (*See Ex. 14, at 100:4-10*).[11]

10. Concomitant to recruiting schools, the University, by then **submitting** the Quiet Time program to the Board Review Committee for approval, effectively vouchsafed it (**second round** vetting). At this juncture, the University is both the "moving force" for Quiet Time and it "knew or should have known" that the program was teaching religion; *See also Hendel v. World Plan Exec. Council* and *Maharishi Foundation, USA*, explaining why TM is a religion and finding that as such it is constitutionally protected under the First Amendment at p. 23. (1996 WL 34420369).

11. After the CPS Review Board approved Quiet Time, the University helped **implement** the daily deprivation of student academic learning time by *requesting and approving the classroom scheduling:* more "concerted effort"*;*

12. **Evaluating.** According to Jaureese Gaines' deposition, after the school year, John Wolf and Gaines presented preliminary findings to school administration to evaluate the program performance in their school. (*See Ex. 17 at 74: 5-10*), and these preliminary findings meetings took place both after the 2016-2017 school year and the 2018-19 school year (*See Ex. 17 at 75:16-19, 75:23-76:4*).[12]

---

[10] According to DLF, all principals and teachers were offered TM training, and, "The following former or current Senior Administrators and Educators at the CPS are among those at the CPS directly knowledgeable about the manner of instruction and ceremony as they have all taken the same uniform instruction in the TM program as the students General Counsel: James Bebley Networks: Ms. Denise Little, Strategy and Management: Todd Babbitz, Operations: Tom Tyrell, Administration: Tim Cawley, SEL: Justina Schlund," which equals "concerted effort," "meeting of minds," and" "knew or should have known" the religious actions within the Puja and mantras. *See Ex. 15*.

[11] Defendants are recruiting in "concerted effort" towards the unconstitutional goal of putting students into Quiet Time. Their "minds" would all "meet" on the research structure, classroom scheduling, and program delivery.

[12] Both "evaluation" and "supervising" connotes "meeting of minds" and "concerted effort" because Defendants were communicating and cooperating to further their common illegal program.

11

13.  **Supervising.** Recruiting more schools. In January 2017, the University supervisor, John Wolf, had an email dialogue with DLF coordinator Chris Busch. Wolf: "…at the next available Local School Council meeting for our partner schools. I'm thinking we can do our research presentation and then you guys can introduce TM and offer the opportunity for members to join." The men discuss whether DLF or the University should take the initiative, and they concluded it should be a University "research presentation" with TM training as an "add on." *See. Ex. 18.*

14.  **More Supervising.** The University collected and compared all the violent crime arrest records of both the control groups and the TM groups for a four-year period. We know this because chief counsel for DLF, William Goldstein, and local counsel, Sidley, wrote to the Board in June 2019 that the [University] study showed 65%-70% reduction in such arrests for violence! DLF now opines that the study they proclaimed in 2019 was actually not completed—another example of DLF deception. *See Ex. 19.* DLF now passes the buck to "the researchers at the University for further information." The University has yet, in any of the related lawsuits, furnished a complete study or furnished documentation concerning the reduction in arrests; curious. Nevertheless, the necessary collection of four years criminal arrest records is one more example of University **supervision**— not previously disclosed by the University. The assertion made on June 29, 2019, also is evidence the Board illegally accessed juvenile arrests records. No wonder the underlying records were not furnished and seem to have disappeared;

15.  **Failure of third round vetting after parent, teachers, and student complaints.** Prior to and in conjunction with the submission to the Board's Review Committee, the University had two contracts (in addition to the Quiet Time evaluation and Quiet Time Memorandum of Understanding in paragraphs 1 and 2 *supra*) with the Board, each titled "Master Research Services Agreement," dated 06/15/2012 and 10/23/2015, respectively. *See Ex. 20; Ex. 21.* The first contract was on behalf of the "Crime Lab," the second on behalf of the "Urban Lab." Both contracts had an almost identical "General Scope of Services," which were compliance requirements for the University. Viz: "rigorous evaluation of pilot programs… Specifically, University will conduct various evaluations of instructional, social/emotional, and violence prevention programs and interventions *to determine their impact on student performance, student behavior, and other key outcomes…"* [italics supplied] *See Ex. 20 at UNIVERSITY_000355 and Ex. 21 at BOE 001246.* Plaintiff contends these "rigorous evaluations" contractual requirements effectively mandated the University to rigorously investigate the Quiet Time program and its prime components, TM, its legal history, the Puja, and asserted negative impacts of TM on students. Quiet Time was billed as a "violence prevention program." Thus, University had a contractual duty to investigate whether it was actually effective, and in the process, it should have discovered and it "should have known" that TM was religious. None of the readily knowable negative views of TM were apparently ever evaluated, nor were the readily-available negatives about the David Lynch Foundation checked out. Just the full name of DLF, as it is displayed in its contract with the Board, screams "red flag!": The "David Lynch Foundation for Consciousness-Based Education and World

12

Peace"! BOE 001280 is titled "First Amendment to Grant Evaluation Service Agreement." *See Ex. 22*. In deciding whether the University of Chicago should have known about the religious components of TM, Plaintiff suggests that the conflict of interest inherent in the University green lighting or "rigorously evaluating" a program where its own department would receive significant funding is itself adequate legal reason to rule—as a matter of law—the University should have known. Furthermore, examples of student and parent complaints also abound, which alerted all Defendants to the religious nature or perceived religious nature of TM. As early as 2016, "…a few junior girls… felt misled regarding… the mantra and the traditional ceremony… *See Ex. 23*. The girls also went online and found information… suggesting the practices is religious." In 2018, alerted five DLF personnel that Autumn Hall's mother was upset because Bogan student Autumn did not have her permission to learn TM… "concerned that the meditation learned is related to Hinduism… that after she learned TM, the 'voices' [s]he hears have become increasingly dominant… that some of the 'voices' … **have been telling her to kill**."[13] [emphasis added]. *See Ex. 24*. Substitute teacher and "whistle blower" Dasia Skinner complained loudly and to many the religious nature of TM. *See Ex. 25*. Did these or other complaints cause the University or other Defendants to vet the TM negatives or take any corrective action? Apparently not—no discovery information—documents, depositions, or declarations indicate that the University of Chicago made any evaluation at all, much less a "rigorous" evaluation of the negative aspects of or complaints about Quiet Time. This evidence is probative of the proposition that Defendants "*knew,* or should have known,*" of the establishment and free exercise violations caused by TM.

16. **Supporting, incentivizing, and benefitting**—In the incentivizing student participation in Quiet Time, DLF excelled and may have been the "moving force" in this aspect, but both the University and DLF were benefitting: DLF by getting money for itself and its instructors and by making potential lifetime converts or customers for its advanced meditation programs; University of Chicago by getting money for its Urban Lab and student data for their academic study. John Wolf, the University Quiet Time Program director, admitted the University of Chicago compensated students for participation in "focus" group sessions concerning the Quiet Time program. *See Ex. 14 at 204:3*. All three Defendants cooperated—engaged in "concerted effort" to support and incentivize Quiet Time.

Thus Kaya Hudgins, in common with her "Quiet Time" classmates, all have in common that identical question of law—the §1983 liability of the Board and the joint liability of all Defendants for violation of the free exercise and establishment rights of the class. Accordingly, Plaintiff

---

[13] Where might some of these "voices," which apparently trigger mass shootings and wartime atrocities, originate? See "Are Demons Real?" *infra.*

13

asks the Court to rule that "common question of law" satisfies Rule 23(a)(2), and unless Defendants can articulate significant legal or factual disputes, to further opine that the Quiet Time program violated student free exercise and establishment rights, and that all three Defendants are jointly and severally liable: the Board as State actor and DLF and the University of Chicago as private actors under *Monell.*

### c. "Control Group" Students Should Be a Sub-Class

Before moving on to "Typicality," Hudgins proposes: Quiet Time Non-Meditators Should Be Part of the Class. All students, whether in a "control group" or TM-trained, were an essential component of the University study which violated the rights of all "Quiet Time" students. Without the CPS-mandated participation of the control groups, the measurement by UC of the reduction of what DLF called "toxic stress" among high schoolers could never be made.  The effectiveness, *vel non*, of TM training and daily meditation could never be evaluated.  So, control group students were used by the Board, the University, and DLF as "guinea pigs" in common with TM meditators/classmates.

As explained *infra,* every "control group" student, in order to accommodate the Quiet Time Program, was also deprived of academic instructional time properly valued at $1,138.85 per student per year.

A number of *both* control group and TM-required meditation students were directed by CPS teachers functioning as University of Chicago agents to complete a "Quiet Time Study - Student Health Form" (*See Ex. 9*), which contained questions certainly embarrassing to adolescents and seeking information about sexual development, weight, growth of pubic hair, comparison to classmates—and for girls: menstruation and breast development. Although this document was developed by Urban Labs to "analyze your data," it was distributed in the CPS

schools as part of the DLF "Quiet Time" rubric (the document is titled "Quiet Time Study – Student Health Form"). No parental approvals and no request for parental approval—even an "opt-out"—have been furnished by any Defendant in any of the related lawsuits. Although the form says that questions can be skipped, these questions should never have been thrust on adolescents! (more discussion, *infra*, on damages from the questions). This questionnaire further supports both Kaya's qualification under commonality per Rule 23(a)(2) to represent her classmates (all suffered similar abuse from Defendants), but also her qualifications under typicality to represent her classmates[14] per 23 (a)(3) (all have the same claims as Plaintiff).

Some control group students were not abused as severely as TM taught students, but they were all exposed to TM in the following wrongful, tortious ways:

1.  The TM instructors who led Quiet Time observation during class time, certainly extolled Transcendental Meditation practice to all students.
2.  That CPS teachers or TM instructors who would supervise the Quiet Time meditation—*with the control group present in each classroom*—would ring the Ghanta to begin and end the meditation session, *per se* conveyed to the non-meditators a message of CPS endorsement of Hindu ritual.
3.  The scheduling by CPS administrators and principals of Quiet Time meditation in lieu of academic instructional time wrongly told *all* students that, in effect, CPS—and the University and DLF—all believe TM is a good, non-religious practice. Such endorsements violated students' Establishment protections. *Doe ex rel. v. Elmbrook*, 687 F.3d 840 (7th Cir. 2012 *en banc*).
4.  The control group students were, in common with the TM meditators, and by deliberate intent of all Defendants, particularly the University, effectively denied fully informed parental positive consent.
5.  School-wide assemblies were instituted at some or all schools to promote TM.
6.  Posters were put in the hallways and student "ambassadors" were recruited to extol TM to *all* students.

---

[14] Hudgins was given the health form and asked to complete it. It was also asked of Quiet Time students at Bogan during at least one academic year. The actual number of students affected from all schools is unknown at this writing. Consequently, Plaintiff does not suggest that the recipients of the form be recognized as a subclass. Rather, viewing the Quiet Time Student Health Form as one element of the Quiet Time program, Hudgins suggests it may constitute a discrete element of damages to help determine the aliquot apportionment of damages among the class members if the University of Chicago ever produces records of which students were given the Quiet Time Student Health Form.

7. *Every* "control group" student at Bogan was targeted by the school administrator eventually to receive the Puja and other TM training.

The impact, and hence, the amount of harm per individual student, will obviously vary. The CPS and University records as to whether a student went through "Quiet Time," and for one, two, or three years, and whether a student was designated TM or Control Group, provides a straightforward path based on length of exposure for a reasonable apportionment of damages among class members who submit claims. (More *infra*). Thus, the Court should rule that the Quiet Time non-meditators are a sub-class qualified for damages. The Court should also rule the predominating commonalities of "Quiet Time" in violating the legal protections for Kaya and all other participating students thus satisfy Rule 23(a)(2).

## V.  Typicality – Rule 23(a)(3).

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). A claim "is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983). Typicality is closely related to commonality, *Keele*, 149 F.3d at 595, and, as in the case of commonality, factual distinctions between the claims of class members will not necessarily defeat a claim of typicality. *De La Fuente*, 713 F.2d at 233.[15] Otherwise said: Do "the named representatives' claims have the same essential

---

[15] The Seventh Circuit *en banc* ruling in *Doe ex rel.*, 687 F.3d 840 is an Establishment Clause case involving high school students which helpfully illustrates the synergy between commonality and typicality. Although there was no class action certification apparently sought because numerosity was absent (seven students were affected) the commonality was all students in order to attend a graduation ceremony had to do so in a church sanctuary with many Christian symbols. The typicality was a harmful feeling of alienation, exclusion and "an impermissible aspect of coercion." *Id.* at 856. In other words, the *en banc* court in effect found that emotional harm had been inflicted *as a matter of law* and

characteristics as the claims of the class at large"? *In re Hartmarx Sec. Litig.*, 2002 WL 31103491, at 14 (quoting *Retired Chicago Police Ass'n*, 7 F.3d at 596-97). Foremost, because this is a civil rights lawsuit, all students share with Kaya Hudgins the same free exercise and establishment protections. The large majority, being minors during all or part of their time while put in Quiet Time share with Kaya the same typical claim because when both identical law and substantially identical facts are present, typicality of claims follows. "Typical does not mean identical, and the typicality requirement is liberally construed." *In re Neopharm, Inc. Sec. Litig.*, 225 F.R.D. 563, 566 (N.D. Ill. 2004).

Kaya Hudgins' claims are quintessentially typical not only because her constitutional rights are identical to other students, but because she was subjected to the same Puja ritual and Quiet Time meditation regimen as other potential class members. She is also typical because she was a minor, as were most other students, when they went through "Quiet Time." After she realized that TM was deceitful and she resigned as an "ambassador," she continued to be exposed to it during the twice-daily "Quiet Time" meditation sessions. So, at that point, she ceased to be a "meditator," and *de facto* became a control group student. Every "Quiet Time" student was exposed—twice daily—to "impermissible aspect[s] of coercion" *Doe ex rel. v. Elmbrook*, 687 F.3d 856. And neither Kaya nor any CPS student, including 18–20-year-olds, could "consent" to an unconstitutional religious program in a public school. *Freedom From Religion Found, Inc. v. Concord Cmty. Sch.,* 885 F.3d 1038, 1048 (7th Cir. 2018). The Quiet Time Program was uniform throughout the schools. (*See Ex. 6 at ¶7).*

Hudgins also shares the following typical claims that arise from the Quiet Time Program:

---

remanded the case to the trier of fact for "proceedings consistent therewith." Settlement of $9,000 per student ensued.

### a. Students subjected to wrongful conduct to which they were unable to consent.

Although most students were asked to sign "consents," whenever a student was under 18, he or she was legally unable to consent to the religious ceremony, indoctrination and conditioning imposed by TM in a public school. *Concord Cmty. Sch.,* 885 F.3d at 1048.

### b. Students were denied parental protection.

Because parents were never fully informed of the TM program and because the students were required to take the secrecy oath, the adolescents' right to parental protection in their religious training in *Yoder* was violated. Hudgins was living with her grandmother, who never received a permission request or Quiet Time information.

### c. Students were denied CPS *in loco parentis* protection.[16]

By collaborating to deny this protection, the UC and DLF facilitated and benefitted from CPS' own failure to provide *in loco parentis* protection. Defendants' minds met on this thought: "We won't tell the parents their kids need protection, and even though they do, we won't provide it!" In violation of explicit Board regulations requiring positive written parental permission for students in such studies, they only sent "opt-out" letters to some parents, which did not explain the religious aspects of TM, the mental health risks, the loss of academic instructional time, or the *Malnak* holding.

### d. Students were deceived by the Defendants.

Even if students could legally have consented to Quiet Time, they still had the right to honest and full disclosure. Typically, Kaya and her classmates were harmed by deficient

---

[16] Instead of protecting students, CPS allowed them all to be abused. To their belated credit, CPS after teacher, parent and student complaints did oust TM from its schools in 2019. In ousting TM, CPS effectively conceded that the Establishment and Free Exercise Clauses were violated as to its students.

information and/or deliberate deception as to the true nature of TM. The Puja and the illuminated photo of Guru Dev were "sprung" on unprepared students in darkened rooms isolated from CPS teachers: (1) The religious nature of the Puja worship ceremony was a planned deception. DLF thus deceived in asserting TM is not religious;[17]; (2) TM instructors knew the meaning of the Sanskrit invocation—in the eyes of many, a demonic conjuring— at the Puja, but as a matter of training, refused to tell students the meaning; (3) mantras as names of Hindu deities were not disclosed[18]; (4) Defendants failed to even create a website where students could comment, confer and learn about advantages and criticisms of TM. [19]

Perpetrating the preceding four examples of systemic deceit was not only tortious, but it was pervasive and Kaya's exposure to that deception was typical.

### e. The Quiet Time Program created humiliation, guilt, confusion and fear

---

[17] Neither the University, the Board, or DLF ever informed Kaya of *Malnak v. Yogi,* 592 F. 2d 197 (3rd Cir 1979) and that TM had been ordered out of all New Jersey Schools as being religious. However, the thousands of pages of emails and discovery has no evidence of DLF *ever* informing *any* students or parents of *Malnak*.

[18] Whether the mantras are names of Hindu deities is a disputed question of fact. DLF claims the mantras are "meaningless," however Hudgins testified to the contrary in para. 13 of her declaration (*See Ex. 1*). Aryeh Siegel, Plaintiff's TM expert in the *Williams* case, details the practice of giving Hindu deity names as mantras is his declaration (*Ex. 4, paras. 20-24). Siegel also devotes a page (*See Ex. 26*) of chapter 1 of his treatise on TM to the practice, as explained in the words of Maharishi Mahesh Yogi, the founder of TM: "but we do not select the sound at random. We do not select any sound like 'mike,' flower, table, pen, wail, etc. because such ordinary sounds can do nothing more than merely sharpening the mind… For our practice, we select only the suitable mantras of personal gods. Such mantras fetch to us the grace of personal gods." Maharishi Mahesh Yoga, "Beacon Light of the Himalayas, 3 of 4." Available online at http://minet.org/www.trancenet.net/secrets/beacon/beacon1.shtml;

[19] Since after the turn of this century, most commercial and education organizations have created websites to explain and promote their particular programs. None regarding the CPS Quiet Time Program has been produced in discovery, supporting the implication of indoctrination rather than education— WHY, WHY, WHY? Plaintiff believes "conceal and control" are the most obvious inferences from that decision certainly made to avoid answering the questions many parents and students would ask.

19

The pervasive Hinduism throughout TM, particularly in its history, Puja, and mantras, led students and leads this Court to this relevant and serious question:

### *Excursus:* **Are Demons Real?**

"No!"—say many secular Americans, including lawyers—but "Yes!" say the world's three major monotheistic faiths. From the serpent in Eden's Garden, to Satan's temptations, to Jesus in the wilderness (Luke 2), to the Quran's mention in 15:27 that the jinn were created before humans, Satan and evil spiritual beings are considered as unquestionably real and affecting the affairs of humanity. Hinduism recognizes many demons—

https://en.wikipedia.org/wiki/Category:Demons_in_Hinduism

The TM initiation always includes invocations to Hindu "gods" which many would categorize as demons. Thus, a demon reality may have influenced, harassed, or deceived any student who was seated or stood in front of Guru Dev's image. Each of those students, including Hudgins, had the invocation spoken over him or her in Sanskrit (like Hebrew or Latin, a liturgical language) with translations available on the web. Each student was asked for obeisance or participation in some way. Each student had a mantra whispered in his or her ear and was then told it was "meaningless," "don't tell your parents about it," and "you cannot select your own mantra." They were all lied to. If there is a transcendent spiritual realm from which evil spirits operate, then some, like Amontae Williams, but not all, will be affected, even traumatized. If evil spirits do not exist, still many, but not all adolescents would be daunted, haunted, or in terror.

For class action purposes, the Hindu invocations not only reinforce commonality of experience and typicality of claims, but are evidence that damage occurred when the toxic words (both Sanskrit invocations and Hindu god mantras) were spoken into the spirits of the initiates or were commanded by instructors to be mentally repeated by those initiates. For one student, for just

20

one year, over 400 TM sessions would require *thousands of mental repetitions*, quite possibly leading to indoctrination, confusion, and/or toxic boredom. Whether the words/prayers/meditations were to real spiritual entities as some followers of Mohammed, Jesus, Moses, or Brahman might well conclude, or only to impressionable adolescent imaginations, all parties agreed they had they had power[20]. Thus, with spiritual wounds, as with other wounds such as emotional wounds or damages such as deprivation of instructional time, the harm was inflicted on all with some harm being hammered into hearts more repeatedly for those students who were required to meditate names of Hindu gods for several semesters. Deprivation of academic instructional time is damaging *when occurring*, not just eventually when a young person ends up flunking a college math course. Receiving less than others is harm, *per se*, as is the attendant loss of the sometimes joyful experience of learning Because of the wide number of wrongs—torts— visited on young people through Quiet Time, it is fair to conclude most students were harmed in one or multiple ways. Consequently, the religious freedom and establishment violations of Quiet Time, as have been enumerated, are themselves universally tortious—emotional and spiritual assault to every Quiet Time "conscript." Because both sides argue in effect that TM had or could have had a powerful effect on minors, and because minors have an immature, a lessened, capacity to evaluate spiritual impact and harm, Plaintiff argues harm should be presumed, and damages awarded to the class on a fund basis and apportioned by the Court or jury based on length of exposure to Quiet Time.

As in *Elmbrook*, some damages were emotional, spiritual and/or psychological. Impermissible endorsement and coercion occurred both in *Elmbrook* at p. 1328, and the CPS

---

[20] Defendants describe that power as "transcendental"; Plaintiff considers it to be harmful, toxic; The Constitution considers it a violation.

schools. CPS students were burdened with guilt being told TM wouldn't "work" if they disclosed their mantra. Because the emotional damages were a result of a constitutional violation, the standard for recovery is lower than in the torts of intentional or negligent infliction of emotional distress. *Price v. Charlotte*, 93 F3d 1241, 1245 (4th Cir 1996). Wounds from Defendants' abuse may manifest in the students' lives years down the road and in different dysfunctions. Plaintiff will support the typicality of emotional scarring and recurrence through the expert testimony of a licensed professional counselor Doug Duncan, who has treated many cult and PTSD victims, and has submitted an expert opinion in this case, as well as in the *Williams* Case 20-CV-04540. (*See Ex. 27*). The expert in *Williams,* retained by Defendants, Dr. Louis Kraus, whose expert opinion in a similar case, *Sherman v. Township High School*, 2008 WL 7728024, N. Dist. Ill. 2008—challenging a moment of silence under Illinois Law—opined that the observance of only one "moment" of silence daily, "would not be in the child's best interest, nor would it assist with their basic educational needs." (*See* Ex. 28) The extent of governmental imposition in *Sherman* was far less than Quiet Time meditations in time (60 seconds versus 30 minutes), in content (no content versus mantras mandated), in context (no religious aspect versus Puja), and in governmental and *Monell* private endorsement ("pause" for a moment versus TM mantra meditation is government-approved). Thus, that expert opinion infers that the Quiet Time and TM programs were harmful to minors. With respect to this certification motion, Duncan has prepared a second report (*See Ex. 29*) addressing damaging aspects of the University-sponsored student Health form. He opines that the Quiet Time program, "should be considered a type of mental health intervention." He then quotes approvingly a 1980 German study of TM, detailing, "problems with sleeping, anguish, increasing pain in the head, stomach, and back… problems with concentration, hallucinations, feelings of isolation, depression, over-sensitivity, and

22

instability," in *seventy percent* of those in its study. Therefore, both Duncan's and Kraus's expert opinions support the typicality of Hudgins' claims under Rule 23(a) (3), showing the typical student also experienced emotional or psychological harm, which may, as other types of child abuse, be negatively affecting a person's life already, or will do so eventually.

The Supreme Court memorably articulated the logic of the damage issue long ago regarding "annoyance and discomfort," where no hard numbers are involved but the annoyance and discomfort is experienced by a "class" of individuals (in that case, a religious congregation): "As with a blow to the face, there may be no arithmetical rule for the estimate of damages. There is, however, an injury, the extent of which a jury may measure." *Baltimore & P.R.C. v. Fifth Baptist Church*, 108 US 317, 335 (1883) (emphasis supplied) (approving an award of damages for annoyance and discomfort occasioned by a rail yard's smoke and noise); *Accord Memphis v. Stachura* 477 U.S. 299, 310-11 (1986).

###    f.   Coercion and Incentives

Kaya and other students were told they would be *graded*, for their participation in the Quiet Time program.[21] Students also were given incentives such as pizza to participate in the program. (*See Ex. 1*). A sampling of the line-item Quiet Time budget for four schools, Gage Park, Julian, Bogan, and Daniel Hale William, for just one year shows: Totals $52,200 for "Student/faculty incentives, retreats, celebrations, curriculum supplies." (*See Ex. 30*).

Students who had been taught to trust CPS teachers, were told by their "trusted teachers" to participate in the school-sanctioned religion. (*See Ex. 31*), Typical of other students, Kaya

---

[21] Given that students know their college and employment prospects and eligibility to play high school sports are based upon their grades, "grading" is not even a subtle coercion: it operates both as an inducement and as a threat.

Hudgins experienced such pressure/inducements to practice TM (*See Ex. 1*)

g. **The students were groomed to continue Transcendental Meditation beyond school *and for years to come*.**

Twice daily, every school day. DLF representatives and/or classroom teachers were imposing Hinduistic beliefs and practices, enabled and endorsed by CPS and the University. All students who were trained in TM became eligible to purchase post-graduation training sessions with the Maharishi Foundation and seek ever "higher consciousness" (including "god consciousness" if they reach level six of the seven levels of consciousness!)

h. **Deprivation of Education**

Kaya Hudgins typically—indeed identically—with her classmates, was deprived of unreplaceable (our teenage years only happen once in a lifetime) hours of academic instruction time each year displaced by multiple hours per week of Transcendental Meditation. According to the Illinois Office of Elementary and Secondary Education, $13,666.18 was spent on each student education at Bogan High School for 2020 (oese.ed.gov/ppe). Based on six hours of instructional time per student prior to Quiet Time, and a reduction of thirty minutes per day for Quiet Time, the math per student is simple! .5 hours ÷ 6 hours = 8.33% reduction in academic educational opportunity. 8.33% of $13,666.18 = $1,138.85 uniform value of lost instructional time per student, per year. Mandated meditation time deprived Kaya and each student, both control groups and TM meditators of measurable education opportunity: damages of $1,138,85 per year ($569.43 per semester)—$3,416.55 for three years. (More *infra* at apportionment of damages).

VI. **Rule 23(a)4 Adequacy of Representation**

The adequacy of representation requirement is satisfied where "the representative parties

24

will fairly and adequately protect the interests of the class." Kaya Hudgins is an excellent Class representative because she underwent the Puja worship ceremony and Quiet Time meditations regimen at Bogan High School in her sophomore and junior years. She has no interests antagonistic to the interests of absent Class members. She withstood and defied intimidation by Defendants in giving a seven-hour deposition in the *Williams* case, and there are no material conflicts between Plaintiff's interests in this litigation and those of the Class members that would make class certification inappropriate.

It must appear that the named plaintiffs will "vigorously pursue the litigation on behalf of the class." *Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181, 186 (N.D. Ill. 1992) (citing *Secretary of Labor v. Fitzsimmons*, 805 F.2d 682, 697 (7th Cir. 1986). Her vigor is shown by her initiation of this lawsuit after that deposition in the *Williams* case.

Adequacy of representation requires that the class representative's attorneys be qualified (*See Ex. 32*), which sets forth the qualifications of the primary attorneys working on this case. *Sosna v. Iowa*, 419 U.S. 393, 403 (1975). Proposed Class Counsel has already demonstrated for at least two years it has the determination and ability to commit the necessary resources to assure a strong and well-supported case on behalf of Class members and Kaya Hudgins. Counsel are well experienced in civil liberty litigation, particularly in religious freedom cases such as *Swart et al v. Chicago*, 440 F. Supp. 3d 926 (N.D. Ill. 2020), before Judge Blakey, resulting in Chicago's recession of its rules thwarting free speech in Millennium Park. If a class is certified, Mauck & Baker LLC intends to retain a class action administration firm to handle notifications and other necessary processing. Thus, through appointment of Mauck & Baker, LLC as Class Counsel, the adequacy of representation requirement of Rule 23(a)(4) is satisfied.

VII. **Having satisfied the requirements of Rule 23(a)(1), (2), (3) and (4). Plaintiff now argues that 23(b)(3) "predominance and superiority" is satisfied.**

25

Federal Rule of Civil Procedure 23(b)(3) provides: "…(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." [italics added]. Prior to discussing 23(b)(3), subsections (A), (B), (C), and (D) specifically, Hudgins makes these general arguments as to "predominance and superiority": "The requirement of predominance is met where . . . there is a showing of predominance of common questions at the liability stage of the litigation, rather than at the damages stage." *In re Natural Gas Commodities Litig.*, 231 F.R.D. 171, 180-81 (S.D.N.Y. 2005) (certifying a three-year class of both long and short sellers) (citation omitted). The predominant legal issue is whether the Quiet Time program violated the Establishment or the Free Exercise Clause. *Elmbrook, Concord,* and *Malnak* are the precedents applicable to all the students put in QT and so there are few, if any, "questions affecting individual class members," at the liability stage. There are as set forth *supra* other common legal questions, such as coercion, *vel non*, and effectiveness of consent.

The superiority requirement is satisfied where the "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Superiority is readily satisfied because several thousand individual members of the Class and now recent high school graduates from poverty-level families—in the real world—are effectively unlikely to have the resources to bring accountability to the huge, well-resourced, and powerful Defendants. Thus, a "class action would be the most efficient [and probably the only] use of judicial resources in resolving the common issues." *In re Neopharm, Inc. Sec. Litig.*, 225 F.R.D. at 568.

Since the Defendants engaged in a similar course of conduct directed to all CPS teenagers

26

in the Quiet Time program, the critical factual and legal issues are essentially identical. Because it would be economically unreasonable for Plaintiff and the other Class members to adjudicate their identical claims individually, the superiority requirements of Rule 23(b)(3) are satisfied.

Plaintiff now addresses 23(b)(3)(A), (B), (C), and (D):

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

> Plaintiff's Comment: During these three related lawsuits there has been no suggestion by any other potential plaintiff or by any attorney of a separate lawsuit.

(B) the extent and nature of any litigation concerning the controversy already begun [concerning the Quiet Time program at CPS schools] by or against class members;

> Plaintiff's Comment: to the best of Plaintiff's or counsel's knowledge, none.

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

> Plaintiff's Comment: Chicago is by far the best location because the harms occurred here, the class members are mostly here, and two of the three Defendants are headquartered here. Also, Plaintiff considers the federal bench to be more conversant with civil liberty protection.

(D) the likely difficulties in managing a class action."

**Apportionment of Damages—A solution to the concern about "manageability"**

The large number of potential class members raises a question about the variability of "emotional" damages and, presumably, the manageability of a large class with potential different damage levels. The Seventh Circuit has written the following concerning manageability:

> "The superiority requirement of Rule 23(b)(3) is clarified by substantial case law. See 7AA Wright et al., *Federal Practice & Procedure* §§ 1779, 1780. Imposing a stringent version of ascertain ability because of concerns about administrative inconvenience renders the manageability criterion of the superiority requirement superfluous. See Daniel Luks, Note… 82 Fordham L.Rev. 2359, 2395 (2014). It also conflicts with the well-settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns. See, e.g., *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 140 (2d Cir.2001)

27

(Sotomayor, J.) (noting that failure to certify a class action under Rule 23(b) solely on manageability grounds is generally disfavored)…"

*Mullins v. Direct Digital, LLC*, 795 F.3d 654, 663 (7th Cir. 2015).

Kaya Hudgins and all her fellow students were subjected to a species of tortious mind control where negative manifestation of the practice would surface: repeated indoctrination of a specific mantra, allegedly to relieve them of "toxic stress" and criminal proclivity. These are some categories of damages incurred by Quiet Time participants:

1. The repeated exposure would make some, but not all TM trainees *angry and resentful* for being coerced and manipulated into the mental mantra regimen;
2. Many, but not all, will get *sucked into the meditation web* and seek to obtain seven levels of consciousness taught by advanced TM (including level 6 "God" consciousness);
3. In so doing, some may eventually break away and feel liberated from the *TM Deception,* while yet others may feel they have wasted their time and money pursuing "World Peace"[22] through meditation;
4. Still others may feel the *sting or agony of racial discrimination* because some TM draftees will eventually conclude that the targeting of CPS schools with over 90% black or brown student populations was *racist.* When a shotgun is fired into a crowd, when a toxin is released into a water supply, or when children are indoctrinated with racism, some, but not all, will be wounded. Some may die while others may be unaffected. All of the wounding, particular to minors who usually are more impressionable, will manifest in different and multiple ways at different times. Hudgins and all students were commanded to keep their mantras and Puja ceremony details secret from their parents, and thus were *deprived of parental protection*. Hudgins and all students were lied to when told their mantras were "meaningless," when in fact they were names of Hindu deities;
5. Kaya and all students carry the lifetime risk of post-traumatic dysfunction—inflicted through the coerced Puja ceremony and repeated mantra-based mediation. Hudgins and some, but not all students, were told to complete the "Quiet Time" Student Health Form, which damaged some, but not all, students through *humiliation, insecurity, and feelings of inferiority* when asked about weight, pubic hair, menstruation, and breast development relative to other girls. This Quiet Time Questionnaire was apparently not for the benefit of CPS or DLF (although they both administered it), but rather, was for the exclusive benefit of the University (or its surrogate, Northwestern

---

[22] The Services Agreement between the Board and the Foundation, *See Ex. 22 at BOE 001252*, is captioned as being with "David Lynch Foundation for Consciousness Based Education and World Peace."

University, which used the student data for a study of some sort never produced). Plaintiff asserts the Quiet Time Health Form constitutes another exploitive and damaging part of the Quiet Time program;

6. As set forth above, Kaya, totally typical of all the Quiet Time students, was *deprived of academic instructional time* for thirty minutes every school day, hurting her educational progress;

Kaya Hudgins, then, epitomizes the CPS student subjected to the Quiet Time program with damages which can fairly be viewed as typical. Because she and most potential class members were *minors* when they went through Puja and were given mantras, the Court need not and should not require them individually to articulate how their faith, emotions, or trust in teachers or parents was harmed because they may not know—minors, by legal definition, immature people, lack the capacity to fully understand the negative impacts. The Supreme Court provides this relevant *dictum*: "But youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage. Our history is replete with laws and judicial recognition that minors, especially in their earlier years, generally are less mature and responsible than adults." *Eddings v. Oklahoma*, 455 U.S. 104, 115-16 (1982). The damage was the force feeding of the toxin to youngsters, not just the resulting nausea or cancer.

Depending on how the Court defines the classes, there may be 1,000-3,000 former students involved. The Board certainly has academic transcripts to provide a list of class members, contact information, and their semesters of Quiet Time involvement. In the event of Certification, social media (emails, texts, Facebook, Twitter) among the young people will easily proliferate as students notify their friends. Of course, mail or other traditional media notifications can be used. A website to explain the lawsuit and facilitate claim submission will be created. The Court and/or a jury is given wide leeway in structuring payment to class members. Because the wounded were minors,

29

Plaintiff believes they would be most fairly compensated when the trier of facts decides on a fund to be **apportioned by length of exposure.** Individual class members would of course be free to submit solid evidence of particularized damage. Thus, one (but not the only) straightforward method would be to determine a damage fund amount against Defendants including possible punitive amounts against the DLF and/or the University. Damages can be then apportioned based on length of exposure. By way of example, the finder of facts could allocate:

1. Puja initiate—1000 points
2. Twice daily mantra participation—200 points per TM semester. For control group, 100 points per TM semester.
3. Loss of academic instructional time—200 points per semester with all Quiet Time students.
4. Required receipt of Quiet Time Student Health Form—50 points.

The challenges of class notification, damage apportionment, and manageability have been answered well by other courts. For example, on November 3rd, 2023, the Northern District of California awarded Class Action Certification for three separate classes of college athletes against the NCAA and five college athletic conferences. The potential classes consisted of about 14,250 with potentially different damage claims for use of their "names, images, and likenesses," despite the obvious conclusion that some athletes appeared on broadcast games only a few times, and others many times, and despite the equally obvious manageability claims. *In re: College Athlete NIL Litigation*, Document 387, case 20-cv-03919CW (filed 11/3/23).

A reasonably designed system such as suggested above is fair and quite manageable because it obviates the need for most non-uniform individual claims and provides substantive relief to the overwhelming majority of young people. Certainly, any legal system aspiring to justice should provide class action recourse to black and brown students in poverty neighborhoods comparable, *mutatis mutandis*, to what affluent, lawyer-laden Winnetka/Barrington groups enjoy when a Fortune 500 company misreports earnings.

**CONCLUSION**

For the reasons set forth, the Court should require the University to respond with DLF and the Board to this Class Action Motion, and in due course, certify the proposed class of all students who went through "Quiet Time," appoint Kaya Hudgins as class representative, appoint Mauck & Baker as class counsel, and direct Plaintiff to submit a proposed certification order in compliance with the Court's judgment order and in compliance with Rule 23(c). (If the Court decides that control group students lack class action eligibility or have significantly different claims, the Court may narrow the class to Puja/TM participants).

Dated: November 8, 2023                                    Respectfully submitted,

**KAYA HUDGINS**,

                                                  By: */s/ John. W. Mauck*
                                                  One of their attorneys

John W. Mauck                          Sorin A. Leahu
Judith A. Kott                         **Leahu Law Firm**
Robin J. Rubrecht                      53 W. Jackson Blvd. Suite 1527
**MAUCK & BAKER, LLC**                 Chicago, IL 60604
1 N. LaSalle St., Suite 3150           847-529-7221
Chicago, IL, 60602                     sleahu@leahulaw.com
312-726-1243
jmauck@mauckbaker.com
jkott@mauckbaker.com
rrbruecht@mauckbaker.com

31

## CERTIFICATE OF SERVICE

I, John W. Mauck, an attorney, hereby certify that I served the foregoing **Revised Motion for Class Certification for the Students of the Chicago Public Schools Placed in the Quiet Time Program** on all counsel of record on November 8, 2023, via the District Court's CM/ECF system.

*/s/ John W. Mauck*
JOHN W. MAUCK

John W. Mauck
Judith A. Kott
Robin J. Rubrecht
**MAUCK & BAKER, LLC**
1 N. LaSalle St., Suite 3150
Chicago, IL, 60602
312-726-1243
jmauck@mauckbaker.com
jkott@mauckbaker.com
rrbruecht@mauckbaker.com

Sorin A. Leahu
**Leahu Law Firm**
53 W. Jackson Blvd. Suite 1527
Chicago, IL 60604
847-529-7221
sleahu@leahulaw.com

## SERVICE LIST

David J. Stein / David.Stein@gtlaw.com
Tiffany S. Fordyce / fordycet@gtlaw.com
Greenberg Traurig, LLP
77 W. Wacker Drive, Suite 3100
Chicago, IL 60601

Kaitlin T. Salisbury / ktsalisbury@cps.edu
Christina Rosenberg / crosenberg@cps.edu
Board of Education of the City of Chicago
Law Department
1 N. Dearborn St., #900
Chicago, IL 60631

James J. Sipchen / jsipchen@pretzel-stouffer.com
Kayla A. Condeni / kcondeni@pretzel-stouffer.com
Pretzel & Stouffer, Chartered
200 S. Wacker Dr. Suite 2600, Chicago, IL 60606

Mark S. Mester / mark.mester@lw.com
Johanna Spellman / johanna.spellman@lw.com
Renatta Gorski / renatta.gorski@lw.com
Sofia A. Vitiello / sofia.vitiello@lw.com
Latham & Watkins LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611

Carolyn M. Homer (pro hac vice)
carolyn.homer@lw.com
Latham & Watkins LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004

32